SUPREME COURT OF LOUISIANA

2023 OCT -6 AM 9:59

CLERK OF COURT

IN THE

SUPREME COURT

STATE OF LOUSIANA

No. 23-KP-1339

---

STATE OF LOUISIANA
Respondent

Versus

EARL BRADLEY
Relator

---

**APPLICATION FOR WRIT OF CERTIORI AND PROHIBITION FROM THE RULING OF THE LOUISIANA FIFTH CIRCUIT COURT OF APPEAL, DOCKET NUMBER 23-KH-377, THE HONORABLE SUSAN M. CHEHARDY, MARC E. JOHNSON, AND STEPHEN J. WINDHORST, REVIEWING THE RULING OF THE HONORABLE DANYELLE M. TAYLOR, SECTION "O", 24TH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, CASE NO. 99-5825**

---

**WRIT APPLICATION FROM FIFTH CIRCUIT AFFIRMING TRIAL COURT'S SUMMARY DENIAL OF POST-CONVICTION RELIEF**

---

Respectfully Submitted,
MANARD LAW OFFICES

P. Walker Lasiter, Bar Roll # 38102
4412 Trenton Street
Metairie, LA 70006
Office: (504) 585-7777
Fax: (504) 556-2977

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

**EXHIBIT A**

# SUPREME COURT OF LOUISIANA
# WRIT APPLICATION FILING SHEET

NO.__________________

**TITLE** TO BE COMPLETED BY COUNSEL or PRO SE LITIGANT FILING APPLICATION

Earl Bradley
VS.
State of Louisiana

Applicant: Earl Bradley
Have there been any other filings in this Court in this matter? ☑ Yes ☐ No

Are you seeking a Stay Order? no
Priority Treatment?____
**If so you MUST complete & attach a Priority Form**

## LEAD COUNSEL/PRO SE LITIGANT INFORMATION

APPLICANT:
Name: Manard Law Offices
Address: 4412 Trenton Street
Metairie, LA 70006
PhoneNo. 5045857777 Bar Roll No. 38102

RESPONDENT:
Name: Jefferson Parish DA's Office
Address: 200 Derbigny Street
Gretna, LA 70053
PhoneNo. 5043681020 Bar Roll No. 27431

Pleading being filed: ☑ In proper person, ☐ In Forma Pauperis
**Attach a list of additional counsel/pro se litigants, their addresses, phone numbers and the parties they represent.**

## TYPE OF PLEADING

☐ Civil, ☑ Criminal, ☐ R.S. 46:1844 protection, ☐ Bar, ☐ Civil Juvenile, ☐ Criminal Juvenile, ☐ Other
☐ CINC, ☐ Termination, ☐ Surrender, ☐ Adoption, ☐ Child Custody

## ADMINISTRATIVE OR MUNICIPAL COURT INFORMATION

Tribunal/Court:__________ Docket No.__________
Judge/Commissioner/Hearing Officer:__________ Ruling Date:__________

## DISTRICT COURT INFORMATION

Parish and Judicial District Court: 24th JDC - Jefferson Parish Docket Number: 99-5825
Judge and Section: Judge Danyelle Taylor Date of Ruling/Judgment: May 31, 2023

## APPELLATE COURT INFORMATION

Circuit: Fifth Docket No. 23-KH-377 Action: Denied Petitioner's supervisory writ
Applicant in Appellate Court: Earl Bradley Filing Date: 8/2/2023
Ruling Date: 9/6/2023 Panel of Judges: Susan M. Chehardy, Marc E. Johnson, Stephen J. Windhorst En Banc: ☐

## REHEARING INFORMATION

Applicant:__________ Date Filed:______ Action on Rehearing:______
Ruling Date:______ Panel of Judges:__________ En Banc: ☐

## PRESENT STATUS

☐ Pre-Trial, Hearing/Trial Scheduled date:__________, ☐ Trial in Progress, ☑ Post Trial
Is there a stay now in effect? No Has this pleading been filed simultaneously in any other court? No
If so, explain briefly____________________

## VERIFICATION

**I certify that the above information and all of the information contained in this application is true and correct to the best of my knowledge and that all relevant pleadings and rulings, as required by Supreme Court Rule X, are attached to this filing. I further certify that a copy of this application has been mailed or delivered to the appropriate court of appeal (if required), to the respondent judge in the case of a remedial writ, and to all other counsel and unrepresented parties.**

10/5/2023
DATE

Walker Laiten
SIGNATURE

TABLE OF CONTENTS

TABLE OF CONTENTS ....................i
TABLE OF AUTHORITIES....................ii-iii
QUESTIONS PRESENTED ....................iv
RULE X STATEMENT....................1
STATEMENT OF JURISDICTION....................2
SUMMARY....................2-10
STATEMENT OF FACTS ....................10-12
LIST OF THE EVIDENCE DISCOVERED SINCE TRIAL....................13
ARGUMENT ....................13-22
ASSIGNMENT OF ERROR 1....................13-16
ASSIGNMENT OF ERROR 2....................16-19
ASSIGNMENT OF ERROR 3....................19-20
ASSIGNMENT OF ERROR 4....................20-23
CONCLUSION ....................23
VERIFICATION....................24

WRIT EXHIBITS:

1. Exhibit A: Louisiana Fifth Circuit Court of Appeals Ruling, September 6, 2023
2. Exhibit B: Petitioner's Application for a Supervisory Writ with exhibits, filed on August 2, 2023
3. Exhibit C: State's Response to Petitioner's Application for Supervisory Writ filed September 1, 2023

Table of Authorities

*Alvarez v. State*, 2018 WL 4354727 (La. App. 2018)................................16

*Banks v. Dretke*, 540 U.S. 668 (2004)..............................................22

*Cone v. Bell*, 556 U.S. 449 (2009)...................................................22

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018)....................................12

*Haines v. Kerner*, 404 U.S. 519 (1972)..............................................20

*House v. Bell*, 547 U.S. 518 (2006)..............................................17, 19

*Kyles v. Whitley*, 514 U.S. 419 (1995)...............................................3

*In re Davis*, 557 U.S. 952 (2009)....................................................10

*McQuiggin v. Perkins*, 569 U.S. 383 (2013)................................10, 18, 19

*Murray v. Carrier*, 477 U.S. 478 (1986)............................................18

*Schlup v. Delo*, 513 U.S. 298 (1995)............................................18, 19

*State v. Bright*, 875 So. 2d 37 (La. 2004)...................................17, 22, 23

*State v. Lang*, 128 So.3d 330 (La.app. 5 Cir 10/9/2013)..........................17

*Shih Wei Su v. Filion*, 335 F.3d 119 (2d Cir. 2002)................................22

*Smith v. Cain*, 565 U.S. 73 (2012)................................................21, 23

*State v. Bradley*, 858 So. 2d 80.......................................2, 3, 6, 10, 12

*State v. Cavalier*, 701 So. 2d 949 (La. 1997)......................................15

*State v. Davis*, 295 So. 3d 396 (La. 2020)...........................................8

*State v. Frederick L. Condley, Kendrick Williams*, 04-1349 (La. App. 5 Cir. 5/31/05)......................................................................20

*State v. Hammons*, 597 So. 2d 990(La. 1992)......................................5, 6

*State v. Heath*, 513 So.2d 493...........................................................4

*State v. Hurst*, 209 So. 3d 701 (La. 2015)..........................................16

*State v. Kang*, 2019 WL 150635 (La. App. 2019)...................................16

*State v. Pierre*, 125 So. 3d 403 (2013)..............................................18

*State v. Raine*, 238 So.3d 1076..........................................................4

*State v. Trosclair*, 443 So. 1098 (La. 1983).......................................4, 5

*Wearry v. Cain*, 136 S. Ct. 1002 (2016).........................................21, 23

*Williams v. Cain*, 2014 La. App. LEXIS 3210............................16, 19, 20

Statutes

§ 926.2..................................................1, 9, 14, 15, 16, 17, 18

§ 930(A)....................2, 14

§ 930.4....................1, 2, 9, 14, 15, 16, 18, 19

§ 930.8....................9, 15, 19

Florida Statute 893.13. 6A....................23

Louisiana Constitution, Article 5, Section 10(A)....................10

Secondary Sources

Gross et al., 95 *J. Crim. L. and Criminology* at 544....................4

Hugo Adam Bedau and Michael L. Raddet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Sanford L. Rev. 21, 60 (1987)....................4

## QUESTIONS PRESENTED

1. Did the lower court err when it held that the District Court did not abuse its discretion when it summarily denied Mr. Bradley's petition without a hearing pursuant to La.C.Cr.P. § 930(A)?
2. Did the Fifth Circuit err when it misapplied La.C.Cr.P. § 926.2 and erroneously held that constitutional violations were subject to procedural bars even though Mr. Bradley made a "gateway" claim of actual innocence?
3. Did the Fifth Circuit erroneously hold that Mr. Bradley failed to present newly discovered evidence, fraud upon the court, ineffective assistance of counsel and *Brady* claims that would have probably changed the verdict?
4. Did the Fifth Circuit err when it did not grant Mr. Bradley's APCR on the record before it when the State failed to dispute Mr. Bradley's claims that a *Brady* violation and fraud upon the court occurred that would have probably changed the verdict had the jury known these facts?

# RULE X STATEMENT

**Significant Unresolved Issues of Law**

Mr. Bradley submitted three affidavits: one from Terri-Lee Isaac, which documented the recantation and admission of perjury in the lone witness against Mr. Bradley, one from Mr. Bradley's co-defendant, Albert Russel, and Mae Rivet Smith. The evidence used to corroborate these testimonial statements was supplemental police report, a surveillance video, and the medical examiner report.

The Fifth Circuit ruled that the corroborating evidence was not the type of evidence that is required to corroborate testimonial evidence pursuant to La.C.Cr.P. § 926.2. However, that is just not so. La.C.Cr.P. § 926.2 makes no distinction between what type of physical, scientific or documentary evidence that is needed to corroborate the testimonial evidence, such as the type submitted in the case at bar.

Here, the lone eyewitness in this case was wholly refuted (not just contradicted) by the physical, scientific, documentary, and testimonial evidence submitted by Mr. Bradley. At the very least, a hearing should have been held to address the merits of these claims.

Likewise, the lower court failed to account for the fact that Mr. Bradley also made a gateway claim of innocence pursuant to *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) that would also have allowed the court to consider any of the constitutional issues raised.

This issue is ripe for consideration before this Court, and Petitioner requests oral argument to be heard on this matter.

**Erroneous Interpretation or Application of Constitution or Laws**

The Fifth Circuit failed to account for the newly discovered evidence in this case, outside of Mr. Bradley's claims pursuant to *State v. Cavalier*, 701 So. 2d 949, 951 (La. 1997) that would have probably changed the verdict.

Likewise, the lower court's ruling with regard to Mr. Bradley's fraud upon the court claim and *Brady* violation failed to take into account the gravity of both the State's failure to disclose evidence and the false testimony of the State's lone witness, Amy Larck. Larck had both a substantial record that was purposefully omitted to make her look less criminal and was subject to probation in another state. The jury was not informed of any of this. Her testimony was the only direct evidence against Bradley. It was crucial. Her misrepresentations were material.

The 5th Circuit failed to properly account for this evidence. At the very least a hearing should have been held.

## STATEMENT OF JURISDICTION

This Honorable Court is vested with jurisdiction herein pursuant to Louisiana Constitution, Article V, Sections 2 and 5(A) of the Louisiana Constitution of 1974, granting the Supreme Court of Louisiana control of and general supervisory jurisdiction over all inferior courts for the reasons stated herein. This matter is filed timely in accordance with Louisiana Court Rules, Rule X, Section 5.

## SUMMARY

Mr. Bradley submitted an application for post-conviction relief (herein referred to as "APCR") before the 24th Judicial District Court. Without a hearing and merely upon procedural bars, the District Court summarily denied his motion. However, the Fifth Circuit Court of Appeal affirmed the District Court's decision reaching the merits of Mr. Bradley's claims even though there were questions of fact and law that could not have been determined of the record submitted on the papers **and clear evidence that the lone witness perjured herself and the State failed to turn over *Brady* material.**

Within Mr. Bradley's APCR, which included a supplement application, Mr. Bradley attached new evidence that the jury never heard in the form of affidavits from an eyewitness, Mae Rivet Smith, his co-defendant, Albert Russell, and Terri-Lee Isaac, detailing Amy Larck's admissions of perjury, and criminal convictions that were never disclosed regarding the lone witness that testified against Mr. Bradley, Amy Larck.[1] Additionally in support of the testimonial evidence presented, Bradley submitted a supplemental police report, surveillance footage, and medical evidence that all supported his innocence. In the face of this evidence, the hearing court found, without a hearing, that Mr. Bradley failed to meet the requirements of La.C.Cr.P. § 926.2, and that Mr. Bradley was procedurally barred in all other claims pursuant to La.C.Cr.P. § 930.4(D) & (E). The Fifth Circuit Court of Appeal found that, other than failing to meet the requirements pursuant to § 926.2, Mr. Bradly met the exceptions under statute, however failed to present evidence that would make a difference.

Here, Mr. Bradley met the requirements of La.C.Cr.P. § 926.2 and, for the underlying constitutional and newly discovered evidence claims, met the exception pursuant to La.C.Cr.P. § 930.8(A)(1) and would have most certainly affected the verdict. Moreover, the hearing court failed to render an order demanding Mr. Bradley explain any failure under the due diligence requirement pursuant to La.C.Cr.P. § 930.4(F). The lower court's failure to do so was an abuse of discretion and

[1] These convictions also included the fact that Larck was on probation in Florida at the time of her arrest in Louisiana.

a violation of Mr. Bradley's right to due process as there were questions of law and fact that needed to be addressed on the merits. La.C.Cr.P. § 930(A).

Earl Bradley was accused and convicted of killing Barton Sanford during the early morning hours of July 31, 1999. Investigators believed that time to be 1:30AM.[2] *See* Exhibit A of Mr. Bradley's APCR – Jefferson Parish Sheriff's Department's Supplemental Report, pg. 1; *see also* 6/12/1999 TT: 84, 88-100, 129-133.[3] The basis of the investigators' belief of the time, way, and who killed Sanford was the video time stamp at 1:25AM depicting Barton Sanford walking into the alleyway where he was found and Amy Larck's varying and plainly inconsistent statements to police. *See* Exhibit B of APCR – Video of the Alley behind the Happy Hour Bar on July 31, 1999, beginning at approximately 1AM; *see also* Amy Larck's trial testimony; *see also State v. Bradley*, 858 So. 2d 80, 86 (La.App. 5 Cir. 09/16/03).[4] It is undisputed by all parties that Barton Sanford was found in the alley behind the Happy Hour Bar with one gunshot wound to the chest.

Larck was the only alleged "eyewitness". In fact, Larck was the only person out of the many that were interviewed in this case that stated the Earl Bradley killed Mr. Sanford. Larck stated that, during the early morning hours of July 31, 1999, first Barton Sanford and then she went into the back alley of the Happy Hour Bar so that she could perform a sexual favor on Sanford. *See* 6/12/1999 TT: 84, 88-100, 129-133. Larck testified that shortly after Larck and Sanford entered the alley, which is where Sanford was found shot in the chest, Bradley and his co-defendant, Albert Russel, entered the alley. Larck saw Bradley with a gun, quickly left and heard one gunshot as she ran out of the alley across Jung Blvd through the gas station parking lot. *See Id.*; *see also* Exhibit C of APCR – Sketch of the scene.

The problem for both the State and Amy Larck is that Mr. Bradley has the video of the entrance to the back alleyway during the time period when Sanford was seen entering. *See* Exhibit B of APCR (file labeled VTS_01_0), approximately 1:25AM;[5] *see also* Exhibit A of APCR, pg. 8. This

[2] However, as seen below, this time frame is disputed by the medical examiner who testified.

[3] The trial transcript will be delineated by the date of the testimony and "TT:" followed by the page number(s).

[4] Significantly, neither Amy Larck nor Det. Donald Meunier were impeached using the video submitted to the hearing court or Det. Meunier's supplemental report that details the investigators' findings regarding the video in reference to who entered and exited the alley from the late-night hours of July 30, 1999, until roughly August 1, 1999, when the body was found. Astoundingly, Larck was never confronted with what she now admits – that the reason why she is not on any of the surveillance footage is because she was not at the Happy Hour Bar the weekend beginning on July 30, 1999. Disturbingly, the trial prosecutor misrepresented the video evidence in the case at bar, merely presenting to the jury during summation that Sanford walked into the alley as Larck testified. 6/13/2002 TT: 130-134. Yet, the prosecutor failed to mention that neither Larck, Bradley, nor Russell were seen leaving that alleyway after Sanford entered it. *Id.* The failure to alert the jury to this fact was both the product of prosecutorial misconduct and ineffective assistance of counsel.

[5] The video submitted in this brief was presented to the jury as either State's Exhibits 27, 28, or 29.

video eviscerates Amy Larck's testimony. Her testimony is fictional; no one enters the alleyway with Sanford. Two black men are not seen entering the alley shortly after he entered. Larck is not seen entering with Sanford or seen running from the scene. Sanford never left the alleyway after he entered it at 1:25AM on July 31, 1999. *See* Exhibit B of APCR.

Further compounding the lie by the state is the fact that Earl is **never seen entering the alleyway between** 1:25AM and 8AM on July 31, 1999. Bradley was arrested on July 31, 1999, at approximately 7:30AM at the Pinnacle Hotel for drugs. *See* Exhibit D of APCR – Bradley's drug arrest report. Bradley has remained incarcerated ever since that day. The medical examiner in this case, Dr. Susan Garcia, testified that Sanford was dead 24-36 hours from when Mr. Sanford was brought to the medical examiner's office at approximately 6:30PM on August 1, 1999. *See* Exhibit E of APCR – Testimony of Dr. Susan Garcia.[6] Twenty-four hours would have placed Sanford's death at 6:30PM on July 31, 1999. By that point, Bradley had been incarcerated for almost 12 hours. If Sanford died thirty-six hours prior to his movement to the medical examiner's office, his time of death was at 6:30AM on July 31, 1999. No evidence at trial indicated that Earl Bradley was at the Happy Hour Bar at 6:30AM, let alone entering the alley at that time. In fact, the only evidence that anyone entered that alleyway, other than Mr. Sanford, between 1:25AM, and when Sanford was found at approximately 4PM on August 1, 1999, was Mae Rivet Smith. *See* Exhibit A of APCR, pg. 8.

Due process is violated in a criminal trial whenever a witness of the State supplies false testimony on a topic that materially prejudices the rights of the accused. *See generally Kyles v. Whitley*, 514 U.S. 419 (1995). False testimony "is a surprisingly common feature" of the underlying trials that lead to false convictions. *Samuel R. Gross, et, al., Exonerations in the United States: 1989 through 2003*, 95 J. Crim. L. and Criminology 523, 543 (2005) (Discussing false testimony using the term "perjury").

A study of 350 erroneous convictions in "potentially capital cases" revealed that there was "perjury" by prosecution witnesses in approximately one-third of the cases. *See* Hugo Adam Bedau and Michael L. Raddet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Sanford L. Rev. 21, 60 (1987). Indeed, false testimony by prosecution witnesses was "twice as frequent a cause of error as the next most important factors." *Id.* at 61. N. 184. A study of exonerations illustrates that through the present, this continues to be the case. *See e.g., Gross et al.*, 95 J. Crim. L. and Criminology at 544 (Noting that in 43% of the 340 exonerations studied, "at least one sort of perjury" was reported).

[6] Frankly, this is a generous estimate to the State. Dr. Garcia never specified whether the time of death was from when the body was taken to the medical examiner's office at 6:30PM on August 1, 1999, or at the time of Autopsy at roughly 8AM on August 2, 1999.

Now, for the first time ever, Amy Larck has come forward through letters and Facebook messages and stated that she lied – that she did not witness Earl Bradley kill Barton Sanford and that she was coerced into her statement to the police and trial testimony. *See* Exhibit F of APCR – Sworn affidavit of Terri-Lee Isaac. Amy Larck provided the following statements against penal interest (La. C.E. art. 804(A); *State v. Raine*, 238 So.3d 1076, 1084-1086 (La. 4th Cir. 2018)) and rebuttal evidence (*State v. Trosclair*, 443 So. 1098, 1106 (La. 1983); *see generally State v. Heath*, 513 So.2d 493 (La. 2d Cir 1987)) to Ms. Isaac:

> I am a Canadian citizen who was introduced to Earl Bradley in 2005.
>
> Mr. Bradley is serving a life sentence for murder at the Louisiana State Penitentiary at Angola, LA. In the time leading up to, and during our first face to face meeting, Mr. Bradley told me the story of his arrest, shared court records, documents he had obtained from attorneys, and letters he had received in prison. After I read the material, I determined that I wanted to help him gain his freedom.
>
> I am not an attorney, nor am I empowered as an investigator. I determined from reading what was shared with me, specifically the trial testimony, that one of the key witnesses against Mr. Bradley is Amy Larck.
>
> Mr. Bradley showed me letters, (EXHIBIT A) written by Amy Larck, stating her remorse for lying on the witness stand at his trial.[7]
>
> Among the things that Ms. Larck wrote:
>
>> "This is something that God has been telling me to do. I am only trying to make a wrong, right."
>>
>> "Do you actually believe that I could make up all of those things up (sic) by myself? Come on Earl, there is no way I could have done that without being led and talked through it and threatened."
>>
>> "I was not at the Happy Hour at all the night that guy was killed. I did not even leave the area of the Budget (hotel.)"
>>
>> "Let me go back so that you can understand. I left 4th Street for a little while and I was skimming poker machines with Randy with the red car. The only thing that I heard was that someone was found under the trailer behind the Happy Hour. Everyone who ever hung out on 4th Street or the Happy Hour was questioned about the murder. except me. I did not know anything about anyone being questioned. A couple of us were at the gas lite motel and some under cover knocked on the door. They asked who I was and told me that I had reported a rape and they needed me to identify the guy. Everyone in that room except me knew that they were homicide detectives. When we got to the detective bureau they took me straight to homicide. I had NO idea what was going on."
>>
>> "I was in that room for 11 hours being interrogated (sic) 3 separate (sic) times (back to back), I told them that I had no idea what they were talking about. I did not know anything about it. The (sic) kep trying to put suggestions in my mouth and yes I was scared because I have never in my life been in that kind of situation and they were mean to me. Finally they took me back to some room with video tapes and showed me a video tape. He told me that the girl was me, the guy on the right was you, and he did not know who the other guy was. I told him that I was not even at the Happy Hour. He said he had talked to a number of people who said me and you were at the happy Hour together that night. None of this was true!"

[7] The letters with envelopes attached, thereby proving that Amy Larck wrote these letters, are attached as Exhibit G of APCR.

I believe that Amy Larck's recantation to be an important thing in Mr. Bradley's pursuit of justice.

I reached out to Amy Larck via Facebook messenger beginning on Thursday September 19, 2013, and continuing to Wednesday, September 25, 2013. I preserved the messages between us, and have attached them to this affidavit as EXHIBIT B.

On Tuesday, September 24, 2013 Amy Larck wrote: "I was young and impressionable back then and scared to death of being threatened with accessory to murder. I have grown a lot and would like to help Earl be released from prison."

Amy Larck had written to Earl Bradley that she wanted nothing from him in exchange for the truth, but in our exchanges Ms. Larck wanted money, and to know that Earl Bradley would not harm her in any way for having lied on the witness stand. I assured her that I believed Earl Bradley was not interested in retaliation, only exoneration.

Amy Larck never told me what amount of money she wanted in order to come forth with the truth.

I shared our communication with Earl Bradley, who asserted it would be inappropriate to pay Amy Larck.

I have had no further communication from Amy Larck beyond what is attached.

The above statement is true and correct. I offer this information freely and Without hesitation. I have not been coerced, nor have I been given money, nor am I promised any reward for communicating this information.

Larck's letters and Facebook messages are true rebuttal evidence to her trial testimony. *State v. Trosclair*, 443 So. at 1106. While it is true that recantations are looked at skeptically, this is not a true recantation. This is an admission by Larck that she committed perjury and, in fact, fears that she could be charged with perjury. *State v. Hammons*, 597 So. 2d 990, 995-998 (La. 1992); *See* Exhibit F of APCR, pg. B002. Larck, by her own admission, is not available to Bradley now, and most certainly was not available at the time of trial; she was adverse. And now, she's trying to extort Bradley.

And her admissions have more than a ring of truth. By Larck's own admission at trial, she implicated Bradley only after the police threatened to charge her as an accomplice. Her statements and trial testimony were inconsistent; a point which even this Court was clear to point out. *State v. Bradley*, 858 So. 2d at 86. But more importantly, no other witness corroborated her statements or testimony, especially with regard to Albert Russell. *See* Exhibit I of APCR – Hearing testimony dated February 7, 2001, pages 16-17. And more importantly, the video in the case at bar eviscerates Amy Larck's testimony – Larck's testimony regarding the murder is plainly false. *See* Exhibit B of APCR.

Amy Larck was the only evidence against Earl Bradley.[8] Her testimony was beyond material. Her admissions are shocking, documented in writing, and would have absolutely changed the verdict. *State v. Hammons*, 597 So. 2d at 999 (The standard is merely the probability of a different

[8] Bradley's statement was not inculpatory. While it was inconsistent in some respects, multiple witnesses in this case provided inconsistent statements.

verdict). And here, the prosecutor's **entire** closing was about her credibility.

But Larck's testimony about the events that night was not her only lie. She also lied about her criminal record. Larck testified that her first criminal conviction was in Louisiana, from a case that she caught close in time to the case at bar (specifically the crime happened on July 6, 1999, only days after her arrival). 6/12/2002 TT: 122-123. This is plainly not true. *See* Exhibit A of Bradley's Reply to State's Procedural Objections; Exhibit N of APCR – Larck's background check. In December of 2022, Mr. Bradley, through counsel, found Larck's criminal history. In April of 2023, Mr. Bradley, through counsel, received Larck's certified criminal history in Florida. *See* Exhibit A of Bradley's Reply to State's Procedural Objections. It turns out that Larck wasn't just a telemarketer in Illinois just prior to her arrival in Louisiana. Not long before Larck's arrival in Louisiana, she was convicted of simple assault in North Carolina. But prior to that, Larck was arrested and convicted of prostitution and child abuse in Florida. *See* Exhibit A of Bradley's Reply to State's Procedural Objections - Certified copy of Florida Conviction Record. For those convictions, of which some were felonies, Larck did prison time. **She was also on probation when she was arrested in Louisiana and at the time of her testimony. She was shipped back to Florida after her sentence in this only to be arrested again in Florida. For both the probation violation and that arrest, she received a time served sentence.** *See* Exhibit A of Bradley's Reply to State's Procedural Objections. None of this was revealed to defense counsel because counsel, who is a skilled defense attorney, never confronted Larck with these convictions. This is a clear *Brady* violation. *See State v. Bright*, 875 So.2d 37, 41-45 (La. 2004).

Terri-Lee Isaac is not the only witness that has come forward to support Earl's innocence in the case at bar. Mae Rivet Smith has come forward to definitely state that (a). she did not see a body behind the Happy Hour Bar until August 1, 1999, in the afternoon and (b). that, when she heard shots during the late-night hours of July 30, 1999, or the early morning hours of July 31, 1999, Earl Bradley was in her presence and did not have a gun. *See* Exhibit H of APCR – Mae Lucille Rivet Smith affidavit dated June 10, 2022. Ms. Smith swore to the following:

> 1. I have known Earl Bradley from more than 24 years. We met through friends and we both frequented a bar called The Happy Hour bar in Marerro, LA.
>
> 2. I was at the Happy Hour Bar in 1999, on the last weekend of July. The bar did not close through the entire weekend, and I left only once during that weekend.
>
> 3. Friday night, July 30th I was standing at the door of the Happy Hour with my friend Rachel Peret. We were talking and smoking a cigarette. During this time, I saw Earl Bradley enter the alleyway and waved to him. As we waved, we heard shots ring out somewhere beyond the alleyway.
>
> 4. Earl was traveling from Jung Boulevard toward Baritaria. The shots did not take place in

the alleyway. The shots were likely coming from a side street.

5. I was waving to Earl and he was waving back when the shots rang out. He did not have a gun in his hand.

6. During the weekend I was in and out of the bar and the alleyway frequently because I am a smoker, and at the time it was not permitted to smoke in the bar.

7. At the time of the incident, I was homeless, and I spent my time in and around the Happy Hour Bar.

8. I was in and out of the alleyway Friday night the 30th; I was there all day and night Saturday the 31st; I was there all-day Sunday August 1st.

9. At the time I was also familiar with the victim of the shooting Bart Sanford. He was not in the alley when I waved to Earl and we heard shots ring out.

10. I did not see Bart Sanford until Sunday night, when I was talking with Lloyd Everett and he spotted Bart's body in the alleyway.

11. Lloyd Everett went to call the Police, and left me standing in the alleyway to make sure no one disturbed Bart's body. I left the scene after the Police arrived.

12. I later provided information to the police about what I saw at the time. They took a recorded statement from me.

13. I walked in and out of the alleyway many times from Friday until Sunday. I would have seen Bart's body where we eventually saw it had it been there all weekend.

14. I know Amy Larck from the neighborhood; she also frequented The Happy Hour. She was not at the bar that weekend.

15. I know Albert Russell, known as Micey. Albert was not at the Happy Hour that weekend.

16. I am aware Amy Larck gave testimony that she was present in the alleyway Friday night at the time of the shooting, with Albert. I am aware that she testified that she saw Earl Bradley shoot Bart Sanford.

17. I am completely certain Amy and Albert were not in the alleyway, and not with Earl Bradley when shots rang out Friday night.

18. I have always been willing to testify as to what I saw that weekend, and when. I was available to Earl Bradley's attorney and to the prosecutors before, during and after the trial. No one ever asked me to testify.

19. I have reached out to Earl Bradley several times over the last 20+ years to tell him that I know exactly where he was at the time of the shooting. I understand that he could not reply until he had someone who was willing to take my statement.

I offer this statement freely, and am willing to testify under oath as to its authenticity and to provide further details about my recollection. No one has offered me money, or exerted pressure on me to make this statement.

Here, Ms. Smith's provides critical alibi evidence from a person that investigators **knew** was around the body the weekend that Sanford was killed. Her testimony for Bradley would have crushed the State's case, as Ms. Smith's statements to police were consistent and corroborated by police investigation, i.e., the video. Bradley's trial counsel's failure to investigate and call her was plainly ineffective assistance of counsel under the United States and Louisiana constitutions. *State v. Davis*, 295 So. 3d 396 (La. 2020).

Albert Russell has also come forward to support Bradley's innocence. On February 18, 2023, Mr. Bradley's co-defendant provided a sworn statement stating the following: (*See* Exhibit A of Supplemental APCR – Albert Russell sworn affidavit dated February 18, 2023)

> I am a witness to the events of the above-captioned matter.
>
> At the time of the incident, I was living at 468 Wilson Street in Marrero, Louisiana.
>
> I came home one morning and my door was kicked in.
>
> My grandfather came over and gave me a business card of an FBI agent.
>
> I called the agent and he told me to come to the Gretna Detectives Bureau.
>
> They questioned me about some guy that I never knew or seen before, and showed me a picture of a guy that I never seen before and asked me if I knew him.
>
> I told them I had never seen the guy in my life.
>
> The detectives left out the room for about 3 minutes and came back in and told me I was under arrest for second degree murder. I couldn't believe it.
>
> I was incarcerated for 3 years fighting the charge of killing a person I never seen or heard before.
>
> The detectives tried placing me at a club on 4th Street and Jung Boulevard called the Happy Hour.
>
> The club had surveillance cameras inside and out.
>
> I was never at the club at the time the murder happened.

This Court should note that Bradley has never been granted an evidentiary hearing. Yet, the court rejected this petition out of hand as time-barred and completely denied relief without ever considering Bradley's evidence on its merits. There are several problems with that position. First, La.C.Cr.P. § 926.2 has been codified. Bradley is not only entitled to have his petition heard, but if he can prove, by clear and convincing evidence, that had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt, then he is entitled to a new trial. Bradley's petition presents both documentary and testimonial evidence that proves that the sole witness's, Amy Larck's, trial testimony *was false*. Both by a freestanding claim or a gateway claim of innocence,[9] all of Bradley's claims should be heard, even if he had defaulted at some point.

But this petition is also not repetitive within the meaning of La.C.Cr.P. § 930.4 – no freestanding actual innocence claim was raised in any previous petition (nor could one have been,

[9] The lower court incorrectly stated that Mr. Bradley could not bootstrap his constitutional claims to his actual innocence claim pursuant to La.C.Cr.P. § 926.2. A gateway innocence claim is separate and distinct from a free-standing innocence claim under La.C.Cr.P. § 926.2 and is recognized by the Supreme Court of the United States. This point will be addressed further below.

given the state of the law at that time), much of the evidence submitted in support of the newly discovered evidence claim herein was not known or presented previously. And for the same reasons, the petition is not out of time pursuant to La.C.Cr.P. § 930.8, because much of the evidence presented to this Court was discovered only recently as a result of painstaking investigation and as a result of being able to obtain pro bono counsel to investigate and make the necessary arguments. Nor could this evidence have been obtained earlier through due diligence, both because diligence takes into account the resources available to the accused and because evidence of this character only *could* come to light once enough time had passed and enough reckoning with the past had occurred that the words could be said, and the affidavits could be given without fear of retaliation.[10]

But there are even more reasons why this petition should be heard. No court has heard the evidence presented in this motion, and courts today are much more aware of wrongful convictions than they were in the past, when Bradley's previous motions were summarily denied, and it has become an increasing judicial consensus that procedural bars should not prevent an actually innocent defendant from having his day in court. In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Supreme Court held that a persuasive showing of actual innocence should take precedence over time limitations and procedural bars, and though this holding does not directly govern Louisiana post-conviction petitions, it is submitted that this Court should find its reasoning persuasive. Likewise, in *In re Davis*, 557 U.S. 952 (2009), the Supreme Court directed the Georgia state courts to take evidence concerning the defendant's actual innocence and to hear from the witnesses who had previously been denied a hearing on procedural grounds. Doing so in this case would comport with the core function of the criminal justice system – convicting only the guilty and exonerating the innocent – and would recognize that allowing an innocent man to rot in prison on technical grounds is even more abhorrent than allowing a guilty person to evade justice for such reasons.

While the District Court ruled that this petition was timed barred, the Court of Appeal ruled on the merits in order to affirm the District Court's ruling. This move by the Court of Appeal was a tacit admission that Earl Bradley, at the very least, deserved a hearing. Neither the District Court nor the State presented evidence that refuted Bradley's claims, as such, his claims should be heard so that due process is met.

In sum, this Court should remand this matter so that the District Court can hear the witnesses who have never been heard, evaluate the scientific evidence and surveillance evidence that obliterates the only evidence against Bradley: Amy Larck's testimony. Earl Bradley's conviction and

[10] Frankly, Larck is still scared that she will be charged with perjury.

imprisonment is a miscarriage of justice that cries out to be fixed.

## STATEMENT OF FACTS: TRIAL AND POST-CONVICTION PROCEEDINGS[11]

On August 1, 1999, the body of Barton Sanford was found beneath a trailer located at 7501 1/2 Fourth Street near the Happy Hour Saloon in Marrero. The cause of death was a bullet wound to the chest. Detective Donald Meunier of the Jefferson Parish Sheriff's Office investigated and eventually developed Bradley as a possible suspect. On August 7, 1999, Detective Meunier interviewed Bradley and obtained several statements.

In the statements, Bradley indicated that he had attended a party at the Happy Hour Saloon on Friday, July 30, 1999, but denied knowing the victim. However, when confronted with a surveillance video tape taken outside of the Happy Hour Saloon on July 30, 1999, showing him with the victim, Bradley recanted his prior statements. Bradley told Detective Meunier that the victim wanted to purchase crack cocaine and that he had arranged for the victim to make the purchase from an individual named Jason Rivet. However, before the drug deal was completed, Bradley stopped the drug transaction and pulled the victim away because "something looked like it was going down." Bradley subsequently returned to the bar where he remained for approximately one hour before going to the Budget Motel where he remained for the night.

Detective Meunier also interviewed an eyewitness, Amy Larck, who identified Bradley as the shooter.[12] At trial, Lark testified that at the time of the shooting she was a drug addict who supported her habit by prostitution. Larck knew both Bradley and Russell and had been at Russell's house on the evening of July 30, 1999. While there, she overheard Bradley ask Russell if he had a gun to which Russell responded, "I got that for you."

Later that evening, Larck was outside the Happy Hour Saloon where she smoked crack for most of the night. Later that night, while inside the Happy Hour Saloon, Bradley informed Larck that he had a "trick" for her, whom Larck identified as the victim. Larck and Bradley left the bar and walked around the block to give the victim time to come outside. Larck then walked into an alley behind the Happy Hour Saloon where she met the victim. Larck agreed to perform oral sex upon the victim and the victim displayed approximately sixty dollars. At that moment, Bradley and Russell walked around the corner. Bradley had a gun and was screaming at the victim. Larck began backing out of the alley and heard a gunshot. She then ran from the scene and ended up at the Budget Motel with Bradley. After five to ten minutes, Larck left the motel and received a ride to the levee from a

---

[11] The statement of facts was taken directly from the Louisiana Court of Appeal, 5th Circuit's decision. *State v. Bradley*, 858 So. 2d 80 (La.App. 5 Cir. 09/16/03).

[12] Significantly, Det. Meunier interviewed many witnesses. Only Amy Larck stated that Bradley was the shooter.

stranger who later raped her. She later reported the rape to police but did not mention the murder at that time. Not until the police picked her up in connection with the homicide investigation did she mention anything to police about the murder.

After Larck's testimony, the State rested and the defense called its first witness, Karen Breaux. Breaux testified that on July 30, 1999, she was at Russell's house until midnight and did not recall either Larck or Bradley being at the home that day or evening. At around midnight that evening, she went to the Happy Hour Saloon where she observed the victim and Bradley engaged in an argument outside. The victim was accusing Bradley of having ripped him off, which Bradley denied. After a brief moment, Breaux left the area fearing police would arrive shortly.

The defense also called Tammy Disher who testified that, on the evening of July 30, 1999, she saw the victim fighting with an individual named Jason Rivet, who was carrying a gun. She did not see an argument between Bradley and the victim. However, Disher testified that while she was incarcerated with Larck prior to trial, Lark had told her that she was involved in the killing of the victim. Larck told her that she was supposed to "trick" the victim and that Bradley was supposed to rob him but that something went wrong, and Bradley ended up shooting the victim.

Bradley was convicted based upon an 11-1 verdict.

On June 18, 2002, the trial court sentenced Mr. Bradley to life imprisonment with hard labor. Bradley appealed the decision, and the conviction was affirmed. *State v. Bradley*, 858 So. 2d 80 (La.App. 5 Cir. 09/16/03).

On January 20, 2005, Bradley filed a pro se motion for post-conviction relief based upon ineffective assistance of counsel and DNA testing, which was summarily denied.

On July 2, 2008, Mr. Bradley filed a subsequent post-conviction motion, which was again summarily denied.

On May 18, 2021, Bradley's post-conviction motion based upon his non-unanimous verdict was denied.

On December 28, 2022, Bradley filed an application for post-conviction relief (herein referred to as "APCR"). See Exhibit B – Mr. Bradley's supervisory writ and procedural history contained in the writ. Bradley made the following claims:

**POINT I: THIS PETITION SHOULD BE HEARD**

**POINT II: EARL BRADLEY IS ACTUALLY INNOCENT. *See* La.C.Cr.P. Article 926.2; *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018).**

POINT III: NEWLY DISCOVERED EVIDENCE WOULD HAVE PROBABLY CHANGED THE VERDICT HAD THE JURY HEARD WHAT IS NOW BEFORE THE COURT.

POINT IV: THE SOLE EYEWITNESS, AMY LARCK, TESITIFIED FALSELY. AS SUCH, A FRAUD WAS PRESENTED TO THE COURT.

POINT V: THE STATE COMMITTED A BRADY VIOLATION WHEN IT FAILED TO TURN OVER AMY LARCK'S PRIOR CONVICTIONS.

POINT VI: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED INVESTIGATE AND CALL MAE RIVET.

POINT VII: AT A MINIMUM, A HEARING MUST BE HELD TO DETERMINE THE VERACITY OF BRADLEY'S CLAIMS

Along with the APCR, Petitioner requested a stay to further investigate and supplement his petition.

On February 1, 2023, the District Court issued a preliminary order, directing the State to file its objections within 30 days of the order, and Mr. Bradley to file his supplemental brief by April 3, 2023.

The State submitted its procedural objections on March 3, 2023, and supplemented those objections on March 8, 2023.

On March 31, 2023, Bradley submitted his opposition to the State's procedural objections. Simultaneously, he submitted his supplemental APCR with Albert Russell's affidavit.

On May 3, 2023, the State responded to Bradley's supplemental memorandum of law and opposition to procedural objections.

On May 10, 2023, Mr. Bradley replied to the State's response to his supplemental memorandum of law and the State's response to Mr. Bradley's opposition to the State's procedural objections.

On May 31, 2023, the District Court summarily denied Mr. Bradley's APCR.

On June 14, 2023, Mr. Bradley filed a motion to reconsider his APCR and a notice of intent to file a supervisory writ.

On June 21, 2023, the District Court denied Mr. Bradley's motion to reconsider. See Exhibit L. On the same date, the District Court set a return date for Mr. Bradley's supervisory writ, which was July 20, 2023.

On July 7, 2023, Mr. Bradley requested an extension until August 10, 2023. The District Court granted said request.

## LIST OF THE EVIDENCE DISCOVERED SINCE TRIAL

Evidence Presented for the First Time in Bradley's 2022 APCR

The following evidence *was not* presented at trial or in a previous post-conviction motion:

1. **Exhibit D – Police Reports for Earl Bradley drug arrest**
2. **Exhibit E – Affidavit of Terri-Lee Isaac**
3. **Exhibit F – Letters from Amy Larck to Earl Bradley**
4. **Exhibit G – Affidavit of Mae Lucille Rivet Smith**
5. **Exhibit M – Criminal history of Amy Larck**
6. **Exhibit N – Past history of misconduct by Sgt. Grey Thurman**
7. **Exhibit A of Bradley's Reply to State's Procedural Objections - Certified copy of Florida Conviction Record**

## ARGUMENT

**ASSIGNMENT OF ERROR 1: THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED MR. BRADLEY'S APCR WITHOUT A HEARING.**

Here the State failed to produce any evidence that either (1) refuted the affidavits, physical and scientific evidence and the *Brady* material that Mr. Bradley presented in his APCR or (2) showed that Mr. Bradley could have presented it earlier. So as to avoid redundancy, for a detailed recitation of the law, please see Mr. Bradley's APCR (Exhibit A).

La.C.Cr.P. § 930(A) is clear:

> An evidentiary hearing for the taking of testimony or other evidence **shall** be ordered whenever there are questions of fact which cannot properly be resolved pursuant to Articles 928 and 929. The petitioner, in absence of an express waiver, is entitled to be present at such hearing, unless the only evidence to be received is evidence as permitted pursuant to Subsection B of this Section, and the petitioner has been or will be provided with copies of such evidence and an opportunity to respond thereto in writing.

(emphasis added)

As was detailed in Mr. Bradley's APCR (Exhibit A), he submitted an affidavit from Terri-lee Isaacs detailing that Amy Larck admitted that she perjured herself. This was a statement against penal interest and rebuttal evidence. The State presented no evidence that Earl Bradley could have presented this evidence any sooner.

Mae Lucille Rivet Smith was an eyewitness who just recently came forth. While Ms. Smith was in the discovery, there is no evidence that Earl Bradley's attorney had access to her at trial as he made attempts to call her as a witness, but those attempts failed. She came forward when she came forward. The State does not refute this. Her affidavit is absolutely exculpatory and corroborated by the video evidence and police reports. She refutes Larck's testimony. She is a critical witness that was the last person that went into the alleyway where Barton Sanford was found.

Albert Russell provided evidence that he was not with Earl Bradley on the night that Mr. Sanford was killed. Russell's affidavit completely refutes Larck's testimony and is corroborated by the video evidence submitted as a part of the APCR.

Lastly the *Brady* claims submitted in the APCR, in the form of several Florida convictions of

Amy Larck prior to her involvement in this case, was not refuted.

The District Court's decision was boiler plate and did not explain its basis for a summary denial here. The Fifth Circuit's ruling, which set aside the procedural objections, only questioned the credibility of witnesses that never provided testimony. A hearing was required to address credibility in this case as there were most certainly questions of fact that could have had a major impact on a retrial. Bradley met his threshold.

Moreover, both the Fifth Circuit and the District Court rooted their decisions based upon an erroneous holding that Bradley did not meet both prongs of La.C.Cr.P. § 926.2 (which will be addressed further below). The hearing court completely failed to consider Mr. Bradley's newly discovered evidence claims under *State v. Cavalier*, 701 So. 2d 949, 951 (La. 1997), while the Court of Appeal, without having a complete record, found that Bradley's evidence was somehow not "credible".

La.C.Cr.P. § 930.8(1) defines "diligence" as a "subjective inquiry that must take into account the circumstances of the petitioner," including "the educational background of the petitioner, the petitioner's access to formally trained inmate counsel, the financial resources of the petitioner, the age of the petitioner, the mental abilities of the petitioner, or **whether the interests of justice will be served by the consideration of new evidence**" (emphasis added). Earl Bradley is and was an indigent prisoner serving a life sentence without the resources to hire investigators and attorneys, or to conduct the searches and interviews that the undersigned counsel has undertaken since becoming his attorney. This Court should remember that Bradley was just a junkie at the time of his arrest and had a record for drugs, not violence. And certainly, the interests of justice militate powerfully in favor of considering new evidence – especially since Amy Larck has made the admissions now before the Court along with her clearly lying about her previous convictions and the affidavits of Russell and Smith. Larck's admissions are exponentially bolstered by the surveillance video, police investigation, and Dr. Susan Garcia's testimony regarding the time of death. Add Ms. Smith's and Russell's statement to the mix – this evidence proves that Amy Larck's **trial testimony is false, and Earl Bradley is sitting in prison an innocent man.**

The courts of Louisiana have repeatedly held that, even where the State alleges a post-conviction petition to be repetitive and/or untimely, a hearing must be held where "[an] affiant stated that he had not previously revealed the information [in his or her affidavit] to any investigator or attorney representing relator," rendering it "reasonable to infer that trial counsel was unaware of the facts upon which the instant claim is based" and such facts "were not known to relator or his

prior attorney [such that] the exception to the post-conviction limitations period applies." *State v. Hurst*, 209 So. 3d 701 (La. 2015); *see also Alvarez v. State*, ___ So. 3d ___, 2018 WL 4354727, *3 (La. App. 2018) (hearing required where there was reason to infer that facts were unknown to petitioner or his prior counsel, and where "defendant has argued persuasively that the nature of the new evidence is not such that it should have been discovered by the exercise of due diligence"); *State v. Kang*, ___ So. 3d ___, 2019 WL 150635, *4-5 (La. App. 2019) (where affidavits of defense counsel and investigator stated that they had not previously seen documents obtained post-trial, the petition could not be dismissed on the pleadings and a hearing was required); *see also* La.C.Cr.P. § 930.4(F). Here, likewise, issues are presented that cannot be decided on the pleadings, and this Court must hear the witnesses on both the threshold issue of diligence and on the merits. *Williams v. Cain*, 2014 La. App. LEXIS 3210, *2-4 (La.App. 5 Cir. 03/26/14).

## ASSIGNMENT OF ERROR 2: THE DISTRICT COURT AND FIFTH CIRCUIT ERRONEOUSLY APPLIED La.C.Cr.P. § 926.2 AND FAILED TO CONSIDER MR. BRADLEY'S GATEWAY CLAIM OF ACTUAL INNOCENCE WHICH WOULD HAVE LIFTED ANY PROCEDURAL BARS TO THE CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL, *BRADY*, AND FRAUD UPON THE COURT.

### The lower courts erroneously applied La.C.Cr.P. § 926.2

Here, Mr. Bradley has presented new testimonial evidence in the form of affidavits (Terri Lee Isaac, Mae Rivet Smith, and Albert Russell) that are corroborated by physical and medical evidence, thereby meeting the requirements of 926.2 and met the exceptions in 930.3, 930.4 and 930.8. Technically, the State's *Brady* violation when it failed to turn over Amy Larck's criminal history regarding her past convictions prior to trial and Larck's false testimony regarding her criminal history **corroborated the affidavits of Isaac, Smith, and Albert Russell, thus meeting any interpretation of 926.2**.

Significantly, without any citation, the District Court held that affidavits such as Isaac's, Smith's and Russell's affidavits (even if they are new) that fall under La.C.Cr.P. § 926.2(B)(1)(a)(ii) must supported by newly discovered "[s]cientific, forensic, physical, or nontestimonial documentary evidence."[13]. Presumably, the District Court gathered its interpretation from the State's procedural objections. *See* Exhibits D & E of Exhibit B. None of the cases cited by the State (*see* Exhibit D & E of Exhibit B) offered both testimonial and physical, medical and nontestimonial documentary evidence (the *Brady* material and supplemental police report) as Mr. Bradley has done in the case at bar. *See* Memorandum (Exhibit A) Exhibits A, B, E, F, D, H, and Albert Russell's affidavit submitted in Mr. Bradley's supplemental PCR. The Fifth Circuit, however, does not make the

[13] "Scientific, forensic, physical, or nontestimonial documentary evidence." La. Code Crim. Proc. art. 926.2(A)(1)(a)(i).

requirement that testimonial evidence be corroborated by **new** evidence pursuant to La.C.Cr.P. § 926.2(B)(1)(a)(i). The Fifth Circuit just held that Bradley failed to produce evidence that met the statute but did not specify why.

Contrary to the either position, the District Court should have consider all the evidence submitted to the jury pursuant to La.C.Cr.P. § 926.2(B)(1)(b), which aligns with Mr. Bradley's position that "[s]cientific, forensic, physical, or nontestimonial documentary evidence", when submitted as corroborative evidence of La.C.Cr.P. § 926.2(B)(1)(a)(ii), does not have to be "new".[14] Interestingly, the language in La.C.Cr.P. § 926.2(B)(1)(b) aligns with the United Supreme Court precedent in *House v. Bell*, 547 U.S. 518, 537-538 (2006), which held that a post-conviction court *must consider all of the evidence, whether old or new "without regard to whether it would be necessarily admitted under rules of admissibility that would govern at trial." Id.* (*citing Schlup v. Delo*, 513 U.S. 298, 327-328 (1995)). The video evidence (Exhibit B of Mr. Bradley's APCR), the supplemental report from the Jefferson Parish Sheriff's department (Exhibit A of Mr. Bradley's APCR), which is a business record, the medical findings regarding the time of death by Dr. Garcia[15] (Exhibit E of Mr. Bradley's APCR), and the drug arrest of Earl Bradley (Exhibit D of Mr. Bradley's APCR) corroborate all of the testimonial evidence submitted in Terri-lee Isaac's, Mae Rivet Smith's, and Albert Russell's affidavits.

But here, Earl Bradley **has submitted** new "nontestimonial documentary evidence" that substantiates all three affidavits and Mr. Bradley's position that Amy Larck lied at trial and perjured herself: the letters and Facebook messages from Amy Larck herself[16] and the *Brady* material that the State failed to disclose. *See State v. Lang*, (La.app. 5 Cir 10/9/2013) 128 So.3d 330, 338-339 (*citing Crawford v. Washington*, 124 St. C. 1354, 1364, 1374 (2004); *State v. Leonard*, (La.App. 5 Cir. 7/26/2005) 910 So.2d 977, 989-990 (Testimonial evidence is defined as "affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements" used by the prosecution.) Here, the letters and Facebook messages from Amy Larck are not testimonial; they are an unobstructed window into mind of a liar who would do anything to get out of jail. As the Court can now see from Ms. Larck's Facebook messages to Ms. Isaac, Ms. Larck never believed that those messages would end up in court as she admitted that she was afraid of perjury charges and wanted

[14] Additionally, this bar is exactly what the legislature sought to avoid when it drafted La.C.Cr.P. § 926.2. The point of La.C.Cr.P. § 926.2 is to allow a defendant to fully litigate his claims of innocence without needless procedural bars.

[15] Dr. Garcia's testimony is corroborated by the supplemental report submitted and her autopsy report that was submitted as a trial exhibit. But more importantly, it is not Dr. Garcia's testimony that is the evidence, it is her medical findings relating to the time of death, which she provided to the Sheriff's Department, which is the medical evidence in the case at bar.

[16] Contrary to the Fifth Circuit's holding, Larck's Facebook messages were authenticated by Isaac. Those messages were taken from Isaac's account. Therefore, Isaac could authenticate them.

money for her potential testimony. These statements, along with the letters (again, which Ms. Larck never believed would end up in court), are nontestimonial that support Terri-lee Isaac's, Mae Rivet Smith's and Albert Russell's affidavits. Lest we not forget the convictions that the State failed to disclose.

There, on the points related to freestanding actual innocence claims pursuant to La.C.Cr.P. § 926.2, this Court should allow this petition to be heard and a hearing held.

The District Court erroneously denied Mr. Bradley's gateway innocence claim allowing his claims of ineffective assistance of counsel, fraud upon the court and *Brady* violations to be heard.

But even if this Court were to believe that there is a bar, the interest of justice requires these claims to be heard, including the claims of ineffectiveness, fraud upon the court and *Brady* violations. La. C.Cr.P. § 930.4(A).[17] Louisiana acknowledges the Supreme Court precedence relating to "gateway" claims of innocence that would allow an otherwise procedurally barred constitutional claim to heard when there is new evidence that it is *more probable than not* that no reasonable juror would convict petitioner. *Schlup*, 513 U.S. at 324, 327-328, 329-330; *see State v. Pierre*, 125 So. 3d 403, 409 (2013).[18] As such, all of the evidence, old and new, including but not limited to the video evidence (Exhibit B of Bradley's APCR) which proves that Amy Larck lied during her testimony, that Earl Bradley was not in the alleyway that night, the Sheriff's supplemental report (Exhibit A of Bradley's APCR), and the time of death given by Dr. Garcia (Exhibit E of Bradley's APCR), should be considered by this Court in relation to all of Mr. Bradley's claims, including his claims of ineffective assistance of counsel and fraud upon the court.

But perhaps more importantly than any claims relating to the interest of justice, *Murray v. Carrier*, 477 U.S. 478 (1986) and the progeny of cases that follow have long established that the law of the land in both state and federal court is that both factual evidence of innocence and substantive due process violations overcome procedural bars. *See also McQuiggin v. Perkins*, 569 U.S. 383 (2013). This applies to Louisiana law. The Supremacy Clause of the Constitution of the United States (Article VI, Clause 2) establishes that the Constitution, federal laws made pursuant to it, and treaties made under its authority, constitute the "supreme Law of the Land," and thus take priority over any conflicting state laws. Pursuant to the Supreme Court precedent that follows from *Carrier, House v. Bell*, 547 U.S. 518, 537-538 (2006) and *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995, this Court **must consider all of the evidence, whether old or new "without regard to whether it would be**

[17] The Fifth Circuit apparently made the same error.

[18] The State also argued that *McQuiggin v. Perkins*, 569 U.S. 383 (2013) does not govern state law. However, *Pierre* clearly sites *McQuiggin* as the basis for a proper consideration of a gateway innocence claim. As such, *McQuiggin* is applicable in the case at bar.

necessarily admitted under rules of admissibility that would govern at trial."

As such, all of Mr. Bradley's constitutional claims should be heard. *Williams v. Cain*, 2014 La. App. LEXIS 3210 (La.App. 5 Cir. 03/26/14).

## ASSIGNMENT OF ERROR 3: THE DISTRICT COURT ERRONEOUSLY HELD THAT MR. BRADLEY WAS PROCEDURALLY BARRED FROM PRESENTING HIS CLAIMS OF NEWLY DISCOVERED EVIDENCE, FRAUD UPON THE COURT, INEFFECTIVE ASSISTANCE OF COUNSEL AND *BRADY* CLAIMS. THE FIFTH CIRCUIT ERRED IN REACHING THE MERITS WITHOUT ORDERING A HEARING.

The District Court erred when it summarily denied Mr. Bradley's APCR on newly discovered evidence, ineffective assistance of counsel and *Brady* violations because all of the material submitted in the motion to support these claims was recently discovered and was presented with due diligence. *See* La. C.Cr.P. §§ 930.4 & 930.8. The Fifth Circuit compounded said error when it reached the merits without ordering a hearing in a case wherein there is clear evidence that Earl Bradley is not guilty. Only a hearing would allow Mr. Bradley's right to due process be met.

Mae Lucille Rivet Smith's was not found and then spoke to until in or around June of 2022.[19] The facts averred to in Terri-lee Isaac's affidavit were discovered in December of 2022, when she finally decided to make a sworn statement. Albert Russell finally decided to waive his right to remain silent and provide a statement in February of 2023. Additionally, the *Brady* material, Amy Larck's criminal history of past convictions prior to the trial, was not discovered until December of 2022. Mr. Bradley did not receive her certified Florida convictions until April of *2023*.[20]

Neither the State nor the District Court rebutted the timeliness of the discovery and presentation of this evidence. Neither the State nor the District Court considered that Mr. Bradley has been an indigent defendant during this entire prosecution, from arrest to his post-conviction proceedings.[21] Mr. Bradley is a layman of the law, and his understanding of how and where to investigate for evidence (such as Larck's criminal history), what constitutes admissible evidence and when to present a motion should be viewed in a more lenient fashion because of his indigency. *See* La. C.Cr.P. § 930.8(A)(1); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Dioguardi v. Durning*, 139 F.2d 774 (CA2 1944)).

But even more to the point, the Fifth Circuit has specifically held that when there are questions as to diligence when a petitioner presents potentially meritorious claims in an APCR, the

---

[19] Ms. Smith was living in Florida at the time.

[20] Mr. Bradley still awaits the North Carolina convictions that occurred prior to trial. A subpoena was submitted for the District Court's signature, but it has yet to be executed.

[21] The State may mention the APCR that Mr. Bradley filed relating to his 11-1 verdict. In that APCR, like the present APCR, Mr. Bradley was represented by pro bono counsel.

District Court must conduct a hearing. In *Williams v. Cain*, which is directly on point to Mr. Bradley's case, this Court held:

> First, our review reveals that while relator has had a direct appeal to this Court and a previous application for post-conviction relief, relator has never raised the *Brady* issue that he now raises. *See State v. Frederick L. Condley, Kendrick Williams*, 04-1349 (La. App. 5 Cir. 5/31/05), 904 So.2d 881; and, *Kendrick Williams v. Burl Cain*, 07-610 (La. App. 5 Cir.8/13/07) (unpublished writ). Accordingly, we find that relator's current application for post-conviction relief is not successive in violation of La. C.Cr.P. art. 930.4.
>
> Second, although the trial court correctly found that more than two years had passed since the date relator's conviction and sentence became final, the trial court erred in finding that none of the exceptions to this two-year time applied without first hold a hearing.
>
> La. C.C.P. art. 930.8's two-year time bar will not apply if the relator's application for post-conviction relief "alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his attorney." La. C.Cr.P. art. 930.8; *State v. Jarrow*, 03-0846 (La. App. 4 Cir. 9/10/03), 857 So. 2d 12, 14. The trial court must hold a hearing to determine whether this exception to the time bar applies when "there are **questions of fact** which cannot properly be resolved pursuant to Articles 928 and 929" of the Louisiana Code of Criminal Procedure.

*Williams v. Cain*, 2014 La . App. LEXIS 3210, *2-4 (emphasis added).

The *Williams* decision aligns with the requirement pursuant to La. C.C.P. art. 930.4, which requires the District Court to do the following if, like in the case at bar, the court is considering denying the entire application on procedural bars:

> If the court considers dismissing an application for failure of the petitioner to raise the claim in the proceedings leading to conviction, failure to urge the claim on appeal, or failure to include the claim in a prior application, the court shall order the petitioner to state reasons for his failure. If the court finds that the failure was excusable, it shall consider the merits of the claim.

La. C.Cr.P. Art. 930.4(F).

Here, Mr. Bradley has never been able to make the claims of newly discovered evidence, ineffective assistance of counsel, fraud upon the court, and *Brady* violations because he has never had this evidence. The evidence he presented clearly presented questions of fact that the District Court should have considered.

As such, the lower court erred when it summarily denied Mr. Bradley's application.

**<u>ASSIGNMENT OF ERROR 4</u>: THE DISTRICT COURT AND FIFTH CIRCUIT ERRED WHEN IT DID NOT GRANT MR. BRADLEY'S APCR ON THE RECORD BEFORE IT WHEN THE STATE FAILED TO DISPUTE THE DOCUMENTARY CERTIFIED RECORDS THAT SUPPORTED MR. BRADLEY'S CLAIMS THAT A *BRADY* VIOLATION AND A FRAUD UPON THE COURT OCCURRED.**

Here, Mr. Bradley confirmed that Larck had several convictions that she served **prison time** for in the State of Florida and was on probation in Florida when she was arrested in Louisiana and testified in the case at bar. <u>See</u> Exhibit N of Bradley's APCR (Exhibit A); Exhibit A of Bradley's

May 10, 2023 Reply (Exhibit H).[22] None of these records were turned over. The State actually, in its supplemental response/objections to Mr. Bradley's PCR (Exhibit G), cited the trial testimony from Amy Larck **that supports Mr. Bradley's contention that there was an egregious *Brady* violation here.** Larck was clear; she had no convictions prior to her arrival in Louisiana. Larck also never testified that, at the time of trial, she had absconded from probation in the State of Florida based upon her child neglect conviction.

As shown by the State's quotes of Larck's testimony, the trial prosecutor actually pulled out of Larck that she arrived in Louisiana from Illinois and that she was a telemarketer prior to this case. Larck's trial testimony painted a picture that she was a tax paying civilian prior to July 6, 1999, which was her first arrest in Louisiana. Defense counsel, a highly experienced attorney, for Bradley failed to cross her on any of the convictions from Florida that proceeded this case or regarding the fact that she was on probation. [23]

The Supreme Court has already been very clear that impeachment material that was not turned over is a *Brady* violation warranting a new trial. *Wearry v. Cain*, 136 S. Ct. 1002, 1006-07 (2016) (A case stemming out of Louisiana, the United States Supreme Court found a *Brady* violation where prosecutor failed to disclose impeachment evidence concerning the witness who provided "the only evidence directly tying [Wearry] to [the] crime" of which he was convicted, even though other impeachment evidence was available); *Smith v. Cain*, 565 U.S. 73, 75-76 (2012) (A case stemming out of Louisiana, the United States Supreme Court found a Brady violation occurred where impeachment evidence was withheld concerning the only eyewitness to the crime); *see generally Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (summarizing the *Brady* standard); *Banks v. Dretke*, 540 U.S. 668, 698-99 (2004) (same).

Specifically, the Louisiana Supreme Court has held that when impeachment material related to a witness, especially the lone witness like Amy Larck in this case, is not turned over, a new trial is warranted. *See generally State v. Bright*, 875 So. 2d 37 (La. 2004). The *Bright* court held:

> When the State's case hinges on the testimony of one eyewitness, the *Brady* violation looms larger.
>
> *State v. Bright*, 875 So. 2d 37 at 43-44.

Here, Amy Larck was the sole piece of evidence used to convict Bradley. There was no physical evidence or otherwise that connected him to the crime. The State presented Larck as an

[22] *See* Cycles 4-7. Larck was extradited from Louisiana to Florida because she fled from probation that stemmed from her neglect of a child conviction that occurred in 1996.

[23] Also, interesting to note is the fact that Larck's criminal history would have warranted a higher sentence on her guilty pleas.

open book, revealing all of her "sins", completely forthright that she only began to have a criminal career when she was sucked into the criminal element when she arrived in Louisiana. This was just not true, and the State knew it.[24]

Not only did the State commit a *Brady* violation, but the State also allowed Ms. Larck to testify falsely regarding her criminal history and omit the fact that Ms. Larck faced a probation violation due to her rearrest and flight from probation in the State of Florida. A prosecutor has a duty of fairness to the accused and candor to the court. The prosecutor has an obligation to correct false or mistaken testimony by one of his or her witnesses. The "Supreme Court has made clear that prejudice is readily shown in such cases [wherein the prosecutor allowed a witness to testify falsely], and the conviction must be set aside unless there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2002) (*citing United States v. Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972); *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (citing *Agurs* and adding that the Supreme Court cases mean that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" (quotation marks omitted)).

This Court should vacate Mr. Bradley's conviction just based on the fact that the State allowed Ms. Larck to testify falsely about her criminal history and the potential jail exposure that she was facing which went directly to her character and credibility as a witness.

The fact of the matter is that Amy Larck, by July 6, 1999, was a career criminal – a child abuser, prostitute, and thief. She also fled from the State of Florida when she was on probation.[25] What would a jury do now having heard that Larck was lying so substantially about her criminal history and had additional liability hanging over her head from the State of Florida based upon the felony probation violation? The prejudice that Bradley faced in this regard was significant – at least one of the jurors did not believe Ms. Larck.[26] Any amount of impeachment material would have swung the needle in a case wherein there was no evidence that connected Bradley to the murder

[24] By the point of Ms. Larck's testimony, she had been incarcerated for a significant amount of time. She had been fingerprinted and her background would have been checked; the prosecutors would have also known that she was on probation in Florida and violated that probation by her rearrest in Louisiana. Apparently, the State of Florida was aware that she was a fugitive from the state, as there seems to be a warrant for her arrest that was generated on July 17, 2000. The State had this criminal history but just did not disclose it.

[25] Interestingly, when Larck was returned to Florida in August of 2005, she was arrested again in December of 2005 for possession of drugs facing up to 5 years in prison. *See* Exhibit A of Exhibit H; *see also* Florida Statute 893.13. 6A (makes it a third-degree felony to possess a controlled substance. A third-degree felony is punishable by up to five years in prison and a fine of $5,000). Larck ended up only serving two months in jail for everything.

[26] This Court should remember that Mr. Bradley's first trial ended up in a 6-6 mistrial. Larck didn't just lie once, she lied twice.

other than Larck. *See Bright, supra.*; *Wearry, supra.*; *Smith, supra.* But under *Agurs* and its progeny, reversal is required because there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." On these points alone, Bradley deserves a new trial.

As previously stated, the Petitioner submits that no hearing is necessary to grant this motion.

## CONCLUSION

**WHEREFORE,** in light of the foregoing, this Court should either order a new trial or remand this matter for a hearing or grant such other and further relief to petitioner as it may deem just and proper.

**Dated: October 5, 2023**
**Metairie, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

Walker Lasiter
P. Walker Lasiter, Bar Roll # 38102
4412 Trenton Street
Metairie, LA 70006

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

# VERIFICATION

I P. Walker Lasiter, do hereby verify that the allegations contained in the foregoing Application for Writ of Review are true and correct to the best of my knowledge, information, and belief. I further certify that a copy of this application has been served upon the Clerk of the Court of the 5th Circuit Court of Appeal, 101 Derbigny St, Gretna, LA 70053; and opposing counsel, the Jefferson Parish District Attorney's Office, 200 Derbigny Street, Gretna, Louisiana, 70053, this 5th day of October, 2023.

Walker Lasiter
P. Walker Lasiter, Esq.

| | |
|---|---|
| STATE OF LOUISIANA | NO. 23-KH-377 |
| VERSUS | FIFTH CIRCUIT |
| EARL BRADLEY | COURT OF APPEAL |
| | STATE OF LOUISIANA |

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS
Wiseman
Linda Wiseman
First Deputy, Clerk of Court

September 06, 2023

Linda Wiseman
First Deputy Clerk

**IN RE** EARL BRADLEY

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE DANYELLE M. TAYLOR, DIVISION "O", NUMBER 99-5825

Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and Stephen J. Windhorst

**WRIT DENIED**

Relator, Earl Bradley, files the present writ application seeking review of the trial court's May 31, 2023 denial of his December 28, 2022 Application for Post-Conviction Relief (APCR).

*Facts and Procedural History*

On October 28, 1999, a Jefferson Parish Grand Jury returned an indictment against relator, Earl Bradley, for the second-degree murder of Barton Sanford in violation of La. R.S. 14:30.1. Mr. Sanford's body was found on August 1, 1999, near the Happy Hour Saloon in Marrero. An investigation conducted by the Jefferson Parish Sheriff's Office resulted in the development of relator and his co-defendant, Albert Russell, as suspects. An eyewitness, Amy Larck, testified at trial for the prosecution and identified relator as the shooter. Ms. Larck also admitted on cross examination that she was a drug addict who supported her habit by prostitution.



EXHIBIT A

On June 13, 2002, a jury found relator guilty of second-degree murder. The trial court sentenced relator to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This Court affirmed relator's conviction and sentence, and the Louisiana Supreme Court denied relator's writ application. *State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80,[1] *writ denied*, 03-2745 (La. 2/13/04), 867 So.2d 688. Relator subsequently filed APCRs in the trial court in February 2005, May 2008, July 2008, and May 2021, all of which were denied. *See also State ex rel. Bradley v. State*, 08-1951 (La. 1/30/09), 999 So.2d 750.[2]

On December 28, 2022, relator filed a counseled APCR raising a claim of factual innocence pursuant to La. C.Cr.P. art. 926.2.[3] In support of his claim, relator submitted an affidavit from Mae Rivet Smith, who stated that when she heard a gunshot during the time frame of the instant offense, she saw relator, and he did not have a gun. Relator also submitted an affidavit from Terri-Lee Isaac, which purported to include admissions of perjury from the State's sole eyewitness, Amy Larck. Relator further alleged that the State withheld impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), based on the State's failure to disclose Larck's entire criminal record. Relator also contended that the State elicited false testimony from Larck in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Finally, relator argued that trial counsel rendered ineffective assistance by failing to call Mae Rivet Smith as a witness.

---

[1] On appeal, relator raised two assignments of error: (1) insufficient evidence, and (2) involuntary statement. *Bradley*, 03-384, 858 So.2d at 84-88.

[2] In *State ex rel. Bradley*, 08-1951, *supra*, the Supreme Court denied relator's writ application stating: "Petitioner fails to show that he filed an application for post-conviction relief that was denied in an order that did not conform to the requirements of La. Const. art. V section 8(B). La. C.Cr.P. art. 930.2; *cf. State v. Cordero, 08-1717 (La. 10/3/08), 993 So.2d 203.*"

[3] La. C.Cr.P. art. 926.2, effective August 1, 2021, provides for a freestanding claim of factual innocence not based on DNA evidence.

On March 3, 2023, the State filed its procedural objections, arguing that relator's evidence in support of his factual innocence claim failed to meet the criteria set forth in La. C.Cr.P. art. 926.2. The State also argued that relator's claims of a *Brady* violation, perjured testimony, and ineffective assistance of counsel were procedurally barred as untimely and successive.

Relator filed an opposition to the State's procedural objections arguing that his application rested on newly discovered evidence, including an affidavit from his former co-defendant Russell, who now denies being at the Happy Hour Saloon on the evening of the incident. The State then filed a response to relator's opposition, re-urging its procedural objections but also addressing the merits of relator's *Brady* and perjured-testimony claims. According to the State, relator was aware of Larck's Louisiana criminal record at trial, and relator referred to Larck's criminal record and her allegedly untruthful testimony in his 2005 APCR. Relator replied to the State's response with documentation of Larck's criminal records obtained from Florida and North Carolina.

On May 31, 2023, the trial court denied relator's APCR, first summarizing relator's factual innocence evidence:

> Petitioner's evidence presented includes affidavits of Teri-Lee Isaac and Mae Lucelle Rivet Smith, which are recantations of sworn testimony. He also includes an affidavit of his co-defendant, Albert Russell. He submits "corroborating evidence" of handwritten letters to petitioner and Facebook messenger communications. He also claims that newly discovered evidence includes criminal history of Larck, and discovery of past misconduct of Det. Grey Thurman. Petitioner also relies on video evidence from the night of the murder, the Sheriff's supplemental report, and time of death given from Dr. Garcia.

The trial court found that relator "fail[ed] to present any evidence in support of his claim which meets the necessary criteria" set out in the factual innocence statute. The trial court further found that relator's claims of a *Brady* violation, perjured

testimony, and ineffective assistance of counsel were untimely,[4] noting that "the 'grace period' provided in La. C.Cr.P. art. 926.2(A) only applies to 'factual innocence' claims, and not to any claim 'bootstrapped' thereto." The trial court further found that relator's *Brady* and perjured-testimony claims were successive under La. C.Cr.P. art. 930.4(D) and/or (E).[5]

On June 14, 2023, relator filed a Motion to Reconsider, asserting that the trial court failed to consider his May 10, 2023 reply to the State's response. Relator also argued that the trial court made "erroneous findings of fact" and challenged the court's "misapplication of newly discovered evidence."

The trial court denied relator's Motion to Reconsider on June 21, 2023, noting first that the post-conviction statutes did not provide for the filing of such a motion. But in an abundance of caution, the court also addressed the motion, again stating that the affidavits provided in support of relator's factual innocence claim were "purely testimonial" and "not corroborated by any new evidence that is scientific, forensic, physical, or nontestimonial documentary evidence as per La. C.Cr.P. art. 926.2(B)(l)(a)(ii)," thus failing to meet the necessary burden. The trial court further stated:

> As to petitioner's claim regarding the alleged *Brady* violation and Larck's criminal history, this claim involving impeachment evidence does not in any way relate to or support petitioner's factual innocence claim permitted by La. C.Cr.P. art. 926.2. As this court ruled, the "grace period" provided in La. C.Cr.P. art. 926.2(A) only applies to "factual innocence" claims, and not to any claim "bootstrapped" thereto. Furthermore, the issue concerning Larck's credibility was addressed/litigated on direct appeal … and her credibility/criminal history was litigated in petitioner's 2005 APCR. In denying petitioner's APCR on May 31, 2023, the court ruled that the issues

---

[4] *See* La. C.Cr.P. art. 930.8(A), which provides, in pertinent part: "No application for post-conviction relief including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final."

[5] La. C.Cr.P. art. 930.4(D) provides: "A successive application shall be dismissed if it fails to raise a new or different claim." La. C.Cr.P. art. 930.4(E) provides: "A successive application shall be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application."

> surrounding this claim are procedurally barred from review at this time as they are untimely under La. C.Cr.P. art. 930.8. Thus, the court will not address the merits at this time.

The court reiterated its earlier finding that relator's *Brady* claim was successive and further stated that the arguments contained in relator's May 10, 2023 reply to the State's response were "ultimately untimely, successive, and not pertinent to the factual innocence claim."

Relator, through counsel, now timely seeks review of the trial court's ruling. In his writ application, relator re-urges his claims of factual innocence, a *Brady* violation, perjured testimony, and ineffective assistance of counsel. Relator also argues that the trial court erred in failing to conduct an evidentiary hearing.

*Analysis*

Relator's claims of factual innocence are based on three affidavits that he contends are corroborated by physical and medical evidence. According to Terri Lee Isaac's December 22, 2022 affidavit, in 2005, she was "introduced" to relator, who showed her letters that relator had received from Amy Larck in which Larck expressed "remorse for lying on the stand at his trial." Isaac stated that in September of 2013, she exchanged Facebook messages with Larck, who indicated that she wanted to help relator "be released from prison," but Isaac's correspondence ended when Larck requested monetary compensation.

Next, Mae Rivet Smith's June 10, 2022 affidavit indicated that she had known relator for more than 24 years and that she was a frequent patron of the Happy Hour Saloon. Smith stated that on the night of July 30, 1999, she was standing at the door of the bar when she saw relator in the alleyway and was waving to him as shots "rang out" from a side street. According to Smith, relator did not have a gun in his hand. Smith also stated that she did not see the victim's body behind the Happy Hour Saloon until the afternoon of August 1, 1999. Smith

further claimed that neither Larck nor Albert Russell were at the Happy Hour Saloon that weekend. Third, in a February 28, 2023 affidavit from co-defendant Albert Russell, he now denies being at the Happy Hour Saloon "at the time the murder happened."

La. C.Cr.P. art. 926.2 provides in pertinent part:

> A. A petitioner who has been convicted of an offense may seek post conviction relief on the grounds that he is factually innocent of the offense for which he was convicted. A petitioner's first claim of factual innocence pursuant to this Article that would otherwise be barred from review on the merits by the time limitation provided in Article 930.8 or the procedural objections provided in Article 930.4 shall not be barred if the claim is contained in an application for post conviction relief filed on or before December 31, 2022, and if the petitioner was convicted after a trial completed to verdict. This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner....
>
> B. (1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:
>
> (i) Scientific, forensic, physical, or nontestimonial documentary evidence.
>
> (ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.
>
> (b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

In this case, relator was "convicted after a trial completed to verdict" and filed his APCR with the district court on December 28, 2022, meeting the initial

requirements of La. C.Cr.P. art. 926.2(A). However, Relator's affidavit evidence fails to meet the requirements of La. C.Cr.P. art. 926.2(B). Isaac's affidavit does not withstand scrutiny under La. C.Cr.P. art. 926.2's requirement that such evidence be corroborated by "scientific, forensic, physical, or non-testimonial documentary evidence," given relator's reliance on Larck's alleged recantation (made in Facebook messages) and Larck's handwritten letters to relator as corroborating evidence.[6] Relator also offered no proof of authenticity as to the Facebook messages or letters that he submitted, such as an affidavit from Larck herself confirming the statements made in them. *See* La. C.Cr.P. art. 930.2. A recantation also does not qualify as corroborating evidence under La. C.Cr.P. art. 926.2(B)(l)(a), as it is testimonial.[7]

Mae Rivet Smith's affidavit also falls short. Smith stated that she was homeless at the time of the incident and that she had been at the Happy Hour Saloon for almost the entire weekend, but that she frequently went to the alley. She stated that she did not see the victim in the alleyway behind the Happy Hour Saloon at the time of the shooting, but she saw relator enter the alleyway and that they waved to one another. While waving at each other, they heard shots ring out somewhere beyond the alley, possibly on a side street. Smith's affidavit states that she had known the victim, knew Amy Larck, and knew Albert Russell, and that neither Larck nor Russell was at the Happy Hour Saloon that weekend. Smith also contends that she had "always been willing to testify" but that "no one ever asked [her] to testify."

---

[6] Furthermore, conflicting statements in Isaac's affidavit and her Facebook messages with Larck cast doubt on the reliability of Isaac's affidavit, in which she stated that she was "introduced" to relator in 2005, but in her Facebook message to Larck, she described herself as relator's fiancée and further claimed that she met him in 2006.

[7] La. C.Cr.P. art. 926.2(B)(2) provides that "[a] recantation of prior sworn testimony may be considered if corroborated by the evidence required by Subsubparagraph (1)(a) of this Paragraph. However, a recantation of prior sworn testimony cannot form the sole basis for relief pursuant to this Article."

The defense did in fact attempt to call Smith as a witness at trial, but efforts to subpoena her were unsuccessful. Additionally, relator submitted two letters from Smith as part of his ineffective assistance of counsel claim in his 2005 APCR. In the letters, Smith explained that she never received notice to appear at his trial because his attorney was not given her correct name. Smith also stated that she knew relator "didn't do it."[8] Smith's 2022 affidavit, like the other testimonial evidence, does not satisfy the criteria of La. C.Cr.P. art. 926.2(B)(l)(a), as it provides no new evidence and was known/discoverable prior to trial.

Even if Smith's affidavit provided "new" evidence, however, La. C.Cr.P. art. 926.2(B)(l)(a)(ii) requires that the testimonial evidence relied upon in support of a factual innocence claim must be corroborated by "scientific, forensic, physical, or nontestimonial documentary evidence" under La. C.Cr.P. art. 926.2(B)(l)(a)(i). Here, the corroborating evidence submitted by relator includes surveillance-video footage, testimony from the forensic pathologist as to the time of death, the supplemental police report, and evidence of Detective Thurman's history of suppressing exculpatory evidence, none of which constitute sufficient corroborating evidence.

The supplemental police report indicates that the surveillance video "revealed the victim's contact with a black male patron, identified as Earl Bradley, in the front area of the Happy Hour Saloon shortly after his arrival." The supplemental police report further contains a summary of relator's statement, as follows: "[A]fter viewing relevant segments of the video surveillance tapes, Bradley conceded having known the victim and having contact with the victim on that night. Additionally, Bradley acknowledged there [sic] contact might have been construed by others as confrontational, which was substantiated." Smith's 2022

[8] The trial court denied relator's APCR on February 1, 2005. Relator did not seek review of that ruling in this Court.

affidavit contradicts her statements to police as described in the supplemental police report, which do not mention gunshots or relator's presence at the Happy Hour Saloon. The forensic pathologist's testimony as to the time of the victim's death, which relator contends conflicts with Larck's testimony, also fails to constitute corroborative evidence for Smith's affidavit under La. C.Cr.P. art. 926.2(B)(l)(a)(ii).

Relator's inclusion of an unrelated 2012 civil rights action that was not filed by relator, but which contains allegations of police misconduct committed by Detective Thurman, among others, also has no bearing on relator's case where relator presents no evidence of such misconduct during the instant investigation. *See* La. C.Cr.P. art. 930.2.

Finally, relator has not shown how Albert Russell's affidavit, which denies any involvement in the instant offense, supports relator's claim of factual innocence, as there is no mention of relator in the affidavit. *See* La. C.Cr.P. art. 930.2. In short, relator's factual innocence claim falls short of the requirements set forth in La. C.Cr.P. art. 926.2. Consequently, relator's claim, which lacks support as a claim of factual innocence, is untimely given that relator's conviction and sentence became final in 2004.[9] *See* La. C.Cr.P. art. 930.8(A) ("No application for post-conviction relief including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final.").

Relator next argues that the trial court erred in finding that his *Brady* claim was procedurally barred as untimely and repetitive. According to relator, the State failed to disclose Larck's entire criminal record to the defense. In support, relator submitted Larck's criminal history provided by the Florida Department of Law

[9] *State v. Bradley*, 03-2745 (La. 2/13/04), 867 So.2d 688.

Enforcement in response to relator's April 4, 2023 request for a background check on Larck. Relator also submitted a LexisNexis report, which included Larck's North Carolina simple assault conviction.[10]

Relator's conviction and sentence became final in 2004. As such, relator's December 28, 2022 APCR appears untimely under La. C.Cr.P. art. 930.8. Relator also raised issues about Larck's credibility with respect to her Louisiana criminal record, as well an alleged deal offered to Larck that relator claimed the State failed to disclose, on appeal and in his 2005 APCR.

On appeal, this Court addressed relator's claim that Larck's testimony was further discredited by the deal that she received in exchange for her testimony, stating:

> Bradley notes that Larck had previously pled guilty to several felonies for which she received concurrent five-year sentences on each of the charges and was not billed as a habitual offender. However, Larck denied the existence of any plea agreement and further testified that she had been sentenced prior to testifying.
>
> Even if a deal had been made, a conviction may be based on testimony of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face. *United States v. Osum,* 943 F.2d 1394, 1405 (5th Cir.1991); *State v. Neal,* 00-674 (La .6/29/01), 796 So.2d 649, 659, *cert. denied,* 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed. 231 (2002). In the instant case, Larck's testimony was not incredible or insubstantial and, therefore, the existence of a deal or a lighter sentence than she would have received had she been billed as multiple offender did not undermine the reliability of her testimony.

*Bradley*, 858 So.2d at 85.

In relator's 2005 APCR, he argued that counsel rendered ineffective assistance by failing to investigate Larck and failing to challenge her testimony based on her "extensive criminal background" and her favorable treatment by the

[10] Relator states that he is still waiting for official confirmation of Larck's North Carolina convictions.

State. The trial court found that this claim had no merit, noting that this Court had determined on appeal that “the jury heard Larck’s testimony and her reasons for initially lying to investigators, and chose to accept her testimony.”

Relator’s current *Brady* claim asserts newly discovered evidence under La. C.Cr.P. art. 930.8(A)(1), which allows a defendant to file an APCR more than two years after his conviction and sentence become final, if “[t]he application alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his prior attorneys.” Here, relator maintains that he recently discovered Larck’s undisclosed out-of-state criminal record that reveals a prior conviction for simple assault in North Carolina, prior convictions for prostitution and child abuse in Florida, and evidence that Larck was on probation for the child abuse conviction at the time of her testimony. Thus, to the extent that relator’s prior claims regarding Larck’s criminal record rested on different grounds than the arguments raised here, La. C.Cr.P. art. 930.4(A) and (D)’s procedural bar arguably does not apply.

In *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97, the United States Supreme Court held that the suppression by the State of evidence favorable to the accused after it receives a request for it violates a defendant’s due process rights where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecutors. *See also State v. Bright*, 02-2793 (La. 5/25/04), 875 So.2d 37, 41-42. The duty to disclose is applicable even where there has been no request by the accused. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The State’s due process duty to disclose applies to both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *State v. Kemp* 00-2228 (La. 10/15/02), 828 So.2d 540, 545. *Brady* also requires the disclosure of evidence concerning a promise of leniency or immunity to a material witness in exchange

for his testimony at trial. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). *See also State ex rel. Guise v. State*, 00-2185 (La. 10/15/02), 828 So.2d 557, 558.

Evidence is "material" under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. A reviewing court determining materiality must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

Discovery violations are not grounds for reversal unless they have actually prejudiced the defendant. *State v. Garrick*, 03-137 (La. 4/14/04), 870 So.2d 990, 993 (*per curiam*); *State v. Strickland*, 398 So.2d 1062, 1067 (La. 1981). Even a discovery violation involving the State's failure to disclose exculpatory evidence does not require reversal under the Due Process Clause "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

During her direct examination, Larck admitted that she frequented the area around the Happy Hour Saloon to engage in prostitution and smoke crack. She further admitted that she was incarcerated for skimming poker machines when she gave her statement to the police. Larck also wore prison garb when testifying at trial, explaining that she was currently incarcerated for three convictions: (1) possession of cocaine with the intent to distribute; (2) crime against nature; and (3) theft of goods in excess of $300. Larck denied that the State offered any deal or

favorable treatment in exchange for her testimony. According to Larck, she received a five-year term for her convictions. Defense counsel thoroughly cross-examined Larck, drawing attention to her prior convictions and suggesting that Larck received a deal given that she faced a possible prison term of 144 years. Counsel also questioned Larck about her crack addiction and how she engaged in prostitution to pay for drugs.

Given these facts, we find that relator's *Brady* claim, alleging that the State failed to disclose Larck's multiple convictions, arises from evidence that would have been cumulative of the evidence already presented at trial. "[W]hen the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996), *cert. denied*, 519 U.S. 1012, 117 S.Ct. 519, 136 L.Ed.2d 407 (1996). *See also United States v. Quintanilla*, 25 F.3d 694, 699 (8th Cir. 1994), *cert. denied sub nom. Torres Velasquez v. United States*, 513 U.S. 978, 115 S.Ct. 457, 130 L.Ed.2d 365 (1994) (no *Brady* violation when the prosecution does not disclose some cumulative evidence, but "substantial" other evidence on the same point does reach the jury). As such, we find no reasonable probability that the evidentiary suppression of Larck's out-of-state convictions served to undermine confidence in the outcome of the trial.

Relator further contends that the State elicited false testimony from Larck in violation of *Napue*, because the State "should have known that Larck, even in her early 20s, was a career criminal, not just in Louisiana but in other states." Relator also points out that when Larck was asked about her "first conviction," she failed to mention her prior convictions in Florida or North Carolina.

To prove a *Napue* claim, a defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. *State v. Broadway*, 96-2659 (La. 10/19/99), 753 So.2d 801, 814, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562,

146 L.Ed.2d 466 (2000). Fundamental fairness, *i.e.*, due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177.

The State denies a defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *See Giglio*, *supra*; *Napue, supra*. The defendant must show that: (1) the testimony was false, (2) the State knew it was false, and (3) the testimony was material. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). To find a violation of due process, however, the perjury must have been material to relator's conviction. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. at 109-10, 96 S.Ct. at 2400. Perjury is material, and a new trial is required, if "'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Kirkpatrick*, 992 F.2d at 497 (citing *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397 (footnote omitted)); *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766.

As discussed above, because relator's newly discovered evidence of Larck's prior out-of-state convictions is cumulative of Larck's Louisiana convictions to which she admitted at trial while wearing prison garb, it is not likely that evidence of Larck's Florida and North Carolina convictions would have affected the judgment of the jury. Thus, we find relator's *Napue* claim fails.

Relator further contends that counsel rendered ineffective assistance by failing to interview and call Smith as a witness. This claim is time-barred by La. C.Cr.P. art. 930.8, because La. C.Cr.P. art. 930.8(A)(1), which provides for an exception to the time-bar only where "[t]he application alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his prior attorneys," is inapplicable. Defense counsel

attempted to call Smith as a witness at trial but was unable to secure her presence. Furthermore, the claim is repetitive, as relator has previously raised it in his 2005 APCR. *See* La. C.Cr.P. art. 930.4(D).

Lastly, relator complains that the trial court erred in failing to conduct an evidentiary hearing. A trial court may dispose of the petition for relief summarily if the factual and legal issues can be resolved based upon the application and answer, and supporting documents, including relevant transcripts, depositions, and other reliable documents submitted by either party or available to the court. La. C.Cr.P. art. 929(A). Given the factually and legally untenable issues raised in relator's APCR, we find the trial court acted within its discretion in resolving relator's claims without conducting an evidentiary hearing. *State ex rel. Tassin v. Whitley*, 602 So.2d 721, 722 (La. 1992).

For the foregoing reasons, relator's writ application is denied.

Gretna, Louisiana, this 6th day of September, 2023.

**SMC**
**MEJ**
**SJW**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **09/06/2023** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

# 23-KH-377

**E-NOTIFIED**

24th Judicial District Court (Clerk)
Honorable Danyelle M. Taylor (DISTRICT JUDGE)
P. Walker Lasiter (Relator)
Thomas J. Butler (Respondent)
Monique D. Nolan (Respondent)

**MAILED**

Justin C. Bonus (Relator)
Attorney at Law
Manard Law Offices
118-35 Queens Boulevard
Suite 400
Forest Hills, NY 11375

Honorable Paul D. Connick, Jr.
(Respondent)
District Attorney
Twenty-Fourth Judicial District
200 Derbigny Street
Gretna, LA 70053

# LOUISIANA COURT OF APPEAL, FIFTH CIRCUIT

## WRIT APPLICATION INTAKE FORM

**Adopted on 5/23/2014 by Court** *en banc*

*(Auto Generated by eCourt)*

Case Title: **State of Louisiana vs. Earl Bradley**

### EXPEDITED CONSIDERATION

Is Expedited Consideration being requested? **NO** If no, move to District Court Information.

Stay requested at a district Court? **NO** Granted Until ☐ Denied ☐ N/A

Is a Stay Order being requested from the Fifth Circuit? ☐ Yes ☐ No

Case Status: ☐ Pre-Trial ☐ Trial in Progress ☐ Next Hearing or Trial Set

☐ Jury Trial ☐ Bench Trial ☐ Post-Trial

What is the nature of the request for expedited consideration?

### DISTRICT COURT INFORMATION

Case Type (please check all that apply) ☐ Criminal ☐ Civil ☐ Family ☐ Juvenile

Trial Judge: **Danyelle M. Taylor** Date Ruling was Rendered:

Briefly explain purpose of writ: **To challenge the denial of Earl Bradley's Post-Conviction Motion without a hearing.**

### SEALED RECORD INFORMATION

To your knowledge, is any portion of this application under seal by the lower court? **NO**

If yes, please indicate the portion of the record sealed and include the lower court order with the application.

Are you requesting that any portion of this application be sealed? **NO**

If yes, a request for such must be included with the application.

### PRIOR / PENDING CASE INFORMATION

To your knowledge, have there been other filings, appeals/ writ applications in this Court in this matter? **NO**

If yes, please specify:

To your knowledge, are there any appeals or applications for supervisory review related to the present matter currently pending before this court? **NO**

If yes, please specify:

To your knowledge, would any of the matters currently pending in this court impact the current filing or will the current filing impact any of the matters pending? **NO**

If yes, please explain:

To your knowledge, has this pleading been filed simultaneously in any other court? **NO**

If yes, please explain:

I, undersigned counsel, certify that the above information and all the information contained in this application is true and correct to the best of my knowledge and that all relevant pleadings, and rulings, as required by Uniform Rules 4-2, 4-3, 4-4, and 4-5 of the Courts of Appeal are attached to this filing. I further certify that a copy of this application has been mailed or delivered to the respondent judge and to all other counsel and unrepresented parties required by Uniform Rule 4-5. I understand that failure to comply with Uniform Rules 4-2, 4-3, 4-4, and 4-5 may result in the dismissal or denial of my application. I SHALL IMMEDIATELY NOTIFY THE COURT IF THE NEED FOR EXPEDITED CONSIDERATION CHANGES DUE TO SETTLEMENT, CONTINUANCE OR ANY OTHER CIRCUMSTANCE. FAILURE TO NOTIFY THE COURT MAY SUBJECT ME TO PUNISHMENT FOR CONTEMPT OF AUTHORITY OF THE COURT. I further understand that this form will include the date and time the Writ Application was submitted. My email address will serve as my signature on the form.

| **8/2/2023 3:58:48PM** | **Peyton Lasiter [#38102] walker@wmanard.com** | **(O): 5045857777 (M): 5043887769** |
|---|---|---|
| Date | Signature / Bar Roll No. | Best Contact No. |



**EXHIBIT B**

LEGEND:
ROYAL BLUE – ALL PLEADINGS, MOTIONS, JURY CHARGES, AND QUESTIONS
RED – ALL COURT RULINGS, JUDGMENTS, VERDICT SHEET, PROTECTIVE ORDER
BLACK – MINUTES, POLLING SLIPS, MOTION TO SEAL, WARRANT OF ARREST
ORANGE – EXHIBITS/DOCUMENTARY EVIDENCE
AQUA – COVER PAGE FOR HEARINGS AND TRIAL TRANSCRIPTS

IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUSIANA

No.

---

STATE OF LOUISIANA
Respondent

Versus

EARL BRADLEY
Relator

---

**APPLICATION FOR SUPERVISORY WRITS OF PROHIBITION, MANDAMUS, AND CERTIORI FROM THE RULING OF THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, NO. 99-5825, DIVISION "O" THE HONORABLE DANYELLE M. TAYLOR.**

---

**ORIGNIAL APPLICATION ON BEHALF EARL BRADLEY, RELATOR**

---

Respectfully Submitted,
MANARD LAW OFFICES

P. Walker Lassiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii
PRELIMINARY STATEMENT ........ 1-10
STATEMENT OF JURISDICTION ........ 10
STATEMENT OF FACTS ........ 10-13
LIST OF THE EVIDENCE DISCOVERED SINCE TRIAL ........ 13-14
QUESTIONS PRESENTED ........ 14
ARGUMENT ........ 14-23
ASSIGNMENT OF ERROR 1 ........ 14-16
ASSIGNMENT OF ERROR 2 ........ 16-19
ASSIGNMENT OF ERROR 3 ........ 19-21
ASSIGNMENT OF ERROR 4 ........ 21-23
CONCLUSION ........ 23
VERIFICATION ........ 25
WRIT EXHIBITS:

1. Exhibit A: Bradley APCR filed December 28, 2022
2. Exhibit B: District Court's Order dated February 1, 2023
3. Exhibit C: State's Procedural Objections dated March 3, 2023
4. Exhibit D: State's Supplementary Procedural Objections dated March 8, 2023
5. Exhibit E: Bradley's Opposition to Procedural Objections dated March 31, 2023
6. Exhibit F: Bradley's Supplemental APCR dated March 31, 2023
7. Exhibit G: State's Response to Mr. Bradley's Opposition to Procedural Objections dated May 3, 2023
8. Exhibit H: Bradley's Reply to the State's Response dated May 10, 2023
9. Exhibit I: District Court's Order dated May 31, 2023
10. Exhibit J: Bradley's motion to reconsider dated June 14, 2023
11. Exhibit K: Notice of Intent to file a Writ dated June 14, 2023
12. Exhibit L: District Court Order (Re Reconsideration) dated June 21, 2023
13. Exhibit M: Order setting a return date for Writ dated June 21, 2023
14. Exhibit N: Order extending return date dated July 7, 2023.

Table of Authorities

*Alvarez v. State*, 2018 WL 4354727 (La. App. 2018) ......................................16

*Banks v. Dretke*, 540 U.S. 668 (2004) ...............................................................22

*Cone v. Bell*, 556 U.S. 449 (2009) ..................................................................... 22

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ............................................... 12

*Haines v. Kerner*, 404 U.S. 519 (1972) ...........................................................20

*House v. Bell*, 547 U.S. 518 (2006) .......................................................... 17, 19

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................................... 3

*In re Davis*, 557 U.S. 952 (2009) .......................................................................10

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) ........................................10, 18, 19

*Murray v. Carrier*, 477 U.S. 478 (1986) .............................................................18

*Schlup v. Delo*, 513 U.S. 298 (1995)… ...................................................... 18, 19

*State v. Bright*, 875 So. 2d 37 (La. 2004) ..............................................17, 22, 23

*State v. Lang*, 128 So.3d 330 (La.app. 5 Cir 10/9/2013) ..................................17

*Shih Wei Su v. Filion*, 335 F.3d 119 (2d Cir. 2002) ..........................................22

*Smith v. Cain*, 565 U.S. 73 (2012) ................................................................21, 23

*State v. Bradley*, 858 So. 2d 80 ........................................................ 2, 3, 6, 10, 12

*State v. Cavalier*, 701 So. 2d 949 (La. 1997) .....................................................15

*State v. Davis*, 295 So. 3d 396 (La. 2020) .............................................................8

*State v. Frederick L. Condley, Kendrick Williams*, 04-1349 (La. App. 5 Cir. 5/31/05) ............................................................................................................. 20

*State v. Hammons*, 597 So. 2d 990(La. 1992) ................................................. 5, 6

*State v. Heath*, 513 So.2d 493 .................................................................................4

*State v. Hurst*, 209 So. 3d 701 (La. 2015) ..........................................................16

*State v. Kang*, 2019 WL 150635 (La. App. 2019) ............................................. 16

*State v. Pierre*, 125 So. 3d 403 (2013) ................................................................18

*State v. Raine*, 238 So.3d 1076 ..............................................................................4

*State v. Trosclair*, 443 So. 1098 (La. 1983) ..................................................... 4, 5

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ...................................................... 21, 23

*Williams v. Cain*, 2014 La. App. LEXIS 3210 ...................................... 16, 19, 20

Statutes

§ 926.2……………………………………..……………1, 9, 14, 15, 16, 17, 18

§ 930(A)… ........................................................................................................2, 14

§ 930.4……………………………………………..1, 2, 9, 14, 15, 16, 18, 19

§ 930.8……………………………..…………………….……….9, 15, 19

Florida Statute 893.13. 6A .................................................................................... 23

Louisiana Constitution, Article 5, Section 10(A)...............................................10

<u>Secondary Sources</u>

Gross et al., 95 *J. Crim. L. and Criminology* at 544............................................4

IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUSIANA

No.

STATE OF LOUISIANA
Respondent

Versus

EARL BRADLEY
Relator

**APPLICATION FOR SUPERVISORY WRITS OF PROHIBITION, MANDAMUS, AND CERTIORI FROM THE RULING OF THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, NO. 99-5825, DIVISION "O" THE HONORABLE DANYELLE M. TAYLOR.**

**ORIGNIAL APPLICATION ON BEHALF EARL BRADLEY, RELATOR**

## PRELIMINARY STATEMENT

Mr. Bradley submitted an application for post-conviction relief (herein referred to as "APCR") before the District Court. Without a hearing and merely upon procedural bars, the District Court summarily denied his motion. Withing Mr. Bradley's APCR, which included a supplement application, Mr. Bradley attached new evidence that the jury never heard in the form of affidavits from an eyewitness, Mae Rivet Smith, his co-defendant, Albert Russell, and Terri-Lee Isaac, detailing Amy Larck's admissions of perjury, and criminal convictions that were never disclosed regarding the lone witness that testified against Mr. Bradley, Amy Larck. Additionally in support of the testimonial evidence presented, Bradley submitted a supplemental police report, surveillance footage, and medical evidence that all supported his innocence. In the face of this evidence, the hearing court found, without a hearing, that Mr. Bradley failed to meet the requirements of La.C.Cr.P. § 926.2, and that Mr. Bradley was procedurally barred in all other claims pursuant to La.C.Cr.P. § 930.4(D) & (E).

Here, Mr. Bradley met the requirements of La.C.Cr.P. § 926.2 and, for the underlying

constitutional and newly discovered evidence claims, met the exception pursuant to La.C.Cr.P. § 930.8(A)(1). Moreover, the hearing court failed to render an order demanding Mr. Bradley explain any failure under the due diligence requirement pursuant to La.C.Cr.P. § 930.4(F). This lower court's failure to do so was an abuse of discretion and a violation of Mr. Bradley's right to due process as there were questions of law and fact that needed to be addressed on the merits. La.C.Cr.P. § 930(A).

Earl Bradley was accused and convicted of killing Barton Sanford during the early morning hours of July 31, 1999. Investigators believed that time to be 1:30AM.[1] *See* Exhibit A of Mr. Bradley's APCR – Jefferson Parish Sheriff's Department's Supplemental Report, pg. 1; *see also* 6/12/1999 TT: 84, 88-100, 129-133.[2] The basis of the investigators' belief of the time, way, and who killed Sanford was the video time stamp at 1:25AM depicting Barton Sanford walking into the alleyway where he was found and Amy Larck's varying and plainly inconsistent statements to police. *See* Exhibit B of APCR – Video of the Alley behind the Happy Hour Bar on July 31, 1999, beginning at approximately 1AM; *see also* Amy Larck's trial testimony; *see also* *State v. Bradley*, 858 So. 2d 80, 86 (La.App. 5 Cir. 09/16/03).[3] It is undisputed by all parties that Barton Sanford was found in the alley behind the Happy Hour Bar with one gunshot wound to the chest.

Larck was the only alleged "eyewitness". In fact, Larck was the only person out of the many that were interviewed in this case that stated the Earl Bradley killed Mr. Sanford. Larck stated that, during the early morning hours of July 31, 1999, first Barton Sanford and then she went into the back alley of the Happy Hour Bar so that she could perform a sexual favor on Sanford. *See* 6/12/1999 TT: 84, 88-100, 129-133. Larck testified that shortly after Larck and Sanford entered the alley, which is where Sanford was found shot in the chest, Bradley and his co-defendant, Albert Russel, entered the alley. Larck saw Bradley with a gun, quickly left and

[1] However, as seen below, this time frame is disputed by the medical examiner who testified.

[2] The trial transcript will be delineated by the date of the testimony and "TT:" followed by the page number(s).

[3] Significantly, neither Amy Larck nor Det. Donald Meunier were impeached using the video submitted to the hearing court or Det. Meunier's supplemental report that details the investigators' findings regarding the video in reference to who entered and exited the alley from the late-night hours of July 30, 1999, until roughly August 1, 1999, when the body was found. Astoundingly, Larck was never confronted with what she now admits – that the reason why she is not on any of the surveillance footage is because she was not at the Happy Hour Bar the weekend beginning on July 30, 1999. Disturbingly, the trial prosecutor misrepresented the video evidence in the case at bar, merely presenting to the jury during summation that Sanford walked into the alley as Larck testified. 6/13/2002 TT: 130-134. Yet, the prosecutor failed to mention that neither Larck, Bradley, nor Russell were seen leaving that alleyway after Sanford entered it. *Id*. The failure to alert the jury to this fact was both the product of prosecutorial misconduct and ineffective assistance of counsel.

heard one gunshot as she ran out of the alley across Jung Blvd through the gas station parking lot. *See Id.*; *see also* Exhibit C of APCR – Sketch of the scene.

The problem for both the State and Amy Larck is that Mr. Bradley has the video of the entrance to the back alleyway during the time period when Sanford was seen entering. *See* Exhibit B of APCR (file labeled VTS_01_0), approximately 1:25AM;[4] *see also* Exhibit A of APCR, pg. 8. This video eviscerates Amy Larck's testimony. Her testimony is fictional; no one enters the alleyway with Sanford. Two black men are not seen entering the alley shortly after he entered. Larck is not seen entering with Sanford or seen running from the scene. Sanford never left the alleyway after he entered it at 1:25AM on July 31, 1999. *See* Exhibit B of APCR.

Further compounding the lie by the state is the fact that Earl is **never seen entering the alleyway between** 1:25AM and 8AM on July 31, 1999. Bradley was arrested on July 31, 1999, at approximately 7:30AM at the Pinnacle Hotel for drugs. *See* Exhibit D of APCR – Bradley's drug arrest report. Bradley has remained incarcerated ever since that day. The medical examiner in this case, Dr. Susan Garcia, testified that Sanford was dead 24-36 hours from when Mr. Sanford was brought to the medical examiner's office at approximately 6:30PM on August 1, 1999. *See* Exhibit E of APCR – Testimony of Dr. Susan Garcia.[5] Twenty-four hours would have placed Sanford's death at 6:30PM on July 31, 1999. By that point, Bradley had been incarcerated for almost 12 hours. If Sanford died thirty-six hours prior to his movement to the medical examiner's office, his time of death was at 6:30AM on July 31, 1999. No evidence at trial indicated that Earl Bradley was at the Happy Hour Bar at 6:30AM, let alone entering the alley at that time. In fact, the only evidence that anyone entered that alleyway, other than Mr. Sanford, between 1:25AM, and when Sanford was found at approximately 4PM on August 1, 1999, was Mae Rivet Smith. *See* Exhibit A of APCR, pg. 8.

Due process is violated in a criminal trial whenever a witness of the State supplies false testimony on a topic that materially prejudices the rights of the accused. *See generally Kyles v. Whitley*, 514 U.S. 419 (1995). False testimony "is a surprisingly common feature" of the underlying trials that lead to false convictions. *Samuel R. Gross, et, al., Exonerations in the United States: 1989 through 2003*, 95 J. Crim. L. and Criminology 523, 543 (2005) (Discussing false testimony using the term "perjury").

---

[4] The video submitted in this brief was presented to the jury as either State's Exhibits 27, 28, or 29.

[5] Frankly, this is a generous estimate to the State. Dr. Garcia never specified whether the time of death was from when the body was taken to the medical examiner's office at 6:30PM on August 1, 1999, or at the time of Autopsy at roughly 8AM on August 2, 1999.

A study of 350 erroneous convictions in "potentially capital cases" revealed that there was "perjury" by prosecution witnesses in approximately one-third of the cases. *See* Hugo Adam Bedau and Michael L. Raddet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Sanford L. Rev. 21, 60 (1987). Indeed, false testimony by prosecution witnesses was "twice as frequent a cause of error as the next most important factors." *Id.* at 61. N. 184. A study of exonerations illustrates that through the present, this continues to be the case. *See e.g.*, *Gross et al.*, 95 J. Crim. L. and Criminology at 544 (Noting that in 43% of the 340 exonerations studied, "at least one sort of perjury" was reported).

Now, for the first time ever, Amy Larck has come forward through letters and Facebook messages and stated that she lied – that she did not witness Earl Bradley kill Barton Sanford and that she was coerced into her statement to the police and trial testimony. *See* Exhibit F of APCR – Sworn affidavit of Terri-Lee Isaac. Amy Larck provided the following statements against penal interest (La. C.E. art. 804(A); *State v. Raine*, 238 So.3d 1076, 1084-1086 (La. 4th Cir. 2018)) and rebuttal evidence (*State v. Trosclair*, 443 So. 1098, 1106 (La. 1983); *see generally State v. Heath*, 513 So.2d 493 (La. 2d Cir 1987)) to Ms. Isaac:

> I am a Canadian citizen who was introduced to Earl Bradley in 2005.
>
> Mr. Bradley is serving a life sentence for murder at the Louisiana State Penitentiary at Angola, LA. In the time leading up to, and during our first face to face meeting, Mr. Bradley told me the story of his arrest, shared court records, documents he had obtained from attorneys, and letters he had received in prison. After I read the material, I determined that I wanted to help him gain his freedom.
>
> I am not an attorney, nor am I empowered as an investigator. I determined from reading what was shared with me, specifically the trial testimony, that one of the key witnesses against Mr. Bradley is Amy Larck.
>
> Mr. Bradley showed me letters, (EXHIBIT A) written by Amy Larck, stating her remorse for lying on the witness stand at his trial.[6]
>
> Among the things that Ms. Larck wrote:
>
>> "This is something that God has been telling me to do. I am only trying to make a wrong, right."
>>
>> "Do you actually believe that I could make up all of those things up (sic) by myself? Come on Earl, there is no way I could have done that without being led and talked through it and threatened."
>>
>> "I was not at the Happy Hour at all the night that guy was killed. I did not even leave the area of the Budget (hotel.)"
>>
>> "Let me go back so that you can understand. I left 4th Street for a little while and I was skimming poker machines with Randy with the red car. The only

[6] The letters with envelopes attached, thereby proving that Amy Larck wrote these letters, are attached as Exhibit G of APCR.

> thing that I heard was that someone was found under the trailer behind the Happy Hour. Everyone who ever hung out on 4th Street or the Happy Hour was questioned about the murder. except me. I did not know anything about anyone being questioned. A couple of us were at the gas lite motel and some under cover knocked on the door. They asked who I was and told me that I had reported a rape and they needed me to identify the guy. Everyone in that room except me knew that they were homicide detectives. When we got to the detective bureau they took me straight to homicide. I had NO idea what was going on."
>
> "I was in that room for 11 hours being interrogated (sic) 3 separate (sic) times (back to back), I told them that I had no idea what they were talking about. I did not know anything about it. The (sic) kep trying to put suggestions in my mouth and yes I was scared because I have never in my life been in that kind of situation and they were mean to me. Finally they took me back to some room with video tapes and showed me a video tape. He told me that the girl was me, the guy on the right was you, and he did not know who the other guy was. I told him that I was not even at the Happy Hour. He said he had talked to a number of people who said me and you were at the happy Hour together that night. None of this was true!"

I believe that Amy Larck's recantation to be an important thing in Mr. Bradley's pursuit of justice.

I reached out to Amy Larck via Facebook messenger beginning on Thursday September 19, 2013, and continuing to Wednesday, September 25, 2013. I preserved the messages between us, and have attached them to this affidavit as EXHIBIT B.

On Tuesday, September 24, 2013 Amy Larck wrote: "I was young and impressionable back then and scared to death of being threatened with accessory to murder. I have grown a lot and would like to help Earl be released from prison."

Amy Larck had written to Earl Bradley that she wanted nothing from him in exchange for the truth, but in our exchanges Ms. Larck wanted money, and to know that Earl Bradley would not harm her in any way for having lied on the witness stand. I assured her that I believed Earl Bradley was not interested in retaliation, only exoneration.

Amy Larck never told me what amount of money she wanted in order to come forth with the truth.

I shared our communication with Earl Bradley, who asserted it would be inappropriate to pay Amy Larck.

I have had no further communication from Amy Larck beyond what is attached.

The above statement is true and correct. I offer this information freely and Without hesitation. I have not been coerced, nor have I been given money, nor am I promised any reward for communicating this information.

Larck's letters and Facebook messages are true rebuttal evidence to her trial testimony.

*State v. Trosclair*, 443 So. at 1106. While it is true that recantations are looked at skeptically, this is not a true recantation. This is an admission by Larck that she committed perjury and, in fact, fears that she could be charged with perjury. *State v. Hammons*, 597 So. 2d 990, 995-998 (La. 1992); *See* Exhibit F of APCR, pg. B002. Larck, by her own admission, is not available to Bradley now, and most certainly was not available at the time of trial; she was adverse. And now, she's trying to extort Bradley.

And her admissions have more than a ring of truth. By Larck's own admission at trial, she implicated Bradley only after the police threatened to charge her as an accomplice. Her statements **and** trial testimony were inconsistent; a point which even this Court was clear to point out. *State v. Bradley*, 858 So. 2d at 86. But more importantly, no other witness corroborated her statements or testimony, especially with regard to Albert Russell. *See* Exhibit I of APCR – Hearing testimony dated February 7, 2001, pages 16-17. And more importantly, the video in the case at bar eviscerates Amy Larck's testimony – Larck's testimony regarding the murder is plainly false. *See* Exhibit B of APCR.

Amy Larck was the only evidence against Earl Bradley.[7] Her testimony was beyond material. Her admissions are shocking, documented in writing, and would have absolutely changed the verdict. *State v. Hammons*, 597 So. 2d at 999 (The standard is merely the probability of a different verdict). And here, the prosecutor's **entire** closing was about her credibility.

But Larck's testimony about the events that night was not her only lie. She also lied about her criminal record. Larck testified that her first criminal conviction was in Louisiana, from a case that she caught close in time to the case at bar (specifically the crime happened on July 6, 1999, only days after her arrival). 6/12/2002 TT: 122-123. This is plainly not true. *See* Exhibit A of Bradley's Reply to State's Procedural Objections; Exhibit N of APCR – Larck's background check. In December of 2022, Mr. Bradley, through counsel, found Larck's criminal history. In April of 2023, Mr. Bradley, through counsel, received Larck's certified criminal history in Florida. *See* Exhibit A of Bradley's Reply to State's Procedural Objections. It turns out that Larck wasn't just a telemarketer in Illinois just prior to her arrival in Louisiana. Not long before Larck's arrival in Louisiana, she was convicted of simple assault in North Carolina. But prior to that, Larck was arrested and convicted of prostitution and child abuse in Florida. *See* Exhibit A of Bradley's Reply to State's Procedural Objections - Certified copy of Florida Conviction Record. For those convictions, of which some were felonies, Larck did prison time. **She was also on probation when she was arrested in Louisiana and at the time of her testimony. She was shipped back to Florida after her sentence in this only to be arrested again in Florida. For both the probation violation and that arrest, she received a time served sentence.** *See* Exhibit A of Bradley's Reply to State's Procedural Objections. None of this was revealed to defense counsel because counsel, who is a skilled defense attorney, never confronted Larck with

[7] Bradley's statement was not inculpatory. While it was inconsistent in some respects, multiple witnesses in this case provided inconsistent statements.

these convictions. This is a clear *Brady* violation. *See State v. Bright*, 875 So.2d 37, 41-45 (La. 2004).

Terri-Lee Isaac is not the only witness that has come forward to support Earl's innocence in the case at bar. Mae Rivet Smith has come forward to definitely state that (a). she did not see a body behind the Happy Hour Bar until August 1, 1999, in the afternoon and (b). that, when she heard shots during the late-night hours of July 30, 1999, or the early morning hours of July 31, 1999, Earl Bradley was in her presence and did not have a gun. *See* Exhibit H of APCR – Mae Lucille Rivet Smith affidavit dated June 10, 2022. Ms. Smith swore to the following:

> 1. I have known Earl Bradley from more than 24 years. We met through friends and we both frequented a bar called The Happy Hour bar in Marerro, LA.
>
> 2. I was at the Happy Hour Bar in 1999, on the last weekend of July. The bar did not close through the entire weekend, and I left only once during that weekend.
>
> 3. Friday night, July 30th I was standing at the door of the Happy Hour with my friend Rachel Peret. We were talking and smoking a cigarette. During this time, I saw Earl Bradley enter the alleyway and waved to him. As we waved, we heard shots ring out somewhere beyond the alleyway.
>
> 4. Earl was traveling from Jung Boulevard toward Baritaria. The shots did not take place in the alleyway. The shots were likely coming from a side street.
>
> 5. I was waving to Earl and he was waving back when the shots rang out. He did not have a gun in his hand.
>
> 6. During the weekend I was in and out of the bar and the alleyway frequently because I am a smoker, and at the time it was not permitted to smoke in the bar.
>
> 7. At the time of the incident, I was homeless, and I spent my time in and around the Happy Hour Bar.
>
> 8. I was in and out of the alleyway Friday night the 30th; I was there all day and night Saturday the 31st; I was there all-day Sunday August 1st.
>
> 9. At the time I was also familiar with the victim of the shooting Bart Sanford. He was not in the alley when I waved to Earl and we heard shots ring out.
>
> 10. I did not see Bart Sanford until Sunday night, when I was talking with Lloyd Everett and he spotted Bart's body in the alleyway.
>
> 11. Lloyd Everett went to call the Police, and left me standing in the alleyway to make sure no one disturbed Bart's body. I left the scene after the Police arrived.
>
> 12. I later provided information to the police about what I saw at the time. They took a recorded statement from me.
>
> 13. I walked in and out of the alleyway many times from Friday until Sunday. I would have seen Bart's body where we eventually saw it had it been there all weekend.
>
> 14. I know Amy Larck from the neighborhood; she also frequented The Happy Hour. She was not at the bar that weekend.
>
> 15. I know Albert Russell, known as Micey. Albert was not at the Happy Hour that weekend.

> 16. I am aware Amy Larck gave testimony that she was present in the alleyway Friday night at the time of the shooting, with Albert. I am aware that she testified that she saw Earl Bradley shoot Bart Sanford.
>
> 17. I am completely certain Amy and Albert were not in the alleyway, and not with Earl Bradley when shots rang out Friday night.
>
> 18. I have always been willing to testify as to what I saw that weekend, and when. I was available to Earl Bradley's attorney and to the prosecutors before, during and after the trial. No one ever asked me to testify.
>
> 19. I have reached out to Earl Bradley several times over the last 20+ years to tell him that I know exactly where he was at the time of the shooting. I understand that he could not reply until he had someone who was willing to take my statement.
>
> I offer this statement freely, and am willing to testify under oath as to its authenticity and to provide further details about my recollection. No one has offered me money, or exerted pressure on me to make this statement.

Here, Ms. Smith's provides critical alibi evidence from a person that investigators **knew** was around the body the weekend that Sanford was killed. Her testimony for Bradley would have crushed the State's case, as Ms. Smith's statements to police were consistent and corroborated by police investigation, i.e., the video. Bradley's trial counsel's failure to investigate and call her was plainly ineffective assistance of counsel under the United States and Louisiana constitutions. *State v. Davis*, 295 So. 3d 396 (La. 2020).

Albert Russell has also come forward to support Bradley's innocence. On February 18, 2023, Mr. Bradley's co-defendant provided a sworn statement stating the following: (*See* Exhibit A of Supplemental APCR – Albert Russell sworn affidavit dated February 18, 2023)

> I am a witness to the events of the above-captioned matter.
>
> At the time of the incident, I was living at 468 Wilson Street in Marrero, Louisiana.
>
> I came home one morning and my door was kicked in.
>
> My grandfather came over and gave me a business card of an FBI agent.
>
> I called the agent and he told me to come to the Gretna Detectives Bureau.
>
> They questioned me about some guy that I never knew or seen before, and showed me a picture of a guy that I never seen before and asked me if I knew him.
>
> I told them I had never seen the guy in my life.
>
> The detectives left out the room for about 3 minutes and came back in and told me I was under arrest for second degree murder. I couldn't believe it.
>
> I was incarcerated for 3 years fighting the charge of killing a person I never seen or heard before.
>
> The detectives tried placing me at a club on 4th Street and Jung Boulevard called the Happy Hour.

The club had surveillance cameras inside and out.

I was never at the club at the time the murder happened.

This Court should note that Bradley has never been granted an evidentiary hearing. Yet, the court rejected this petition out of hand as time-barred and completely denied relief without ever considering Bradley's evidence on its merits. There are several problems with that position. First, La.C.Cr.P. § 926.2 has been codified. Bradley is not only entitled to have his petition heard, but if he can prove, by clear and convincing evidence, that had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt, then he is entitled to a new trial. Bradley's petition presents both documentary and testimonial evidence that proves that the sole witness's, Amy Larck's, trial testimony *was false*. Both by a freestanding claim or a gateway claim of innocence,[8] all of Bradley's claims should be heard, even if he had defaulted at some point.

But this petition is also not repetitive within the meaning of La.C.Cr.P. § 930.4 – no freestanding actual innocence claim was raised in any previous petition (nor could one have been, given the state of the law at that time), much of the evidence submitted in support of the newly discovered evidence claim herein was not known or presented previously. And for the same reasons, the petition is not out of time pursuant to La.C.Cr.P. § 930.8, because much of the evidence presented to this Court was discovered only recently as a result of painstaking investigation and as a result of being able to obtain pro bono counsel to investigate and make the necessary arguments. Nor could this evidence have been obtained earlier through due diligence, both because diligence takes into account the resources available to the accused and because evidence of this character only *could* come to light once enough time had passed and enough reckoning with the past had occurred that the words could be said, and the affidavits could be given without fear of retaliation.[9]

But there are even more reasons why this petition should be heard. No court has heard the evidence presented in this motion, and courts today are much more aware of wrongful convictions than they were in the past, when Bradley's previous motions were summarily denied,

[8] The lower court incorrectly stated that Mr. Bradley could not bootstrap his constitutional claims to his actual innocence claim pursuant to La.C.Cr.P. § 926.2. A gateway innocence claim is separate and distinct from a free-standing innocence claim under La.C.Cr.P. § 926.2 and is recognized by the Supreme Court of the United States. This point will be addressed further below.

[9] Frankly, Larck is still scared that she will be charged with perjury.

and it has become an increasing judicial consensus that procedural bars should not prevent an actually innocent defendant from having his day in court. In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Supreme Court held that a persuasive showing of actual innocence should take precedence over time limitations and procedural bars, and though this holding does not directly govern Louisiana post-conviction petitions, it is submitted that this Court should find its reasoning persuasive. Likewise, in *In re Davis*, 557 U.S. 952 (2009), the Supreme Court directed the Georgia state courts to take evidence concerning the defendant's actual innocence and to hear from the witnesses who had previously been denied a hearing on procedural grounds. Doing so in this case would comport with the core function of the criminal justice system – convicting only the guilty and exonerating the innocent – and would recognize that allowing an innocent man to rot in prison on technical grounds is even more abhorrent than allowing a guilty person to evade justice for such reasons.

In sum, this Court should hear the witnesses who have never been heard, evaluate the scientific evidence and surveillance evidence obliterates the only evidence against Bradley: Amy Larck's testimony. Earl Bradley's imprison conviction and imprisonment is a miscarriage of justices that cries out to be fixed.

## STATEMENT OF JURISDICTION

This Honorable Court is vested with jurisdiction herein pursuant to Louisiana Constitution, Article 5, Section 10(A) of the Louisiana Constitution of 1974, which states in part that a court of appeal "has supervisory jurisdiction over cases which arise within its circuit." This case arises from the Twenty-fourth Judicial District Court, Parish of Avoyelles, which is a district within this Court's circuit.

## STATEMENT OF FACTS: TRIAL AND POST-CONVICTION PROCEEDINGS[10]

On August 1, 1999, the body of Barton Sanford was found beneath a trailer located at 7501 1/2 Fourth Street near the Happy Hour Saloon in Marrero. The cause of death was a bullet wound to the chest. Detective Donald Meunier of the Jefferson Parish Sheriff's Office investigated and eventually developed Bradley as a possible suspect. On August 7, 1999, Detective Meunier interviewed Bradley and obtained several statements.

In the statements, Bradley indicated that he had attended a party at the Happy Hour Saloon on Friday, July 30, 1999, but denied knowing the victim. However, when confronted with

[10] The statement of facts was taken directly from the Louisiana Court of Appeal, 5th Circuit's decision. *State v. Bradley*, 858 So. 2d 80 (La.App. 5 Cir. 09/16/03).

a surveillance video tape taken outside of the Happy Hour Saloon on July 30, 1999, showing him with the victim, Bradley recanted his prior statements. Bradley told Detective Meunier that the victim wanted to purchase crack cocaine and that he had arranged for the victim to make the purchase from an individual named Jason Rivet. However, before the drug deal was completed, Bradley stopped the drug transaction and pulled the victim away because "something looked like it was going down." Bradley subsequently returned to the bar where he remained for approximately one hour before going to the Budget Motel where he remained for the night.

Detective Meunier also interviewed an eyewitness, Amy Larck, who identified Bradley as the shooter.[11] At trial, Lark testified that at the time of the shooting she was a drug addict who supported her habit by prostitution. Larck knew both Bradley and Russell and had been at Russell's house on the evening of July 30, 1999. While there, she overheard Bradley ask Russell if he had a gun to which Russell responded, "I got that for you."

Later that evening, Larck was outside the Happy Hour Saloon where she smoked crack for most of the night. Later that night, while inside the Happy Hour Saloon, Bradley informed Larck that he had a "trick" for her, whom Larck identified as the victim. Larck and Bradley left the bar and walked around the block to give the victim time to come outside. Larck then walked into an alley behind the Happy Hour Saloon where she met the victim. Larck agreed to perform oral sex upon the victim and the victim displayed approximately sixty dollars. At that moment, Bradley and Russell walked around the corner. Bradley had a gun and was screaming at the victim. Larck began backing out of the alley and heard a gunshot. She then ran from the scene and ended up at the Budget Motel with Bradley. After five to ten minutes, Larck left the motel and received a ride to the levee from a stranger who later raped her. She later reported the rape to police but did not mention the murder at that time. Not until the police picked her up in connection with the homicide investigation did she mention anything to police about the murder.

After Larck's testimony, the State rested and the defense called its first witness, Karen Breaux. Breaux testified that on July 30, 1999, she was at Russell's house until midnight and did not recall either Larck or Bradley being at the home that day or evening. At around midnight that evening, she went to the Happy Hour Saloon where she observed the victim and Bradley engaged in an argument outside. The victim was accusing Bradley of having ripped him off,

[11] Significantly, Det. Meunier interviewed many witnesses. Only Amy Larck stated that Bradley was the shooter.

which Bradley denied. After a brief moment, Breaux left the area fearing police would arrive shortly.

The defense also called Tammy Disher who testified that, on the evening of July 30, 1999, she saw the victim fighting with an individual named Jason Rivet, who was carrying a gun. She did not see an argument between Bradley and the victim. However, Disher testified that while she was incarcerated with Larck prior to trial, Lark had told her that she was involved in the killing of the victim. Larck told her that she was supposed to "trick" the victim and that Bradley was supposed to rob him but that something went wrong, and Bradley ended up shooting the victim.

Bradley was convicted based upon an 11-1 verdict.

On June 18, 2002, the trial court sentenced Mr. Bradley to life imprisonment with hard labor. Bradley appealed the decision, and the conviction was affirmed. *State v. Bradley*, 858 So. 2d 80 (La.App. 5 Cir. 09/16/03).

On January 20, 2005, Bradley filed a pro se motion for post-conviction relief based upon ineffective assistance of counsel and DNA testing, which was summarily denied.

On July 2, 2008, Mr. Bradley filed a subsequent post-conviction motion, which was again summarily denied.

On May 18, 2021, Bradley's post-conviction motion based upon his non-unanimous verdict was denied.

On December 28, 2022, Bradley filed an application for post-conviction relief (herein referred to as "APCR"). See Exhibit A – December 28, 2022 APCR. Bradley made the following claims:

**POINT I: THIS PETITION SHOULD BE HEARD**

**POINT II: EARL BRADLEY IS ACTUALLY INNOCENT. *See* La.C.Cr.P. Article 926.2; *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018).**

**POINT III: NEWLY DISCOVERED EVIDENCE WOULD HAVE PROBABLY CHANGED THE VERDICT HAD THE JURY HEARD WHAT IS NOW BEFORE THE COURT.**

**POINT IV: THE SOLE EYEWITNESS, AMY LARCK, TESIFIED FALSELY. AS SUCH, A FRAUD WAS PRESENTED TO THE COURT.**

**POINT V: THE STATE COMMITTED A BRADY VIOLATION WHEN IT FAILED TO TURN OVER AMY LARCK'S PRIOR CONVICTIONS.**

**POINT VI: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED INVESTIGATE AND CALL MAE RIVET.**

**POINT VII: AT A MINIMUM, A HEARING MUST BE HELD TO DETERMINE THE VERACITY OF BRADLEY'S CLAIMS**

Along with the APCR, Petitioner requested a stay to further investigate and supplement his petition.

On February 1, 2023, the District Court issued a preliminary order, directing the State to file its objections within 30 days of the order, and Mr. Bradley to file his supplemental brief by April 3, 2023. *See* Exhibit B – Preliminary Order dated February 1, 2023.

The State submitted its procedural objections on March 3, 2023 and supplemented those objections on March 8, 2023. *See* Exhibits C & D.

On March 31, 2023, Bradley submitted his opposition to the State's procedural objections. *See* Exhibit E. Simultaneously, he submitted his supplemental APCR with Albert Russell's affidavit. *See* Exhibit F.

On May 3, 2023, the State responded to Bradley's supplemental memorandum of law and opposition to procedural objections. *See* Exhibit G.

On May 10, 2023, Mr. Bradley replied to the State's response to his supplemental memorandum of law and the State's response to Mr. Bradley's opposition to the State's procedural objections. *See* Exhibit H.

On May 31, 2023, the District Court summarily denied Mr. Bradley's APCR. *See* Exhibit I.

On June 14, 2023, Mr. Bradley filed a motion to reconsider his APCR and a notice of intent to file a supervisory writ. *See* Exhibits J & K.

On June 21, 2023, the District Court denied Mr. Bradley's motion to reconsider. See Exhibit L. On the same date, the District Court set a return date for Mr. Bradley's supervisory writ, which was July 20, 2023. *See* Exhibit M.

On July 7, 2023, Mr. Bradley requested an extension until August 10, 2023. The District Court granted said request. *See* Exhibit N.

**LIST OF THE EVIDENCE DISCOVERED SINCE TRIAL**

**Evidence Presented for the First Time in Bradley's 2022 APCR**

The following evidence *was not* presented at trial or in a previous post-conviction motion:

1. **Exhibit D – Police Reports for Earl Bradley drug arrest**
2. **Exhibit E – Affidavit of Terri-Lee Isaac**
3. **Exhibit F – Letters from Amy Larck to Earl Bradley**

4. **Exhibit G – Affidavit of Mae Lucille Rivet Smith**
5. **Exhibit M – Criminal history of Amy Larck**
6. **Exhibit N – Past history of misconduct by Sgt. Grey Thurman**
7. **Exhibit A of Bradley's Reply to State's Procedural Objections - Certified copy of Florida Conviction Record**

## QUESTIONS PRESENTED

1. Did the District Court abuse its discretion when it summarily denied Mr. Bradley's petition without a hearing pursuant to La.C.Cr.P. § 930(A)?
2. Did the District Court err when it misapplied La.C.Cr.P. § 926.2 and erroneously held that constitutional violations were subject to procedural bars even though Mr. Bradley made a "gateway" claim of actual innocence?
3. Did the District Court erroneously hold that Mr. Bradley was procedurally barred from presenting his claims of newly discovered evidence, fraud upon the court, ineffective assistance of counsel and *Brady* claims with allowing Mr. Bradley to explain any deficiencies pursuant to La.C.Cr.P. § 930.4(F) or considering that Mr. Bradley was an indigent defendant throughout his post-conviction proceedings?
4. Did the District Court err when it did not grant Mr. Bradley's APCR on the record before it when the State failed to dispute Mr. Bradley's claims that a *Brady* violation and fraud upon the court occurred?

## ARGUMENT

**ASSIGNMENT OF ERROR 1: THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED MR. BRADLEY'S APCR WITHOUT A HEARING.**

Here the State failed to produce any evidence that either (1) refuted the affidavits, physical and scientific and the *Brady* material that Mr. Bradley presented in his APCR or (2) showed that Mr. Bradley could have presented it earlier. So as to avoid redundancy, for a detailed recitation of the law, please see Mr. Bradley's APCR (Exhibit A).

La.C.Cr.P. § 930(A) is clear:

> An evidentiary hearing for the taking of testimony or other evidence **shall** be ordered whenever there are questions of fact which cannot properly be resolved pursuant to Articles 928 and 929. The petitioner, in absence of an express waiver, is entitled to be present at such hearing, unless the only evidence to be received is evidence as permitted pursuant to Subsection B of this Section, and the petitioner has been or will be provided with copies of such evidence and an opportunity to respond thereto in writing.
>
> (emphasis added)

As was detailed in Mr. Bradley's APCR (Exhibit A), he submitted an affidavit from Terri-lee Isaacs detailing that Amy Larck admitted that she perjured herself. This was a statement against penal interest and rebuttal evidence. The State presented no evidence that Earl Bradley could have presented this evidence any sooner.

Mae Lucille Rivet Smith was an eyewitness who just recently came forth. While Ms. Smith was in the discovery, there is no evidence that Earl Bradley's attorney had access to her at trial. She came forward when she came forward. The State does not refute this. Her affidavit is absolutely exculpatory and corroborated by the video evidence and police reports. She refutes

Larck's testimony. She is a critical witness that was the last person that went into the alleyway where Barton Sanford was found.

Albert Russell provided evidence that he was not with Earl Bradley on the night that Mr. Sanford was killed. Russell's affidavit completely refutes Larck's testimony and is corroborated by the video evidence submitted as a part of the APCR.

Lastly the *Brady* claims submitted in the APCR, in the form of several Florida convictions of Amy Larck prior to her involvement in this case, was not refuted.

The District Court's decision was boiler plate and did not explain its basis for a summary denial here. It rooted its decision its erroneous holding that Bradley did not meet both prongs of La.C.Cr.P. § 926.2 (which will be addressed further below) and that the rest of Mr. Bradley's claims could have been brought earlier and were procedurally barred under La.C.Cr.P. § 930.4(D) & (E). The hearing court completely failed to consider Mr. Bradley's newly discovered evidence claims under *State v. Cavalier*, 701 So. 2d 949, 951 (La. 1997).

La.C.Cr.P. § 930.8(1) defines "diligence" as a "subjective inquiry that must take into account the circumstances of the petitioner," including "the educational background of the petitioner, the petitioner's access to formally trained inmate counsel, the financial resources of the petitioner, the age of the petitioner, the mental abilities of the petitioner, **or whether the interests of justice will be served by the consideration of new evidence**" (emphasis added). Earl Bradley is and was an indigent prisoner serving a life sentence without the resources to hire investigators and attorneys, or to conduct the searches and interviews that the undersigned counsel has undertaken since becoming his attorney. This Court should remember that Bradley was just a junkie at the time of his arrest and had a record for drugs, not violence. And certainly, the interests of justice militate powerfully in favor of considering new evidence – especially since Amy Larck has made the admissions now before the Court along with her clearly lying about her previous convictions and the affidavits of Russell and Smith. Larck's admissions are exponentially bolstered by the surveillance video, police investigation, and Dr. Susan Garcia's testimony regarding the time of death. Add Ms. Smith's and Russell's statement to the mix – this evidence proves that Amy Larck's **trial testimony is false, and Earl Bradley is sitting in prison an innocent man**.

The courts of Louisiana have repeatedly held that, even where the State alleges a post-conviction petition to be repetitive and/or untimely, a hearing must be held where "[an] affiant

stated that he had not previously revealed the information [in his or her affidavit] to any investigator or attorney representing relator," rendering it "reasonable to infer that trial counsel was unaware of the facts upon which the instant claim is based" and such facts "were not known to relator or his prior attorney [such that] the exception to the post-conviction limitations period applies." *State v. Hurst*, 209 So. 3d 701 (La. 2015); *see also Alvarez v. State*, ___ So. 3d ___, 2018 WL 4354727, *3 (La. App. 2018) (hearing required where there was reason to infer that facts were unknown to petitioner or his prior counsel, and where "defendant has argued persuasively that the nature of the new evidence is not such that it should have been discovered by the exercise of due diligence"); *State v. Kang*, ___ So. 3d ___, 2019 WL 150635, *4-5 (La. App. 2019) (where affidavits of defense counsel and investigator stated that they had not previously seen documents obtained post-trial, the petition could not be dismissed on the pleadings and a hearing was required); *see also* La.C.Cr.P. § 930.4(F). Here, likewise, issues are presented that cannot be decided on the pleadings, and this Court must hear the witnesses on both the threshold issue of diligence and on the merits. *Williams v. Cain*, 2014 La. App. LEXIS 3210, *2-4 (La.App. 5 Cir. 03/26/14).

**ASSIGNMENT OF ERROR 2: THE DISTRICT COURT ERRONEOUSLY APPLIED La.C.Cr.P. § 926.2 AND FAILED TO CONSIDER MR. BRADLEY'S GATEWAY CLAIM OF ACTUAL INNOCENCE WHICH WOULD HAVE LIFTED ANY PROCEDURAL BARS TO THE CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL, *BRADY*, AND FRAUD UPON THE COURT.**

The lower court erroneously applied La.C.Cr.P. § 926.2

Here, Mr. Bradley has presented new testimonial evidence in the form of affidavits (Terri Lee Isaac, Mae Rivet Smith, and Albert Russell) that are corroborated by physical and medical evidence, thereby meeting the requirements of 926.2 and met the exceptions in 930.3, 930.4 and 930.8. Technically, the State's *Brady* violation when it failed to turn over Amy Larck's criminal history regarding her past convictions prior to trial and Larck's false testimony regarding her criminal history **corroborated the affidavits of Isaac, Smith, and Albert Russell, thus meeting any interpretation of 926.2**.

Significantly, without any citation, the District Court held that affidavits such as Isaac's, Smith's and Russell's affidavits (even if they are new) that fall under La.C.Cr.P. § 926.2(B)(1)(a)(ii) must supported by newly discovered "[s]cientific, forensic, physical, or

nontestimonial documentary evidence."[12]. Presumably, the District Court gathered its interpretation from the State's procedural objections. *See* Exhibits D & E. None of the cases cited by the State (*see* Exhibit D & E) offered both testimonial and physical, medical and nontestimonial documentary evidence (the *Brady* material) as Mr. Bradley has done in the case at bar. *See* Memorandum (Exhibit A) Exhibits A, B, E, F, D, H, and Albert Russell's affidavit submitted in Mr. Bradley's supplemental PCR. Contrary to the District Court's position, the District Court should have consider all the evidence submitted to the jury pursuant to La.C.Cr.P. § 926.2(B)(1)(b), which aligns with Mr. Bradley's position that "[s]cientific, forensic, physical, or nontestimonial documentary evidence", when submitted as corroborative evidence of La.C.Cr.P. § 926.2(B)(1)(a)(ii), does not have to be "new".[13] Interestingly, the language in La.C.Cr.P. § 926.2(B)(1)(b) aligns with the United Supreme Court precedent in *House v. Bell*, 547 U.S. 518, 537-538 (2006), which held that a post-conviction court *must consider all of the evidence, whether old or new "without regard to whether it would be necessarily admitted under rules of admissibility that would govern at trial*." *Id*. (*citing Schlup v. Delo*, 513 U.S. 298, 327-328 (1995)). The video evidence (Exhibit B of Mr. Bradley's APCR), the supplemental report from the Jefferson Parish Sheriff's department (Exhibit A of Mr. Bradley's APCR), which is a business record, the medical findings regarding the time of death by Dr. Garcia[14] (Exhibit E of Mr. Bradley's APCR), and the drug arrest of Earl Bradley (Exhibit D of Mr. Bradley's APCR) corroborate all of the testimonial evidence submitted in Terri-lee Isaac's, Mae Rivet Smith's, and Albert Russell's affidavits.

But here, Earl Bradley **has submitted** new "nontestimonial documentary evidence" that substantiates all three affidavits and Mr. Bradley's position that Amy Larck lied at trial and perjured herself: the letters and Facebook messages from Amy Larck herself and the *Brady* material that the State failed to disclose. *See State v. Lang*, (La.app. 5 Cir 10/9/2013) 128 So.3d 330, 338-339 (*citing Crawford v. Washington*, 124 St. C. 1354, 1364, 1374 (2004); *State v. Leonard*, (La.App. 5 Cir. 7/26/2005) 910 So.2d 977, 989-990 (Testimonial evidence is defined as

---

[12] "Scientific, forensic, physical, or nontestimonial documentary evidence." La. Code Crim. Proc. art. 926.2(A)(1)(a)(i).

[13] Additionally, this bar is exactly what the legislature sought to avoid when it drafted La.C.Cr.P. § 926.2. The point of La.C.Cr.P. § 926.2 is to allow a defendant to fully litigate his claims of innocence without needless procedural bars.

[14] Dr. Garcia's testimony is corroborated by the supplemental report submitted and her autopsy report that was submitted as a trial exhibit. But more importantly, it is not Dr. Garcia's testimony that is the evidence, it is her medical findings relating to the time of death, which she provided to the Sheriff's Department, which is the medical evidence in the case at bar.

"affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements" used by the prosecution.) Here, the letters and Facebook messages from Amy Larck are not testimonial; they are an unobstructed window into mind of a liar who would do anything to get out of jail. As the Court can now see from Ms. Larck's Facebook messages to Ms. Isaac, Ms. Larck never believed that those messages would end up in court as she admitted that she was afraid of perjury charges and wanted money for her potential testimony. These statements, along with the letters (again, which Ms. Larck never believed would end up in court), are nontestimonial that support Terri-lee Isaac's, Mae Rivet Smith's and Albert Russell's affidavits. Lest we not forget the convictions that the State failed to disclose.

There, on the points related to freestanding actual innocence claims pursuant to La.C.Cr.P. § 926.2, this Court should allow this petition to be heard and a hearing held.

The District Court erroneously denied Mr. Bradley's gateway innocence claim allowing his claims of ineffective assistance of counsel, fraud upon the court and *Brady* violations to be heard.

But even if this Court were to believe that there is a bar, the interest of justice requires these claims to be heard, including the claims of ineffectiveness, fraud upon the court and *Brady* violations. La. C.Cr.P. § 930.4(A). Louisiana acknowledges the Supreme Court precedence relating to "gateway" claims of innocence that would allow an otherwise procedurally barred constitutional claim to heard when there is new evidence that it is *more probable than not* that no reasonable juror would convict petitioner. *Schlup*, 513 U.S. at 324, 327-328, 329-330; *see State v. Pierre*, 125 So. 3d 403, 409 (2013).[15] As such, all of the evidence, old and new, including but not limited to the video evidence (Exhibit B of Bradley's APCR) which proves that Amy Larck lied during her testimony, that Earl Bradley was not in the alleyway that night, the Sheriff's supplemental report (Exhibit A of Bradley's APCR), and the time of death given by Dr. Garcia (Exhibit E of Bradley's APCR), should be considered by this Court in relation to all of Mr. Bradley's claims, including his claims of ineffective assistance of counsel and fraud upon the court.

But perhaps more importantly than any claims relating to the interest of justice, *Murray v. Carrier*, 477 U.S. 478 (1986) and the progeny of cases that follow have long established that the law of the land in both state and federal court is that both factual evidence of innocence and

[15] The State also argued that *McQuiggin v. Perkins*, 569 U.S. 383 (2013) does not govern state law. However, *Pierre* clearly sites *McQuiggin* as the basis for a proper consideration of a gateway innocence claim. As such, *McQuiggin* is applicable in the case at bar.

substantive due process violations overcome procedural bars. *See also McQuiggin v. Perkins*, 569 U.S. 383 (2013). This applies to Louisiana law. The Supremacy Clause of the Constitution of the United States (Article VI, Clause 2) establishes that the Constitution, federal laws made pursuant to it, and treaties made under its authority, constitute the "supreme Law of the Land," and thus take priority over any conflicting state laws. Pursuant to the Supreme Court precedent that follows from *Carrier, House v. Bell*, 547 U.S. 518, 537-538 (2006) and *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995, this Court **must consider all of the evidence, whether old or new "without regard to whether it would be necessarily admitted under rules of admissibility that would govern at trial."**

As such, all of Mr. Bradley's constitutional claims should be heard. In *Williams v. Cain*, 2014 La. App. LEXIS 3210, *2-4 (La.App. 5 Cir. 03/26/14)

**ASSIGNMENT OF ERROR 3: THE DISTRICT COURT ERRONEOUSLY HELD THAT MR. BRADLEY WAS PROCEDURALLY BARRED FROM PRESENTING HIS CLAIMS OF NEWLY DISCOVERED EVIDENCE, FRAUD UPON THE COURT, INEFFECTIVE ASSISTANCE OF COUNSEL AND *BRADY* CLAIMS.**

The District Court erred when it summarily denied Mr. Bradley's APCR on newly discovered evidence, ineffective assistance of counsel and *Brady* violations because all of the material submitted in the motion to support these claims was recently discovered and was presented with due diligence. *See* La. C.Cr.P. §§ 930.4 & 930.8.

Mae Lucille Rivet Smith's was not found and then spoke to until in or around June of 2022.[16] The facts averred to in Terri-lee Isaac's affidavit were discovered in December of 2022, when she finally decided to make a sworn statement. Albert Russell finally decided to waive his right to remain silent and provide a statement in February of 2023. Additionally, the *Brady* material, Amy Larck's criminal history of past convictions prior to the trial, was not discovered until December of 2022. Mr. Bradley did not receive her certified Florida convictions until April of *2023*.[17]

Neither the State nor the District Court rebutted the timeliness of the discovery and presentation of this evidence. Neither the State nor the District Court considered that Mr. Bradley has been an indigent defendant during this entire prosecution, from arrest to his post-conviction

[16] Ms. Smith was living in Florida at the time.

[17] Mr. Bradley still awaits the North Carolina convictions that occurred prior to trial. A subpoena was submitted for the District Court's signature, but it has yet to be executed.

proceedings.[18] Mr. Bradley is a layman of the law, and his understanding of how and where to investigate for evidence (such as Larck's criminal history), what constitutes admissible evidence and when to present a motion should be viewed in a more lenient fashion because of his indigency. *See* La. C.Cr.P. § 930.8(A)(1); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Dioguardi v. Durning*, 139 F.2d 774 (CA2 1944)).

But even more to the point, this Circuit has specifically held that when there are questions as to diligence when a petitioner presents potentially meritorious claims in a APCR, the District Court must conduct a hearing. In *Williams v. Cain*, which is directly on point to Mr. Bradley's case, this Court held:

> First, our review reveals that while relator has had a direct appeal to this Court and a previous application for post-conviction relief, relator has never raised the *Brady* issue that he now raises. *See State v. Frederick L. Condley, Kendrick Williams*, 04-1349 (La. App. 5 Cir. 5/31/05), 904 So.2d 881; and, *Kendrick Williams v. Burl Cain*, 07-610 (La. App. 5 Cir.8/13/07) (unpublished writ). Accordingly, we find that relator's current application for post-conviction relief is not successive in violation of La. C.Cr.P. art. 930.4.
>
> Second, although the trial court correctly found that more than two years had passed since the date relator's conviction and sentence became final, the trial court erred in finding that none of the exceptions to this two-year time applied without first hold a hearing.
>
> La. C.C.P. art. 930.8's two-year time bar will not apply if the relator's application for post-conviction relief "alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his attorney." La. C.Cr.P. art. 930.8; *State v. Jarrow*, 03-0846 (La. App. 4 Cir. 9/10/03), 857 So. 2d 12, 14. The trial court must hold a hearing to determine whether this exception to the time bar applies when "there are questions of fact which cannot properly be resolved pursuant to Articles 928 and 929" of the Louisiana Code of Criminal Procedure.

*Williams v. Cain*, 2014 La . App. LEXIS 3210, *2-4.

The *Williams* decision aligns with the requirement pursuant to La. C.C.P. art. 930.4, which requires the District Court to do the following if, like in the case at bar, the court is considering denying the entire application on procedural bars:

> If the court considers dismissing an application for failure of the petitioner to raise the claim in the proceedings leading to conviction, failure to urge the claim on appeal, or failure to include the claim in a prior application, the court shall order the petitioner to state reasons for his failure. If the court finds that the failure was excusable, it shall consider the merits of the claim.

La. C.Cr.P. Art. 930.4(F).

Here, Mr. Bradley has never been able to make the claims of newly discovered evidence,

---

[18] The State may mention the APCR that Mr. Bradley filed relating to his 11-1 verdict. In that APCR, like the present APCR, Mr. Bradley was represented by pro bono counsel.

ineffective assistance of counsel, fraud upon the court, and *Brady* violations because he has never had this evidence.

As such, the lower court erred when it summarily denied Mr. Bradley's application.

**ASSIGNMENT OF ERROR 4: THE DISTRICT COURT ERR WHEN IT DID NOT GRANT MR. BRADLEY'S APCR ON THE RECORD BEFORE IT WHEN THE STATE FAILED TO DISPUTE THE DOCUMENTARY CERTIFIED RECORDS THAT SUPPORTED MR. BRADLEY'S CLAIMS THAT A *BRADY* VIOLATION AND A FRAUD UPON THE COURT OCCURRED.**

Here, Mr. Bradley confirmed that Larck had several convictions that she served **prison time for** in the State of Florida and was on probation in Florida when she was arrested in Louisiana and testified in the case at bar. See Exhibit N of Bradley's APCR (Exhibit A); Exhibit A of Bradley's May 10, 2023 Reply (Exhibit H).[19] None of these records were turned over. The State actually, in its supplemental response/objections to Mr. Bradley's PCR (Exhibit G), cited the trial testimony from Amy Larck **that supports Mr. Bradley's contention that there was an egregious *Brady* violation here**. Larck was clear; she had no convictions prior to her arrival in Louisiana. Larck also never testified that, at the time of trial, she had absconded from probation in the State of Florida based upon her child neglect conviction.

As shown by the State's quotes of Larck's testimony, the trial prosecutor actually pulled out of Larck that she arrived in Louisiana from Illinois and that she was a telemarketer prior to this case. Larck's trial testimony painted a picture that she was a tax paying civilian prior to July 6, 1999, which was her first arrest in Louisiana. Defense counsel, a highly experienced attorney, for Bradley failed to cross her on any of the convictions from Florida that proceeded this case or regarding the fact that she was on probation. [20]

The Supreme Court has already been very clear that impeachment material that was not turned over is a *Brady* violation warranting a new trial. *Wearry v. Cain*, 136 S. Ct. 1002, 1006-07 (2016) (A case stemming out of Louisiana, the United States Supreme Court found a *Brady* violation where prosecutor failed to disclose impeachment evidence concerning the witness who provided "the only evidence directly tying [Wearry] to [the] crime" of which he was convicted, even though other impeachment evidence was available); *Smith v. Cain*, 565 U.S. 73, 75-76 (2012) (A case stemming out of Louisiana, the United States Supreme Court found a Brady violation occurred where impeachment evidence was withheld concerning the only eyewitness to

[19] *See* Cycles 4-7. Larck was extradited from Louisiana to Florida because she fled from probation that stemmed from her neglect of a child conviction that occurred in 1996.

[20] Also, interesting to note is the fact that Larck's criminal history would have warranted a higher sentence on her guilty pleas.

the crime); *see generally Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (summarizing the *Brady* standard); *Banks v. Dretke*, 540 U.S. 668, 698-99 (2004) (same).

Specifically, the Louisiana Supreme Court has held that when impeachment material related to a witness, especially the lone witness like Amy Larck in this case, is not turned over, a new trial is warranted. *See generally State v. Bright*, 875 So. 2d 37 (La. 2004). The *Bright* court held:

When the State's case hinges on the testimony of one eyewitness, the *Brady* violation looms larger.

*State v. Bright*, 875 So. 2d 37 at 43-44.

Here, Amy Larck was the sole piece of evidence used to convict Bradley. There was no physical evidence or otherwise that connected him to the crime. The State presented Larck as an open book, revealing all of her "sins", completely forthright that she only began to have a criminal career when she was sucked into the criminal element when she arrived in Louisiana. This was just not true, and the State knew it.[21]

Not only did the State commit a *Brady* violation, but the State also allowed Ms. Larck to testify falsely regarding her criminal history and omit the fact that Ms. Larck faced a probation violation due to her rearrest and flight from probation in the State of Florida. A prosecutor has a duty of fairness to the accused and candor to the court. The prosecutor has an obligation to correct false or mistaken testimony by one of his or her witnesses. The "Supreme Court has made clear that prejudice is readily shown in such cases [wherein the prosecutor allowed a witness to testify falsely], and the conviction must be set aside unless there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2002) (*citing United States v. Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972); *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (citing *Agurs* and adding that the Supreme Court cases mean that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" (quotation marks omitted)).

This Court should vacate Mr. Bradley's conviction just based on the fact that the State

[21] By the point of Ms. Larck's testimony, she had been incarcerated for a significant amount of time. She had been fingerprinted and her background would have been checked; the prosecutors would have also known that she was on probation in Florida and violated that probation by her rearrest in Louisiana. Apparently, the State of Florida was aware that she was a fugitive from the state, as there seems to be a warrant for her arrest that was generated on July 17, 2000. The State had this criminal history but just did not disclose it.

allowed Ms. Larck to testify falsely about her criminal history and the potential jail exposure that she was facing which went directly to her character and credibility as a witness.

The fact of the matter is that Amy Larck, by July 6, 1999, was a career criminal – a child abuser, prostitute, and thief. She also fled from the State of Florida when she was on probation.[22] What would a jury do now having heard that Larck was lying so substantially about her criminal history and had additional liability hanging over her head from the State of Florida based upon the felony probation violation? The prejudice that Bradley faced in this regard was significant – at least one of the jurors did not believe Ms. Larck.[23] Any amount of impeachment material would have swung the needle in a case wherein there was no evidence that connected Bradley to the murder other than Larck. *See Bright, supra*.; *Wearry, supra*.; *Smith, supra*. But under *Agurs* and its progeny, reversal is required because there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." On these points alone, Bradley deserves a new trial.

As previously stated, the Petitioner submits that no hearing is necessary to grant this motion.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court should either order a new trial or remand this matter for a hearing or grant such other and further relief to petitioner as it may deem just and proper.

**Dated:**
**August __2__, 2023**
**New Orleans, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

Walker Lasiter
P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400

[22] Interestingly, when Larck was returned to Florida in August of 2005, she was arrested again in December of 2005 for possession of drugs facing up to 5 years in prison. *See* Exhibit A of Exhibit H; *see also* Florida Statute 893.13. 6A (makes it a third-degree felony to possess a controlled substance. A third-degree felony is punishable by up to five years in prison and a fine of $5,000). Larck ended up only serving two months in jail for everything.

[23] This Court should remember that Mr. Bradley's first trial ended up in a 6-6 mistrial. Larck didn't just lie once, she lied twice.

Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

**VERIFICATION**

I, P. Walker Lasiter, do hereby verify that the allegations contained in the foregoing Application for Writ of Review are true and correct to the best of my knowledge, information, and belief. I further certify that a copy of this application has been served upon respondent judge, the Honorable Danyelle M. Taylor, Division "O", 24th Judicial District Court, 200 Derbigny Street, Gretna, Louisiana 70053; and opposing counsel, the Jefferson Parish District Attorney's Office, 200 Derbigny Street, Gretna, Louisiana, 70053, this 2nd day of August, 2023.

Walker Lasiter
P. Walker Lasiter, Esq.

24TH JUDICIAL DISTRICT COURT
JEFFERSON PARISH
STATE OF LOUISIANA

---

EARL BRADLEY
Petitioner

DOCKET. No. 99-5825

Versus

TIMOTHY HOOPER, Warden
Louisiana State Penitentiary

---

FILED:______________________
DEPUTY CLERK

______________________

**APPLICATION FOR POST-CONVICTION RELIEF AND MEMORANDUM IN SUPPORT FROM THE CRIMINAL CONVICTION ENTITLED STATE OF LOUISIANA V. EARL BRADLEY, IN THE TWENTY FOURTH JUDICIAL DISTRICT COURT IN AND FOR THE PARISH OF JEFFERSON, THE HONORABLE ROSS P. LADART, JUDGE, PRESIDING**

---

Respectfully Submitted,
MANARD LAW OFFICES

P. Walker Lassiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

24TH JUDICIAL DISTRICT COURT
JEFFERSON PARISH
STATE OF LOUISIANA

EARL BRADLEY
Petitioner

DOCKET No. 99-5825

Versus

TIMOTHY HOOPER, Warden
Louisiana State Penitentiary

FILED:____________________

____________________
DEPUTY CLERK

**APPLICATION FOR POST-CONVICTION RELIEF**

NOW INTO COURT comes Earl Bradley, through undersigned counsel, who respectfully represents:

I.

Petitioner seeks post-conviction relief based upon the following facts and information:

***

1. **Name and address of Court which entered the judge of conviction challenged:**

   The Honorable Ross P. LaDart
   Twenty Fourth Judicial District Court, Docket No 99-5825
   Jefferson Parish Courthouse
   200 Derbigny Street
   Gretna, LA 70053

2. **Date of judgment of conviction:**

   Jury trial was held on June 12, 2002 and June 13, 2002. Judgment was rendered on July 18, 2002.

3. **Length of sentence:**

   Life in prison without parole.

4. **Nature of offense:**

   14:30.1 Murder in Second Degree

5. **Plea:**

   Not guilty.

6. **The Petitioner had a trial by jury.**

7. **Name and address of trial counsel:**

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Paul C. Fleming
2821 Kingman St.
Suite C
Metairie, LA 70006

8. **Petitioner did not testify at trial.**

9. **Name and Address of lawyer at sentencing:**

Same as above.

10. **Petitioner did appeal his conviction.**

11. **Citation, docket number, and date of opinion by the Louisiana Supreme Court:**

State v. Bradley, 858 So. 2d 80, 2003 La. App. LEXIS 2475, 03 384 (La.App. 5 Cir. 09/16/03)

12. **Name and address of appellate counse:**

Margaret S. Sollars
513 Country Club Blvd
Thibodaux, LA, 70301-3711

13. **Petitioner has filed several PCR with the last one dated April 12, 2021. Mr. Bradley was represented, upon information and belief, the Justice Initiative in a motion challenging Mr. Bradley's 11-1 verdict. Although this present post-conviction application is not his first filing and it is filed outside the two-year time period established by law for filing of post-conviction, this application is timely nonetheless as it falls within one of the exceptions to the time limit and is made pursuant to the Actual Innocence statute La.C.Cr.P. Article 926.2. It meets a timely filed exception, brought under several sections of La.C.Cr.P. Article 930.4 and 930.8 in that there are several due process violations and newly discovered evidence that supports this application.**

14. **Present claims asserted for post-conviction relief herein:**

**POINT I: THIS PETITION SHOULD BE HEARD**

**POINT II: EARL BRADLEY IS ACTUALLY INNOCENT. See La.C.Cr.P. Article 926.2; Floyd v. Vannoy, 894 F.3d 143 (5th Cir. 2018).**

**POINT III: NEWLY DISCOVERED EVIDENCE WOULD HAVE PROBABLY CHANGED THE VERDICT HAD THE JURY HEARD WHAT IS NOW BEFORE THE COURT.**

**POINT IV: THE SOLE EYEWITNESS, AMY LARCK, TESITIFIED FALSELY. AS SUCH, A FRAUD WAS PRESENTED TO THE COURT.**

**POINT V: THE STATE COMMITTED A BRADY VIOLATION WHEN IT FAILED TO TURN OVER AMY LARCK'S PRIOR CONVICTIONS.**

**POINT VI: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED INVESTIGATE AND CALL MAE RIVET.**

**POINT VII: AT A MINIMUM, A HEARING MUST BE HELD TO DETERMINE THE VERACITY OF BRADLEY'S CLAIMS**

WHEREFORE, the investigation into this case is ongoing and Mr. Bradley reserves the right to supplement and amend his petition, as there are pieces of his file that are missing.

WHEREFORE, Petitioner prays that the Court grant relief to which he may be entitled.

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Dated: December 28, 2022
New Orleans, LA
RESPECTFULLY YOURS,

MANARD LAW OFFICES

Walker Lasiter

P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

JUSTIN C. BONUS, ESQ.
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**CERTIFICATE OF SERVICE**

I, Walker Lasiter, do hereby certify that a copy of the foregoing has been delivered via hand to the Jefferson Parish District Attorney's Office this 28th day of December.

Walker Lasiter

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**24TH JUDICIAL DISTRICT COURT**
JEFFERSON PARISH
STATE OF LOUISIANA

EARL BRADLEY
Petitioner

DOCKET No. 99-5825

Versus

TIMOTHY HOOPER, Warden
Louisiana State Penitentiary

FILED:____________________

____________________
DEPUTY CLERK

**MEMORANDUM IN SUPPORT OF APPLICATION FOR POST-CONVICTION RELIEF**

**NOW INTO COURT**, through undersigned counsel, comes Petitioner Earl Bradley, DOC # 403836, respectfully submitting this Memorandum in Support of Application for Post-Conviction Relief.

> While there were numerous inconsistencies in Larck's testimony, the inconsistencies concerned Larck's activities prior to and after the shooting. These were not determinative of any element of the offense. Larck's testimony was not internally inconsistent with any other evidence. Although she gave conflicting statements at times, she consistently testified as to the location of the murder and that Bradley shot the victim. The jury in the instant case heard Larck's testimony and her reasons for initially lying to investigating officers.

State v. Bradley, 858 So. 2d 80, 86 (La.App. 5 Cir. 09/16/03)

**PRELIMINARY STATEMENT**

For over 20 years, Earl Bradley has claimed that he sits in prison an innocent man. The motion presented to this Court details the evidence that proves that Earl did not kill Barton Sanford – both documentary and testimonial evidence that had the jury heard no rational juror would have convicted Bradley. La.C.Cr.P. § 926.2.

Earl Bradley was accused and convicted of killing Barton Sanford during the early morning hours of July 31, 1999 – to be exact, right around 1:30AM. See Exhibit A – Jefferson Parish Sheriff's Department's Supplemental Report, pg. 1; see also 6/12/1999 TT: 84, 88-100,

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

129-133.[1] The basis of the investigators' belief of the time, way, and who killed Sanford was the video depicting Barton Sanford walking into the alleyway where he was found at 1:25AM and Amy Larck's varying and plainly inconsistent statements to police. See Exhibit B – Video of the Alley behind the Happy Hour Bar on July 31, 1999, beginning at approximately 1AM; see also Amy Larck's trial testimony; see also State v. Bradley, 858 So. 2d at 86.[2] It is undisputed by all parties that Barton Sanford was found in the alley behind the Happy Hour Bar with one gunshot wound to the chest.

Larck was the only alleged "eyewitness". In fact, Larck was the only person out of the many that were interviewed in this case that stated the Earl Bradley killed Mr. Sanford. Larck stated that, during the early morning hours of July 31, 1999, first Barton Sanford and then she went into the back alley of the Happy Hour Bar so that she could perform a sexual favor on Sanford. See 6/12/1999 TT: 84, 88-100, 129-133. Shortly after Larck and Sanford entered the alley, which is where Sanford was found shot in the chest, Bradley and his co-defendant, Albert Russel, entered the alley. Larck saw Bradley with a gun, quickly left and heard one gunshot as she ran out of the alley across Jung Blvd through the gas station parking lot. See Id.; see also Exhibit C – Sketch of the scene.

The problem for both the State and Amy Larck is that Mr. Bradley has the video of the entrance to the back alleyway during the time period when Sanford was seen entering. See Exhibit B (file labeled VTS_01_0), approximately 1:25AM;[3] see also Exhibit A, pg. 8. This video eviscerates Amy Larck's testimony. Her testimony is fictional; no one enters the alleyway with Sanford. Two black men are not seen entering the alley shortly after he entered. Larck is not seen entering with Sanford or seen running from the scene. Sanford never left the alleyway after he entered it at 1:25AM on July 31, 1999. See Exhibit B.

Further compounding the lie by the state is the fact that Earl is *never seen entering the alleyway between* 1:25AM and 8AM on July 31, 1999. Bradley was arrested on July 31, 1999, at

---

[1] The trial transcript will be delineated by the date of the testimony and "TT:" followed by the page number(s).

[2] Significantly, neither Amy Larck nor Det. Donald Meunier were impeached using the video attached or Det. Meunier's supplemental report that details the investigators' findings regarding the video and who entered and exited the alley from the late-night hours of July 30, 1999, until roughly August 1, 1999, when the body was found. Astoundingly, Larck was never confronted with what she now admits – that the reason why she is not on any of the surveillance footage is because she was not at the Happy Hour Bar the weekend beginning on July 30, 1999. Disturbingly, the trial prosecutor misrepresented the video evidence in the case at bar, merely presenting to the jury during summation that Sanford walked into the alley as Larck testified. 6/13/2002 TT: 130-134. Yet, the prosecutor failed to mention that neither Larck, Bradley, nor Russell were seen leaving that alleyway after Sanford entered it. Id. The failure to alert the jury to this fact was both the product of prosecutorial misconduct and ineffective assistance of counsel.

[3] The video submitted in this brief was presented to the jury as either State's Exhibits 27, 28, or 29.



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

approximately 7:30AM at the Pinnacle Hotel for drugs. See Exhibit D – Bradley's drug arrest report. Bradley has remained incarcerated ever since that day. The medical examiner in this case, Dr. Susan Garcia, testified that Sanford was dead 24-36 hours from when Mr. Sanford was brought to the medical examiner's office at approximately 6:30PM on August 1, 1999. See Exhibit E – Testimony of Dr. Susan Garcia.[4] Twenty-four hours would have placed Sanford's death at 6:30PM on July 31, 1999. By that point, Bradley had been incarcerated for almost 12 hours. If Sanford died thirty-six hours prior to his movement to the medical examiner's office, his time of death was at 6:30AM on July 31, 1999. No evidence at trial indicated that Earl Bradley was at the Happy Hour Bar at 6:30AM, let alone entering the alley at that time. In fact, the only evidence that anyone entered that alleyway, other than Mr. Sanford, between 1:25AM, and when Sanford was found at approximately 4PM on August 1, 1999, was Mac Rivet Smith. See Exhibit A, pg. 8.

Due process is violated in a criminal trial is whenever a witness of the State supplies false testimony on a topic that materially prejudices the rights of the accused. See generally Kyles v. Whitley, 514 U.S. 419 (1995). False testimony "is a surprisingly common feature" of the underlying trials that lead to false convictions. Samuel R. Gross, et. al., Exonerations in the United States: 1989 through 2003, 95 J. Crim. L. and Criminology 523, 543 (2005) (Discussing false testimony using the term "perjury").

A study of 350 erroneous convictions in "potentially capital cases" revealed that there was "perjury" by prosecution witnesses in approximately one-third of the cases. See Hugo Adam Bedau and Michael L. Raddet, Miscarriages of Justice in Potentially Capital Cases, 40 Sanford L. Rev. 21, 60 (1987). Indeed, false testimony by prosecution witnesses was "twice as frequent a cause of error as the next most important factors." Id. at 61. N. 184. A study of exonerations illustrates that through the present, this continues to be the case. See e.g., Gross et al., 95 J. Crim. L. and Criminology at 544 (Noting that in 43% of the 340 exonerations studied, "at least one sort of perjury" was reported).

Now, for the first time ever, Amy Larck has come forward through letters and Facebook messages and stated that she lied – that she did not witness Earl Bradley kill Barton Sanford and that she was coerced into her statement to the police and trial testimony. See Exhibit F – Sworn

---

[4] Frankly, this is a generous estimate to the State. Dr. Garcia never specified whether the time of death was from when the body was taken to the medical examiner's office at 6:30PM on August 1, 1999, or at the time of Autopsy at roughly 8AM on August 2, 1999.



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

affidavit of Terri-Lee Isaac. Amy Larck provided the following statements against penal interest (La. C.E. art. 804(A); State v. Raine, 238 So.3d 1076, 1084-1086 (La. 4th Cir. 2018)) and rebuttal evidence (State v. Trosclair, 443 So. 1098, 1106 (La. 1983); see generally State v. Heath, 513 So.2d 493 (La. 2d Cir 1987)) to Ms. Isaac:

> I am a Canadian citizen who was introduced to Earl Bradley in 2005.
>
> Mr. Bradley is serving a life sentence for murder at the Louisiana State Penitentiary at Angola, LA. In the time leading up to, and during our first face to face meeting, Mr. Bradley told me the story of his arrest, shared court records, documents he had obtained from attorneys, and letters he had received in prison. After I read the material, I determined that I wanted to help him gain his freedom.
>
> I am not an attorney, nor am I empowered as an investigator. I determined from reading what was shared with me, specifically the trial testimony, that one of the key witnesses against Mr. Bradley is Amy Larck.
>
> Mr. Bradley showed me letters, (EXHIBIT A) written by Amy Larck, stating her remorse for lying on the witness stand at his trial.[5]
>
> Among the things that Ms. Larck wrote:
>
>> "This is something that God has been telling me to do. I am only trying to make a wrong, right."
>>
>> "Do you actually believe that I could make up all of those things up (sic) by myself? Come on Earl, there is no way I could have done that without being led and talked through it and threatened."
>>
>> "I was not at the Happy Hour at all the night that guy was killed. I did not even leave the area of the Budget (hotel.)"
>>
>> "Let me go back so that you can understand. I left 4th Street for a little while and I was skimming poker machines with Randy with the red car. The only thing that I heard was that someone was found under the trailer behind the Happy Hour. Everyone who ever hung out on 4th Street or the Happy Hour was questioned about the murder, except me. I did not know anything about anyone being questioned. A couple of us were at the gas lite motel and some under cover knocked on the door. They asked who I was and told me that I had reported a rape and they needed me to identify the guy. Everyone in that room except me knew that they were homicide detectives. When we got to the detective bureau they took me straight to homicide. I had NO idea what was going on."
>>
>> "I was in that room for 11 hours being interrogated (sic) 3 separate (sic) times (back to back), I told them that I had no idea what they were talking about. I did not know anything about it. The (sic) kep trying to put suggestions in my mouth and yes I was scared because I have never in my life been in that kind of situation and they were mean to me. Finally they took me back to some room with video tapes and showed me a video tape. He told me that the girl was me, the guy on the right was you, and he did not know who the other guy was. I told him that I was not even at the Happy Hour. He said he had talked to a number of people who said me and you were at the happy Hour together that night. None of this was true!"
>
> I believe that Amy Larck's recantation to be an important thing in Mr. Bradley's pursuit of justice.

[5] The letters with envelopes attached, thereby proving that Amy Larck wrote these letters, are attached as Exhibit G.



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

I reached out to Amy Larck via Facebook messenger beginning on Thursday September 19, 2013, and continuing to Wednesday, September 25, 2013. I preserved the messages between us, and have attached them to this affidavit as EXHIBIT B.

On Tuesday, September 24, 2013 Amy Larck wrote: "I was young and impressionable back then and scared to death of being threatened with accessory to murder. I have grown a lot and would like to help Earl be released from prison."

Amy Larck had written to Earl Bradley that she wanted nothing from him in exchange for the truth, but in our exchanges Ms. Larck wanted money, and to know that Earl Bradley would not harm her in any way for having lied on the witness stand. I assured her that I believed Earl Bradley was not interested in retaliation, only exoneration.

Amy Larck never told me what amount of money she wanted in order to come forth with the truth.

I shared our communication with Earl Bradley, who asserted it would be inappropriate to pay Amy Larck.

I have had no further communication from Amy Larck beyond what is attached.

The above statement is true and correct. I offer this information freely and Without hesitation. I have not been coerced, nor have I been given money, nor am I promised any reward for communicating this information.

Larck's letters and Facebook messages are true rebuttal evidence to her trial testimony. State v. Trosclair, 443 So. at 1106. While it is true that recantations are looked at skeptically, this is not a true recantation. This is an admission by Larck that she committed perjury and, in fact, fears that she could be charged with perjury. State v. Hammons, 597 So. 2d 990, 995-998 (La. 1992); See Exhibit F, pg. B002. Larck, by her own admission, is not available to Bradley now, and most certainly was not available at the time of trial; she was adverse. And now, she's trying to extort Bradley.

And her admissions have more than a ring of truth. By Larck's own admission at trial, she implicated Bradley only after the police threatened to charge her as an accomplice. Her statements *and* trial testimony were inconsistent; a point which even the Appellate Division was clear to point out. State v. Bradley, 858 So. 2d at 86. But more importantly, no other witness corroborated her statements or testimony, especially with regard to Albert Russell. See Exhibit I – Hearing testimony dated February 7, 2001, pages 16-17. And more importantly, the video in the case at bar eviscerates Amy Larck's testimony – Larck's testimony regarding the murder is plainly false. See Exhibit B.

Amy Larck was the only evidence against Earl Bradley.[6] Her testimony was beyond material. Her admissions are shocking, documented in writing, and would have absolutely

[6] Bradley's statement was not inculpatory. While it was inconsistent in some respects, multiple witnesses in this case provided inconsistent statements.



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

changed the verdict. State v. Hammons, 597 So. 2d at 999 (The standard is merely the probability of a different verdict). And here, the prosecutors *entire* closing was about her credibility.

But Larck's testimony about the events that night was not her only lie. She also lied about her criminal record. Larck testified that her first criminal conviction was in Louisiana, from a case that she caught close in time to the case at bar (specifically the crime happened on July 6, 1999, only days after her arrival). 6/12/2002 TT: 122-123. This is plainly not true. See Exhibit N – Larck's background check. It turns out that Larck wasn't just a telemarketer in Illinois just prior to her arrival in Louisiana. Not long before Larck's arrival in Louisiana, she was convicted of simple assault in North Carolina. But prior to that, Larck was arrested and convicted of prostitution and child abuse in Florida. For those convictions, of which some were felonies, Larck did prison time. Apparently, none of this was revealed to defense counsel because counsel, who is a skilled defense attorney, never confronted Larck with these convictions. This is a clear Brady violation. See State v. Bright, 875 So.2d 37, 41-45 (La. 2004).

Terri-Lee Isaac is not the only witness that has come forward to support Earl's innocence in the case at bar. Mae Rivet Smith has come forward to definitely state that (a). she did not see a body behind the Happy Hour Bar until August 1, 1999, in the afternoon and (b). that, when she heard shots during the late-night hours of July 30, 1999, or the early morning hours of July 31, 1999, Earl Bradley was in her presence and did not have a gun. See Exhibit H – Mae Lucille Rivet Smith affidavit dated June 10, 2022. Ms. Smith swore to the following:

> 1. I have known Earl Bradley from more than 24 years. We met through friends and we both frequented a bar called The Happy Hour bar in Marerro, LA.
>
> 2. I was at the Happy Hour Bar in 1999, on the last weekend of July. The bar did not close through the entire weekend, and I left only once during that weekend.
>
> 3. Friday night, July 30th I was standing at the door of the Happy Hour with my friend Rachel Peret. We were talking and smoking a cigarette. During this time, I saw Earl Bradley enter the alleyway and waved to him. As we waved, we heard shots ring out somewhere beyond the alleyway.
>
> 4. Earl was traveling from Jung Boulevard toward Baritaria. The shots did not take place in the alleyway. The shots were likely coming from a side street.
>
> 5. I was waving to Earl and he was waving back when the shots rang out. He did not have a gun in his hand.
>
> 6. During the weekend I was in and out of the bar and the alleyway frequently because I am a smoker, and at the time it was not permitted to smoke in the bar.
>
> 7. At the time of the incident, I was homeless, and I spent my time in and around the Happy Hour Bar.

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

8. I was in and out of the alleyway Friday night the 30th; I was there all day and night Saturday the 31st; I was there all-day Sunday August 1st.

9. At the time I was also familiar with the victim of the shooting Bart Sanford. He was not in the alley when I waved to Earl and we heard shots ring out.

10. I did not see Bart Sanford until Sunday night, when I was talking with Lloyd Everett and he spotted Bart's body in the alleyway.

11. Lloyd Everett went to call the Police, and left me standing in the alleyway to make sure no one disturbed Bart's body. I left the scene after the Police arrived.

12. I later provided information to the police about what I saw at the time. They took a recorded statement from me.

13. I walked in and out of the alleyway many times from Friday until Sunday. I would have seen Bart's body where we eventually saw it had it been there all weekend.

14. I know Amy Larck from the neighborhood; she also frequented The Happy Hour. She was not at the bar that weekend.

15. I know Albert Russell, known as Micey. Albert was not at the Happy Hour that weekend.

16. I am aware Amy Larck gave testimony that she was present in the alleyway Friday night at the time of the shooting, with Albert. I am aware that she testified that she saw Earl Bradley shoot Bart Sanford.

17. I am completely certain Amy and Albert were not in the alleyway, and not with Earl Bradley when shots rang out Friday night.

18. I have always been willing to testify as to what I saw that weekend, and when. I was available to Earl Bradley's attorney and to the prosecutors before, during and after the trial. No one ever asked me to testify.

19. I have reached out to Earl Bradley several times over the last 20+ years to tell him that I know exactly where he was at the time of the shooting. I understand that he could not reply until he had someone who was willing to take my statement.

I offer this statement freely, and am willing to testify under oath as to its authenticity and to provide further details about my recollection. No one has offered me money, or exerted pressure on me to make this statement.

Here, Ms. Smith's provides critical alibi evidence from a person that investigators *knew* was around the body the weekend that Sanford was killed. Her testimony for Bradley would have crushed the State's case, as Ms. Smith's statements to police were consistent and corroborated by police investigation, i.e., the video. Bradley's trial counsel's failure to investigate and call her was plainly ineffective assistance of counsel under the United States and Louisiana constitutions. State v. Davis, 295 So. 3d 396 (La. 2020).

Here, the investigators in this case focused on Earl Bradley and Albert Russell and failed to follow up on information that Jason Rivet had a serious dispute with the deceased over drugs and that there were other people that had information that Blaine and Brian Delone killed Barton

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Sanford. In short, Earl Bradley was the victim of tunnel vision here. See Exhibit J, pg. 43-44 Final Report of the New York State Bar Association's Task Force on Wrongful Convictions, (April 4, 2009) (Early focus or "tunnel vision" occurs when investigators make a determination before evidence has been reviewed and witnesses have been interviewed. Investigator's, even in their own report, were clear that Barton Sanford entered the alleyway by himself. Significantly, neither Earl Bradley nor Albert Russell entered that alleyway behind the Happy Hour. Ms. Smith confirms this in her affidavit, and she's corroborated by the video. Yet, even when the investigators were confronted with this evidence, they took the word of a junkie, Amy Larck, and presented a wholly incredible case to the prosecutor. No one corroborated Larck's testimony. Earl Bradley is not connected to this crime scene in this slightest bit. Moreover, there were other individuals who had as much, if not more means and much more motive to commit this murder. Yet, these men were not investigated); see Exhibit K – Elaad, Eitan. Tunnel Vision and Confirmation Bias Among Police Investigators and Laypeople in Hypothetical Criminal Contexts (2022) ("tunnel vision, which is over-reliance on own sources while ignoring external information"); Exhibit L – Reichart, Brian. Tunnel Vision: Causes, Effects, and Mitigation Strategies (2016) ("Tunnel vision is the tendency fueled by bias and pressure that leads actors in the criminal justice system to single-mindedly focus on a suspect and build a case for conviction while ignoring evidence that points away from guilt. Once it has taken hold of an individual, mere notions or assumptions are reified and become almost immovable. The consequences can be devastating-the innocent are sent to prison and the guilty remain free"); Exhibit M – Findley, Keith A. & Scott, Michael S. Wisconsin Law Review: The Multiple Dimensions of Tunnel Vision In Criminal Cases (2006) ("By tunnel vision, we mean that 'compendium of common heuristics and logical fallacies,' to which we are all susceptible, that lead actors in the criminal justice system to "focus on a suspect, select and filter the evidence that will 'build a case' for conviction, while ignoring or suppressing evidence that points away from guilt"). Significantly, the supervising officer, Grey Thurman, has a history of suppressing exculpatory information and driving an investigation in a direction that he believes is the correct outcome. See Exhibit O – Civil Complaint Williams v. Connick, 2:12-cv-01274-MLCF-DEK. Thurman supervised Meunier in this case and conducted at least one of the interviews with Amy Larck.

First, this Court should note that Bradley has never been granted an evidentiary hearing. Still, the State will no doubt argue that this Court should reject this petition out of hand as time-

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

barred and that it should deny relief without ever considering Bradley's evidence on its merits. There are several problems with that position. First, La.C.Cr.P. § 926.2 has been codified. Bradley is not only entitled to have his petition heard, but if he can prove, by clear and convincing evidence, that had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt, then he is entitled to a new trial. Bradley's petition is presenting both documentary and testimonial evidence that proves that the sole witness's, Amy Larck's, trial testimony *was false*. Both by a freestanding claim or a gateway claim of innocence, all of Bradley's claims should be heard, even if he had defaulted at some point.

But this petition is also not repetitive within the meaning of La.C.Cr.P. § 930.4 – no freestanding actual innocence claim was raised in any previous petition (nor could one have been, given the state of the law at that time), much of the evidence submitted in support of the newly discovered evidence claim herein was not known or presented previously. And for the same reasons, the petition is not out of time pursuant to La.C.Cr.P. § 930.8, because much of the evidence presented to this Court was discovered only recently as a result of painstaking investigation and as a result of being able to obtain pro bono counsel to make the necessary arguments. Nor could this evidence have been obtained earlier through due diligence, both because diligence takes into account the resources available to the accused and because evidence of this character only *could* come to light once enough time had passed and enough reckoning with the past had occurred that the words could be said, and the affidavits could be given without fear of retaliation.[7]

But there are even more reasons why this petition should be heard. No court has heard the evidence presented in this motion, and courts today are much more aware of wrongful convictions than they were in the past, when Bradley's previous motions were summarily denied, and it has become an increasing judicial consensus that procedural bars should not prevent an actually innocent defendant from having his day in court. In McQuiggin v. Perkins, 569 U.S. 383 (2013), the Supreme Court held that a persuasive showing of actual innocence should take precedence over time limitations and procedural bars, and though this holding does not directly govern Louisiana post-conviction petitions, it is submitted that this Court should find its reasoning persuasive. Likewise, in In re Davis, 557 U.S. 952 (2009), the Supreme Court directed

[7] Frankly, Larck is still scared that she will be charged with perjury.



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

the Georgia state courts to take evidence concerning the defendant's actual innocence and to hear from the witnesses who had previously been denied a hearing on procedural grounds. Doing so in this case would comport with the core function of the criminal justice system – convicting only the guilty and exonerating the innocent – and would recognize that allowing an innocent man to rot in prison on technical grounds is even more abhorrent than allowing a guilty person to evade justice for such reasons.

In sum, this Court should hear the witnesses who have never been heard, evaluate the scientific evidence and surveillance evidence obliterates the only evidence against Bradley: Amy Larck's testimony. Earl Bradley's imprison conviction and imprisonment is a miscarriage of justices that cries out to be fixed.

**STATEMENT OF FACTS: TRIAL AND POST-CONVICTION PROCEEDINGS**[8]

On August 1, 1999, the body of Barton Sanford was found beneath a trailer located at 7501 1/2 Fourth Street near the Happy Hour Saloon in Marrero. The cause of death was a bullet wound to the chest. Detective Donald Meunier of the Jefferson Parish Sheriff's Office investigated and eventually developed Bradley as a possible suspect. On August 7, 1999, Detective Meunier interviewed Bradley and obtained several statements.

In the statements, Bradley indicated that he had attended a party at the Happy Hour Saloon on Friday, July 30, 1999, but denied knowing the victim. However, when confronted with a surveillance video tape taken outside of the Happy Hour Saloon on July 30, 1999, showing him with the victim, Bradley recanted his prior statements. Bradley told Detective Meunier that the victim wanted to purchase crack cocaine and that he had arranged for the victim to make the purchase from an individual named Jason Rivet. However, before the drug deal was completed, Bradley stopped the drug transaction and pulled the victim away because "something looked like it was going down." Bradley subsequently returned to the bar where he remained for approximately one hour before going to the Budget Motel where he remained for the night.

Detective Meunier also interviewed an eyewitness, Amy Larck, who identified Bradley as the shooter. At trial, Lark testified that at the time of the shooting she was a drug addict who supported her habit by prostitution. Larck knew both Bradley and Russell and had been at Russell's house on the evening of July 30, 1999. While there, she overheard Bradley ask Russell if he had a gun to which Russell responded, "I got that for you."

[8] The statement of facts was taken directly from the Louisiana Court of Appeal, 5th Circuit's decision. State v. Bradley, 858 So. 2d 80 (La.App. 5 Cir. 09/16/03).





E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Later that evening, Larck was outside the Happy Hour Saloon where she smoked crack for most of the night. Later that night, while inside the Happy Hour Saloon, Bradley informed Larck that he had a "trick" for her, whom Larck identified as the victim. Larck and Bradley left the bar and walked around the block to give the victim time to come outside. Larck then walked into an alley behind the Happy Hour Saloon where she met the victim. Larck agreed to perform oral sex upon the victim and the victim displayed approximately sixty dollars. At that moment, Bradley and Russell walked around the corner. Bradley had a gun and was screaming at the victim. Larck began backing out of the alley and heard a gunshot. She then ran from the scene and ended up at the Budget Motel with Bradley. After five to ten minutes. Larck left the motel and received a ride to the levee from a stranger who later raped her. She later reported the rape to police but did not mention the murder at that time. Not until police picked her up in connection with the homicide investigation did she mention anything to police about the murder.

After Larck's testimony, the State rested and the defense called its first witness, Karen Breaux. Breaux testified that on July 30, 1999, she was at Russell's house until midnight and did not recall either Larck or Bradley being at the home that day or evening. At around midnight that evening, she went to the Happy Hour Saloon where she observed the victim and Bradley engaged in an argument outside. The victim was accusing Bradley of having ripped him off which Bradley denied. After a brief moment, Breaux left the area fearing police would arrive shortly.

The defense also called Tammy Disher who testified that, on the evening of July 30, 1999, she saw the victim fighting with an individual named Jason Rivet, who was carrying a gun. She did not see an argument between Bradley and the victim. However, Disher testified that while she was incarcerated with Larck prior to trial, Lark had told her that she was involved in the killing of the victim. Larck told her that she was supposed to "trick" the victim and that Bradley was supposed to rob him but that something went wrong, and Bradley ended up shooting the victim.

Bradley was convicted based upon an 11-1 verdict.

On June 18, 2002, the trial court sentenced Mr. Bradley to life imprisonment with hard labor. Bradley appealed the decision, and the conviction was affirmed. State v. Bradley, 858 So. 2d 80 (La.App. 5 Cir. 09/16/03).

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

On January 20, 2005, Bradley filed a pro se motion for post-conviction relief based upon ineffective assistance of counsel and DNA testing, which was summarily denied.

On July 2, 2008, Mr. Bradley filed a subsequent post-conviction motion, which was again summarily denied.

On May 18, 2021, Bradley's post-conviction motion based upon his non-unanimous verdict was denied.

## LIST OF THE EVIDENCE DISCOVERED SINCE TRIAL

**Evidence Presented for the First Time in this Motion**

The following evidence *was not* presented at trial or in a previous post-conviction motion:

1. **Exhibit D – Police Reports for Earl Bradley drug arrest**
2. **Exhibit E – Affidavit of Terri-Lee Isaac**
3. **Exhibit F – Letters from Amy Larck to Earl Bradley**
4. **Exhibit G – Affidavit of Mae Lucille Rivet Smith**
5. **Exhibit M – Criminal history of Amy Larck**
6. **Exhibit N – Past history of misconduct by Sgt. Grey Thurman**

## ARGUMENT

### POINT I: THIS PETITION SHOULD BE HEARD

Petitioner anticipates that, despite the truly compelling evidence set forth above, the State will seek to stop this Court's consideration of that evidence before it even begins. As it has done before, the State will no doubt rely upon the procedural bars and statute of limitations set forth in La.C.Cr.P. §§ 930.4 and 930.8 to argue that this petition is repetitive and/or out of time. This Court should reject that argument, both under the letter of the relevant statutes (including La.C.Cr.P. § 926.2) and because a persuasive showing of actual innocence, such as Bradley has made, should overcome any procedural bars.

As relevant here, La.C.Cr.P. § 926.2 specifically states the following:

> **B.(1)(a)** To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:
>
> **(i)** Scientific, forensic, physical, or nontestimonial documentary evidence.
>
> **(ii)** Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.

Here, Bradley Amy Larck's admissions, Mae Rivet Smith's affidavit, the video evidence,

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

the medical examiner's time of death and the Brady material supporting Bradley's innocence. Bradley clearly meets his burden here to be heard pursuant to La.C.Cr.P. § 926.2.

But Bradley also meets his burden under the law prior to Louisiana's codification of actual innocence. La.C.Cr.P. § 930.4 states that a post-conviction petition is deemed repetitive where it "alleges a claim of which the petitioner had knowledge and inexcusably failed to raise in the proceedings leading to conviction," "fails to raise a new or different claim," and/or "raises a new or different claim that was inexcusably omitted from a prior application." See La.C.Cr.P. § 930.4(B), (D), (E). Likewise, La.C.Cr.P. § 930.8 requires post-conviction applications to be made within two years after the conviction and sentence have become final, unless "the facts upon which the claim is predicated were not known to the petitioner or his prior attorneys" and that he has "exercised diligence in attempting to discover any post-conviction claims that may exist."

None of these provisions should bar the instant petition. The Brady material was only recently found. Larck's letters and Facebook messages are now being used now that Bradley has pro bono counsel. Ms. Smith's affidavit was just provided this year. And Thurman's history was just discovered. This was a comprehensive investigation that has taken time. See, e.g., People v. Tankleff, 49 A.D.2d 160, 180 (N.Y.App.Div. 2d Dep't 2007) ("[T]he due diligence requirement is measured against the defendant's available resources and the practicalities of the particular situation" (34 NY Jur 2d, Criminal Law § 3064, at 866; see People v Hildenbrandt, 125 AD2d 819, 821, 509 NYS2d 919 (2d Dep't1986))... The defendant's investigation resulted in a body of new evidence which required time to accumulate. He should not be penalized for waiting to amass all of the new evidence and then presenting it cumulatively to the County Court. Such conduct avoided separate motions upon the discovery of each witness [or development of each argument], obviated the squandering of resources, and preserved judicial economy.")

This is also not a petition that "fails to raise a new or different claim." No free-standing actual innocence claim has been raised by Bradley before. His previous petitions did not include claims of newly discovered evidence, Brady, fraud upon the court, and/or ineffective assistance of counsel *based on the full range of evidence known to him now*. He has not previously made a claim of cumulative error which includes these factors, nor has he raised the various procedural and Brady claims set forth below.

And by the same token, any failure to allege these claims in the prior petitions was not

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

"inexcusable," nor are those claims untimely, because they are based in large part on evidence that has been recently acquired and that could not previously have been raised with the exercise of diligence. La.C.Cr.P. § 930.8(1) defines "diligence" as a "subjective inquiry that must take into account the circumstances of the petitioner," including "the educational background of the petitioner, the petitioner's access to formally trained inmate counsel, the financial resources of the petitioner, the age of the petitioner, the mental abilities of the petitioner, *or whether the interests of justice will be served by the consideration of new evidence*" (emphasis added). Earl Bradley is and was an indigent prisoner serving a life sentence without the resources to hire investigators and attorneys, or to conduct the searches and interviews that the undersigned counsel has undertaken since becoming his attorney. This Court should remember that Bradley was just a junkie at the time of his arrest and had a record for drugs, not violence. And certainly, the interests of justice militate powerfully in favor of considering new evidence – especially since Amy Larck has made the admissions now before the Court. Larck's admissions are exponentially bolstered by the surveillance video, police investigation, and Dr. Susan Garcia's testimony regarding the time of death. Add Ms. Smith's statement to the mix – this evidence proves that Amy Larck's *trial testimony is false, and Earl Bradley is sitting in prison an innocent man.*

The courts of Louisiana have repeatedly held that, even where the State alleges a post-conviction petition to be repetitive and/or untimely, a hearing must be held where "[an] affiant stated that he had not previously revealed the information [in his or her affidavit] to any investigator or attorney representing relator," rendering it "reasonable to infer that trial counsel was unaware of the facts upon which the instant claim is based" and such facts "were not known to relator or his prior attorney [such that] the exception to the post-conviction limitations period applies." State v. Hurst, 209 So. 3d 701 (La. 2015); see also Alvarez v. State, ___ So. 3d ___, 2018 WL 4354727, *3 (La. App. 2018) (hearing required where there was reason to infer that facts were unknown to petitioner or his prior counsel, and where "defendant has argued persuasively that the nature of the new evidence is not such that it should have been discovered by the exercise of due diligence"); State v. Kang, ___ So. 3d ___, 2019 WL 150635, *4-5 (La. App. 2019) (where affidavits of defense counsel and investigator stated that they had not previously seen documents obtained post-trial, the petition could not be dismissed on the pleadings and a hearing was required). Here, likewise, issues are presented that cannot be



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

decided on the pleadings, and this Court must hear the witnesses on both the threshold issue of diligence and on the merits.

As the Supreme Court has emphasized, a defendant, like Bradley, who has never received a hearing to present his evidence, is not treated fairly where "no court, state or federal, has ever conducted a hearing to assess the reliability of the score of postconviction affidavits that, if reliable, would satisfy the threshold showing for a truly persuasive demonstration of actual innocence," In re Davis, 577 U.S. 952 (2009) (Stevens, J., concurring), and Bradley, too, surely deserves that one day in court.

Moreover, as a separate and independent reason to overcome any procedural bars and/or timeliness objections, persuasive claims of actual innocence have been recognized as a gateway for a Court to review underlying constitutional errors[9] and are not subject to procedural bars. Murray v. Carrier, 477 U.S. 478, 494 (1986).[10] Timeliness, too, must yield where actual innocence is shown. See McQuiggin v. Perkins, 569 U.S. 383 (2013). The Supreme Court has recognized that, in the extraordinary case, the principles of finality must yield "to the imperative of correcting [fundamental injustice]." House v. Bell, 547 U.S. 518, 536 (2006) (Schlup v. Delo, 513 U.S. 298, 324 (1995); Carrier, 477 U.S. at 495 (citations omitted)); see also Herrera v. Collins, 506 U.S. 390, 404 (1993).

The Supreme Court has established a criterion for individuals to assert actual innocence: with the presentation of the evidence the petitioner is now submitting to the court, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schulp, 513 U.S. at 327; see also Bell, 547 U.S. at 537. This holds the petitioner to the standard of presenting a truly extraordinary case, "while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." Schulp, 513 U.S. at 327(quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991).

As elucidated by the Bell Court, a habeas court *must consider all of the evidence, whether old or new "without regard to whether it would be necessarily admitted under rules of admissibility that would govern at trial.'"* 547 U.S. at 537-38 (Schulp, 513 U.S. at 327-28 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi.

---

[9] Bradley's claims of constitutional errors include fraud upon the court, Brady violations, and ineffective assistance of counsel.

[10] Indeed, at least one Federal court has held that a free-standing actual innocence claim was cognizable, although it found, after an evidentiary hearing, that the defendant had failed to sustain that claim. See In re Davis, 2010 U.S. Dist. LEXIS 87340 (S.D. Ga. 2010).



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

L. Rev. 142, 160 (1970) (emphasis added)).

To be sure, these Supreme Court holdings do not directly govern proceedings in the state courts of Louisiana. However, petitioner submits that the reasoning of the above cases – that any and all technical considerations must yield to the interests of justice where a defendant alleges convincingly that he is innocent – are just as persuasive in the context of a Louisiana post-conviction proceeding as in the context of federal habeas corpus. And for the reasons detailed in Point II *infra*, petitioner submits that he has more than made a sufficient threshold showing. As shown in the Preliminary Statement, Statement of Facts, and as listed in detail below, petitioner has presented evidence showing that he did not kill Barton Sanford. Bradley has shown that he is factually innocent and that he was convicted, not based on facts or evidence, but the testimony of one unreliable witness who admitted that she was a pathological liar and now has been proven as such. 6/13/2002 TT: 63. The only way to correct this injustice is to hear Mr. Bradley' petition now.

Petitioner anticipates that, despite the truly compelling evidence set forth above, the State will seek to stop this Court's consideration of that evidence before it even begins. As it has done before, the State will no doubt rely upon the procedural bars and statute of limitations set forth in La.C.Cr.P. §§ 930.4 and 930.8 to argue that this petition is repetitive and/or out of time. This Court should reject that argument, both under the letter of the relevant statutes and because a persuasive showing of actual innocence, such as Simmons has made, should overcome any procedural bars.

**<u>POINT II</u>: EARL BRADLEY IS ACTUALLY INNOCENT**

Turning to the merits, petitioner Bradley first submits that "all the evidence… old [and] new," <u>House</u>, 547 U.S. at 537-38, demonstrates clearly and convincingly that he is actually innocent of the crimes of which he was convicted. The State of Louisiana has finally recognized actual innocence when it codified La.C.Cr.P. § 926.2. The statute requires that a petitioner present "(i) Scientific, forensic, physical, or nontestimonial documentary evidence.
(ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph." The standard of proof is clear and convincing evidence that no rational juror would convict the petitioner.

Here, as admitted by both Amy Larck and the 5th Circuit, Appellate Division, Larck's testimony was fraught with inconsistencies and that Larck is an admitted pathological liar. <u>See</u>



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

State v. Bradley, supra. Neither the jury nor the Appellate Division heard Larck's admissions and rebuttal evidence embodied in letters to Bradley by letter and to Ms. Isaac by Facebook posts. See La. C.E. art. 804(A); State v. Raine, 238 So.3d 1076, 1084-1086 (La. 4th Cir. 2018)) and rebuttal evidence (State v. Trosclair, 443 So. 1098, 1106 (La. 1983); see generally State v. Heath, 513 So.2d 493 (La. 2d Cir 1987); See Exhibit E. This is documentary evidence of Larck's admissions that she lied. On this point alone, Bradley has met his burden.

But Larck's admissions are bolstered by the medical examiner's testimony regarding the time of death of Sanford and the video evidence. See Exhibit B; See Exhibit E. And notably, defense counsel never confronted Larck about the video evidence submitted as State's Exhibits 27-29. Larck was *never even seen on any of the surveillance video in or around the bar* and most certainly not on the most critical point, which was at or around 1:25AM on July 31, 2002. Even the police investigation failed to corroborate almost the entirety of Larck's version of events. See Exhibits A. And it should be no surprise to this Court that Larck also lied about her criminal record. See Exhibit N. She was wholly unreliable.

Adding further devastation to the State's case is Mae Lucille Rivet Smith's affidavit. See Exhibit H. Smith was clear that she remembered hearing shots in or around the time that Sanford. She is also clear that Earl didn't have a weapon and was not in the alley at that point.[11] Ms. Smith's affidavit and version of events are corroborated by her statements to police some 23 years ago and the surveillance video.

Based upon the above, it is now evident that there is clear and convincing evidence that no rational juror would convict Bradley.

**POINT III: NEWLY DISCOVERED EVIDENCE WOULD HAVE PROBABLY CHANGED THE VERDICT HAD THE JURY HEARD WHAT IS NOW BEFORE THE COURT**

This Court also can and should grant relief on the ground that the evidence discovered since the trial, even if not sufficient to constitute clear and convincing evidence of actual innocence (which it is), undermines the verdict. In Louisiana, "[a] defendant seeking a new trial based on newly discovered evidence must establish four elements: (1) that the new evidence was discovered after trial; (2) that failure to discover the evidence before trial was not attributable to his lack of diligence; (3) that the evidence is material to the issues at trial; and (4) that the evidence is of such a nature that it would probably produce a different verdict in the event of

[11] We know that Earl never went down that alley; only Smith did.



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

retrial." State v. Cavalier, 701 So. 2d 949, 951 (La. 1997). "In ruling on the motion, the trial judge's duty is not to weigh the evidence as though he were a jury determining guilt or innocence, rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury's judgment." Id., quoting State v. Prudholm, 446 So. 2d 729, 736 (La. 1984).

A court weighing a newly discovered evidence motion cannot deny the motion simply on the basis that the evidence presented by the State was legally sufficient to convict; instead, in weighing the newly discovered evidence against the proof at trial, it must determine whether the trial evidence "appears strong enough to support a conclusion that the newly discovered evidence probably would not have changed the verdict, when one considers the newly discovered evidence that would be presented at a new trial." Cavalier, 701 So. 2d at 752.

Here, these four elements are satisfied. First, the evidence of Larck's admissions, undisclosed convictions, and Ms. Smith's affidavit have only been recently discovered.

Second, the evidence could not have been obtained prior to or during trial through the exercise of diligence. First, Larck's admissions were most certainly not obtainable because she was not available at the time -- she was the State's witness, who risked perjury, as she had testified at Bradley's first trial that he was the killer. Her previous convictions were undisclosed, even though they were requested by defense counsel. Smith's affidavit contains evidence that no one knew at the time of Bradley's trial. And if the revelations in Smith's affidavit are not newly discovered, they are the product of ineffective assistance of counsel for defense counsel's failure to interview and call Ms. Smith.

Third, the evidence is clearly material to the issues at trial. Amy Larck was the only witness and the only piece of evidence that indicated Bradley killed Sanford. The evidence presented here provides documentary proof about the unreliability of Larck's testimony, rebuttal evidence, statements against penal interest, and, essentially, alibi evidence. Notably, the standard of materiality in a newly discovered evidence claim is less demanding than in an actual innocence claim. See Alvarez, supra, 2018 WL 4354727, *3. And none of the evidence here could possibly be called anything other than material. The evidence casts direct light on the issue of whether Earl Bradley actually killed Barton Sanford.

Fourth and finally, the evidence is "of such a nature that it would probably produce a different verdict in the event of retrial." Cavalier, 701 So. 2d at 951. The Preliminary Statement and Point II supra explains in detail why the totality of this evidence completely devastates the

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

prosecution's case, and rather than repeating the arguments of the Preliminary Statement and Point II in detail, petitioner refers this Court to those arguments as a showing of how the entire case was built of lie upon lie. There is both directly exculpatory and impeachment evidence herein, and again, even if this Court were to consider it the latter, "the court possesses the discretion to grant a new trial when the witness's testimony is essentially uncorroborated and dispositive of the question of guilt or innocence and it appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result." Cavalier, 701 So. 2d at 951, quoting United States v. Davila, 428 F.2d 465, 466 (9th Cir. 1970). "In making this determination, the court may assume that the jury would have known that the witness had lied about the matter." Id. at 952. Here, Larck's testimony was *not* "corroborated" by anything. Indeed, the medical examiner's testimony and video evidence attached herein *negates* both Larck – and her testimony, as the only proof against Bradley, was so "dispositive of the question of guilt or innocence" that a jury "know[ing] [they] had lied about the matter" would plainly have reached a different verdict.

And finally, to the extent relevant to this Court's analysis of the issue, the new evidence would be admissible at a retrial. As stated in the Preliminary Statement, the evidence in this motion is statements against penal interest and rebuttal evidence by Amy Larck to other witnesses, evidence from Ms. Smith, a person that everyone knew was present that early morning, impeachment evidence, video evidence, and medical evidence.

Thus, petitioner has come before this Court with compelling evidence that satisfies all the elements of Cavalier – it is new, it could not have been presented at trial via the exercise of diligence, it is material to the issues on trial, and any jury hearing it would probably, and indeed surely, have returned a verdict of acquittal. This Court should vacate his conviction and dismiss the charges or order a new trial.

**POINT IV: AMY LARCK TESITIFIED FALSELY. AS SUCH, A FRAUD WAS PRESENTED TO THE COURT.[12]**

Separately and apart from the issue of newly discovered evidence, petitioner is also entitled to relief on the ground that the *old* evidence – the trial testimony of Amy Larck – was

[12] Frankly, the trial prosecutor treaded very closely to misrepresenting the surveillance footage in this case and thereby committed prosecutorial misconduct. Berger v. United States, 295 U.S. 78, 88 (1935) (Although a prosecutor "may strike hard blows, he is not at liberty to strike foul ones," and it is "his duty to refrain from improper methods calculated to produce a wrongful conviction.")



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

perjured and that the prosecutor knew or should have known that it was perjured.[13] This constituted a fraud on the court and a due process violation under Napue v. Illinois, 360 U.S. 264, 269-71 (1959), and its progeny. See also Bradley v. Cain, 647 F.3d at 271-272.

As a threshold matter, Bradley's gateway claim of innocence allows this Court to address an underlying constitutional claim, such as fraud upon the court. Schlup v. Delo, 513 U.S. 298 (1995); see also La.C.Cr.P. § 926.2.

It is well settled under Napue and its progeny that prosecutors may not permissibly rely on false testimony to obtain a conviction, and in fact has an affirmative obligation to correct the record if its witnesses testify falsely. Notably, in order to obtain relief on a Napue claim, it is not necessary to prove that the State's notice of the falsehood was actual; instead, relief is mandated if the prosecuting attorney had constructive notice of the falsity of the testimony, e.g., through documents in its file. See Creel v. Johnston, 162 F.3d 385 (5th Cir. 1998); Graham v. Wilson, 828 F.2d 656 (10th Cir. 1987).[14] "In order to establish knowing use of perjured testimony the petitioner may rely on circumstantial evidence, and need only show either actual or constructive knowledge." Smith v. Page, 1998 WL 25197 (N.D. Ill. 1998). Moreover, the State's knowing use of perjurious testimony in violation of Napue has been held to require "virtually automatic" reversal. United States v. Wallach, 935 F.2d 445, 456 (2d Cir.1991).

In sum, Napue and its progeny require a new trial if "(1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material." State v. Phillips, 61 So. 3d 130, 136 (La. App. 2011), citing United States v. O'Keefe, 128 F.3d 885, 893 (5th Cir. 1997).

First, it is law of the case that the 5th Circuit Appellate Division of Louisiana found Larck to have provide inconsistent testimony, albeit, not about the material fact of who killed Barton Sanford. See State v. Bradley, supra.

Here, with the evidence presented in this motion, it is patent that the testimony of Larck was false, and that such falsity was known to the prosecution through the surveillance video, the

[13] Specifically, her criminal history and her presence at the Happy Hour Bar and in the alley or vicinity of the alley at the time of the shooting of Barton Sanford.

[14] Here, the sheriff's department's supplemental report (Exhibit A), the surveillance video (Exhibit B), the medical examiner's testimony (Exhibit E), and Amy Larck's criminal history (Exhibit N) were in the possession of the prosecutor. Larck's testimony contrary to the truth was known or should have been known.

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

sheriff's supplemental report and the medical examiner's testimony.[15] Moreover, the prosecutor should have known that Larck, even in her early 20's, was a career criminal, not just in Louisiana but in other states. See Creel, supra. The State allowed Larck to essentially testify that she was a tax paying citizen until she came to Marrero, La.

And there can be no doubt that the false testimony was material. Amy Larck was the only evidence of guilt and the State's entire closing was predicated on Larck's credibility. Without the false testimony, there was no evidence that Earl Bradley killed Barton Sanford. Napue and its progeny thus require that Bradley' conviction at long last be set aside.

**POINT V: THE STATE COMMITTED A BRADY VIOLATION**

Next, the State violated Brady v. Maryland, 373 F.3d 83 (1963) and its progeny by its nondisclosure Amy Larck's out-of-state criminal history in the years prior to her arrival in Louisiana. See Exhibits N.

As a threshold matter, Bradley's gateway claim of innocence allows this Court to address an underlying constitutional claim, such as Brady. Schlup v. Delo, 513 U.S. 298 (1995); see also La.C.Cr.P. § 926.2.

**Brady Standard:** In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The Court observed that "[a] prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant." Id. at 87-88. "That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice," even if the suppression "is not the result of guile." Id. at 88.

In a series of subsequent decisions, the Court has refined both the scope of Brady disclosure and the meaning of the term "material to guilt or punishment." In Giglio v. United States, 405 U.S. 150 (1972), for instance, the Court held that the Brady obligation extends to evidence that would impeach the credibility of prosecution witnesses. "Where the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the] general [Brady] rule." Id. at 154. Thus, in a case where – as here –

[15] In fact, there was a tense exchange between the trial prosecutor and the medical examiner, when the trial prosecutor attempted to lead the ME to state that the time of death fit the shooting of Barton Sanford in the early morning hours of July 31, 1999. The ME declined and stated a time of death that was far from that timeline. See Exhibit E, pg. 6.



E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

the government's proof "depended almost entirely" on the testimony of witnesses, the witnesses' credibility "was therefore an important issue in the case," and the jury was entitled to know of information bearing on it. Id. at 154-55.

The Giglio court also expanded upon the relevant standard of materiality, adopting the same metric as in Napue, supra, i.e., that reversal is required where the withheld evidence "could in any reasonable likelihood have affected the judgment of the jury." See Giglio, 405 U.S. at 154.

In United States v. Agurs, 427 U.S. 97, 111-12 (1976), the Court held that the Brady obligation existed regardless of whether or not a specific request for exculpatory evidence was made, but that where no such request was made, the standard of materiality was more than that required to overcome a claim of harmless error. Nevertheless, "the proper standard of materiality must reflect [an] overriding concern with the justice of the finding of guilt." Id. at 112. Since a finding of guilt is permissible only if proven beyond a reasonable doubt, "it necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." Id. "This means that the omission must be evaluated in the context of the entire record," and that "*if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt*." Id. at 113 (emphasis added).

In United States v. Bagley, 478 U.S. 667 (1985), the Court reaffirmed that, as held in Giglio, supra, "[i]mpeachment evidence... as well as exculpatory evidence, falls within the Brady rule," because "[s]uch evidence is favorable to the accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." Id. at 676. The Court "rejected any... distinction between impeachment evidence and exculpatory evidence" in terms of materiality. Id. The Bagley Court further found that the standard of materiality in all cases was reasonable probability, which it characterized, consistently with Agurs, as "a probability sufficient to undermine the outcome."

In Kyles v. Whitley, 514 U.S. 419, 434 (1995), the Court elaborated upon the meaning of "reasonable probability," noting that "[f]our aspects of materiality under Bagley bear emphasis." First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Id. "[T]he adjective [reasonable] is important," and "the question is not whether the

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.

"The second aspect of Bagley materiality bearing emphasis… is that it is not a sufficiency of the evidence test." Id. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434-35. "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict," and thus, the required showing is "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435.

"Third, we note that, contrary to the assumption made by the Court of Appeals, once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review," because Bagley materiality includes a finding of harmfulness. Id. (citation omitted). And fourth, in determining materiality, "suppressed evidence [is to be] considered collectively, not item by item." Id. at 436.

In Strickler v. Greene, 527 U.S. 263, 280-82 (1999), the Court summed up its Brady jurisprudence by opining that there are three "essential elements of a Brady violation," namely (i) suppression, (ii) of favorable evidence, (iii) that is material to guilt or punishment. This formulation, as well as the Bagley/Kyles definition of materiality, has been reiterated in numerous subsequent Supreme Court decisions. See, e.g., Wearry v. Cain, 136 S. Ct. 1002, 1006-07 (2016) (finding Brady violation where prosecutor failed to disclose impeachment evidence concerning the witness who provided "the only evidence directly tying [Wearry] to [the] crime" of which he was convicted, even though other impeachment evidence was available); Smith v. Cain, 566 U.S. 73, 75-76 (2012) (Brady violation occurred where impeachment evidence was withheld concerning the only eyewitness to the crime); see generally Cone v. Bell, 556 U.S. 449, 469-70 (2009) (summarizing the Brady standard); Banks v. Dretke, 540 U.S. 668, 698-99 (2004) (same).

**Brady Was Violated:** The withholding of exculpatory evidence, namely the previous criminal history of Amy Larck, in this case clearly violated Brady. This Court should note that the State's entire closing was focused on the credibility – how credible Amy Larck was.

At least as much to the point, however, Amy Larck's previous out-of-state convictions

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

falls well within Brady, Giglio and their progeny. As discussed above, Brady material is evidence that is (i) suppressed, (ii) favorable to the accused, and (iii) material. Here, the prosecuting attorney has acknowledged that the evidence in question was in the possession of the State prior to trial but was not disclosed.

As to materiality, this evidence would certainly have resulted in a reasonable probability of a different verdict – had the jury heard that Larck had lied about her criminal history – that she was a career prostitute who abused children would have been devastating to the State's only piece of evidence. State v. Bright, 875 So.2d at 41-45. This especially rings true when one considers the focus of the State's summation which focused on Larck's credibility.

Not only is a reasonable probability less than a preponderance as Kyles makes clear, but it is fairly low threshold," see Riggs v. Fairman, 399 F.3d 1179, 1183 (9th Cir. 2005), which is satisfied whenever the chances of a different outcome are "better than negligible." See Ward v. Jenkins, 613 F.3d 692, 701 (7th Cir. 2010). Indeed, as the Agurs and Wearry Courts, supra, stated, even evidence of "relatively minor importance" will be sufficient to satisfy the outcome where, as here, the case was shaky to begin with.

And the withheld evidence here was far more than "minor." The lynchpin of the State's case at trial was solely Larck's credibility that Bradley shot and killed Sanford. Now with the body of evidence, including Larck's admissions that she lied about Bradley's and her own involvement in Sanford's death, the State's case is devastated. The State's case is based upon a witness that lied about one thing after another. Falsus in uno, falsus in omnibus.

In sum, this is as clear a case of a Brady violation. Impeachment evidence was clearly suppressed, and the likelihood that the outcome would have been different had this evidence been disclosed is not merely "reasonable" but overwhelming with the complete lack of corroborating physical evidence in this case. And when the withheld Brady material is considered in light of the further exculpatory evidence that has developed *since* the trial, Mae Lucille Rivet Smith's affidavit, Larck's admissions over the years and the medical and surveillance evidence, there can be no possible question that Bradley's conviction must be vacated.

**POINT VI: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO INVESTIGATE OR CALL MAE LUCILLE RIVET SMITH AND USE THE SURVEILLANCE FOOTAGE, THE MEDICAL EXAMINER'S TIME OF DEATH, AND THE SHERIFF'S SUPPLEMENTAL REPORT TO PROVE EARL BRADLEY'S INNOCENCE.**

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Sixth, Bradley received ineffective assistance at trial. This is a patent case of ineffective assistance of counsel based upon defense counsel's failure to call Smith,[16] and use the police investigation, surveillance footage and the ME's time of death determination to attack the fictional story told by Larck. What possible strategy could excuse counsel's failure to conduct even the most elementary follow-up and investigation concerning this evidence, much less his failure to use it when cross-examining the State's witnesses? There was no strategy to this failure. In fact, based upon the failure of defense counsel's failure to use the surveillance video to exonerate Bradley, the prosecutor was able *to cherry pick the portions of the video that supported the State's position without rebuttal on summation.*[17] Without belaboring a factual recitation of these points, this Court should see the Preliminary Statement and POINT II to see in-depth arguments of the value of this evidence.

It is axiomatic that under the United States Constitution that criminal defendants are entitled to effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). Under Strickland and its progeny, a defendant who claims that he was denied the effective assistance of counsel must meet a two-prong test: he must show both that his attorney fell below accepted professional standards and that he was prejudiced by his counsel's lapse. See id. The Strickland standard is applicable both federally and in the courts of Louisiana. See State v. Thomas, 124 So. 3d 1049, 1053 (La. 2013); State v. Washington, 491 So. 2d 1337, 1339 (La. 1986).

The first prong of the standard measures counsel's performance against professional norms existing at the time of the representation. See Strickland, 466 U.S. at 688-89. Although counsel's performance is viewed deferentially, see id., at 689-90, this deference does not extend to errors of omission for which counsel cannot provide any reasonable strategic or tactical justification. See Berryman v. Morton, 100 F.3d 1089, 1096-97 (3d Cir. 1996) (in Section 2254 habeas case, holding that even if the state court was correct in finding that the petitioner's counsel had a strategy, that strategy was unreasonable as a matter of law); see also Libberton v. Ryan, 583 F.3d 1147, 1169 (9th Cir. 2009) (finding that failure to pursue mitigating evidence could not be justified by any valid strategy); Sullivan v. Fairman, 819 F.2d 1382 (7th Cir.1987)

[16] The failure to use Smith is assuming the Court finds that Smith's statements are *not* newly discovered evidence.

[17] In fact, this strategy by the trial prosecutor was genius. He had the last word on a piece of evidence that would have eviscerated his case. His use of the video was the pinnacle point of the trial, and it highlights defense counsel's failure to do so. 6/13/2002 TT: 130-134.





E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

(counsel "should not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy and tactics'").

In order to demonstrate prejudice under the Strickland standard, the defendant must show a reasonable probability that his counsel's errors affected the outcome of the trial or on his direct appeal. See Strickland, 466 U.S. at 686. The reasonable probability standard is the same as discussed above for Brady material – i.e., it is not a sufficiency test, it does not require a preponderance, and is satisfied by any "better than negligible" chance that the outcome would have been different. See Kyles, supra; Ward, supra. Thus, a defendant need not show that he would have been acquitted or that he would have been entitled to judgment as a matter of law had his counsel not erred, but only that his counsel's performance undermines confidence in the outcome when considered as part of the whole case. Id. Moreover, this determination may be made with the benefit of hindsight. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

The ineffective assistance standard does not contemplate "averaging out" counsel's performance, and a prejudicial error cannot be excused simply because the defense counsel's performance was adequate or even superior in other respects. See generally Rosario v. Ercole, 617 F.3d 683 (2d Cir. 2010); accord Henry v. Poole, 409 F.3d 48, 70-71 (2d Cir. 2005).

In this case, the strategy pursued by defense counsel was attacking the credibility of Amy Larck. Ms. Smith's statements to police were devastating to the State's case. As she stated in her affidavit, Bradley's attorney failed to even speak to her. The medical evidence in this case and the surveillance video are even more plainly exculpatory than Smith's statements. As is the Sheriff's Supplemental Report, which details the review of the video and provides no indication that Larck is anywhere near the Happy Hour Bar, let alone that alleyway when Sanford enters it. It is incomprehensible as to why defense counsel did not marshal this evidence. "An attorney's failure to present available exculpatory evidence is *ordinarily* deficient, unless some cogent tactical or other consideration justified it," Eze v. Senkowski, 321 F.3d 110, 121 (2d Cir. 2003) (emphasis added), and here, no such tactical consideration, cogent or otherwise, existed.

Petitioner has clearly demonstrated ineffective assistance of counsel and is entitled to vacatur on that basis in addition to the other reasons set forth above.

**POINT VII: AT A MINIMUM, A HEARING MUST BE HELD TO DETERMINE THE VERACITY OF BRADLEY' CLAIMS**

Petitioner submits that no hearing is necessary to grant this motion. As discussed in the Preliminary Statement and Point II *supra*, the proof newly submitted with this motion, combined

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

with all the exculpatory evidence withheld before the trial – "all the evidence, old and new" – overwhelmingly proves his innocence. There is nothing left of the case against Bradley and petitioner submits that, at this point, the State can no longer claim in good faith that he is guilty.

If the State does dispute Bradley' innocence, however, any such dispute is an issue of credibility that cannot be determined on the pleadings. If the witnesses whose affidavits and the reports and other evidence that are annexed to this report are credited, then Bradley is innocent – no ifs, ands, or buts – and therefore, this Court cannot dismiss the petition without hearing from them and determining whether they *should* be credited. Where the resolution of a PCR petition hinges on factual disputes, the petition cannot be decided on the pleadings. See La.C.Cr.P. § 926.2; see Hurst, supra; Alvarez, supra; Kang, supra. Therefore, at minimum, this Court should schedule an evidentiary hearing at which Bradley witnesses may be heard, see Davis, supra, and at which he may prove his innocence conclusively.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court should issue an Order granting this petition or alternatively scheduling a hearing thereon and granting such other and further relief to petitioner as it may deem just and proper.

**Dated: December 28 2022**
**New Orleans, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

Walker Lasiter
P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

E-Filed:12/28/2022 11:32:30 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

# Exhibit A

# JEFFERSON PARISH SHERIFF'S OFFICE
## HOMICIDE SECTION
**Detective Donald Meunier**

**Supplemental Report**
**H-619-99**

---

WM 7BM 1 1A 1-1

**Incident:** Second Degree Murder

**Day/ Date/ Time:** Saturday/ July 31, 1999/ @ 1:25am

**Location of Occurrence:** 7501 4th Street, Marrero

**District/ Rep Area:** Third District/ 3102

**Victim:** Barton M. Sanford [redacted]

**Suspect # 1: Albert Russell a.k.a. " Mice" or " Micie"**
Black/ Male
DOB: [redacted]
SSN: [redacted]
5'11"/ 210lbs./ Black hair/ Brown eyes
468 Wilson Street, Marrero

**Suspect # 2: Earl Bradley**
Black/ Male
DOB: [redacted]
SSN: [redacted]
5'11"/ 160lbs./ Black hair/ Brown eyes
6305 4th Street, Marrero

**Violation:** R.S.14:30.1 Second Degree Murder

Detective Donald Meunier

Approving Supervisor

Victim: Barton Sanford 3 3102 H-619-99

**Persons Interviewed:**

**August 1, 1999**

1) Mae Rivet Smith W/F; [redacted]

2) Dale Scott Fryer W/M

3) Karen Parks W/F;

4) Randall Relan W/M;

**August 2, 1999**

5) Patricia Boudreaux W/F; [redacted]

**August 4, 1999**

6) Mae Rivet Smith W/F; [redacted]
(3 Statements)

7) Rachael Perret W/F; [redacted]

**August 7, 1999**

8) Craig Mayeaux W/M; [redacted]

9) Earl Bradley N/M;
(4 Statements)

10) James Artberry N/M;

11) Michael Harris N/M;

12) Teena Breaux N/F;

**August 9, 1999**

13) Lucille Palmer W/F; [redacted]

Detective Donald Meunier

Approving Supervisor

**August 10, 1999**

14) Lloyd Every III N/M; [redacted]

15) Tammy Disher W/F; [redacted]

**August 11, 1999**

16) Karen Breaux W/F; [redacted]

**August 12, 1999**

17) James Artberry N/M; [redacted]

18) Amy Larck W/F; [redacted]
(2 Statements)

**August 18, 1999**

19) Amy Larck W/F; [redacted]

**August 30, 1999**

20) Albert Russell N/M; [redacted]

21) Christy Hudson W/F; [redacted]

**October 25, 1999**

22) Amy Larck W/F; [redacted]

**Exhibits:**

Exhibit 1) Transcription of an audio taped statement of Mae Rivet Smith
Exhibit 2) Transcription of an audio taped statement of Dale Scott Fryer
Exhibit 3) Transcription of an audio taped statement of Karen Parks
Exhibit 4) Transcription of an audio taped statement of Randall Relan
Exhibit 5) Transcription of an audio taped statement of Patricia Boudreaux

Detective Donald Meunier

Approving Supervisor

Exhibit 6) JPSO Rights of Arrestee or Suspect Form endorsed by Mae Rivet Smith
Exhibit 7) Transcription of an audio taped statement of Mae Rivet Smith
Exhibit 8) Transcription of an audio taped statement of Mae Rivet Smith
Exhibit 9) Transcription of an audio taped statement of Mae Rivet Smith
Exhibit 10) Transcription of an audio taped statement of Rachael Perret
Exhibit 11) Transcription of an audio taped statement of Craig Mayeaux
Exhibit 12) JPSO Rights of Arrestee or Suspect Form endorsed by Earl Bradley
Exhibit 13) Transcription of an audio taped statement of Earl Bradley
Exhibit 14) Transcription of an audio taped statement of Earl Bradley
Exhibit 15) Transcription of an audio taped statement of Earl Bradley
Exhibit 16) Transcription of an audio taped statement of Earl Bradley
Exhibit 17) Transcription of an audio taped statement of James Artberry
Exhibit 18) Transcription of an audio taped statement of Michael Harris
Exhibit 19) Transcription of an audio taped statement of Teena Breaux
Exhibit 20) Transcription of an audio taped statement of Lucille Palmer
Exhibit 21) Transcription of an audio taped statement of Lloyd Every III
Exhibit 22) Transcription of an audio taped statement of Tammy Disher
Exhibit 23) Transcription of an audio taped statement of Karen Breaux
Exhibit 24) Transcription of an audio taped statement of James Artberry
Exhibit 25) Transcription of an audio taped statement of Amy Larck
Exhibit 26) Transcription of an audio taped statement of Amy Larck
Exhibit 27) Transcription of an audio taped statement of Amy Larck
Exhibit 28) JPSO Rights of Arrestee or Suspect Form endorsed by Albert Russell
Exhibit 29) Transcription of an audio taped statement of Albert Russell
Exhibit 30) Transcription of an audio taped statement of Christy Hudson
Exhibit 31) Transcription of an audio taped statement of Amy Larck
Exhibit 32) Warrant of Arrest for Earl Bradley
Exhibit 33) Warrant of Arrest for Albert Russell
Exhibit 34) Search Warrant for 468 Wilson Road, residence of Albert Russell
Exhibit 35) Seventy five rounds of Ammunition recovered from 468 Wilson St.
44 – 7.62 caliber rounds
17 - .38 caliber rounds
33 - .25 caliber rounds
1 – 9mm rounds
Exhibit 36) Photographic Line-up / Albert Russell
Exhibit 37) Transcription of an audio taped statement of Amy Larck
Exhibit 38) Seven video surveillance tapes from the Happy Hour Saloon from Friday, July 30, 1999 through Sunday, August 1, 1999
Exhibit 39) Twelve AFIS photographs, including Earl Bradley
Exhibit 40) Autopsy Report – Jefferson Parish Forensic Center

**Custody of Exhibits:**
Exhibits 1-34 and 36-40 will be secured in the Homicide Evidence Locker.
Exhibit 35 was logged on page 02 of the Homicide Evidence Book and transferred to Property and Evidence.

Detective Donald Meunier

Approving Supervisor

## Narrative:

On Sunday, August 1, 1999, at approximately 6:20pm, members of the Jefferson Parish Sheriff's Office (JPSO) Third District responded to a 9-1-1 from 7501 4th Street, Happy Hour Saloon, in reference to a report of a lifeless white male discovered beneath a trailer located at 7501 ½ 4th Street. Upon arrival, Third District Deputies K. Pierce and G. Castaneda, JP 3B1, along with Sergeant J. Forcade, JP 3B20, entered the rear alley directly behind the Happy Hour Saloon from the accessible point of entry on Jung Boulevard. Once in the alley, the deputies observed a lifeless white male lying in a supine position partially beneath a trailer, which bears the municipal address of 75011/2 4th Street. As the white male was in the early stages of decomposition, the deputies notified the JPSO Detective Bureau and the Coroner's Office.

Subsequent to notification, Crime Scene Technician Koelling, JP815, Investigator Mark Bone of the Coroner's Office and Detective Joseph Picone, JP595, of the Robbery Section, who was assigned the on-call responsibilities for crimes against persons, arrived on scene. The initial external examination of the deceased by Coroner's Investigator Bone revealed a single gunshot wound to the left chest area. At that time notification was made to the Homicide Section.

Upon notification, Lieutenant Steve Buras, Sergeant Grey Thurman and Detective Donald Meunier of the Homicide Section responded to the scene. Once on scene, assisting detectives conducted a general canvass within the vicinity and questioned patrons of the Happy Hour Saloon in an effort to locate potential witnesses. Upon his return, Marcel Alverez Flores, the resident of the aforementioned trailer located at 7501 ½ 4th Street, was questioned relative to the discovery of the victim beneath his trailer. The questioning of Flores produced no information pertinent to the investigation.

Sergeant Thurman and Detective Meunier processed the scene with assistance from Crime Scene Technician Koelling. Prior to completion of the scene processing, Detective Piconne advised Detective Meunier he had obtained all video surveillance tapes from the single, interior camera and the three exterior cameras of the Happy Hour Saloon from Friday, July 30, 1999 through Sunday, August 1, 1999. At that time the surveillance tapes were transferred to the custody of Detective Meunier and the Homicide Section for subsequent viewing. The Happy Hour Saloon video surveillance tapes will be retained within the JPSO Homicide Evidence Locker.

The Happy Hour Saloon employes the use of four surveillance cameras; one positioned on the interior and three on the exterior of the establishment. Of the three exterior cameras two are located on 4th Street on either side of the main entrance; one facing east, the other facing west. The last remaining exterior camera is located atop a wooden pole on Jung Boulevard at the southeast corner of the alley directly behind the Happy Hour Saloon. Each surveillance tape is intended to cover a twenty- four-hour time period. By policy, no tapes are retained for more than one week without being re-used.

The crime scene was established as a rectangular alley, enclosed on three sides and located directly behind the Happy Hour Saloon, 7501 4th Street. The alley has an accessible and unobstructed point of entry at its east end from Jung Boulevard. The west end of the alley is accessible only through a padlocked wooden gate centered on a standard wooden fence with wood lattice attached above. The south side of the alley is bordered by a residential trailer bearing the municipal address of 7501 ½ 4th Street, despite its actual location on Jung Boulevard. The trailer was subsequently established to be the residence of one Marcel Alverez Flores. The alley affords no direct access to either the Happy Hour Saloon or the trailer.

The victim was discovered in a supine position in the south-west corner of the alley partially beneath the aforementioned trailer. The victim was positioned with his head to the west and completely beneath the trailer and his feet to the east with the lower portion of the legs extended beyond the trailer into the alley. The victim was clad in a white tee shirt, labeled "Recycle Life", blue jeans with a black leather belt and brown work type boots. An on-scene inventory of the victim's clothing revealed the following: $57.45 in United States currency within the left front pant pocket, a set of keys in the right front pant pocket and a crescent wrench and wallet in the right rear pant pocket. Within the wallet was identification bearing the name of Barton Sanford. An external examination of the victim revealed a single gunshot wound entry to the left chest area with an exit through the back, left of mid-line. The entry and exit penetrated the tee shirt in a manner consistent with the wound entry and exit. Additionally, the victim exhibited the initial stages of decomposition with visible signs of marbling and blanching on the back and right arm, which was consistent with his position beneath the trailer. Once the victim was extracted from beneath the trailer, a minimal blood-like substance was observed in the mud and on a weather-beaten plywood board on which the victim was resting. Neither a weapon nor any casings were recovered from the scene.

Crime Scene Technician Koelling secured overall scene photographs, including photographs of the victim. Technician Koelling then obtained hair samples from the victim and four blood samples; three from the board and one from the mud. Additionally, a gunshot residue test was administered on the victim at the scene. The deceased was transported to the Jefferson Parish Forensic Center pending an autopsy scheduled for the morning of August 2, 1999.

On August 2, 1999 at approximately 8:40am Sergeant Thurman and Detective Meunier attended the autopsy of the deceased, which was performed by Forensic Pathologist Susan Garcia at the Jefferson Parish Forensic Center, 2018 8th Street in Harvey. The autopsy established the deceased "sustained a single gunshot wound to left chest area which resulted in a perforation of the body and injury to the heart and lung. Early decompositional changes are consistent with time last seen and increased temperature. Manner of death is homicide." A copy of the autopsy report is attached to and considered a permanent part of this record.

Detective Donald Meunier

Approving Supervisor

Based on the identification recovered from the victim's person, detectives accessed criminal history records on Barton Sanford from which a photograph was obtained. The photograph positively established the identity of the victim as Barton M. Sanford. Barton M. Sanford, also known as " Bartman" by various patrons of the Happy Hour Saloon, was an occasional patron believed to be currently employed at Avondale Shipyard. Subsequent contact with Avondale Shipyard identified the victim as an employee of LA Resources, a subcontractor for Avondale Shipyard. LA Resources, located at 1037 West Bank Expressway, confirmed the victim was originally from Orange County, Texas and as of July 8, 1999 was employed by LA Resources as a ship-fitter at Avondale Shipyard.

Due to the degree of decomposition present upon discovery of the victim during the evening hours on Sunday, August 1, 1999, detectives initially reviewed the Happy Hour Saloon surveillance tapes from Friday, July 30, 1999. Prior to midnight on Friday, July 30, 1999, one of the two surveillance cameras located on either side of the front entrance to the Happy Hour Saloon, namely the camera positioned to the west of the entrance facing east, captured the image of the victim as he exited a Westbank taxi cab at the intersection of 4th Street and Jung Boulevard. The victim exited the cab alone and subsequently entered the Happy Hour Saloon. Through subsequent investigation, detectives identified the taxi cab driver as Craig Mayeaux.

Upon reviewing video taken on Friday, July 30, 1999 from the interior surveillance camera at the Happy Hour Saloon, detectives observed the victim. As the surveillance video established the victim was present at the Happy Hour Saloon on Friday, July 30, 1999 prior to midnight, detectives obtained the work schedule for bartenders on that date. The schedule identified one Francis Lowery as the bartender on Friday, July 30, 1999 between 4:00pm and midnight. As such, detectives questioned Francis Lowery relative to the presence of the victim on the aforesaid date. Francis Lowery confirmed she was tending bar at the Happy Hour Saloon on Friday, July 30, 1999 between 4:00pm and midnight and confirmed the presence of the victim, whom she identified as "Bartman", an occasional patron of the Happy Hour Saloon. Francis Lowery additionally informed detectives she allowed the victim to remain in the establishment, but refused to serve him alcohol based on his apparent level of intoxication upon arriving that night. Francis Lowery additionally assisted detectives by viewing segments of the aforesaid surveillance tapes and identifying various individuals observed therein.

Further viewing of the surveillance tapes from both cameras facing east and west on 4th Street on Friday, July 30, 1999 revealed the victim's contact with a black male patron, identified as Earl Bradley, in the front area of the Happy Hour Saloon shortly after his arrival. Both Bradley and the victim were then observed walking together west on 4th Street out of camera range and returning to the front of the bar shortly thereafter. At that time, neither was wearing a shirt, but after a brief exchange both re-attired. These observations were captured on the two surveillance cameras located on 4th Street to the east and the west of the front door to the Happy Hour Saloon.

Detective Donald Meunier

Approving Supervisor

A third exterior surveillance camera concealed atop a wooden pole on Jung Boulevard at the south-east corner of the alley behind the Happy Hour Saloon captured the victim walking alone on Jung Boulevard southbound from 4th Street into said alley. The positioning of this third exterior camera afforded an unobstructed view of the victim, clad in a white or light colored tee shirt and blue jeans, as he entered the alley alone at approximately 1:25am on Saturday, July 31, 1999. However, this camera was positioned in such a way as to allow unobserved entry and exit of the alley if approached from the south on Jung Boulevard. Despite continued viewing of the Jung Boulevard camera, both 4th Street cameras and the interior bar camera, the victim was never observed exiting the alley nor was he observed in or about the establishment after the time he entered the alley on Saturday, July 31, 1999 at approximately 1:25am.

Continued viewing of the Jung Boulevard camera revealed only one individual entering and departing the alley after the victim entered at approximately 1:25am on Saturday, July 31, 1999. This individual, subsequently identified as Mae Rivet Smith, was interviewed on August 1, 1999 and August 4, 1999 relative to her repeated entry and exit from the alley on Saturday, July 31, 1999 after 1:25am. Mae Rivet Smith conceded concealing drug paraphernalia within the alley and thus entered the alley each time she required said paraphernalia. Nonetheless, Mae Rivet Smith stated she never observed the presence of anyone in the alley during her repeated albeit brief excursions therein.
It should be noted Mae Rivet Smith was observed in the presence of another female, subsequently identified as Rachael Perret, who accompanied Smith on Jung Boulevard but never entered the alley.

Between August 1, 1999 and August 30, 1999, twenty-seven audio taped statements were obtained from the eighteen persons interviewed relative to this investigation. Certain statements contained no information of evidentiary value and, as such, are documented below simply by date, time, person providing the statement and the detective conducting the interview.

On August 1, 1999 at approximately 9:35pm, Mae Rivet Smith was interviewed at the JPSO Detective Bureau by Lieutenant Buras wherein an audio taped statement was obtained. In brief, Mae Rivet Smith reported she and Lloyd Every III discovered the victim beneath the trailer located at 7501 ½ 4th Street on Sunday, August 1, 1999. For details refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

On August 1, 1999 at approximately 10:00pm, Dale Scott Fryer was interviewed at the JPSO Detective Bureau by Lieutenant Buras wherein an audio taped statement was obtained. For details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

On August 1, 1999 at approximately 10:05pm, Karen Parks was interviewed at the JPSO Detective Bureau by Detective Drury wherein an audio taped statement was obtained. For details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

Detective Donald Meunier

Approving Supervisor

On August 1, 1999 at approximately 11:07pm, Randall W. Relan was interviewed at the JPSO Detective Bureau by Sergeant Dennis Thornton wherein an audio taped statement was obtained. For details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

On August 2, 1999 at approximately 11:40pm, Patricia Boudreaux was interviewed at the JPSO Detective Bureau by Detective Meunier wherein an audio taped statement was obtained. In brief, Patricia Boudreaux stated she was briefly acquainted with the victim, whom she knew by his given name as well as the nickname "Bartman", but prior to this interview was unaware of his murder. For details, refer to the attached transcription, which is considered a permanent part of this record.

On August 4, 1999 Mae Rivet Smith was interviewed for a second time at the JPSO Detective Bureau. This interview was conducted by Detective Meunier whereupon three additional audio taped statements were obtained. In brief, Mae Rivet Smith identified a picture of the victim as a subject known to her as " Bartman", whom she met approximately one and a half to two months before his murder. Mae Rivet Smith did not recall seeing the victim at the Happy Hour Saloon on Friday, July 30, 1999, but acknowledged it was possible as she was present from approximately 5:00pm to 5:00am on Saturday, July 31, 1999. Mae Rivet Smith satisfactorily explained that her repeated excursions into the alley behind the Happy Hour Saloon during this time frame were to retrieve drug paraphernalia and at no time did she observe the victim or anyone else in said alley. For further details, refer to the attached transcriptions of the audio taped statements, which are considered a permanent part of this record. Refer also to the attached Rights of Arrestee or Suspect Form, including a waiver of rights, endorsed by Mae Rivet Smith prior to the interviews, which is considered a permanent part of this record.

On August 4, 1999 at approximately 9:48pm, Rachael Perret was interviewed at the JPSO Detective Bureau by Sergeant Thurman wherein an audio taped statement was obtained. In brief, Rachael Perret corroborated Mae Rivet Smith's account of events, including her presence at the Happy Hour Saloon and the purpose of Mae Rivet Smith's excursions into the alley. For details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

On August 7, 1999 at approximately 11:50pm, Craig Mayeux, the aforementioned Westbank taxi cab driver, was interviewed at the JPSO Detective Bureau by Detective Drury wherein an audio taped statement was obtained. In brief, Craig Mayeux identified himself as a cab driver employed by West Bank Cab Company. Mayeux identified a photograph of the victim as the taxi fare he picked up at Hank's Bar in Bridge City and ultimately transported to the Happy Hour Saloon on Friday, July 30, 1999. For details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

Detective Donald Meunier

Approving Supervisor

On August 7, 1999 Earl Bradley was interviewed at the JPSO Detective Bureau by Detective Meunier wherein four audio taped statements were obtained. In brief, Earl Bradley initially denied any knowledge of or acquaintance with the victim and misrepresented the length of time he spent at the Happy Hour Saloon on Friday, July 30, 1999. Bradley subsequently conceded he and the victim had walked west on 4th Street to meet a third subject in order to purchase an undetermined quantity of crack cocaine. According to Bradley's account, he was able to remove the victim from a potentially volatile situation involving a third subject, but, in so doing, spectators may have perceived there was an argument or altercation between he and the victim. For further details, refer to the attached transcription of these audio taped statements, which are considered a permanent part of this record. Also refer to the Rights of Arrestee or Suspect Form, including a waiver of rights, endorsed by Earl Bradley prior to his four voluntary audio taped statements. The endorsed form is attached to and considered a permanent part of this record.

On August 7, 1999 at approximately 5:24pm, James Artberry was interviewed at the JPSO Detective Bureau by Sergeant Thurman wherein an audio taped statement was obtained. In brief, James Artberry was present at the Happy Hour Saloon on Friday, July 30, 1999 and related witnessing an argument on 4th Street, west of the Happy Hour Saloon, between the victim and Earl Bradley. According to Artberry, the victim and Earl Bradley were arguing about " money and dope" and the victim seemed to be saying "Earl had ripped him off". When asked to define the magnitude of the argument, Artberry described it as "cursing each other". Artberry stated he departed for his residence, 7409 4th Street, with Karen Breaux and both were at his residence approximately one to two hours after the argument when they heard a single gunshot from the immediate vicinity of the Happy Hour Saloon. For further details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

On August 7, 1999 at approximately 6:55pm, Michael Harris was interviewed at the JPSO Detective Bureau by Sergeant Thurman wherein an audio taped statement was obtained. In brief, Harris stated he was at the Happy Hour Saloon on Friday, July 30, 1999 as was Earl Bradley and " Micie", subsequently identified as Albert Russell, among others. Harris reported observing the victim and Earl Bradley on 4th Street to the west of the Happy Hour Saloon shoving one another. For further details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

On August 7, 1999 at approximately 9:04pm, Teena Breaux was interviewed at the JPSO Detective Bureau by Sergeant Thurman wherein an audio taped statement was obtained. For details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

Detective Donald Meunier [signature] Approving Supervisor 10

On August 9, 1999 at approximately 3:06pm, Lucille Palmer was interviewed at the JPSO Detective Bureau by Detective Meunier wherein an audio taped statement was obtained. According to Palmer, Lloyd Every III subsequently informed her Earl Bradley had offered to sell him a gun the night of the murder while at the Happy Hour Saloon. For further details, refer to the attached transcription of the audio taped statement, which is considered a permanent part of this record.

On August 10, 1999, at approximately 3:41pm, Lloyd Every III was interviewed at the JPSO Detective Bureau by Detective Meunier wherein an audio taped statement was obtained. In brief, Lloyd Every confirmed Earl Bradley was at the Happy Hour Saloon on the evening of Friday, July 30, 1999, adding he and Earl Bradley had a conversation at one of the sidewalk tables located on 4th Street. Lloyd Every stated the conversation initially revolved around the sale of narcotics and ultimately lead to Earl Bradley offering to sell Lloyd Every a gun. For further details, refer to the attached transcription, which is considered a permanent part of this record.

On August 10, 1999, at approximately 8:35pm, Tammy Disher was interviewed at the JPSO Detective Bureau by Detective Meunier wherein an audio taped statement was obtained. Tammy Disher remembered seeing a fist fight just west of the Happy Hour Saloon on the evening of Friday, July 30, 1999 involving a known narcotics trafficker named Jason Rivet and the victim. Tammy Disher stated she could not recall if Earl Bradley was involved in the fight, but confirmed he was present at the time. For further details, refer to the attached transcription, which is considered a permanent part of this record.

On August 11, 1999, at approximately 4:25pm, Karen Breaux was interviewed at the JPSO Detective Bureau by Detective Meunier wherein an audio taped statement was obtained. Karen Breaux stated she observed Earl Bradley arguing with and hollering at a white male outside the Happy Hour Saloon on the evening of Friday, July 30, 1999. Karen Breaux provided an apt description of the victim, but was unable to categorically identify him from a photograph as the white male arguing with Earl Bradley over narcotics. For further details, refer to the attached transcription, which is considered a permanent part of this record.

On August 12, 1999, at approximately 6:00pm, James Artberry was interviewed at the JPSO Detective Bureau by Sergeant Thurman wherein an audio taped statement was obtained. James Artberry confirmed an argument on the evening of Friday, July 30, 1999 over sixty dollars of crack cocaine between Earl Bradley and the victim. For further details, refer to the attached transcription, which is considered a permanent part of this record.

On August 12 , 1999, at approximately 9:40pm, Amy Larck was interviewed at the JPSO Detective Bureau by Detective Meunier wherein two audio taped statement were obtained. In brief, Amy Larck confirmed the victim and Earl Bradley were involved in an argument outside the Happy Hour Saloon on the night of the murder. Ultimately, Amy Larck reported being approached by Earl Bradley, who directed her to meet the victim in the alley behind the Happy Hour Saloon for the purpose of sexual favors. Earl Bradley assured Amy Larck he would alert her if the police arrived in the area. The victim then proceeded down Jung Boulevard toward the alley while Amy Larck, Earl Bradley and "Micie", identified as Albert Russell, walked west on 4th Street toward Urbandale Street, south on Urbandale Street, east on Terrebone Street and north onto Jung Boulevard, as directed by Earl Bradley. Amy Larck then entered the alley alone and approached the victim, who was standing alone in the far corner. While Amy Larck and the victim conversed, Earl Bradley and Albert Russell entered the alley and approached the victim. Earl Bradley and Albert Russell began arguing with and cursing the victim. Earl Bradley then produced a silver revolver, based on the description provided by Amy Larck, and pointed it at the victim while Albert Russell continued looking over his shoulder toward Jung Boulevard. Amy Larck began backing out of the alley, then turned toward Jung Boulevard and continued walking rapidly toward Jung Boulevard. Upon reaching the corner of the alley at the sidewalk on Jung Boulevard, Amy Larck heard one gunshot and began running across Jung Boulevard, through the empty lot at Jung Boulevard and 4th Street, onto 4th Street east bound. For further details, refer to the attached transcriptions, which are considered a permanent part of this record.

On August 18, 1999, at approximately 8:00pm, Amy Larck was interviewed at the JPSO Detective Bureau by Sergeant Thurman wherein an audio taped statement was obtained. In brief, Amy Larck confirmed viewing a series of photographs and identifying Earl Bradley among others on August 12, 1999. On August 18, 1999 Amy Larck positively identified Albert Russell, also known as "Micie", from a photographic line-up. For further details, refer to the attached transcription, which is considered a permanent part of this record.

Based on the facts and circumstances recounted by Amy Larck, the witness to the murder, and substantial corroborative physical evidence, Detective Meunier obtained Warrants of Arrest from Judge Pitre of the Twenty-Fourth Judicial District for Earl Bradley and Albert Russell for second degree murder on August 23, 1999. The arrest warrants are attached to and considered a permanent part of this record. On this date Detective Meunier additionally obtained a Search Warrant for 468 Wilson Street, the residence of Albert Russell, from Judge Pitre of the Twenty- Fourth Judicial District. The search warrant was executed on August 24, 1999 and yielded assorted ammunition in varying calibers. The assorted ammunition was secured in the Homicide Evidence Locker and subsequently logged into the Homicide Evidence Book on page 002 and transported to the JPSO Property and Evidence facility.

Detective Donald Meunier

Approving Supervisor

On August 30, 1999, Albert Russell presented himself at the JPSO Detective Bureau where he was placed under arrest for second degree murder and advised of his Miranda rights, via a Rights of Arrestee Form. Russell endorsed the rights form and the waiver of rights. Russell subsequently provided Detective Meunier with an audio taped statement. In brief, Russell stated he was at his residence, 468 Wilson Street, with his girlfriend, Christie Hudson, from Thursday, July 29, 1999 through Sunday, August 1, 1999. For further details refer to the attached transcription, which is considered a permanent part of this record.

On August 30, 1999, Christie Hudson was interviewed at the JPSO Detective Bureau by Detective Meunier wherein an audio taped statement was obtained. In brief, Christie Hudson did not support Albert Russell's alibi. Christie Hudson stated Albert Russell was with her for the majority of the time he claimed; however, he absented himself for an hour to an hour and one half between 10:00pm on Friday July 30, 1999 and 2:00am on Saturday July 31, 1999. For further details refer to the attached transcription, which is considered a permanent part of this record.

On October 25, 1999, at approximately 7:45pm, Amy Larck was interviewed at the JPSO Detective Bureau by Sergeant Thurman wherein an audio taped statement was obtained. In brief, Amy Larck acknowledged overhearing a conversation between Earl Bradley and Albert Russell at Russell's residence, 468 Wilson Street, on Friday July 30, 1999 between 6:00pm and 8:00pm. Amy Larck reported overhearing Earl Bradley ask Albert Russell for a gun to which Albert Russell replied affirmatively. For further details refer to the attached transcription, which is considered a permanent part of this record.

In brief, Earl Bradley and Albert Russell were charged with the second degree murder of Barton Sanford based on the following facts and circumstances. An eyewitness, Amy Larck, placed both Bradley and Russell in the alley arguing with the victim shortly after he is observed on camera entering said alley. The eyewitness observed Bradley pointing a revolver at the victim's chest area, the area in which the victim sustained a single fatal gunshot wound, while he and Russell argued with the victim in the rear of the alley. As the eyewitness fled the alley, she heard a single gunshot. No casing was recovered from the scene, which would be consistent with a revolver. The eyewitness, Bradley and Russell were not captured on video surveillance entering the alley, as they entered from the south on Jung Boulevard at the direction of Bradley. During questioning, Bradley acknowledged he was aware of the Jung Boulevard camera and its positioning in relation to the alley. The sole reason the eyewitness originally entered the alley was to meet the victim, after being directed to do so by Bradley moments earlier. Prior to arriving at the Happy Hour Saloon, the eyewitness overheard a conversation between Bradley and Russell at Russell's residence, 468 Wilson Street, in which Bradley asked Russell for a gun, to which Russell replied in the affirmative.

Detective Donald Meunier

Approving Supervisor

Bradley originally misinformed detectives as to the actual time of his departure from the Happy Hour Saloon on Friday, July 30, 1999 and initially claimed not to recognize the victim from a photograph nor to have had any contact or acquaintance with the victim that night or on any other occasion. Ultimately, after viewing relevant segments of the video surveillance tapes, Bradley conceded having known the victim and having contact with the victim on that night. Additionally, Bradley acknowledged there contact might have been construed by others as confrontational, which was substantiated by witnesses.

Russell claimed he and his girlfriend remained at his residence from July 29 through August 1, 1999. Russell denied being at the Happy Hour Saloon on Friday, July 30, 1999. Russell's girlfriend did not support his alibi.

Lloyd Avery III reported Bradley's attempt to sell him a gun while both were at the Happy Hour Saloon on the night of the murder.

Both Bradley and Russell deny any friendly acquaintance with one another, yet the eyewitness placed both together at Russell's residence and later at the Happy Hour Saloon where they jointly confronted the victim in the alley. Additionally, Bradley, Russell and Amy Larck were observed together on the 4th Street video surveillance camera walking west on 4th Street from the Happy Hour Saloon on Friday, July 30, 1999.

Based on the aforesaid facts and circumstances, Earl Bradley and Albert Russell were charged with second degree murder in the shooting death of Barton Sanford and, as such, Detective Meunier submits this case be closed.

Detective Donald Meunier

Item H-619-99

**JEFFERSON PARISH SHERIFF'S OFFICE**
**GRETNA, LOUISIANA**

**RIGHTS OF ARRESTEE OR SUSPECTS**

DAY WED. DATE 8-4-99 TIME 2:10 AM LOCATION 725 MAPLE AVE.

NAME MAE L. RIVET DATE OF BIRTH [redacted] AGE 38

RACE W ADDRESS 108 PLUM ST. 1 WESTWEGO

EDUCATION 5TH GRADE

____ YOU ARE UNDER ARREST FOR AND WILL BE CHARGED WITH VIOLATION OF:

✓ YOU ARE UNDER INVESTIGATION RELATIVE TO:

RS 14:30 RELATIVE TO MURDER

MLR BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

MLR YOU HAVE THE RIGHT TO REMAIN SILENT.

MLR ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

MLR YOU HAVE THE RIGHT TO TALK WITH A LAWYER FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS AND TO HAVE HIM WITH YOU DURING QUESTIONING.

MLR IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE APPOINTED FOR YOU BEFORE ANY QUESTIONING IF YOU WISH.

MLR IF YOU DECIDE TO ANSWER QUESTIONS NOW WITHOUT A LAWYER PRESENT, YOU WILL STILL HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME UNTIL YOU TALK TO A LAWYER.

********************************

I have read this statement of my rights Mae L Rivet

This statement of my rights has been read to me by the undersigned Officer

DW MEUNIER

**WAIVER OF RIGHTS**

I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

SIGNED Mae L Rivet
(ACCUSED)

WITNESS: ________________

WITNESS: ________________

JPSO 2.02

X

Item H-619-99

**JEFFERSON PARISH SHERIFF'S OFFICE**

**GRETNA, LOUISIANA**

**RIGHTS OF ARRESTEE OR SUSPECTS**

DAY Sat. DATE 8-7-99 TIME 12:45P LOCATION 725 Maple Ave.

NAME Earl Bradley DATE OF BIRTH [redacted] AGE 38

RACE N ADDRESS 6305 4th St. Building 4, Apt. A

EDUCATION 1 yr. of College

____ YOU ARE UNDER ARREST FOR AND WILL BE CHARGED WITH VIOLATION OF:

Y YOU ARE UNDER INVESTIGATION RELATIVE TO:

RS 14:30 RELATIVE TO Murder

EB BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

EB YOU HAVE THE RIGHT TO REMAIN SILENT.

EB ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

EB YOU HAVE THE RIGHT TO TALK WITH A LAWYER FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS AND TO HAVE HIM WITH YOU DURING QUESTIONING.

EB IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE APPOINTED FOR YOU BEFORE ANY QUESTIONING IF YOU WISH.

EB IF YOU DECIDE TO ANSWER QUESTIONS NOW WITHOUT A LAWYER PRESENT, YOU WILL STILL HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME UNTIL YOU TALK TO A LAWYER.

********************************

I have read this statement of my rights Earl Bradley

This statement of my rights has been read to me by the undersigned Officer

Don Meunier

**WAIVER OF RIGHTS**

I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

SIGNED Earl Bradley
(ACCUSED)

WITNESS: __________

WITNESS: __________

4

JPSO 2.02

Item H-619-99

**JEFFERSON PARISH SHERIFF'S OFFICE**
**GRETNA, LOUISIANA**

**RIGHTS OF ARRESTEE OR SUSPECTS**

DAY Mon DATE 9-30-99 TIME 5:10 PM LOCATION 925 Maple

NAME Albert T. Russell DATE OF BIRTH [redacted] AGE 36

RACE N ADDRESS 468 Wilson

EDUCATION 3 years College

✓ YOU ARE UNDER ARREST FOR AND WILL BE CHARGED WITH VIOLATION OF:

DM AR X YOU ARE UNDER INVESTIGATION RELATIVE TO:

RS 14:30.1 RELATIVE TO Second Degree Murder

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

AR YOU HAVE THE RIGHT TO REMAIN SILENT.

AR ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

AR YOU HAVE THE RIGHT TO TALK WITH A LAWYER FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS AND TO HAVE HIM WITH YOU DURING QUESTIONING.

AR IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE APPOINTED FOR YOU BEFORE ANY QUESTIONING IF YOU WISH.

AR IF YOU DECIDE TO ANSWER QUESTIONS NOW WITHOUT A LAWYER PRESENT, YOU WILL STILL HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME UNTIL YOU TALK TO A LAWYER.

********************************

I have read this statement of my rights Albert Russell

This statement of my rights has been read to me by the undersigned Officer

Donald Meunier

**WAIVER OF RIGHTS**

I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

SIGNED Albert Russell
(ACCUSED)

WITNESS: ________________

WITNESS: ________________

JPSO 2.02

X

Victim: Barton Sanford 3 3102 H-619-99

**Narrative:**

On Thursday, September 7, 2000, two handwritten letters addressed to Sergeant Grey Thurman and Detective Donald Meunier were delivered to the Jefferson Parish Sheriff's Office Detective Bureau from the Jefferson Parish Correctional Center. Both letters were written by Amy Larck, an eyewitness to the shooting death of Barton Sanford documented under item H-619-99. Amy Larck is currently detained at the correctional center on a material witness warrant obtained and executed in the latter portion of August by the District Attorney's Office relative to the aforesaid homicide.

Both letters refer to Larck's potential testimony in the pending murder trial. For complete details refer to the attached copies of the letters, which are considered a permanent part of this report.

On Thursday, September 7, 2000 Crime Scene Technician M. Kuzma secured photographs of both letters and their respective envelopes at the direction of Detective Meunier.

The letters were then logged into the Homicide Evidence Book on page 31 and subsequently transported to and retained within JPSO Property and Evidence.

Detective Donald Meunier

Detective Donald Meunier

Approving Supervisor

# Exhibit B

(Enclosed in a thumbdrive)

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 129 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

# Exhibit C

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM




1. BODY
2. OUTDOOR STAIRCASE
3 2ND FLOOR PORCH

Case No: 23-KH-377 | Page 84 of 758

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

# Exhibit D

CITY OF GRETNA POLICE DEPARTMENT – SUPPLEMENT REPORT

Pg # 1 | 2. Org X 3. Supl ___ | 1. Complaint # G-52554-99

10. Victim: State of Louisiana | 102. Date of Supplement: 7/31/99 | 4. Location of Incident: 91 Westbank Expressway

9. Crime: LRS 40:967C, 14:108.1c

Field #

On Saturday July 31, 1999 at approx 0750 hrs the undersigned officer was conducting a business check in the parking lot of 91 Westbank Expressway, The Pinnicale Motel, when he observed a black male wearing dark shirt, dark pants with the left leg leg roll up to his mid-thigh, and knocking on several doors at the motel.

The undersigned then approached the male subject and advised him to step over the the marked police unit.

The undersigned then conducted a pat down of the suspect for safety at which time a key to a vehicle was located. The undersigned then asked the subject what vehicle was his and he pointed to a black BMW 325 (License plate # 18810; Alabama Tuskegee University Plate) occupi by 1 black male (back seat) and 1 white male (front seat). The undersign then advised the two other subjects to step out of the vehicle and step over to his marked police unit.

The undersigned then observed the suspect, later identified as Earl Bradley N/M 10/19/59, to have his left pant leg to have been unrolled down to his knee and a clear plastic wrapper lying on the ground next to his left foot. The undersigned the walked over toward Bradley and finished unrolling his pant leg at which time he discoved small off white pieces of rock like substance on his left pant leg. The undersigned then pick-up the clear plastic wrapper which contained two off white rock like substance known to the undersigned as crack cocaine. The undersigned then field tested the substance from the wrapper and from Bradley's pant leg at which time both revealed to contain cocaine.

Bradley was then advised of his rights and placed under arrested

3. Reporting Officer: OFC D Carrick Jr #114 | 99. Detective | 104. Supervisor Approving: [signature]

Additional Officer | 100. Crime Scene Tech | 200. Status: open ☐ closed ☒ / suspended ☐

CITY OF GRETNA POLICE DEPARTMENT –
SUPPLEMENT REPORT

Pg # 1 | 2. Org X 3. Supl ___ | 1. Complaint # G-52554-99

10. Victim: State of Louisiana | 102. Date of Supplement: 7/31/99 | 4. Location of Incident: 91 Westbank Expressway

9. Crime: LRS 40:967C, 14:108.1C

Field #

On Saturday July 31, 1999 at approx 0750 hrs the undersigned officer was conducting a business check in the parking lot of 91 Westbank Expressway, The Pinnicale Motel, when he observed a black male wearing dark shirt, dark pants with the left leg leg roll up to his mid-thigh and knocking on several doors at the motel.

The undersigned then approached the male subject and advised him to step over to the marked police unit.

The undersigned then conducted a pat down of the suspect for safety at which time a key to a vehicle was located. The undersigned then asked the subject what vehicle was his and he pointed to a black BMW 325 (License plate # IB810; Alabama Tuskegee University Plate) occupi by 1 black male (back seat) and 1 white male (front seat). The undersigned then advised the two other subjects to step out of the vehicle and step over to his marked police unit.

The undersigned then observed the suspect, later identified as Earl Bradley N/M 10/19/59, to have his left pant leg to have been unrolled down to his knee and a clear plastic wrapper lying on the ground next to his left foot. The undersigned the walked over toward Bradley and finished unrolling his pant leg at which time he discoved small off white pieces of rock like substance on his left pant leg. The undersigned then pick-up the clear plastic wrapper which contained two off white rock like substance known to the undersigned as crack cocaine. The undersigned then field tested the substance from the wrapper and from Bradley's pant leg at which time both revealed to contain cocaine.

Bradley was then advised of his rights and placed under arrested

3. Reporting Officer: OFC D Carrick Jr #114 | 99. Detective | 104. Supervisor Approving: [signature]
Additional Officer | 100. Crime Scene Tech | 200. Status: open ☐ closed ☒ suspended ☐

# JEFFERSON PARISH SHERIFF'S OFFICE

GRETNA, LA.

ARREST REPORT AND *PROBABLE CAUSE AFFIDAVIT* (REV 1/96)

## ARRESTEE DATA

ARRESTEE NAME: BRADLEY, EARL | RACE SEX: B/M | BIRTH DATE: 10/19/59 | SKIN: MED

ARRESTEE ADDRESS: 6305 4TH ST. APT 4A | HEIGHT: 5'10" | WEIGHT: 165 | HAIR: BLK | EYES: BRN | ARREST NUMBER:

CITY: MARRERO | STATE: LA. | RESIDENCY - ETHNICITY: NON RES / NON HISP. | BIRTH STATE: LA. | NATIONALITY: U.S. | ARREST TRACKING #:

ALIAS NAME: Adams, Terry | SOC. SEC. #: 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 | OPERATOR'S LICENSE #: unk | LIC ST: | STATE ID #:

MARKS-SCARS-TATTOOS-ETC.

TYPE | LOCATION | DESCRIPTION | WEAPON | GANG

1
2
3

## ARREST DATA

LOCATION OF ARREST: 91 WESTBANK EX. | DIST & R.A.: 2/518 | DATE OF ARREST: 7-31-99 | TIME OF ARREST: 0750 hrs | DATE: 07-31-1999 | TIME: 6:07 P.M.

ARRESTING OFFICER'S NAME: OFC D. CARRICK | OFFICER'S P.R. #: 114 | UNIT: 20 | ARREST CREDIT: 08

ARRESTING OFFICER'S NAME 2: W/A | OFFICER'S P.R. #:

NO PROBABLE CAUSE ______ Judge or Magistrate

TRANSPORTING OFFICER'S NAME 2: Same | TRANS. OFFICER'S P.R. #:

PROBABLE CAUSE [signature] Judge or Magistrate

## CHARGES

| ORDINANCE/STATUTE # | QUA. TYPE/MEA | DRUG TYPE | FEL/MISD | ATTACHMENT # | ITEM NO |
|---|---|---|---|---|---|
| 1 LRS 40:967.C (Possession of Sch II CDS) to wit .5grams | | | Fel. | | G-52554-99 |
| 2 LRS 14:108.1c (Failure to make identity known) | | | Misd. | | G-52554-99 |
| 3 LRS 14:000 Fugitive JPSO | | | | 982353 | G-52557-99 |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |

COURT OF TRIAL: TBA | SECTION:

## OFFENSE DATA

LOCATION OF OFFENSE: 91 Westbank Expressway | DATE OF OFFENSE: 7/31/99 | TIME OF OFFENSE: 0750

## PROBABLE CAUSE AFFIDAVIT

BEFORE ME THE UNDERSIGNED AUTHORITY PERSONALLY CAME AND APPEARED THE UNDERSIGNED, WHO AFTER BEING DULY SWORN STATED AS FOLLOWS:

1 The above subject was arrested and advised of his rights after he was observed
2 knocking on doors at 91 Westbank Expressway, The Pinnacle Motel. After observing
3 the subject knocking on several doors at the hotel, which numerous narcotic arrest had
4 been made, the subject was approached by the undersigned. The undersigned then observed
5 two subjects sitting in a black BMW which the above arrested subject advised he had drove. The
undersigned then had the two other subject come over to the undersigned patrol unit. The
undersigned then observed a clear plastic wrapper with two off-white rock like substances known
as crack cocaine next to the suspects left foot. The undersigned then unrolled
subjects left sweat pant leg & found residue. Both the rock like substance
were field test positive for cocaine. Subj was transport JPCC in good physical condition.

SWORN TO AND SUBSCRIBED BEFORE ME, THIS 31 DAY OF July 1999.

[signature]
EX-OFFICIO NOTARY PUBLIC

VICTIM: NO ☐ | AGE OF VICTIM | SUSPECT YES ☐ NO ☐ | WITNESS YES ☐ NO ☐ | SUSPECT IDENTIFIED YES ☐ NO ☐ | EVIDENCE SEIZED YES ☐ NO ☐ | OTHER WITNESS YES ☐ NO ☐

CRIMINAL INTERCEPT UNIT CODE 6 NO ☒

OFFICER SIGNATURE: OR: [signature] | PAY #: 114

ASSIGNMENT OR AGENCY: ...

# Exhibit E

P R O C E E D I N G S

MR. ROWAN:

The State would call Dr. Susan Garcia.

DR. SUSAN M. GARCIA; after having been first duly sworn, testified on her oath as follows:

MINUTE CLERK:

Please be seated. State your name.

THE WITNESS:

My name is Dr. Susan M. Garcia.

MR. ROWAN:

Your Honor, at this time I would offer a stipulation to the Defense that Dr. Garcia is an Expert in the field of Forensic Pathology.

MR. FLEMING:

That's acceptable; certainly.

DIRECT EXAMINATION

BY MR. ROWAN:

Q Dr. Garcia, did you have the occasion to perform an autopsy of one Barton Sanford?

A Yes.

Q Now, how is it that one does an autopsy?

A I work as a Forensic Pathologist for Jefferson Parish Forensic Center. We do autopsies on all violent deaths, suspected violent deaths or unexpected natural deaths. So this was a suspected violent death.

Q I'm going to show you what I've marked as State's Exhibit One. See if you can recognize this, Doctor.

A State's Exhibit One is a copy of my Autopsy Report, the Toxicology Report and the body

P R O C E E D I N G S

MR. ROWAN:

The State would call Dr. Susan Garcia.

DR. SUSAN M. GARCIA; after having been first duly sworn, testified on her oath as follows:

MINUTE CLERK:

Please be seated. State your name.

THE WITNESS:

My name is Dr. Susan M. Garcia.

MR. ROWAN:

Your Honor, at this time I would offer a stipulation to the Defense that Dr. Garcia is an Expert in the field of Forensic Pathology.

MR. FLEMING:

That's acceptable; certainly.

DIRECT EXAMINATION

BY MR. ROWAN:

Q Dr. Garcia, did you have the occasion to perform an autopsy of one Barton Sanford?

A Yes.

Q Now, how is it that one does an autopsy?

A I work as a Forensic Pathologist for Jefferson Parish Forensic Center. We do autopsies on all violent deaths, suspected violent deaths or unexpected natural deaths. So this was a suspected violent death.

Q I'm going to show you what I've marked as State's Exhibit One. See if you can recognize this, Doctor.

A State's Exhibit One is a copy of my Autopsy Report, the Toxicology Report and the body

diagram that I made at the time of autopsy on one Barton Sanford; our Case Number 368-99.

Q Now Doctor, you don't actually go out to the scene?

A No.

Q They're brought to you and you perform an autopsy; you see what visual signs of how this person may have died, and give an opinion?

A Yes.

Q In connection with this, did you have the occasion to examine this particular body and determine exactly how he died?

A Yes. This decedent sustained a distant range gunshot wound to his chest. It injured his heart and his lung, and it exited from his back; and there was no projectile to recover. He died as a result of a gunshot wound to the chest.

Q Do you have any idea how long he may have been out there prior to being brought in to you?

A The decedent was early stages of decomposition. Depending on what time of the year it is, the composition can either be accelerated or decelerated. In hot weather it occurs faster, especially of you're outside in hot weather. If you're inside, with the air conditioner running, it takes a little longer. His decomposition were primarily from about the chest up; and were really the early signs of decomposition.

Q The person had been found allegedly been shot July 31st. And he was brought to you when; August first?

A The decedent - Our office was notified on August first, 1999 at approximately 6:30 in the evening.

Q So roughly it's along those line of decomposition?

A Well, once our office is notified, then the body is transported to our facility, they're put in cold storage. So decomposition is markedly arrested. It's not completely stopped, but it's markedly arrested. But decompositional changes in this individual would fit about twenty-four to thirty-six hours in a warm environment. And August in this area is usually pretty warm.

Q Doctor, I show you what has been marked as State's Exhibit Two through Ten.

MR. ROWAN:

Your Honor, may I approach the witness.

THE COURT:

Yes.

EXAMINATION BY MR. ROWAN:

Q Doctor, would you take a look at State's Exhibits Two through Ten; see if you recognize those.

A State's Exhibits Two through Ten are photographs taken of the decedent at the time of autopsy in our morgue, and accurately reflect what the decedent looked like and the injuries sustained at the time of autopsy.

Q Doctor, when you did your examination, did you notice if there was any - other than the gunshot wound - any outward trauma, such as abrasions or cuts to his nose or lips or anything to suggest anything to you?
A No, he did not. He had decompositional changes present in his face and his neck region, but no gross visible signs of external trauma.
Q Okay. And that was something you would have noticed?
A Yes.
Q Now, was there a Toxicology screen that was run on this gentleman?
A Yes. The toxicology screens are a routine examination on any individual who comes into our office.
Q What were the results of that?
A I believe the decedent had an increase in alcohol, and he also had a trace of cocaine in urine. I have to caution both counsel that in decomposed individuals, although the level of alcohol appears to be significantly elevated; once decompositional prostheses have started, if the level of alcohol is above .20, then you are confident in saying that the decedent consumed alcohol prior to death, but you can't say how much. If the level was beneath .20, then that can be simply due to decompositional changes alone. So the fact that the decedent has roughly .25% reportable alcohol, is no way to be construed with that as comparable to a

living individual who would drop dead immediately.
Q Doctor, in regards to blood, in this particular type of injury, would you expect it to be a lot a blood at the scene?
A There could be. There doesn't have to be, but there could be.
Q Okay. And lets say there was just drops of blood where the victim would have fallen and died, would that surprise you?
A Neither scenario surprises me.
Q Why is that?
A I have seen cases where people were shot in the chest - now, not in the head; the head wounds are always bloody. Chest wounds can often, because of the nature of the skin being elastic, can essential serve as it's own bandage. And you can often times not have very much blood on the scene and a significant amount of blood within the individual. And sometimes they bleed out quite profusely. There is no written rule.
Q Okay. But like you said, you would expect a head wound to be very bloody.
A Head wounds are almost always extremely bloody, even if it was a minor injury.
Q Can you tell how much the victim bleed within the body, when you did the incision?
A When his chest-plate; well, the anterior portion of the rib cage is removed, I estimate blood loss to the best of my ability. And it was approximately 2,500 to 3,000 CC's; which is

Q a little bit more than a two liter bottle of blood contained within his body.
MR. ROWAN:
I don't have any further questions. I'll tender to Mr. Fleming.
MR. FLEMING:
Good morning, Doctor.

CROSS EXAMINATION

BY MR. FLEMING:
Q Mr. Sanford was approximately six-foot three?
A Seventy-five inches. He was measured at - I think that's correct; yes.
Q Seventy-five inches.
A Yes, sir.
Q A little bit taller than me, roughly?
A How tall are you?
Q About five-ten.
A Then he's taller than you.
Q Taller than me; okay. That's not a good estimate?
A Not for that position.
Q Okay. How about the wound, the entrance wound of Mr. Sanford entered the chest, just below the left nipple; correct?
A Yes; that is correct.
Q Or off center a little bit.
A Yes; that's correct.
Q Okay. And did it exit the back?
A Yes, sir; that is also correct.
Q And there was entrance - I'm sorry. It entered, I believe, eighteen inches from the top of the head; correct?

A Correct.
Q And it exited seventeen and three-quarters inches from the top of the head; right?
A Correct.
Q It's slightly downward?
A For all intent and purposes it's minuscule, almost horizontal.
Q But it is slightly downward?
A If you put in a statistical error of measuring in English System from the top of the head, it's almost equidistance. But if you want to push it for accuracy, I'll say slightly downward.
Q Okay. And if I'm not mistaken, the wound was slight left to right; slightly entered to the left, going somewhat towards the right. I'm looking at page four.
A Yes, sir. The course and track of wound is described, from the individual who sustained the wound's perspective. So it's going from his left to slightly his right; is essentially horizontal, slightly down, and going from front to back.
Q Well, a body decomposing doesn't have any effect on the measurement of cocaine in a person's system; does it? Or does it?
A I'm not sure I'm qualified to answer that question. We did not quantitate the cocaine in the urine. No. It effects alcohol.
Q Okay. You also indicate in your Report that there was no stifling or powder present on Mr. Sanford.

A Correct.
Q And Mr. Rowan and I and yourself know what that means. But would you explain what the stifling means, Doctor.
A Generally in gunshot wounds people are always curious as to whether or not we can determine the range of fire at the time of discharge of the weapon. And what both counsel are referring to is the presence of either powder or smoke; which would indicate a contact or a close range wound. As the muzzle is a little further away from the skin, depending on the caliber and the ammunition used, you get a pattern which is referred to as stifling, which are little pinpoint dots on the skin around the wound. And then if you go a little bit further back; say about eight to ten inches, again, depending on the type of weapon, you have none of these characteristics. And it therefore becomes a distant range wound, by exclusion of the other markers. So it's a distant wound range, because there are no other markers to make it a closer range.
Q By distant range, specifically you would mean from what point outward?
A Anywhere from say ten to twelve inches on out.
Q So it doesn't have to be a mile out to be a distant range, or so?
A No. Again, once you from ten to twelve - once you get to the range of distant range, I can't tell you how far.

Q Okay. So is it safe to say this was roughly a foot or more. The gun would have been fired a foot or more -
A At least ten to twelve, depending on the type of weapon and the ammunition used; yes.
Q Were you able to determine what type of gun was used?
A Well, I had no projectile to recover; so, no.
Q But you can't tell that by the autopsy itself; can you?
A No. It's a general misconception that small bullets make small wounds and big bullets make big wounds; and that is not true.
Q I think your artistic ability may be better than mine.
A Probably not.
Q A very rough sketch. Fell free to draw.
A Sure.
Q Say that's Mr. Sanford. You indicate on here roughly where the entrance wound would have been. Please feel free to make any other marks on there.
A No; that's alright. You assume that this is the medical; also a circle around it.
Q Okay.
A Right about here. (Indicating)
Q Okay. For the record, it's roughly across the mark "X".
A "X" marks the spot.
Q "X" marks the spot.
In indicating time; you had indicated it was roughly 24 to 36 hours. But you really

can't tell an exact time-frame at the time of death?

A We can't give an exact time-frame, no. We have to go on other ancillary information. And again, as I said; it's probably on a twenty-four hour rather than thirty-six. Because the body from approximately the waist down was in very good condition. And again, it's August in southern Louisiana; I doubt very seriously if it was cool that day.

The changes of decomposition were early.

Q I guess my question is; you cannot get quite the precise time?

A No; I'm afraid not.

MR. FLEMING:

Thank you, Doctor. I have no further questions of Dr. Garcia, Your Honor.

MR. ROWAN:

Just a few, Your Honor.

REDIRECT EXAMINATION

BY MR. ROWAN:

Q Doctor, you were asked about toxicology and cocaine and alcohol. It wouldn't surprise you to know that the victim may have been like a stumbling drunk at this particular time; would it, prior to his death?

A I have no comment one way or the other. The alcohol was only elevated to the sense that I can say that he did ingest alcohol prior to death.

Q Mr. Fleming asked you about the course and track of the particular wound. You can't tell

whether the victim may have been lying on his back and somebody stood over him to shoot him, or anything like that; can you?

A As long as the gun is in front of him and it's relatively at a horizontal level to the level of the gun when its discharged, there is a variety of different positions he could be in; both the shooter and the victim.

Q Anything at a distance greater than twelve feet, you wouldn't expect to find any stifling or powder burns?

A Twelve inches.

Q Twelve inches; I'm sorry.

A That's okay. No.

MR. ROWAN:

Okay. I don't have any further questions.

THE COURT:

Is this witness released?

MR. FLEMING:

Yes.

MR. ROWAN:

Yes, Your Honor.

THE COURT:

Thank you, Doctor; you may go.

MR. ROWAN:

Your Honor, I would offer, file and introduce into evidence State's Exhibit One, the Doctor's Report, for record keeping purposes; and State's Exhibit Two through Ten, the photographs she identified as being accurately depicting.

MR. FLEMING:

No objection.

THE COURT:

Alright. You care for publication at this time?

MR. ROWAN:

No, Your Honor.

THE COURT:

Is there a Sequestration Request?

MR. FLEMING:

Yes.

THE COURT:

So ordered. Mr. Rowan, I just ordered Sequestration.

MR. ROWAN:

Okay; the Doctor is going to leave.

THE COURT:

Just for the record.

MR. ROWAN:

Yes, sir. I would call Detective Don Meunier.

DETECTIVE DONALD MEUNIER; after having been first duly sworn, testified on his oath as follows:

MINUTE CLERK:

Be seated please and state your name.

THE WITNESS:

Donald Meunier.

DIRECT EXAMINATION

BY MR. ROWAN:

Q Detective, how long have you been in homicide?

A A little over three years.

Q Where were you before that?

the weekends. They're assigned a schedule. And it was his weekend to work. And up until a point it was established to be a homicide, he may have well been the person to handle it if it had not been established to be a homicide.

Q And when you report to a homicide scene, what is your job?

A Well, in this case I was a the Case Investigator. So my job is the scene investigation, preservation and collection of evidence, directing crime scene photographs to be taken, and document the scene as it was at the time. And any and all evidence that was seized was pertinent.

Q Why do you document the scene at the time?

A In large measure you're going to use the photographer to do that. You're going to get overall shots of the scene, specific scenes of any evidence you may find pertinent. Obviously the victim's body is going to be photographed; the position it was in.

Q What I'm going to do is, I'm going to show you what has been marked as State's Exhibit Eleven through Sixteen.

May I approach the witness, Your Honor?

THE COURT:

Yes.

EXAMINATION BY MR. ROWAN:

Q Detective, would you look at these exhibits and see if you recognize those exhibits.

# Exhibit F

Teri-Lee Isaac
Suite 1104
808 5th, SE
Calgary, Alberta
CANADA T2G 4T5

Email: terilee_isaac@hotmail.com

October 24, 2022

**AFFIDAVIT**

I, Teri-Lee Isaac, declare as follows:

I am a Canadian citizen who was introduced to Earl Bradley in 2005.

Mr. Bradley is serving a life sentence for murder at the Louisiana State Penitentiary at Angola, LA. In the time leading up to, and during our first face to face meeting, Mr. Bradley told me the story of his arrest, shared court records, documents he had obtained from attorneys, and letters he had received in prison. After I read the material, I determined that I wanted to help him gain his freedom.

I am not an attorney, nor am I empowered as an investigator. I determined from reading what was shared with me, specifically the trial testimony, that one of the key witnesses against Mr. Bradley is Amy Larck.

Mr. Bradley showed me letters, (EXHIBIT A) written by Amy Larck, stating her remorse for lying on the witness stand at his trial.

Among the things that Ms. Larck wrote:

> "This is something that God has been telling me to do. I am only trying to make a wrong, right."
>
> "Do you actually believe that I could make up all of those things up (sic) by myself? Come on Earl, there is no way I could have done that without being led and talked through it and threatened."
>
> "I was not at the Happy Hour at all the night that guy was killed. I did not even leave the area of the Budget (hotel.)"
>
> "Let me go back so that you can understand. I left 4th Street for a little while and I was skimming poker machines with Randy with the red car. The only thing that I heard was that someone was found under the trailer behind the Happy Hour. Everyone who ever hung out on 4th Street or the Happy Hour was questioned about the murder, except me. I did not know anything about anyone being questioned. A couple of us were at the gas lite motel and some under cover knocked on the door. They asked who I was and told me that I had reported a rape and they needed me to identify the guy. Everyone in that room except me knew that they were homicide detectives. When we got to the detective bureau they took me straight to homicide. I had NO idea what was going on."
>
> "I was in that room for 11 hours being interrogated (sic) 3 separate (sic) times (back to back), I told them that I had no idea what they were talking about. I did not know anything about it. The (sic) kep trying to put suggestions in my mouth and yes I was scared because I have never in my life been in that kind of situation and they were mean to me. Finally they took me back to some room with video tapes and showed me a video tape. He told me that the girl was me, the guy on the right was you, and he did not know who the other guy was. I told him that I was not even at the Happy Hour. He said he had talked to a

number of people who said me and you were at the happy Hour together that night. None of this was true!"

I believe that Amy Larck's recantation to be an important thing in Mr. Bradley's pursuit of justice.

I reached out to Amy Larck via Facebook messenger beginning on Thursday September 19, 2013, and continuing to Wednesday, September 25, 2013. I preserved the messages between us, and have attached them to this affidavit as EXHIBIT B.

On Tuesday, September 24, 2013 Amy Larck wrote: "I was young and impressionable back then and scared to death of being threatened with accessory to murder. I have grown a lot and would like to help Earl be released from prison."

Amy Larck had written to Earl Bradley that she wanted nothing from him in exchange for the truth , but in our exchanges Ms. Larck wanted money, and to know that Earl Bradley would not harm her in any way for having lied on the witness stand. I assured her that I believed Earl Bradley was not interested in retaliation, only exoneration.

Amy Larck never told me what amount of money she wanted in order to come forth with the truth.
I shared our communication with Earl Bradley, who asserted it would be inappropriate to pay Amy Larck.
I have had no further communication from Amy Larck beyond what is attached.

The above statement is true and correct. I offer this information freely and without hesitation. I have not been coerced, nor have I been given money, nor am I promised any reward for communicating this information.

---

TERI-LEE ISAAC, Affiant

Sworn to and subscribed before me, on this 22nd day of December, 2022

Notary Public

FRANCIS O. CHIEJINE
Notary Public - Alberta
Permanent Commission
920, 734 - 7th Ave. S.W.
Calgary, AB Canada T2P 3P8
403-232-0836

(1)

Earl,

I'm glad that you decided to write back to me, you are probably very confused. First of all, what could I possibly do to hurt you anymore? I do not play games anymore, either. There is nothing I can gain from helping you. I have almost done my 5 years flat the whole time that I received. This is something that God has been telling me to do. I am only trying to make a wrong, right.

Do you actually believe that I could make up all of those things up by myself? Come on Earl, there is no way I could have done that without being led and talked through it and threatened. I was not even at the Happy Hour at all the night that guy was killed. I did not even leave the area of the Budget.

Let me go back so that you can understand. I left 4th street for a little while and I was Skimming poker machines with Randy with the red car. The only

AA

EXHIBIT A -001

(2)

thing that I heard was that someone was found under the trailer behind the Happy Hour. Everyone who ever hung out on 4th street or the Happy Hour was questioned about the murder. except me. I did not know anything about anyone being questioned. a couple of us were at the gas lite motel and some under cover knocked on the door. They asked who I was and told me that I had reported a rape and they need me to identify the guy. Everyone in that room except me knew that they were homicide detectives. When we got to the detective bureau they took me straight to homicide. I had NO idea what was going on.

I was in that room for 11 hours being interogated. 3 seperate times (back to back), I told them that I had no idea what they were talking about. I did not know anything about it. The kept trying to put suggestions in my mouth and yes I was scared

EXHIBIT A -002

(3)

because I have never in my life been in that Kind of situation and they were mean to me. Finally they took me back to some Room with video tapes and showed me a video tape. He told me that the girl was me, the guy on the right was you, and he did not know who the other guy was. I told him that I was not even at the Happy Hour. He said he had Talked to a number of people who said that me and you were at the Happy Hour together that night. None of this was true.

What made me go along with his story, suggestions, and lies was when he threatened that if I did not identify you that I would be charged with accessory to murder. I was hystarical and I did not know what to do so, I went along with what they were telling me. I felt like I did not have a choice. Personally, I do not care what people think, but I know that my testimony got you convicted

EXHIBIT A -003

2

and I know that the detectives and the D.A. made me lie by threatening me even after I told them that I was not there.

I have always cared about you and even now I do. You have always been a good guy and very good to me. I tried to get into as much detail as I could but to write every detail would take forever. I'm not sure where to go from here but you just let me know. I am willing to do whatever it takes to help you get out of prison. This letter is the absolute truth, I have no reason to lie to you because there is nothing for me to gain.

Please write me back and let me know where we go from here. I could never ever forget about you ♡ I'm on your side ♡

I will be waiting to hear from you ♡

Always
Amy

It's not your fault and please stop blaming urself



EXHIBIT A -004

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

D

January 13, 2005

Earl,

I received your message from Mae (Pebbles) about writing back to you because of the perfume on the letter. I am going to try my best to write what I wrote in the other letter.

I have been doing some serious soul-searching for quite awhile to ask God what to do. I will not be able to go into a lot of detail in this letter until I know that I will be able to trust you. We both know that I can help you and that is exactly what I want to do. The circumstances under which I testified are not my fault. I will explain everything to you when I know that I can trust you. I really want to help you.

I need to ask something of you before I go any further. I know that God has forgiven me but I need you to forgive me. It is very important to know if you will forgive me or not. I know that you are not a bad guy, Earl, and I have never had anything against you. You have never done anything to hurt me. You

EXHIBIT A -005

2)

actually watched my back out there. I also know that you do not deserve to spend the rest of your life in prison. I am going to help you in any way that I am able to. I will fight for you until you are out of there.

There is so much that I want to tell you about everything that happened but I can't yet. I also know that what I need to tell you can be held against me. I'm not worried! I just do not want you to hold any grudge or animosity towards me. I want to do everything in my power to help you. my time is very short here but when I do get on the outside, I will give you an address where you can write to me.

I hope that you will write back to me as soon as you get this letter. I am very sorry and I hope that you will forgive me.

Sincerely

A. ?

EXHIBIT A -006

April 30, 2005.

INSPECTED 12

Earl,

I have been extremely busy working like a slave because of this 3 year audit. I am not getting any sleep and I'm exhausted.

Stop thinking that I have lied to you because I have not. I am taking care of everything that I told that I would do. Trust that God will take care of this. Stop worrying and doubting.

I cannot write much because I have to go to work. Keep your faith in God and know that I'm doing everything that I can for you.

Talk to you soon

Amy

EXHIBIT A -007

Conversation with Amy Larck on facebook

- **Teri Isaac**

**Hello**

You don't know me!
I am looking for Amy Larck, date of birth: 3/27/76
If you are not her, please accept my apology for the intrusion.
If this is you, could you please get back to me.
Thank you so much
Teri

- September 19



2:05pm **Amy Larck**

This is her, get in touch with me



2:19pm**Teri Isaac**

Add



2:55pm**Teri Isaac**

Hello Amy, thank youi so much for replying to my message.
I hope you are well, and happy.
My name is Teri. I am Earl Bradley's fiance. I have known him since 2006, and he has been desperately looking for you.
As you know he is in prison. We have been fighting to have him released for such a long time. I understand you are the key to helping him with his release.
I met Earl in 2006. He is truly a good man.
I would love to get the chance to talk with you. I can either call you or give you my number.
I sincerely hope you will write me back.
Thank you again

Teri

- September 20



2:41pm**Amy Larck**

EXHIBIT B -001

(2)

Give me your number. It may take a couple of days to get back to you as I am also trying to get my life straightened out. I have been in legal trouble for years along with being an addict. I'm home to get my life back on track. I have not purposely ignored you,but addicts only have one thing on their mind. I definitely want to make this right but their will be some conditions that will be put into place. We will get into that at a later date. Feel free to e-mail me at larckamy@yahoo.com.



4:51pm **Teri Isaac**

Hello again Amy,
Thank you so much for writing me back.
I do understand that you are getting your life straightened out, and you have no idea how much it means to Earl (and myself), that you are willing to help him.
I do also understand and expected there would be conditions, and I will be more than happy to talk to you about that as well.
I am not here to judge you, please believe that. We have all had our difficulties in life, and I am no better than anyone else. I have made my fair share of mistakes in my life as well.
I am just an ordinary person, looking to make life as positive as possible. If you have a moment , you should check out my photos, there are pictures of me and Earl there.
I live in Calgary Canada. Quite far from Louisiana, and I try my best to get to visit Earl when I can. I am not wealthy by any means, just hard working, trying to make ends meet.
Here is my phone number: 403-389-3778. I don't expect you to call long distance, I know that can get costly. I can't take collect calls, but I have purchased a long distance calling card for you to use. Here is the number for that card.
1-866-913-8554, the PIN# is 105 946 3529. You can call me anytime, however, if I don't answer it means I am probably at work, but leave a message, then you can try to call again, ANYTIME.
Thank you so very much for listening to me Amy, you are an angel.
Please take good care of yourself. If you ever want to call just to talk, feel free. I know you don't know me, but I am a good friend, and I listen very well.

Teri

Tuesday



12:02pm **Amy Larck**

Teri, you can get a hold of project innocence in Louisiana and have them contact me by e-mail or face book. Like I said before there are some conditions that will have to be made for my benefit. I'm going to need some things from you and Earl.



12:32pm **Amy Larck**

I would also like compensation for putting myself in a position where I could be retaliated against and could have charges in Louisiana brought against me for perjury. I have to keep my best interests in mind. I need some kind of collateral that will at least give me some assurance that I may be okay in the long run.I will let u make me an offer and once received, I will then actually call project innocence myself and tell my whole story, to allow Earl to be free after all these years. You have my word on it and I do what I say. I was young and impressionable back then and scared to death of being threatened with accessory to murder.I have grown a lot and would like to help Earl be released from prison. I hope to hear from u very soon. If not, then I will assume that you have given up on the whole situation. I will only make this offer once so, jump on it while u can. Contact Earl and let him know what I have offered.

EXHIBIT B -002



3:15pm Teri Isaac

(3)



1:09pm**Amy Larck**

I have already written project innocence about the whole situation. Earl has to be the one to let them know he needs their assistance. I'm sure once they get a letter from him or if he has a case with them, then they will contact me so, we can get the ball rolling. I will not go any further without compensation from you or Earl. Get back to me as soon as possible.

- Tuesday



4:46pm**Teri Isaac**

Hello Amy, I just got home from work, and saw your message. Thank you for getting back to me. Earl has already contacted the innocence project. I am going to be speaking with Earl tomorrow.........he will be calling me.

- Tuesday



10:44pm**Teri Isaac**

Hello again Amy,
Sorry, for the short note earlier. I didn't have much time, but wanted you to know that Earl and I have been working hard trying to get him released. We haven't given up at all. In fact, finding you is definately the answer to our prayers. I certaling understand your position, and will do what I can to get the ball rolling, and help you out as well.
I will get in touch with you as soon as I talk with Earl. In the mean time, feel free to give me a call anytime, using the phone card number I gave you in an earlier message.
God Bless you Amy

Teri

- Today



3:15pm**Teri Isaac**

Before I talk with Earl, I need to know how much money you want to get the ball rolling.
I am not rich, and of course, Earl has no money at all. Just give me an idea so that I can see where to start to help you as well.
Thank you Amy



?pm**Amy Larck**

EXHIBIT B -003

I understand that most people are struggling with money. I need some help getting on my feet and getting place to live. I need 1000 but make me an offer.



3:31pm **Teri Isaac**

I certainly understand that. I am going to see if I can raise that money. I appreciate your honesty, and thank you with all my heart



3:43pm**Amy Larck**

I will also need a certified and a notorized statement from you and Earl that there will be no retaliation against me. This really was not my fault. You can make me an offer of what you may be able to afford. I'm not inconsiderate or cruel. I will notify my city detectives when he is released and let them know the situation. I am doing this for my safety. Write back and tell me what u think u may be able to afford



3:46pm**Teri Isaac**

One of the things that Earl told me years ago, was that he did not blame you at all. We both understand the circumstances. And I know you have suffered over the years as well. I also understand that you need to protect yourself.

# Exhibit G

Amy Larck #440521
L.C.I.W. | Libra 2-C
P.O. Box 26
St. Gabriel, LA
70776

INSPECTED

ANGOLA TN 381
JAN 24 PM
19 JAN 2005

Earl Bradley #403836
Louisiana State Prison
Camp - Oak-1
70712

RAMB +10

Amy Larck #440521
L.C.I.W. | Libra 2-C
P.O. Box 26
St. Gabriel, LA
70776

Rec'd
ent
cont
1-19-05

BATON ROUGE LA 708
JAN 5 PM
4 JAN 2005

perfume stain
& smell

Earl Bradley #403836
Oak-1
Louisiana State Prison
Angola, LA 70712

(1)

January 13, 2005

Earl,

I received your message from Mae (Pebbles) about writing back to you because of the perfume on the letter. I am going to try my best to write what I wrote in the other letter.

I have been doing some serious soul-searching for quite awhile to ask God what to do. I will not be able to go into a lot of detail in this letter until I know that I will be able to trust you. We both know that I can help you and that is exactly what I want to do. The circumstances under which I testified are not my fault. I will explain everything to you when I know that I can trust you. I really want to help you.

I need to ask something of you before I go any further. I know that God has forgiven me but I need you to forgive me. It is very important to know if you will forgive me or not. I know that you are not a bad guy, Earl. and I have never had anything against you. You have never done anything to hurt me

(2)

actually watched my back out there. I also know that you do not deserve to spend the rest of your life in prison. I am going to help you in any way that I am able to. I will fight for you until you are out of there.

There is so much that I want to tell you about everything that happened but I can't yet. I also know that what I need to tell you can be held against me. I'm not worried! I just do not want you to hold any grudge or animosity towards me. I want to do everything in my power to help you. my time is very short here but when I do get on the outside, I will give you an address where you can write to me.

I hope that you will write back to me as soon as you get this letter. I am very sorry and I hope that you will forgive me.

Sincerely
Amy

(1) 1-27-05

Earl,

I'm glad that you decided to write back to me, you are probably very confused. First of all, what could I possibly do to hurt you anymore? I do not play games anymore, either. There is nothing I can gain from helping you. I have almost done my 5 years flat the whole time that I received. This is something that God has been telling me to do. I am only trying to make a wrong, right.

Do you actually believe that I could make up all of those things up by myself? Come on Earl, there is no way I could have done that without being led and talked through it and threatened. I was not even at the Happy Hour at all the night that guy was killed. I did not even leave the area of the Budget.

Let me go back so that you can understand. I left 4th street for a little while and I was skimming poker machines with Randy with the red car. The only

(2)

thing that I heard was that someone was found under the trailer behind the Happy Hour. Everyone who ever hung out on 4th street or the Happy Hour was questioned about the murder except me. I did not know anything about anyone being questioned. A couple of us were at the gas lite motel and some under covers knocked on the door. They asked who I was and told me that I had reported a rape and they needed me to identify the guy. Everyone in that room except me knew that they were homicide detectives. When we got to the detective bureau they took me straight to homicide. I had NO idea what was going on.

I was in that room for 11 hours being interogated. 3 seperate times (back to back), I told them that I had no idea what they were talking about. I did not know anything about it. The kept trying to put suggestions in my mouth and yes I was scared

(3)

because I have never in my life been in that Kind of situation and they were mean to me. Finally they took me back to some Room with video tapes and showed me a video tape. He told me that the girl was me, the guy on the right was you, and he did not know who the other guy was. I told him that I was not even at the Happy Hour. He said he had Talked to a number of people who said that me and you were at the Happy Hour together that night. None of this was true.

What made me go along with his story, suggestions, and lies was when he threatened that if I did not identify you that I would be charged with accessory to murder. I was hysterical and I did not know what to do so, I went along with what they were telling me. I felt like I did not have a choice. Personally, I do not care what people think, but I know that my testimony got you convicted

(4)

and I know that the detectives and the D.A. made me lie by threatening me even after I told them that I was not there.

I have always cared about you and even now I do. You have always been a good guy and very good to me. I tried to get into as much detail as I could but to write every detail would take forever. I'm not sure where to go from here but you just let me know. I am willing to do whatever it takes to help you get out of prison. This letter is the absolute truth, I have no reason to lie to you because there is nothing for me to gain.

Please write me back and let me know where we go from here. I could never ever forget about you ♡ I'm on your side ♡

I will be waiting to hear from you ♡

Always
Amy

P.S. It's not your fault and please stop blaming yourself.

INSPECTED 12

April 30, 2005

Earl,

I have been extremely busy working like a slave because of this 3 year audit. I am not getting any sleep and I'm exhausted.

Stop thinking that I have lied to you because I have not. I am taking care of everything that I told that I would do. Trust that God will take care of this. Stop worrying and doubting.

I cannot write much because I have to go to work. Keep your faith in God and know that I'm doing everything that I can for you.

Talk to you soon

Amy

# Exhibit H

# AFFIDAVIT

My full legal name is Mae Lucille Rivet Smith
I reside at 107 Vic A Pitre Drive
Westwego, LA 70094

My birthdate is September 21, 1960

The last four digits of my social security number are: 2865

---

I hereby swear or affirm the following statement:

1. I have known Earl Bradley from more than 24 years. We met through friends and we both frequented a bar called The Happy Hour bar in Marero, LA.

2. I was at the Happy Hour Bar in 1999, on the last weekend of July. The bar did not close through the entire weekend, and I left only once during that weekend.

3. Friday night, July 30th I was standing at the door of the Happy Hour with my friend Rachel Peret. We were talking and smoking a cigarette. During this time, I saw Earl Bradley enter the alleyway and waved to him. As we waved, we heard shots ring out somewhere beyond the alleyway.

4. Earl was traveling from Jung Boulevard toward Baritaria. The shots did not take place in the alleyway. The shots were likely coming from a side street.

5. I was waving to Earl and he was waving back when the shots rang out. He did not have a gun in his hand.

6. During the weekend I was in and out of the bar and the alleyway frequently because I am a smoker, and at the time it was not permitted to smoke in the bar.

7. At the time of the incident, I was homeless, and I spent my time in and around the Happy Hour Bar.

8. I was in and out of the alleyway Friday night the 30th; I was there all day and night Saturday the 31st; I was there all-day Sunday August 1st.

9. At the time I was also familiar with the victim of the shooting Bart Sanford. He was not in the alley when I waved to Earl and we heard shots ring out.

10. I did not see Bart Sanford until Sunday night, when I was talking with Lloyd Everett and he spotted Bart's body in the alleyway.

11. Lloyd Everett went to call the Police, and left me standing in the alleyway to make sure no one disturbed Bart's body. I left the scene after the Police arrived.

12. I later provided information to the police about what I saw at the time. They took a recorded statement from me.

13. I walked in and out of the alleyway many times from Friday until Sunday. I would have seen Bart's body where we eventually saw it had it been there all weekend.

14. I know Amy Larck from the neighborhood; she also frequented The Happy Hour. She was not at the bar that weekend.

15. I know Albert Russell, known as Micey. Albert was not at the Happy Hour that weekend.

16. I am aware Amy Larck gave testimony that she was present in the alleyway Friday night at the time of the shooting, with Albert. I am aware that she testified that she saw Earl Bradley shoot Bart Sanford.

17. I am completely certain Amy and Albert were not in the alleyway, and not with Earl Bradley when shots rang out Friday night.

18. I have always been willing to testify as to what I saw that weekend, and when. I was available to Earl Bradley's attorney and to the prosecutors before, during and after the trial. No one ever asked me to testify.

19. I have reached out to Earl Bradley several times over the last 20+ years to tell him that I know exactly where he was at the time of the shooting. I understand that he could not reply until he had someone who was willing to take my statement.

I offer this statement freely, and am willing to testify under oath as to its authenticity and to provide further details about my recollection. No one has offered me money, or exerted pressure on me to make this statement.

Sworn to and subscribed to me t

SEE NOTARIAL CERTIFICATE ATTACHED

Mae Rivet

Mae Lucille Rivet Smith

State of Florida
County of Volusia

Sworn to (or affirmed) and subscribed before me this day 10 of June , 2022 , by Mae Rivet who provided identification of Louisiana identification card.

MADELINE MENDEZ
Notary Public - State of Florida
Commission # GG 969454
Expires on March 31, 2024
NOTARY PUBLIC · STATE OF FLORIDA

Notary signature
Madeline Mendez
Madeline Mendez
03/31/2024
GG 969454
Online Notary

Notarized online using audio-video communication

# Exhibit I

TWENTY-FOURTH JUDICIAL DISTRICT COURT

PARISH OF JEFFERSON

STATE OF LOUISIANA

| | |
|---|---|
| STATE OF LOUISIANA | NO. 99-5825 |
| VERSUS | DIV. "O" |
| EARL BRADLEY<br>ALBERT RUSSELL | |

FILED Nov. 12, 2002 DEPUTY CLERK

Testimony and proceedings taken in the above numbered and entitled cause in open court, Division "O", on Wednesday, February 7, 2001, before the Honorable Ross P. LaDart, Judge presiding.

272

# INDEX OF WITNESSES


| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Det. G. Thurman | Direct Exam by Mr. Fleming | 12 |
| | Direct Exam by Mr. Barnett | 16 |
| P. Snyder | Direct Exam by Mr. Fleming | 25 |
| | Cross Exam by Mr. Paciera | 32 |
| Q. Kelly | Direct Exam by Mr. Fleming | 33 |
| R. Long | Direct Exam by Mr. Fleming | 37 |
| C. Regan | Direct Exam by Mr. Fleming | 41 |
| | Cross Exam by Mr. Paciera | 42 |
| M. Somosa | Direct Exam by Mr. Fleming | 45 |

APPEARANCES:

REPRESENTING: The State of Louisiana

PAUL D. CONNICK, JR.
District Attorney
Parish of Jefferson
5th Floor Annex Building
New Gretna Courthouse
Gretna, Louisiana 70053

BY: Louis Butler
BY: Vincent Paciera

REPRESENTING: Defendant, Earl Bradley

JEFFERSON PARISH
INDIGENT DEFENDER BOARD
848 Second Street
Gretna, Louisiana 70053

BY: Paul Fleming

REPRESENTING: Co-defendant, Albert Russell

RALPH P. BARNETT
Attorney at Law

Reported by: Susan Stentz
Certified Court Reporter
State of Louisiana

P R O C E E D I N G S

THE COURT:
Mr. Paciera, you have business with us?

MR. PACIERA:
I'm going to be second chair on some motions that you have in a murder case, I understand, Your Honor.

THE COURT:
Okay, this afternoon at 1:30?

MR. BUTLER:
Mr. Barnett's case, I don't believe we called that up, did we?

MR. PACIERA:
Mr. Barnett was just, oh, he's back.

THE COURT:
He's here. Are we ready to take those up?

MR. BARNETT:
Your Honor, if I may, I only have about a one minute, I have no testimony. I know Mr. Fleming does, I've adopted whatever you rule with him goes for me. My only request is the striking of a statement made by my defendant, I'm asking to strike certain portions which reflect criminal activity and a conviction which

cannot come in before a jury unless my defendant takes the witness stand.

THE COURT:

Did I not rule on that already?

MR. BARNETT:

No, sir, you held it in abeyance until today. I think it's a very simplistic thing.

THE COURT:

Okay, are we ready to take these matters up?

MR. BARNETT:

I mean that's all I have, Your Honor.

THE COURT:

And I will address that.

MR. PACIERA:

I know that we have Detective Grey Thurman upstairs. My understanding is that's who was needed for the, to complete these motions?

MR. FLEMING:

To complete one motion. There are two motions that lie and I know that Mr. Paciera is at a disadvantage as he is just getting in on the case. There is another motion in which I had subpoenaed several members of the District Attorney's Office, as well as a

276

local attorney not affiliated with the District Attorney's Office.

THE COURT:

And a judge too, this was a reveal the deal?

MR. FLEMING:

I did not, I did initially issue a subpoena for one of your colleagues on the bench. I did not ask that that subpoena be re-issued after looking into that matter further. It is my opinion that the Judge would have nothing to add.

THE COURT:

Excuse me, Detective Thurman is right outside the door.

MR. FLEMING:

And as you may remember we had previously started that motion, we had four or five members of the Jefferson Parish Sheriff's Office testify regarding potential Brady information and Detective Thurman was unable to be here I believe. I just have a few minutes of testimony from him.

But, we do have the other matter, the other motion with other members of the District Attorney's Office.

THE COURT:

Are those folks ready?

MR. FLEMING:

Are not here.

MR. BUTLER:

Judge, may we approach on that matter just very briefly?

THE COURT:

Yes.

[A DISCUSSION WAS HELD OFF THE RECORD.]

THE COURT:

All right, No. 12 on the docket, Earl Bradley, State of Louisiana versus Earl Bradley.

MR. FLEMING:

Paul Fleming on behalf of Earl Bradley, Your Honor.

THE COURT:

This is an ongoing open motion --

MR. FLEMING:

That is correct, Your Honor.

THE COURT:

-- to reveal the deal?

MR. FLEMING:

I believe actually before we get to that we're going to finish up the motion to produce exculpatory material if I'm not mistaken. That was the particular motion that Detective Thurman is present for, a motion for

278

exculpatory material. And that's the one that several other detectives had testified about previously. But, of course, I'm at your disposal, Your Honor.

THE COURT:

It seems to me that I have already addressed some Brady material in this case, maybe that was another case. What we have now is a statement, is that what we're going to do now?

MR. PACIERA:

Well, Detective Thurman is not here with respect to the statement, that's, they're two different things. Whichever one you want to proceed on we can proceed on.

THE COURT:

I want to let the detective testify and then we'll move on.

MR. BARNETT:

Judge, if you're referring to a statement by Albert Russell, I have the statement. There's no need for testimony, other than just a little oral argument.

THE COURT:

Is that --

MR. PACIERA:

That's two different things.

THE COURT:

I understand that, but I think Mr. Barnett would like to relocate, and maybe we can at least identify the statement that I am to review.

MR. BARNETT:

Your Honor, it's a statement that was given at 5:55 on August 30th in the detective bureau.

THE COURT:

Mr. Barnett, if you'll approach, I'm going to give you some red ready tags and I'm going to ask you to apply a tag to each line or phrase that you find offensive. And if you'll do that and I take it Mr. Butler is going to be handling this motion, Mr. Paciera is riding shotgun. Maybe if you're not actively involved in the testimony that I'm about to hear you will sit with Mr. Barnett while he affixes those little red ready tags.

MR. PACIERA:

I prefer to sit in the courtroom while the defective is testifying. But, as Mr. Barnett is marking this I will read it in the courtroom and by the time we're finished with the testimony

I should be able to respond to those sections he wants to delete.

THE COURT:

Thank you, Mr. Paciera. Let's take up whatever it is that Detective Thurman Is going to testify about.

MR. FLEMING:

Yes, Judge. For the record that is my motion for exculpatory material and that was the second motion that I had filed on November 30, 2000.

THE COURT:

I don't know that we're going to have any trumpets here, if there's somebody you want called to the witness stand, please do so.

MR. FLEMING:

I certainly will. First I was going to move for an order of sequestration. I'm not sure if there are any other witnesses involved in this matter.

THE COURT:

Is there anybody in this courtroom subpoenaed or called today or who just happens to be here to give testimony in connection with State of Louisiana versus Earl Bradley or Albert

Russell? All right, just Detective Thurman. In any event, the order of sequestration is in place.

MR. FLEMING:

Thank you, Your Honor. I would call Detective Grey Thurman, your Honor.

* * * *

SGT. GREY THURMAN, was called as a witness and after having first been duly sworn, was examined and testified on his oath as follows:

MR. FLEMING:

Judge, we had previously handled this matter pursuant to Code of Evidence, Article 611(c), particularly that because Detective Thurman is identified with the Jefferson Parish Sheriff's Office or specifically he's a member of the Jefferson Parish Sheriff's Office and identified with the State of Louisiana that I be allowed to ask leading questions, treat him hostile so to speak, although there is certainly no hostility.

THE COURT:

And we certainly wish you the best of luck in that endeavor.

DIRECT EXAMINATION

BY MR. FLEMING:

Q. Detective Thurman, you were involved in the investigation of a potential homicide that occurred on or about July 31, 1999 involving Bart Sanford, correct?

A. Correct.

Q. And what were your duties regarding that investigation?

A. I was the supervisor for Detective

Meunier who was the case officer, as well as work the case along with him.

Q. Were you -- you were involved in interviewing potential witnesses in this matter?

A. Yes, sir.

Q. And you would have been involved in discussing the matter with your subordinates, correct?

A. Correct.

Q. Detective/Sergeant, did you become aware of any witness indicating that she saw two men perhaps in a red car dump the body?

A. No, sir.

Q. Are you aware of any potential witness, perhaps somebody in the neighborhood telling one of your men that?

A. No, sir, never that two people in a red car dumped a body, no, sir.

Q. What about a white man or white men, that they would have dumped the body?

A. No, sir.

Q. Are you aware of any witness statements being given regarding a red vehicle in that vicinity on or about the time you would have suspected that the homicide would have occurred?

A. No, sir, the only statements that were ever made concerning a red vehicle, just to show you that I'm not hostile, was initially it was thought that the deceased was a gentleman by a name of Randy who drove a red

vehicle.

And that's prior to the body being removed from under the trailer with proper identification identifying him. But, the physical appearance was that of a person by the name of Randy who drove a red Trans Am and people had first, when they could see the lower portion of the body or would peek under to see the over all description they thought that was Randy.

So, we started looking for the red Trans Am to see if that was, in fact, Randy or not and Randy was located driving his red Trans Am.

So, it was thought to maybe be a victim at first, but not a suspect.

Q. At one time you had a suspect by the name of Jason Rivet (phonetical) involved in this murder?

A. I wouldn't call Mr. Rivet a suspect, he was someone who frequented the bar that we were looking to speak to, but I wouldn't qualify him as a suspect.

Q. You or one of your subordinates would have spoken with Mr. Rivet?

A. Yes, sir.

Q. And he was certainly somebody you looked at, correct?

A. We looked at anyone and everyone who was around the bar or may have been around the bar at the time of the homicide.

Q. And Mr. Rivet could be described as

285

rather unsavory, a drug dealer?

MR. PACIERA:

I'm going to object, I don't understand why that could be relevant.

THE COURT:

What's the relevance?

MR. FLEMING:

It's a motion to, motion for exculpatory material. This is regarding potential other suspects or why a person wouldn't have been suspected.

MR. PACIERA:

Again, I'll renew my objection. Whether he is savory or unsavory or any other adjective is irrelevant to this motion.

THE COURT:

Sustained.

MR. FLEMING:

Note my objection.

BY MR. FLEMING:

Q. Jason Rivet is involved in drug dealing, correct?

A. From what I understand, yes, sir.

MR. FLEMING:

Thank you, I have no further questions.

MR. BARNETT:

Your Honor, I have one question. I joined in, adopted

the motions. I just have one question.

THE COURT:

The Court recognizes your adoption. Ask your question please.

DIRECT EXAMINATION

BY MR. BARNETT:

Q. In all of the, except for this girl you identified in the grand jury as a certain unsavory character --

MR. PACIERA:

Wait, he can stop, I can object right now, because he's asking for testimony which would have taken place in the grand jury.

BY MR. BARNETT:

Q. You've identified this girl. Other than she and all of the people that were interviewed, there had to be about twelve people at least interviewed, not one person that was interviewed saw Albert Russell at the bar that night, isn't that correct?

A. Okay, when we say "she", we're referring to Amy --

Q. Amy, other than she. I mean, I have all of the statements, not one mentions that Albert Russell was anywhere around?

A. From memory I don't know, not to argue, I don't know if someone else could have said that Albert was at the bar earlier, not that I'm aware of.

But, we did interview people or speak to people that statements wouldn't have been obtained from, but from recollection, no, I don't know of anyone else that saw him there.

MR. BARNETT:

I have no other questions.

MR. PACIERA:

The State has no questions, Your Honor.

THE COURT:

You may step down. Call your next witness.

MR. FLEMING:

Judge, that would conclude this portion, that would conclude this motion for exculpatory material.

THE COURT:

The Court is satisfied that there is no exculpatory material and to that extent the motion is denied.

Now, you have other witnesses?

MR. FLEMING:

But, of course, the State does have ongoing obligation to provide the defense --

THE COURT:

Absolutely.

MR. FLEMING:

-- exculpatory material. I have no other witnesses pertaining to that matter. We have the other

matter regarding the motion to reveal the deal so to speak.

THE COURT:

I understand we have some ADAs out there on deck, you want to take those up?

MR. FLEMING:

I'm not sure who's out there, that's fine though, Judge, if I could see who's there.

MR. BARNETT:

Your Honor, I've marked the portions with that little red thing that you gave me and Mr. Paciera has reviewed it I do believe.

MR. PACIERA:

No, I will do that.

MR. BARNETT:

I'm sorry, I thought he did.

THE COURT:

Mr. Fleming?

MR. FLEMING:

There's no one outside, Judge.

THE COURT:

I just saw Mr. Regan a moment ago, he stuck his head in.

MR. FLEMING:

I don't know that Mr. Regan was sticking his head in the door for that, for this purpose, Judge, I know he's been running around

different courtrooms.

THE COURT:

I need an ADA to call upstairs to get some of these other ADAs down here to testify.

MR. PACIERA:

Judge, do you anticipate that your docket is going to proceed to the lunch hour, because if that's the case then I would suggest that we take up the rest of this at 1:30 since Mr. Barnett doesn't need to be here for that.

MR. FLEMING:

I'm not opposed to that.

THE COURT:

I have a number of other motions at 1:30, but I'll be glad to do that if the testimony is going to be as brief as what I've just heard.

MR. FLEMING:

It's going to be, exactly, Judge.

THE COURT:

1:30. Now, as far as Mr. Barnett is concerned, do you have a moment to review that now?

MR. PACIERA:

If you had an ADA, I can call the rest of your docket or I can just do this, you tell me what you

290

want me to do.

THE COURT:

Today is the very first day with my new ADA and it's a rather inauspicious beginning I might say.

MR. PACIERA:

We'll straighten that out, but I'll proceed with the rest of the docket.

THE COURT:

Mr. Barnett, if you can wait?

[A RECESS WAS HELD.]

MR. PACIERA:

Good afternoon, Your Honor, Vincent Paciera for the State. We had passed this issue which is defendant's motion, defendant, Albert Russell, his motion to excise portions of his statement because of comments in it in which he talks about drugs and such, dealing drugs and a prior conviction.

The State is not in a position to agree to excise it at this time. The State will file a notice of Prieur and I think we'll have to set this for a Prieur hearing because the issue of the drugs is going to be germane to motive and other identification

issues.

THE COURT:

So, Mr. Barnett's motion would be perhaps a little premature this morning.

MR. BARNETT:

My motion is not premature, their answer is beyond prematurity though, Your Honor. But, I'm willing and certainly able to set a hearing under Prieur.

THE COURT:

Well, what we'll do is we'll do the Prieur hearing and we'll resolve both motions at that time. Is that acceptable to you, Mr. Barnett?

MR. BARNETT:

That's fine, yes, Your Honor.

THE COURT:

Okay, you need a date for that?

MR. PACIERA:

Yes, Your Honor.

THE COURT:

Even though you've not filed it, when do you anticipate it being filed?

MR. PACIERA:

In a week, Judge.

THE COURT:

In a week?

MR. PACIERA:

Yes. But, I'm not going to be ready to hear it in a week. I would like to have about, is there a trial date already, when is the trial date? Okay, we'd need a hearing sometime prior to the trial date.

[A DISCUSSION WAS HELD OFF THE RECORD.]

THE COURT:

We're going to take up those pending motions, and that's in Russell and your client, Mr. Fleming.

MR. FLEMING:

Bradley.

THE COURT:

There is a sequestration order in effect. Anybody here in connection with giving testimony --

MR. FLEMING:

I only see one person here, Mr. Paul Snyder. There's no one else present, although I believe everyone else was served.

THE COURT:

Was Mr. Snyder one of the ones you subpoenaed?

MR. FLEMING:

Absolutely.

THE COURT:

Then, let's get Mr. Snyder back

to work.

MR. BARNETT:

Your Honor, may I just for a second re-address my issue. I understand we'll pick a date on a Prieur hearing.

THE COURT:

Yes, we will, you'll be notified by my clerk.

MR. BARNETT:

Thank you.

MR. FLEMING:

Judge, for the record I had subpoenaed six people to be present today, I believe there are two people, some others are available. I know Mr. Paciera has indicated that Mr. Brindisi, one of the people I subpoenaed is not present. And I had also issued a subpoena for Ms. Larck's attorney, Mr. Somosa who I believe was served. We talked, I talked to him about this and I don't see Mr. Somosa present for whatever reason.

THE COURT:

Well, it seems that this motion is, it unfolds while we go through the motions. So, let's watch it unfold.

MR. FLEMING:

And out of an abundance of caution, although the Court did reiterate that there is a sequestration order, I would move for sequestration again.

THE COURT:

So ordered, anybody here other than Mr. Snyder to give testimony in connection with State of Louisiana versus Albert Russell and Mr. Bradley?

MR. FLEMING:

I'd call Paul Snyder.

* * * *

PAUL SNYDER, was called as a witness and after having first been duly sworn, was examined and testified on his oath as follows:

MR. FLEMING:

Your Honor, for the record, as we handled the last hearing I would ask to question the witnesses under the Code of Evidence as hostile witnesses as they are identified, cause these witnesses will be current or former members of the district attorney's staff identifiable with opposing party, just in terms of leading.

THE COURT:

So noted. You may proceed.

DIRECT EXAMINATION

BY MR. FLEMING:

Q. Mr. Snyder, you work with the Jefferson Parish District Attorney's Office?

A. Yes.

Q. And your duties as such involve screening cases and presenting matters to the grand jury?

A. That's correct.

Q. And you presented the matter of Earl Bradley and Albert Russell to the grand jury in this matter?

A. Yes, I did.

Q. In connection with your screening of

that case and presenting it to the grand jury you had the chance and opportunity to meet with and interview Amy Larck?
A. Yes, I did.
Q. I'm not sure if I'm pronouncing her name right, I believe that's L-A-R-C-K?
A. Correct.
Q. Ms. Larck is a prostitute/drug addict, correct?

MR. PACIERA:
Objection, I don't know any grounds for that.

MR. FLEMING:
Well, it kind of leads into the bulk of what we're getting at, Judge.

MR. PACIERA:
I object.

THE COURT:
And I sustain the objection as I did last time.

MR. FLEMING:
Trying to save a little time, I'll do it the longer way.

THE COURT:
I understand that, we are, this is the reveal the deal motion, right, then let's get to it.

BY MR. FLEMING:
Q. Mr. Snyder, were you while presenting this matter to the grand jury and screening the case and reviewing the case you had

become aware that Ms. Larck had pending criminal charges?
A. Yes, I did.
Q. And in speaking with Ms. Larck did you advise her of her right to counsel?
A. Not, I didn't speak to her about her pending criminal charges, I spoke to her about her witnessing the murder that was committed by Russell and Bradley, I didn't speak to her about her charges.
Q. That would be a no, you didn't advise her of any right to counsel and so forth?
A. No, I didn't.
Q. Did you, scratch that. Have those charges been accepted?
A. I'm not sure, I don't believe they had at the time I was speaking to her.
Q. You are aware that Ms. Larck had prior criminal convictions?
A. I don't remember that, no.
Q. Did you have any discussions with Ms. Larck regarding any consideration that you or the District Attorney's Office would give her in connection with her testimony?
A. I told her that if she testified truthfully we would inform the Court that was hearing her criminal case that she testified truthfully in a murder case.
Q. Did she ask, did you volunteer on your own or did she ask you about that, Mr. Snyder?
A. I don't remember that, that was quite

awhile ago when I interviewed her.

Q. I understand. One moment please, Judge. You did, is that the -- strike that, strike that. Mr. Snyder, in discussing Ms. Larck's matters with her, her pending criminal charges or any consideration that may be given to her in connection with her testimony against Mr. Bradley and Mr. Russell, you are aware that she presently faced drug charges in that matter, is that correct, including the distribution of narcotics?

A. At that time, no, I don't believe there were any drug charges. At that time there was another charge, a different crime that I was aware of.

Q. And did you discuss with her the possibility of not filing charges against her in those matters?

A. No.

Q. Refusing charges?

A. Uh-uh (negative response).

Q. Did you discuss the possibility with Ms. Larck of filing lesser charges?

A. No.

Q. Did you discuss with Ms. Larck the possibility of not filing a multiple bill against her in connection with that?

A. With those charges, no.

Q. And what you've just stated the, if she testified truthfully, was that the full substance of your conversation with Ms. Larck

concerning --

A. Those charges, yes.

Q. Of course testifying truthfully would be what is truthful in the district attorney's opinion?

MR. PACIERA:

Objection.

THE COURT:

Sustained.

BY MR. FLEMING:

Q. When you informed Ms. Larck that you would relay the fact that she testified "truthfully" against Mr. Bradley and Mr. Russell, did you discuss what that testimony would be?

A. Well, when I interviewed her we discussed the statement she had already given to the Sheriff's Office and that's why I was interviewing her was based on that statement. So, I assumed truthfully would be consistent with the statement that she gave to the Sheriff's Office.

Q. So, in discussing that with her it was understood that truthful meant consistent with the statement she gave to the detectives?

A. I never discussed what truthful meant to her. But, we talked about what she observed and when we were finished talking about what she observed when the man was murdered, I said if you testify truthfully about that I will inform the Court that you

did.
Q. Consistent with what she had told you?
A. Well, I didn't tell her that, you know, if you say exactly what you said on this statement I'm going to tell the Judge that you testified truthfully. I said if you testify truthfully we will let the Court know that.
Q. Did you undertake any efforts to place Ms. Larck in a drug treatment program?
A. No, I did not, no.
Q. You did not. Did you make any notes to that effect that she perhaps needed drug treatment?
A. No. That happened way later, someone else handled that. The case, when I went to see her that was before the grand jury indictment. There were no other charges or anything that I was aware of against her, other than the one charge that I knew at that particular time. We did not discuss a drug re-hab or drug treatment.
Q. And you have no knowledge of that, other than what, you know that it took place?
A. Yes. I know about a meeting, I was there when Quentin Kelly met with her and talked about getting into drug treatment.
Q. Was that something that Ms. Larck asked for or was that something that the District Attorney's Office offered for her?
A. I believe that's something that she asked Mr. Kelly if he could get her into some

type of in-patient treatment, that's what she needed.
Q. Are you aware whether the District Attorney's Office paid for any such treatment?
A. I'm aware that Quentin Kelly attempted to get her into it and I believe did get her into some type of treatment. I don't know who paid the bill.
Q. Are you familiar with any other deals or offers that may have been made to Ms. Larck in connection with her testimony?
A. Well, at that particular meeting Mr. Kelly told her that if she testified in the murder case he would recommend to whoever was handling her other cases that no multiple bill would be filed against her.
Q. Mr. Kelly relayed that fact to Ms. Larck?
A. Yes.
Q. Other than that, are you aware of any deals or offers and so forth that would have been made?
A. No.
Q. Did Ms. Larck have an attorney present at that meeting?
A. No.

MR. FLEMING:

Thank you, Mr. Larck. I don't have any further questions, Judge.

CROSS EXAMINATION

BY MR. PACIERA:

Q. I have just one question. In your face to face meeting with this lady was the information that she relayed to you consistent with the information that you had read in her statement?

A. Yes, it was.

MR. PACIERA:

Thank you, no further questions.

THE COURT:

Call your next witness.

MR. FLEMING:

I call Quentin Kelly.

* * * *

QUENTIN KELLY, was called as a witness and after having first been duly sworn, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. FLEMING:

Q. Mr. Kelly, you used to be employed by the District Attorney's Office in Jefferson Parish, correct?

A. Correct.

Q. And pursuant to that you were responsible for prosecuting the case of State of Louisiana versus Earl Bradley and Albert Russell?

A. I was the prosecutor in this division when the case was assigned.

Q. You had primary responsibility for that case?

A. Yes.

Q. And pursuant to that you had interviewed one Amy Larck, a witness against Mr. Bradley and Mr. Russell?

A. Yes, I did.

Q. You were aware Ms. Larck had other pending criminal charges?

A. I was made aware of it, yes.

Q. And that she had prior criminal convictions as well?

A. I believe so, I don't remember offhand.

Q. You actually had the opportunity to place Ms. Larck I believe in a drug re-hab program?

A. Yes, I did.
Q. Approximately when was that, Mr. Kelly?
A. I don't recall the date, it was probably two, three months ago.
Q. What drug treatment program was that?
A. Bridge House.
Q. Is that residential?
A. Yes.
Q. Is that publicly funded?
A. I have no idea.
Q. Did you request or secure any funds to place Ms. Larck in the drug treatment center?
A. No, I didn't, I just spoke with the director, they said they had a bed available.
Q. You discussed with Ms. Larck the possibility of offering some consideration to her should she should testify against Mr. Bradley and Mr. Russell?
A. I don't say I'd offer her consideration, I said if she completed re-hab and if she testified truthfully I would recommend to my superior, Mr. Regan, that we wouldn't bill her. But that was a recommendation only, I don't have any authority to bill or not bill, that's Conn Regan.
Q. You told that to Ms. Larck --
A. Yes.
Q. -- you agreed to suggest not filing a multiple bill. One moment, please. Was anyone else present at that meeting when you informed Ms. Larck of that?

A. Paul Snyder might have been in for part of it or I don't remember if he was for all of it or not, but I know he did walk by while the meeting was in progress.
Q. And Frank Brindisi in the District Attorney's Office is the prosecutor assigned to prosecute Ms. Larck's pending criminal charges?
A. I have no idea who was assigned it.
Q. You didn't speak to Mr. Brindisi about this matter?
A. No.
Q. Did you discuss the possibility of dismissing any charges against Ms. Larck should she testify?
A. No.
Q. Did you discuss the possibility of reducing the charges against Ms. Larck if she testified against Mr. Bradley?
A. Nope.
Q. Did you at any time speak with Ms. Larck's attorney concerning this matter?
A. Nope.
Q. And is it your testimony that that's the full substance of any offers, loosely termed offers and/or agreements and/or discussions concerning Ms. Larck's testimony in this case?
A. Yes, that was the full extent.
MR. FLEMING:
Thank you, Mr. Kelly, I have no further questions, Judge.

MR. PACIERA:

No questions.

* * * *

ROBERT LONG, was called as a witness and after having first been duly sworn, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. FLEMING:

Q. Mr. Long, you're employed by the District Attorney's Office in Jefferson, correct?

A. Yes, sir.

Q. And pursuant to your employment you, I believe, are supervisor of the screening division of the District Attorney's Office?

A. Yes, sir.

Q. Subject to your duties you supervise the various screeners that screen incoming cases and so forth, right?

A. Among other things, yes.

Q. And that is one of your duties?

A. Yeah.

Q. One of the people you supervise would be Paul Snyder?

A. Yes.

Q. Do you remember having any discussion with Mr. Snyder regarding the matters of -- strike that. Let me draw your attention to a case presented to the grand jury regarding second degree murder, Earl Bradley and Albert Russell. You remember having any discussions with Mr. Snyder concerning that case?

A. No.

Q. Do you remember having any discussions

with Mr. Snyder concerning a potential state's witness Amy Larck --

A. No.

Q. -- who had pending criminal charges of her own?

A. No, I have been made aware of the fact that I think I screened that case against Ms. Larck. But other than that, I don't particularly recall having any discussions about that.

Q. It's your recollection you would have screened the current pending charges against Ms. Larck?

A. Only so far as I was told that I had in preparation for this testimony.

Q. So it would be your testimony you have no knowledge of any potential offers, deals and/or agreements with Ms. Larck concerning her testimony against Mr. Bradley?

A. No, I have no knowledge of that.

MR. FLEMING:

Thank you, Mr. Long. I have no further questions, Judge.

MR. PACIERA:

No questions.

MR. PACIERA:

As we previously indicated Mr. Brindisi is home ill today. Who does that leave?

MR. FLEMING:

Mr. Regan and Mr. Somosa.

THE COURT:

Can we get Mr. Regan to come visit us?

MR. BUTLER:

I understand he's in route, Judge.

THE COURT:

Mr. Somosa works for the IDB, is he down in his division?

MR. FLEMING:

Judge, not that I'm aware of. As Your Honor is aware and perhaps I should say this for the record since Your Honor did mention Mr. Somosa works for the IDB, as do I so to speak. The public defender's office does not employ any attorneys, all the attorneys are separately, independently contracted out by the Indigent Defender Board. There is no official connection between Mr. Somosa and myself.

THE COURT:

I wasn't implying that there was.

MR. FLEMING:

I just wanted to make everything clear.

MR. PACIERA:

It's my impression that the, although each are independently contracted they all operate out of

the office across the street called the IDB office.

MR. FLEMING:

That is somewhat incorrect. We all operate out of our own offices.

THE COURT:

Let me suggest this, if Mr. Regan is one of your witnesses, why don't we take him now and then we'll enter into some sort of in depth organizational discussion of the IDB.

MR. FLEMING:

That's fine. I'd call Mr. Regan.

* * * *

CORNELIUS REGAN, was called as a witness and after having first been duly sworn, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. FLEMING:

Q. Mr. Regan, you are currently employed by the Jefferson Parish District Attorney's Office, correct?
A. Yes.
Q. And pursuant to your employment you are in charge, you are the supervisor of the felony trials division, correct?
A. Correct.
Q. And pursuant to those duties you supervise all of the trial attorneys and/or have somewhat responsibility for all the trial matters that take place in this building, correct?
A. Yes.
Q. Are you familiar with the matter of State of Louisiana versus Earl Bradley and Albert Russell?
A. No really.
Q. Are you familiar with a defendant in another division by the name of Amy Larck?
A. No.
Q. Did you have any discussions regarding a potential deal in the Bradley and Russell matter for Ms. Larck should she testify against Mr. Bradley?
A. No.

Q. For the record, it is your testimony Mr. Regan then that you have no knowledge of this matter or Ms. Larck's matter or any deals?
A. I can't independently recall the facts of this particular case, nor what she was charged with, no.
Q. One final question, then it's possible you would have had a discussion concerning these matters, you just don't remember because you deal with so many cases, is that a fair assessment?
A. I guess that's correct, yeah.

MR. FLEMING:

Thank you, Mr. Regan. I have no further questions, Judge. If they care to cross-examine their supervisor under oath.

CROSS EXAMINATION

BY MR. PACIERA:
Q. Mr. Regan, do you have any recollection of speaking to any of these three defendants that counsel has mentioned personally?
A. No.

MR. PACIERA:

Thank you. I have no further questions. The State can't produce anybody else.

MR. FLEMING:

Judge, I would ask just perhaps to hold this matter open. I will try to contact Mr. Somosa in the

313

mean time, if we could pass this matter for a few minutes.

THE COURT:

Would you do that?

MR. FLEMING:

Certainly.

THE COURT:

And if we don't address it today, there's tomorrow and then there's Friday.

MR. FLEMING:

That's fine.

THE COURT:

Mr. Brindisi is ill, I understand. Is there anyone else?

MR. FLEMING:

No, the only remaining people would be Mr. Brindisi and Mr. Somosa.

THE COURT:

The matter will remain open until we hear from them.

[A RECESS WAS HELD.]

THE COURT:

Mr. Fleming, let's take up the rest of the Bradley motions to reveal the deal.

MR. FLEMING:

Certainly, Your Honor. I would call the remaining witness for today's purpose, Michael Somosa.

* * * *

MICHAEL SOMOSA, was called as a witness and after having first been duly sworn, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. FLEMING:

Q. Good afternoon, Mr. Somosa. Mr. Somosa, you're an attorney at law, are you not?
A. Yes, sir, I am.
Q. And you have been appointed by the Court to represent Amy Larck in Division "H" before Judge Kernan Hand?
A. That's correct.
Q. And I believe you represent Ms. Larck on three except cases, correct?
A. Yes, sir, I believe that's correct.
Q. One case involves three counts of distribution of narcotics?
A. I know that one of them is a multiple count case. I can't recall the exact numbers or what all the charges are, but yes, sir.
Q. Multiple counts of distribution?
A. Yes, sir.
Q. And another case I believe with simple possession of narcotics and a crime against nature?
A. Yes, sir.
Q. And another case with a theft or something of that nature?
A. I believe that's correct, yes.
Q. And you, pursuant to your

315

representation of Ms. Larck you have become aware that she has prior criminal convictions?

A. That's correct.

Q. You are --

A. Or at least so says the DA's Office, that remains a matter of proof.

Q. And you are aware that Ms. Larck is a potential state's witness against Earl Bradley and Albert Russell in a homicide case in this division?

A. I don't recall the exact names of the defendants, but I do know that she is a potential witness in a homicide case.

Q. And you know it is a Division "O" case?

A. As far as I know, yes, sir.

Q. You're aware that I represent one of the defendants?

A. You and I have spoken before about this.

Q. Mr. Somosa, has the District Attorney's Office approached you concerning any deals, offers and/or agreements concerning Ms. Larck, rather that she testify against the defendants in the homicide case?

A. No, sir. But, I certainly would be, would entertain any such approach if they made such an approach.

Q. That matter has been delayed several times?

A. Yes, sir, it has.

Q. That's somewhat unusual given Mr.

316

Brindisi?
A. I wouldn't say that it's somewhat unusual. I've certainly joined in any requests for a continuance. In fact, if you look at the record it may have even shown as a defense continuance, which, you know, it would have been fine with us.
Q. You indicated you had not discussed any deals or offers. Have you discussed the possibility of discussing any deals or offers for her testimony?
A. Yes, sir, as I indicated we're certainly open to any discussions among those lines. And I've let the DA's Office know that.
Q. Did, and that would be Mr. Brindisi, I'm sorry I mentioned the name. For the record that's Mr. Brindisi who is prosecuting Ms. Larck?
A. Yes, sir, in Division "H".
Q. Mr. Brindisi, strike that. Mr. Somosa, while I have you, an issue was brought up, maybe you could clarify that for us. Have you filed a sanity commission regarding Ms. Larck?
A. I don't recall if I did or not. I've got her files over here, I can check because the case is, as I say has got a little mold on it. So, I filed several sanities within the past few months. I may or may not have in her case, I don't recall if I did or not.
Q. Let's back up one second. Has Mr.

Brindisi talked to you about there possibly being something on the table for Ms. Larck?
A. I did not, Mr. Brindisi never made such a representation to me. I have spoken with Mr. Quentin Kelly who is the former prosecutor in this division. And in fact my discussions with Mr. Brindisi have always been I'd like to try to roll this if we could, these various cases knowing that there was some very, very serious charges against, pending against Ms. Larck. And basically my attitude was can you talk to whoever is going to be handling it, if it's a Code 6 or if it's Mr. Kelly, whoever is going to be the DA in that, in Division "O", speak to them about the pendency of the case and that sort of thing. And that's where Mr. Brindisi and I truthfully have left it.
Q. Have you had any discussions, I thought you said you did have a discussion with Mr. Kelly --
A. Yes, sir, I have.
Q. Did you discuss the possibility of any deals, agreements?
A. Mr. Kelly had indicated to me a desire to try to cooperate with her. I think he had indicated he had tried to get her in some kind of re-hab. And again, forgive me cause I don't remember the specifics, he had mentioned something about that. In fact, I just ran into him just a few minutes ago coming over here. But, as far as any, and

then he mentioned something about I think that she may have bombed out of one of the re-hab programs. And the last I know that she is, in fact, in St. Bernard Parish jail or she may be over here, I have no idea exactly where she's incarcerated.

Q. As a multiple offender, multiple bill regarding the distribution charges, she would be facing a minimum of 15 years up to 60 years per count?

A. If she is in fact at least a double bill, yes, sir, that's correct.

MR. FLEMING:

I have no further questions of Mr. Somosa concerning this issue, although Mr. Paciera had brought up the matter of her competency. Would the Court like Mr. Somosa to review his records and perhaps he could clarify that as to whether there's a pending competency.

THE COURT:

Mr. Somosa, can my criminal clerk trust an entry which appears on his screen that you in fact filed a motion?

THE WITNESS:

Yes, sir, yes, sir. But, I've got my files right next, sitting right next to Mr. Roberts.

FURTHER EXAMINATION

BY MR. FLEMING:

Q. I guess for the record, would that refresh your memory?
A. Sure, sure. I apologize for not remembering.

MR. FLEMING:

Let the record reflect that I'm not reviewing Mr. Somosa's files in any way, shape or form.

THE WITNESS:

Mr. Fleming, I don't see any indication of it in these files. But, if there's something that I may have filed and may not have wound in one of these three files, certainly I'd stand corrected, but I see no indication of it in here.

BY MR. FLEMING:

Q. And you have no specific recollection of that?
A. No, sir.

MR. FLEMING:

I would tender Mr. Somosa.

MR. BUTLER:

No questions, Judge.

THE COURT:

You may step down. So it would seem we're down just to Mr. Brindisi, is that correct?

MR. FLEMING:

That is correct, Your Honor. I guess we had discussed handling Mr. Barnett's remaining motions

the day of the 5th. I would not be opposed to continuing Mr. Brindisi's testimony to that date also. I don't particularly expect him to testify any differently than any of the other witnesses, but out of an abundance of caution.

THE COURT:

Is that your sense that's the way things are going --

MR. FLEMING:

Well, that's my sense, but I'm not waiving any right to call him. I think out of an abundance of caution we should still have Mr. Brindisi testify. Of course, something could change between now and then.

THE COURT:

As soon as he's in the building he'll be called along with the rest of the cast.

[End of proceedings.]



321

# REPORTER'S PAGE

I, Susan Stentz, Certified Court Reporter, in and for the State of Louisiana, the officer before whom this sworn testimony was taken, do hereby state:

That due to the spontaneous discourse of this proceeding, where necessary, dashes (--) have been used to indicate pauses, changes in thought, and/or talk-overs; that same is the proper method for a Court Reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(Assumed spelling)."

SUSAN STENTZ
CERTIFIED COURT REPORTER

# Exhibit J

# Final Report of the New York State Bar Association's Task Force on Wrongful Convictions

For the Consideration of the House of Delegates • April 4, 2009



# Table of Contents

Executive Summary........ 4

*Work of Paramount Importance*........ 4

*The Formation of the Task Force*........ 4

*The First Meeting*........ 5

*Mission Statement (Box)*........ 5

*The Causes of Wrongful Convictions*........ 6

*Additional Information About Case Studies*........ 6

*Frequency of Specific Causes Linked to Wrongful Convictions (Chart)*........ 7

*The Formation of the Subcommittees*........ 8

*The Recommendations of the Subcommittees*........ 8

*The Vote of the Task Force*........ 8

*Proposals for the Consideration of the House of Delegates*........ 8

Proposals of the Government Practices Subcommittee........ 8

Proposals of the Identification Procedures Subcommittee........ 10

Proposals of the Forensic Evidence Subcommittee........ 12

Proposals of the False Confession Subcommittee.............................. 13

Proposals of the Jailhouse Informant Subcommittee.......................... 14

Proposals of the Defense Practices Subcommittee............................. 14

Proposals of the Compensation Subcommittee................................. 16

*Public Hearings by the Task Force*............................................................. 17

*Special Thanks from the Task Force*.......................................................... 17

*Conclusion*.................................................................................... 18

Final Report of the Government Practices Subcommittee.......................................... 19

Final Report of the Identification Procedures Subcommittee..................................... 45

Final Report of the Forensic Evidence Subcommittee................................................ 90

Final Report of the False Confession Subcommittee.................................................. 104

Final Report of the Jailhouse Informant Subcommittee.............................................. 114

Final Report of the Defense Practices Subcommittee................................................ 121

Final Report of the Compensation Subcommittee..................................................... 128

Appendix A.......................................................................................... 184

Appendix B.......................................................................................... 186

Appendix C.......................................................................................... 187

# Executive Summary

## A Review of the Task Force's Work



*Some Faces of New Yorkers Wrongfully Convicted: Jeff Deskovic, Alan Newton, Anthony Capozzi, Scott Fappiano, and Douglas Warney.*

### Work of Paramount Importance

When Bernice Leber assumed the presidency of the New York State Bar Association on June 2, 2008, she immediately recognized the need to study the root causes of wrongful convictions in New York and to promulgate any changes necessary to make certain that only the guilty are convicted. She stated, "[f]or each wrongful conviction that surfaces, how many others are still unfairly resolved? Ensuring the fair administration of justice must be the number one priority in our criminal justice system. As leaders of the profession, we have a responsibility to do everything we can to protect the innocent and make sure men and women are not punished – not even for one day – for crimes they did not commit," To that end, President Leber immediately announced the creation of a Task Force on Wrongful Convictions to carry out this cornerstone of her administration.

### The Formation of the Task Force

The Honorable Barry Kamins, immediate past president of the New York City Bar Association and adjunct professor at Brooklyn and Fordham Law Schools, was asked to serve as Chair of the Task Force, and some of the state's top judges, prosecutors, defense counsel, legal scholars and experts in the field of criminal justice agreed to serve as its Members. A complete roster of the Task Force appears as Appendix A.

MISSION STATEMENT

The number of exonerations in New York undermines the assumption that the criminal justice system sufficiently protects the innocent. Many of the exonerations do not involve DNA evidence. The consequences are far-reaching, considering, among other things, the lengthy incarcerations some defendants have experienced.

The Task Force is charged with identifying the causes for wrongful convictions, and to attempt to eliminate them.

The Task Force shall identify all of the causes of the wrongful convictions and isolate the systemic causes that produced these injustices.

The Task Force shall focus on current rules, procedures and statutes that were implicated in each case and propose solutions in the form of procedural changes and legislation.

The Task Force shall provide opportunities to educate the profession and the public on the causes of these erroneous convictions with the aim of ensuring that our laws, policies and practices are designed to reduce the risk of convicting the innocent and increasing the likelihood of convicting the guilty.

In addition, the Task Force shall review and report on the current remedies/compensation available to those wrongly convicted and propose reforms, where appropriate.

The Task Force shall also prepare a report recommending any appropriate reforms, both by statute, policy and practice, to the Executive Committee and the House of Delegates.

## The First Meeting

The first meeting was convened on June 13, 2008, and the Task Force quickly adopted its mission statement (see box at left). In addition, the group defined what it meant by the term "wrongfully convicted." That definition, which would determine the criteria of those cases which the Task Force would study, was determined to be only those individuals whose New York convictions were subsequently overturned by judicial/formal exoneration.[1]

Judge Kamins assigned between 3 to 5 wrongfully convicted individuals to each Member of the Task Force. He asked the Members to carefully review the facts of each case and then draft a detailed report for each that could be reviewed by the entire Task Force. A total of 53 cases were selected, and each Member reviewed all documentation available about their assigned cases, including but not limited to, court files and various media reports. In

[1] The Task Force does not express an opinion that all 53 exonerees were actually innocent. However, while some individuals may not have been, in fact, innocent, in all these cases the criminal justice system broke down to the degree that a conviction was wrongly obtained.

addition, many Task Force Members interviewed attorneys, law enforcement personnel and judges involved in both the original criminal case and the subsequent exoneration efforts. A list of the 53 wrongfully convicted New Yorkers the Task Force studied is attached as Appendix B.[2]

## The Causes of Wrongful Convictions

As the 53 case studies were carefully reviewed, six root causes were readily identified as primary factors responsible for the wrongful convictions:

- Government Practices: one or more general errors by a government actor (a prosecutor, member of law enforcement, or judge).
- Identification Procedures: the misidentification of the accused by the victim and/or one or more eyewitnesses.
- Mishandling of Forensic Evidence: errors in the handling or preservation of key forensic evidence and/or the failure to use DNA testing.
- Use of False Confessions: the extraction and use of what turned out to be a false confession by the accused.
- Use of Jailhouse Informants: the admission and reliance by the jury on what later was determined to be false testimony by a jailhouse or other informant.
- Defense Practices: one of more errors by an attorney representing the falsely accused, usually a failure to fully investigate or to offer alternative theories and/or suspects.

## Additional Information About Case Studies

The case studies also revealed some additional key information that was taken into account by the Task Force when determining what proposals to recommend:

1. Slightly *less* than half of the cases reviewed by the Task Force resulting in a wrongful conviction involved a DNA exoneration. This meant that while scientific advances have played an essential role in helping to prevent wrongful convictions, many other non-

[2] The case reports detailing the facts of the 53 cases studied by the Task Force will be made a part of this final report as part of an additional appendix.

scientific factors have also been the cause of wrongful convictions and had to be carefully examined and considered.

2. As demonstrated in the chart below, certain causes appeared more prevalent than others for causing a wrongful conviction in New York.[3] Based on the Task Force's findings, the top three were (a) misidentification of the accused; (b) general errors by a government actor; and (c) errors in the handling or preservation of key forensic evidence. It should also be noted, that it was extremely rare that only one factor caused a wrongful conviction. The Task Force observed that most wrongful conviction cases resulted from multiple causes.

## Frequency of Specific Causes Linked to Wrongful Convictions




---

3 These causes were determined by the Task Force following its review of the 53 case studies as described above.

## The Formation of Subcommittees

To further study these root causes and the adequacy of the current legal framework to compensate New Yorkers who are wrongfully convicted, the following seven subcommittees were formed on September 12, 2008: (a) Government Practices; (b) Identification Procedures; (c) Forensic Evidence; (d) Defense Practices; (e) False Confessions; (f) Jailhouse Informants; and (h) Compensation for the Wrongfully Convicted.

Each subcommittee was tasked with carefully reviewing (a) each case study; and (b) any current laws, protocols, training procedures, court practices, rules, etc. that were linked to the cause they were assigned to review. Following that, the subcommittees were requested to make specific recommendations of changes they thought appropriate and necessary to eliminate their specific cause of wrongful convictions.

## The Recommendations of the Subcommittees

Each subcommittee drafted a report to the entire Task Force detailing its specific proposals and the corresponding reasoning for each. Those reports were circulated to the Task Force in advance of its meeting on November 11, 2008, and can be found at pages 19 - 183, *infra*.

## The Vote of the Task Force

The Task Force met on November 11, 2008 and carefully reviewed and discussed each proposal submitted by the seven subcommittees. At the end of each discussion, a vote was taken of those present, and the following specific proposals were passed by a majority for the consideration of the House of Delegates at its meeting on April 4, 2009:

### Government Practices

1. In the Event of a Late *Brady* Disclosure, Whether Before or During Trial, the Court Should Grant an Adjournment of Sufficient Length to Enable the Defense to Prepare, and, Where Appropriate, Preclude Evidence, Give an Appropriate Instruction to the Jury and Grant Such Other Relief As Is Appropriate

2. If *Brady* Information Relevant to the Defense Has Not Been Given to the Defense or Has Been Delivered in a Late Turnover, or If False Testimony Is Used at Trial, Relief on

Appeal or Collateral Challenge Should Be Granted Unless the State Shows There Was No Possibility the Information Would Have Affected the Decision

3. Where Procedures Do Not Currently Exist, Prosecutors Should Put in Place Appropriate Internal Procedures for Preventing *Brady* and Truthful Evidence Rule Violations and For Examining, Evaluating, and Determining Whether the Official Conduct of an Assistant Is Improper and Should Be Sanctioned, and If Appropriate Imposing Such Sanctions

4. Under the Rules of Professional Conduct (Superseding the Code of Professional Responsibility), A Statewide Procedure Should Be Established for Identifying and Reviewing Intentional or Reckless Violations of Both *Brady* and the Truthful Evidence Rule

5. A *Brady* Conference Should Be Held Before Trial to Resolve Issues of Turnover

6. Law Enforcement Officials Should Be Trained and Supervised In the Application of *Brady* and Truthful Evidence Rules

7. The Subcommittee on Government Procedures Jointly Recommends the Proposals Submitted by the Subcommittee on Forensic Evidence and Adds the Following:

   a. First, a careful examination of the crime scene, so fundamental to prosecutions of violent crime, should be conducted.

   b. Second, evidence should be maintained in a way that ensures its integrity and permits ready retrieval.

   c. Third, before and after trial physical evidence of all types should be logged and stored to guarantee retrieval.

   d. Fourth, evidence should not be discarded or destroyed except in conformity with established protocols.

   e. Fifth, with proper safeguards, before and after trial the defense should enjoy access to physical evidence.

f. Sixth, where either a prosecution test or a subsequent defense test of a limited sample may destroy the sample, and make future tests impossible, trained representatives of both sides should where practicable be permitted to select the testing procedure and observe the testing.

g. Seventh, police department and other prosecutorial agencies should establish, with the advise of biological scientists and other significant experts, a protocol for the testing of samples taken in all cases that meet certain established criteria and that each such case be monitored for compliance with the protocol.

h. Eighth, the failure to follow protocols should, where appropriate (as in cases in which public officials have failed to establish procedures or have systematically violated them or the state has acted intentionally to destroy the evidence), give to the defendant at a trial or post conviction procedure the benefit of a permissible presumption that any forensic result would be deemed favorable to the defendant's position.

8. Police Officers Should Be Trained to Investigate Alternate Theories for a Case at Least Until They Are Reasonably Satisfied That Those Theories Are Without Merit

## Identification Procedures

1. Change the Way in Which Identification Procedures (Including Lineups and Photo Arrays) Are Conducted to Enhance the Reliability of Eyewitness Identifications

a. *Double blind administration* - The administration of the identification procedure should be performed by persons who do not know the identity of the suspect.

b. *Cautionary instructions* - Eyewitnesses should be told that individuals administering the identification procedure do not know who the suspect is and told that the perpetrator may or may not be present.

c. *Effective use of fillers* - At least five fillers should be used. If practicable, fillers should be matched to the eyewitness' description of the suspect, but at the same time the suspect should not stand out as being different from the fillers.

d. *One suspect per lineup*.

e. *Documentation of the procedure* - Where the identification procedure is a police-arranged procedure such as a lineup or photographic array, the entire identification procedure should be videotaped with enough cameras with audio to capture the witness, administrator and members of the lineup or photo array. The Task Force specifically believes that the eyewitness' confidence level immediately after identifying an individual should be documented before any feedback is given as to his or her selection. If such video documentation is not possible due to the location or circumstances of the procedure (e.g., the eyewitness is in the hospital), then the procedure should be documented with audio recording and detailed written notes.

f. *Sequential presentation of identification procedures* - There is evidence that sequential and double-blind identification procedures result in a reduction in "false positive" results, i.e., identifications of suspects who are in fact innocent of the crime, while other evidence exists which calls this conclusion into question. We propose that further research, including field studies, into the efficacy of sequential versus simultaneous procedures be conducted, and that further recommendations be made following this additional research.

2. Allow Expert Testimony on Eyewitness Identifications at Trial

- An expert should be permitted to testify as to the scientific research surrounding identification procedures, including their administration, reliability and the nature of human memory, in any case where identification is an issue and where such testimony is relevant. In the event that prosecutors or defense attorneys lack the resources to hire an expert on eyewitness identifications, funds should be provided to both prosecutors and defense attorneys to permit the hiring of these kinds of experts.

3. Provide Jury Instructions on Eyewitness Identifications

- Jury instructions should be provided so that at the time of deliberations, the jury is aware of any potential unreliability in the eyewitness identification. Through jury instructions, jurors should be made aware of the factors to consider in evaluating the reliability of an eyewitness identification. Specifically, in any case where an eyewitness identification procedure is not conducted in accordance with the

improved procedures outlined here (i.e., double-blind; one suspect per procedure; cautionary instructions provided to the eyewitness; effective use of fillers; one suspect per procedure), jurors should be instructed that they may consider the failure to implement the procedure as a factor in accepting or rejecting the identification. Jurors should likewise be instructed that they may consider law enforcement's failure to properly document the identification procedure when deciding whether to accept or reject the in-court identification

4. Evidence of Photographic Identifications Should Be Admitted at Trial If They Are Properly Documented by Video Recording and If They Are Conducted in Accordance With the Proposed Improvements to Identification Procedure (i.e., Double-Blind; One Suspect Per Procedure; Cautionary Instructions Provided to the Eyewitness; Effective Use of Fillers; One Suspect Per Procedure)

5. Failure to Comply With the Proposed Reforms to Identification Procedures Should Be Considered By the Trial Court As a Factor in Determining Whether Evidence of the Eyewitness Identification Should Be Admitted at Trial

6. Police, Prosecutors, Defense Attorneys and Judges Should Be Trained in the Issues Related to Eyewitness Identifications and Should Be Made Aware of the Factors That Can Cause Erroneous Eyewitness Identifications and the Procedures That Can Minimize Them

7. Funding Should Be Made Available to Law Enforcement Agencies to Permit the Implementation of These Proposed Improvements to Eyewitness Identification Procedures

## Forensic Evidence

1. Ensure Proper Preservation, Cataloguing and Retention of All Forensic Evidence

    a. Enact legislation to expand the jurisdiction of the Forensic Science Commission to include responsibility to promulgate mandatory standards for the preservation, cataloguing and retention of all forensic evidence obtained at crime scenes or other locations relevant to the commission of a crime;

b. Enact legislation to require that all existing forensic evidence, especially biological and fingerprint evidence, which currently exists in local or state warehouses and/or storage facilities, be catalogued using state-of-the-art technology, such as bar-coding;

c. Enact legislation to require that all forensic evidence obtained in connection with the commission of a crime be maintained for a minimum of ten years after a person convicted of such crime has been discharged from any post-incarceration period of supervision; in cases where no person has been accused of the crime, all forensic evidence shall be maintained until the expiration of all applicable statutes of limitations for prosecution of the crime.

2. Expand the Jurisdiction of the Forensic Science Commission to Provide Independent Oversight of Forensic Disciplines

3. Establish Authority for Judges to Order Comparison of Crime Scene Evidence to Available Forensic Databases Upon Request of an Accused or Convicted Person

4. Permit Wrongfully Convicted Persons To Prove Their Innocence, Regardless of Whether the Conviction Was the Result of a Trial Verdict or a Guilty Plea

5. Promulgate Standards and Best Practices To Guide All Law Enforcement Agencies in the Processing of Crime Scenes and the Collection, Processing, Evaluation and Storage of Forensic Evidence

6. Provide Forensic Science Training for Prosecutors, Defense Lawyers and Judges

7. Establish a Permanent Independent Commission to Minimize the Incidence of Wrongful Convictions

## False Confessions

1. Custodial Interrogations of All Felony-Level Crime Suspects Should Be Electronically Recorded in Their Entirety

2. Specific Training About False Confessions Should be Given to Police, Prosecutors, Judges and Defense Attorneys

3. Further Study Should be Undertaken on the Impact of the Phenomenon of False Confessions on a Defendant's Willingness to Plead Guilty

## Jailhouse Informants

1. Any Informant's Testimony Should Be Corroborated (The Corroboration Requirement for the Use of Accomplice Testimony Should Be Extended to Non-Accomplice Informants)

2. The Jury Should Be Instructed to Consider Several Factors Indicating the Extent to Which the Testimony is Credible, Including: (i) Any Explicit or Implied Inducements that the Informant May Have Received or Will Receive; (ii) the Prior Criminal History of the Informant; (iii) Evidence That He or She is a "Career Informant" Who Has Testified in Other Criminal Cases; and (iv) Any Other Factors That Might Tend to Render the Witnesses' Testimony Unreliable

3. The Court Should Conduct a Pre-Trial Reliability Hearing with Respect to the Testimony of Informants

4. When the Court Finds the Need to Protect the Identity of an Informant Compelling, It Should Conduct an In Camera Review of the Information Relating to the Informant's Credibility, and Provide the Defense With All Such Information As May be Provided Without Disclosing the Informant's Identity

5. A Videotape Recording, When Possible, Should be Made of Any Informant's Statement Given to Any Law Enforcement Agent or Prosecutor

6. The Prosecution Should Develop "Best Practices" That Check the Reliability of Informant Testimony

## Defense Practices

1. The Task Force Generally Endorses the Specific Recommendations Made by the American Bar Association's Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process and Guideline 4.1 of The National Legal Aid and Defender Association's Performance Guidelines for Criminal Defense Representation

2. Those Standards Should be Widely Publicized by the New York State Bar Association and Distributed Extensively to the Criminal Defense Bar Through the Heads of All Defender Agencies, the Administrators of all Assigned Counsel Plans, and by Malpractice Insurance Providers to Those Attorneys Whom They Insure

3. The Administrators of Assigned Counsel Plans Must Scrutinize More Carefully the Qualifications of Attorneys Seeking Appointment Under the Plan to Represent Indigent Defendants

4. The Administrators of Assigned Counsel Plans Should be Provided with Adequate Resources to be Allocated for Staff to Enable Those Plans to Increase Their Ability to Monitor the Performance of Attorneys Assigned Under the Plan, and, If Possible, to Develop Within the Plan a Structure Which Offers Supervision and Legal Consultation to Plan Attorneys

5. Bar Associations Should Solicit Experienced Members of the Criminal Defense Bar to Make Themselves Available on a Designated Telephone Hotline or in a Specific Office to Fellow Attorneys Who Seek Advice and Counsel With Regard to Their Representation of a Criminal Defendant, and Bar Associations Should Give Formal Recognition in Some Fashion to Attorneys Who Provide Such Mentoring

6. The Rules Governing CLE Credits Should be Amended to Provide That Attorneys Who Undertake the Defense of Criminal Cases Must Certify That in Each Calendar Year They Have Taken a Specified Number of CLE Hours Devoted to Subjects Pertaining to the Representation of Criminal Defendants

7. Organizations Which Currently Operate a Resource Center for Public Defenders and Assigned Counsel Should be Given Additional Resources That Would Enable Them to Increase Their Ability to Provide Guidance and Counsel to Any Attorney, Assigned or Retained, Who Seeks Assistance

8. The Task Force endorses the recommendations of the Report of the Commission on the Future of Indigent Services, June 2006, specifically including the recommendation of an Independent Public Defense Commission to oversee the quality and delivery of public defense services.

## Compensation for the Wrongfully Convicted

1. The Broad Definition of Eligibility in the *Court of Claims Act § 8-b Subdivision 2* Should Remain Unchanged to Offer the Opportunity for Legal Redress to All Individuals Who Have Been Imprisoned and Subsequently Found Innocent

2. The Provision Contained in *Subsection (c) of the Court of Claims Act § 8-b* Should Be Amended to Require the Claimant Only Prove That He or She Has Been Exonerated on Every Charge Submitted to the Fact-Finder

3. Contributing to the Conviction in Cases of Attorney Negligence or Coerced Confession Should Not Be a Factor in Determining Appropriate Compensation, and *Subsection (d) of the Court of Claims Act § 8-b* Should Be So Amended

4. A Fixed Minimum Guaranteed Amount Per Year of Incarceration Should Be Set with the Option to Seek More, Upon Satisfying the Requirements Outlined in the *Court of Claims Act § 8-b*. If the Claimant Opts to Seek Additional Compensation, He or She Forfeits the Guaranteed Amount

5. Many State Statutes Include a Provision Prohibiting the State from Offsetting the Total Compensation Awarded by any Expenses Incurred Related to Securing or Maintaining the Claimant's Custody or to Feed, Clothe or Provide Medical Services for the Claimant. It is our Recommendation that Such a Provision be Included in the New York State Statute (*Court of Claims Act § 8-b*)

6. *Subsection 7 of the Court of Claims Act § 8-b* Should Remain Unchanged

7. Based on Need, the Immediate Provision of Subsistence Funds and Access to Services to Assist in Reentry Should Be Provided to All Individuals Who Have Been Released from Prison After Exoneration. Such Services Should Include Assistance in Acquiring Affordable Housing, Job Training, Education, Health Care, and Child Custody Assistance

8. The Claimant Should Not Be Eligible for Compensation for Any Term of Incarceration that was Attributable to a Separate and Lawful Conviction Resulting in a Concurrent Term of Imprisonment

9. State Law Should Specify That Upon the Death of a Wrongfully Imprisoned Individual, Any Compensation Awarded Will Be Paid to His or Her Estate

10. The State Should Automatically Order the Expungement of All Criminal Records Related to the Wrongful Arrest, Conviction and Sentence at the Expense of the State Upon Exoneration. Such Records Shall Only Be Available to a Claimant and the State in an Unjust Conviction and Imprisonment Claim Upon Application to the Court

## Public Hearings by the Task Force

The Task Force held two public hearings, the transcripts of which are attached as Appendix C. The first occurred on February 13, 2009 at the offices of the New York City Bar Association. The second hearing took place on February 24, 2009 at the New York State Bar Association in Albany.

## Special Thanks from the Task Force

The Task Force is truly indebted to the many individuals and institutions that generously assisted it in completing its work. Specifically, the Task Force would like to thank:

- Arent Fox LLP - Darsche Turner, Aimee Hall, Shawanna Johnson and Tope Yusuf
- Fried, Frank, Harris, Shriver & Jacobson LLP -- Jennifer Colyer, Steven Witzel, Holly Chen, Lauren Flicker, Amanuel Kiros, Charlotte Levy, Aleksandr Livshits, Maya Mitchell, Andrew Smith, Johnathan Smith and Scott Wells
- The Fortune Society - Harvey Weinig; and Daniel Spiegel and Ariel Ruiz (law students)
- The Innocence Project - Barry Scheck, Peter Neufeld, Madeline deLone, Rebecca Brown and Gabriel Oberfield
- The Law Offices of Robert C. Gottlieb – Celia A. Gordon, Jordan M. Dressler and Sarah E. Eagen
- Morrison & Foerster, LLP - Emily Huters (Associate); Cindy Abramson, Amanda Bakale, Tim Cleary, Steve Koshgerian, Leda Moloff, Suhna Pierce, Sarah Prutzman, Ariel Ruiz, Ben Smiley and Katie Viggiani (Summer Associates 2008)

- National Association of Criminal Defense Lawyers - Quintin Chatman and Daniel Weir
- The New York State District Attorney's Association
- Jon Getz, Don Thompson, Gary Craig, Frank R. Dudis, Esq. and William Easton

## Conclusion

As stated in the Task Force's Mission Statement, any wrongful conviction erodes the public's confidence in our state's criminal justice system. It is equally clear that these improper convictions destroy the lives of innocent men and women - both the falsely accused *and* the victims of the original crime. We have the ability to learn from our mistakes and avoid these miscarriages of justice. For these and for the multitude of other reasons presented in this report, the Task Force on Wrongful Convictions respectfully urges the House of Delegates to pass the specific proposals presented herein at its meeting on April 4, 2009.

Respectfully submitted,

Hon. Barry Kamins
Chair, Task Force on Wrongful Convictions

Richard Aborn, Esq.
Jack Auspitz, Esq.
Hon. Phylis Skloot Bamberger
Thomas Belfiore
David Louis Cohen, Esq.
Tracee Davis, Esq.
Hon. Janet DiFiore
Vincent E. Doyle, III, Esq.
Mark Dwyer, Esq.
Anthony Girese, Esq.
Robert C. Gottlieb, Esq.
Prof. William Hellerstein
Hon. Charles J. Hynes
Hon. Howard Levine
Hon. John Martin
JoAnne Page, Esq.
M. Scott Peeler, Esq.
Norman L. Reimer, Esq.
Prof. Laurie Shanks
Hon. George Bundy Smith
Lauren Wachtler, Esq.

# Government Practices

SUBCOMMITTEE REPORT AND FINAL PROPOSALS

## Introduction

The results of the Task Force's case studies, in which 53 people were wrongfully convicted, reveal that government practices, by police or prosecutors, were possible causes of the wrongful convictions in over 50% of the cases. These practices include (1) the use of evidence that is false, including false testimony about police promises, threats and offers of benefit to a state witness, *see Shih Wei Su v. Filion*, 335 F.3d 119 (2d Cir. 2003); (2) the failure of the prosecutor to deliver favorable information to the defense pursuant to the New York State and Federal constitutional due process principles as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and earlier New York authorities; (3) the failure of the police department to collect and transfer evidence in a manner that preserves its integrity, and to store, preserve, and safeguard physical evidence for testing or examination or retesting, especially for testing based on advancing scientific technologies, and the failure, to have physical objects tested for forensic evidence that might confirm or refute a person's involvement in a crime; and (4) the early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime.

Even if cases do not reveal an actually innocent person being wrongfully convicted, they nonetheless often reveal troubling due process violations that may result in a defendant being denied a fair trial. The analysis and recommendations presented in this report reflect concern for the application of due process principles in all cases - not just those that involve a wrongful conviction.

## Use of Perjured and False Testimony or Evidence

"Since at least 1935 [in *Mooney v. Holohan*, 294 U.S. 103] it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution....This is so because, in order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost." *Shih Wei Su*, 335 F. 3d at 126.

The same principle is part of New York based jurisprudence: "[t]he prosecutor should ... correct...[false] trial testimony given by [the witness] and the impression it created....[The] failure to do so constitutes 'error so fundamental , so substantial' that a verdict of guilt will not be permitted to stand....A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." *People v. Savvides*, 1 N.Y.2d 554, 556-57 (1956).

Despite the age and clarity of the law, violations of these principles occur. In fact, two clear examples appeared in wrongful conviction cases studied by the Task Force:

In the case of James Walker, a prosecutor testified during pretrial proceedings that no lineup had been held when in fact a lineup had occurred and a filler-police officer, not Walker, was identified as the person who assaulted a victim in the crime. The detective in the case testified he did not recall a lineup.[4]

Similarly, in the case of Albert Ramos, the prosecutor appears to have either misled or falsely argued to the jury that it was the alleged sex act by the accused that enabled the child to explain what occurred during the crime. However, undisclosed files showed the child knew about sexual conduct before and acted it out before the alleged crime. Further, when the prosecution witnesses changed their stories, the prosecutor did not inform the defense of the change and the defense could not deal with the changes because the defense did not have the

---

[4] The 1972 conviction of James Walker was not obtained during the tenure of the current District Attorney of Kings County. When Mr. Walker filed his 440 motion to vacate judgment in 1990, the current District Attorney had his office promptly investigate the allegations and then consented to the vacatur of the conviction and the dismissal of the indictment.

witnesses' prior statements. Finally, it was not disclosed to the defense that the child's own acts could have caused the injury she sustained.

Other cases are also instructive. In *People v. May*, 228 A.D.2d 523 (2d Dep't 1996), the conviction was reversed because the prosecutor did not reveal or correct false testimony about a promise regarding sentencing of a prosecution witness; and in *People v. Ross*, 43 A.D.3d 567(3d Dep't), *appeal denied* 9 N.Y.3d 964 (2007), false testimony was used, but no reversal was required because the trial judge established a curative procedure. *See also People v. Pressley*, 91 N.Y.2d 825 (1997), where uncorrected false testimony was used, although it was deemed not to be prejudicial.

## Violation of the *Brady* Rule

All prosecutors in all cases have an obligation to deliver exculpatory and favorable information to the defense relevant to the issues of guilt and punishment. In *Brady v. Maryland*, where the evidence was relevant to the determining punishment, the U.S. Supreme Court held that the turnover of the information is a requirement of due process. 373 U.S. at 86-89.

New York State has set the rule with equal clarity. The Constitution's mandate is that evidence or information be given to the defense in a criminal case if it is favorable to the defense and it is either material to guilt or punishment or affects the credibility of prosecution witnesses whose testimony may be determinative of guilt or innocence. *People v. Santorelli*, 95 N.Y.2d 412 , 421 (2000), *cert. denied*, 532 U.S. 1008 (2001); *People v. Baxley*, 84 N.Y.2d 208, 212-14 (1994). "The concept of fairness embodied in the Due Process Clauses of the State and Federal Constitutions imposes upon the prosecution a duty to apprise the defense of evidence favorable to the accused. To give substance to this constitutional right, it is incumbent upon the prosecutor, who speaks for the government, to ensure that material evidence which is in its possession and is exculpatory in nature is turned over to the defendant. This duty of candor and disclosure is no less applicable when the evidence is relevant only to the issue of credibility." *People v. Novoa*, 70 N.Y.2d 490, 496 (1987) (citations omitted).

The significance to the New York justice system of the due process principle and the resulting prosecutor's obligation, now simply called "Brady," is manifested in the independent State constitutional grounds for the rule. "[The Court of Appeals] analysis of the prosecutor's duty to disclose exculpatory evidence is rooted in [state]cases dealing with the similar question of

knowing prosecutorial use of false and misleading testimony....[T]hese cases even predate the identified Federal progenitors of *Brady*, and were decided entirely without reference to Federal law, based on our own view of this State's requirements of a fair trial....We have long emphasized that our view of due process in this area is, in large measure, predicated both upon 'elemental fairness' to the defendant, and upon concern that the prosecutor's office discharge its ethical and professional obligations." *People v. Vilardi*, 76 N.Y.2d 67, 75-76 (1990) (citations omitted). *Vilardi* makes clear that the New York rule has two due process purposes: inhibiting prosecutorial misconduct and providing a fair trial to a person charged with a crime.

The *Brady* rule has necessarily yielded principles to allow practical application by trial judges who must enforce it and prosecutors who must follow it:

1. *Brady* obligations apply whether there has been a defense request or not. *United States v. Agurs*, 427 U.S. 97 (1976).

2. The obligation of the prosecutor to turn over the information controls even if the prosecutor believes the information to be false.

3. The obligation of the prosecutor applies to information relevant to the credibility of witnesses as well as to information relating to other matters in the case. *People v. Hunter*, 11 N.Y.3d 1 (2008); *People v. Valentin*, 1 A.D.3d 982 (4th Dep't 2003), *appeal denied*, 1 N.Y.3d 602 (2004).

4. The obligation of the prosecutor exists whether the failure to deliver favorable information is intentional or not, or in good faith or not. *People v. Hunter*, 11 N.Y.3d 1 (2008); *People v. Bryce*, 88 N.Y.2d 124 (1996); *People v. Baxley*, 84 N.Y.2d 208.

5. Even without personal knowledge of the favorable or exculpatory information, the prosecutor is charged with knowledge if a state official working on the case has the information. The prosecutor has a duty to learn of any favorable evidence known to others acting on the state's behalf, including the police, and to disclose the information. *Youngblood v. West Virginia*, 547 U.S. 867 (2006); *Kyles v. Whitley*, 514 U.S. 419 (1995); *People v. Santorelli*, 95 N.Y.2d 412; *People v. Wright*, 86 N.Y.2d 591 (1995); *People v. Novoa*, 70 N.Y.2d 490; *People v. Harris*, 35 A.D.3d 1197 (4th Dep't 2006); *People v. Valentin*, 1 A.D.3d 982.

6. Activities by those working on an investigation that result in a suppression of the information are attributed to the prosecutor. *People v. Steadman*, 82 N.Y.2d 1 (1993).

7. Late disclosure of favorable information during trial is satisfactory if the defense has the opportunity to investigate and integrate the information into the defense position. *See People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992); *People v. Watson*, 17 A.D.3d 385 (2d Dep't 2005), *appeal denied*, 5 N.Y.3d 771.

In one situation the prosecutor is relieved of the obligation to turn over favorable information: if the defense knew or should have known the information. *People v. Doshi*, 93 N.Y.2d 499 (1999). *See, e.g., People v. McClain*, 53 A.D.3d 556 (2d Dep't), *appeal denied*, 11 N.Y.3d 791 (2008); *People v. Delarosa*, 48 A.D.3d 1098 (4th Dep't), *appeal denied*, 10 N.Y.3d 861 (2008)

All types of information fall within the types of evidence which must be disclosed to the defense: *e.g.*, (1) promises to a witness, actual or implied on any reading of the information (*People v. Steadman*, 82 N.Y.2d 1); (2) prior criminal record or bad acts of the witnesses; (3) prior inconsistent statements of a witness (*People v. Bond*, 95 N.Y.2d 840 (2000); *People v. Gantt*, 13 A.D.3d 204 (1st Dep't 2004), *appeal denied*, 4 N.Y.3d 798 (2005); (4) information derived from any investigation made by an agency of the state working on the case including police reports and the results of interviews (*People v. Harris*, 35 A.D.3d 1197; (5) physical evidence including human body parts (*People v. Bryce*, 88 N.Y.2d 124) and body fluid samples; (6) evidence obtained through forensic testing; (7) photographs; (8) investigative communications with other branches of government (*People v. Cwikla*, 46 N.Y.2d 434 (1979)); (9) information about a motive to testify (*People v. Wright*, 86 N.Y.2de 591; (10) a failure to correct false testimony (*People v. Steadman*, 82 N.Y.2d 1; *People v. Novoa*, 70 N.Y.2d 490; *People v. Ross*, 43 A.D.3d 567 (3d Dep't 2007), *appeal denied*, 9 N.Y.3d 964 (2007); (11) recantation of a statement by a witness (*see People v. Baxley*, 84 N.Y.2d 208); (12) a failure to

disclose the conduct of the complainant that would impeach credibility (*People v. Hunter*, 11 N.Y. 3d 1).[5]

The obligation of prompt turnover is a continuing one triggered by *Brady* material coming to the knowledge of anyone working on or associated with the investigation of the case. By statute, Criminal Procedure Law section 240.20, delivery is required once a pretrial defense motion is made and granted. Often *Brady* material is not delivered until just before the trial begins or during the trial even if the state is in possession of the information earlier. It has been held that the failure to give the defense exculpatory evidence, which the prosecutor had for several months, until the eve of trial was inexcusable. *People v. Baba-Ali*, 179 A.D.2d at 729-30.

Examples of several cases examined by the Task Force demonstrate the presence of this issue.

In the case of Lazaro Burt, a detective interviewed an eyewitness to a shooting six days after the crime. The eyewitness was in jail and accessible to the police. The eyewitness told the detective the name of the person who was the shooter, and that the person was not Mr. Burt. The statement was written down and placed in the file of the case. The defense made pretrial *Brady* motions and the prosecutor made no reference to the statement. The record of the trial shows that the defense did not receive a copy of the statement until the fifth day of the trial, 16 months after the shooting, when the witness could no longer be found. The jury never knew that a person other than Burt had been named as the shooter.

In the matter of Kerry Kotler, the complainant was raped. A few minutes later, another person was raped nearby. The perpetrator of the second rape matched the description given by the complainant. The second victim was shown Kotler's photo but did not identify him, thereby permitting the argument that someone other than the accused also committed the earlier crime. The defense was not told about the second rape and the failure of the second victim to identify

5 Certain members of the Task Force note that for decades the federal and state decisional law requires the non-disclosed information to affect guilt or innocence *materially* for a violation of the rule to have occurred. *See, e.g., Banks v. Dretke*, 540 U.S. 668, 691 (2004) (suppressed evidence must be "material" to demonstrate one of the components for a Brady violation); *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976) (the materiality standard focuses on the impact of the undisclosed evidence on the "issue of guilt or innocence," not on the "defendant's ability to prepare for trial . . . .") (citation omitted); *People v. Pressley*, 91 N.Y.2d 825 (1997) (false testimony of witness about criminal record does not require reversal when no prejudice demonstrated).

Kotler. Further, the defense was not told that when the complainant selected Kotler's photograph, she said only that he *looked* like the rapist. Finally, the lead detective on the case destroyed both his original notes about the second rape and the original of the police report. Kotler learned all of this after the conviction. While the *Brady* violation was not the sole cause of the wrongful conviction, it might have contributed to it.

In the case of James Walker, Mr. Walker was identified by a drug addict several months after the crime as the person who assaulted a guard at a check cashing store during a robbery in which another victim was killed. After the conviction of Walker for felony murder, Walker learned that the addict-informer had identified another person as one of the participants in the crime -- which had to have been a lie because that other person was in jail at the time of the robbery. The defense was never told that the informer had wrongly accused someone else. Further, Walker was not told that the man whom he was accused of beating had not identified him in a lineup, but rather selected a filler who was a police officer.

In the Albert Ramos matter, Mr. Ramos was charged with sexual abuse of a child. Several exculpatory documents in the district attorney's file were never given to the defense. These documents cast doubt on the testimony of the prosecution witnesses including the child complainant, her mother, grandmother, and teacher, and supported the defense contention that no act of sexual abuse occurred. The documents showed that the child masturbated, watched sexually explicit movies, and placed dolls in sexual positions -- all before the date of the alleged incident. The information rebutted the testimony about the knowledge of the child about sexual conduct and explained the presence of her symptoms.

In the matter of George Whitmore, the defense was not told that a button obtained by the victim from the coat of her attacker could not be scientifically shown to have come from Whitmore's coat.[6]

In the case of Lee Long, a detective confirmed Long's alibi at the time of Long's arrest but prepared no report with respect to the information obtained. The alibi witness did not

---

[6] Eugene Gold, former District Attorney of Kings County, reviewed the circumstances of Mr. Whitmore's Brooklyn conviction (that arose out of an investigation in New York County and had been obtained by his predecessor). Based on that review, District Attorney Gold moved to set aside the conviction and asked the Court to dismiss the indictment.

remember the detective's name and had no way to support the challenge to the defense position. The *Brady* obligation was avoided by the detectives' failure to record the information.

And finally, in the Betty Tyson case, Ms. Tyson was charged with murder. A police report showing that a witness' claim that Tyson had been with the deceased on the night of the murder was fabricated was not given to the defense. (The original statement was false, having been obtained by the police by coercive conduct.)

The cases before the Task Force generally deal with convictions that are more than ten years old, raising the hope that times have changed and that violations will now be rare. However, despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show such conduct still occurs. *See, e.g., People v. Hunter*, 11 N.Y3d 1 (2008); *People v. Williams*, 7 N.Y.3d 15 (2006); *People v. Pressley*, 91 N.Y.2d 825 (1997); *People v. Thompson*, 54 A.D.3d 975 (2d Dep't 2008); *People v. Phillips*, 55 A.D.3d 1145 (3d Dep't 2008); *People v. Colon*, 865 N.Y.S.2d 601 (1st Dep't 2008); *People v. Williams*, 50 A.D.3d 1177 (3d Dep't 2008); *People v. Garcia*, 46 A.D.3d 461 (1st Dep't 2007); *People v. Harris*, 35 A.D.3d 1197 (4th Dept. 2006); *People v. Leon*, 23 A.D.3d 1110 (4th Dep't), *appeal denied*, 6 N.Y.3d 755 (2005); *People v. Gantt*, 13 A.D.3d 204 (1st Dep't 2004), *appeal denied*, 4 N.Y.3d 798 (2005); *People v. Hendricks*, 4 A.D.3d 798 (4th Dep't), *appeal denied*, 2 N.Y.3d 800 (2004); *People v. Knight*, 2007 WL 4896695 (Supreme Ct. Queens Cty. 2007). *See also* Elizabeth Napier Dewar, *A Fair Remedy for Brady Violations*, 115 Yale L.J. 1450, 1453-56 (2006) (hereinafter "Dewar"). Neither are the federal courts immune from *Brady* issues. *See, e.g., United States v. Theodore F. Stevens*, 1:08-CR-231 (D.D.C.) in which the prosecutor excised favorable material from a document given to the defense and questions arose as to whether the conduct was accidental and whether the sanction was adequate.

## Subcommittee Recommendations

A. <u>Remedies Relating to the Case</u>

1. In the Event of a Late *Brady* Disclosure, Whether Before or During Trial, the Court Should Grant an Adjournment of Sufficient Length to Enable the Defense to Prepare, and, Where Appropriate, Preclude Evidence, Give an Appropriate Instruction to the Jury and Grant Such Other Relief As Is Appropriate

Note

Pretrial and trial obligations of the prosecutor to disclose and turn over favorable, exculpatory, and truthful information relevant to the defense are not limited by the factors that a reviewing court would consider on appeal or collateral attack if there were an improper failure to turn over information. The obligation of prosecutors and other public officials arises when the investigation begins and continues throughout the proceeding. The prosecutor and the judge in the trial court deal with the issue of the prosecutor's responsibility: what the prosecutor actually knows, or is deemed to know, or is expected to learn, and what the prosecutor is expected to disclose to the defense.

When claims of violation of *Brady* or the use of false testimony arise before the trial ends, the judge determines the appropriate corrective action. *People v. Williams*, 7 N.Y.3d at 19-20. If the issue arises at pre-trial proceedings, the judge can order a new hearing or reopen the earlier one. *Id.* At trial, the judge can grant an adjournment to enable the defense to investigate and prepare; can preclude the presentation of evidence; or can give an instruction to the jury that is adverse to the prosecution. Dewar, 115 Yale L.J. at 1457-60.

The needs of the defense are critical to determining the length of an adjournment. Additional investigation, including researching government and public documents, finding witnesses whose whereabouts may be unknown, and conducting forensic tests on physical evidence may be required.

2. If *Brady* Information Relevant to the Defense Has Not Been Given to the Defense or Has Been Delivered in a Late Turnover, or If False Testimony Is Used at Trial, Relief on Appeal or Collateral Challenge Should be Granted Unless the State Shows There Was No Possibility the Information Would Have Affected the Decision

Note

Under New York law, if there is a conviction followed by appellate review or collateral challenge to the conviction, the rules of the game change for evaluating a *Brady* violation or the use of false testimony. On appellate review or in collateral proceedings, issues of prejudice and preservation are relevant to the granting of a remedy to the convicted person for improper prosecutorial conduct. *See People v. Ennis*, 2008 N.Y. Slip Op. 09007 (N.Y. Nov. 20, 2008).

The prosecutor's failure to deliver favorable information pursuant to a defense request results in a new trial or dismissal of the case if the defendant shows that the undelivered evidence had a reasonable possibility of affecting the verdict. If there was no specific defense request for *Brady* material, the defendant must show there was a reasonable probability that the undelivered information affected the outcome of the case. *People v. Vilardi*, 76 N.Y.2d 67.

By making it easier to overturn a conviction where the defense had made a specific request, the Court of Appeals intended to emphasize the seriousness of the State's failure to act knowing that the defense was interested in a particular piece of information. *Compare United States v. Bagley*, 473 U.S. 667 (1985 ) (which applies the same test for prejudice whether or not a request for information was made by the defense and rejected the two levels of prejudice previously set out in *United States v. Agurs*, 427 U.S. 97 (1976)). The *Vilardi* standard for relief is critical to the enforcement of the *Brady* and truthful evidence rules, for under current law it is the primary means for providing a remedy for the State's improper conduct.

Despite *Vilardi*, there have been a sufficient number of cases in which *Brady* has not been followed to warrant a change in the post-conviction test justifying a remedy for the defendant. Under the circumstances, it is appropriate to seek a change in the *Vilardi* test. The Subcommittee believes that the *Vilardi* test which provides a remedy for the failure to turn over information under *Brady* or for using false information should be revised to require that the State show there was no possibility of prejudice to the convicted person.[7]

B. <u>Procedures Relating to the Prosecutor</u>

In addition to remedies for the convicted defendant whose case involved improper State conduct, official conduct should be examined and evaluated to determine if sanctions are warranted.

---

[7] Certain members of the Task Force do not approve of the second recommendation for the following two reasons. First, the recommendation appears to require reversal even when there is no "knowing" use of false testimony. Second, in determining when a reversal is appropriate, *Vilardi* strikes the appropriate balance among the significant interests implicated. The recommended rule could mean windfall reversals for guilty defendants, as it seems to require virtually automatic reversal for *any* violation (even in cases in which courts employed remedies), unless the prosecutor can demonstrate "no possibility" that the violation affected the verdict, a burden unclear and impossible to meet.

Research has not revealed public disciplinary steps against prosecutors. Private or sealed proceedings by prosecutors' offices or Appellate Division grievance committees are not available. Cases in the State Court of Claims for damages do not sanction prosecutors, but rather the State. Often, the name of the state official is not mentioned in any public document. There is little or no risk to the specific official involved resulting from a failure to follow the rule. Dewar , 115 Yale L.J. at 1456 n.26 and resource materials cited therein.

3. Where Procedures Do Not Currently Exist, Prosecutors Should Put in Place Appropriate Internal Procedures for Preventing *Brady* and Truthful Evidence Rule Violations and for Examining, Evaluating, and Determining Whether the Official Conduct of an Assistant Is Improper and Should be Sanctioned, and If Appropriate Imposing Such Sanctions

Note

After discussion with the Task Force, the Subcommittee on Government Practices sent to the District Attorneys of the State a questionnaire asking if the offices had internal procedures for dealing with *Brady* and truthful evidence rule violations; the nature of those procedures; what sanctions were available for misconduct; whether the sanctions had ever been imposed; and whether referrals to attorney disciplinary committees had ever been made. Responses were received from twenty offices and the New York State District Attorneys Association. One office declined to respond because of pending litigation. The Task Force deeply appreciates the time and interest of those who submitted answers to the inquiries.

Many of the questionnaire responders provided comments in addition to answers to the inquiries. The view of several was that the nature of the conduct was critical in deciding both whether there was a violation of the rules and whether a sanction should be imposed. One response listed the factors to be considered: (1) the nature of the conduct; (2) the explanation for the conduct; (3) the experience of the assistant; and (4) the performance record of the assistant.

Many urged that a distinction be made between intentional misconduct and negligent conduct or mistakes, with sanctions determined on a case-by-case basis. It was the widely expressed view that intentional violations of the rules should not be tolerated, and could result in a range of sanctions, including termination of employment. Mistakes or negligence should be

treated less severely, perhaps with a letter to the file, loss of accrued time, demotion, and the imposition of further training and supervision.

The questionnaire answers revealed that in some counties there was a procedure, either formal or informal, for handling misconduct or that the office had a small number of assistants so that the District Attorney either handled the cases or supervised the assistants personally. Some offices had no procedures. Generally, the available internal procedures were review of the questioned conduct by the District Attorney or the Chief Attorney with a report to the District Attorney. In one office, the Chief of Appeals was involved in the review process.

Although the questionnaire responses showed the imposition of one internal sanction and one referral to a disciplinary committee, the other responses indicated no other instances of either an internal sanction (including training or supervision) or referrals to the various disciplinary committees. Many of the responders to the questionnaire explained that there had been no need to impose a sanction or even to have a process for examining conduct because there had been no questionable conduct identified or found by a court. Others added that there had been none in many years.

Several of the questionnaire responses focused on efforts to prevent *Brady* and truthful evidence rule violations or the harm that might result from such violations. One tool is education and training, especially emphasized in the letter from the District Attorneys Association. The second is close supervision by a senior assistant or the District Attorney of all new Assistant District Attorneys. The third is open file discovery which reduces the chance that information will not be disclosed. The fourth is to elicit information about sentence and other promises from a prosecution witness on direct examination. And fifth is the revelation to the court and the defense of what has occurred along with the previously undisclosed information to avoid harm to the defense.

Barry Scheck, Director of the Innocence Project, testified at the New York City hearing that District Attorneys' Offices, 18(b) Panel Administrators, Public Defender Offices, and retained counsel (through bar associations) should have compliance officers who would receive confidential complaints from trial and appellate judges concerning possible attorney misconduct. This internal review system would deal with "obvious" misconduct, negligent conduct and "malperformance" unless it was determined that the case should be referred immediately for disciplinary procedures. NYC Hearing at 75-78.

Joel Rudin, a lawyer representing wrongfully convicted individuals in civil lawsuits, testified that through discovery in those civil matters, he obtained the personnel records of line prosecutors in several counties who had prosecuted approximately 200 cases between the late 1970's and 2003 where courts found (a) "misconduct" for Rosario or Brady violations; (b) use of misleading or false testimony; and (c) improper arguments in summation. Rudin further testified that he had found evidence of only two prosecutors involved with those cases who were formally disciplined by their offices. NYC Hearing at 143-145. Some Members of the Task Force asked Rudin to acknowledge that the term "prosecutorial misconduct" is broadly used and would include clear cases where discipline would not be appropriate. *Id.* at 151-157.

Where there is no effective procedure already in place for preventing, identifying and sanctioning misconduct, prosecutor's offices should establish such a procedure appropriate to its staffing. In cases in which a state or federal court has concluded that an Assistant District Attorney has violated the rules, the prosecutor's process should determine the appropriate sanction, including dismissal from employment. If the court has not made such a finding, where questions about an assistant's behavior are raised, the office should undertake an investigation of the conduct and determine if there has been unconstitutional conduct and, if so, the appropriate sanctions to be imposed.

4. Under the Rules of Professional Conduct (Superseding the Code of Professional Responsibility), A Statewide Procedure Should Be Established for Identifying and Reviewing Intentional or Reckless Violations of Both *Brady* and the Truthful Evidence Rule

<u>Note</u>

The case for the application of disciplinary rules to prosecutors whose conduct violates *Brady* and the truthful evidence rule was carefully and exhaustively made over twenty years ago. Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors for Brady Violations: A Paper Tiger*, 65 N.C. L. Rev. 693 (1987). After extensive research, it was reported in the article that a

system in which there are rules of conduct that apply generally to all lawyers and specifically to prosecutors provides a comprehensive network of prohibitions to *Brady*-type misconduct.[8]

To the extent that conduct must be evaluated to determine if *Brady* and truthful evidence rule violations occurred, the Rules of Professional Conduct define the behavior that is improper and the State's disciplinary rules provide existing procedure for dealing with the issues.

The Rules of Professional Conduct contain one provision that specifically applies to prosecutors and several other provisions that are applicable to all attorneys. Rule 3.8(b) states "[a] prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant or to a defendant who has no counsel of the existence of evidence or information known to the prosecutor or other government lawyer that tends to negate the guilt of the accused, mitigate the degree of the of the offense, or reduce the sentence, except when relieved of this responsibility by a protective order of a tribunal."

The language of Rule 3.8(b) expands the scope of what prosecutors were required to disclose under the former Code of Professional Responsibility DR7-103(B). Under the prior Code, prosecutors were mandated to disclose evidence while the language of Rule 3.8(b), requires disclosure of both evidence and information.

Other rules relate to the responsibilities and obligations of all lawyers, prosecutors, criminal defense lawyers, and lawyers in civil cases.

The language of Rule 3.3(a)(1) could be applied to making knowingly false statements to a court about *Brady* material: "[a] lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

---

8 There can be no thorough empirical study of how New York State's disciplinary system has functioned in this regard due to the secrecy imposed by Judiciary Law Section 90. Moreover, it is obvious that not all violations of the *Brady* rule are appropriate bases for disciplinary sanctions. Some witnesses at the New York City public hearing, lawyers with knowledge of and involved in the litigation of cases involving wrongful convictions, stated that in their experience there is little use of disciplinary procedures when a *Brady* violation occurs. Some Task Force Members express the belief, like Rosen, that the disciplinary system frequently fails to investigate and bring charges when Brady violations occur. Other Members of the Task Force believe, based on their own experience, that investigations do occur in appropriate cases.

Rule 3.3 (a)(3) states "[a] lawyer shall not knowingly offer or use evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false."

Rule 3.4(a) instructs that "[a] lawyer shall not (1) suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce; . . . . (3) conceal or knowingly fail to disclose that which the lawyer is required by law to reveal; (4) knowingly use perjured testimony or false evidence.

Conduct within the language of these rules is the deliberate withholding of evidence that tends to exonerate the accused and is a "fraudulent act," "conduct involving bad faith" as well as a "fraud on the court" which "undermines the integrity of the proceeding." *Baba Ali v. State of New York*, 20 A.D.3d 376,377 (2d Dep't 2005). The conduct that may be within the scope of the Rules and the conduct that might warrant a reversal or vacature of a judgment of conviction may not be identical or exactly overlapping, but a disciplinary process that is focused on intentional or reckless behavior is likely to adequately emphasize the importance of the rule.

There is of course a procedural mechanism in place for examining claimed intentional and reckless violations of the rules. Each of the Appellate Divisions has established a disciplinary committee with counsel and staff to investigate and prosecute matters involving alleged misconduct by attorneys and the procedures for doing so. 22 NYCRR Part 603 (First Department); 22 NYCRR Part 691 (Second Department); 22 NYCRR Part 806 (Third Department); 22 NYCRR Part 1022 (4th Department). Investigations are begun by the filing of a specific complaint or by the committee *sua sponte*. Section 603.4(c) (First Department); Section 691.4(c) (Second Department); Section 806.4 (Third Department); Section 1022.19 (Fourth Department).

It is during these investigations that the committee makes a determination as to whether the conduct of the lawyer is serious enough to commence a disciplinary proceeding before the court. The test is whether there has been, under Judiciary Law section 90(2), professional misconduct. Such conduct is defined as conduct in violation of the rules of the Appellate Division, the Code of Professional Responsibility and the Canons of Professional Responsibility,

or other rules setting out the standards for attorney conduct. Sections 603.2, 605.4 (First Department); Section 691.2(Second Department); Section 806.2 (Third Department); Section 1022.17 (Fourth Department). The Judiciary Law section 90(2) also includes as sanctionable conduct fraud, deceit, and conduct prejudicial to the administration of justice.

When, after the investigation, the committee determines that no action is warranted, the complaint is dismissed, or, if the investigation was begun *sua sponte*, the investigation is closed. If after the investigation, the committee decides that the acts of misconduct have been established by clear and convincing evidence, but the conduct is not serious enough to warrant a disciplinary proceeding, the committee may issue lesser sanctions, including admonishing the attorney, cautioning the attorney, issuing a letter of education, or issuing an admonition or reprimand, depending on the Department's rules. Section 806.4(c) (Third Department); Sections 603.9, 605.2(a)(1),(22) (First Department); Section 691.4(e) (Second Department); Section 1022.19 (Fourth Department). Procedures are available to the attorney to explain or challenge the accusation.

If the conduct is more serious, the conduct may be brought before the court in a disciplinary proceeding. There is a formal hearing and only the court or its designated subcommittee has the power to censure, suspend, or remove the attorney from office. Judiciary Law section 90 (2); Sections 603.4(d), 605.2(a)(12), 605.5 (First Department); 691.4 (Second Department); Section 806.4(c) (Third Department).

Conversations with counsel for attorney disciplinary committees reveal that they learn of potential behavior subject to discipline through newspapers; other news sources; information from knowledge of committee members; word of mouth; the filing of a complaint by a party, a litigant, another attorney, or a member of the public; and judicial decisions and orders.

Although court decisions provide a source of information about *Brady* and truthful evidence issues, there is no standardized procedure for sending cases from the Appellate Divisions involving lawyer conduct to the committees. The Appellate Division clerks do not

forward to the disciplinary committees opinions of the courts dealing with prosecutorial misconduct.[9]

The Task Force recommends that cases in which a state court finds there has been intentional or reckless prosecutorial misconduct based on a *Brady* or truthful evidence rule violation be referred by the clerk of the court to the appropriate disciplinary committee for examination, investigation and further processing where appropriate. Where there are vacatures of convictions by federal courts, upon the remand to the state court, the state court clerk should likewise forward the case to the committee for consideration of sanctions.

There already exists under the Code of Judicial Conduct Rule 100.3(D)(2) authorization for a judge who receives information indicating a substantial likelihood that a lawyer has committed a substantial violation of the Code of Professional Responsibility to take appropriate action. The rule should be interpreted so that judges will learn of the scope of their responsibility. *See also* Rules of Professional Conduct Rule 8.3 (a) which instructs that a lawyer who knows that another lawyer has violated the Rules that raises a substantial question as to that lawyers honesty, trustworthiness or fitness as a lawyer shall report such knowledge to a tribunal or other authority empowered or other authority empowered to investigate or act upon such conduct.[10]

---

9 The Task Force received a letter from the Departmental Disciplinary Committee of the First Judicial Department confirming that "[i]f the Committee learns of a judicial decision criticizing a prosecutor for intentionally failing to provide the defense with exculpatory materials or a defendant's attorney for gross ineffective assistance of counsel, the Committee might open an inquiry to determine whether discipline were appropriate. These decisions are made on a case-by-case basis."

10 Certain members of the Task Force view this recommendation as unnecessary as they believe existing controls suffice to discourage and deter violations. They also believe that it is essential to strive to avoid such errors, but a statewide procedure that appears to result in a virtual automatic referral for disciplinary action could deter the vigorous advocacy necessary to the effective performance of the prosecution function. *Cf., e.g., Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976). The recommendation also appears to offer no guidance as to when the rule would apply, and what specific standard must be met before a referral occurs.

C. Court Procedures

5. A *Brady* Conference Should Be Held Before Trial to Resolve Issues of Turnover

Note

At a designated date before the first scheduled date for trial (assuming a possible adjournment), the judge should conduct a *Brady* proceeding with a certification that the police and prosecutor's files (as well as any related files), have been examined and all material delivered. Applications for delayed delivery can be made at that time.[11]

Joel Rudin (see above) and Bruce Barkett, of the New York State Association of Criminal Defense Lawyers, testified that New York State discovery rules were restrictive. Rudin explained that in some counties, plea offers were made and withdrawn before discovery was given so that the accused did not know how to evaluate the circumstances of the case and the plea offer. NYC hearing at 141. Barkett testified that he may have to begin a trial without important information that should have been investigated prior to trial. NYC hearing at 168.

Barry Scheck testified stated there should be a rule requiring that at some time before the trial, perhaps a month or two, both the prosecutor and the defense examine their files to determine that the required documents have been delivered to the other party. This examination would be followed by a conference with the judge at which the parties would verify that appropriate turnover had been made. In the event there is a failure to turnover the required documents, the matter can be examined by a compliance officer (as noted earlier) to determine if there were systematic failures. NYC hearing at 79-80.

---

[11] Certain members of the Task Force do not approve of this recommendation and provide the following basis for their objections. The *Brady* obligation belongs solely to the prosecutor who, guided by ethical rules and the Constitution, and based on his or her experience, knowledge of the case, and consultation with superiors in his or her office, exercises the evidentiary determination to fulfill that obligation. *See, e.g., Drekte*, 540 U.S. at 696 (*Brady* rule highlights special role of prosecutor in American system of justice). Mandating a pre-trial conference in *every* case for judicial review of the prosecutor's file impermissibly allows the judicial branch to intrude into the exclusive domain of a member of the executive branch, the prosecutor, in the advocacy determination of what to disclose and when; weakens the adversary system and the vigorous performance of the prosecutor's function, *see, e.g., Pachtman*, 424 U.S. at 431 n.34; and unnecessarily expends scarce judicial resources and time in sifting through prosecutors' files that in some cases consists of thousands of pages. *But see, e.g., Agurs*, 427 U.S. at 106 (in a particular case prosecutor may submit a *Brady* problem to the trial judge).

D. Procedures Related to Law Enforcement

6. Law Enforcement Officials Should be Trained and Supervised in the Application of *Brady* and Truthful Evidence Rules

Note

The Task Force recommends that prosecutors conduct regular training programs for all Assistants to make sure that the relevant due process principles are fully internalized and become the starting point for all cases. To supplement and reinforce the training, trial assistants should be supervised by a senior assistant who will probe the circumstances in the cases to assure that the trial assistant has complied with the law.

District Attorney Daniel M. Donovan of Richmond County, representing the New York State District Attorney's Association, and District Attorney Richard A. Brown of Queens County testified about the extensive education programs conducted by the Association and in Queens County. Donovan explained that a number of prosecutors' offices have continuing legal education programs for training of assistants and that 12 are accredited CLE providers. The New York Prosecutors Training institute, with eight full-time attorneys and year round programming, offers prosecutors through out the state training in the issues raised by the Task Force. The District Attorneys Association also established the Committee on the Fair Administration of Justice and Ethical Standards that reviews important cases and rules relating to professional responsibility, prosecutorial misconduct and civil liability, and does training in ethics and responsibility. The Committee also has a "best practices component" that researches other areas in the law to develop new procedures and practices, especially concerned with scientific issues. The Committee will also aid prosecutors offices with small staffs to investigate credible claims of innocence. NYC hearing at 6-35.

District Attorney Brown testified that he takes every opportunity to send the clearest message to his assistants that their paramount responsibility is "to do justice." Training is the most important way of sending the unequivocal message. The Queens office has a full time director of training. Training is also conducted by by the District Attorneys Association and the prosecutors Training Institute. NYC hearing at 49-50.

The need for training also applies to police officers. "Prosecutors' access to exculpatory evidence known to the police depends ultimately on the willingness of the police to record,

preserve, and reveal such evidence. Despite pressures inclining the police against such practices, they also have an interest in cooperating with prosecutors to implement Brady..... [P]olice have an interest, especially in the early stages of investigation, in exonerating innocent suspects in order to refocus their efforts on finding the guilty. Training should stress the risk that suppression of exculpatory evidence will lead to conviction of the innocent. More particularly, it should....stress the potentially exonerative value of 'negative information' and 'first descriptions' from witnesses. Like much potentially exculpatory evidence, such information is 'casually acquired' by the police as a by-product of the search for incriminating evidence." Stanley Z. Fisher, *The Prosecutor's Ethical Duty to Seek Exculpatory Evidence in Police Hands: Lessons from England*, 68 Fordham L. Rev. 1379, 1431 (2000)(citations omitted).

As with prosecutors, police officers must be trained about their *Brady* obligations and supervised as they carry out their work to be sure the rules are followed. The training and supervision are critical when police officers are involved in initial responses to a crime in progress or just completed and the situation is often chaotic.

The training should emphasize the importance of the *Brady* rule to the innocent accused and to the public when the actual perpetrator of the crime remains unpursued. The use of hypothetical situations, either on tape or orally presented, to discuss the nature of *Brady* material and what needs to be done with it should be used as a teaching tool.

Training has acquired heightened significance in the last fifteen years as the number of trials has decreased. With the absence of trials and police testimony about how investigations were conducted, police are not questioned by prosecutors in preparation for trial and by defense counsel in cross examination as to what steps were taken in the investigation and what evidence was found. The lack of this intense type of questioning is a lost opportunity to demonstrate to police officers the importance of learning about exculpatory (as well as inculpatory) evidence, the need to inform the prosecutor of the information, and the importance of preserving the information.

E. Procedures Related to the Testing and Preservation of Evidence

Physical evidence is often critical to the proper assessment of an accused person's guilt. Likewise, physical evidence can be critical to the determination that a suspect is innocent. Law enforcement officials' interest in helping arrive at a correct result provide the incentive to obtain,

maintain, test, and preserve relevant physical evidence, and no motive to withhold such evidence from the defense.

The Task Force's inquiries have shown that, whether due to insufficient resources, lack of effort, a failure to recognize the importance of testing and preservation of evidence, or even venality, physical evidence all too often is not collected although available, is not stored in a manner that prevents degradation or contamination, is lost, is not disclosed to the defense, or is not tracked by the police department. Those failures have, in many cases, contributed to the conviction of the innocent. The most frequent examples of the physical evidence that might produce relevant information if tested are body fluids especially blood, which can be examined for type and other characteristics. The Subcommittee was also surprised to find that vitullo or rape kits were also frequently untested.

The many cases examined by the Task Force show that testing, storage and preservation of evidence is a systemic mess. The tests relevant to case investigations are not conducted on a regular basis. The cases reveal that samples are lost or destroyed, that record keeping about the specimens does not accurately show where and how they are stored or if they have been destroyed. A sample of the cases reviewed by the Task Force show the dizzying efforts to find physical evidence that is reported lost, misfiled, or destroyed, with no record of the evidence. Many samples have been found only accidentally.

To note several examples:

In the case of Alan Newton, the accused was convicted in 1985 of a rape he did not commit and spent 21 years in prison. That injustice could have at least been reduced by emerging DNA technology, but the authorities took 11 years to find the rape kit after Newton requested testing in 1994. Ironically, the kit was ultimately found in the precise location in which it should have been, suggesting that the police property clerk had simply failed to look for it for over a decade. When the kit was finally turned over for testing, the DNA analysis proved that Newton was innocent.

In the Jeff Deskovic matter, the accused was convicted in 1990 of a rape and murder he did not commit. Semen was found in the young victim's body, and testing determined that it was not supplied by Deskovic. Deskovic was convicted anyway, on the theory that the victim had previously had consensual sex with another. When he continued to maintain his innocence after

conviction, the authorities simply refused to check the DNA profile against available state and national databases to determine who had supplied it. When a check was finally made in 2006, it was determined that the DNA was from a man who was convicted of another murder in 1994, and Deskovic was finally released.[12]

And in the case of Scott Fappiano, the accused spent 21 years in prison for a 1983 rape he did not commit.[13] The rapist had smoked a cigarette. Cigarette butts were recovered at the crime scene; serology tests showed Fappiano was not the man who smoked them. However, because the crime scene unit had not immediately seized the cigarettes, and the scene was not properly safeguarded until they finally were, the prosecutor was able to argue that someone other than the rapist might have smoked the cigarettes after the crime. In addition, a bra that may have borne the criminal's saliva was not subjected to a test for saliva, although it was tested for sperm. Beginning in 1989, Fappiano asked that new DNA techniques be used to examine a small semen sample left by the rapist, but that sample could not be located until 2005. When it was then analyzed, it proved that Fappiano was innocent.

These are cases in which evidence was mishandled and in which the errors were belatedly rectified. It is likely there are more like them -- cases where exculpatory evidence was irretrievably lost or never gathered in the first place. Curing the problem simply requires good faith and common sense from law enforcement officials.

---

12 The current District Attorney of Westchester County never refused to check Deskovic's DNA profile against state and national databases. When first asked, in 2006 by the Innocence Project, the current District Attorney of Westchester County consented immediately to the request that ultimately resulted in Deskovic's release.

13 The Fappiano case did not occur during the administration of the current District Attorney of Kings County. When the Innocence Project approached the current District Attorney with DNA evidence establishing Mr. Fappiano's innocence, his office promptly moved to set aside the conviction and dismiss the indictment.

7. The Subcommittee on Government Procedures Jointly Recommends the Proposals Submitted by the Subcommittee on Forensic Evidence

Note

The recommendations of the Subcommittee on Forensic Evidence relating to the treatment of forensic evidence are jointly recommended by the Subcommittee on Government Procedures. We add the following notes:

In 2007, the American Bar Association issued standards relating to "biological evidence" for the first time - in essence, to DNA evidence. DNA Evidence, *ABA Standards for Criminal Justice* (3d Ed. 2007) (hereafter, "ABA Standards"). Several of the standards are applicable to the recovery of physical evidence in general. Implementation of the recommended practices would prevent the chance that an incorrect verdict will result, and are therefore recommended:

First, a careful examination of the crime scene (so fundamental to prosecutions of violent crime) should be conducted. Whenever a serious crime appears to have been committed, a properly trained law enforcement officer or other official forensic investigator should be dispatched to the location and, following written guidelines, should identify, collect, and preserve evidence. When there is doubt as to whether material should be collected, the decision should be in favor of collection. As to biological evidence, the investigator should take due care to ensure that what is collected is representative of all materials that could yield evidence. Funding should be made available for such work. On request and absent good cause to the contrary, a defendant's trained investigator should be provided access to the scene to conduct an examination for the defense. *See* ABA Standards, Standard 16-2.1.

Second, evidence should be maintained in a way that ensures its integrity and permits ready retrieval. Before trial, the focus should be on storing fragile evidence so as to preclude degradation and contamination. In particular, biological evidence is readily susceptible to spoliation. Proper safeguards are not expensive, when one considers the serious nature of the crimes in which biological evidence tends to be used. Every jurisdiction in New York should adopt protocols to ensure that investigators submit fragile evidence to storage facilities with the means to maintain it. *See* ABA Standards, Standard 16-2.5; Standard 16-2.6.

Third, before and after trial physical evidence of all types should be logged and stored to guarantee retrieval. Simple bar-coding and other computer tracking techniques are readily and cheaply available. Especially in large jurisdictions, evidence storage facilities should be run by trained personnel willing to, and competent to, utilize those techniques. Currently, evidence storage seems to be an extremely low priority for many police agencies, and retrieval failures – especially after a conviction – seem to be treated with little concern. Such conditions are unprofessional and inexcusable.

Fourth, evidence should not be discarded or destroyed except in conformity with established protocols. *See* ABA Standards, Standard 16-2.6. The best practice would be for prosecutor's offices themselves to retain exhibits that are not contraband, dangerous, or fragile, and to monitor storage of exhibits that are contraband, dangerous, or fragile.

Fifth, with proper safeguards, before and after trial the defense should enjoy access to physical evidence. With only very rare exceptions, there is no cognizable disadvantage to law enforcement in permitting such access. The defense is entitled to test evidence before trial. Likewise, new scientific developments may make re-testing sensible after conviction. Under New York law, defendants frequently find it difficult to gain access to evidence that might exonerate the innocent. It is difficult to understand why limited access is the norm, and why some prosecutors have resisted re-testing, as in the *Deskovic* case.[14] One is sometimes reminded of the church officials who refused to look through Galileo's telescope. *See* ABA Standards, Standard 16-6.1. Concerns about physical evidence returned to the owner need to be addressed. Records of the return need to be maintained, but perhaps a substitute, such as a photograph, can also be kept if future need for the object arises.

Sixth, where either a prosecution test or a subsequent defense test of a limited sample may destroy the sample, and make future tests impossible, trained representatives of both sides should where practicable be permitted to select the testing procedure and observe the testing. *See* ABA Standards, Standard 16-3.4. It is possible that test questions may need be resolved by a court.

---

14 In sworn testimony given in connection with his civil claim, Deskovic stated that he wrote *once* to the previous District Attorney of Westchester County (Jeanine Pirro) in about 1997, requesting a test of semen from the victim and a prison interview with the then District Attorney. As previously noted, the current District Attorney of Westchester County consented to Deskovic's request for re-testing.

Seventh, police department and other prosecutorial agencies should establish, with the advise of biological scientists and other significant experts, a protocol for the testing of samples taken in all cases that meet certain established criteria and each such case should be monitored for compliance with the protocol. As with the testing of evidence, a protocol should be established for storage and preservation, and the adherence to its strictures monitored.

Eighth, the failure to follow protocols should, where appropriate (as in cases in which public officials have failed to establish procedures or have systematically violated them or the state has acted intentionally to destroy the evidence), give to the defendant at a trial or post conviction procedure the benefit of a permissible presumption that any forensic result would be deemed favorable to the defendant's position.[15]

F. Procedures to Avoid Erroneous Early Focus

The American criminal justice system is an adversary system. In this context, there are occasions in which police or prosecution officials first decide that a suspect is guilty and then dismiss other indications to the contrary. The cases reviewed by the Task Force show this has happened in many of them. This focus arises early in the investigation, before the evidence has been examined, witnesses interviewed, and objects tested for forensic evidence. It is also claimed that alternative theories and possible other subjects are not examined and the case moves forward without a full examination.

An example of such a case is James Walker. After a man was killed in the course of a robbery, rewards were offered for information. A drug addict came forward and implicated Walker. Based on this testimony alone, Walker was convicted. The prosecutor and the lead detective suppressed the fact that the informer had implicated a second man, a friend of Walker who was in jail at the time of the crime, and that a surviving victim had seen Walker in a line-up but selected someone else. Walker was exonerated after serving 19 years in prison.

Another example is the case of George Whitmore, in which Whitmore implicated himself in a double homicide after coercive questioning. The actual perpetrator was discovered some years later.

---

15 Certain members of the Task Force did not approve of this recommendation, on the grounds that it is too broad and vague; and in cases of intentional destruction, the law already provides remedies, *see, e.g.,* CPL 240.70 (1).

In the case of Norman Carter, the police accepted at face value a witness' (the actual perpetrator) version of the events of the murder even though her recitation of the events changed and she did not accuse Carter until questioned over several days. Information given to the police was not given to the prosecutor or the defense. For example, the detective did not make a report of information that gave a description that did not match that of Carter. Another witness' information was viewed by the detective as not aiding the investigation.

Even as this report was being edited, cases were reported to have resulted in wrongful prosecutions and custody because of early focus by the police on a particular person. In one, a person was arrested, interrogated, detained for hours, and charged with harassment for sending abusive e-mails. A civil suit alleged that the police failed to investigate the source of abusive e-mails and wrongfully blamed the plaintiff. The complaint stated that the police ignored "a mountain of evidence" that proved the plaintiff did not send the e-mails. New York City settled the case by giving the plaintiff $25,000. *See New York Times*, November 21, 2008, p.A28, col.3.

In another recently reported case, a person was arrested for murder. The accused explained to the New York City detective that he had an alibi and that his metro-card would prove that he could not have been at the scene of the crime at the time of the crime. The detective took the card and then returned it to the defendant with no further discussion. The defense pursued the investigation and confirmed the alibi with photos and MTA computer records. The defendant, being prosecuted in the federal court, was released from custody pending further study of the case by the prosecutor. *See id.,* November 19, 2008, p. A1, col. 3.

8. Police Officers Should Be Trained To Investigate Alternate Theories for a Case, At Least Until They Are Reasonably Satisfied That Those Theories Are Without Merit

Note

Prosecutors must be trained to recognize when witnesses' information and other evidence points to other possible suspects. The trial prosecutor and the supervising prosecutor should examine the entire police file and interview all investigation officers as well as witnesses in the case to determine that appropriate investigations were conducted. This review of the file should take place early in the process with the police officers or detectives so that the prosecutor can direct any further investigations. The actual as well as the legal responsibility for appraisal of the case should be that of the prosecutor and not of the police officer.

# Identification Procedures

## SUBCOMMITTEE REPORT AND FINAL PROPOSALS

### The Problems with Witness Identification Procedures

Current Legal Mechanisms

In the comprehensive studies that have been done nationwide, and in the analysis of those cases identified by this Task Force, erroneous identifications were responsible for more wrongful convictions than any other single factor.[16] Further, existing legal protections, such as cross-examination of witnesses and the presence of counsel at lineups target purposeful as well as unintentional misconduct and do not sufficiently protect against witnesses who mistakenly believe that they are making the correct identification. To address this problem, the guiding principle should be to reduce or eliminate the problem of erroneous eyewitness identifications early in the criminal justice process in order to ensure that reliable evidence is presented at trial and that verdicts are based on accurate information, and, to the extent possible, to ensure that innocent individuals do not even enter the criminal justice system, thus freeing law enforcement to devote resources to identifying and pursuing the guilty. Thus efforts should be made at the investigative level to enhance the accuracy of identification procedures, and at the trial level to ensure that juries are properly informed of the factors that may affect the reliability of the identification and, if appropriate, the limitations of such procedures.

---

16 An analysis undertaken by the Subcommittee of the wrongful conviction cases studied by the Task Force shows that of the 53 cases examined, 36 of them (68%) involved an erroneous identification by an eyewitness which caused or contributed to the conviction. *See also* Sam Gross's comprehensive survey of 328 exonerations from 1989 through 2003 covers the period during which DNA testing on forensic evidence became available, and concludes that roughly half of all exonerations were due to DNA testing. Samuel R. Gross et al., Exonerations in the United States, 1989 Through 2003 (2004), available at http:// www.law.umich.edu/newsandinfo/exonerations-in-us.pdf. The study found "a steady increase in the number of DNA exonerations, from one or two a year in 1989 to 1991, to an average of 6 a year from 1992 through 1995, to an average of 21 a year since 2001."

The Burden of Proof at Wade Hearings

Under current New York law, Wade hearings, where the admissibility of pretrial identification procedures can be challenged on the grounds that they were unduly suggestive or conducted in violation of the right to counsel, provide one of the few opportunities for defendants to challenge pretrial identification procedures.[17] Moreover, even though defendants need only meet a low threshold in order to be entitled to a Wade hearing,[18] to ultimately prevail at a hearing, defendants must meet a much higher burden. For instance, while the prosecution, during Wade hearings, has the initial burden of establishing the reasonableness of the police conduct and the lack of suggestiveness in the identification procedure used, it is the defense that bears the burden of ultimately proving that the procedure was unduly suggestive.[19] Insufficient or faulty police documentation of an identification procedure (e.g., a poor quality photograph of a lineup or a failure to report accurately the time or place of a show up or the individuals present there) may hamper the defense in meeting its burden, and, by extension, impede the hearing court (and, eventually, an appellate court) from making a fully informed decision regarding the constitutionality of the identification procedure.

Given the number of wrongful convictions, and the fact that wrongful convictions reversed after appellate review impose severe costs on innocent defendants – such as lengthy terms of incarceration – as well as costs to society – in that guilty offenders remain free to continue victimizing – Wade hearings and appellate review do not sufficiently address the problem of wrongful convictions based on mistaken eyewitness testimony.

The Narrow Scope of the Appeals Process

Convictions based upon erroneous eyewitness identifications are difficult to overturn on appeal under existing New York State law. First, although the state's intermediate appellate

---

17 *See People v. Chipp*, 75 N.Y.2d 327, 335 (N.Y. 1990) ("It is firmly established in our jurisprudence that unduly suggestive pretrial identification procedures violate due process and therefore are not admissible to determine the guilt or innocence of an accused." (citing *United States v. Wade*, 388 U.S. 218 (1967))).

18 *See People v. Ortiz*, 90 N.Y.2d 533, 538 (N.Y. 1997) (explaining that under N.Y. Criminal Procedure Law § 710.60(3)(b) a defendant does not need to "allege specific facts tending to show suggestiveness in order to be entitled to a Wade hearing.")

19 *Chipp*, 75 N.Y.2d at 335.

courts have factual review power to determine both whether an identification procedure was non-suggestive and whether the jury's conclusion that the defendant was the perpetrator was against the weight of the evidence,[20] these courts give substantial deference to the triers of fact who saw and heard the witnesses firsthand.[21]

Second, the New York Court of Appeals, unlike the Appellate Division, has no factual review power, and the Court of Appeals will reverse a conviction on the grounds that identification testimony should have been suppressed only when the lower courts' findings of fact are clearly unsupported by the record and thus present a question of law for review.[22]

Third, because an appellate court is limited to the facts appearing in the record, it may not have before it all the information relevant to determining whether an identification procedure was suggestive. Although New York Criminal Procedure Law section 440.10 provides a vehicle by which a defendant may bring matters *dehors* the record to the attention of a court and thereby seek reversal of a conviction, it is difficult for an incarcerated defendant to conduct any kind of

---

20 *See* C.P.L. § 470.15(1), (5); *People v. Neely*, 219 A.D.2d 444, 447 (2d Dep't 1996) (Appellate Division may make factual determinations that reverse or modify the findings of hearing courts) (Rosenblatt, J.). *See generally People v. Romero*, 7 N.Y.3d 633 (2006); *People v. Bleakley*, 69 N.Y.2d 490 (1987) (both cases discussing the Appellate Division's weight of the evidence review power).

21 *See People v. Prochilo*, 41 N.Y.2d 759, 761 (1977) (deference accorded to hearing court); *Bleakley*, 69 N.Y2d at 495 (deference to trier of fact at trial).

22 *Compare People v. Calabria*, 3 N.Y.3d 80, 83-84 (2004) (declining to reverse one-witness identification case and noting, "Although the Appellate Division is empowered to reverse a conviction because, in its view, the verdict is against the weight of the evidence, we are not") (citations omitted) with *People v. Foster*, 64 N.Y.2d 1144, 1146-48 (1985) (reversing conviction of codefendant Reed and dismissing the indictment because the testimony of the sole identification witness was incredible as a matter of law). *See also People v. Jackson*, 98 N.Y.2d 555, 559 (2002) (holding that Wade hearing dealing with the propriety of a lineup involved a mixed question of law and fact, and thus, the hearing court's determination, affirmed by the Appellate Division and supported by the record, was beyond Court of Appeals review).

investigation that might reveal the type of misconduct or impropriety (such as police coaching or coercing a witness at a lineup procedure) that would provide the basis for a 440 motion.[23]

Fourth, exclusions of expert eyewitness testimony are reviewed on appeal under an abuse of discretion standard, which is a high standard to meet.[24] In addition, the discretion to admit or exclude experts (including psychological experts on eyewitness identifications) rests solely with the trial courts, and the appellate courts are deferential to the lower court decisions.[25]

After trial, convictions based on erroneous eyewitness identifications are difficult to overturn because appellate and habeas corpus decisions are almost always predicated on

---

[23] While section 440.30(1-a) of the Criminal Procedure Law permits a defendant to seek testing on any evidence, secured in connection with the trial, that might contain DNA, there are many cases (e.g., gunpoint robberies) in which no such evidence containing DNA exists. DNA testing is a great tool to free the innocent as well as convict the guilty, especially in identification cases, but DNA evidence is not always available.

[24] *See United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir. 1987) ("On review, we reverse only if the district court abused its wide discretion or committed manifest error in excluding expert testimony.") (internal citation omitted); *United States v. Villiard*, 186 F.3d 893, 895 (8th Cir. 1999) ("As to the district court′s refusal, after conducting a hearing under [*Daubert*] to admit expert testimony concerning the reliability of eyewitness identifications, we are especially hesitant to find an abuse of discretion [in denying expert eyewitness identification testimony] unless the government's case against the defendant rested exclusively on uncorroborated eyewitness testimony.") (internal quotation marks and citation omitted)).

[25] *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589-92 (U.S. 1993) (explaining that under Federal Rule of Evidence 702, the decision to admit expert scientific testimony is within the sound discretion and authority of the trial judge). *See Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30 (1st Cir. 2000) ("It is well-settled that trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses. It is settled law in this circuit that whether a witness is qualified to express an expert opinion is a matter left to the sound discretion of the trial judge. In the absence of clear error, as a matter of law, the trial judge's decision will not be reversed.") (internal quotation marks and citation omitted). *Goodwin v. MTD Prods.*, 232 F.3d 600, 606 (7th Cir. 2000) ("[I]t is well established that a trial judge has wide discretion in determining both the competency of an expert witness as well as the relevancy of the expert's testimony on a particular subject. Consequently, a judge's decision to limit an expert′s testimony will be overturned on appeal only if manifestly erroneous.") (internal quotation marks and citation omitted); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous."); *United States v. Harris*, 995 F.2d 532, 534 (4th Cir. 1993) ("The exclusion of expert testimony under Rule 702 [of the Federal Rules of Evidence] is within the sound discretion of the trial judge.") (internal citation omitted).

questions of law, not questions of fact. This limited nature of appeals makes the reversal of erroneous verdicts almost impossible. In particular, mistakes resulting from juror error are difficult to correct. It is unlikely that a conviction due to a jury's mistaken application of law to facts will be reversed because current legal mechanisms are not conducive to examining and correcting mistakes of juror judgment. As a result, the justice system becomes frustrated, with innocent parties jailed and criminals freed.

In short, once a jury has returned a guilty verdict based on a mistaken eyewitness identification, it might be years before such error is corrected, if ever. During the interim between a wrongful conviction and a reversal of the conviction – if any – innocent defendants suffer the severe costs of incarceration, and society incurs the cost of guilty offenders remaining free to perpetrate crimes against other victims.

Suggestive Eyewitness Identification Procedures Admitted under Federal Standards of Review

Federal standards of review at both the trial and appellate level encourage courts reviewing eyewitness identification procedures to ignore infractions which often lead to erroneous verdicts and to determine whether the defendant is probably guilty based on other available evidence.[26] In federal courts, a due process right to be free from unduly suggestive procedures has been established.[27] Nonetheless, erroneous admissions of excludable identifications have been upheld on appeal under a harmless error standard of review. Moreover, the standard of review used by federal courts to review unduly suggestive procedures focuses on whether the defendant is probably guilty instead of whether procedures were suggestive. Both the reliability standard used at trial and pretrial Wade hearings and the harmless error standard used on appeal allow courts to search the record for corroborating evidence and determine what a reasonable jury would conclude.

When established, the due process right to be free from unduly suggestive procedures was strict, and unnecessarily suggestive procedures were to be excluded.[28] The remedy at trial

---

26 *See Manson v. Brathwaite*, 432 U.S. at 128 (J. Marshall dissenting).

27 *See Stovall v. Denno*, 388 U.S. 293, 295 (1967).

28 *See Manson v. Brathwaite* note 8 at 114.

for a violation of this constitutional right is exclusion of the evidence or a curative instruction.[29] Federal trial courts now use a two-step test, asking first whether the procedure was unduly suggestive, and second whether it was reliable.[30] Here, reliability is ascertained from factors such as the witnesses' opportunity to view the suspect, the witnesses' level of certainty and the time that elapsed between the initial observation and the subsequent eyewitness identification procedure. As a result, courts have the discretion to search the record to find alternate or corroborating evidence that the defendant is most likely guilty, despite the existence of suggestive conduct that rises to the level of violating due process.

Similarly, on appeal, the harmless error standard[31] allows courts to determine whether a suspect is guilty based on the totality of the evidence despite unconstitutional procedures. As originally contemplated, the harmless error standard was to be used by the appellate court to examine whether the constitutional violation contributed to the conviction. Originally, the burden of proving that the error was harmless beyond a reasonable doubt was not easily met, as the court focused on whether the violation occurred or whether the procedure was unduly suggestive. However, the standard has been reframed[32] to whether "a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt."[33] As a result, instead of confining their focus to whether an error directly contributed to the jury's verdict, courts broadly search the record for independent evidence of guilt, which taken alone could support the conviction. This allows the state to side step false evidence.

Given that federal standards of review, as currently contemplated, allow suggestive eyewitness procedures to be admitted, we cannot expect to safeguard the innocent from wrongful convictions by means of trial or appellate remedies alone.

---

29 *Watkins v. Sowders*, 449 U.S. 341, 346-47 (1981) (holding that, in the context of witness identifications, either curative instructions or a suppression hearing may remedy constitutional error).

30 *See Manson v. Brathwaite*, note 10.

31 *See Chapman v. California,* 386 U.S. at 19-20, 23-24 (establishing the harmless error standard "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.")

32 *See Rose v. Clark*.

33 *Id.*

Under current New York law, even if a court concludes that a pretrial identification procedure was unduly suggestive and rendered a witness' identification of a defendant unreliable, the error in admitting that testimony is still subject to harmless error analysis.[34] It should be noted that the standard of review for constitutional harmless error – "no reasonable possibility that the error might have contributed to the defendant's conviction" – is stricter than the federal standard.

Objectives of Reform Proposals

In order to eliminate the problem of witness misidentifications as early in the criminal justice process as possible, the ideal solution is to:

(1) make eyewitness identification evidence as reliable as it can be, and

(2) educate juries through expert testimony or jury instructions as to

(a) the limitations of such evidence, and

(b) the circumstances they should consider in determining how much credence to give an eyewitness identification.

Regarding point (1) above, some methodological procedures of collecting witness identification evidence increase the frequency of identifications of suspects who are not the actual culprits.

The pretrial eyewitness identification procedure – be it a lineup or a photographic array identification – should be optimized to decrease the possibility of a false identification leading to a wrongful conviction and to make the identification more reliable.[35] Scientific research has

---

34 *See People v. Johnson*, 345 N.Y.S.2d 1011 (stating that although evidence of prior identification of a defendant from a photograph is improper (*see, e.g. People v. Caserta*, 19 N.Y.2d 18, 277 N.Y.S.2d 647, 224 N.E.2d 82; *People v. Trowbridge*, 305 N.Y. 471, 113 N.E.2d 841), where the other proof of identification and of guilt is as clear and strong as in this case, the admission of such evidence may be regarded as harmless error). *See People v. Perez,* 785 N.Y.S.2d 218 (finding that any improper suggestiveness in photographic array from which murder defendant was identified was harmless error, where the identification was confirmatory since one identifying witness was a prior acquaintance of the defendant).

35 *Gary L. Wells, et al., Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22(6) Law and Human Behavior 603, [13-14] (1998) [hereinafter "Eyewitness ID Procedures"].

identified the following phenomena associated with current eyewitness identification procedures that can and should be controlled and corrected, which are dealt with in greater detail in the next section.

- Use of relative judgments by eyewitnesses rather than absolute judgments
- Malleable confidence levels of the witness in his or her identification
- Intentional or unintentional influence on the results of an eyewitness identification by the administrator of the procedure

## Problems with Current Eyewitness Identification Procedures

Relative Judgments

Eyewitnesses tend to make relative judgments rather than absolute judgments during identification procedures.[36] This means that rather than identifying a member of the lineup or photo array based on an absolute determination, they often identify the one member of the lineup or photo array that looks more like the culprit than the others in the lineup, even if the actual culprit is not in the lineup. This is the result of a dual process theory of recognition memory, which explains how memory relates to the choices one makes when attempting to identify someone in a lineup.[37]

In the first process, signal detection theory isolates two decisions made by the witness:

- *Discrimination Accuracy*. This is the ability of an individual to correctly detect a signal triggering one's memory vs. correctly reject the absence of such a signal. This is affected by factors that influence the quality of the memory representation, such as how well the witness was able to internalize a stimulus during the crime.

---

[36] A minority of the Task Force believes that, given the current state of uncertainty in the scientific community about the nature of identification decision-making processes, no single model (the "Relative Judgments" model or any other) should be highlighted as a definitive explanation.

[37] Christian A. Meissner, et al., *Eyewitness decisions in simultaneous and sequential lineups: A dual-process signal detection theory analysis*, 33 (5) Memory & Cognition 783 (2005).

- *Response Criterion*. This is the degree of evidence necessary for the witness to respond that a signal/stimulus (internalized at the time of the witnessing) has been presented in the lineup. This can be influenced by any number of social or instructional factors that may create a proclivity or bias to respond in one manner or another.[38]

Second is a cognitive process that underlies the above decision-making process:

- *Recollection*. This is the retrieval of conscious-level conceptual information based on contextual details. Simply put, this is the ability to consciously recall information from memory.

- *Familiarity*. This is fluent, perceptually-based information that is believed to be encoded in an automatic, non-conscious manner. More simply, it is the feeling that something is familiar or known without context on a non-conscious level.[39]

In this dual process of recognition memory, familiarity is directly influenced by response criterion, but recollection is not, meaning that the eyewitness identification process can directly influence how much weight a witness gives to non-conscious "feelings" that some stimulus is familiar to them. Recollection, the conscious recall of context-based information, is not affected by the eyewitness identification process.[40] Experiments show that these dual mental processes are consistent with the notion of relative judgments by a witness viewing a lineup. When presented with a lineup of similar-looking individuals, witnesses rely on familiarity-based memory processes to a greater extent than when they are presented with a single individual because the simultaneous presentation of the lineup provides a contextual basis for the application of familiarity.[41] That is to say, in these circumstances eyewitnesses tend to think, "which one looks familiar to me" rather than "are there any context clues that make me think this particular person is the culprit." This is a relative judgment rather than an absolute judgment.

38 *Id.* at 784.

39 *Id.*

40 *Id.* at 784, 789.

41 *Id.* at 785-90.

These relative judgments manifest themselves in many ways. For instance, there is solid scientific evidence that people have more trouble identifying members of a race other than their own than members of their own race,[42] making it more likely that when viewing a lineup full of members of another race, they will make relative judgments rather than absolute judgments.

Further, in an experiment in which half of the witnesses to a crime are given a lineup of six people, including the culprit and five fillers, and the other half are given a lineup of the same five fillers but no culprit, misidentifications of each of the five fillers by the witnesses are more frequent when the culprit is absent as opposed to when he is present.[43] This indicates that the witnesses are making a relative judgment rather than an absolute one. If the witnesses were making judgments based on true recognition (absolute judgment), then the same percentage that identified the culprit in the lineup in which he was present would instead choose "not present" in the lineup in which he was not present. Instead, those eyewitnesses viewing the lineup without the culprit for the most part spread their choices among the rest of the fillers—the ones that, absent the true culprit, looked the most like the actual culprit. This means that most of those that chose the actual culprit when he was in the lineup did not do so because of actual recognition, but because of relative similarity. These were relative judgments, not absolute ones.[44]

This difference matters because research shows that eyewitnesses who described their identification decision-making process as one of elimination (i.e. relative judgments) were more likely to have made false identifications than those who reported that the face "just popped out at me."[45]

---

[42] Wells, G. L. & Loftus, E. F., *Eyewitness Memory for People and Events, in Comprehensive Handbook of Psychology*, A. Goldstein, Ed., Volume 11, Forensic psychology (New York: John Wiley and Sons, 2003), citing Meissner, C.A. & Brigham, J.C. *Thirty years of investigating the own-race bias in memory for faces: A meta-analytic review*, 7 Psychology, Public Policy and Law 3 (2001).

[43] Eyewitness ID Procedures, *supra* note 17, *citing* Gary L. Wells, *What do we know about eyewitness identification?* 48 American Psychologist 553 (1993).

[44] *Id.*

[45] Dunning, D. & Stern, L.B., *Distinguishing Accurate from Inaccurate Identifications via Inquiries About Decision Processes*, 67 Journal of Personality and Social Psychology 818 (1994). *See also* R.C.L. Lindsay, et al., *Biased Lineups: Sequential Presentation Reduces the Problem*.

As will be discussed, in order to allow a judge and/or jury to evaluate for themselves the level of confidence of the witness, the entire identification procedure should be recorded on video.

<u>Malleable Confidence Levels</u>

Studies have long shown the possibility for witness malleability in the investigative process. For instance, witnesses who are questioned repeatedly grow more confident in the accuracy of details in their reports to police.[46] Likewise, the confidence level of an eyewitness in his or her identification, including confidence in the quality of his or her recollection of the perpetrator and confidence in the ease with which he or she identified the person in the lineup or photo array, is malleable and can be influenced by a number of factors both during and after the identification procedure.[47] This can result in the witness' in-court statement of confidence being an unintentional misrepresentation of the eyewitness' actual confidence in the certainty of his or her identification, which affects verdicts because juries give more consideration to a witness' confidence level in their evaluation of identification evidence than any other aspect of identification testimony.[48] This artificially inflated certainty by eyewitnesses in their identifications can be due to (1) any confirmatory feedback they may receive during or after an identification procedure, (2) the format of the identification procedure and any relative judgments the witnesses make in the process of identifying someone in a lineup or photo array, and (3) preparations of the witness for cross-examination.[49]

Witnesses who receive feedback confirming or disconfirming that the identifications they made are somehow in line with other evidence have significantly higher or lower confidence levels, respectively, in their identifications than those receiving no feedback at all. For instance, in one experiment, eyewitnesses given feedback that a co-witness identified the same member of the lineup had significantly higher confidence levels in their identifications than those given no feedback, while those told that a co-witness identified a different member of the lineup had a

---

46 Eyewitness ID Procedures, *supra* note 17 at 19.

47 Wells, G.L. & Bradfield, A.L., *"Good, You Identified the Suspect": Feedback to Eyewitness Distorts Their Reports of the Witnessing Experience*, 83(3) Journal of Applied Psychology 360, 374 (1998).

48 Eyewitness ID Procedures, *supra* note 17 at 18-19.

49 *Id.*

much lower confidence level than those given no feedback.[50] Even stronger effects on witness confidence levels occur when witnesses are told that they identified the suspect instead of being told nothing. Those receiving confirmatory feedback even exaggerate facts about the witnessing conditions such as the quality of their views of the suspect and how much time they spent observing the culprit's face.[51]

Experiments further show that relative judgments made by witnesses not only affect who is chosen, but the confidence of the witness in his or her choice. For instance, a witness' confidence in his or her selection of a member of the lineup or photo array varies depending on the extent to which the members of the lineup or photo array that were not chosen by the witness also fit the description the witness previously gave of the subject. Thus, relative judgments, in addition to causing witnesses to identify the person who looks most like the culprit, also cause witnesses to be more confident in that identification when the person they identified was the only person in the lineup or photo array to fit the description of the culprit, even if the one fitting that description wasn't the actual culprit.[52]

Additionally, experiments have shown that briefing witnesses about the types of questions they will face on cross-examination increases the confidence they express in their identifications during cross-examination in relation to those who were not briefed. This "briefing effect" only occurred among witnesses making erroneous identifications—their confidence levels rose dramatically—but not among those making accurate identifications, whose confidence levels did not change.[53]

Thus, relative judgments in identifications, feedback, and witness preparations for trial can all lead to artificially distorted witness confidence in trial testimony, either inflated or deflated. Because of the weight given by juries to eyewitness confidence levels, fluctuation in

---

50 *Id.* at 19-20, *citing* Luus C.A.E. & Wells, G.L., *The Malleability of Eyewitness confidence: Co-witness and Perseverance Effects*, 79 Journal of Applied Psychology 714 (1994).

51 *Id.* at 20, *citing* Wells & Bradfield, *supra* note 28.

52 *Id.* at 11-12, *citing* Wells, G.L., Rydell, S.M., & Seelau, E.P., *On the Selection of Distractors for Eyewitness Lineups*, 78 Journal of Applied Psychology 835 (1993).

53 *Id.* at 19, *citing* Wells, G.L., Ferguson, T.J. & Lindsay, R.C.L., *The Tractability of Eyewitness Confidence and its Implication for Triers of Fact*, 66 Journal of Applied Psychology 688 (1981).

either direction can have a negative impact on the efforts of the criminal justice system to ensure that justice is achieved.

Administrator Influence on Identification

Officials in charge of administering the eyewitness identification procedure can intentionally or unintentionally influence the results through cueing of the witness towards the subject. In research on experiments generally, it has been shown that interpersonal interactions and processes can have powerful effects on the results of an experiment, particularly when close physical distance between the experimenter and experimentee permits eye contact, visible facial expressions, and verbal exchanges.[54] Relatedly, there is a danger that an investigating police officer who is administering the eyewitness identification procedure will unconsciously bias the evidence towards a confirmation of that answer, creating the phenomenon of the self-fulfilling prophecy.

Experiments show that photo spread administrators' nonverbal behavior, such as smiling and nonverbal reinforcement of a particular photograph, can lead eyewitnesses to falsely identify a certain person as the culprit.[55] Further, what an administrator of the identification procedure says to the eyewitness at the time of the lineup can both focus the eyewitness on the suspect and have strong effects on the confidence of the eyewitness, including boosting the confidence of tentative witnesses, even when the witness has misidentified an innocent suspect.[56] These cues can be intentional or unintentional on the part of the administering officer, but nevertheless have an effect on the result of the identification procedure.

---

54 *Id.* at 21, *citing* Harris, M.J. & Rosenthal, R., *Mediation of Interpersonal Expectancy Effects: 31 Met-Analyses*, 97 Psychological Bulletin 363 (1985).

55 *Id.*, *citing* Fanselow, M.S. & Buckhout, R., *Nonverbal Cueing as a Source of Biasing Information in Eyewitness Identification Testing*, New York: Center for Responsive Psychology, Brooklyn College C.U.N.Y., 1976.

56 *Id.*, *citing* Luus & Wells, *supra* note 31, Wells & Bradfield, *supra* note 28, Wells, G.L. & Seelau, E., *Eyewitness Identification: Psychological Research and Legal Policy on Lineups*, 1 Psychology, Public Policy, and Law 765 (1995).

## Proposed Solutions

To the extent that the above-listed problems can be corrected at the administration of the lineup, they should be. To the extent that these problems cannot be corrected at the administration of the lineup or can be corrected but are not, the jury should be educated as to the limitations of this eyewitness testimony so they can give it its proper weight in their deliberations. To that end, we propose the following solutions:

In the Administration of Eyewitness Identification Procedures

**1. Change the way in which identification procedures (including lineups and photo arrays) are conducted to enhance the reliability of eyewitness identifications.**

a. *Double blind administration*

The administration of the lineup or photo array should be performed by someone who does not know the identity of the suspect. Due to the problems outlined above in terms of the intentional or unintentional influence on the eyewitness' identification and confidence levels by an administrator, the removal of an individual who knows the identity of the suspect and can thereby influence the results of the procedure would eliminate the possibility of these problems affecting identifications. These same double blind procedures have long been used in behavioral and medical experiments to prevent unwanted influence on the results[57] and the rationale for conducting experiments in a double-blind manner applies equally well to lineups and photo arrays.[58]

b. *Cautionary instructions*

Eyewitnesses should be told that the person administering the lineup does not know who the suspect is and that the perpetrator may or may not be in the lineup – in effect that "none of the above" is a valid answer. This lowers the rate of inaccurate eyewitness identifications without lowering the number of accurate identifications by focusing the witness on using absolute judgments rather than relative judgments. Additionally, eyewitnesses should perceive the

57 Harris & Rosenthal, *supra* note 19.

58 Eyewitness ID Procedures, *supra* note 17 at 21.

administrators of the procedure to be blind as to which person is the suspect in order to prevent witnesses from looking to the administrator for cues.[59]

A survey of empirical data gathered over the course of years of scientific studies shows that a "might or might not be present" instruction given to eyewitnesses reduces misidentifications when the actual culprit is not in the lineup.[60] One study using this instruction saw a reduction in misidentifications when the culprit was not present from 78% to 33%, while still resulting in 87% identification of the culprit when the culprit was present.[61]

c. *Effective use of fillers*

Fillers should be chosen for their similarity to the witness' description of the perpetrator, rather than for their similarity to the suspect. At the same time, the suspect should not differ from the fillers in a way that would make the suspect stand out, and there should be no other factors drawing attention to the suspect. In addition, no filler should so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from that filler. Choosing fillers in this manner avoids creating a lineup of clones of the suspect and does not make an innocent person stand out in the lineup.[62]

Additionally, research has shown that the more fillers there are in a lineup or photo array, the less likely a witness is to misidentify an innocent suspect as the perpetrator.[63] The typical number of fillers in New York is five, and that number, which is acceptable, should be standard statewide.

---

59 *Id.* at 23.

60 Nancy Steblay, *Social Influence in Eyewitness Recall: A Meta-Analytic Review of Lineup Instruction Effects*, 21 Law and Human Behavior 283 (1997).

61 Eyewitness ID Procedures, *supra* note 17 at 11, *citing* Malpass, R.S. & Devine, P.G., *Eyewitness Identification: Lineup Instructions and the Absence of the Offender*, 66 Journal of Applied Psychology 482 (1981).

62 *Id.* at 25.

63 *Id.* at 27.

d. *One suspect per lineup*

Placing multiple suspects – as opposed to one suspect – in a lineup reduces the reliability of the lineup by making it more likely that the eyewitness will pick a suspect out of the lineup with a very low certainty that it was the perpetrator. Statistically, this is the case because if five suspects are put in a lineup or photo array, whichever one the witness picks will likely have charges brought against him because the witness identified a suspect. However, if one suspect and five fillers are put in a lineup or photo array, and a filler is picked, the identification was obviously a mistake. Therefore, the more suspects there are per lineup, the more likely it is that a witness' identification of one of those suspects is a mistake that could not be identified as such.[64]

e. *Documentation of the procedure*

Every step of the identification procedure should be documented, especially the eyewitness' confidence level immediately after identifying the person in the lineup he or she believes is the perpetrator and before any feedback on that choice is given. This documentation procedure should include the taking of an assessment of certainty from the identifying witness immediately after the identification is made describing the witness' level of certainty in his or her selection. Likewise, law enforcement should be required to preserve all photographs, arrays and documents used in identification procedures, including the witness' initial description of the perpetrator. This assessment of certainty of the eyewitness must be videotaped and audio recorded.[65] We propose that standards for how to conduct the certainty assessment be developed and promulgated to assist and direct law enforcement in this endeavor.

There are two reasons for such a requirement. First, documenting every step effectively allows the procedure to be "discoverable" and allows the jury to understand the reliability of the evidence being presented to it. This should include videotaping the eyewitness identification

---

64 Gary L. Wells, *Eyewitness Identification: Systemic Reforms*, 2006(2) Wisc. L. Rev. 615, 623 (2006).

65 A minority of Task Force Members voted against this recommendation on the grounds that requiring videotaping could impose significant financial costs on law enforcement agencies and discourage a number of witnesses from participating in identification procedures. Others voiced concerns that a video recording of a witness' visible and audible reactions could constitute inadmissible evidence and would be of questionable value to the jury in assessing the witness' confidence in the identification.

procedure with enough synchronized cameras with audio to capture at all times the witness, the administrator, and the members of the lineup or photo array.

The second reason for this documentation is to account for the problem discussed previously that an eyewitness' confidence level is malleable and can be influenced by information coming to light after the lineup identification is made. Recording the eyewitness' visible and audible reaction contemporaneously with the recording of the identification itself will assist the judge and/or jury in evaluating the witness' confidence level at the time of the identification.

We propose that a failure by law enforcement to implement these documentation procedures would be considered by the trial court as a factor in determining whether evidence of the eyewitness identification procedure could be introduced at trial. The trial court would be required to conduct a pre-trial hearing to determine whether documentation procedures have been followed, and, if not, preclusion of the evidence of the identification procedure could be ordered as a sanction.

f. *Sequential Presentation of Lineups/Photo Arrays*

Some researchers suggest that eyewitnesses should only be able to view one photo or lineup member at a time, should not know how many photos or lineup members will be presented or which one is the last one, and should give a "yes" or "no" response to each one before the next is presented. This process forces witnesses to make absolute judgments as to individuals rather than making relative judgments about a group of people. Sequential presentation is likely only effective when in combination with double blind administration because the intentional or unintentional cues given by an officer administering the lineup that knows the identity of the suspect will be more obvious when the witness is only viewing one member of the lineup at a time.

The sequential presentation procedure relies less on the "familiar" memory process and more on the "recollection" process (as described in the problems section above), meaning there is an absolute judgment taking place based on the witness' recollection of context-based information rather than a relative judgment based on non-contextual, non-conscious memory.[66]

---

[66] Christian A. Meissner, et al., *Eyewitness decisions in simultaneous and sequential lineups: A dual-process signal detection theory analysis*, 33 (5) Memory & Cognition 783 (2005).

Lab studies confirm that the sequential presentation procedure results in far fewer witness misidentifications of non-culprits (false positives).[67]

Recently, there has been some data to suggest that while sequential presentation does decrease false positives it also increases false negatives (not identifying the actual culprit when he was present). This research shows that sequential presentation reduces choosing of a lineup member by eyewitnesses when the witnesses are not positive they see the culprit in the lineup.[68] The data shows, however, that the ratio of accurate to mistaken identifications actually rises, meaning that the sequential presentation method improves the odds that a suspect, if identified, is the actual culprit.[69] Additionally, those that are more likely to produce false negatives are the ones whose memories are weaker.[70] This leads to the conclusion that the true effect of the sequential procedure on false negatives is that it lowers the possibility that a witness with poor recollection will use relative judgments to guess correctly. It does not affect those that are good identification witnesses and use absolute judgments.

Two field studies have taken place using actual implementation of double blind sequential procedures in police departments. The Illinois state police commissioned their own study headed by the general counsel to the Superintendent of the Chicago Police Department, Sheri Mecklenburg (the "Mecklenburg Report" or the "Chicago Study"). She found that, counter to all experimental evidence, the double blind sequential procedure had higher rates of filler picks and lower rates of suspect picks than traditional lineups.[71] This field study has

---

67 *Id.*; Gary L. Wells, *Eyewitness Identification: Systemic Reforms*, 2006(2) Wisc. L. Rev. 615, 625-26 (2006).

68 Gary L. Wells, *Eyewitness Identification: Systemic Reforms*, 2006(2) Wisc. L. Rev. 615, 626-28 (2006), *citing* Nancy M. Steblay et al., *Eyewitness Accuracy Rates in Sequential and Simultaneous Lineup Presentations: A Meta-Analytic Comparison*, 25 Law & Human Behavior 459 (2001).

69 *Id.*

70 *Id.* at 628.

71 *Report to the Legislature of the State of Illinois: The Illinois Pilot Program on Sequential Double-Blind Identification Procedures*, prepared by Sheri H. Mecklenburg, Program Director, submitted March 17, 2006.

received much criticism, both in the academic community[72] and in the press.[73] This field study was non peer-reviewed and the police department will not release the data so it can be analyzed by outside parties.[74] Further, the methodology of this study was roundly criticized by experts, including Daniel Wright (psychology professor at the University of Sussex in Brighton, UK), Gary Wells (psychology professor at Iowa State and an expert in the field), Daniel Schachter (psychology professor at Harvard) and Nobel laureate Daniel Kahneman (psychology professor at Princeton).[75] Mecklenburg failed to isolate certain variables in her field tests, causing "devastating consequences for assessing the real-world implications of this particular study."[76]

A second field study conducted in Hennepin County, Minnesota, which includes Minneapolis, supports the idea that this procedure eliminates relative judgments and makes identifications more reliable. Using many of the suggestions outlined above, including the double blind, sequential presentation of photos in a photo array, when compared to previous laboratory and field tests, the Hennepin County Attorney notes that witnesses dramatically less frequently chose a filler and instead more frequently identified either the suspect or made no choice at all.[77] This is consistent with a notion that witnesses make more absolute judgments and fewer relative judgments with this sequential procedure.[78]

In summary, there is evidence that sequential and double-blind identification procedures result in a reduction in "false positive" results, i.e., identifications of suspects who are in fact innocent of the crime, while other evidence exists which calls this conclusion into question. We propose, therefore, that further research, including field studies, into the efficacy of sequential

---

72 Daniel L. Schacter, et al., *Policy Forum: Studying Eyewitness Investigations in the Field*, 32(1) Law of Human Behavior 3 (2008); Gary L. Wells, *Field Experiments on Eyewitness Identification: Towards a Better Understanding of Pitfalls and Prospects*, 32(1) Law of Human Behavior 6 (2008).

73 Laura Spinney, *Line-ups on trial*, 453(22) Nature 442 (May 2008).

74 *Id.*

75 Schacter, *supra* note 56; Wells, *supra* note 56.

76 Schacter, *supra* note 56.

77 Amy Klobuchar and Hilary Lindell Caliguri, *Protecting the Innocent/Convicting the Guilty: Hennepin County's pilot Project in Blind Sequential Eyewitness Identification*, 32 Wm. Mitchell L. Rev. 1, 23 (2005-2006).

78 Gary L. Wells, *Eyewitness Identification: Systemic Reforms*, 2006(2) Wisc. L. Rev. 615, 627 (2006).

versus simultaneous procedures be conducted, and that further recommendations be made following this additional research.

At Trial

**2. Allow expert testimony on eyewitness identifications at trial.**

Expert testimony on eyewitness identifications that is supported by behavioral science helps the trier of fact to assess the reliability of eyewitness identification testimony, when used effectively. Judges have broad discretion to allow such demeanor-based expert testimony where the testimony concerns the underlying factors affecting an eyewitness' perception, making expert testimony a viable part of the solution to erroneous eyewitness identifications.

In New York State courts, the criteria for admitting expert testimony is governed by the standard set forth in *Frye v. United States*.[79] The *Frye* standard states that "expert testimony based on scientific principles or procedures is admissible but only after a principle or procedure has 'gained general acceptance' in its specified field.[80] The Court of Appeals has acknowledged that *Frye* should not be interpreted as "setting an insurmountable standard"[81] and to that end a scientific principle or procedure need not be "unanimously endorsed" by the scientific community in order to be admissible.[82]

The New York Court of Appeals has acknowledged that expert testimony on eyewitness identifications may be of great assistance to jurors. That Court has recently written:

> Thus, it is clear that expert testimony regarding the factors that affect the accuracy of eyewitness identifications, in the appropriate case, may be admissible in the exercise of the court's discretion. Moreover, there are cases in which it would be an abuse of a court's discretion to exclude expert testimony on the reliability of eyewitness identifications.[83]

---

79 293 F. 1013 (D.C. Cir. 1923); *People v. Wesley*, 83 N.Y.2d 417, 422 (1994).

80 *Id.* (Internal citations omitted).

81 *Parker v. Mobil Oil Corp.*, 7 N.Y.3d 434, 447 (2006).

82 *Wesley*, *supra*, 83 N.Y.2d at 423 (internal citations omitted).

83 *People v. LeGrand*, 8 N.Y.3d 449, 456 (2007).

While the New York Court of Appeals has, on a number of occasions, determined that trial judges did not abuse their discretion when they excluded expert testimony on eyewitness identification[84], in *LeGrand*, the Court held that "where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications . . . ."[85]

Even though *LeGrand* arguably stands for the principle of increased reliance on eyewitness identification experts, a recent opinion from the First Department of the Appellate Division suggests that the applicability of the *LeGrand* holding is debatable. In *People v. Abney,*[86] a divided panel of the Court upheld the trial judge's exclusion of expert testimony on the reliability of eyewitness identification. In support of its holding, the majority not only interpreted *LeGrand* narrowly, but it also attempted to distinguish it by explaining that the record in *Abney* included "sufficient corroborating evidence" of the defendant's guilt.[87] However, the dissent vehemently disagreed, writing: "We should not limit *LeGrand* . . . to its facts, and thus effectively consign it to jurisprudential oblivion."[88] The opinions in *Abney* only provide further support for the need for additional guidance regarding the use of expert testimony in the context of eyewitness identifications.

In the event that prosecutors or defense attorneys lack the resources to hire an expert on eyewitness identifications, funds should be provided to both prosecutors and defense attorneys to permit the hiring of these kinds of experts.

### 3. Provide jury instructions on eyewitness identifications.

To the extent that a local criminal justice system does not improve the reliability of its eyewitness testimony, the jury should be informed of the extent to which the evidence under its consideration is unreliable. Educating juries through jury instructions is an often cited remedy

---

84 *See*, *e.g.*, *People v. Young*, 7 N.Y.3d 40 (N.Y. 2006); *People v. Lee*, 96 N.Y.2d 157 (2001).

85 8 N.Y.3d at 452.

86 *People v. Abney*, No. 3314-05, 2008 WL 4559965 (N.Y. App. Div. Oct. 14, 2008).

87 *Id.* at *4.

88 *Id.* at *10 (Moskowitz, J., dissenting).

to the problems inherent in eyewitness identifications. In cases where the primary evidence is eyewitness identifications, judges are permitted to caution the jury as to its potential unreliability.

Some state courts have adopted special instructions to handle inadequacies in eyewitness identification. For example, the New Jersey State Supreme Court in *State v. Cromedy* held that cross-racial identifications, which occur when an eyewitness is asked to identify a person of another race, require a special jury instruction.[89]

However, there is a strong preference for expert testimony over jury instructions as a means to reach jurors. Psychological research indicates that traditional jury instructions on the weaknesses of eyewitness identification have virtually no impact on the jury's actual evaluation of problematic characteristics of an identification, whereas expert testimony has some appreciable effect in sensitizing jurors to the relevant issues.[90] In addition, the use of jury instructions (in lieu of providing expert testimony) has been criticized as inadequate to educate juries. Professor Guerra Thompson finds that the substance of jury instructions is beyond the common knowledge of jurors, and by imparting this critical information at the end of the trial, jury instructions come too late to help jurors evaluate eyewitness identification testimony.[91] As a result, jury instructions alone appear to be insufficient as a remedy for mistaken eyewitness identifications.

We propose that the following jury instruction be given in cases involving eyewitness identification evidence:[92]

NOTE – BRACKETED LANGUAGE SHOULD BE USED IF APPLICABLE

---

89 *State v. Cromedy*, 727 A.2d 457, 458- 59 (N.J. 1999); see also *United States v. Telfaire*, 469 F.2d 552, 561 (D.C. Cir. 1972) (C.J.Bazelon, dissenting).

90 Steven Penrod & Brian Cutler, *Witness Confidence and Witness Accuracy: Assessing Their Forensic Relation*, 1 Psychol. Pub. Pol'y & L. 817, 834, 840-41 (1995).

91 Sandra Guerra Thompson, *Beyond A Reasonable Doubt? Reconsidering Uncorroborated Eyewitness Identification Testimony,* 41 U.C. Davis L. Rev. 1487.

92 A minority of the Subcommittee expressed concern that portions of this proposed jury instruction are not supported by scientific research and requested that this full report be forwarded to the Committee on Criminal Jury Instructions (CJI) with a recommendation that the Committee determine how jury instructions on eyewitness identification should be updated.

One of the most important questions [The only important question] in this case is the identification of the defendant as the person who committed the crime. The prosecution has the burden of proving beyond a reasonable doubt, not only that the crime was committed, but also that the defendant was the person who committed the crime. If, after considering the evidence you have heard from both sides, you are not convinced beyond a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.[93]

The identification testimony that you have heard was an expression of belief or impression by the witness. To find the defendant not guilty, you need not believe that the identification witness was insincere, but merely that the witness was mistaken in his [her] belief or impression.

Many factors affect the accuracy of identification. In considering whether the prosecution has proved beyond a reasonable doubt that the defendant is the person who committed the crime, you should consider the following:

Did the witness have an adequate opportunity to observe the criminal actor?

In answering this question, you should consider:

1. What were the lighting conditions under which the witness made his/her observation?
2. What was the distance between the witness and the perpetrator?
3. Did the witness have an unobstructed view of the perpetrator?
4. Did the witness have an opportunity to see and remember the facial features, body size, hair, skin color, and clothing of the perpetrator?
5. For what period of time did the witness actually observe the perpetrator? During that time, in what direction were the witness and

93 This language has been cited approvingly by the Supreme Court of Utah (*State v. Long*, 721 P.2d 483,495 (Utah 1986), *citing* R. Sanders, *Helping the Jury Evaluate Eyewitness Testimony: The Need for Additional Safeguards*, 12 Am. J. Crim. L. 189, 222-24 (1984)).

the perpetrator facing, and where was the witness's attention directed?

6. Did the witness have a particular reason to look at and remember the perpetrator?

7. Did the perpetrator have distinctive features that a witness would be likely to notice and remember?

8. Did the witness have an opportunity to give a description of the perpetrator? If so, to what extent did it match or not match the defendant, as you find the defendant's appearance to have been on the day in question?

9. What was the mental, physical, and emotional state of the witness before, during, and after the observation? To what extent, if any, did that condition affect the witness's ability to observe and accurately remember the perpetrator?

10. [Did the witness ever see the person identified prior to the day in question? If so, how many times did the witness see that person and under what circumstances? To what extent, if any, did those prior observations affect the witness's ability to accurately recognize and identify such person as the perpetrator?[94]]

11. [You should also consider whether the witness is of a different race than the criminal actor. Identification by a person of a different race may be less reliable than identification by a person of the same race. In this case the identifying witness is of a different race than the defendant. In the experience of many it is more difficult to identify members of a different race than members of one's own. Psychological studies support this impression. In addition, laboratory studies reveal that even people with no prejudice against other races

---

94 These factors are drawn from the New York State Criminal Jury Instructions, 2nd on "Identification – One Witness" (January 2008).

and substantial contact with persons of other races still experience difficulty in accurately identifying members of a different race. Quite often people do not recognize this difficulty in themselves. You should consider these facts in evaluating the witness's testimony, but you must also consider whether there are other factors present in this case that overcome any such difficulty of identification.[95]]

Was the witness sufficiently attentive to the criminal actor at the time of the crime?

In answering this question, you should consider whether the witness knew that a crime was taking place during the time he [she] observed the actor. Even if the witness had adequate opportunity and capacity to observe the criminal actor, he [she] may not have done so unless he [she] was aware that a crime was being committed.]

Was the witness' identification of the defendant completely the product of his [her] own memory?

In answering this question, you should consider:

1. The length of time that passed between the witness' original observation and his [her] identification of the defendant;

2. The witness′ [mental] capacity and state of mind at the time of the identification;

3. The witness′ exposure to opinions, descriptions or identifications given by other witnesses, to photographs or newspaper accounts, or to any other information or influence that may have affected the independence of his [her] identification;

4. [Any instances when the witness, or any eyewitness to the crime, failed to identify the defendant;]

95 Sheri Lynn Johnson, *Cross-Racial Identification Errors in Criminal Cases*, 69 Cornell L. Rev. 934, 977-79 (1984).

5. [Any instances when the witness, or any eyewitness to the crime, gave a description of the actor that is inconsistent with the defendant's appearance;]

You have heard testimony regarding an identification procedure in which the defendant was identified by the witness. You may consider the methods used in conducting this procedure and the circumstances under which the defendant was presented to the witness for identification. For example, you may consider that when an officer who is aware of the identity of the suspect presents a lineup to a witness, he may inadvertently cue the witness as to which of the individuals is the suspect. Similarly, a witness who is presented with six individuals in a lineup simultaneously may be more likely to select one of the individuals than a witness who is presented with the individuals sequentially, regardless of whether the perpetrator is included in the lineup.

You should also take into account the circumstances under which the witness first viewed and identified the defendant, the suggestibility, if any, of the procedure used in that viewing, any physical descriptions that the witness may have given to the police, and all the other factors which you find relating to reliability or lack of reliability of the identification of the defendant.

You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

You may take into account that an identification made by picking the defendant from a group of similar individuals is generally more reliable than an identification made from the defendant being presented alone to the witness.

You may also take into account that identifications made from seeing the person are generally more reliable than identifications made from a photograph.

> You may consider the instructions, or lack of instructions, given to the witness during the identification procedure. For example, you may consider that indicating to a witness that a suspect is present in an identification procedure or failing to warn the witness that the perpetrator may or may not be in the procedure may increase the likelihood that the witness will select one of the individuals in the procedure even when the perpetrator is not present. Thus, such action on the part of the officer may have increased the probability of a misidentification.[96]
>
> You may also consider the strength of the identification, including the witness' degree of certainty. Certainty, however, does not mean accuracy, and a witness may be sincere in his [her] belief but may still be mistaken in that belief.
>
> I again emphasize that the burden of proving that the defendant is the person who committed the crime is on the prosecution. If, after considering the evidence you have heard from the prosecution and from the defense, and after evaluating the eyewitness testimony in light of the considerations listed above, you have a reasonable doubt about whether the defendant is the person who committed the crime, you must find him not guilty.

**4. Evidence of photographic identifications should be admitted at trial if they are properly documented by video recording and if they are conducted in accordance with the proposed improvements to identification procedure.**

New York is the only jurisdiction in which jurors are precluded from receiving evidence of photographic identifications. We propose that legislation be introduced to permit the introduction of evidence of photographic identifications, if such photographic identification procedures are properly documented in accordance with the proposed procedures (i.e., video recordings of the procedure and the eyewitness' assessment of certainty) and if the photographic procedure is conducted in accordance with our proposed improvements (i.e., double-blind; one

---

96 Connecticut Criminal Jury Instructions § 2.6-4, *citing State v. Ledbetter*, 275 Conn. 534 (Conn. 2005).

suspect per procedure; cautionary instructions provided to the eyewitness; effective use of fillers).[97]

**5. Sanctions for failure to comply with mandated procedures.**

We propose that legislation be adopted that would allow for preclusion of eyewitness identification testimony for failure to comply with proposed procedures. Specifically, we propose that a failure to implement the proposed improvements to eyewitness identification procedures be considered as a factor by the trial judge in deciding whether to admit evidence of the identification procedure at trial. The trial court would be required to conduct a pre-trial hearing to determine whether mandated procedures have been followed.

**6. Specialized training of police, prosecutors, judges and defense attorneys.**

It is clear that specialized training is necessary to educate those who work in the criminal justice system about the realities of eyewitness identifications – the reality that eyewitnesses can be certain and yet be wrong, and the problems with the conduct of these procedures which, if left unchanged, can lead to wrongful arrests, prosecutions and convictions. With this appreciation, each participant in the system must then understand and act on what he or she can do to prevent faulty eyewitness identification procedures or to expose them if they do occur.

Police should be educated about the dangers of eyewitness identification procedures and the science underlying eyewitness identifications. Their training should inform the police about the techniques associated with an increased risk of erroneous eyewitness identifications. They should likewise be trained to implement the procedural changes outlined in this report as well as the underlying reasons for these changes. The police should be trained in how to instruct and interact with an eyewitness during an identification procedure. Police should be specifically trained in the proper documentation of eyewitness identification procedures and in the need to preserve these records.

Of course, the responsibility to address the problem of erroneous identifications does not rest with the police alone. Therefore, the other participants in the criminal justice system

---

97 A minority of the Task Force expressed the opinion that photographic identifications should be admissible as long as the procedure was conducted in compliance with constitutional requirements and without any linkage to video recording or other proposed improvements to identification procedures.

should also be trained. Specifically, prosecutors should be trained in the social science on the topic. As a preliminary matter, the prosecutors must reach a determination as to whether an identification is trustworthy. Prosecutors need to approach this decision with an awareness that erroneous eyewitness identifications do occur, and an understanding of the factors that are more likely to result in a faulty identification.

Defense attorneys also should be fully informed on the issues involving eyewitness identifications. Without this knowledge, a defense attorney may be reluctant to consider the possibility that the eyewitness identification of his or her client was mistaken and that the client is innocent. Such an attorney may fail to challenge the admissibility of the identification aggressively enough or may urge the client to accept a seemingly favorable plea. Defense attorneys also should be familiar with the latest research on the issues, and they should learn the most effective means to present that information to the fact-finder and to the court. Defense attorneys should be trained in the means to elicit testimony – from the police, the client and expert witnesses – to convey the process by which an erroneous identification could have occurred.

Finally, judges should also be educated about the reality of erroneous eyewitness identifications and the factors that can contribute to them to better inform the decisions they must make about the admissibility of an eyewitness identification and challenges that may be brought by the defense.

**7. Funding for implementation of proposed procedures.**

The Subcommittee is mindful of the financial and logistical impact that implementation of these proposal may have on law enforcement agencies throughout New York State, particularly in small localities. We understand that appropriate funding is a prerequisite in order to effectuate these important changes in eyewitness identification procedures as the Subcommittee has proposed. We therefore propose that sufficient resources be made available to New York State law enforcement agencies to permit them to implement these improvements to eyewitness identification procedures.

**APPENDIX A**

## INTRODUCTION

In light of the litany of deficiencies in traditional eyewitness identification procedures, a number of jurisdictions have taken steps to reform eyewitness identification procedures. These reforms can be grouped into a number of broad categories, none of which are mutually exclusive. First, jurisdictions have developed task forces or similar commissions to conduct research and suggest recommendations on the topic of eyewitness identification procedures. Second, jurisdictions have created commissioned pilot studies to investigate how proposed eyewitness identification procedures would operate. Third, jurisdictions have created "best practices" manuals or guidelines, and have encouraged law enforcement officials to reform their practices, where appropriate, to those proposed in the best practices manuals. Fourth, some jurisdictions have adopted prescriptive, legislative reforms. Finally, in some instances the courts have modified the law and/or procedures surrounding eyewitness identification procedures either through litigation or their inherent, supervisory powers.

This appendix discusses the reform efforts that have occurred in jurisdictions across the country. It only briefly summaries the reforms, but it provides insight into what has been done to combat the problems relating to traditional eyewitness identification methods.

## REFORMS BY JURISDICTION

### Federal

In light of the considerable number of mistaken eyewitness identifications, in 1999 the Department of Justice's National Institute of Justice commissioned a best practices manual designed and approved by the Technical Working Group for Eyewitness Evidence.[98] The manual was designed to provide guidance and instruction to jurisdictions nationwide about ways in which they could consider reforming eyewitness identification procedures. Among other things, the report encourages law enforcement officials to: provide thorough cautionary instructions to witnesses, document eyewitness identification procedures, and record witness recollections.

---

98 National Institute of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* (1999), http://ojp.usdoj.gov/nij/pubs-sum/178240.htm.

**California**

Starting in 2002, Santa Clara County started requiring the use of double-blind, sequential identification procedures whenever possible.[99] On April 13, 2006, the statewide Commission on the Fair Administration of Justice released a report entitled "Report and Recommendations Regarding Eyewitness Identification Procedures."[100] The report, which based its findings on the reforms in Santa Clara and other jurisdictions throughout the country, offered the following recommendations and/or reforms: double-blind and sequential identification procedures; lineup procedures and photo displays should be videotaped or audiotaped wherever possible; cautionary instructions should be provided to witnesses; there should be a minimum of six photos presented in a photo spread as well as a minimum of six people in a lineup; the institution of training programs for law enforcement officials on recommended procedures for eyewitness IDs as well as training programs for judges, prosecutors, and defense lawyers on the risks inherent in cross-racial identifications and unreliable identification procedures; and the enactment of a task force which would include the California Attorney General to develop statewide policies and procedures. Recent efforts to implement legislative reforms have been vetoed by the governor.

**Illinois**

In 2000, then-Governor George Ryan established the Commission on Capital Punishment to study and review the administration of capital punishment in the State of Illinois. In its April 2002 report, the Commission recommended a number of reforms, some of which related to eyewitness identification procedures.[101] Among other things, the Commission recommended, at least in some cases, double-blind, sequential eyewitness identification

---

99 Santa Clara County Police Chiefs' Association, Santa Clara County Line-up Protocol, http://www.innocenceproject.org/docs/Santa_Clara_eyewitness.pdf.

100 California Commission on the Fair Administration of Justice, *Report and Recommendations Regarding Eyewitness Identification Procedures* (April 13, 2006), http://ccfaj.org/documents/reports/eyewitness/official/eyewitnessidrep.pdf.

101 Report of the Governor's Commission on Capital Punishment (April 15 2002), http://www.idoc.state.il.us/ccp/ccp/reports/index.html.

procedures should be used. In 2003, when the Death Penalty Reform Bill[102] was enacted, some, but not all, of the reforms regarding eyewitness identification procedures were included. Specifically, the bill provides that: lineups must be "photographed or otherwise recorded;" all photographs and photographic spreads must be disclosed to defense counsel; and that eyewitness viewing a lineup must sign a standardized form which informs them that the suspect may not be in lineup, they are not obligated to make an identification, and they cannot assume lineup administrator knows which person is the suspect. The bill also mandated the implementation of a pilot study to consider the effectiveness of sequential lineup procedures.

**Maryland**

On May 17, 2007, Governor Martin O'Malley signed a bill into law that required each law enforcement agency in the State to adopt written policies relating to eyewitness identification procedures that complied with the United States Department of Justice standards by December 1, 2007.[103]

**Massachusetts**

While there have not yet been any statewide reforms in Massachusetts, a number of municipalities in the State have altered the manner in which they conduct eyewitness identification procedures. The Northhampton Police Department has mandated the following reforms: the use of double-blind and sequential identification procedures; cautionary instructions to witnesses; and the requirement of a minimum of five fillers for photographic identifications and four fillers for lineup identifications.[104] The city of Boston has implemented similar reforms.[105]

---

102 725 Ill. Comp. Stat. 5/107A-5 (2003). Relevant provisions of this bill are provided in Appendix B.

103 MD. CODE ANN., PUB. SAFETY § 3-506 (2007). Relevant provisions of this bill are provided in Appendix B.

104 Northampton Police Department, Administration & Operations Manual O-408, "*Eyewitness Identification Procedures*," http://www.innocenceproject.org/docs/Northampton_MA_ID_Protocols.pdf.

105 The Justice Project, *Eyewitness Identification: A Policy Review* (2006), http://www.thejusticeproject.org/wp-content/uploads/polpack_eyewitnessid-fin21.pdf.

**Minnesota**

While Minnesota has not yet implemented any statewide reforms to the way eyewitness identification procedures are conducted in the State, a pilot program conducted in Hennepin County has garnered considerable national attention. In 2003, Hennepin County Attorney Amy Klobuchar spearheaded an effort to implement a sequential, double-blind pilot program in four police departments, including Minneapolis.[106] The reforms, which were implemented at minimum cost, led to a reduction in the number of filler identification, and at the same time, they did not lead to any significant drop in suspect identifications. A subsequent study showed that sequential, double-blind procedures increased protections against misidentifications, benefited investigators, and resulted in higher quality eyewitness evidence. Due to these results, the Hennepin County Attorney has advocated for broad adoption of such reforms.

**New Jersey**

In 2001, Attorney General John Farmer Jr., in his capacity as overseer of the State's criminal justice system, instituted widespread reforms in the manner in which the State conducted eyewitness identification procedures.[107] Those reforms made New Jersey the first state to officially adopt the recommendations of the National Institute of Justice's 1999 report *Eyewitness Evidence: A Guide for Law Enforcement*. Due to the reforms implemented by the Attorney General, the State now mandates the use of double-blind, sequential lineups. Furthermore, police officers are required to issue cautionary instructions, ensure that lineups are constructed effectively and include an adequate number of appropriate fillers, and document identification procedures, including witnesses' statements of certainty. These reforms have been cited with approval, at least partially, by the New Jersey Supreme Court.[108]

---

106 Amy Klobuchar, Nancy M. Steblay & Hilary Lindell Caligiuri, *Improving Eyewitness Identifications: Hennepin County's Blind Sequential Lineup Pilot Project*, 4 Cardozo Pub. L. Pol'y & Ethics J. 381 (2006).

107 New Jersey Department of Law and Public Safety, Office of the Attorney General, *Memorandum Re: Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures to all County Prosecutors, Police Chiefs, and Law Enforcement Chief Executives* (April 18, 2001), http://www.state.nj.us/lps/dcj/agguide/photoid.pdf.

108 See *State v. Delgado*, 188 N.J. 48 (2006) (unanimously holding that complete documentation of the identification procedure is a condition of admissibility for out-of-court identifications).

**North Carolina**

In November 2002, then-Chief Justice I. Beverly Lake of the North Carolina Supreme Court created the North Carolina Actual Innocence Commission to study and recommend potential strategies for lessening incidence of wrongful convictions. In its October 2003 report, the Commission recommended and endorsed the following eyewitness identification procedural reforms: the use of cautionary instructions with witnesses; documentation of a witness' confidence in the identification without any feedback given by the administrator; the effective use of fillers (a minimum of eight photos in a photo identification procedures and a minimum of six individuals in live identification procedures); and sequential double-blind procedures.[109] In 2007, North Carolina passed legislation that adopted many of the aforementioned reforms.[110]

**Virginia**

In 2004, the Virginia General Assembly passed a resolution directing the Virginia State Crime Commission to conduct a study on mistaken eyewitness identifications, lineup procedures, and the potential costs and benefits surrounding the implementation of the sequential method in eyewitness identification procedures. In January 2005, the Crime Commission released its study and made recommendations.[111] In response to the Commission's study, legislation was subsequently enacted that requires photographs of arrestees to be submitted to the Central Criminal Records Exchange, police departments to develop written policies and procedures for in-person and photo lineups, and for the Department of Criminal Justice Services and the Virginia Crime Commission to develop model lineup procedures and training requirements.[112]

---

109 North Carolina Actual Innocence Commission, Recommendations for Eyewitness Identification (October 2003), http://www.ncids.org/News%20&%20Updates/Eyewitness%20ID.pdf.

110 Eyewitness Identification Reform Act. N.C. Gen. Stat. § 15A-284.52 (2007). Relevant provisions of this bill are provided in Appendix B.

111 Virginia State Crime Commission, *Mistaken Eyewitness Identification: Report to the Governor and the General Assembly of Virginia* (January 2005), http://leg2.state.va.us.dls/h&sdocs.nsf/By+Year/HD402005/$file/HD40.pdf.

112 Va. Code Ann. § 19.2-390 (2005); Va. Code Ann. § 19.2-390.02 (2005).

**West Virginia**

On March 10, 2007, the State enacted legislation, the Eyewitness Identification Act,[113] which required law enforcement officials to conform with the Department of Justice's guidelines on eyewitness identification procedures. Among other things, the Act requires that law enforcement officials provide witnesses with cautionary instructions before conducting a lineup as well as a detailed documentation of the lineup procedure. The Act also mandated the creation of a task force to study and identify best practices for eyewitness identifications.

**Wisconsin**

The Wisconsin Department of Justice, working with University of Wisconsin Law School, developed a comprehensive set of model eyewitness identification guidelines for law enforcement that was distributed in March 2005.[114] The guidelines include recommendations on matters such as: the use of cautionary instructions to witnesses before, and the use of assessments of witness confidence immediately after, identifications procedures as well as the benefits of double-blind sequential presentation of lineups. While the model policy is only advisory, the Wisconsin Department of Justice has developed a training program for law enforcement officials across the state, and to date, over 800 investigators have been trained on these new procedures. Additionally, training has been incorporated into the curriculum for new investigators.[115]

In 2004, a Wisconsin state representative created a task force to study the case of mistaken witness identification in the Steven Avery case and to make recommendations on reforming eyewitness identification procedures. The following fall, the state enacted legislation that reformed the manner in which eyewitness identification procedures are conducted. Among the reforms, law enforcement officials were required to have written procedures "designed to

---

113 W. VA. CODE § 62-1E-2. Relevant provisions of this bill are provided in Appendix B.

114 State of Wisconsin, Office of the Attorney General, *Model Policy and Procedure for Eyewitness Identification* (2005), http://www.doj.state.wi.us/dles/tns/EyewitnessPublic.pdf.

115 The Justice Project, *Eyewitness Identification: A Policy Review* (2006), http://www.thejusticeproject.org/wp-content/uploads/polpack_eyewitnessid-fin21.pdf.

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

reduce the potential for erroneous identifications."[116] In creating those policies, not only were police departments instructed to consider model policies adopted by other jurisdictions, but the legislation also requires biennial review of policies. Furthermore, the law requires that "to the extent feasible," blind administrators and the sequential procedures must be used.

[116] WIS. STAT. § 175.50 (2005). Relevant provisions of this bill are provided in Appendix B.

**APPENDIX B**

## INTRODUCTION

This Appendix contains provisions from various state legislative proposals on eyewitness identification procedure reforms that have been enacted into law.

## STATE LEGISLATION

### Illinois

Lineup and Photo Spread Procedure (2003)[117]

(a) All lineups shall be photographed or otherwise recorded. These photographs shall be disclosed to the accused and his or her defense counsel during discovery proceedings as provided in Illinois Supreme Court Rules. All photographs of suspects shown to an eyewitness during the photo spread shall be disclosed to the accused and his or her defense counsel during discovery proceedings as provided in Illinois Supreme Court Rules.

(b) Each eyewitness who views a lineup or photo spread shall sign a form containing the following information:

(1) The suspect might not be in the lineup or photo spread and the eyewitness is not obligated to make an identification.

(2) The eyewitness should not assume that the person administering the lineup or photo spread knows which person is the suspect in the case.

(c) Suspects in a lineup or photo spread should not appear to be substantially different from "fillers" or "distracters" in the lineup or photo spread, based on the eyewitness' previous description of the perpetrator, or based on other factors that would draw attention to the suspect.

117 725 ILL. COMP. STAT. 5/107A-5 (2003).

**North Carolina**

Eyewitness Identification Reform Act (Effective March 1, 2008)[118]

*Purpose*

The purpose of this Article is to help solve crime, convict the guilty, and exonerate the innocent in criminal proceedings by improving procedures for eyewitness identification of suspects.

*Eyewitness Identification Reform*

(b) Eyewitness Identification Procedures. -- Lineups conducted by State, county, and other local law enforcement officers shall meet all of the following requirements:

(1) A lineup shall be conducted by an independent administrator or by an alternative method as provided by subsection (c) of this section.

(2) Individuals or photos shall be presented to witnesses sequentially, with each individual or photo presented to the witness separately, in a previously determined order, and removed after it is viewed before the next individual or photo is presented.

(3) Before a lineup, the eyewitness shall be instructed that:

a. The perpetrator might or might not be presented in the lineup,

b. The lineup administrator does not know the suspect's identity,

c. The eyewitness should not feel compelled to make an identification,

d. It is as important to exclude innocent persons as it is to identify the perpetrator, and

e. The investigation will continue whether or not an identification is made.

f. The eyewitness shall acknowledge the receipt of the instructions in writing. If the eyewitness refuses to sign, the lineup administrator shall note the refusal of the eyewitness to sign the acknowledgement and shall also sign the acknowledgement.

---

118 N.C. GEN. STAT. §§ 15A-284.51-53 (2007).

(4) In a photo lineup, the photograph of the suspect shall be contemporary and, to the extent practicable, shall resemble the suspect's appearance at the time of the offense.

(5) The lineup shall be composed so that the fillers generally resemble the eyewitness's description of the perpetrator, while ensuring that the suspect does not unduly stand out from the fillers. In addition:

a. All fillers selected shall resemble, as much as practicable, the eyewitness's description of the perpetrator in significant features, including any unique or unusual features.

b. At least five fillers shall be included in a photo lineup, in addition to the suspect.

c. At least five fillers shall be included in a live lineup, in addition to the suspect.

d. If the eyewitness has previously viewed a photo lineup or live lineup in connection with the identification of another person suspected of involvement in the offense, the fillers in the lineup in which the current suspect participates shall be different from the fillers used in any prior lineups.

(6) If there are multiple eyewitnesses, the suspect shall be placed in a different position in the lineup or photo array for each eyewitness.

(7) In a lineup, no writings or information concerning any previous arrest, indictment, or conviction of the suspect shall be visible or made known to the eyewitness.

(8) In a live lineup, any identifying actions, such as speech, gestures, or other movements, shall be performed by all lineup participants.

(9) In a live lineup, all lineup participants must be out of view of the eyewitness prior to the lineup.

(10) Only one suspect shall be included in a lineup.

(11) Nothing shall be said to the eyewitness regarding the suspect's position in the lineup or regarding anything that might influence the eyewitness's identification.

(12) The lineup administrator shall seek and document a clear statement from the eyewitness, at the time of the identification and in the eyewitness's own words, as to the eyewitness's confidence level that the person identified in a given lineup is the perpetrator. The lineup

administrator shall separate all witnesses in order to discourage witnesses from conferring with one another before or during the procedure. Each witness shall be given instructions regarding the identification procedures without other witnesses present.

(13) If the eyewitness identifies a person as the perpetrator, the eyewitness shall not be provided any information concerning the person before the lineup administrator obtains the eyewitness's confidence statement about the selection. There shall not be anyone present during the live lineup or photographic identification procedures who knows the suspect's identity, except the eyewitness and counsel as required by law.

(14) Unless it is not practical, a video record of live identification procedures shall be made. If a video record is not practical, the reasons shall be documented, and an audio record shall be made. If neither a video nor audio record are practical, the reasons shall be documented, and the lineup administrator shall make a written record of the lineup.

(15) Whether video, audio, or in writing, the record shall include all of the following information:

a. All identification and non-identification results obtained during the identification procedure, signed by the eyewitness, including the eyewitness's confidence statement. If the eyewitness refuses to sign, the lineup administrator shall note the refusal of the eyewitness to sign the results and shall also sign the notation.

b. The names of all persons present at the lineup.

c. The date, time, and location of the lineup.

d. The words used by the eyewitness in any identification, including words that describe the eyewitness′s certainty of identification.

e. Whether it was a photo lineup or live lineup and how many photos or individuals were presented in the lineup.

f. The sources of all photographs or persons used.

g. In a photo lineup, the photographs themselves.

h. In a live lineup, a photo or other visual recording of the lineup that includes all persons who participated in the lineup.

(c) Alternative Methods for Identification if Independent Administrator Is Not Used. -- In lieu of using an independent administrator, a photo lineup eyewitness identification procedure may be conducted using an alternative method specified and approved by the North Carolina Criminal Justice Education and Training Standards Commission. Any alternative method shall be carefully structured to achieve neutral administration and to prevent the administrator from knowing which photograph is being presented to the eyewitness during the identification procedure. Alternative methods may include any of the following:

(1) Automated computer programs that can automatically administer the photo lineup directly to an eyewitness and prevent the administrator from seeing which photo the witness is viewing until after the procedure is completed.

(2) A procedure in which photographs are placed in folders, randomly numbered, and shuffled and then presented to an eyewitness such that the administrator cannot see or track which photograph is being presented to the witness until after the procedure is completed.

(3) Any other procedures that achieve neutral administration.

(d) Remedies. -- All of the following shall be available as consequences of compliance or noncompliance with the requirements of this section:

(1) Failure to comply with any of the requirements of this section shall be considered by the court in adjudicating motions to suppress eyewitness identification.

(2) Failure to comply with any of the requirements of this section shall be admissible in support of claims of eyewitness misidentification, as long as such evidence is otherwise admissible.

(3) When evidence of compliance or noncompliance with the requirements of this section has been presented at trial, the jury shall be instructed that it may consider credible evidence of compliance or noncompliance to determine the reliability of eyewitness identifications.

*Training of Law Enforcement Officers*

Pursuant to its authority under G.S. 17C-6 and G.S. 17E-4, the North Carolina Criminal Justice Education and Training Standards Commission and the North Carolina Sheriffs' Education and Training Standards Commission, in consultation with the Department of Justice, shall create educational materials and conduct training programs on how to conduct lineups in compliance with this Article.

**Maryland**

Written Policies Regarding Eyewitness Identification (May 17, 2007)[119]

(a) Adoption. -- On or before December 1, 2007, each law enforcement agency in the State shall adopt written policies relating to eyewitness identification that comply with the United States Department of Justice standards on obtaining accurate eyewitness identification.

(b) Filing with Department of State Police. -- On or before January 1, 2008, each law enforcement agency in the State shall file a copy of the written policy relating to eyewitness identification with the Department of State Police.

(c) Compiling and public inspection. –

(1) On or before February 1, 2008, the Department of State Police shall compile the written policy relating to eyewitness identification of each law enforcement agency in the State.

(2) The Department of State Police shall allow public inspection of each policy compiled.

**West Virginia**

Eyewitness Identification Act (March 10, 2007)[120]

*Eyewitness Identification Procedures.*

(a) Before a lineup, the eyewitness should be given the following three instructions:

(1) That the perpetrator might or might not be present in the lineup;

---

119 MD. CODE ANN., PUB. SAFETY § 3-506 (2007).

120 W. VA. CODE §§ 62-1E-2, 3 (2007).

(2) That the eyewitness is not required to make an identification; and

(3) That it is as important to exclude innocent persons as it is to identify the perpetrator.

(b) Law-enforcement officers should make a written record of a lineup, including the following information:

(1) The date, time and location of the lineup.

(2) The names of every person in the lineup, if known, and all other persons present at the lineup.

(3) The words used by the eyewitness in any identification, including words that describe the eyewitness' certainty or uncertainty in the identification at the time the identification is made.

(4) Whether it was a photo lineup or live lineup.

(5) The number of photos or individuals that were presented in the lineup.

(6) Whether the lineup administrator knew which person in the lineup was the suspect.

(7) Whether, before the lineup, the eyewitness was instructed that the perpetrator might or might not be presented in the lineup.

(8) Whether the lineup was simultaneous or sequential.

(9) The signature, or initials, of the eyewitness, or notation if the eyewitness declines or is unable to sign.

(10) A video of the lineup and the eyewitness' response may be included.

(c) There is hereby created a task force to study and identify best practices for eyewitness identification... .

(d) The task force, or their assigned designees, shall serve without compensation, and in consultation with eyewitness identification practitioners and experts, shall develop recommended guidelines for policies, procedures and training with respect to the collection and handling of eyewitness evidence in criminal investigations by law-enforcement agencies that are consistent with the reliable evidence supporting best practices. The purpose of the guidelines is

to provide law-enforcement agencies with information regarding eyewitness identification policies and procedures to increase the accuracy of the crime investigation process.

(e) Such guidelines shall include procedures for the administration of live and photographic lineups and instructions that will increase the accuracy of eyewitness identifications. The task force, in developing these guidelines, shall consider:

(1) The use of blind administration of live and photo lineups;

(2) The issuance of specific instructions to the eyewitness before and during the identification procedure;

(3) The number and selection of fillers to be used in live and photo lineups;

(4) Sequential versus simultaneous presentation of lineup members;

(5) Whether only one suspect should be included in any live or photo lineup;

(6) The timing of when the administrator should request and record the eyewitness's statement of his confidence in his selection;

(7) Whether to refrain from providing of any confirmatory information to the eyewitness;

(8) The visual recording of the lineup and its administration;

(9) The video or audio recording of the lineup procedure;

(10) Any other policies or procedures the task force determines to be relevant; and

(11) What training, if any, should be made available to law- enforcement personnel in the use of these procedures....

*Training of Law-Enforcement Officers.*

The Superintendent of State Police may create educational materials and conduct training programs to instruct law-enforcement officers and recruits how to conduct lineups in compliance with this section.

**Wisconsin**

Eyewitness Identification Procedures.[121]

(2) Each law enforcement agency shall adopt written policies for using an eyewitness to identify a suspect upon viewing the suspect in person or upon viewing a representation of the suspect. The policies shall be designed to reduce the potential for erroneous identifications by eyewitnesses in criminal cases.

(3) A law enforcement agency shall biennially review policies adopted under this section.

(4) In developing and revising policies under this section, a law enforcement agency shall consider model policies and policies adopted by other jurisdictions.

(5) A law enforcement agency shall consider including in policies adopted under this section practices to enhance the objectivity and reliability of eyewitness identifications and to minimize the possibility of mistaken identifications, including the following:

(a) To the extent feasible, having a person who does not know the identity of the suspect administer the eyewitness viewing of individuals or representations.

(b) To the extent feasible, showing individuals or representations sequentially rather than simultaneously to an eyewitness.

(c) Minimizing factors that influence an eyewitness to identify a suspect or overstate his or her confidence level in identifying a suspect, including verbal or nonverbal reactions of the person administering the eyewitness viewing of individuals or representations.

(d) Documenting the procedure by which the eyewitness views the suspect or a representation of the suspect and documenting the results or outcome of the procedure.

121 WIS. STAT. § 175.50 (2005).

# Forensic Evidence

## SUBCOMMITTEE REPORT AND FINAL PROPOSALS

### Introduction

The review of numerous exonerations in New York State confirms that myriad failures related to the handling of forensic evidence and the conduct of crime scene investigations contribute significantly to wrongful conviction. While it is forensic evidence, principally DNA, that achieves the ultimate exoneration of the wrongfully condemned, recognition of the importance of this evidence and adoption of reforms may prevent wrongful conviction in the first instance. Eventual exonerations do not prove that the system works; rather they prove the existence of the problem and the need for reform. In cases where crucial evidence is not preserved, is preserved but is later lost, or where it is never properly analyzed, a wrongful conviction may never be uncovered.

In considering forensic science reform, it should be acknowledged that New York State was among the first states to take important strides in this area. In the 1990s, New York State established a Commission on Forensic Science and a DNA Subcommittee pursuant to Article 49-B of the Executive Law. The Commission was empowered to develop minimum standards and a program of accreditation for all public forensic science laboratories in New York State. Accreditation of forensic DNA laboratories is granted through the Commission. The DNA Subcommittee advises the Commission on Forensic Science on matters related to the implementation of scientific controls and quality assurance procedures for the performance of forensic DNA analysis. Forensic laboratories must demonstrate compliance with the standards of the American Society of Crime Lab Directors/Laboratory Accreditation Board (ASCLD/LAB), the American Board of Forensic Toxicology (ABFT), and/or the Quality Assurance Standards for the DNA Testing Laboratories published by the FBI.

In addition, New York State added a section to the Criminal Procedure Law (Section 440.30 1-a) to provide a mechanism by which a convicted defendant could seek post-conviction testing of biological evidence where there is a reasonable probability that DNA testing would have produced a more favorable verdict for the defendant.

While the Commission on Forensic Sciences and the post-conviction DNA testing are noteworthy advances, experience suggests the need for further reform. Indeed, the essential efficacy of the nation's forensic science disciplines is in question. The recent release of a congressionally authorized report for the National Research Council on behalf of the National Academies finds serious systemic deficiencies in forensic science and advocates for major reforms and new research. The report, "*Strengthening Forensic Science in the United States: A Path Forward*," released on February 18, 2009, finds that in the absence of mandatory standards and protocols, forensic evidence is often presented without scientific bases thereby leading to unreliable conclusions. This comprehensive study of forensic science proposes broad reforms, including mandatory certification and accreditation, extensive research to determine the scientific reliability of heretofore accepted disciplines, such as fingerprint and toolmark analysis, and the establishment of a National Institute of Forensic Science to lead research efforts, establish and enforce standards for forensic science professionals and laboratories and oversee education standards.

New York should follow the lead of this ground-breaking report by establishing the high standards and best practices necessary to ensure the reliability of all forensic evidence proffered in criminal prosecutions. (*See* recommendation 5, *infra*). But wholly apart from the fundamental flaws in forensic science exposed by the National Academies report, numerous exonerations in New York State demonstrate that fundamental systemic deficiencies in how and when forensic evidence is collected, stored and used are pervasive. The case synopses below summarize some of these failings. Based upon these cases, and after reviewing other reports, recommendations and proposed legislation, the subcommittee proposes a number of reform measures designed to minimize the role that the deficient use of forensic evidence plays in the criminal justice system.

## Synopses of New York Cases: Forensic Evidence Failures

- **James O'Donnell** – In 1998, defendant was convicted of sodomy based upon misidentification; sentenced to 3 ½ to 7 years.
  - Failure to test biological evidence until two years after conviction.
- **Anthony Faison and Charles Shepard** – In May 1988, convicted of murder; sentenced to 20 years to life and 14 years to life respectively.
  - Failure by both prosecution and defense counsel to understand, appreciate or inform jury that crime scene forensic evidence was inconsistent with eyewitness account.
  - Failure to run latent fingerprints recovered at the scene with existing databases, which would have identified actual perpetrator.
- **Victor Ortiz** – In January 1983, convicted of rape and sodomy; sentenced to 12 ½ - 25 years.
  - Unavailability of DNA testing.
  - Failure to obtain biological samples from another potential source of sperm, despite inconsistent accounts by victim and other source.
- **Scott Fappiano** – In 1983, defendant was convicted of rape and sodomy based, in part, upon an eyewitness identification.
  - Failure to perform additional blood type testing during initial investigation may have deprived defendant of key exculpatory evidence.
  - People's consumption of specimen may have lessened the availability of blood samples for further post-conviction testing by the defense.
  - Improper cataloguing and retention of DNA and other forensic evidence lengthened period of wrongful incarceration.
  - More sophisticated DNA testing which would have eliminated defendant as a suspect was unavailable at the time of trial.

- **Hector Gonzalez** – In 1996, defendant was convicted of murder in the second degree based, in part, upon an eyewitness identification and forensic evidence (blood samples).
  - Failure of police, prosecutors and defense counsel to request DNA testing, which was available in 1996, rather than relying exclusively on serological testing which was inconclusive.
- **Anthony Capozzi** - In 1987, defendant was convicted of rape, sexual assault and sodomy based, in part, upon eye witnesses identification.
  - More sophisticated DNA testing was unavailable at the time of trial which would have eliminated defendant as a suspect.
  - Post-conviction requests for specimens from the local medical center went ignored because the requests had not been made pursuant to the established protocols.
  - Improper cataloguing may have led law enforcement to believe that slides from the rape kit were unavailable, further hampering defendant's efforts to conduct DNA testing.
- **Roy Brown** – In 1992, defendant was convicted of murder based upon, among other things, bite marks found on the victims body and testimony by defendant's wife and ex-wife of defendant's propensity to bite when angry.
  - Failure by prosecutors to disclose potentially exculpatory opinion of forensic odontologist.
  - More sophisticated DNA testing was unavailable at the time of trial.
  - People's consumption of saliva specimens may have lessened availability of samples for further post-conviction testing by the defense.
- **Marion Coakley** – In 1985, defendant was convicted of rape in the first degree based, in part, upon testimony of forensic blood type testing expert.
  - Failure by defense counsel and prosecution to conduct additional serological testing which would have confirmed exculpatory opinion of forensic expert.

- Court's refusal to grant the defense an adjournment in order to conduct further testing which would have confirmed exculpatory opinion of forensic expert.

- Forensic expert's lack of knowledge about the state of testing serological evidence which may have caused unwarranted uncertainty regarding his opinion.

- **Antron McCray** – In 1990, defendant was convicted of rape and robbery in the first degree in the Central Park Jogger case based upon incriminating statements and admissions made by defendant, and co-defendants who were allegedly involved in the crimes and the presence of certain forensic evidence (hair and semen).

  - Failure by police and prosecutors to further investigate the inconsistent and exculpatory DNA test results which failed to connect the hair and other DNA evidence and defendant(s) to the crime.

  - Police mishandling of forensic evidence which may have caused the hairs to be picked up at the precinct house, rather than during the crime.

- **Michael Mercer** – In 1992, defendant was found guilty of rape, sodomy and robbery based, in part, upon the eyewitness testimony of the victim.

  - More sophisticated DNA testing was unavailable at the time of trial.

- **Kevin Richardson** – In 1990, defendant was convicted of attempted murder, robbery, rape and sodomy in the Central Park Jogger case based upon incriminating statements and admissions made by defendant and co-defendants who were allegedly involved in the crimes and the presence of certain forensic evidence (hair and semen).

  - Failure by police and prosecutors to further investigate the inconsistent and exculpatory DNA test results which failed to connect the hair and other DNA evidence and defendant(s) to the crime.

  - Police mishandling of forensic evidence which may have caused the hairs to be picked up at the precinct house, rather than during the crime.

- **Yusef Salaam** – In 1990, defendant was convicted of robbery and rape in the Central Park Jogger case based, in part, upon alleged oral unsigned statements made by

defendant and co-defendants who were allegedly involved in the crimes and the presence of certain forensic evidence (hair and semen).

- Failure by police and prosecutors to further investigate the inconsistent and exculpatory DNA test results which failed to connect the hair and other DNA evidence and defendant(s) to the crime.

- Police mishandling of forensic evidence which may have caused the hairs to be picked up at the precinct house, rather than during the crime.

• **Raymond Santana** – In 1990, defendant was convicted of robbery and rape in the Central Park Jogger case based, in part, upon incriminating statements and admissions made by defendant and co-defendants who were allegedly involved in the crimes and the presence of certain forensic evidence (hair and semen).

  - Failure by police and prosecutors to further investigate the inconsistent and exculpatory DNA test results which failed to connect the hair and other DNA evidence and defendant(s) to the crime.

  - Police mishandling of forensic evidence which may have caused the hairs to be picked up at the precinct house, rather than during the crime.

• **Kharey Wise** – In 1990, defendant was convicted of assault, sexual abuse and rioting in connection with the Central Park Jogger case based, in part, upon incriminating statements and admissions made by defendant and co-defendants who were allegedly involved in the crimes and the presence of certain forensic evidence (hair and semen).

  - Failure by police and prosecutors to further investigate the inconsistent and exculpatory DNA test results which failed to connect the hair and other DNA evidence and defendant(s) to the crime.

  - Police mishandling of forensic evidence which may have caused the hairs to be picked up at the precinct house, rather than during the crime.

• **Terry Chalmers** – In 1987, defendant was twice convicted of rape, sodomy, and grand larceny arising from two separate incidents based upon self-incriminating statements and inconclusive forensic testing.

- More sophisticated DNA testing was unavailable at the time of trial which later conclusively established that defendant had not committed the rapes.

• **Douglas Warney** – In 1997, defendant was convicted of murder based upon self-incriminating statements made by defendant, a mentally retarded man suffering from serious physical and mental disabilities at the time of his interrogation and arrest.

- Failure by police and prosecutors to further investigate and analyze forensic evidence that was inconsistent with defendant's alleged confession.

- More sophisticated DNA testing was unavailable at the time of trial.

- During the post-conviction phase, the prosecutors originally opposed and the court denied a defense motion for more advanced DNA testing. It is noteworthy that those very tests (conducted voluntarily by the District Attorney's Office along with a post-conviction investigation) eventually led to the exoneration.

## Proposals

1. <u>Ensure Proper Preservation, Cataloguing and Retention of All Forensic Evidence</u>

   a. Enact legislation to expand the jurisdiction of the Forensic Science Commission to include responsibility to promulgate mandatory standards for the preservation, cataloguing and retention of all forensic evidence obtained at crime scenes or other locations relevant to the commission of a crime;

   b. Enact legislation to require that all existing forensic evidence, especially biological and fingerprint evidence, which currently exists in local or state warehouses and/or storage facilities, be catalogued using state-of-the-art technology, such as bar-coding;

   c. Enact legislation to require that all forensic evidence obtained in connection with the commission of a crime be maintained for a minimum of ten years after a person convicted of such crime has been discharged from any post-incarceration period of supervision; in cases where no person has been accused of the crime, all forensic evidence shall be maintained until the expiration of all applicable statutes of limitations for prosecution of the crime.

Notes

As is evident from the examination of New York exonerations, many injustices never would have been corrected but for the availability of biological evidence many years after the prosecution. Recent experience has demonstrated that evolving technology makes possible exclusions and inclusions that were not feasible years ago. Ever smaller samples yield ever more conclusive results as more sophisticated testing methods emerge.

The loss or destruction of forensic evidence renders later testing impossible. According to The Justice Project, "[t]he loss or destruction of DNA evidence jeopardizes the integrity of the criminal justice system." New York's experience demonstrates that while biological evidence is the most common basis upon which innocence can be established, it is by no means the only crime scene evidence that can reverse an injustice. For example, despite new witnesses implicating another suspect and a recantation by a key witness, the prosecution and the court rejected Anthony Faison's and Charles Shepard's claims of innocence. Ultimately, the exoneration was achieved only when the match of a latent print implicated the new suspect. Thus, the critical importance of preserving both biological and other forensic evidence cannot be overstated.

Unfortunately, New York currently has a haphazard and careless approach to the preservation of evidence. Numerous cases have been documented in which requests for vital evidence, which could be subjected to biological or other testing, could not be accommodated because the evidence could not be found. On October 10, 2006, the New York State Assembly's Standing Committee on Codes conducted a hearing on Storage and Accessibility of DNA Crime Scene Evidence in Criminal Investigations. Among the witnesses were Peter Neufeld, Esq., Co-Director, The Innocence Project and exonerees Alan Newton and Scott Fappiano. The testimony demonstrates the chronic need for a thorough inventorying of all available forensic evidence. In the cases of Newton and Fappiano, the evidence that would have spared them years of needless incarceration was available – it just could not be located.

Peter Neufeld testified in 2006 that, based upon a preliminary sample of cases, efforts to locate the biological evidence from 23 sexual assaults or homicides under investigation by The Innocence Project for possible wrongful conviction had been unsuccessful. Indeed, it was not that there was conclusive documentation that the evidence had been destroyed, but rather, the evidence simply could not be located. Mr. Neufeld indicated that The Innocence Project rate of

closing cases because of lost or destroyed evidence is 35 percent higher in New York State and 56 percent higher in New York City than in the rest of the country. *See also* Peter Neufeld, *Legal and Ethical Implications of Post-Conviction DNA Exonerations*, 35 New Eng. L. Rev. 639, 641 (2001).

Plainly there is a need for reform in this area. Properly identifying, preserving and cataloguing forensic evidence will enable New York to make effective use of new testing technologies to exonerate the innocent and solve unsolved crimes. Presently 21 states (and the District of Columbia) require evidence preservation throughout the term of incarceration. (Arkansas, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, New Mexico, North Carolina, Oklahoma, Rhode Island, Texas, Virginia, Wisconsin and Washington, D.C., all have such statutes. A partial list of references is available at footnote 8 of *The Justice Project Report*, *supra*, and a continuously updated roster is available through The Innocence Project.)

New York's Forensic Science Commission is an appropriate entity to promulgate mandatory standards for the preservation, cataloguing and retention of forensic evidence. A potential model for enabling legislation is the Assembly Bill 8693 that was introduced in the 2007-2008 Regular Session. Additional legislation may be required to expand the jurisdiction of the Forensic Science Commission to ensure appropriate authority to issue standards applicable to all forensic evidence.

2. Expand the Jurisdiction of the Forensic Science Commission to Provide Independent Oversight of Forensic Disciplines

Notes

New York was a trailblazer in establishing the Commission on Forensic Science, as codified under N.Y. Exec. Law 49-B, Section 995 *et seq*. The Commission plays a major role in assuring the reliability and validity of forensic analyses that arise from the operations of crime laboratories and laboratory personnel. Its jurisdiction, however, does not extend to all forensic science providers. Some medical examiner offices and police departments employ forensic disciplines without the same oversight as would be in place if these operations were performed under the aegis of a crime lab. Many disciplines, including in some cases fingerprint and ballistics analyses, and in all cases forensic odontology, arson, and other forensic sciences, are not covered by the Commission. Of paramount importance, crime scene investigators are not

currently subject to Commission oversight. Yet evidence identification, collection and preservation at a crime scene are vitally important functions that directly affect the capacity to identify suspects and exonerate the innocent.

Procedural and methodological deficiencies in these disciplines contribute to wrongful conviction. For example, the failure to seek a match for the latent print in the Faison and Shepard case, and the discredited reliance upon odontology evidence in the Roy Brown case, might have been averted if the Commission had authority to promulgate standards for the qualification and training of those performing these vital services in the field. In light of the Commission's authority to ensure the integrity of forensic evidence, it should have adequate and explicit jurisdiction to fulfill that mission.

3. Establish Authority for Judges to Order Comparison of Crime Scene Evidence to Available Forensic Databases Upon Request of an Accused or Convicted Person

Notes

At present, no explicit authority exists for a court to compel that biological and/or fingerprint evidence obtained at crime scenes be compared with existing databases. That discretion is solely vested in the hands of law enforcement. As many of the New York exonerations confirm, comparing crime scene evidence to appropriate forensic databases can both exonerate the wrongfully convicted and provide the necessary evidence to prosecute the real perpetrator. Further, while prosecutors and law enforcement overwhelmingly discharge their awesome responsibilities with integrity and a firm commitment to justice, the exoneration case analyses confirm that post-conviction prosecutorial resistance to innocence claims is a barrier to exoneration.

Accordingly, courts must have the ultimate authority to direct that such comparisons must be made when there is any reasonable possibility that an innocent person is accused or wrongfully convicted. The proposed legislation introduced in the Assembly in the 2007 - 2008 Regular Session contains a provision that would add a new section 10 to Section 995-c of the Executive Law conferring this authority upon showing that such a request is reasonable and may be material to the defense.

4. Permit Wrongfully Convicted Persons To Prove Their Innocence, Regardless of Whether the Conviction Was the Result of a Trial Verdict or a Guilty Plea

Notes

Those who have studied exonerations nationally have concluded that post-conviction DNA testing must be available to those who may be wrongfully convicted, regardless of whether their conviction was the result of a trial verdict or a guilty plea, and notwithstanding a confession or a previous unfavorable test result. As The Justice Project has noted, "[e]xcluding defendants who confessed or pled guilty does not take into account evidence that many false confessions and even some plea bargains are obtained from innocent people." "Nearly a dozen of the more than 200 DNA exonerees in the United States initially pled guilty, and 50 of the first 200 purportedly confessed to crimes that they did not commit." As has now been well-established in various studies on the phenomenon of false confession, many people, particularly mentally and emotionally vulnerable populations, plead guilty even though they are innocent. Faced with a choice between a guilty plea or the prospect of a much higher sentence following a guilty verdict, and unaware of the possibility that scientific evidence can establish their innocence, they take what seems like the lesser of two bad alternatives.

Bad decisions should not irrevocably condemn those who are actually innocent. While New York's statute does not specifically address the availability of post-conviction DNA testing for those who have pled guilty, New York appellate courts have construed the statute as foreclosing DNA testing after a guilty plea. *People v. Byrdsong*, 33 A.D.3d 175 (2d Dep't 2006), *lv denied* 7 N.Y.3d 900 (2006); *People v. Lebron*, 44 A.D.3d 310 (1st Dept 2007), lv denied 9 N.Y.3d 1007 (2007); *People v. Allen*, 47 A.D. 3d 543 (1st Dep't 2008). Such judicial interpretation should not be permitted. Accordingly, the law should be amended to ensure that such testing is available irrespective of whether the conviction was the result of a verdict or a plea.

5. Promulgate Standards and Best Practices To Guide All Law Enforcement Agencies in the Processing of Crime Scenes and the Collection, Processing, Evaluation and Storage of Forensic Evidence

Notes

The proposed legislation outlined in recommendations 1 and 2, which would vest the Commission on Forensic Science with full authority over forensic issues, is the best way to

achieve universal compliance with the highest standards and the best state-of-the-art methodologies. Experience teaches, however, that legislative action in New York can be an arduous and often futile route to reform. Accordingly, the New York State Bar Association should undertake a project to promulgate its own set of standards and best practices to maximize the tremendous potential to use forensic evidence to effectively prosecute the guilty, protect the wrongfully accused and exonerate the innocent.

There is precedent for such a project. In 2005, the State Bar empaneled a Special Committee to Enhance the Quality of Mandated Representation that promulgated statewide Standards for the Provision of Mandated Representation. The standards seek to elevate the quality of representation provided to the indigent accused. A similar project should be undertaken with respect to forensic science to develop comprehensive standards and best practices. The designated group should include the best minds in the respective sciences and leaders in law enforcement, and should provide appropriate representation for the judiciary and the prosecution and defense bars. While not having the force of law, such standards will tend to elevate practice and guide prosecutors, defense attorneys and judges as they discharge their responsibilities in the criminal justice system.

6. <u>Provide Forensic Science Training for Prosecutors, Defense Lawyers and Judges</u>

<u>Notes</u>

If the criminal justice system is to function effectively, each component must be equipped to understand, evaluate and, when necessary, challenge forensic evidence. Forensic evidence, which is often proffered as more reliable than testimonial evidence because it is not subject to inherent human limitations and potential unreliability resulting from bias, motive or interest, carries enormous weight with juries. The exonerations conclusively demonstrate, however, that when forensic evidence is misunderstood, misapplied or mishandled, it is just as capable of producing an erroneous result. Judges, prosecutors and defense attorneys cannot discharge their responsibility unless they are fully conversant with the nuances and emerging technologies in the forensic evidence fields. Sustained and focused training is essential.

The New York State Bar Association should urge the government to provide designated resources to promote such training.

In addition, NYSBA should assist by promulgating a statewide plan for cooperative training that would bring together the judiciary, the prosecution and defense bars with the science and technology communities to assess emerging issues and forge collaborative educational initiatives related to forensic science, technology and the law. The project should begin with a series of regional statewide training conferences and should eventually evolve into an ongoing training module that the State Bar and local bar associations can maintain on an ongoing basis. These cooperative ventures should seek a joint commitment for participation (and possibly the allocation of training funds) by the judiciary, the district attorneys and public defender entities and the private bar. The crucial need for fundamental training in the basics of emerging forensic science methodologies transcends the unique tactical considerations that may be more appropriately addressed in exclusive settings. Cooperative training in forensic science offers the potential for huge economies and will elevate the standards of practice, often obviating the need for wasteful litigation and minimizing the incidence of wrongful conviction.

7. Establish a Permanent, Independent Commission To Minimize the Incidence of Wrongful Convictions

Notes

The only reliable way to correct any flawed system is to study cases of failure to understand what went wrong and then propose remedies and reforms to prevent reoccurrence. The New York exonerations, as is evident in exonerations nationally, reveal recurring factors that are present in wrongful convictions. This is particularly so with respect to forensic science failures. There is no reason why the criminal justice system should not do what industry, the military and the transportation sector does when there is a major accident or failure: launch a thorough investigation, including the procurement of all relevant evidence and testimony to identify precisely how an innocent person came to be convicted of a crime. The conviction of an innocent person is the justice system's equivalent of factory catastrophe, a plane crash or the bombardment of the wrong target. It deserves to be investigated fully, forthrightly and publicly.

New York should establish a permanent, independent Commission to review any criminal or juvenile case involving a wrongful conviction. The Commission, which should include representation from the forensic science fields, law enforcement, the judiciary, the defense and prosecution bars, and victims' rights advocates, must be empowered to hold hearings, procure evidence and make findings of fact to determine the cause or causes of any

wrongful conviction and recommend reforms to lessen the likelihood of recurrence. The Commission should have the authority to subpoena witnesses, examine them under oath or affirmation, and compel the production of such records and data as may be necessary to carry out its mission. A model for the creation of such a "Commission for the Integrity of the Criminal Justice System" was contained in the proposed legislation introduced in the New York State Assembly in the 2007-2008 Regular Session (8693-A, Article 23).

Until legislation creating such a Commission is enacted, NYSBA should create its own permanent Task Force on Wrongful Conviction. Such a Task Force, modeled after the current Task Force, should be expanded to include representatives of the forensic science field, and should convene to thoroughly investigate any reported case of wrongful conviction in New York State. While lacking the power of compulsory process, such a Task Force can play an important salutary role in exposing the defects that perpetuate the tragedy of wrongful conviction.

# False Confessions

SUBCOMMITTEE REPORT AND FINAL PROPOSALS

## Introduction

In an alarming number of wrongful convictions, the accused makes a false confession or incriminatory statement. Indeed, in 23% (12 of 53) of the wrongful convictions analyzed by the Task Force, the accused had falsely confessed. As shocking as this figure may be, it is in fact consistent with national research indicating that false confessions contribute to almost 25% of the known cases of wrongful conviction.[122] These findings demonstrate that false confessions occur and contribute to wrongful convictions more frequently than previously thought.

False confessions pose a particularly significant danger for wrongful conviction because confessions are such persuasive evidence. As characterized by the NYSBA's Criminal Justice Section, "[c]onfessions are powerful evidence."[123] Indeed, a confession is likely the most potent evidence of guilt, and often sufficient in and of itself to secure a conviction. As noted in one Law Review article:

> Confessions are among the most powerful forms of evidence introduced in a court of law, even when they are contradicted by other case evidence and contain significant errors. This is because police, prosecutors, judges, jurors and the media all tend to view confessions as self-authenticating and see them as dispositive evidence of guilt. Juries tend

---

122 Jeremy W. Newton, *False Confession: Considerations for Modern Interrogation Techniques at Home and War*, 9 J.L. & Soc. Challenges 63 (2008); C. Ronald Huff, *Wrongful Conviction: Causes and Public Policy Issues*, 18(1)(ABA) Criminal Justice 15 (Spring 2003); The Innocence Project, Understand the Causes (available at http://www.innocenceproject.org/understand/).

123 Report and Proposed Resolution of the Criminal Justice Section Concerning Electronic Recording of Custodial Interrogations (June 2004).

> to discount the possibility of false confessions as unthinkable, if not impossible.[124]

The law has developed a series of evolving rules designed to exclude the admission of unreliable confessions. For example, under both common law and constitutional law, courts exclude confessions that have been given involuntarily. The United States Supreme Court expanded the doctrine of voluntariness into the so-called *Miranda* rule[125] the requirement that police advise suspects of certain rights before any interrogation. In addition, both common law and statutory law in New York require that confessions be corroborated. Specifically, Criminal Procedure Law § 60.50 provides that "[a] person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed." For years, the courts have relied upon the two rules of voluntariness and corroboration to exclude unreliable confessions and reduce the possibility of wrongful convictions based upon such confessions.

The prevalence of false confessions found by every study of the topic casts doubt on the adequacy of these rules either to prevent false confessions or to exclude their admission into evidence. Indeed, the false confessions in the cases studied by the Task Force were all deemed to be "voluntary" under current standards and were all corroborated by other evidence. Existing protections simply did not suffice to identify confessions that may have been voluntary under current constitutional analysis, but were factually false.

Any effort to address the problem of false confessions must begin by rejecting the commonly-held but incorrect belief that an innocent person would never confess to a crime he did not commit. Indeed, experiments demonstrate that innocent people under certain forms of

---

124 Richard A. Leo, et al., *Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century,* 2006 Wis. L. Rev. 479 (2006).

125 *Miranda v. Arizona*, 384 U.S. 436 (1966).

stress, including aggressive accusatory questioning, confess to things they did not do.[126] To explain this phenomenon, scholars invoke the "rational choice" theory of false confessions.[127] This theory posits that some suspects falsely confess because the process of interrogation convinces them that confessing is the most rational choice under the circumstances.[128] This can occur under various circumstances:

> This can occur, for example, when an innocent suspect believes that the police have strong evidence against him/her and that confessing is the only way to avoid the most severe penalty. Or, it can occur if an innocent suspect, wanting to end a stressful interrogation, believes that she will be unable to convince the interrogator of her innocence and confesses out of the belief that she will be able to prove her innocence later in court.[129]

Contrary to what some may suspect, most false confessions do not appear to be the product of deliberate police misconduct. Rather, honest investigators, using legitimate means in good faith, may unwittingly encourage false admissions. In fact, researchers have concluded that time-tested interrogation techniques, widely used by modern law enforcement agencies, increase the risk of false confessions from innocent suspects.[130] These techniques include confrontational

---

126 *See generally* Sol M. Kassin and Katherine L. Kiechel, *The Social Psychology of False Confessions: Compliance, Internalization, and Confabulation*, 7 Psychol. Sci. 125 (1996). In one experiment, students were given a purported test of their "reaction-time" by typing letters on a computer keyboard as the experimenter read them out loud. The subjects were admonished not to press the "ALT" key, because doing so would cause the computer to malfunction. In fact, the computer was programed to shut down part way through the experiment, at which point the experimenter would accuse the subject of pressing the "ALT" key. Subjects were then interrogated. The techniques included aggressive questioning and the fabrication of alleged "eyewitness" testimony that the subject had pressed the key. Overall, 69% of all subjects signed a false confession to pressing the forbidden key. Equally amazingly, 28% of the subjects exhibited "internalization," i.e. truly believed they had pressed the "ALT" key.

127 *See, e.g.*, Richard J. Ofshe and Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv. U. L. Rev. 979 (1997).

128 Wisconsin Criminal Justice Study Commission, Position Paper on False Confessions.

129 *Id.*

130 *See* Paul M. Kassin, *On the Psychology False Confessions: Does Innocence Put Innocents at Risk*, 60 American Psychologists 215 (2005); Richard P. Conti, *The Psychology of False Confessions, The Journal of Credibility Assessment and Witness Psychology*, Vol. 2, No. 1 (1999).

interrogation, psychological coercion and outright deception, all of which are legally permissible. While these methods are used because they effectively elicit confessions from guilty subjects, they unfortunately also elicit false confessions as well.[131] The failsafe is supposed to be the interrogator's ability to determine whether the subject is telling the truth, a skill experienced police officers often believe they have. Research demonstrates, however, that such investigators are no more accurate in detecting deception than the average person.[132] At the same time, the more experienced an investigator, the more likely he or she is to disbelieve any suspect, and the more confident that investigator will be in his or her opinion.[133] The findings of this research are confirmed by the cases studied by the Task Force, where honest, well-intentioned investigators unwittingly induced false confessions that they firmly believed were true.

The analysis also suggests that false confessions are often extracted from the most vulnerable suspects. Juveniles, the mentally disabled and the mentally ill - all particularly susceptible to aggressive interrogation techniques - account for a high percentage of the documented cases of false confessions.[134] This was borne out in the cases studied by the Task Force, where eight out of the ten false confessions came from suspects who were juveniles and/or had mental disabilities or mental illnesses. Researchers also believe that members of minority groups and those from unusual cultural backgrounds are particularly vulnerable to psychological inducement, and therefore at increased risk to falsely confess.[135]

---

131 Richard P. Conti, *The Psychology of False Confessions, The Journal of Credibility Assessment and Witness Psychology*, Vol. 2, No. 1 (1999).

132 Edward J. Sackman, *False Confessions: Rethinking a Contemporary Problem,* 16-WTR Kan. J.L. & Pub. Policy 208 (2006-2007).

133 *Id.*

134 Steven Drizin and Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891 (2004).

135 ABA Report; Cynthia K. Lee, *Murder and the Reasonable Man: Passion and Fear in the Criminal Courtroom* (New York: New York University Press) (2003).

## Recommendations

Recognizing these realities, the following recommendations are made to address the problem of false confessions.

### 1. Custodial Interrogations of all Felony-Level Crime Suspects Should Be Electronically Recorded in Their Entirety.

By far the most common reform recommended by those who study the phenomenon of false confessions is the electronic recording of custodial interrogations in their entirety.[136] Proponents of this reform assert that recording the entire interrogation provides the best means by which a finder of fact can evaluate whether the techniques employed produced a reliable statement from the accused.

Of course, other benefits will flow from a policy of electronic recording. Electronic recording ensures the integrity of the process by accurately recording the entire interrogation. Recording should therefore help resolve disputes regarding alleged statements. Recording should reduce later false denials that incriminating admissions were actually made. As a matter of judicial economy, recording would likely reduce the time necessary to resolve suppression issues. With an accurate record of the interrogation, courts should be better equipped to

---

[136] Indeed, this very recommendation was adopted by the New York State Bar Association's House of Delegates at its meeting in June 2004. The House, the policy-making body of the Association, adopted a resolution at that time providing:

> Resolved, that the New York State Bar Association urges all law enforcement agencies to videotape the entirety of custodial interrogations of crime suspects in the most serious cases at police precincts, courthouses, detention centers, or other buildings where suspects are held for question; and be it
>
> Further Resolved, that the New York State Bar Association urges the New York State Legislature to enact laws requiring the videotaping of the entirety of custodial interrogations of crime suspects in the most serious cases at police precincts, courthouses, detention centers, or other buildings where suspects are held for questioning, or, where videotaping is impractical, to require the audio taping of the entirety of such custodial interrogations, and to provide appropriate remedies for non-compliance, and to appropriate funds to implement this legislation.

determine whether constitutional and other procedural protections were honored. Recording is also likely to discourage the police from treating suspects inappropriately and from using interrogation methods likely to lead to untrustworthy confessions. On the other hand, recording will provide strong evidence to counter false complaints of physical or psychological abuse.

For the above reasons, a growing number of jurisdictions across the country require the electronic recording of interrogations. At present, 12 states and the District of Columbia require that interrogations be electronically recorded. Eight of those jurisdictions require recording by statute: Illinois, Maine, Nevada, New Mexico, North Carolina, Texas, Wisconsin, and the District of Columbia.[137] Five states require recording by judicial decree: Alaska, Massachusetts, Minnesota, New Hampshire, and New Jersey.[138] These jurisdictions impose different sanctions for noncompliance. Five states impose the penalty of suppression for a willful failure to record (Alaska, Minnesota, and New Hampshire by judicial decree, Illinois and Texas by statute). Three states impose the penalty of an adverse jury instruction (Massachusetts by judicial decree, Nevada and Wisconsin by statute). Two states defer to the trial court to impose a penalty, either suppression or adverse inference (New Jersey by judicial decree, North Carolina by statute). Three jurisdictions do not impose any penalty (Maine, New Mexico, and the District of Columbia). Five states require recording for all crimes (Alaska, Massachusetts, Minnesota, New Hampshire, and Texas). Two states require recording for any felony (New Mexico and Wisconsin). Five jurisdictions require recording only for homicides and other serious felonies (Illinois, Maine, Nevada, New Jersey, North Carolina, and the District of Columbia).

The growing trend in New York State is one of voluntarily implementing recording programs.[139] New York does not currently require electronic recording by statute, but 26 of the

---

137 Illinois - 725 ILCS 5/103-2.1 (adults) and 705 ILCS 405/5-401.5 (juveniles); Maine 25 M.R.S. § 2803-B; Nevada Leg. Bill 179, 2008; New Mexico Chapter 252 of 2005; North Carolina Art. 8, § 15A-211 N.C. Gen Statute; Texas Crim. Proc. Article 38.22; Wisconsin Wis. Stat. § 968.073 (adults) and Wis. Stat. § 938.195 (juveniles); District of Columbia D.C. Code § 5116.01.

138 Alaska: *Stephan v. State*, 711 P.2d 1156 (1985); Massachusetts: *Commonwealth v. DiGiambattista*, 813 N.E. 2d 516 (2004); Minnesota: *State v. Scales*, 518 N.W.2d 587 (1994); New Hampshire: *State v. Barnett*, 789 A.2d 629 (2002); New Jersey: N.J. Court Rule 3:17.

139 New York Prosecutors Training Institute, *Recording Interrogations in New York: Past, Present and Future*, July 25, 2008, pp. 1518.

62 counties in the state have voluntarily adopted some form of recording. The New York State Bar Association currently is monitoring pilot electronic recording programs in four counties (Broome, Greene, Schenectady and Westchester) through a grant of state-appropriated funding.

The trend toward recording interrogations is largely attributable to the willingness of prosecutors and police to embrace recording as a desirable goal. Indeed, prosecutors and police favor recording because recordings are powerful evidence of guilt to place before a jury. In fact, in this day of easy recording, juries will often ask why a confession was not electronically recorded. Thus, law enforcement appears to support a shift to electronic recording.

But even if all agree that confessions should be electronically recorded, there are ultimate issues about how to encourage and implement recording programs. Many in the law enforcement community fear that a law mandating immediate recording throughout the state is a "one-size-fits-all" approach that will be logistically prohibitive and costly. Additionally, some are concerned that suppression, a remedy traditionally reserved for violations of constitutional or other important rights, is an inappropriate remedy for the failure to record. And the suppression of a wholly reliable, properly-obtained confession simply because it was not recorded may not properly serve the important concern of public safety.

Additionally, although electronic recording may be beneficial in identifying false concessions, it may not be possible to know exactly how effective it will be. Certainly, electronic recording does little to address voluntary false confessions, perhaps resulting from the suspect's mental illness or perverse desire for notoriety (for example, John Mark Karr who falsely confessed to the killing of Jon Benet Ramsey). As for those false confession cases that are the result of the use of coercive interrogation tactics, proponents of electronic recording assume that courts and juries will be able to judge the tactics used, the length of the interrogation, and the demeanor of the suspect and interrogator therefore evaluating the voluntariness and truthfulness of the confession. Some commentators have questioned this assumption.[140]

After considering these issues, the Task Force concludes that the electronic recording of the entirety of all custodial interrogations in felony-level investigations would help prevent and identify false confessions, and therefore should be required. Indeed, the Task Force believes

---

140 Kassin, Meissner, Norwick, *"I'd Know a False Confession if I Saw One": A Comparative Study of College Students and Police Investigators, Law and Human Behavior*, Vol. 29, No. 2, April 2005.

that electronic recording of custodial interrogations in all criminal investigations should be pursued as an aspirational goal. Jurisdictions in New York and across the country that have implemented recording programs have reported that the experience is positive. At the same time, the Task Force recognizes that there are significant costs involving equipment, installation, maintenance, training, copying, storage, record-keeping, transcription and translation. Encouraging voluntary pilot programs will allow those involved to explore the variables unique to different regions that impact the cost, feasibility and best practices for the particular jurisdiction. By identifying potential obstacles up front, all will be in a better position to develop protocols and practices that effectively meet the special needs of individual counties as well as those that best guard the rights of those interrogated. We recommend that the New York State Bar Association urge the Legislature to continue funding pilot programs.

### 2. Specific Training About False Confessions Should be Given to Police, Prosecutors, Judges and Defense Attorneys.

It is clear that specialized training is necessary to educate those who work in the criminal justice system about the realities of false confessions. The problem simply cannot be addressed until all participants appreciate that false confessions do occur. With this appreciation, each participant must then understand what he or she can do to help prevent false confessions, or to expose them if they do occur.

Police should be educated about the dangers of false confessions. They should be trained to use appropriate interviewing skills to elicit truthful statements from suspects. The goal of their interrogation techniques should shift from eliciting confessions to eliciting truthful confessions. Their training should incorporate the most recent social science research on the topic. The training should inform police about the techniques associated with an increased risk of eliciting false confessions, such as the use of deception or fabricated claims of incriminating evidence.[141] Special training also should be developed to educate police on the particular vulnerability of juveniles, the mentally disabled and the mentally ill.

Of course, the responsibility to address the problem of false confessions does not rest with the police alone. Therefore, the other participants in the criminal justice system also should

---

141 Sol M. Kassin, *On the Psychology of Confessions: Does Innocence Put Innocents at Risk*, Am. Psychologist 60 215 (2005).

be trained. Once police have elicited a confession from a suspect, the decision whether to charge the suspect rests with the prosecution. As a preliminary matter, the prosecutors must reach a determination whether the confession is trustworthy. Prosecutors need to approach this decision with an awareness that false confessions do occur, and an understanding of the factors that are more likely to result in a false confession.

Defense attorneys also should be fully informed on the issues involving false confessions. Without this knowledge, a defense attorney may be reluctant to consider the possibility that a client's confession was false and that the client is innocent. Such an attorney may fail to challenge the admissibility of the confession aggressively enough or may urge the client to accept a seemingly favorable plea. Defense attorneys also should be familiar with the latest research on the psychology of false confessions, and they should learn the most effective means to present that information to the fact-finder and court.[142] Defense attorneys should be trained in the means to elicit testimony from the police, the client and possibly expert witnesses to convey the process by which a false confession could have occurred.

Finally, judges should also be informed about the reality of false confessions and the factors that can contribute to them to better inform the decisions they must make about the admissibility of the confession and challenges that may be brought by the defense. Judicial training should specifically include information relevant to a court's decision whether to allow expert testimony on issues relating to false confessions in appropriate cases. In light of the lessons of wrongful conviction cases, there may be more reason for courts to be open to expert testimony on false confessions. And regardless of whether expert testimony is deemed admissible at trial, the defense may benefit from the assistance of an expert in challenging an alleged confession as false. Judges need to be educated about the availability of such expert assistance, so that applications from assigned counsel for court permission to hire such experts are properly considered.

All of the participants in the criminal justice system share the desire to prevent false confessions from leading to wrongful convictions. Both social science research and anecdotal evidence of wrongful convictions have demonstrated that false confessions do occur. Those who work within the system should be trained in this reality. They must learn the best methods to

142 Wisconsin Criminal Justice Study Commission, Position Paper on False Confessions.

prevent false confessions and to identify those that do occur, so that they will not contribute to wrongful convictions in the future.

### 3. Further Study Should be Undertaken on the Impact of the Phenomenon of False Confessions on a Defendant's Willingness to Plead Guilty.

Confessions and the circumstances under which they are obtained, are likely to have an impact on the entry of guilty pleas. The social science research reviewed by the Task Force suggests that some people, subjected to particular forms of interrogation, will not only falsely confess, they actually will come to believe that they are guilty.[143] Once charged, these people may feel morally compelled to plead guilty. Those who know their confession was false may nevertheless conclude reasonably that they have little chance of success against charges. In short, the existence of a confession places extreme pressure on a defendant to plead guilty. In light of what the Task Force has learned about the reality of false confessions, the Task Force believes that further study of this pressure is warranted. Therefore, the Task Force recommends that a qualified panel study this problem and make additional recommendations regarding what procedures are needed prior to an indictment, while a plea offer is pending, to provide the defense of any recording of the custodial interrogation and information about the circumstances under which it was conducted.

---

143 *See, e.g.*, Sol M. Kassin and Katherine L. Kiechel, *The Social Psychology of False Confessions: Compliance, Internalization, and Confabulation*, 7 Psychol. Sci. 125 (1996).

# Jailhouse Informants

SUBCOMMITTEE REPORT AND FINAL PROPOSALS

## Introduction

A large percentage of cases in which wrongful convictions have been documented involve testimony from informants who are themselves in-custody or facing criminal prosecution or otherwise receiving incentives such as financial payments for their testimony. According to Northwestern University Law School Center on Wrongful Convictions, 45.9% of documented wrongful capital convictions have involved false informant testimony, making jailhouse informants a leading component of wrongful convictions in capital cases in this country. Most studies have found that nearly 50% of wrongful murder convictions involve perjury by someone such as a "jailhouse snitch" or a witness who stood to gain from giving false testimony. Given this background, this Subcommittee was asked to recommend procedures to improve the reliability of informant testimony used in criminal prosecutions.

At the outset, it is important to recognize that there are a wide variety of informants who may provide information to law enforcement. Every witness to a crime is in effect an informant whose motives may be pure or suspect. When law enforcement officials speak about informant testimony they are generally referring either to a participant in a crime who is willing to implicate others in return for a favorable disposition of the charges relating to his or her participation, or to an individual who was not a participant in the crime in question but who asserts that he or she has been told about the crime by one of the participants and who is willing to testify about those conversations in exchange for some benefit, usually a favorable disposition with respect to unrelated charges pending against the informant. For the purposes of this report, when we speak of informant testimony, we are talking about the latter case - someone, not an accomplice, who seeks to provide information in order to obtain a favorable disposition of pending charges or some other benefit.

Our research disclosed certain well-known cases involving informants who receive substantial benefits for providing false testimony in cases where the defendant was later exonerated. For example, one individual named Essam Magid, was able not only to avoid jail for many crimes which the prosecuting attorneys knew he committed, but earned hundreds of thousands of dollars by serving as an informant, framing dozens of innocent people before one person he targeted finally refused to plead guilty and revealed the arrangement. Another, Leslie White, a prototypical jailhouse snitch, sent dozens of suspects to prison by fabricating confessions and evidence reducing his own sentences by years.

The Subcommittee recognizes that there is a delicate balance between law enforcement's legitimate need for informant testimony, particularly in murder cases where there may be no eyewitnesses to the crime, and safeguarding the rights of those who stand to be convicted on the basis of informant testimony.

In connection with our task, the Subcommittee reviewed numerous articles written on the subject, which included the report of the ABA Criminal Justice Section's *Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process*, the report and recommendations of the California Commission on the Fair Administration of Justice, certain reported cases and briefs including informant testimony: *Florida Bar v. Allen I. Karten* (11th Circuit) and *United States v. Singleton*, 165 F.3d 1297 (10th Cir. 1999), and *The Snitch System*, a study of convictions and case histories compiled by Northwestern University School of Law Center on Wrongful Convictions.

Subcommittee members spoke with and interviewed several prosecutors relating to the use of, and their practices regarding the use of, informant testimony.

## Proposals

After review of the materials, the Subcommittee was able to identify six areas where the use of informant testimony has been addressed and certain safeguards implemented in various states which the Subcommittee recommends adopting.

### 1. Any Informant's Testimony Should Be Corroborated

As we noted above, one type of individual who provides testimony in a criminal case is an accomplice who participated in the crime at issue. Section 60.22 of the New York Criminal Procedure Law provides:

> A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense.

The Subcommittee recommends that, at a minimum, the corroboration requirement for the use of accomplice testimony should be extended to non-accomplice informants. As with accomplice testimony the existence of corroboration should be a threshold question for the trial judge and explained to the jury in the court's charge. We would go further and recommend that the extent of corroboration should be considered by the prosecutor in determining the charges against the defendant. Additionally, given that the overwhelming majority of cases are disposed of through the plea-bargaining process rather than at trial, we recommend that corroboration be a threshold requirement that must be found satisfied by the judge and prosecutor in accepting a plea. Our recommendation is in accord with the ABA resolution which provides: "No prosecution should occur based solely upon jailhouse informant testimony."

### 2. Jury Instructions

Our research indicated that a jury instruction appears to be the most common manner in which Courts treat informant testimony. In addition to telling the jury that the informant's testimony must be corroborated, at the request of a party, the judge will instruct the jury in any case in which an informant testifies that the testimony should be viewed with caution and close scrutiny, and that the jury should consider the extent to which that testimony may have been influenced by the expectation of any benefit or remuneration or promised favorable treatment in

connection with a pending criminal prosecution. A great variety of jury instructions appears to exist in differing states.[144]

The Subcommittee believes that the jury should be instructed to take into account several factors indicating the extent to which the testimony is credible, including: (i) any explicit or implied inducements that the informant may have received or will receive; (ii) the prior criminal history of the informant; (iii) evidence that he or she is a "career informant" who has testified in other criminal cases; and (iv) any other factors that might tend to render the witnesses' testimony unreliable.

### 3. A Pre-Trial Reliability Hearing

There has been recognition that often discovery, cross-examination, and even jury instructions do not guaranty a protection of the individual who is facing informant testimony in connection with a criminal trial. The Subcommittee recommends that the Court act as a preliminary "gatekeeper" much in the sense of the civil *Daubert v. Merrill* line of cases in which the Court engages in a reliability hearing with respect to testimony of expert witnesses. Where informant testimony is proffered, the Court would evaluate the reliability of the informant's testimony before he or she is permitted to testify at trial. This would permit fuller disclosure of any promises made to the informant by the government, permit more thorough testing of the veracity of the informants' testimony and reduce the opportunities for abuse.

Illinois is one state which has enacted a statute that provides a potential blueprint for the type of reliability inquiry that a trial court should conduct in evaluating informant testimony. The statute places the burden on the government to prove the reliability by a preponderance of the evidence and requires the Court to consider factors including (a) the criminal history of the informant; (b) any deals, promises, or inducements which may have been made; (c) statements made by the accused; (d) the time and place of the statements and how disclosure to law enforcement officials was made; (e) whether the informant recanted that testimony or statement

---

144 The ABA Report points out that in Virginia, in the absence of corroboration, it is the duty of the Court to issue a cautionary instruction; in Mississippi, it is in the Court's discretion to issue a cautionary instruction but an abuse of discretion may be found when the state's evidence rests solely on accomplice testimony and there is a question as to the reasonableness and consistency of that testimony. In Utah, although it is within the discretion of judge whether to give a cautionary instruction, if the judge finds the testimony "contradictory, uncertain or improbable" the cautionary instruction becomes mandatory.

and if so, where and when the recantation took place; (f) other cases in which the informant testified; and (g) a catch-all factor to include any other relevant information relating to the informant's credibility.

These considerations permit the Court to examine all manner of the informant's testimony relating to its reliability, whether pre-plea or pre-trial, and to exclude testimony found to be unreliable.

### 4. Plea Bargains

Since the overwhelming majority of cases are disposed of by plea rather than by trial, the Subcommittee also focused on the risk that wrongful convictions based upon false informant testimony might occur through plea bargaining and thus be both less likely to be identified and remedied and more difficult to prevent. There is an inherent tension between the ability of a defendant to receive a reduced sentence by taking a plea early on in the development of a case, and the need to prevent wrongful convictions based upon false informant testimony that would not normally be revealed until later in pre-trial discovery or during trial.

The plea bargain process will often provide a strong inducement for a defendant to plead guilty. Even an innocent individual may decide to plead guilty when faced with a plea offer that substantially diminishes or even eliminates the prison term he or she would serve if convicted. A defense lawyer, who is told by a prosecutor that there is a witness who will testify that the defendant admitted committing the crime, may be skeptical of the client's protestations of innocence and strongly recommend that the client plead to a substantially reduced charge.

Given these concerns, it seems desirable that a defendant, who is offered a plea bargain, be given all the relevant information about any informant in the case before being required to accept the plea. We recognize, however, that there may be legitimate reasons why a prosecutor would be willing to offer a defendant a favorable plea disposition in order to avoid the disclosure of the informant's role in the case that our other recommendations would require, i.e. the informant is currently participating in an undercover investigation which would have to be terminated if the identity of the informant were disclosed. Where the prosecutor presents the judge with such circumstance, and the judge finds the need to protect the identity of the informant compelling, we recommend that the judge conduct an in camera review of the information relating to the informant's credibility, as detailed elsewhere in these

recommendations, and provide defendant with all such information as may be provided without disclosing the informant's identity. In order to balance these interests we recommend that when taking a plea in any case in which the prosecution would be required to provide the defendant with information about an informant, the judge should be required to find that the defendant is aware that if he were to proceed to trial he would have the right to obtain information about any informant whom the prosecution would call at the trial, and to cross-examine any such informant and that the defendant is knowingly waiving that right in order to obtain the agreed upon disposition.

### 5. Videotaping, If Possible, of the Informant's Statements Relating to the Accused.

We are mindful that recommendations relating to the videotaping of confessions have been made by the New York State Bar Association. The Subcommittee believes that videotaping, if possible, should also be made of any informant's statement given to any law enforcement agent or prosecutor. This would be an additional safeguard added to the reliability of the testimony and would be useful to the judge in the "gatekeeper" hearing in advance of determining the admissibility of the informant testimony in both the pre-trial or pre-plea disclosure which we are recommending.

### 6. Prosecutor's Best Practices

The Subcommittee also recommends as a "best practice" that the prosecution itself check on the reliability of the informant's testimony and that a "checklist" of factors that prosecutors should review be provided to them. These would include assessing:

(i) the extent to which the statement is corroborated;

(ii) the specificity of the alleged statement;

(iii) the extent to which the statement contains details of evidence known only to the perpetrator;

(iv) the extent to which the statement contains details which could reasonably be assessed by the in-custody informer, other than through inculpatory statements by the accused;

(v) the informer's general character;

(vi) any request the informer has made for benefits or special treatment;

(vii) whether the informer has, in the past, given reliable information to the authorities;

(viii) whether the informer has previously provided information which was shown to be unreliable;

(ix) whether the informer has previously testified in any court proceeding;

(x) whether the informer made some written or other record of the words spoken by the accused;

(xi) circumstances under which the informer's report of the alleged statement was taken;

(xii) the manner in which the report of the statement was taken by the police (written, interview, investigation of circumstances, etc.);

(xiii) any other known evidence that may attest to or diminish the credibility of the informer; and

(xiv) any relevant information contained in any available registry of informers.

These recommendations relating to prosecution screening appeared in the report of the ABA Criminal Justice Section's Ad Hoc Innocence Committee to Insure the Integrity of the Criminal Process, and the Subcommittee believes that its recommendation should be adopted as part of the best practices to be adopted by government agencies and prosecutors.

# Defense Practices

## SUBCOMMITTEE REPORT AND FINAL PROPOSALS

### The Nature of the Problem

The subcommittee reviewed 16 cases in which one of the factors identified by the reporter as leading to the wrongful conviction was the inadequate representation afforded the defendant by his attorney. Counsel's failures in these cases fall into two principal categories: inadequate pretrial investigation and preparation, and incompetence in the conduct of the trial.

### Sixteen Case Studies

The cases in which there was inadequate pretrial investigation and preparation consisted of the following shortcomings:

(1) a failure to examine or have analyzed the physical evidence (*People v. Newton*, *People v. Burt*);

(2) a failure to investigate defendant's alibi or other exculpatory evidence (*People v. Rojas, People v. Garcia, People v. Stewart, People v. Coakley, People v. Ramos, People v. Carter, People v. Tyson, People v. Warney, People v. Martinez, People v. Deskovic, People v. Faison & Shepard*);

(3) a failure to maintain meaningful contact with the client (*Rojas, Burt, Warney*);

The cases in which there was ineffective representation at trial consisted of

(1) a lack of attentiveness to the facts of the case (*People v. Newton, People v. Rojas, People v. Warney, People v. Martinez*); and

(2) a failure to utilize available evidence that would have cast doubt on the defendant's guilt (*People v. Rojas, People v. Garcia, People v. Burt, People v. Stewart, People v. Ramos*).

In all but two of the cases examined, counsel was either retained or assigned pursuant Article 18-b of the County Law (*Deskovic* and *Warney*).

## The Kaye Commission

The structural defects in the delivery of indigent defense services in the State of New York have been most recently documented in the Final Report to the Chief Judge of New York by the Commission on the Future of Indigent Defense Services ("the Kaye Commission"), submitted to Chief Judge Kaye in June 2006. The representational deficiencies in the cases studied herein transcend structural defects. They predominate, not where large public defender agencies are involved, but with sole or very small firm practitioners. There is an existing issue in New York as to whether there is, in fact, any type of quality control as to the qualifications and performance of non-public defender assigned counsel. There is ample basis for concluding that current assigned counsel plans do not have such controls in place: this may be due both to a lack of due diligence by assigned counsel administrators in the initial appointment of private attorneys or in the lack of assessment in performance of assigned counsel with regard to retention on an 18-b panel.

Even if the current assigned counsel plans throughout the state appointed qualified counsel or purged incompetent counsel, there exists no mechanism for ensuring that retained counsel will provide quality representation, and there also appears to be a lack of support and resources within these plans, both in terms of legal oversight and consultation as well as investigative and case preparation services.

## A Failure of Individual Attorneys

Insofar as the deficiencies in the cases examined emanated from the representation afforded by both assigned and retained counsel, they are primarily found in the failure of individual attorneys to comprehend and implement the essential requirements for quality representation in the defense of a criminal defendant. Consequently, the following recommendations are grounded in the necessity to ensure that all attorneys who undertake the defense of a person charged with a crime adhere to a well-defined and undisputed protocol for such representation.

## Recommendations

A. Standards

There already exists an abundance of standards that are applicable to defense counsel's obligations when undertaking the defense of a criminal case. One can begin with the basic requirements of the Code of Professional Responsibility, and proceed to the American Bar Association's Standards for the Defense Function, the New York State Bar Association's Standards for the Provision of Mandated Representation, and the National Legal Aid and Defender Association's Performance Guidelines for Criminal Defense Representation.

In light of this heavily traveled ground, there is no reason to create an entirely new set of standards. Thus, we endorse the following recommendations made by the American Bar Association's Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process:

- That governing bodies ensure that defense counsel have adequate resources and training to fulfill their obligation to conduct thorough and independent investigation into their clients' guilt or innocence in every case, including heightened scrutiny into cases that rely on eye-witness identification, witnesses who receive any benefit in return for their testimony, and confession by youthful or mentally limited defendants;

- Require defense counsel to investigate circumstances indicating innocence regardless of the client's admissions or statements of facts constituting guilt or the client's stated desire to plead guilty or dispose of the case without trial;

- Require that defense counsel cooperate fully with successor counsel, including the preservation and transfer of all pertinent records and information;

- Require defense counsel in all cases, whether or not serious criminal cases, to meet the requirements enumerated in the ABA Standards for Criminal Justice Providing Defense Services.

Report of the ABA Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process: ACHIEVING JUSTICE: FREEING THE INNOCENT, CONVICTING THE GUILTY 79, 80 (2006).

We also endorse Guideline 4.1 of The National Legal Aid and Defender Association's Performance Guidelines for Criminal Defense Representation which specifies that:

(a) Counsel has a duty to conduct an independent investigation regardless of the accused's admissions or statements to the lawyer of facts constituting guilt. The Investigation should be conducted as promptly as possible.

(b) Sources of investigative information may include the following:

(1) Charging documents

Copies of all charging documents in the case should be obtained and examined to determine the specific charges that have been brought against the accused. The relevant statutes and precedents should be examined to identify:

(A) the elements of the offenses(s) with which the accused is charged;

(B) the defenses, ordinary and affirmative, that may be available;

(C) any defects in the charging documents, constitutional or otherwise, such as statute of limitations or double jeopardy.

(2) the accused

If not previously conducted, an in-depth interview of the client should be conducted as soon as possible and appropriate after appointment or retention of counsel. The interview with the client should be used to:

(A) seek information concerning the incident or events giving rise to the charge(s) or improper police investigative practices or prosecutorial conduct which affects the client's rights;

(B) explore the existence of other potential sources of information relating to the offense;

* * *

(3) potential witnesses

Counsel should consider whether to interview the potential witnesses, including any complaining witnesses and others adverse to the accused. If the attorney conducts such interviews of potential witnesses, he or she should attempt to do so in the presence of a third person who will be available, if necessary, to testify as a defense witness at trial. Alternatively, counsel should have an investigator conduct such interviews.

(4) the police and prosecution

Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports. Where necessary, counsel should pursue such efforts through formal and informal discovery unless a sound tactical reason exists for not doing so.

(5) physical evidence

Where appropriate, counsel should make a prompt request to the police or investigative agency for any physical evidence or expert reports relevant to the offense or sentencing.

(6) the scene

Where appropriate, counsel should attempt to view the scene of the alleged offense. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g. weather, time of day, and lighting conditions).

(7) expert assistance

Counsel should secure the assistance of experts where it is necessary or appropriate to:

(A) the preparation of the defense;

(B) adequate understanding of the prosecution's case;

(C) rebut the prosecution's case.

National Legal Aid and Defender Association, *Performance Guidelines for Criminal Defense Representation*, 54, 55 (1994).

B. Action Proposals

To ensure that the above standards become an active part of our effort to interdict representation that puts innocent men and women at risk in a criminal prosecution, we make the following additional recommendations:

1. The Task Force should generally endorse the specific recommendations made by the American Bar Association's Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process and Guideline 4.1 of The National Legal Aid and Defender Association's Performance Guidelines for Criminal Defense Representation.

2. Those standards should be widely publicized by the New York State Bar Association and distributed extensively to the criminal defense bar through the heads of all defender agencies, the administrators of all assigned counsel plans, and by malpractice insurance providers to those attorneys whom they insure.

3. The administrators of assigned counsel plans must scrutinize more carefully the qualifications of attorneys seeking appointment under the plan to represent indigent defendants.

4. The administrators of assigned counsel plans should be provided with adequate resources to be allocated for staff to enable those plans to increase their ability to monitor the performance of attorneys assigned under the plan, and, if possible, to develop within the plan a structure which offers supervision and legal consultation to plan attorneys.

5. Bar associations should solicit experienced members of the criminal defense bar to make themselves available on a designated telephone hotline or in a specific office to fellow attorneys who seek advice and counsel with regard to their representation of a criminal defendant and bar associations should give formal recognition in some fashion to attorneys who provide such mentoring.

6. The rules governing CLE credits should be amended to provide that attorneys who undertake the defense of criminal cases must certify that in each calendar year that they have taken a specified number of CLE hours devoted to subjects pertaining to the representation of criminal defendants.

7. Organizations which currently operate a resource center for public defenders and assigned counsel should be given additional resources that would enable them to increase their ability to provide guidance and counsel to any attorney, assigned or retained, who seeks assistance.

8. The Task Force endorses the recommendations of the Report of the Commission on the Future of Indigent Services, June 2006, specifically including the recommendation of an Independent Public Defense Commission to oversee the quality and delivery of public defense services.

# Compensation for the Wrongfully Convicted

SUBCOMMITTEE REPORT AND FINAL PROPOSALS

## Introduction

Twenty-five states, Washington, DC and the federal government have enacted provisions to compensate the wrongfully convicted and imprisoned. New York currently allows claims for unjust conviction and imprisonment to be brought against the state in the Court of Claims under the *Court of Claims Act § 8-b*. Any individual who has been convicted and subsequently imprisoned for one or more felonies or misdemeanors which he or she did not commit may present a claim for damages against the state.

Public policy must strive to strike a balance between properly compensating those individuals who suffer the horror of being imprisoned even though they are factually innocent with the ability of law enforcement to discharge its responsibilities without fear of facing fiscal sanction for every misstep. Unlike in civil law where there is redress for negligent acts, the process for compensating innocent individuals who have been wrongfully convicted should not be turned into the equivalent of providing monetary compensation for any error of law enforcement, but should provide compensation for egregious acts. With this in mind, the Subcommittee on Compensation for the Wrongfully Convicted: (A) makes the following comments regarding the Court of Claims Act § 8-b; and (B) makes additional recommendations.

Following the recommendations, the Subcommittee provides an overview of how other states, Washington, DC, and the federal government have approached the issue of compensation for the wrongfully convicted and imprisoned.

**A. Commentary on the Court of Claims Act § 8-b:**

Eligibility (*Court of Claims Act § 8-b subdivision 2*)

The *Court of Claims Act § 8-b subdivision 2* provides that "[a]ny person convicted and subsequently imprisoned for one or more felonies or misdemeanors against the state which he did not commit may…present a claim for damages against the state."

**Recommendation**: This broad definition of eligibility should remain unchanged to offer the opportunity for legal redress to all individuals who have been imprisoned and subsequently found innocent.

Disqualifications (*Court of Claims Act § 8-b subdivision 5*)

The *Court of Claims Act § 8-b subdivision 5* requires the claimant to prove by clear and convincing evidence that:

> "…(c) he did not commit any of the acts charged in the accusatory instrument or his acts or omissions charged in the accusatory instrument did not constitute a felony or misdemeanor against the state; and
>
> (d) he did not by his own conduct cause or bring about his conviction."

Under provision (c) the claimant must prove that he or she has been exonerated on every charge initially brought in the accusatory instrument, regardless of whether or not a charged offense was dismissed prior to submission to the fact-finder.

**Recommendation**: This provision should be amended to require that the claimant only prove that he or she has been exonerated on every charge submitted to the fact-finder.

In addition, under provision (d) any individual who has by his or her own conduct caused or brought about their conviction is disqualified from seeking redress. This section precludes any individual who pled guilty, failed to present evidence due to the negligence of his or her attorney or made a confession that was coerced from seeking compensation. The New York State Bar Association Task Force on Wrongful Conviction found negligent defense practices in 34% of cases reviewed and false confessions in 23% of the cases reviewed.

**Recommendation**: Contributing to the conviction in cases of attorney negligence or coerced confession should not be a factor in determining appropriate compensation. This provision should be amended. Entering a plea of guilty should not automatically deter an innocent individual from seeking compensation, if the claimant is able to prove the plea was entered due to negligence on the part of his or her attorney or was entered under duress. A finding of duress, however, shall not attach if the plea was entered in an effort to mitigate the risk of a longer sentence being imposed should the defendant choose to go to trial.

Compensation (*Court of Claims Act § 8-b subdivision 6*)

The *Court of Claims Act § 8-b subdivision 6* does not set a minimum or maximum amount of compensation to be provided. It states that the court "shall award damages in such sum of money as the court determines will fairly and reasonably compensate him." Of cases that have been decided or settled, the compensation provided to wrongfully convicted individuals is disparate. In a decided case a claimant was awarded the total sum of $500,000 for non-pecuniary losses, plus $30,658.43 for past lost wages. Claimants in cases that have been settled have received up to $3.5 million.

**Recommendation**: A fixed minimum guaranteed amount per year of incarceration should be set with the option to seek more, upon satisfying the requirements outlined in the Court of Claims Act § 8-b. If the claimant opts to seek additional compensation he or she forfeits the guaranteed amount.

**Recommendation**: Many state statutes include a provision prohibiting the state from offsetting the total compensation awarded by any expenses incurred related to securing or maintaining the claimant's custody or to feed, clothe or provide medical services for the claimant, it is our recommendation that such a provision be included in the New York State statute.

Filing Term (*Court of Claims Act § 8-b subdivision 7*)

The *Court of Claims Act § 8-b subdivision 7* requires claims to be filed within two years after the pardon or dismissal of an accusatory instrument. The majority of states which stipulate a filing term for claims against the state to seek damages for wrongful conviction and imprisonment require the claim to be filed within two years of the individual's exoneration.

**Recommendation**: This provision should remain unchanged.

**B. Additional Recommendations**:

The Subcommittee on Compensation for the Wrongfully Convicted recommends the following additions to the Court of Claims Act § 8-b:

Supplemental Awards

Innocent persons are often released from prison with no assistance. Ironically, this directly contrasts with convicted felons who receive a broad panoply of support services.

**Recommendation**: Based on need, the immediate provision of subsistence funds and access to services to assist in reentry should be provided to all individuals who have been released from prison after receiving a pardon on the grounds of innocence. Such services should include assistance in acquiring affordable housing, job training, education, health care, and child custody assistance. Innocent persons should at a minimum receive the same post-release services as a felon.

Disqualifications

**Recommendation**: The claimant should not be eligible for compensation for any term of incarceration that was attributable to a separate and lawful conviction resulting in a concurrent term of imprisonment.

Beneficiary Provisions

**Recommendation**: State law should specify that upon the death of a wrongfully imprisoned individual, any compensation awarded will be paid to his or her estate.

Records Expungement

**Recommendation**: The state should automatically order the expungement of all criminal records related to the wrongful arrest, conviction and sentence at the expense of the state upon exoneration. Such records shall only be available to a claimant and the State in an unjust conviction and imprisonment claim upon application to the court.

**Legislative Provisions for the Compensation of the Wrongfully Convicted and Incarcerated**

Twenty-five states, Washington, DC and the Federal Government have enacted provisions to compensate the wrongfully convicted and imprisoned.

Statutes include the following components:

- Eligibility requirements
  - Any person who has been wrongfully convicted of a felony and imprisoned
  - Any person convicted and imprisoned found to be innocent through DNA analysis
  - Persons imprisoned who receive a pardon from the governor on the ground of innocence of the crime
- Amount of monetary compensation per year or day of wrongful incarceration (minimum amount, maximum amount, period of payment)
  - $50 per day (IA, MO)
  - $50,000 per year (FL)
  - Not to exceed $300,000 per year (ME)
  - Maximum of $2 million including costs of supplemental awards (FL)
  - Sum of money the court determines will fairly and reasonably compensate him (NY, WV)
  - 90 percent of the state per capita personal income per year (VA)
  - Twice the amount of the claimant's income in the year prior to his incarceration (NJ)
  - Increased compensation if sentenced to death (US, TX)
  - Only educational aid (MT)
  - Provided up to 20 years (VA)

- How compensation is distributed
  - Lump sum or installments
  - Initial sum then installments
  - TN: "equal monthly installments calculated by dividing the non-commuted amount by the estimated number of months the claimant will live based on the claimant's life expectancy"
- Available term after release to file for compensation
  - Within 6 months (CA)
  - Within 5 years (NC)
  - Majority of states requiring filing within 2 years of exoneration
- Jurisdiction for determining innocence and appropriate compensation
  - Claims Court (IL, NY, US)
  - State Board of Control (CA)
  - Board of Public Works (MD)
  - District Court (IA, LA, UT)
  - Superior Court (ME, MA, NJ)
  - Sentencing Court (MO)
  - Department of Legal Affairs (FL)
  - Comptroller (TX)
  - Industrial Commission (NC)
  - Court of Common Pleas (OH)
  - Board of Claims (TN, WI)
  - Committee on Compensation for Wrongful Incarceration (AL)

- Burden of proof that must be met to receive compensation
  - Preponderance of Evidence
  - Clear and Convincing Evidence
- Disqualifications
  - Person contributed to the bringing about of his arrest or conviction for the crime with which he was charged
  - Non-DNA exonerations
  - Subsequent felony conviction
  - Entered a guilty plea
  - Serving a concurrent sentence for an unrelated offense
- Supplemental awards
  - Tuition and fees
  - Medical or counseling services
  - Job or skill training
  - Compensation for child support payments
  - Attorney's fees
- Tax
  - Provision to exclude compensation from state income tax
- Records expungement provisions
  - Automatic order to expunge criminal records at expense of the state

- Allocation of state funds for compensation dollars
  - Legislature appropriations (AL, CA, TX)
  - Innocence Compensation Fund (LA)
  - General Emergency Fund (MD, NC)
  - Crime Victim Reparations Fund (UT)
- Eligibility for further civil redress
  - Provision to prohibit the wrongfully imprisoned individual from seeking further civil redress from the state or its employees and agencies
- Prohibition of offsetting reward for expenses incurred by the state
  - Provision to prohibit the state from offsetting the total compensation by any expenses incurred related to securing or maintaining the claimant's custody or to feed, clothe or provide medical services for the claimant
- Beneficiary provisions
  - Upon death of the wrongfully imprisoned individual compensation will cease or will be paid to surviving spouse and/or minor children
- Other issues to consider
  - Further supplemental awards
    - Family reunification assistance
    - Housing assistance
    - Benefits assistance – proof of identity, public assistance
  - Many reentry service providers are bound by contracts that restrict clientele to those who have been convicted, excluding exonerees from services

- Proffer a guaranteed minimum amount of compensation with the option to sue for more. If the claimant opts to sue for additional compensation he or she forfeits the guaranteed compensation.

- The wrongfully convicted individual shall receive the same post-release services as a released felon is provided

• Compensation Provided in NY

- Victor Ortiz

  ‣ Awarded the total sum of $500,000 for non-pecuniary losses, plus $30,658.43 for past lost wages

- Most cases have been denied due to the inability to meet the burden of proof (clear and convincing evidence) or the "contribution" clause

- Settlements

  ‣ Shih-Wei Su: $3.5 million – served 12 years of 16 to 50 year sentence for ordering a gang member to shoot a rival gang member, case was overturned by US Court of Appeals (Queens)

  ‣ Vincent Jenkins: $2 million – served 17 years for rape, exonerated by DNA (Buffalo)

  ‣ Anthony Faison and Charles Shepherd: $1.65 million each – served 14 years for shooting death of a cab driver, hired investigator found the actual perpetrator who later confessed and pleaded guilty (Kings)

• Lawyer Interviews (*the following comments were provided by attorneys who have represented claimants in Unjust Conviction and Imprisonment Act claims. Representatives from the Attorney General's Office have been contacted and the Subcommittee is awaiting their comments*)

- Should previous convictions be considered in compensation

  ‣ Liability vs. damages issue – potential to bifurcate decisions

- Remove jurisdiction from Court of Claims because judges are appointed and have an interest in protecting the state. Compensation cases should be decided by a jury.
- Reform NYPD policies regarding destruction of evidence
  - 21 cases where NYPD has lost evidence
  - Set guidelines to control how long evidence is maintained
- The burden of proof is too high and unfair in some cases. Claimants should not have to prove they did nothing at all to contribute to their conviction if there was police or prosecutorial misconduct involved.
- Create a sliding scale of burden of proof in which the more there is misconduct by police or prosecution a lesser burden of proof be required by the claimant.
- Certain rules of evidence should be eliminated in Unjust Conviction and Incarceration claims. Hearsay and police reports should come in as the events generally took place so long ago that it is difficult to find witnesses or if memory of events is not always good.
- The common theme is that the procedural requirements of the statute are quite difficult to navigate and cause many litigants to be denied relief. The requirement that the claimant establish factual innocence is quite a high hurdle. It is difficult to establish unless the underlying case had such a concession at the time of dismissal (such as where the prosecution confirmed that the client was innocent).
- The lawyers also felt that the Court of Claims sometimes interpreted the exclusion that the claimant did not contribute to or bring about his own conviction in a very restrictive manner. This may be utilized to dismiss cases involving false confessions.

National Survey Comparison of the Minimum and Maximum Compensation Offered to the Wrongfully Convicted and Imprisoned

| State | Compensation per term of incarceration | Maximum Compensation |
|---|---|---|
| **Alabama** | Minimum of $50,000 per year | No maximum; the Committee may recommend supplemental compensation to the Legislature in bill form |
| **California** | | Maximum of $100 per day |
| **Connecticut** | Discretion of the Claims Commissioner | |
| **Florida** | $50,000 per year | $2 million total including supplemental awards |
| **Illinois** | | For imprisonment of 5 years or less: not more than $15,000; for imprisonment 5-14 years: not more than $30,000; for imprisonment of over 14 years: not more than $35,000 - with a cost-of living adjusted increase for every year since 1945 |
| **Iowa** | $50 per day | |
| **Louisiana** | $15,000 per year | $150,000 |
| **Maine** | | $300,000 |
| **Maryland** | A reasonable amount for any financial or other appropriate counseling for the individual | |
| **Massachusetts** | | $500,000 |

| State | Compensation per term of incarceration | Maximum Compensation |
|---|---|---|
| **Missouri** | $50 per day for post-conviction incarceration | $36,500 per year |
| **Montana** | No monetary compensation; Education aid only | |
| **New Hampshire** | | $20,000 |
| **New Jersey** | | Shall not exceed twice the amount of the claimant's income in the year prior to his incarceration or $20,000 for each year of incarceration, whichever is greater |
| **New York** | Sum of money as the court determines will fairly and reasonably compensate him | |
| **North Carolina** | $20,000 per year | $500,000 |
| **Ohio** | $40,300 per year, or the adjusted amount determined by the auditor of state | |
| **Oklahoma** | | $175,000 |
| **Tennessee** | | $1,000,000 |
| **Texas** | $50,000 per year;<br>If sentenced to death $100,00 per year | $500,000 excluding child support payments and interest on child support arrearages |

| State | Compensation per term of incarceration | Maximum Compensation |
|---|---|---|
| **Utah** | The monetary equivalent of the average annual nonagricultural payroll in Utah at time of release per year | Compensation provided for a maximum of 15 years of incarceration |
| **Vermont** | Minimum of $30,000 per year | Maximum of $60,000 per year |
| **Virginia** | Amount equal to 90 percent of the Virginia per capita personal income as reported by the Bureau of Economic Analysis of the United States Department of Commerce for each year of incarceration | Compensation provided for up to 20 years of incarceration |
| **West Virginia** | Sum of money as the court determines will fairly and reasonably compensate him | |
| **Wisconsin** | | Not to exceed $25,000 and at a rate of compensation not greater than $5,000 per year of imprisonment |
| **Washington, DC** | No provision | No provision |

| State | Compensation per term of incarceration | Maximum Compensation |
|---|---|---|
| | | The amount of damages awarded shall not exceed $100,000 for each 12-month period of incarceration for any plaintiff who was unjustly sentenced to death and $50,000 for each 12-month period of incarceration for any other plaintiff. |

## National Survey of Wrongful Conviction and Imprisonment Provisions

**Alabama** (2001 Alabama Laws Act 2001-659)

| | |
|---|---|
| Eligibility | • Have been convicted by the State of one or more felony offenses, all of which the person was innocent, and have served time in prison as a result of the conviction(s).<br>• Have been incarcerated pretrial on a state felony charge, for at least two years through no fault of his or her own, before having charges dismissed based on innocence. |
| Where Filed | Division of Risk Management of the Department of Finance |
| Who Decides | Committee on Compensation for Wrongful Incarceration |
| Compensation per term of incarceration | Minimum of $50,000 per year |
| Maximum Compensation | No maximum; the Committee may recommend supplemental compensation to the Legislature in bill form. |
| Payment Form | Committee discretion: either lump sum or in installments |
| Filing Term After Exoneration | Within 2 years |

| | |
|---|---|
| Disqualifications | • A person serving a term of imprisonment for a crime other than a crime for which the person was wrongfully incarcerated.<br>• If the sentence for the crime of which the person was mistakenly convicted was served concurrently with sentence for the conviction of another crime.<br>• If convicted of any of the acts charged with in conjunction with the charge which resulted in the wrongful conviction or his or her acts or omissions constituted a felony or misdemeanor against the state.<br>• Individual shall not have been the subject of an act of the Legislature that authorized an award of compensation for his or her wrongful conviction.<br>• A person awarded compensation and subsequently convicted of a felony crime will not be eligible to receive any unpaid amounts from any compensation authorized. |
| Burden of Proof | Preponderance of evidence |
| Tax | No provision |
| Records of Expungement | No provision |
| Fund Allocations | Any available state funds or legislature appropriate distributed by the Comptroller |
| Definitions of Innocence | • The conviction vacated or reversed and the accusatory instrument dismissed on grounds of innocence; or<br>• The accusatory instrument dismissed on a ground consistent with innocence. |
| Upon Death | The person's estate is eligible to receive any remaining compensation |
| Civil Redress against state | No provision |

| | |
|---|---|
| Deduction of award for state expenses | Prohibited |

**California** (Penal Code Section 4900 - 4906)

| | |
|---|---|
| Eligibility | Any person who, having been convicted of any crime against the State amounting to a felony, and having been imprisoned therefore in a State prison granted a pardon by the Governor for the reason that the crime with which he was charged was either not committed at all or, if committed, was not committed by him, or who being innocent of the crime with which he was charged for either of the forgoing reasons, shall have served the term or any part thereof for which was imprisoned. |
| Where Filed | State Board of Control |
| Who Decides | Legislature |
| Compensation per term of incarceration | No provision |
| Maximum Compensation | Maximum of $100 per day |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 6 months |
| Disqualifications | By any act or omission on his part, either intentionally or negligently, contribute to the bringing about of his arrest or conviction for the crime with which he was charged. |
| Burden of Proof | Preponderance of evidence |
| Supplemental Awards | No provision |
| Tax | Not treated as gross income |
| Records Expungement | No provision |
| Fund Allocations | Legislature determines appropriations to be distributed by the Comptroller |

| | |
|---|---|
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Connecticut** (Public Act No. 08-143)

| | |
|---|---|
| Eligibility | • Such person has been convicted by this state of one or more crimes, of which the person was innocent, has been sentenced to a term of imprisonment for such crime or crimes and has served all or part of such sentence; and<br>• Such person's conviction was vacated or reversed and the complaint or information dismissed on grounds of innocence or the complaint or information dismissed on a ground consistent with innocence. |
| Where Filed | Claims Commissioner |
| Who Decides | Claims Commissioner |
| Compensation per term of incarceration | Discretion of the Claims Commissioner |
| Maximum Compensation | No provision |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 2 years |
| Disqualifications | No provision |
| Burden of Proof | Preponderance of evidence |

| | |
|---|---|
| Supplemental Awards | Payment for the expenses of employment training and counseling, tuition and fees at any constituent unit of the state system of higher education and any other services such person's reintegration into the community. |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | Permitted |
| Deduction of award for state expenses incurred | No provision |

**Florida** (Laws of Florida Chapter 2008-39)

| | |
|---|---|
| Eligibility | A person whose felony conviction and sentence have been vacated by a court of competent jurisdiction and the original sentencing court has issued its order finding that the person neither committed the act nor the offense that served as the basis for the conviction and incarceration and that the person did not aid, abet, or act as an accomplice or accessory to a person who committed the act or offense. |

| | |
|---|---|
| Where Filed | • *Petition for determination of status of wrongfully incarcerated person and eligibility for compensation:* Original sentencing court.<br>• *Application for compensation:* Department of Legal Affairs |
| Who Decides | Department of Legal Affairs |
| Compensation per term of incarceration | $50,000 per year |
| Maximum Compensation | $2 million total including supplemental awards |
| Payment Form | No provision |
| Filing Term After Exoneration | • *Petition for determination of status of wrongfully incarcerated person and eligibility for compensation:* Within 90 days of order vacating conviction and sentence.<br>• *Application for compensation:* Within 2 years of original sentencing court order finding that the person meets the definition of wrongfully incarcerated and eligible for compensation. |

| | |
|---|---|
| Disqualifications | • Before the person's wrongful conviction and incarceration, the person was convicted of, or pled guilty or nolo contendere to, regardless of adjudication, any felony offense, or a crime committed in another jurisdiction the elements of which would constitute a felony in this state, or a crime committed against the US which is designated a felony, excluding any delinquency disposition;<br>• During the person's wrongful incarceration, the person was convicted of, or pled guilty or nolo contendere to, regardless of adjudication, any felony offense; or<br>• During the person's wrongful incarceration, the person was also serving a concurrent sentence for another felony for which the person was not wrongfully convicted.<br>• A wrongfully incarcerated person who commits a felony law violation that results in revocation of the parole or community supervision is ineligible for any compensation.<br>• If the person has a lawsuit pending against the state or any agency, instrumentality, or any political subdivision thereof, in state of federal court requesting compensation arising out of the the facts in connection with the claimant's conviction and incarceration.<br>• If the person is the subject of a claim bill pending for claims subject out of the facts in connection with the claimant's conviction and incarceration. |
| Burden of Proof | Preponderance of evidence |

| | |
|---|---|
| Supplemental Awards | • Waiver of tuition and fees for up to 120 hours of instruction at any career center, community college, or state university.<br>• Amount of any fine, penalty or court costs imposed and paid by wrongfully incarcerated person.<br>• The amount of any reasonable attorney's fees and expenses incurred and paid in connection with all criminal proceedings and appeals.<br>• Waiver of fees associated with the expunction of the person's criminal record. |
| Tax | No provision |
| Records Expungement | Immediate administrative expunction of the person's criminal record resulting from his or her wrongful arrest; Administratively ex-punge the claimant's criminal record arising from his or her wrongful arrest, wrongful conviction and wrongful incarceration. |
| Fund Allocations | General Revenue Fund or another source designated by the Legislature in the form of an annuity is purchased by the Chief Financial Officer |
| Definition of Innocence | No provision |
| Upon Death | Beneficiary provisions to be drawn before annuity is purchased |
| Civil Redress against state | Prohibited |
| Deduction of award for state expenses incurred | No provision |

**Illinois** (705 ILCS 505/8)

| | |
|---|---|
| Eligibility | Persons imprisoned who receive a pardon from the governor on the ground of the crime. |
| Where Filed | Court of Claims |
| Who Decides | Court of Claims |
| Compensation per term of incarceration | • For imprisonment of 5 years or less: not more than $15,000<br>• For imprisonment of 5 - 14 years: not more than $30,000<br>• For imprisonment of over 14 years: not more than $35,000<br>• With a cost-of living adjusted increase for every year since 1945 |
| Maximum Compensation | • For imprisonment of 5 years or less: not more than $15,000<br>• For imprisonment of 5 - 14 years: not more than $30,000<br>• For imprisonment of over 14 years: not more than $35,000<br>• With a cost-of living adjusted increase for every year since 1945 |
| Payment Form | No provision |
| Filing Term After Exoneration | No provision |
| Disqualifications | No provision |
| Burden of Proof | No provision |
| Supplemental Awards | Attorney's fees not to exceed 25% of the award granted |
| Tax | No provision |
| Records Expungement | No provision |

| | |
|---|---|
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Iowa** (ICA Section 663A.1)

| | |
|---|---|
| Eligibility | • The individual charged by indictment or information with the commission of a public offense classified as an aggravated misdemeanor or felony.<br>• The individual did not plead guilty to the public offense charged, or to any lesser included offense, but was convicted by the court or by a jury of an offense classified as an aggravated misdemeanor or felony.<br>• The individual was sentenced to incarceration for a term of imprisonment not to exceed two years if the offense was an aggravated misdemeanor or to an indeterminate term of years under Ch 902 if the offense was a felony, as a result of the conviction.<br>• The individual's conviction was vacated or dismissed, or was reversed, and no further proceedings can be or will be held against the individual on any facts and circumstances alleged in the proceedings which had resulted in the conviction.<br>• The individual was imprisoned solely on the basis of the conviction that was vacated, dismissed, or reversed and on which no further proceedings can be or will be had. |

| | |
|---|---|
| Where Filed | District Court - civil |
| Who Decides | District Court |
| Compensation per term of incarceration | $50 per day |
| Maximum Compensation | No provision |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 2 years |
| Disqualifications | Plead guilty |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | • The amount of restitution for any fine, surcharge, other penalty, or court costs imposed and paid and any reasonable attorney's fees and expenses incurred in connection with all criminal proceedings and appeals regarding the wrongfully imposed judgment and sentence and such fees and expenses incurred in connection with any civil actions and proceedings for post-conviction relief.<br>• The value of any lost wages, salary, or other earned income which directly resulted from the individual's conviction and imprisonment, up to $25,000 per year. |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | Prohibited |

**Louisiana** (LSA-RS 15:572.8)

| | |
|---|---|
| Eligibility | If he has served in whole or in part a sentence of imprisonment under the laws of this state for a crime for which he was convicted and: (1) the conviction of the applicant has been reversed or vacated; and (2) the applicant has proved by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted. |
| Where Filed | Nineteenth Judicial District Court |
| Who Decides | Nineteenth Judicial District Court |
| Compensation per term of incarceration | $15,000 per year |
| Maximum Compensation | Maximum total $150,000 |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 2 years |
| Disqualifications | Any term served under a concurrent sentence. |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | • Costs of job-skills training for one year<br>• Appropriate medically necessary medical and counseling services for three years<br>• Tuition and fees at any community college or unit of the public university system of the state of Louisiana |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | Innocence Compensation Fund |

| | |
|---|---|
| Definition of Innocence | Factual innocence - The application did not commit the crime for which he was convicted and incarcerated nor did he commit any crime based upon the same set of facts used in his original conviction. |
| Upon Death | If an annuity is purchased to provide compensation, the contract will provide for survivors benefits. |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | Prohibited |

**Maine** (14 MRSA Section 8241)

| | |
|---|---|
| Eligibility | • The person was convicted of a criminal offense;<br>• As a result of that conviction, the person was sentenced to a period of incarceration and was actually incarcerated;<br>• Subsequent to the conviction and as a condition precedent to suit, the person received a full and free pardon, which is accompanied by a written finding by the Governor who grants the pardon that the person is innocent of the crime for which that person was convicted; and<br>• The court finds that the person is innocent of the crime for which the person was convicted. |
| Where Filed | Superior Court |
| Who Decides | Superior Court |
| Compensation per term of incarceration | No provision |
| Maximum Compensation | $300,000 |

| | |
|---|---|
| Payment Form | No provision |
| Filing Term After Exoneration | No provision |
| Disqualifications | No provision |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | Court costs, interest and "all other costs that a court may assess" |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | General Fund |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Maryland** (MD Code State Finance and Procurement Section 10-501)

| | |
|---|---|
| Eligibility | If the individual has received from the Governor a full pardon stating that the individual's conviction has been shown conclusively to be in error. |
| Where Filed | Board of Public Works |
| Who Decides | Board of Public Works |
| Compensation per term of incarceration | Reasonable amount for any financial or other appropriate counseling for the individual. |
| Maximum Compensation | No provision |
| Payment Form | Lump sum or installments |
| Filing Term After Exoneration | No provision |

| | |
|---|---|
| Disqualifications | No provision |
| Burden of Proof | No provision |
| Supplemental Awards | No provision |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | General Emergency Fund or money that the Governor provides in the annual budget |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Massachusetts** (MGLA 258D Section 1)

| | |
|---|---|
| Eligibility | • Those that have been granted a full pardon, if the governor expressly states in writing his belief in the individual's innocence; or<br>• Those who have been granted judicial relief by a state court of competent jurisdiction on grounds which tend to establish the innocence of the individual, and if (a) the judicial relief vacates or reverses the judgment of a felony conviction, and the felony indictment or complaint used to charge the individual or complaint used to charge the individual with such felony has been dismissed, or if a new trial was ordered, the individual was not retried and the felony indictment or complaint was dismissed or a nolle proseqi was entered, or if a new trial was ordered the individual was found not guilty at the new trial; and (b) at the time of the filing of an action under this chapter no criminal proceeding is pending or can be brought against the individual by a district attorney or the attorney general for any act associated with such felony conviction. |
| Where Filed | Superior Court |
| Who Decides | Superior Court |
| Compensation per term of incarceration | No provision |
| Maximum Compensation | $500,000 |
| Payment Form | Lump sum or installments |
| Filing Term After Exoneration | Within 2 years |

| | |
|---|---|
| Disqualifications | • Plead guilty to the offense charged, or to lesser included offense, unless such guilty plea was withdrawn, vacated or nullified by operation of law on a basis other than a claimed deficiency in the plea warnings.<br>• Was sentenced to less than 1 year in state prison.<br>• Any term served under a concurrent sentence. |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | • Physical or emotional evidence<br>• 50 percent reduction of tuition and fees for education services from any state or community college |
| Tax | No provision |
| Records Expungement | Upon the entry of a judgment in favor of a claimant and following a separate hearing on the matter, the court shall enter an order either directing the expungement or sealing of those records of the claimant maintained by the criminal history systems board, the probation department, and the sex offender registry that directly pertain to the claimant's erroneous felony conviction case, including documents and other materials and any samples obtained from the claimant. |
| Fund Allocations | Funds appropriated by the general court |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |

| | |
|---|---|
| Deduction of award for state expenses incurred | Prohibited |

**Missouri** (Missouri Statues Title XL Section 650.058)

| | |
|---|---|
| Eligibility | Any individual who was found guilty of a felony in a Missouri court and was later determined to be actually innocent of such crime solely as result of DNA Profiling analysis. |
| Where Filed | Sentencing Court |
| Who Decides | Sentencing Court |
| Compensation per term of incarceration | $50 per day for post-conviction incarceration |
| Maximum Compensation | $36,500 per year |
| Payment Form | Determined by the Department of Corrections |
| Filing Term After Exoneration | No provision |
| Disqualifications | If the individual was serving any term of a sentence for any other crime concurrently with the sentence for which he or she is determined to be actually innocent, unless such individual was serving another concurrent sentence because his or her parole was revoked by a court or the board of probation and parole in connection with the crime for which the person has been exonerated. |
| Burden of Proof | No provision |
| Supplemental Awards | No provision |
| Tax | No provision |

| | |
|---|---|
| Records Expungement | An individual who is determined to be actually innocent of a crime shall automatically be granted an order of expungement from the court in which he or she pled guilty or was sentenced to expunge from all official records all recordations of his or her arrest, plea, trial, or convictions. |
| Fund Allocations | Department of Corrections appropriations |
| Definition of Innocence | Actually innocent - (1) The individual was convicted of a felony for which a final order of release was entered by the court; (2) All appeals of the order of release have been exhausted; (3) The individual was not serving any term of a sentence for any other crime concurrently with the sentence for which he or she is determined to be actually innocent, unless such individual was serving another concurrent sentence because his or her parole was revoked by a court or the board of probation and parole in connection with the crime for which the person has been exonerated; and (4) Testing ordered demonstrates a person's innocence of the crime for which the person is in custody. |
| Upon Death | The state's obligation to pay restitution shall cease upon the individual's death. |
| Civil Redress against state | Prohibited |
| Deduction of award for state expenses incurred | No provision |

**Montana** (MCA 53-1-214)

| | |
|---|---|
| Eligibility | A person who was convicted in the state of a felony offense, who was incarcerated in a state prison for any period of time, and whose judgment was overturned by a court based on the results of postconviction forensic DNA testing that exonerates the person of the crime for which the person was convicted. |
| Where Filed | Department of Corrections |
| Who Decides | Department of Corrections |
| Compensation per term of incarceration | Only Education aid |
| Maximum Compensation | No provision |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 10 years of release |
| Disqualifications | Non-DNA exoneration |
| Burden of Proof | DNA testing |
| Supplemental Awards | Educational aid including tuition, fees, books, board, and room at any: (a) Montana community college; (b) unit of the Montana university system; or (c) accredited Montana tribally controlled community college |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | Legislature appropriations |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |

| | |
|---|---|
| Deduction of award for state expenses incurred | No provision |

**New Hampshire** (NH Rev Stat Section 541-B:14)

| | |
|---|---|
| Eligibility | A person found to be innocent of the crime for which he was convicted an unjustly served time in the state prison. |
| Where Filed | Board of Claims |
| Who Decides | Board of Claims |
| Compensation per term of incarceration | Up to $20,000 for the entirety of the individual's wrongful imprisonment |
| Maximum Compensation | $20,000 |
| Payment Form | No provision |
| Filing Term After Exoneration | No provision |
| Disqualifications | No provision |
| Burden of Proof | No provision |
| Supplemental Awards | No provision |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**New Jersey** (NJ ST 52:4C-1)

| | |
|---|---|
| Eligibility | Innocent persons who can demonstrate by clear and convincing evidence that they were mistakenly convicted and imprisoned. |
| Where Filed | Superior Court against the Department of the Treasury |
| Who Decides | Superior Court |
| Compensation per term of incarceration | Not to exceed the amount of the claimant's income in the year prior to his incarceration of $20,000 per year of incarceration, which-ever is greater. |
| Maximum Compensation | Twice the amount of the claimant's income in the year prior to his incarceration or $20,000 per year of incarceration, whichever is greater. |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 2 years |
| Disqualifications | • By his own conduct cause or bring about his conviction; is serving a term of imprisonment for a crime other than a crime of which the person was mistakenly convicted.<br>• If the sentence for the crime of which the person was mistakenly convicted was served concurrently with the sentence for the conviction of another crime. |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | Reasonable attorney fees |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |

| | |
|---|---|
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**New York** (Laws of New York Court of Claims Act Section 8-b)

| | |
|---|---|
| Eligibility | Any person convicted and subsequently imprisoned for one or more felonies or misdemeanors against the state which he did not commit. |
| Where Filed | Court of Claims |
| Who Decides | Court of Claims |
| Compensation per term of incarceration | Sum of money as the court determines will fairly and reasonably compensate him. |
| Maximum Compensation | No provision |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 2 years |
| Disqualifications | By his own conduct cause or bring about his conviction. |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | No provision |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |

| | |
|---|---|
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**North Carolina** (NC GS Article 8 Section 148-82-84)

| | |
|---|---|
| Eligibility | Any person who, having been convicted of a felony and having been imprisoned therefore in a State prison of this State, and who has thereafter or who shall hereafter be granted a pardon of innocence by the Governor upon the grounds that the crime with which the person was charged either was not committed at all or was not committed by that person. |
| Where Filed | Industrial Commission |
| Who Decides | Industrial Commission |
| Compensation per term of incarceration | $20,000 per year |
| Maximum Compensation | $500,000 |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 5 years |
| Disqualifications | No provision |
| Burden of Proof | Preponderance of evidence |
| Supplemental Awards | No provision |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | Contingency and Emergency Fund or out of any other available State funds distributed by the Director of the Budget |
| Definition of Innocence | No provision |
| Upon Death | No provision |

| | |
|---|---|
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Ohio** (Ohio RC Section 2743.49)

| | |
|---|---|
| Eligibility | • The individual was charged with a violation of a section of the Revised Code by an indictment or information and the violation charged was an aggravated felony or felony.<br>• The individual was found guilty of, but did not plead guilty to, the particular charge or a lesser-included offense by the court or jury involved, and the offense of which the individual was found guilty was an aggravated felony or felony.<br>• The individual was sentenced to an indefinite or definite term of imprisonment in a state correctional institution for the offense of which the individual was found guilty.<br>• The individual's conviction was vacated or was dismissed, or reversed on appeal, the prosecuting attorney in the case cannot or will not seek any further appeal of right or upon leave or court, and no criminal proceeding is pending, can be brought, or will be brought by any prosecuting attorney, city director of law, village solicitor, or other chief legal officer of a municipal corporation against the individual for any act associated with that conviction.<br>• Subsequent to sentencing and during or subsequent to imprisonment, an error in procedure resulted in the individual's release or it was determined by a court of common pleas that the offense of which the individual was found guilty, including all lesser-included offenses, either was not committed by the individual or was not committed by any person. |
| Where Filed | Court of Claims |
| Who Decides | Court of Claims |

| | |
|---|---|
| Compensation per term of incarceration | $40,300 per year, or the adjusted amount determined by the auditor of state |
| Maximum Compensation | No provision |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 2 years |
| Disqualifications | Plead guilty to the particular charge or a lesser-included offense |
| Burden of Proof | The claimant shall be irrebuttably presumed to be a wrongfully imprisoned individual. |
| Supplemental Awards | • Any fine or court costs imposed and paid, and the reasonable attorney's fees and other expenses incurred by the wrongfully imprisoned individual in connection with all associated criminal proceedings and appeals, and if applicable, in connection with obtaining the wrongfully imprisoned individual's discharge from confinement in the state correction institution.<br>• Any loss of wages, salary, or other earned income that directly resulted from the wrongfully imprisoned individual's arrest, prosecution, conviction, and wrongful imprisonment.<br>• Any user fee or copayment for services at a detention facility.<br>• The cost of housing and feeding in a detention facility.<br>• The cost of supervision.<br>• The cost of any ancillary services provided to the wrongfully imprisoned individual. |
| Tax | No provision |
| Records Expungement | No provision |

| | |
|---|---|
| Fund Allocations | Contingency and Emergency Fund or out of any other available State funds distributed by the Director of the Budget |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | Permitted |
| Deduction of award for state expenses incurred | Prohibited |

**Oklahoma** (51 Okla. St. Ann. Section 154)

| | |
|---|---|
| Eligibility | Claimant has received a full pardon on the basis of a written finding by the Governor of actual innocence for the crime for which the claimant was sentenced or has been granted judicial relief absolving of guilt on the basis of actual innocence of the crime for which the claimant was sentenced. |
| Where Filed | No provision |
| Who Decides | No provision |
| Compensation per term of incarceration | No provision |
| Maximum Compensation | $175,000 |
| Payment Form | No provision |
| Filing Term After Exoneration | No provision |
| Disqualifications | • Plead guilty to the offense charged or to any lesser-included offense.<br>• Any term of a sentence in prison during which the claimant was also serving a concurrent sentence. |
| Burden of Proof | No provision |

| | |
|---|---|
| Supplemental Awards | No provision |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |

| | |
|---|---|
| Definition of Innocence | Actual innocence - (a) The individual was charged, by indictment or information, with the commission of a public offense classified as a felony: (b) the individual did not plead guilty to the offense charged, or to any lesser included offense, but was convicted of the offense; (c) The individual was sentenced to incarceration for a term of imprisonment as a result of the conviction; (d) The individual was imprisoned solely on the basis of the conviction for the offense; and (e) (1) In the case of a pardon, a determination was made by either the Pardon and Parole Board or the Governor that the offense for which the individual was convicted, sentenced and imprisoned, including any lesser offenses, was not committed by the individual, or (2) In the case of judicial relief, a court of competent jurisdiction found by clear and convincing evidence that the offense for which the individual was convicted, sentenced and imprisoned, including any lesser included offenses, was not committed by the individual and issued an order vacating, dismissing or reversing the conviction and sentence and providing that no further proceedings can be or will be held against the individual on any facts and circumstances alleged in the proceedings which had resulted in the conviction. |
| Upon Death | No provision |
| Civil Redress against state | No provision |

| | |
|---|---|
| Deduction of award for state expenses incurred | No provision |

**Tennessee** (TCA Section 9-8-108)

| | |
|---|---|
| Eligibility | Persons wrongfully imprisoned and granted exoneration. |
| Where Filed | Board of Claims |
| Who Decides | Board of Claims |
| Compensation per term of incarceration | No provision |
| Maximum Compensation | $1,000,000 |
| Payment Form | Equal monthly installments calculated by dividing the non-commuted amount by the estimated number of months the claimant will live based on the claimant's life expectancy; or lump sum |
| Filing Term After Exoneration | Within 1 year |
| Disqualifications | No provision |
| Burden of Proof | No provision |
| Supplemental Awards | No provision |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | Any monthly installments left remaining shall be paid to the claimant's surviving spouse and surviving minor children until spouse dies or remarries and or children reach majority status or die. |

| | |
|---|---|
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Texas** (Civil Practice and Remedies Code Title 5 Section 103)

| | |
|---|---|
| Eligibility | • The person has served in whole or in part a sentence in prison under the laws of this state; and<br>• The person: (A) has received a full pardon on the basis of innocence for the crime for which the person was sentenced; or (B) has been granted relief on the basis of actual innocence of the crime for which the person was sentenced. |
| Where Filed | Comptroller's judiciary section |
| Who Decides | Comptroller |
| Compensation per term of incarceration | $50,000 per year. If sentenced to death $100,000 per year |
| Maximum Compensation | $500,000 excluding child support payments and interest on child support arrearages |
| Payment Form | Two equal annual installments |
| Filing Term After Exoneration | Within 3 years |
| Disqualifications | • Any part of a sentence in prison during which the person was also serving a concurrent sentence.<br>• If convicted of a subsequent felony. |
| Burden of Proof | Preponderance of evidence |

| | |
|---|---|
| Supplemental Awards | • Compensation for child support payments owed by the person that became due and interest on child support arrearages that accrued during the time served in prison but were not paid.<br>• Counseling for one year.<br>• Expenses incurred in connection with all associated criminal proceedings and appeals including fine or court costs paid and reasonable attorney's fee.<br>• Wages, salary or other earned income that was lost.<br>• Medical and counseling expenses incurred by the petitioner as a direct result of the arrest, prosecution, conviction, or wrongful imprisonment. |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | Appropriation by the legislature distributed by the comptroller |
| Definition of Innocence | No provision |
| Upon Death | Compensation is terminated |
| Civil Redress against state | Prohibited |
| Deduction of award for state expenses incurred | Prohibited |

**Utah** (Section 78-35a)

| | |
|---|---|
| Eligibility | A person who has been found factually innocent and has served a period of incarceration. |
| Where Filed | District Court |
| Who Decides | District Court |

| | |
|---|---|
| Compensation per term of incarceration | The monetary equivalent of the average annual nonagricultural payroll wage in Utah at time of release per year of imprisonment. |
| Maximum Compensation | Provided for a maximum of 15 years |
| Payment Form | Initial payment of 20% then quarterly installments paid within 10 years |
| Filing Term After Exoneration | Within 1 year |
| Disqualifications | • Term of incarceration that was attributable to a separate and lawful conviction.<br>• If the person was already serving a prison sentence in another jurisdiction at the time of the conviction of the crime for which that person has been found factually innocent. |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | No provision |
| Tax | Not subject to any Utah state taxes |
| Records Expungement | If found factually innocent the court shall issue an order of expungement of the petitioner's criminal record for all acts in the charging document upon which the payment is based. |
| Fund Allocations | The Office of Crime Victim Reparation shall pay from the Crime Victim Reparations Fund an initial sum equal to either 20% of the total financial assistance payment or an amount equal to two years of incarceration; the Legislature shall appropriate from the General Fund a separate line item on the Commission on Criminal and Juvenile Justice the remainder. |

| | |
|---|---|
| Definition of Innocence | Factually innocent - A person did not (a) engage in the conduct for which the person was convicted; (b) engage in conduct relating to any lesser included offenses; or (c) commit any other felony arising out of or reasonably connected to the facts supporting the indictment or information upon which the person was convicted. |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | Prohibited |

**Vermont** (13 VSA Section 5574)

| | |
|---|---|
| Eligibility | • The complainant was convicted of a crime, was sentenced to a term of imprisonment, and served all or any part of the sentence.<br>• As a result of DNA evidence: (A) The complainant's conviction was reversed or vacated, the complainant's information or indictment was dismissed, or the complainant was acquitted after a second or subsequent trial; or (B) The complainant was pardoned for the crime for which he or she was sentenced.<br>• DNA evidence establishes that the complainant did not commit the crime for which he or she was sentenced.<br>• The complainant did not fabricate evidence or commit or suborn perjury during any proceedings related to the crime with which he or she was charged. |
| Where Filed | Civil Court |

| | |
|---|---|
| Who Decides | Civil Court |
| Compensation per term of incarceration | Minimum of $30,000 per year |
| Maximum Compensation | Maximum of $60,000 per year |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 3 years |
| Disqualifications | • If fabricated evidence or committed or suborned perjury during any proceedings related to the crime.<br>• Any term served under another sentence. |
| Burden of Proof | Preponderance of evidence |
| Supplemental Awards | • Economic damages, including lost wages and costs incurred by the claimant for his or her criminal defense and for efforts to prove his or her innocence.<br>• Up to ten years of eligibility for the Vermont Health Access Plan using state-only funds.<br>• Compensation for any reasonable reintegrative services and mental and physical health care costs incurred by the claimant for the time period between his or her release from mistaken incarceration and the date of the award.<br>• Reasonable attorney's fees and costs for the action seeking compensation. |
| Tax | Not subject to any state taxes, except for the portion of the judgment awarded as attorney's fees |
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |

| | |
|---|---|
| Civil Redress against state | Prohibited |
| Deduction of award for state expenses incurred | Prohibited |

**Virginia** (Tort Claims Act Section 8.01-195.10)

| | |
|---|---|
| Eligibility | Incarceration for a felony conviction for which (i) the conviction has been vacated, (ii) the person incarcerated must have entered a final plea of not guilty, or regardless of the plea, any person sentenced to death, or convicted of a Class 1 felony, a Class 2 felony, or any felony for which the maximum penalty is imprisonment for life, and (iii) the person incarcerated did not by any act or omission on his part intentionally contribute to his conviction for the felony for which he was incarcerated. |
| Where Filed | Civil Court |
| Who Decides | Legislature |
| Compensation per term of incarceration | Amount equal to 90 percent of the Virginia per capita personal income as reported by the Bureau of Economic Analysis of the US Department of Commerce for each year, or portion thereof, of incarceration. |
| Maximum Compensation | Provided for up to 20 years of incarceration. |
| Payment Form | Initial lump sum equal to 20 percent of the compensation award with the remaining paid in equal monthly payments for a period certain of 25 years. |
| Filing Term After Exoneration | No provision |

| | |
|---|---|
| Disqualifications | • Any act or omission on his part that intentionally contributed to his conviction.<br>• Any subsequent conviction of a felony. |
| Burden of Proof | No provision |
| Supplemental Awards | • $15,000 (deducted from compensation award) transition assistance grant<br>• Up to $10,000 reimbursement for career and technical training within the Virginia community college system |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | General Assembly appropriations distributed by the Comptroller |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | Waived |
| Deduction of award for state expenses incurred | No provision |

**West Virginia** (W. Va. Code Section 14-2-13a)

| | |
|---|---|
| Eligibility | Any person arrested or imprisoned or convicted and subsequently imprisoned for one or more felonies or misdemeanors against the state which he did not commit. |
| Where Filed | Claims Court |
| Who Decides | Claims Court |
| Compensation per term of incarceration | Sum of money as the court determines will fairly and reasonably compensate him. |

| | |
|---|---|
| Maximum Compensation | No provision |
| Payment Form | No provision |
| Filing Term After Exoneration | Within 2 years |
| Disqualifications | By his own conduct cause or bring about his conviction. |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | No provision |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Wisconsin** (WSA 775.05)

| | |
|---|---|
| Eligibility | Any person who is imprisoned as the result of his or her conviction for a crime in any court of this state, of which crime the person claims to be innocent and is released from imprisonment. |
| Where Filed | Claims Board |
| Who Decides | Claims Board |
| Compensation per term of incarceration | Not greater than $5,000 per year |
| Maximum Compensation | No provision |
| Payment Form | No provision |

| | |
|---|---|
| Filing Term After Exoneration | No provision |
| Disqualifications | No provision |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | Attorney's fees, costs and disbursements |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | Legislature appropriations |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Washington, DC** (DC ST Section 2-421)

| | |
|---|---|
| Eligibility | Any person unjustly convicted of and subsequently imprisoned for a criminal offense. |
| Where Filed | Civil Court |
| Who Decides | Civil Court |
| Compensation per term of incarceration | No provision |
| Maximum Compensation | No provision |
| Payment Form | No provision |
| Filing Term After Exoneration | No provision |
| Disqualifications | Entered a plea of guilty |
| Burden of Proof | Clear and convincing evidence |
| Supplemental Awards | No provision |
| Tax | No provision |

| | |
|---|---|
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

**Federal** (28 USCS Section 2513)

| | |
|---|---|
| Eligibility | • His conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted, or on new trial or rehearing he was found not guilty of such offense, as appears from the record or certificate of the court setting aside or reversing such conviction, or that he has been pardoned upon the stated ground of innocence and unjust conviction; and<br>• He did not commit any of the acts charged or his acts, deeds, or omissions in connection with such charge constituted no offense against the United States, or any State, Territory or the District of Columbia, and he did not by misconduct or neglect cause or bring about his own prosecution |
| Where Filed | US Court of Federal Claims |
| Who Decides | US Court of Federal Claims |

| | |
|---|---|
| Compensation per term of incarceration | The amount of damages awarded shall not exceed $100,000 for each 12-month period of incarceration for any plaintiff who was unjustly sentenced to death and $50,000 for each 12-month period of incarceration for any other plaintiff. |
| Maximum Compensation | The amount of damages awarded shall not exceed $100,000 for each 12-month period of incarceration for any plaintiff who was unjustly sentenced to death and $50,000 for each 12-month period of incarceration for any other plaintiff. |
| Payment Form | No provision |
| Filing Term After Exoneration | No provision |
| Disqualifications | By misconduct or neglect cause or bring about his own prosecution |
| Burden of Proof | No provision |
| Supplemental Awards | No provision |
| Tax | No provision |
| Records Expungement | No provision |
| Fund Allocations | No provision |
| Definition of Innocence | No provision |
| Upon Death | No provision |
| Civil Redress against state | No provision |
| Deduction of award for state expenses incurred | No provision |

# Appendix A

Task Force Members

- **Richard Aborn, Esq. –** President, Constantine & Aborn Advisory Services LLC and President of the Citizen's Crime Commission of New York City
- **Jack Auspitz, Esq. –** Morrison & Foerster LLP, New York City
- **Hon. Phylis Skloot Bamberger** - Retired Court of Claims Judge, New York City
- **Thomas Belfiore** – Commissioner-Sheriff, Westchester County Department of Public Safety, Hawthorne
- **David Louis Cohen, Esq.** - Law Office of David L. Cohen, Esq., Kew Gardens
- **Tracee Davis, Esq. –** Zeichner, Ellman & Krause LLP, New York City
- **Hon. Janet DiFiore –** Westchester County District Attorney, White Plains
- **Vincent E. Doyle, III, Esq. –** Connors & Vilardo LLP, Buffalo
- **Mark Dwyer, Esq.** - New York County District Attorney's Office, Manhattan
- **Anthony Girese, Esq. –** Bronx County District's Attorney Office, Bronx
- **Robert C. Gottlieb, Esq. –** Law Offices of Robert C. Gottlieb, New York
- **Prof. William Hellerstein –** Brooklyn Law School, Garrison
- **Hon. Charles J. Hynes –** Kings County District Attorney, Brooklyn
- **Hon. Barry Kamins** - Judge, Criminal Court, New York County and Chair of the Task Force on Wrongful Convictions
- **Hon. Howard Levine –** Retired Court of Appeals Judge, Whiteman Osterman & Hanna LLP, Albany

- **Hon. John Martin** – Former U.S. District Judge for the Southern District, Martin & Obermaier, New York City
- **JoAnne Page, Esq.** – President and Chief Executive Officer, the Fortune Society, New York City
- **Matthew Scott Peeler, Esq**. - Arent Fox LLP, New York City, and Secretary of the Task Force on Wrongful Convictions
- **Norman L. Reimer, Esq.** – Executive Director, National Association of Criminal Defense Lawyers, Washington, DC
- **Prof. Laurie Shanks** – Clinical Professor of Law, Albany Law School, Albany
- **Hon. George Bundy Smith** – Retired Court of Appeals Judge, Chadbourne & Parke LLP, New York City
- **Lauren Wachtler, Esq.** – Mitchell, Silberberg & Knupp LLP, New York City

# Appendix B

Case Studies - Wrongful Convictions in New York

| | | |
|---|---|---|
| 1. Jeffrey Blake (1991) | 20. Dennis Halstead (1987) | 39. Luis Rojas (1992) |
| 2. Clarence Braunskill (1989) | 21. Gerald Harris (1992) | 40. Yusef Salaam (1990) |
| 3. Roy Brown (1992) | 22. John Kogut (1986) | 41. Raymond Santana (1990) |
| 4. Lazaro Burt (1992) | 23. Kerry Kotler (1982) | 42. Charles Shepherd (1988) |
| 5. Leonard Callace (1987) | 24. Dan Lackey (2004) | 43. Arthur Stewart (1995) |
| 6. Anthony Capozzi (1987) | 25. Lee Long (1995) | 44. Betty Tyson (1973) |
| 7. Napolean Cardenas (1999) | 26. Angelo Martinez (1986) | 45. John Vera (1995) |
| 8. Nathanial Carter (1982) | 27. William Maynard (1971) | 46. Habib Wahir Abdal (1983) |
| 9. Terry Chalmers (1987) | 28. Antron McCray (1990) | 47. James Walker (1971) |
| 10. Marion Coakley (1985) | 29. Robert McLaughlin (1980) | 48. Collin Warner (1980) |
| 11. Timothy Crosby (1989) | 30. Michael Mercer (1992) | 49. Douglas Warney (1997) |
| 12. Charles Dabbs (1984) | 31. Ruben Montalvo (1989) | 50. George Whitmore (1964) |
| 13. Charles Daniels (1979) | 32. Jose Morales (1989) | 51. Korey Wise (1990) |
| 14. Lynn DeJac (1994) | 33. Alan Newton (1985) | 52. David Wong (1987) |
| 15. Jeff Deskovic (1990) | 34. James O'Donnell (1998) | 53. Collin Woodley (1990) |
| 16. Anthony Faison (1988) | 35. Victor Ortiz (1984) | |
| 17. Scott Fappiano (1985) | 36. Albert Ramos (1985) | |
| 18. Jose Garcia (1992) | 37. John Restivo (1987) | |
| 19. Hector Gonzalez (1996) | 38. Kevin Richardson (1990) | |

* The year of conviction is noted in parenthesis next to each name.

# Appendix C

## Transcripts of Public Hearings

(A) New York State Bar Association Task Force on Wrongful Conviction Hearing

*New York City Bar Association* *February 13, 2009, 9:30 a.m.*

(B) New York State Bar Association Task Force on Wrongful Conviction Hearing

*New York State Bar Association, Albany* *February 24, 2009, 10:00 a.m.*

# Exhibit K

Check for updates
Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

*Original Research*

SAGE Open
April-June 2022: 1–10
© The Author(s) 2022
DOI: 10.1177/21582440221095022
journals.sagepub.com/home/sgo
SAGE

# Tunnel Vision and Confirmation Bias Among Police Investigators and Laypeople in Hypothetical Criminal Contexts

**Eitan Elaad**[1]

**Abstract**

Tunnel vision is the tendency of actors in the criminal justice system to use short-cuts to filter evidence selectively to build a case for a suspect's conviction. Confirmation bias tends to favor information that confirms an individual's preconceptions independently of the information's accuracy: the present study manipulated tunnel vision and confirmation bias. The purpose was to examine the combined effects of these biases on Israeli police investigators and laypeople in hypothetical criminal investigation situations. Results indicated that police investigators were more strongly affected than laypersons by tunnel vision. Police investigators were more confident about the suspect's guilt than were laypeople in the presence of incriminating and exonerating information, alike. Still, investigators did not ignore exonerating information and lowered their confidence in the suspect's guilt when exonerating information was presented. We discussed the results according to police legitimacy and self-assessed lie-detection ability, which is rated higher by police investigators than by laypeople.

**Keywords**

police investigators, tunnel vision, confirmation bias, lie-detection ability assessment, deception

Legitimacy is a core notion in police work. Legitimacy is conceptualized as the belief that a person or institution receives authority over citizens to act honestly and according to the citizen's best interests (Tyler, 2006). Tankebe (2013) suggested four related factors that constitute police legitimacy: *Distributive fairness* or the perception that the authority makes fair decisions (e.g., continue questioning only those who should be questioned and avoiding disproportional questioning of minorities or poor people). *Procedural fairness* concerns the decision-making process, whether errors are corrected, and whether suspects are treated with respect. *Effectiveness* refers to obtaining accurate results about different types of crimes. *Lawfulness* is whether the authority exercise power according to preexisting law. Individuals comply with the law and view power as justified when they view legal authorities as legitimate. Tyler and Jackson (2014) argue that legitimacy encourages people to report a crime.

The *truth bias* or the tendency of people to judge messages as truthful rather than deceptive (Bond & Depaulo, 2006; Vrij, 2008) should support police legitimacy. Nevertheless, the truth bias often counters the police's mission to keep law and order. Instead, we find a guilt-presumptive process in criminal interrogation that triggers corrupt evidence gathering and biased forensic analysis. Guilt-presumption might lead to false confessions and safeguard wrongful convictions (Scherr et al., 2020). The pseudodiagnosticity bias (Doherty et al., 1979) or the failure to identify and select diagnostically relevant information may be mentioned here. We suggest that presumption of guilt involves a tendency to select and consider data that refers only to the guilt hypothesis of the police investigator. Presumption of guilt may therefore undermine police legitimacy in the eyes of the public. To reduce the presumption of guilt attempts were made to improve police performance to detect when the suspect is telling the truth (e.g., Dando & Bull, 2011; Dando & Ormerod, 2017; Sandham et al., 2020).

We designed the present study to explore two biases related to the presumption of guilt: tunnel vision and confirmation bias. Tunnel vision in the criminal justice system has been suggested to contribute to the wrongful conviction problem. Tunnel vision (Findley & Scott, 2006; Martin, 2002) is the tendency of actors in the criminal justice system to use heuristics and short-cuts to filter evidence selectively to build a case for a suspect's conviction while ignoring or

[1]Ariel University, Israel

**Corresponding Author:**
Eitan Elaad, Department of Behavioral Sciences and Psychology, Ariel University, Ariel 40700 Israel.
Email: elade@ariel.ac.il

Creative Commons CC BY: This article is distributed under the terms of the Creative Commons Attribution 4.0 License (https://creativecommons.org/licenses/by/4.0/) which permits any use, reproduction and distribution of the work without further permission provided the original work is attributed as specified on the SAGE and Open Access pages (https://us.sagepub.com/en-us/nam/open-access-at-sage).

suppressing evidence that points to the suspect's innocence. Tunnel vision motivates investigators, prosecutors, and judges, to attribute importance and relevance to information that supports their original conclusion while information inconsistent with the presumption of guilt is easily overlooked, dismissed as irrelevant, or considered unreliable (Findley, 2012). Tunnel vision was identified in the criminal justice system as an explanation for unintentional but endured pursuit to convict innocent suspects (Dioso-Villa, 2015; Findley & Scott, 2006). Tunnel vision was clearly demonstrated in a US murder case where detectives, in the investigation stage, made a series of recorded telephone calls with a prime suspect. The impression from the conversation was that detectives had already decided on the suspect's guilt and pursued an accusatorial agenda rather than a fact-finding one. Specifically, detectives exhibited no interest in the suspect's denials and worked toward eliciting a confession. The suspect was later convicted and then released from prison with the help of the Wisconsin Innocence Project (Maynard & Schelly, 2017).

Tunnel vision is associated with police investigators' tendency to presume guilt, which increases with training and experience (Meissner & Kassin, 2002). Police interrogators will often decide to pursue a suspect's interrogation due to a preliminary presumption of guilt in which they have confidence (Masip & Herrero, 2017). Nevertheless, police presumption of guilt may vary across jurisdictions.

The decision to pursue interrogation may rely on several aspects of deception judgments, such as the plausibility of the testimony. Hartwig and Bond (2011) have noted that "it seems that people are likely to judge communications as deceptive if they provide implausible, illogical accounts with few details" (p. 654). Aamodt and Custer (2006) similarly noted that in real-world situations, judgments about deception are often made on such factors as the story not making logical sense. Tunnel vision increases reliance on factors such as illogical statements.

A recent study (Elaad, 2019) examined differences between the preferences of police investigators and laypeople for lies over implausible truths when assigned to the role of innocent suspects in simulated police investigation scenarios. Specifically, police investigators and laypeople were asked to report how they would behave in four imaginary implausible crime scenarios, given their role as innocent suspects. Results showed that police investigators tended to lie more and present more plausible stories when lying compared to laypeople. Police investigators' tendency to tell lies more than laypeople even when they were asked to simulate the role of an innocent suspect may reflect internal knowledge of how to appear innocent.

Similarly, police investigators may be committed to the Crime Control Model (Packer, 1964), which requires them to secure appropriate sentences of persons guilty of crimes. The crime control model is an affirmative model that emphasizes the existence and exercise of official power. In this context, attributes of the tunnel vision serve the police well when the exercise of power fit in the police culture, low trust, and zero-sum game thinking. Accordingly, police investigators fear false-negative errors (releasing guilty suspects) more than false-positive faults (apprehending innocent persons) and use accusatorial methods in interrogations to force confessions from suspects (Kassin, 2005).

Tunnel vision is associated with various common cognitive biases such as confirmation bias, hindsight bias, and outcome bias which are frequently observed among actors in the criminal justice system (Findley, 2012). Confirmation bias is an effect of favoring information that confirms an individual's preconceptions or hypotheses independently of the information's truthfulness or falsity. For example, forensic confirmation bias may corrupt experts' judgments in various forensic domains and professional forensic sciences. For example, the National Academy of Sciences (NAS, 2009) reported concerns regarding standardization, reliability, accuracy, errors, and the potential for related biases in multiple forensic disciplines. In addition, forensic experts who know the nature and details of the crime then may be biased by the pressure of interrogators, by working for the prosecution, and by using computer lists that feature some suspects ahead of others (Kassin et al., 2013). These influences may increase their vulnerability to biases, including confirmation biases.

Tunnel vision is over-reliance on internal sources while ignoring accurate external information. Confirmation bias is over-reliance on external sources that are not necessarily accurate. People tend to trust their sources in clear-cut cases, while people typically trust external sources in ambiguous cases. Both operate simultaneously and might affect each other. We designed the present study to examine further the combined effects of tunnel vision and confirmation bias on police investigators and laypeople in hypothetical criminal investigation situations.

The present study adapted the two most implausible scenarios used by Elaad (2019). The scenarios were modified so that investigators were asked to act as investigators in familiar situations. One scenario is coupled with intelligence information indicating the suspect's innocence, while the other is accompanied by intelligence information indicating the suspect's guilt. The implausible scenarios facilitate presumptions of guilt, and the added information confirms or contradicts those beliefs. The tunnel vision effect predicts that investigators will respond to the incriminating information and regard the exonerating information as irrelevant. Laypeople with no investigation experience may be willing to treat exonerating information more seriously than do investigators. Specifically, for police investigators, tunnel vision and confirmation bias operated in the same direction and strengthened the assumption of guilt. For laypeople, this is not necessarily the case.

Based on these accounts, we hypothesized that police investigators would rely on their internal knowledge (tunnel

vision) of how an investigator should act in an investigation and rely on the story's plausibility. On the other hand, laypeople will rely more on external information.

The presumption of guilt relates to investigators' perceived ability to detect lies accurately (Elaad, 2009). In practice, people differ little from one another in their ability to detect lies (Bond & DePaulo, 2008), and therefore most people can be regarded as good as others concerning their lie-detection abilities. However, self-assessments of lie-detecting abilities rely on intuitive judgments that are often biased (e.g., Elaad, 2009, 2019). Previous accounts have shown that people tend to rate their ability to detect lies higher than the abilities of other individuals (Ekman & O'Sullivan, 1991; Elaad, 2003). The bias fits general human assumptions that most communications are truthful, and if not, they can easily detect their lack of veracity. Elaad (2019) found that police investigators and laypeople differ in their perceived ability to tell and detect lies, tell the truth convincingly, and detect when other people are truthful. Note that lie-detection and truth-detection are completely distinct abilities because lie-detection requires more significant mental effort than truth detection (Levine et al., 1999). Competence in lie detection engages different cognitive and emotional resources than truth detection (Stewart et al., 2019).

Following Elaad (2019), we suggest that police investigators feel more able than laypeople as successful lie-detectors. Such confidence may be relevant to tunnel vision in the criminal context, and therefore measures of self-assessed abilities are included in the current study.

It is hypothesized that police investigators will show enhanced self-assessed lie-detection abilities than laypeople.

### *Design*

Two equally sized groups of participants, Israeli police investigators and laypeople from the community were tested in a within-subjects design. Four experimental conditions were created by combining scenario ("robbery scenario" and "drug deal scenario") and intelligence information ("incriminating" and "exonerating"). Scenario/information combinations were counterbalanced across participants in each group. Participants were asked to indicate their confidence in the imaginary suspect's guilt, the likelihood that they may believe the suspect, and the frustration they experienced on the task. Confidence in the suspect's guilt, likelihood not to believe, and lack of frustration were used to signify tunnel vision.

## Methods

### *Statistical Power and Participants*

The ethical committee of Ariel University approved the study, and the Israeli police authorities granted permission to police investigators to participate in the study.

We based the present effect size on a previous study that used similar hypothetical scenarios and showed a strong effect when police investigators and laypeople were compared about considering these scenarios (Elaad, 2019). A GPower analysis indicated that a sample of 79 participants is adequate to detect an anticipated medium effect size (0.35) with a power of 0.95 and $\alpha = .05$.

Forty Israeli police investigators (nine females) with a mean age of 38.1 years ($SD = 9.0$) volunteered to participate in the study. Investigators were asked to state their interrogation experience in years, 39 complied. Experience ranged from 1 to 35 years ($M = 11.0$, $SD = 8.6$). Forty laypeople (11 females) with no past interrogation experience were recruited to the study from the local community. Their mean age was 37.6 years ($SD = 10.3$). The two participant groups' roughly equivalent ages and gender proportions were planned. All participants signed a consent form and were assured of confidentiality and anonymity.

### *Hypothetical Crime Scenarios: Plausibility Assessments*

The present study used the two most implausible hypothetical crime scenarios developed by Elaad (2019), a robbery and a drug-deal scenario, described below. Elaad (2019) provided plausibility scores for four criminal scenarios, which had been rated by 40 community members from the local community (20 females) on an 11-point scale ranging from 0 (*not at all plausible*) to 10 (*very plausible*). Of the four scenarios, the robbery and the drug deal scenarios were awarded the lowest plausibility scores ($M = 2.99$, $SD = 2.63$ and $M = 2.82$, $SD = 2.63$, respectively).

### *Hypothetical Crime Scenarios Description*

*Robbery scenario.* *You are an investigator in charge of investigating a robbery. The suspect tells you the following: Two days prior to the robbery, he was walking on the street when two masked men suddenly jumped him and forced him into a car. They covered his eyes and after half an hour's drive, he found himself led into an isolated house. Two days later, with his eyes blindfolded, they forced him into the car again. He felt one of his kidnappers put something in his pants pocket during the ride. The kidnappers then threw him out of the car and drove off. He removed his blindfold and found himself in the middle of an unfamiliar town. After walking for a few minutes, he was approached by two police officers who asked him to identify himself. They then checked the police database and discovered his criminal record. They instantly notified him that he was under arrest on suspicion of committing a robbery a short time ago in the vicinity. They searched him and found a gun in his pocket. He claims that the gun is not his and asks you to believe him.*

**Table 1.** Means (and *SDs*) of Confidence Ratings in the Suspect's Guilt by Investigators and Laypersons.

| Statements information | Robbery | | Drug | | Across statements | | Across information |
|---|---|---|---|---|---|---|---|
| | Incriminating | Exonerating | Incriminating | Exonerating | Incriminating | Exonerating | |
| Investigators | | | | | | | |
| *M* | 7.97 | 6.45 | 8.37 | 7.30 | 8.18 | 6.88 | 7.52 |
| *SD* | 1.13 | 2.06 | 1.44 | 2.00 | 1.29 | 2.05 | 1.39 |
| *N* | 20 | 20 | 20 | 20 | 40 | 40 | 40 |
| Laypersons | | | | | | | |
| *M* | 6.45 | 5.50 | 8.10 | 6.30 | 7.28 | 5.90 | 6.58 |
| *SD* | 1.54 | 2.08 | 1.34 | 2.00 | 1.65 | 2.06 | 1.48 |
| *N* | 20 | 20 | 20 | 20 | 40 | 40 | 40 |
| Across | | | | | | | |
| *M* | 7.21 | 5.98 | 8.24 | 6.80 | 7.73 | 6.39 | 7.06 |
| *SD* | 1.54 | 2.10 | 1.38 | 2.04 | 0.88 | 1.70 | 1.50 |
| *N* | 40 | 40 | 40 | 40 | 80 | 80 | 80 |

*Note*. Higher scores indicate guilt ratings. Lower scores indicate innocence.

***Drug deal scenario.*** *You are an investigator in charge of investigating a drug deal. The suspect has previous drug convictions and was arrested when he was caught with a commercial quantity of cocaine. The suspect tells you the following: He is a drug addict. Two days earlier, he went to buy cocaine for his use. His regular dealer made a mistake and handed him a larger package of cocaine than usual. He went home, not noticing the mistake. Police detectives arrested him near his home. They searched him and found the commercial quantity of the cocaine on him. He was detained, and now he is being interrogated.*

### *Procedure*

Participants were first asked to provide personal information (gender, age, religiosity, and investigators were asked to provide their interrogation experience in years). They then completed a short 4-item questionnaire individually, about their lie/truth-related abilities. Specifically, participants were asked to self-assess their abilities to tell lies, tell the truth, detect lies, and detect truths relative to other people. Responses were given on a scale ranging from 0 (*much worse than other people*) to 100 (*much better than other people*) with a middle point of 50 (*as good as others*).

Participants were also presented with two hypothetical criminal scenarios (the robbery and the drug deal scenarios), each related to an implausible fictional offense and an imaginary suspect. Both investigators and lay participants were asked to imagine that they were interrogating the suspect in each scenario. At the bottom of each scenario, a note indicated that intelligence information implies that the suspect might be guilty or innocent.

Half of each group (investigators and laypeople) received information implying guilt for the robbery scenario and information implying innocence for the drug deal scenario. The second half of each group received the reverse information.

Like in Elaad (2019), participants were asked to indicate on an 11-point scale: (a) their confidence in the suspect's guilt or innocence. Responses ranged from 0 (*absolutely innocent*) to 10 (*utterly guilty*); (b) the likelihood that they may believe the suspect's story. Responses ranged from 0% (*not at all*) to 100% (*very much*); (c) Frustration level in the interrogation situation. Responses ranged from 0 (*no frustration at all*) to 10 (*very frustrated*). *Frustration* is an emotion that occurs in situations where the individual is hindered from reaching a preferred outcome. In the present study, investigators acted in a familiar domain and were not blocked from making good decisions. Laypeople found themselves in an unfamiliar situation where making decisions may be frustrating. For example, an implausible scenario followed by intelligence information indicating innocence should frustrate laypeople more than investigators who are used to such inconsistencies. Group differences between investigators and laypeople in frustration are, therefore, expected.

## Results

### *Effects of Scenario and Added Information on Guilt Assessments*

Participants were asked to express their confidence in the suspect's guilt or innocence (Table 1). A 2 × 2 × 2 ANOVA, scenario (robbery and drug deal), information (incriminating and exonerating), and group (investigators and laypersons), was conducted on participant's confidence ratings. Scenario and information factors served as within-subject factors and the group factor as a between-subject factor. Results revealed a significant scenario effect, $F_{(1, 38)} = 15.2$, $p < .001$, $\eta^2_p = .29$, indicating that participants were more confident about the guilt of the drug deal suspect than about the guilt of the robbery suspect. A significant information effect, $F_{(1, 38)} = 21.0$, $p < .001$, $\eta^2_p = .36$, was also obtained, showing that participants were more confident to ascribe

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM



**Table 2.** Means (and *SDs*) of Likelihood to Believe the Suspect by Investigators and Laypersons.

| Statements information | Robbery | | Drug | | Across | | Across information |
|---|---|---|---|---|---|---|---|
| | Incriminating | Exonerating | Incriminating | Exonerating | Incriminating | Exonerating | |
| Investigators | | | | | | | |
| *M* | 20.0 | 34.5 | 17.3 | 21.0 | 18.6 | 27.8 | 23.2 |
| *SD* | 15.9 | 15.1 | 19.3 | 15.2 | 17.5 | 19.5 | 13.8 |
| *N* | 20 | 20 | 20 | 20 | 40 | 40 | 40 |
| Laypersons | | | | | | | |
| *M* | 46.8 | 50.0 | 29.0 | 47.5 | 37.9 | 48.8 | 43.3 |
| *SD* | 19.2 | 15.6 | 24.7 | 21.5 | 15.6 | 12.7 | 15.1 |
| *N* | 20 | 20 | 20 | 20 | 40 | 40 | 40 |
| Across | | | | | | | |
| *M* | 33.4 | 42.3 | 23.1 | 34.3 | 28.3 | 38.3 | 33.3 |
| *SD* | 22.1 | 22.6 | 22.7 | 22.7 | 16.0 | 17.9 | 17.6 |
| *N* | 40 | 40 | 40 | 40 | 80 | 80 | 80 |

*Note*. Higher scores indicate more believing.

guilt to a suspect when incriminating information was added and was less confident about the suspect's guilt when exonerating information was included. Finally, a significant main effect for group was obtained, $F_{(1,38)}=11.2$, $p=.002$, $\eta^2_p=.23$, implying that police investigators assigned higher confidence scores about the suspect's guilt than did laypeople. A closer look at this difference reveals that investigators assigned higher confidence scores to their presumption of guilt than laypeople, when incriminating, $t_{(78)}=2.72$, $p=.008$, $d=0.61$, and exonerating information, $t_{(78)}=2.06$, $p=.036$, $d=0.48$, were presented (Table 1). No significant interaction effects were observed.

## *Likelihood to Believe the Imaginary Suspect*

Participants were asked to indicate the likelihood that they may believe the suspect in each scenario. The means and standard deviations of the likelihood scores are displayed in Table 2. A 2 × 2 × 2 ANOVA, with one between-subject factor (group) and two within-subject factors (scenario and information), was conducted on the likelihood scores. The analysis revealed a significant main effect for scenario $F_{(1, 38)}=12.5$, $p=.001$, $\eta^2_p=.25$, indicating that the robbery scenario received higher likelihood scores than the drug deal scenario. A significant information effect, $F_{(1, 38)}=13.2$, $p=.001$, $\eta^2_p=.26$, shows that participants tended to assign a higher likelihood score when exonerating information was added, and lower likelihood to believe when incriminating information was included. Finally, a significant main effect for group, $F_{(1, 38)}=37.5$, $p<.001$, $\eta^2_p=.50$, implies that police investigators assigned lower likelihood scores than laypeople. To further examine the last difference, we used t-tests for independent groups. It appeared that laypeople were more willing to believe the suspects than investigators irrespective of the added information – incriminating information, $t_{(78)}=5.2$, $p<.001$, $d=1.16$, and exonerating information, $t_{(78)}=5.7$, $p<.001$, $d=1.28$. No significant interaction effects were found.

## *Frustration Ratings*

Participants were also asked to rate the degree of frustration they experienced when reading each scenario and making decisions of guilt or innocence. Mean frustration ratings are presented in Table 3. Frustration scores were analyzed using a similar 2 × 2 × 2 ANOVA (scenario, information, and group). A significant group effect, $F_{(1,38)}=30.5$, $p<.001$, $\eta^2_p=.45$, shows that laypersons were much more frustrated than investigators. The laypeople's frustration can be explained by the fact that they acted in an unfamiliar domain. A significant group difference appeared when both incriminating, $t_{(38)}=4.8$, $p<.001$, $d=1.53$, and exonerating, $t_{(38)}=4.1$, $p<.001$, $d=1.29$, information was added. A significant scenario effect, $F_{(1, 38)}=9.8$, $p=.003$, $\eta^2_p=.21$, indicated that the robbery scenario caused greater frustration than did the drug deal scenario. No other significant effects were obtained.

A closer look at the laypeople's frustration reveals a significant positive correlation between the likelihood to believe and frustration scores, $r_{(40)}=.32$, $p=.047$. Results may suggest that the more laypeople believed the suspect, the frustration grew larger. No significant link between the likelihood to believe and frustration ratings was found for investigators.

## *Self-Assessed Abilities to Tell and Detect Lies and Truths*

The means and standard deviations computed for the self-assessed abilities are presented in Table 4. To examine group differences in the self-assessments of these abilities, a 2 × 4 MANOVA was used with group (investigators and laypeople) as the between-subject variable, and abilities (the four self-assessed abilities) as the dependent variable. The MANOVA showed a significant overall group effect ($\lambda=.84$, $F_{(4,75)}=3.6$, $p=.01$, $\eta^2_p=.16$). Results imply that investigators exhibited significantly higher assessments of

**Table 3.** Means (and *SDs*) of Frustration Ratings by Investigators and Laypersons.

| Statements information | Robbery | | Drug | | Across | | Across information |
|---|---|---|---|---|---|---|---|
| | Incriminating | Exonerating | Incriminating | Exonerating | Incriminating | Exonerating | |
| Investigators | | | | | | | |
| *M* | 2.10 | 1.90 | 0.85 | 1.60 | 1.48 | 1.75 | 1.61 |
| *SD* | 2.34 | 2.22 | 1.27 | 2.50 | 1.96 | 2.34 | 1.68 |
| *N* | 20 | 20 | 20 | 20 | 40 | 40 | 40 |
| Laypersons | | | | | | | |
| *M* | 4.85 | 4.65 | 2.40 | 3.85 | 3.62 | 4.25 | 3.93 |
| *SD* | 2.11 | 3.18 | 2.60 | 2.32 | 2.64 | 2.78 | 1.75 |
| *N* | 20 | 20 | 20 | 20 | 40 | 40 | 40 |
| Across | | | | | | | |
| *M* | 3.48 | 3.28 | 1.63 | 2.73 | 2.55 | 3.00 | 2.78 |
| *SD* | 2.60 | 3.04 | 2.17 | 2.64 | 2.55 | 2.85 | 2.07 |
| *N* | 40 | 40 | 40 | 40 | 80 | 80 | 80 |

*Note*. Higher scores indicate higher levels of frustration.

**Table 4.** Means (and *SDs*) of Self-Assessed Abilities to Tell and Detect Lies and Truths.

| | *N* | Tell lies | Detect lies | Tell truths | Detect truths |
|---|---|---|---|---|---|
| Investigators | 40 | | | | |
| Mean | | 53.5 | 76.0 | 76.3 | 48.5 |
| *SD* | | 23.4 | 13.9 | 13.3 | 19.5 |
| Laypeople | 40 | | | | |
| Mean | | 50.3 | 62.1 | 69.4 | 59.3 |
| *SD* | | 27.2 | 23.3 | 17.5 | 18.2 |
| Across | 80 | | | | |
| Mean | | 51.9 | 69.0 | 72.8 | 53.9 |
| *SD* | | 25.3 | 20.3 | 15.8 | 19.5 |

*Note*. Higher scores indicate higher self-assessed abilities.

their lie-detecting ability than did laypeople ($F_{(1,78)} = 10.5$, $p = .002$, $\eta^2_p = .12$), and significantly higher assessments of their truth-telling ability ($F_{(1,78)} = 3.9$, $p = .05$, $\eta^2_p = .05$). However, they showed significantly lower truth-detecting ability assessments than did laypeople, ($F_{(1,78)} = -6.5$, $p = .013$, $\eta^2_p = .08$). Finally, the lie-telling ability assessments showed no group difference ($F_{(1,78)} = 0.3$, $p = \text{ns}$).

## Discussion

The present study was designed to highlight factors that undermine police legitimacy in the eyes of the public. First, we argued that police legitimacy is challenged by dominant biases in the police interrogation process. Two of these biases, tunnel vision, and confirmation bias, were manipulated to explore how these biases operate together and affect professional police investigators and laypeople's attitudes toward imaginary suspects who presented implausible stories in hypothetical criminal interrogation situations.

Results showed that investigators were more strongly affected than laypersons by tunnel vision. Specifically, implausible scenarios triggered three tunnel vision facets: (a) Confidence in the suspects' guilt. It was shown that police investigators were more confident about the suspect's guilt than laypeople. (b) Likelihood to disbelieve the suspect's story. Investigators were less likely to believe the suspect's story than laypeople. (c) Lack of frustration on the task. Laypeople showed a much higher frustration than investigators, when they decided to believe the suspect's account. The lower frustration level of investigators may be attributed to the familiar criminal context in which they found themselves.

Confidence in the suspect's guilt, rejecting any option to believe the suspect, and low frustration on the task, indicate that the tunnel vision that was created was strong. We suggest that investigators and laypeople alike presumed guilt when reading and judging the implausible scenarios, but investigators created more robust tunnel vision than laypeople. Investigator's strong presumption of guilt may be associated with their elevated self-assessed lie-detection ability, significantly higher than laypeople's self-assessment.

Presumption of guilt is an apparent bias in criminal interrogations. Kassin (2005) noted that police investigators believe that the suspects they interrogate in custody are not innocent. In a study manipulating involvement in the commission of a mock crime and interrogator's presumption of guilt or innocence, Kassin et al. (2003) reported that investigators who presumed guilt asked incriminating questions, were aggressive, and tried hard to extract a confession from the suspect.

The tunnel vision hypothesis was examined against intelligence information about the suspect's guilt or innocence. Exonerating information was coupled with one scenario, and incriminating information was added to the other

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 426 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM



scenario. According to tunnel vision predictions, investigators who developed a firm belief in the suspect's guilt were expected to render the exonerating information irrelevant, while laypeople were expected to consider the exonerating information more seriously than investigators. However, the results did not support this suggestion. While all participants were confident to ascribe guilt to the imaginary suspects, irrespective of the added information (incriminating or exonerating), this was particularly true for police investigators. Specifically, police investigators were more confident about the suspect's guilt than laypeople in the presence of incriminating and exonerating information. Still, investigators did not ignore exonerated information and lowered their confidence in the suspect's guilt when exonerating information was presented.

Similar effects were found concerning the likelihood of believing the imaginary suspects. The general tendency was not to believe. Still, police investigators were more unwilling to believe the suspect's story than laypeople, irrespective of the added information. However, police investigators did not ignore the exonerating information and responded by attenuating their reluctance to believe the suspects.

In summary, investigators and laypeople accepted the exonerating information as a reliable external source of information, moderated their confidence in guilt judgments, and enhanced their likelihood of believing the suspect.

The creation of tunnel vision and confirmation bias is based on global impressions rather than on single, well-defined behaviors (Hartwig & Bond, 2011). People tend to instantly make intuitive lie/truth judgments based on very little information rather than invest effort in careful consideration of the available information. This implies that people generally rely on simple heuristics when deciding whether to trust a message. Police investigators are not exceptional and can be susceptible to simple observer biases when in doubt whether to pursue the interrogation of a suspect.

Beliefs are generally formed in two ways: by inner sources such as experiences, inferences, and deductions or by accepting what an external source tells us to be true. The belief that the suspect is guilty because the scenario does not make sense is an example of a belief influenced by an inner source. Investigators have much more experience handling similar cases than laypeople and therefore find it easier to generate a firm belief about the suspect's guilt. This notion is supported by Hartwig and Bond (2011), who noted that implausible, illogical accounts with few details trigger distrust. Similarly, Aamodt and Custer (2006) suggested that a story that does not make logical sense is often judged in real-world situations as being deceptive.

It has already been demonstrated that police investigators are sensitive to implausible scenarios (Elaad, 2019). Such sensitivity was replicated in the present study. Elaad (2019) suggested that innocent suspects should try to prepare a plausible version of their statement. A plausible statement is especially important because previous results show that while guilty suspects prepare themselves for an interrogation, innocent suspects feel no need to invest efforts in such preparations because they believe their innocence must be apparent (Granhag & Hartwig, 2008). The present results support this recommendation.

On the other hand, people at large are anchored to the truth-bias, or the tendency of receivers to judge messages as being truthful rather than deceptive (e.g., Kohnken, 1989; Vrij, 2008). In a meta-analysis of lie detection studies, Bond and DePaulo (2006) found that 56% of the messages were judged as truthful and only 44% as deceptive, although participants were presented with equally frequent truths and lies. The truth bias may explain the laypeople's tendency to be less committed to the presumption of guilt than were investigators. Still, believing an implausible scenario frustrated laypeople.

It is well known that preexisting beliefs influenced decisions of law enforcement personnel such as investigators (Kassin et al., 2003), jurors (Lange et al., 2011), and judges (Halverson et al., 1997). However, ambiguity has a moderating effect on this relationship. Preexisting beliefs affect forensic expert judgments in the criminal justice system when the judged case is ambiguous and not when it is conclusive. Elaad et al. (1994) demonstrated the effect among police polygraph examiners who received inconclusive charts and were asked to make a lie/truth decision. Biasing information noted that the examinee had later confessed or someone else had later confessed. The added information influenced decisions. However, when charts indicating deception were presented, judgments were not influenced by biased information that denoted innocence. It appears that tunnel vision was set on when conclusive charts were presented.

Significant scenario effects were found in the present study, indicating that the suspect in the drug deal scenario was judged more strictly than the robbery scenario suspect. Specifically, the drug deal suspect was deemed guilty more confident than the robbery suspect. Furthermore, the drug deal suspect was believed less, with lower frustration involved, than was the robbery suspect. Such differences in interrogations are common. There are straightforward and complex cases, and investigators are expected to solve both successfully. There are so-called jailhouse informers or prisoners who claim to have heard a confession from a (usually high profile) suspect and testify against the suspect in exchange for some benefit. These informers are notoriously unreliable. Because of tunnel vision, their testimony continues to be implicated in wrongful convictions. Investigators are expected to unravel such cases.

A meta-analytical review (Elaad, 2018) showed that people generally overrate their lie-detection ability. This overestimation is especially true for law enforcement officers (Elaad, 2003) and police investigators (Elaad, 2009). We explained the bias by the desire of some investigators to avoid an appearance of being easily deceived and therefore

Case No: 23-KH-377 | Page 380 of 758

unprofessional. Nevertheless, we may suggest that many police investigators believe that if a suspect is lying, they can easily detect these lies (Williams & Gilovich, 2008). To this end, interrogators use learned deception cues, including the significant cue of message plausibility.

## Tunnel Vision Distortions in the Criminal Investigation Process

The number of identified wrongful convictions and false confessions is mounting, and in almost every wrongful conviction, the problem of tunnel vision is present (Findley, 2012; Findley & Scott, 2006; Martin, 2002). According to Martin (2002), tunnel vision distortion is particularly damaging in the investigative process. Investigator's misconduct becomes prevalent in note and record-keeping, witness interviews, the interrogation of suspects, and the conduct of searches. The consequences are often the presence of incomplete or even entirely inaccurate evidence in the trial, which increases the risk of miscarriages of justice. Martin (2002) further emphasized that tunnel vision amplifies the risk of using the informer's evidence. Police work relies on informers, either people who report a crime or provide information to the police for some profit. According to Martin (2002), informers misleading information are often present in wrongful convictions. The informer's problem is particularly severe in the case of prisoners who claim to have heard a confession from a suspect and profit from testifying against that suspect. Such testimony is notoriously unreliable. Tunnel vision enhances the likelihood that the testimony is heard in court and sometimes leads to a wrongful conviction.

## Future Research

Future research is advised to pay attention to other tunnel vision features such as the belief perseverance phenomenon (e.g., Ross et al., 1975). According to the belief perseverance phenomenon, investigators tend to preserve their guilt judgments and refuse to change their views. For example, despite the decisive DNA evidence that the semen taken from a rape-murder scene could not have come from the suspect, police investigators might continue to look for evidence explaining how the suspect is guilty.

## Limitations

The simulated scenarios may have appeared somewhat artificial to police investigators. Specifically, the impact of the present scenarios is less significant than actual performance would suggest, and police investigators may behave differently in real-life situations. Therefore, caution is recommended when generalizing the present results to actual police performance. An experimental design that includes rewards for successfully identifying of suspects by police investigators and laypeople should be considered in future studies.

It may be argued that the presented intelligence information came across as contrived, and therefore results may say little about real-world cases in which investigators rely on specific hard evidence when developing their beliefs. Indeed, when hard evidence exists, the decision to pursue a suspect's interrogation is based on the available hard evidence. However, even when hard evidence is scarce, interrogators are not always inclined to release the suspect. In such cases, police investigators may rely on less decisive evidence that may prompt judgmental biases. For example, police investigators may rely on the plausibility of the suspect's account when deciding whether to pursue or terminate the interrogation.

Finally, we did not control for aphantasia, or the inability to form mental images of people that are not present, which may be relevant to the present scenarios. However, no participant complained about such difficulties. Therefore, it seems that aphantasia was not a problem here.

## Conclusions

Two opposing biases potentially affect police investigator's decisions in criminal interrogations. One is over-reliance on external sources that are not necessarily accurate. The other is tunnel vision, which is over-reliance on own sources while ignoring external information. Such over-reliance might be similarly misleading. Extensively studied, external sources are typically trusted in ambiguous cases, while tunnel vision is shared in clear-cut cases. However, most cases are neither clear nor unclear, which leaves room for both tendencies to operate simultaneously. The current study demonstrated more robust tunnel vision and enhanced self-assessed lie-detection abilities among police investigators than laypeople. However, reliance on external information was firm among investigators and laypeople alike. Future research aims to find ways to moderate the documented biases and be more cautious when presuming guilt. Specifically, to enhance awareness about the investigator's over-reliance on internal and external sources that may be misleading.

### Declaration of Conflicting Interests

The author declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author received no financial support for the research, authorship, and/or publication of this article.

### ORCID iD

Eitan Elaad https://orcid.org/0000-0003-3964-1238

## References

Aamodt, M. G., & Custer, H. (2006). Who can best catch a liar? A meta-analysis of individual differences in detecting deception. *Forensic Examiner*, *15*, 6–11.

Bond, C. F., & DePaulo, B. M. (2006). Accuracy of deception judgments. *Personality and Social Psychology Review*, *10*, 214–234. https://doi.org/10.1207/s15327957pspr1003_2

Bond, C. F., & DePaulo, B. M. (2008). Individual differences in judging deception: Accuracy and Bias. *Psychological Bulletin*, *134*, 477–492.

Dando, C. J., & Bull, R. (2011). Maximising opportunities to detect verbal deception: Training police officers to interview tactically. *Journal of Investigative Psychology and Offender Profilling*, *8*, 189–202. https://doi.org/10.1002/jip.145

Dando, C. J., & Ormerod, T. C. (2017). Analyzing decision logs to understand decision making in serious crime investigations. *Human Factors*, *59*, 1188–1203.

Dioso-Villa, R. (2015). A repository of wrongful convictions in Australia: First step toward estimating prevalence and causal contributing factors. *Flinders Law Journal*, *17*, 163–202.

Doherty, M. E., Mynatt, C. R., Tweney, R. D., & Schiavo, M. D. (1979). Pseudodiagnosticity. *Acta Psychologica*, *49*, 11–21.

Ekman, P., & O'Sullivan, M. (1991). Who can catch a liar? *American Psychologist*, *46*, 913–920. https://doi.org/10.1037/0003-066X.46.9.913

Elaad, E. (2003). Effects of feedback on the overestimated capacity to detect lies and the underestimated ability to tell lies. *Applied Cognitive Psychology*, *17*, 349–363. https://doi.org/10.1002/acp.871

Elaad, E. (2009). Lie-detection biases among male police investigators, prisoners, and laypersons. *Psychological Reports*, *105*, 1047–1056. https://doi.org/10.2466/PR0.105.F.1047-1056

Elaad, E. (2018). Personality, demographic, and psychophysiological correlates of people's self-assessed lying abilities. In J. P. Rosenfeld (Ed.), *Detecting concealed information and deception (*pp. 353–374). Academic Press. https://doi.org/10.1016/B978-0-12-812729-2.00015-X

Elaad, E. (2019). Plausible lies and implausible truths: Police investigator's preferences while portraying the role of innocent suspects. *Legal and Criminological Psychology*, *24*, 229–240. https://doi.org/10.1111/lcrp.12155

Elaad, E., Ginton A., & Ben-Shakhar, G. (1994). The effects of prior expectations and outcome knowledge on polygraph examiners' decisions. *Journal of Behavioral Decision Making*, *7*, 279–292.

Findley, K. A. (2012). Tunnel vision. In B. L. Cutler (Ed.) *Conviction of the innocent* (pp. 303–324.). American Psychological Association.

Findley, K. A., & Scott, M. S. (2006). The multiple dimensions of tunnel vision in criminal cases. *Wisconsin Law Review*, *2006*, 291–397.

Granhag, P. A., & Hartwig, M. (2008). A new theoretical perspective on deception detection: On the psychology of instrumental mind-reading. *Psychology, Crime & Law*, *14*, 189–200. https://doi.org/10.1080/10683160701645181

Halverson, A. M., Hallahan, M., Hart, A. J., & Rosenthal, R. (1997). Reducing the biasing effects of judge's nonverbal behavior with simplified jury instruction. *Journal of Applied Psychology*, *82*, 590–598. https://doi.org/10.1037/0021-9010.82.4.590

Hartwig, M., & Bond, C. F., Jr. (2011). Why do lie-catchers fail? A lens model meta-analysis of human lie judgments. *Psychological Bulletin*, *137*, 643–659.

Kassin, S. M. (2005). On the psychology of confessions. *American Psychologist*, *60*(3), 215–228. https://doi.org/10.1037/0003-066X.60.3.215

Kassin, S. M., Dror, I., & Kukucka, J. (2013). The forensic confirmation bias: Problems, perspectives, and proposed solutions. *Journal of Applied Research in Memory and Cognition*, *2*, 42–52.

Kassin, S. M., Goldstein, C. C., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior*, *27*(2), 187–203. https://doi.org/10.1023/A:1022599230598

Kohnken, G. (1989). Behavioral correlates of statement credibility: Theories, paradigms and results. In H. Wegener, F. Losel & J. Haisch (Eds.), *Criminal behavior and the justice system: Psychological perspectives* (pp. 271–289). Springer-Verlag.

Lange, N. D., Thomas, R. P., Dana, J., & Dawes, R. M. (2011). Contextual biases in the interpretation of auditory evidence. *Law and Human Behavior*, *35*, 178–187. https://doi.org/10.1007/s10979-010-9226-4

Levine, T. R., Sun Park, H., & McCornack, S. A. (1999). Accuracy in detecting truths and lies: Documenting the "veracity effect". *Communication Monographs*, *66*, 125–144. https://doi.org/10.1080/03637759909376468

Martin, D. L. (2002). Lessons about justice from the "laboratory" of wrongful convictions: Tunnel vision, the construction of guilt and informer evidence. *University of Missouri-Kansas City Law Review*, *70*, 847–864.

Masip, J., & Herrero, C. (2017). Examining police officer's response bias in judging veracity. *Psicothema*, *29*(4), 490–495. https://doi.org/10.7334/psicothema2016.357

Maynard, D. W., & Schelly, (2017). Tunnel vision in a murder case: Telephone interaction between police detectives and the prime suspect. *Discourse Studies*, *19*(2), 169–195. https://doi.org/10.1177/1461445617691703

Meissner, C. A., & Kassin, S. M. (2002). "He's guilty!": Investigator bias in judgments of truth and deception. *Law and Human Behavior*, *26*, 469–480. https://doi.org/10.1023/A:1020278620751

National Academy of Sciences. (2009). *Strengthening forensic science in the United States: A path forward*. National Academies Press.

Packer, H. L. (1964). Two models of the criminal process. *University of Pennsylvania Law Review*, *113*, 1–68.

Ross, L., Lepper, M. R., & Hubbard, M. (1975). Perseverance in self-perception and social perception: Biased attributional processes in the debriefing paradigm. *Journal of Personality and Social Psychology*, *32*(5), 880–892. https://doi.org/10.1037/0022-3514.32.5.880

Sandham, A. L., Dando, C. J., Bull, R., & Ormerod, T. C. (2020). Improving professional observers' veracity judgements by tactical interviewing. *Journal of Police and Criminal Psychology*, Advance online publication. https://doi.org/10.1007/s11896-020-09391-1

Scherr, K. C., Redlich, A. D., & Kassin, S. M. (2020). Cumulative disadvantage: A psychological framework for understanding

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 429 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM



how innocence can lead to confession, wrongful conviction, and beyond. *Perspectives on Psychological Science*, *15*, 353–383. https://doi.org/10.1177/1745691619896608

Stewart, S. L. K., Wright, C., & Atherton, C. (2019). Deception detection and truth detection are dependent on different cognitive and emotional traits: An investigation of emotional intelligence, theory of mind, and attention. *Personality and Social Psychology Bulletin*, *45*, 794–807. https://doi.org/10.1177/0146167218796795

Tankebe, J. (2013). Viewing things differently: The dimensions of public perception of police legitimacy. *Criminology*, *51*, 103–135. https://doi.org/10.1111/j.1745-9125.2012.00291.x

Tyler, T. R. (2006). Psychological perspectives on legitimacy and legitimation. *Annual Review of Psychology*, *57*, 375–400. https://doi.org/10.1146/annurev.psych.57.102904.190038

Tyler, T. R., & Jackson, J. (2014). Popular legitimacy and the exercise of legal authority: Motivating compliance, cooperation, and engagement. *Psychology, Public Policy, and Law*, *20*, 78–95. https://doi.org/10.1037/a0034514

Vrij, A. (2008). *Detecting lies and deceit: Pitfalls and opportunities* (2nd ed.). Wiley.

Williams, E. F., & Gilovich, T. (2008). Do people really believe they are above average? *Journal of Experimental Social Psychology*, *44*, 1121–1128. https://doi.org/10.1016/j.jesp.2008.01.002

Case No: 23-KH-377 | Page 383 of 758

# Exhibit L

Hofstra Law Review

Volume 45 | Issue 2 Article 7

12-1-2016

# Tunnel Vision: Causes, Effects, and Mitigation Strategies

Brian Reichart

Follow this and additional works at: http://scholarlycommons.law.hofstra.edu/hlr

Part of the Constitutional Law Commons

Recommended Citation

Reichart, Brian (2016) "Tunnel Vision: Causes, Effects, and Mitigation Strategies," *Hofstra Law Review*: Vol. 45 : Iss. 2 , Article 7.
Available at: http://scholarlycommons.law.hofstra.edu/hlr/vol45/iss2/7

This document is brought to you for free and open access by Scholarly Commons at Hofstra Law. It has been accepted for inclusion in Hofstra Law Review by an authorized administrator of Scholarly Commons at Hofstra Law. For more information, please contact lawcls@hofstra.edu.

# TUNNEL VISION: CAUSES, EFFECTS, AND MITIGATION STRATEGIES

*Brian Reichart**

## I. INTRODUCTION

The recent spate of exonerations has alerted the public about the problem of intentional prosecutorial misconduct.[1] However, an even more disturbing insight gained from the study of exonerations is that many of these wrongful convictions resulted from something shy of intentional misconduct. We have seen investigations that were deeply flawed by an approach in which legal actors focused solely on building a case against a specific suspect rather than conducting a thorough investigation.[2]

In recent years, scholars have focused on "tunnel vision" as a cause of wrongful convictions.[3] Tunnel vision is the tendency fueled by bias and pressure that leads actors in the criminal justice system to single-mindedly focus on a suspect and build a case for conviction while ignoring evidence that points away from guilt.[4] Once it has taken hold of an individual, mere notions or assumptions are reified and become almost immovable. The consequences can be devastating—the innocent are sent to prison and the guilty remain free. Given the limits of the law in correcting tunnel vision after it occurs, educating legal actors before they become the investigators, prosecutors, defense lawyers, and judges

---

* Supervising Attorney and Clinical Teaching Fellow, The Community Justice Project, Georgetown University Law Center. I am indebted to Jane Aiken, Daria Fisher Page, Caitlin Reichart, and Patty Prewitt.

1. *See* NAT'L REGISTRY OF EXONERATIONS, UNIV. OF MICH. LAW SCH., EXONERATIONS IN 2015, at 1, 3-4, 7-8 (2016), http://www.law.umich.edu/special/exoneration/documents/exonerations_in_2015.pdf.

2. *Id.* apps. at 2-3 (seven illustrative exonerations).

3. *See* Keith A. Findley & Michael S. Scott, *The Multiple Dimensions of Tunnel Vision in Criminal Cases*, 2006 WIS. L. REV. 291, 292 (2006).

4. *Id.*

who can serve as the hedge against a biased focus is crucial to minimizing the pernicious effects of tunnel vision.

This Article draws on the author's profound experiences as a law student, practicing attorney, and clinician advocating on behalf of Patricia ("Patty") Prewitt in a case of innocence that has little chance of judicial remedy largely due to the tunnel vision that tainted the investigation and trial. Using the Prewitt case as a vehicle for exploring the effects of tunnel vision, this Article provides insight into how investigations become contaminated by a single-minded theory of culpability.[5] Through an examination of investigators' reports, prosecutor's notes, and trial records of the Prewitt case, this Article identifies decision points where legal actors manifested tunnel vision.[6] This Article also shows how tunnel vision led the investigators and prosecution to inflate the probative value of certain evidence and appeal to gender bias as a means of bolstering a weak case.[7] The Article then explores how tunnel vision results in an inability to cure the fundamental injustice created by these early decisions.[8] Accordingly, tunnel vision must be prevented at the outset. This Article offers an approach to training legal actors to identify both the urge toward tunnel vision and strategies to mitigate it.[9] Such strategies are essential skills for all legal actors, particularly those who are likely to be investigators, prosecutors, defense attorneys, judges, and governors.

## II. TUNNEL VISION AS A CAUSE OF WRONGFUL CONVICTIONS

The National Registry of Exonerations ("NRE") has estimated that tens of thousands of false convictions occur each year across the United States and that many more have accumulated over the decades.[10] Just a fraction of the wrongfully convicted are exonerated.[11] In 2015, a record 149 defendants were exonerated of a criminal conviction.[12] Of these defendants, 58 were exonerated of homicide.[13] Even for the few wrongfully convicted who are released, post-hoc remedies to incarceration are unacceptable. Those who are exonerated will never get back the time they lost—time away from friends and loved ones, and

5. *See infra* Parts III–IV.
6. *See infra* Parts V–VI.
7. *See infra* Part VIII.
8. *See infra* Part XI.
9. *See infra* Parts II–XI.
10. *See* NAT'L REGISTRY OF EXONERATIONS, *supra* note 1, at 2, 17.
11. *See id.* at 2.
12. *Id.* at 1, 3-7.
13. *Id.* at 1, 4, 6.

missed holidays, weddings, and birthdays. We need to understand and correct the errors that cause irreparable damage for the wrongfully convicted and their families.

So what are these errors? The Innocence Project has identified the following causes of wrongful conviction: eyewitness misidentification, false confessions, unvalidated or improper forensics, incentivized informant testimony, government misconduct, and inadequate defense.[14] Tunnel vision affects, and is affected by, these flaws in the criminal justice system.[15] Indeed, the problem of tunnel vision has been described as a common theme in almost every case of wrongful conviction.[16]

Tunnel vision is a "'compendium of common heuristics and logical fallacies,' to which we are all susceptible, that lead actors in the criminal justice system to 'focus on a suspect, select and filter the evidence that will "build a case" for conviction, while ignoring or suppressing evidence that points away from guilt.'"[17] In addition to its cognitive sources, tunnel vision can be facilitated by institutional and cultural pressures.[18] It is insidious and can affect anyone involved in the administration of justice, at times with tragic results.[19] The impact of tunnel vision does not end once conviction is secured. Instead, as demonstrated by the Prewitt case, tunnel vision can prevent a wrongfully convicted individual from obtaining the very evidence necessary for judicial exoneration or gubernatorial clemency. Because tunnel vision can result in wrongful convictions that are very difficult to overturn, it is essential, to the extent possible, to prevent tunnel vision from the outset. Police, prosecutors, lawyers, and judges all must be alert to its lure.

What follows is a story emblematic of the pernicious effects of tunnel vision. Like so many of the skills and insights necessary to be an effective lawyer, tunnel vision is best understood in context. The details are important because tunnel vision does not manifest itself solely through a single decision by a legal actor. Rather, tunnel vision is characterized by "escalating commitments" that lead to an "incremental descent into poor judgment."[20] Decisions are made that compound upon

14. *The Causes*, INNOCENCE PROJECT, http://www.innocenceproject.org/#causes (last visited Dec. 31, 2016).

15. Findley & Scott, *supra* note 3, at 322.

16. *See, e.g.*, *id.* at 296-99.

17. *Id.* at 292 (quoting Dianne L. Martin, *Lessons About Justice from the "Laboratory" of Wrongful Convictions: Tunnel Vision, the Construction of Guilt and Informer Evidence*, 70 UMKC L. REV. 847, 848 (2002)).

18. Keith A. Findley, *Tunnel Vision*, *in* CONVICTION OF THE INNOCENT: LESSONS FROM PSYCHOLOGICAL RESEARCH 303-04, 313 (Brian L. Cutler ed., 2012).

19. Martin, *supra* note 18, at 849.

20. Elizabeth Webster & Jody Miller, *Gendering and Racing Wrongful Conviction:*

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 435 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM


each other while safeguards against wrongful conviction fail.[21] The Prewitt case took place in a small town generally spared the horrors of murder, with a police force unsophisticated in investigative techniques. Unfortunately, as in many close-knit communities, notions of appropriate behavior, gossip, and fear can fuel a rush to engage in cognitive shortcuts and increase the probability of tunnel vision.[22]

This story is shared as a cautionary tale and a call to action. As legal educators, we have a moral responsibility to educate our students about the temptation of tunnel vision and equip them with the tools to minimize its harmful effects. When the stakes are this high, it is critical that legal educators engage in effective training in this area.

## III. MURDER IN HOLDEN

High school sweethearts Bill and Patty Prewitt married in 1968.[23] The Prewitts were active in their small community of Holden, Missouri, a town with 2000 residents roughly fifty miles outside of Kansas City. They had five school-aged children and owned and operated a lumberyard in the center of town.[24] Patty served as President of the local Chamber of Commerce,[25] volunteered with the PTA, coached softball, and helped start a task force to keep drugs out of the high school.[26]

On Friday, February 17, 1984, Bill and Patty Prewitt met their longtime friends Paul and Jeri Austin for dinner at a barbecue restaurant just outside of Holden.[27] It had been a long week at the lumberyard, and the Prewitts looked forward to a relaxing evening with the Austins. After an evening of dinner, dancing, and video games, Bill and Patty drove home at approximately 2:00 a.m. on February 18, in the rainy, rural Missouri night.[28] Bill checked on the kids and went to bed. Patty cleaned the dishes that the children had left in the sink and then followed Bill to bed.

---

*Intersectionality, "Normal Crimes," and Women's Experiences of Miscarriage of Justice*, 78 ALB. L. REV. 973, 1027 (2015) (quoting William S. Lofquist, *Whodunit? An Examination of the Production of Wrongful Convictions*, *in* WRONGLY CONVICTED: PERSPECTIVES ON FAILED JUSTICE 174, 176 (Saundra D. Westervelt & John A. Humphrey eds., 2001)).

21. *See id.* at 1027-29.

22. For a particularly disturbing example of a small town murder investigation gone awry, see JOHN GRISHAM, THE INNOCENT MAN: MURDER AND INJUSTICE IN A SMALL TOWN 118-22 (2006).

23. Shelley Smithson, *Man Killer: Did Patty Prewitt Pump Two Bullets into Her Husband's Head? It Is a Mystery That Has Lingered for Twenty Years*, RFT (Aug. 11, 2004), http://www.riverfronttimes.com/stlouis/man-killer/Content?oid=2492582.

24. *Id.*

25. *See id.*

26. *See id.*

27. *See id.*

28. *See id.*


Case No: 23-KH-377 | Page 389 of 758

What happened next has been disputed for over thirty-two years. In 1985, a jury agreed with the State's account in which Patty shot her husband of fifteen years as he slept just feet away from their children.[29] The prosecutor repeatedly argued that Patty was motivated by "lust and greed."[30] He characterized Patty as an unfit mother and elicited detailed testimony from three men regarding their extramarital relationships with her, each of which had occurred five or more years before Bill's death.[31] Despite their failure to follow exculpatory leads, investigators testified to the dearth of evidence they found to support Patty's account of an intruder.[32]

Patty was sentenced to life in prison without the possibility of parole for fifty years.[33] Patty, now sixty-seven years old, has always maintained her innocence.[34] The author of this Article, as a law student in the Community Justice Project at Georgetown University Law Center, had co-authored a clemency petition on Patty's behalf that was submitted to former Governor Jay Nixon in 2010.[35] In January 2017, Nixon left office without acting on the clemency petition.

## IV. IDENTIFICATION OF THE SUSPECT BASED ON PREEXISTING FRAMEWORKS

How do legal actors come to identify particular suspects as suspect? Sociologist William Lofquist contends that legal actors adopt preexisting frameworks into which particular crime scenarios are fitted.[36] This occurs when legal actors rely upon "normal crime" frameworks. Sociologist David Sudnow identifies normal crime scenarios as those occurrences whose typical features (how they occur and who commits them) are known by legal actors based on routinely encountering such scenarios.[37] Meanwhile, there is a premium on quick action. Experts have identified the first forty-eight hours after the report of a homicide

29. *See id.*
30. *Id.*
31. *See id.*
32. *See id.*
33. *Id.*
34. *See id.*
35. *See* Heather Hollingsworth, *Clemency Sought for Woman in Husband's Killing*, EMISSOURIAN.COM (Dec. 17, 2010), http://www.emissourian.com/news/state/clemency-sought-for-woman-in-husband-s-killing/article_42ecef2a-0a02-11e0-9622-001cc4c002e0.html?mode=jqm; *Clemency Sought for Mo. Woman Convicted in Husband's Murder*, KMBC NEWS (Dec. 8, 2013, 6:54 AM), http://www.kmbc.com/article/clemency-sought-for-mo-woman-convicted-in-husband-s-murder/3679651.
36. Lofquist, *supra* note 21, at 183.
37. David Sudnow, *Normal Crimes: Sociological Features of the Penal Code in a Public Defender Office*, 12 SOC. PROBS. 255, 260 (1965).

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 437 of 856
Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM




as critical to clearing the crime.[38] The necessity for haste likely increases the probability of using cognitive shortcuts.[39] These shortcuts are often based on "typical" understandings of whom the perpetrator is likely to be.[40] This can create either the starting point of a thorough investigation or, as demonstrated in the Prewitt case, invite an investigator to embrace the "typical" solution prematurely.

The lead investigator in the Prewitt case, Johnson County Deputy Sheriff Kevin Hughes, twenty-seven years old, arrived at the Prewitt home at about 4:40 a.m. on February 18, lacking significant homicide investigation experience.[41] There were only five murders in all of Johnson County—population 25,000—in the previous three years.[42] Yet, the young investigator had ambitions for career advancement, and the Prewitt case presented a unique opportunity. Indeed, according to a "fictionalized" account of the Prewitt case authored by the Johnson County prosecuting attorney, Tom Williams, "[Hughes] had a plan—to move up in his career. . . . Precisely, he needed a major case, something spectacular, preferably a murder, one with plenty of mystery, a lot of media interest, a case where he could take the lead and get publicity."[43] Meanwhile, Holden was stunned by the news of a prominent community member's death. In just a few months, this shaken community would have to decide whether to reelect Hughes's boss, Sheriff Charles Norman.[44] Pressure was on Hughes and his colleagues to quickly identify and arrest the perpetrator.

Absent extensive personal experience with homicide investigations, Hughes relied on what he believed was a common feature of these crimes to guide his inquiry. Specifically, Hughes later revealed he had arrived on the scene mindful of a statistic that seventy-five percent of murders are committed by a family member or friend of the victim.[45]

---

38. DAVID L. CARTER & BRIAN RUSSELL, VIOLENCE REDUCTION NETWORK, STRATEGIES TO IMPROVE HOMICIDE INVESTIGATIONS AND INCREASE CLEARANCE RATES 17 (2015), https://www.vrnetwork.org/Documents/VRN%20Homicide%20Investigations%20Webinar%20June%202%2020 15.pdf.

39. *See* Gregory K. Moffatt & Nicholas W. Hersey, *Typical and Atypical Homicide: Investigative Differences and Cold Case Profiling*, 19 FORENSIC EXAMINER 40, 41 (2010).

40. *See id.* at 42.

41. TOM R. WILLIAMS & NAN COCKE, PRACTICE TO DECEIVE 19 (2016). This book is based on a manuscript copyrighted by Prosecutor Tom Williams in 1987. It was published two years after his death. The publisher labeled the book as fiction.

42. E-mail from U.S. Dep't of Justice to author (Feb. 8, 2016, 9:28 AM) (on file with author).

43. WILLIAMS & COCKE, *supra* note 42, at 7.

44. *See* Transcript of Record at 216-17, State v. Prewitt, No. CR484-5F (Mo. Cir. Ct. Oct. 16, 1985).

45. *Id.* at 328.


Case No: 23-KH-377 | Page 391 of 758

Hughes was notified that a shooting had taken place at a residence approximately two miles north of downtown Holden.[46] He learned from Holden Police Chief John Scott that Bill Prewitt was dead in his bedroom. Patty had driven with her five children to a neighbor's house to seek help after Bill was shot.[47] Upon arriving at the Prewitt home, Hughes conducted a brief survey of the murder scene, later recalling that he saw no indication of struggle in the bedroom.[48] Hughes then drove to the neighbor's home to interview Patty with his colleague, Deputy Doug Rusher.[49] Still dressed in the white pajamas she wore to bed, Patty shared her account with Hughes. She woke up to a loud noise, was grabbed by her hair, and thrown to the floor.[50] In complete darkness, a man pulled down Patty's pajama bottoms as he held a knife to her throat.[51] After a struggle, the assailant departed down the stairs.[52] Patty checked on her husband who was immobile. The lights were inoperable, as were the phones.[53] She gathered the children and left for the neighbor's house where she sought help.[54] Hughes learned from Patty that the Prewitts owned two guns. In a report written later that day, Rusher noted that he had observed "hesitation type cuts" running horizontally across Patty's throat.[55] Indeed, years later Hughes would recall, "When I saw the marks on her neck, I thought, '[t]hat looks like she did it looking in the mirror with a razor blade.'"[56]

An hour after his arrival on the scene, it became clear that Hughes was faced with either a "whodunit" case in which there were no clear leads yet or a more "typical" case, at least in his mind, where the murderer was a family member of the victim. From that point forward, his actions demonstrate that Hughes had a single-minded focus on Patty as the perpetrator. With tunnel vision already rooted in his approach to the investigation, subsequent information pointing to another suspect did not move Hughes from this narrow viewpoint.

Psychologists have recognized adults have a natural tendency to "integrate experiences that validate or fit their meaning schemes and

46. *Id.* at 255.

47. WILLIAMS & COCKE, *supra* note 42, at 40-41.

48. Transcript of Record, *supra* note 45, at 261.

49. Transcript of Deposition of Kevin Craig Hughes at 6, State v. Prewitt, No. CV-584-84F (Mo. Cir. Ct. May 25, 1984).

50. WILLIAMS & COCKE, *supra* note 42, at 31.

51. *Id.*

52. Transcript of Record, *supra* note 45, at 279-80, 282.

53. *Id.* at 282-83.

54. *Id.* at 286.

55. Doug Rusher, Johnson Cty. Sheriff's Office, Offense/Incident Report, Complaint No. 84-085 (Feb. 18, 1984) (on file with author).

56. Smithson, *supra* note 24.

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 439 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM


discount those that do not."[57] In order "[t]o learn, adults must break through preexisting patterns, allowing them to either validate or transform assumptions that they may bring to a given situation."[58] Professor Jane Aiken has encouraged law professors to teach "'reflective skepticism,' where students learn to understand that knowledge is constructed, gain the ability to identify and challenge assumptions, and imagine and explore alternatives."[59]

Similarly, adult education scholar Stephen Brookfield has identified four components of critical thinking. First, critical thinkers identify and challenge assumptions. Second, critical thinkers are aware of context. Third, critical thinkers imagine and explore alternatives. Finally, critical thinkers engage in reflective skepticism.[60]

Imagine if, after meeting with Patty, Hughes explored a series of questions such as the following:

> *What assumptions am I making?* It is unlikely that the perpetrator was an outsider. It is only an outsider if there are signs of an intruder. People lock their homes. If there was no struggle, then it was an inside job. If it was an inside job, then it must be the wife. The only direct witness is lying. Patty self-inflicted the lacerations on her neck. She cut the power and the phone lines. There was no intruder. Patty killed her husband.
>
> *What facts support these assumptions?* We live in a small town not subject to much crime. The cuts appear self-inflicted. There are no signs of an intruder.
>
> *Are there other ways to interpret these facts?* The intruder was solely interested in murdering Bill, not theft, so there would be no sign of an intruder. The house was unlocked and, therefore, the intruder could enter without leaving an indication of forced entry. I do not have the expertise to determine whether cuts are self-inflicted.
>
> *What contextual factors are affecting this investigation?* Pressure from the community and my boss.
>
> *What stake do I have in this investigation?* Ambitions for career growth.

57. Jane H. Aiken, *The Clinical Mission of Justice Readiness*, 32 B.C. J.L. & SOC. JUST. 231, 238 (2012).

58. *Id.* at 239.

59. *Id.* at 236.

60. STEPHEN D. BROOKFIELD, DEVELOPING CRITICAL THINKERS: CHALLENGING ADULTS TO EXPLORE ALTERNATIVE WAYS OF THINKING AND ACTING 7-9 (1987).


Case No: 23-KH-377 | Page 393 of 758

Such analysis by Hughes could have dramatically changed the course of the investigation and profoundly altered the life of Patty Prewitt.

## V. BUILDING A CASE (TUNNEL VISION VIA CONFIRMATION BIAS)

Once a suspect is identified, the effects of tunnel vision almost guarantee that the person will be seen as the actual wrongdoer.[61] Among the dimensions of tunnel vision identified by scholars is "confirmation bias." Confirmation bias is the tendency to seek, interpret, or recall information in a manner that supports exiting beliefs, expectations, or hypotheses.[62] One expression of the bias is the tendency to seek information that confirms a hypothesis.[63] While there is nothing inherently wrong in seeking information to confirm a hypothesis, such an approach becomes problematic when it is done at the expense of ignoring any other possibility.[64] Confirmation bias expresses itself not only by what information is sought to confirm a hypothesis but also through the tendency to avoid information that would disconfirm the hypothesis.[65] As Keith Findley and Michael Scott have noted, collecting physical evidence from a crime scene can be influenced by the theory of the crime and where the primary investigator is also the primary collector of physical evidence, as Hughes was in the Prewitt case, there is a heightened risk that important physical evidence might be overlooked if the primary investigator prematurely settles on one theory of the crime.[66]

Hughes's actions on the first day of his investigation are consistent with one experiencing confirmation bias. After his initial interview with Patty at her neighbor's house, Hughes returned to the Prewitt home.[67] Little physical evidence used at trial was collected in these crucial, early hours of the investigation, even though there was plenty that could have been preserved. Fingerprints were not collected from anywhere in the bedroom or from the breaker box used to cut the electric power to the house.[68] Reports made at the time by investigators do not note any effort

61. Findley & Scott, *supra* note 3, at 316 (explaining that once a suspect is identified, tunnel vision often causes investigators to both seek evidence confirming the suspect's guilt and avoid disconfirming evidence).

62. *Id.* at 309, 312.

63. *Id.* at 309.

64. *See, e.g.*, *id.* at 309-10 (describing, briefly, two experiments in which participants sought confirming evidence in lieu of disconfirming evidence while the latter would have been more probative).

65. *Id.*

66. *Id.* at 377.

67. Transcript of Record, *supra* note 45, at 331.

68. *Id.* at 316-17.

to collect or search for hairs in the bedroom.[69] In fact, not a single fingerprint or hair sample was lifted from the entire house. In a report written over a year later and just prior to trial, Hughes claimed that he had searched for hair to verify Patty's account of being pulled from bed by her hair, but no quantities of hair were discovered.[70] At trial, however, Hughes testified that he did see hairs embedded in the bedroom carpet, but they appeared to have been there for a long period of time.[71] Mary Englert, Patty's friend, cleaned the bedroom after the sheriff's office released the crime scene to the Prewitt family.[72] She testified that she had vacuumed hair off the bedroom floor.[73] Footprints were not analyzed despite a later account from the sheriff that many footprints were present near the Prewitt home.[74] The lack of rigor surrounding evidence collection at the Prewitt home is further demonstrated by the way in which the shell casings from the murder weapon were discovered. One shell casing was discovered by a detective roughly eleven hours after the crime scene had been secured and only because it fell out of a wicker loveseat that he sat on.[75] The loveseat was just four feet from the bed where Bill was murdered.[76] A second shell casing was found by Englert behind the love seat after the crime scene had been released by investigators.[77]

Instead of a thorough investigation of the scene, Hughes collected Bill Prewitt's insurance policy, which listed Patty as the beneficiary, as well as over a dozen Alfred Hitchcock mystery novels. In a deposition three months later, Hughes stated that he had taken the books because "[o]n the back of one of the books there was an advertisement for another book, another novel of some kind that said something to the effect of how to commit the perfect murder."[78] It is difficult to imagine how an insurance policy and murder mystery novels relate to the possibility of an intruder murdering Bill Prewitt. The collection of the insurance policy and murder mystery novels indicates Hughes focused on Patty as the prime suspect from the earliest moments of the

69. *Id.* at 324, 327.
70. *Id.* at 324-26.
71. *Id.* at 324.
72. *Id.* at 324, 550-51.
73. *Id.* at 550-51.
74. Transcript of Preliminary Hearing at 43, Missouri v. Prewitt, No. CR684-84F (Mo. Cir. Ct. Apr. 6, 1984).
74. Transcript of Record, *supra* note 45, at 322.
75. *Id.* at 348.
76. *Id.* at 196-97, 262.
77. Smithson, *supra* note 24.
78. Transcript of Deposition of Kevin Craig Hughes, *supra* note 50, at 17.

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 442 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM


investigation. This is the telltale indication of the start of tunnel vision. Such singular focus might have been based on generalities about murders of spouses or, as subsequent evidence suggests, invidious gender bias.[79] No matter the motivation, this start to the case set the course for the remainder of the criminal investigation.

The most effective lawyers develop skills in which they recognize the choices they have in the course of representing their clients. Therefore, law students should be encouraged to take action by design, to the extent possible, rather than by default. Once again, imagine if Hughes considered a series of questions such as the following:

> *What is my hypothesis?* Patty Prewitt murdered her husband.
> *How can I confirm this hypothesis?* Finding evidence that would establish a motive and physical evidence connecting her to the crime.
> *How can I disconfirm this hypothesis?* Finding evidence corroborating Patty's account intruder; dusting for fingerprints on items likely touched by the murderer; identifying any shoe prints in or near the Prewitt home; interviewing neighbors.
> *What actions have I undertaken to confirm or disconfirm my hypothesis?* I have obtained Bill's life insurance policy and the mystery novels.

Hughes might have also engaged in self-reflective practice in order to reduce the chances of a flawed investigation:

> *Are my conclusions based on facts or beliefs?*
> *Who benefits from these conclusions?*
> *Who is harmed by these conclusions?*
> *Am I foreclosing avenues of investigation prematurely?*

## VI. INTERPRETING THE EVIDENCE (TUNNEL VISION AND ASSUMPTIONS)

Tunnel vision impacts not only the manner in which evidence is sought but also the manner in which evidence is interpreted.[80] In particular, "people tend to interpret data in ways that support their prior beliefs."[81] Exculpatory evidence in the Prewitt case was ignored or explained away as immaterial. Ambiguous evidence was interpreted as

79. *See* Findley & Scott, *supra* note 3, at 296-97, 313-15.
80. *Id.* at 307-13.
81. *Id.* at 313.


Case No: 23-KH-377 | Page 396 of 758

confirmation of Patty's guilt. The afternoon of the murder, Deputy Rusher conducted interviews with the Prewitt children. Sarah Prewitt, the oldest child present in the home at the time of the murder, described being awoken in her upstairs bedroom by her mother that morning. Patty ordered Sarah downstairs as her mother gathered the younger siblings from their bedrooms. While Sarah was waiting at the foot of the stairs, she heard, according to investigators' records, a noise that sounded like rattling or someone banging on tin coming from the basement.[82] Sarah also shared that she thought her dad was downstairs because she saw a light coming from beneath the basement door. Because power to the house had been cut, the light seems to indicate that someone was in the basement with a flashlight. There is no record of any subsequent search of the basement as a result of Sarah's comments. In his closing argument, the prosecutor dismissed Sarah's account since it was given "after being in the custody of her mother," implying, of course, that Patty had pressured her daughter to make the comment.[83] This also signals that investigators likely dismissed Sarah's account from the outset.

Tunnel vision impacts the weight assigned to leads. If inconsistent with the working theory, the lead goes unexplored and that possible avenue to prove innocence is foreclosed, perhaps, forever.[84] A neighbor of the Prewitts, Ethel Juanita Stephens, testified that she spoke with the sheriff the morning of the murder to tell him that she had seen a suspicious vehicle on the desolate road facing the Prewitt home just two hours before the murder took place.[85] There is no indication that the sheriff's office conducted any investigation based on this information. The sheriff later denied receiving such information, even though the investigative records include a lead related to a car on the road at the time of the murder.[86] This lead was voided and never revisited. It appears investigators embraced the belief Patty Prewitt was the murderer to such a degree that evidence about a suspicious vehicle consistent with the possibility of an intruder was not considered material enough to the investigation to warrant further inquiry.

Meanwhile, Hughes interviewed another neighbor of the Prewitts, Clifford Gustin, at his home. Gustin recalled that Patty had arrived at his home in hysterics. His wife calmed Patty down, and Gustin sought help from local authorities. Gustin arrived at the Prewitt home with Holden

82. Transcript of Record, *supra* note 45, at 698.

83. *Id.*

84. *See* Findley & Scott, *supra* note 3, at 313-15, 329-30, 375-77.

85. Transcript of Record, *supra* note 45, at 722-23.

86. Smithson, *supra* note 24.

Police Chief Scott in the early morning darkness. According to Hughes's report of the interview, Gustin stated that he thought he saw only one set of tire tracks leading out when pulling into the driveway, and he thought the tracks were made by Prewitt's car when she drove to his home.[87] The remoteness of the Prewitt home no doubt bolstered Hughes's belief that there was no intruder, though Hughes himself did not confirm Gustin's account through an investigation of the road near the Prewitt home. Indeed, at trial, in response to whether he had the statistic that seventy-five percent of murders are committed by family or friends on his mind the morning of the murder, Hughes volunteered, "Yes, sir, I didn't find any car."[88] In his closing argument, the prosecutor, Tom Williams, referred to the lack of vehicle tracks as evidence against Patty's account. Williams posed the following question to the jury, "How did that intruder get there and where did he go?"[89]

This Article has highlighted three pieces of evidence—Sarah's account of light coming from the basement, Stephens's account of a suspicious vehicle, and Gustin's account of the tire tracks—each interpreted by investigators as unfavorable to Patty without further inquiry. By this point in the case, tunnel vision had taken complete hold. Imagine if Hughes had been trained in a methodology that required him to analyze his assumptions in the normal course of his investigation. A major focus of legal training and, in particular, clinical education is to encourage students to unpack assumptions before making critical decisions in a case. One tool for doing so is the "except when/especially when" method of challenging assumptions.[90] To illustrate, one might say that Gustin's account of the tire tracks in the Prewitt driveway indicates there was not an intruder, especially when followed by a number of propositions (for example, Gustin had a clear view of the driveway, the tracks were most likely made by Patty's vehicle when she drove away with the children, it is likely an intruder would have pulled in the Prewitt driveway, individually identifiable tracks would have been left by an intruder's vehicle, there is no other evidence of an intruder, or trained investigators would have noted the tracks if they were material to the case). Conversely, one would say that Gustin's account of the tire tracks indicates there was not an intruder, except when followed by other

87. *See* Kevin Hughes, Johnson Cty. Sheriff's Office, Offense/Incident Report, Complaint No. 84-085 (Feb. 18, 1984) (on file with author).

88. Transcript of Record, *supra* note 45, at 328-29.

89. *Id.* at 661.

90. Emily A. Benfer & Colleen F. Shanahan, *Educating the Invincibles: Strategies for Teaching the Millennial Generation in Law School*, 20 CLINICAL L. REV. 1, 22-23 (2013).

propositions (for example, Gustin had only a fleeting and obscured view of the driveway, an intruder would more likely have walked to the Prewitt home from the main road, or a vehicle would not have left individually identifiable tracks). By engaging in this exercise, evidence is less likely to be quickly interpreted in a manner consistent with confirmation bias.

## VII. FOCUSING THE ENTIRE INVESTIGATIVE TEAM ON PATTY PREWITT: THE SOCIAL INFLUENCE OF BIAS

Tunnel vision can be shaped by social influences. Studies have demonstrated that "descriptions provided in advance (expectations) about a person's qualities can affect how others assess that person."[91] Findley and Scott have observed that "[t]his phenomenon can be particularly significant in criminal cases, where an individual is being judged—by police, prosecutors, defense lawyers, judges, and jurors—and where the initial working hypothesis presented to each actor in the system is that the defendant is guilty (despite the theoretical presumption of innocence)."[92]

On Sunday, February 19, the day after Bill Prewitt was murdered, Kevin Hughes convened the Rural Missouri Major Case Squad ("Major Case Squad") to work on the case.[93] Rural counties with relatively small police forces in Missouri utilize the Major Case Squad to investigate major crimes such as homicides.[94] Approximately twenty-five officers from law enforcement offices across west central Missouri met for an initial briefing on the case from Hughes.[95] In a deposition, Hughes testified he had shared with the officers that morning his suspicion of parts of Patty's account.[96] Hughes stated that Patty was a suspect since there were many inconsistencies in her statements at the time she had been interviewed.[97] In his handwritten notes of that initial meeting, the officer in charge of the Missouri Rural Crime Squad, Sheriff Paul

---

91. *See, e.g.*, Findley & Scott, *supra* note 3, at 314.

92. *Id.*

93. Transcript of Record, *supra* note 45, at 342-44; Transcript of Deposition of Kevin Craig Hughes, *supra* note 50, at 31-32; *see Investigations*, JOHNSON COUNTY SHERIFF'S OFF., http://jocomosheriff.org/page.php?id=6 (last visited Dec. 31, 2016).

94. *See* Transcript of Deposition of Kevin Craig Hughes, *supra* note 50, at 31-32; *Investigations*, *supra* note 94.

95. *See* Transcript of Record, *supra* note 45, at 342-44; *see also* Transcript of Deposition of Kevin Craig Hughes, *supra* note 50, at 33 (estimating that twenty-two law enforcement officers were involved in the case).

96. Transcript of Deposition of Kevin Craig Hughes, *supra* note 50, at 32-33.

97. *Id.* at 26-29.

Johnson, noted that "[t]he victim's wife Patricia Ann Prewitt was a likely suspect."[98]

Hughes's introduction of Patty to the Major Case Squad as the likely suspect prior to the start of their investigation undoubtedly affected the choices they made in the crucial, early stages. According to the prosecutor's account of this meeting, "Sheriff Norman wanted every fact considered on its own merit. Hughes had successfully set a different effort in motion. The facts would now be reconciled to fit the Hughes theory. The investigation at that moment took a definite and direct course toward Patty Prewitt."[99] As a result, "Hughes's soldiers set out like a swarm of scandal sheet reporters, intent on digging up dirt."[100] Records indicate that the efforts of the Major Case Squad focused on information about Patty's affairs and Bill's insurance coverage.[101] Investigators conducted numerous interviews with individuals to discuss second- or third-hand accounts of Patty's past affairs.[102] On Sunday, at least five individuals, some of whom acknowledged that they did not know the Prewitts, shared rumors that Patty had boyfriends and/or was a flirt in response to investigators' questions. Such single-minded focus on Patty and rumors of years-old affairs prevented law enforcement from following leads that would identify other suspects.

One of the insidious aspects of tunnel vision is that it can be injected into a "groupthink" that infects all who are engaged in the investigation and, because it appears that all share the same view, reinforces assumptions.[103] Imagine if before Hughes infected the Crime Squad with his view that Patty was the perpetrator, he had engaged his colleagues in "rounds," which is a clinical method designed to expand options and see problems from other perspectives.[104] Rounds are regularly conducted as a way for students and practitioners in many

98. Memorandum from Paul Johnson, Officer in Charge, Rural Mo. Major Case Squad (Feb. 19, 1984) (on file with author).

99. WILLIAMS & COCKE, *supra* note 42, at 62.

100. *Id.* at 90.

101. *See* Transcript of Record, *supra* note 45, at 331-32.

102. *Id.* at 414-39; T. Charrette & D.S. Stewart, Johnson Cty. Sheriff's Office, Lead No. 10 (Feb. 19, 1984) (on file with author) (Suzan Brown interview notes); Jefferson & Carroll, Johnson Cty. Sheriff's Office, Lead No. 7 (Feb. 19, 1984) (on file with author) (Billy Gunn interview notes); Jefferson & Carroll, Johnson Cty. Sheriff's Office, Lead No. 23 (Feb. 19, 1984) (on file with author) (Harmon Randolph interview notes); Frank Walker & Robert Scott, Johnson Cty. Sheriff's Office, Lead No. 11 (Feb. 19, 1984) (on file with author) (Paul Martin Kluz interview notes); Sammy L. Watson & Tony Zink, Johnson Cty. Sheriff's Office, Lead No. 8 (Feb. 19, 1984) (on file with author) (Robert G. Wolfe interview notes).

103. Tigran W. Eldred, *Exploring Tunnel Vision*, 16 LEGAL ETHICS 390, 396 (2013) (book review).

104. *See* Susan Bryant & Elliott S. Milstein, *Rounds: A "Signature Pedagogy" for Clinical Education?*, 14 CLINICAL L. REV. 195, 196-97 (2007).

professions to present challenging situations to their peers in a structured fashion.[105] The structure prevents jumping directly to a solution from a problem prematurely, before relevant facts have been identified and the problem has been diagnosed as clearly as possible.[106] In a legal context, rounds often begin with the presentation of a challenging circumstance.[107] This is followed by factual questions posed by the rest of the group.[108] During this segment, participants are prohibited from diagnosing the problem or offering solutions. This limitation curbs the tendency to make assumptions about the presenter's issue based on participants' past experiences.[109] Once fact gathering—the crucial and often longest part of rounds—is completed, participants move to problem diagnosis.[110] The presenter is often surprised to learn that his or her peers have completely different diagnoses of the problem. Next, comes question flooding, where each participant poses a single question about the issue presented.[111] No response is permitted to these questions. This is meant to spur thinking about a variety of issues. Question flooding is followed by problem solving, where participants suggest possible solutions.[112] Rounds conclude with a review of whether and how the discussion was useful to the presenter and the group as a whole.

Rounds can be instructive to investigators who work in teams. The structure of rounds requires participants to engage in a deliberative, thoughtful process of collaborative problem solving.[113] If Hughes had engaged the Major Case Squad in rounds, other investigators would have been more likely to raise alternative theories for potential suspects and prevent a rush in judgment toward Patty's guilt.

## VIII. PRESSURE ENHANCES THE RISK OF TUNNEL VISION

Tunnel vision begins with police investigations, but that is not where it ends. Prosecutors may fall prey to tunnel vision at the pretrial stage, especially if they only receive evidence to implicate the suspect.[114]

105. *Id.*

106. *See id.* at 195, 200-01.

107. *See id.* at 250-51.

108. *See* Bryant & Milstein, *supra* note 105, at 244 (examining the various types of questions asked by colleagues and instructors after factual presentation).

109. *See id.* at 204, 210 (identifying that assumptions and perspectives shape judgment).

110. *See id.* at 213-14 (discussing how members of the group define the problem differently).

111. *See id.* at 232-33 (illustrating single questions and comments posed by group members to incite thinking).

112. *See id.* at 211 n.41, 234 (developing solutions discussed).

113. *See id.* at 208-09 (explaining the collaborative learning promoted by rounds).

114. Daniel S. Medwed, *Emotionally Charged: The Prosecutorial Charging Decision and the Innocence Revolution*, 31 CARDOZO L. REV. 2187, 2203 (2010).

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 448 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Reichart: Tunnel Vision: Causes, Effects, and Mitigation Strategies Accepted On: 8/3/2023 8:38:56 AM



As with investigators, prosecutors can be subject to public pressures, which facilitate tunnel vision. One expert has concluded that "public and media pressure . . . poses the greatest risk for distorting normal decision making in the criminal justice system."[115] In the Prewitt case, the manner in which Patty was arrested had been designed by Hughes to pressure the prosecutor to bring charges despite a weak case.

On February 21, investigators recovered a missing gun owned by the Prewitts from a pond on their property and discovered footprints nearby allegedly matching Patty's boots.[116] She was subsequently arrested on February 22.[117] Investigators relied on statements from two men with whom Patty had ended relationships over five years prior to Bill's death.[118] One of the men told investigators that during their relationship, five years before Bill's death, Patty twice expressed a desire for Bill to be killed.[119] The other man claimed that while he and Patty were engaged in a relationship, also five years before Bill's death, she had offered to buy him a lumberyard if he killed Bill.[120]

According to the prosecuting attorney, Tom Williams, Hughes purportedly had a firm belief in the case against Patty on February 22, but he decided "a little insurance wouldn't hurt."[121] So Hughes arranged to have Patty arrested prior to informing Williams. As the prosecutor recalled, "The press would pick up the fact of the arrest and would supply pressure on the prosecutor. It would make it harder for him to refuse to file the charges after the arrest had occurred."[122] On February 24, Patty was charged with capital murder.[123] Just as Hughes had done with the Major Case Squad, he injected bias into Williams's decision to charge Patty with the murder of her husband. Indeed, Williams filed

---

115. BRUCE A. MACFARLANE, WRONGFUL CONVICTIONS: THE EFFECT OF TUNNEL VISION AND PREDISPOSING CIRCUMSTANCES IN THE CRIMINAL JUSTICE SYSTEM 7 (2008), https://www.attorneygeneral.jus.gov.on.ca/inquiries/goudge/policy_research/pdf/Macfarlane_Wrongful-Convictions.pdf.

116. *See* State v. Prewitt, 714 S.W.2d 544, 546 (Mo. Ct. App. 1986); Transcript of Record, *supra* note 45, at 217-20.

117. *See* Memorandum from Cynthia Jones, Johnson Cty. Sheriff's Office (Feb 22, 1984) (on file with author) (referring to the initial arrest of Patty).

118. Transcript of Record, *supra* note 45, at 414-39 (containing testimony from the two men, Jonathan R. Hancock and Richard Hays); *see also id.* at 637-39 (containing testimony from Patty in regard to the two men).

119. *See* K. Logan et al., Johnson Cty. Sheriff's Office, Investigation Report, Lead No. 50 (Feb. 21, 1984) (on file with author) (statement of John Hancock).

120. *Id.* at 423-24 (testimony of Hays).

121. WILLIAMS & COCKE, *supra* note 42, at 157.

122. *Id.*

123. *The Case for Commutation of Patty Prewitt's Sentence*, COMMUTATION FOR PATTY PREWITT, http://commutepatty.blogspot.com (last visited Dec. 31, 2016).

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 449 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM




charges without demanding further evidence from Hughes despite the weak case against Patty.

## IX. TUNNEL BLINDNESS

After an arrest, tunnel vision is almost impossible to mitigate. The effects have been described as follows:

> As more resources—money, time, and emotions—are placed into a narrative involving a suspect, criminal justice professionals are less willing or able to process negative feedback that refutes their conclusions. Instead, they may devote additional resources in order to "recoup" their original investment. As a result, evidence that points away from a suspect is ignored or devalued, and latent errors are overlooked.[124]

Recognizing a weakness in the case against Patty, Williams wrote, "[investigators] had to find, if it existed, a more recent, and more compelling romantic affair."[125] The two affairs initially discovered by investigators "were a bit distant in time and they were a little shallow to provide a motive powerful enough to have propelled the young wife on this course."[126] On February 22, an acquaintance of the Prewitts, Ricky Mitts, was initially interviewed by investigators.[127] One week later, Mitts was interviewed again by Hughes.[128] Only this time did Mitts share that he had been in a sexual relationship with Patty from 1975 to 1979.[129] Mitts also claimed that in the summer of 1982, Patty had offered him $10,000 to kill Bill.[130] Patty allegedly suggested that Mitts set fire to the barn on her property and then shoot Bill when he came to check on it.[131] Immediately after providing this account to Hughes, Mitts went to the Prewitt lumberyard. He eagerly told Patty about his statement to the police and suggested that they marry so he would not have to testify against her.[132]

---

124. Jon B. Gould et al., *Innocent Defendants: Divergent Case Outcomes and What They Teach Us*, *in* WRONGFUL CONVICTION AND CRIMINAL JUSTICE REFORM: MAKING JUSTICE 73, 84 (Marvin Zalman & Julia Carrano eds., 2014).

125. WILLIAMS & COCKE, *supra* note 42, at 135-36.

126. *Id.*

127. Robert Scott & Frank Walker, Johnson Cty. Sheriff's Office, Lead No. 71 (Feb. 22, 1984) (on file with author) (Mitts interview notes).

128. Smithson, *supra* note 24.

129. Transcript of Record, *supra* note 45, at 432.

130. *Id.* at 434-36.

131. *Id.* at 436.

132. *Id.* at 446-47.


Case No: 23-KH-377 | Page 403 of 758

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 450 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM


Mitts had already told investigators that he used the murder weapon previously.[133] It was also discovered that he had been late for work at the time of the murder.[134] Mitts freely admitted in his testimony that, after speaking to Hughes, he proposed to Patty that he divorce his wife and marry Patty to protect her from his testimony.[135] Despite this bizarre behavior, no investigative efforts focused on Mitts. Hughes already accomplished his goal: Patty had been charged with the murder.

In his account of the case, Williams acknowledged that Mitts was "in love with Patty, proficient with the murder weapon, and late for work on the morning of the murder; motive, means and opportunity—the classic formula. . . . Couldn't he have been, in fact, the intruder police never really looked for?"[136]

Scholars have noted that "when presented with information that supports prior beliefs, people allocate fewer resources to scrutinizing the information and are more inclined to accept the information at face value."[137] Perhaps, then, it is not surprising that Hughes did not investigate Mitts. Indeed, Mitts filled a need for the investigators. If true, his statement supported the State's theory that Patty had planned to kill her husband for years and, crucially, provided evidence of a recent attempt by Patty to have Bill murdered.

## X. MAKING MOUNTAINS OUT OF MOLEHILLS: TUNNEL VISION AND NARRATIVE CONSTRUCTION

Once the decision had been made to charge Patty with murder, the prosecutor was faced with a case comprised of little, if any, actual hard evidence. Williams recognized the weakness of the case and offered a plea bargain to Patty that would have made her eligible for parole in seven years.[138] Weak prosecution cases have been identified as a statistically significant factor that distinguishes erroneous convictions from near misses. Accordingly, "[w]eak facts . . . may encourage the

133. *See id.* at 687; Smithson, *supra* note 24 ("When police interviewed Mitts after Bill's death, he told them he had visited the Prewitt house three weeks earlier. He also admitted he had shot Bill's semi-automatic rifle in the past.").

134. Transcript of Record, *supra* note 45, at 688 ("[H]e was suppose[d] to be at work at 2:30 that morning, and he didn't get there until long after Bill Prewitt was dead.").

135. *Id.* at 446-47.

136. WILLIAMS & COCKE, *supra* note 42, at 401.

137. Findley & Scott, *supra* note 3, at 313 (quoting Alafair S. Burke, *Improving Prosecutorial Decision Making: Some Lessons of Cognitive Science*, 47 WM. & MARY L. REV. 1587, 1611 (2006)).

138. *Affidavits Establishing That a Plea Bargain Was Offered to Patty*, COMMUTATION FOR PATTY PREWITT, http://commutepatty.blogspot.com (last visited Dec. 31, 2016).


Case No: 23-KH-377 | Page 404 of 758

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 451 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM




state to engage in certain questionable practices to bolster the case."[139] As exhibited in the Prewitt case, such practices include the failure to disclose exculpatory evidence or reliance on corroborating testimony that is, at best, dubious.[140] To illustrate, "a prosecutor, convinced of the defendant's guilt, may withhold what she considers to be a 'red herring' from the defense."[141] In Patty's case, the State withheld evidence that included a report of footprints near the pond where the gun was recovered.[142] Whether this evidence was related to Bill's murder, we will never know. What may have been a red herring to the prosecutor could have been the basis for a more thorough investigation. In addition, the prosecution relied heavily on the testimony of lead investigator Hughes, particularly his account of an unrecorded seventeen-hour interrogation session.[143] This testimony featured damaging, sexually suggestive statements attributed to Patty, who has consistently denied making such outrageous remarks.[144]

Without hard evidence, Williams was left with a difficult sell to the jury. The prosecutor needed answers to fundamental questions: Why would a seemingly devoted mother kill the father of her children? Why would Patty kill her husband and business partner? What kind of woman turns to this type of violence? Lofquist has analyzed the process of constructing a compelling narrative and explained:

> Without an unambiguous confession or corroborated eyewitness testimony, legal wrongdoing is not the product of factual certainty. Rather, it is the product of narrative constructions: efforts by various people to construct a highly credible narrative account. This process of storytelling or narrative construction inevitably relies on popular images, assumptions, and inferences.[145]

From where do popular images and assumptions emerge? In the context of female murder suspects, Webster and Miller have identified several stereotypes, including monstrous mothers; desperate, spoiled, and manipulative housewives; femme fatales; and cold-blooded killers, where involvement in any illicit activity evidences the capacity to murder.[146] By drawing upon gendered cultural ideologies, the crime narratives constructed by criminal justice actors become highly credible

139. Gould et al., *supra* note 126, at 82.
140. *Id.*
141. *Id.*
142. Transcript of Record, *supra* note 45, at 270-71.
143. *Id.* at 322, 340-43.
144. *See* Smithson, *supra* note 24.
145. Lofquist, *supra* note 21, at 183.
146. Webster & Miller, *supra* note 21, at 1030.


Case No: 23-KH-377 | Page 405 of 758

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 452 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM


and result in wrongful convictions.[147] Absent eyewitnesses and physical evidence linking Patty to the crime, such gender stereotypes were critical to move the jury toward a conviction.

Tom Williams made a series of calculated efforts to play into various gender stereotypes. He relied on the testimony of individuals with whom Patty had relationships over five years before Bill's death, as well as Hughes's account of statements Patty allegedly made during the seventeen-hour, unrecorded interrogation.[148] Williams utilized the four stereotypical tropes to secure a conviction.[149]

### *A. Femme Fatale*

Significant emphasis was placed on Patty's knowledge of operating the .22-caliber rifle used to murder Bill. According to Hughes, Patty told him that the Prewitts previously lived on a property with a chicken house, and rats would get into it.[150] On direct examination, Hughes testified that "[s]he said she used to sit out there and plug those suckers" with the rifle.[151]

On cross-examination, Williams asked if Patty had told officers that she sought the rifle a week before Bill's death to shoot a stray dog. Patty clarified that she had wanted it only to scare the dog away.[152] The prosecutor continued, "You had used the semi-automatic a lot of times, hadn't you?" Patty replied, "I had used it before."[153] The prosecutor also asked if she kept bullets in the jewelry box near her and Bill's bed.[154] Patty explained that the ammunition was in the jewelry box because for fifteen years it was where she would place items that Bill emptied from his pockets.[155]

It is difficult to imagine that a prosecutor would focus so heavily on a defendant's experience with guns or the presence of ammunition in a defendant's bedroom if the defendant were a man. A knowledge of guns would not have incriminated a male from rural Missouri—it would have been expected. Williams, in his closing argument, emphasized Patty's familiarity with the weapon: "Mrs. Prewitt's knowledge of that gun. She

---

147. *Id.*
148. *See* Transcript of Record, *supra* note 45, at 322, 340-43; Smithson, *supra* note 24.
149. *See* Transcript of Record, *supra* note 45, at 654-66; Smithson, *supra* note 24.
150. Transcript of Record, *supra* note 45, at 288-89.
151. *Id.* at 289.
152. *Id.* at 627.
153. *Id.*
154. *Id.* at 628.
155. *Id.*


Case No: 23-KH-377 | Page 406 of 758

used to set and plug those suckers. She knew how to use it. Had one, she knew how to use it, kept her shells for [fifteen] years handy."[156]

### *B. Monstrous Mother*

The prosecution sought to portray Patty as an unfaithful wife and unfit mother. In his direct examination of Richard Hays—one of the men with whom Patty had a relationship five years before the murder—the prosecutor repeatedly questioned the whereabouts of Patty's children at the time of his two sexual encounters with Patty at the Prewitt home.[157] On cross-examination of Patty, Williams continued with this theme:

> [*Williams*:] As I understand your explanation of that, the extramarital affairs were just for the sexual gratification they offered?
> [*Patty*:] No.
> [*Williams*:] Well, what did they afford, ma'am?
> [*Patty*:] I don't know, some comforts. I don't know.
> [*Williams*:] Did they have an effect on your relationship with your children?
> [*Patty*:] No, sir.
> [*Williams*:] Well, wasn't it necessary for you to abandon[] the children's interests when you were with these men?
> [*Patty*:] No, sir.
> [*Williams*:] Is it your testimony that you could continue being a good and proper mother and be at a motel with John Hancock?
> [*Patty*:] I was always a good mother.[158]

According to Williams, these questions served as "a few parting shots" that relied on "the old favorite, motherhood."[159] He knew this would draw an emotional reaction from the jury. In his closing argument, Williams returned to this theme. He stated, "The evidence is that [Patty] defiled [Bill's] home with those lovers when the children were there," and "she abandoned her duties as mother of her children."[160]

### *C. Desperate, Spoiled, and Manipulative Housewives*

On direct examination, Hughes shared a number of sexually suggestive statements allegedly made by Patty. He told the jury that Patty had estimated she and John Hancock met for sexual relations

---

156. *Id.* at 661.
157. *Id.* at 422.
158. *Id.* at 637-38.
159. WILLIAMS & COCKE, *supra* note 42, at 467.
160. Transcript of Record, *supra* note 45, at 698.

"about a million times" over the course of their year-long relationship.[161] When he asked her to be more realistic, Patty allegedly said that they would meet "at least once a day, sometimes three or four times a day."[162] The prosecutor asked Hughes if she had given a reason for that frequency. Hughes replied, "Her exact quote was, 'my fire burns hotter than others.'"[163] In his account of the trial, Williams later wrote that this statement "raised several eyebrows on the jury and became a favorite with the newspaper reporters."[164] Hughes stated that when he had asked Patty if her husband knew of the affairs, she answered, "no," and that she would not tell the truth unless caught red-handed.[165] Finally, in response to the prosecutor's inquiry about whether Patty made "any overture" toward him, Hughes volunteered that Patty asked if he would take her to dinner before she went to prison.[166] In her testimony, Patty denied making each of these statements.[167]

To support his narrative that Patty was motivated by lust and greed, Williams solicited salacious testimony from three men with whom Patty had ended relationships at least five years before Bill's murder. In his closing argument, the prosecutor mockingly referred to Patty's defense as one that relied on an intruder committing the murder "to enjoy Mrs. Prewitt's oft-enjoyed sexual favors."[168] The prosecutor also implied that Patty had used sex as a tool on the night of the murder. Reminding jurors that Bill was found nude in the bed, Williams accused Patty of "lulling" her "unsuspecting" husband to bed before killing him.[169]

In his final remarks, the prosecutor instructed the jury: "Your duty is to convict her of capital murder and anything less will not do your duty. You must do your duty, the awful damage and injury and hurt she has caused justifies it. The dignity of the institution of marriage and the State and our communities require it."[170]

### D. *Cold-Blooded Killer*

The prosecution literally described Patty as cold-blooded. In his direct examination of Hughes, Williams asked, "Did [Patty] say

161. *Id.* at 297.
162. *Id.*
163. *Id.*
164. WILLIAMS & COCKE, *supra* note 42, at 380.
165. Transcript of Record, *supra* note 45, at 299-300.
166. *Id.*
167. *Id.* at 636, 640, 645.
168. *Id.* at 657.
169. *Id.* at 659.
170. *Id.* at 701.

anything about being warm or cold blooded?"[171] Hughes responded as follows:

> [T]he way it happened, we were getting in the car to take her home, the car was cold, and she indicated she was cold. I said, in a few minutes when the car gets warm and the heater gets going, you will be warm. She looked at me and said, "I am cold blooded."[172]

The prosecutor also asked Hughes if Patty had "comment[ed] upon her nature or her values."[173] He replied that Patty had said she has a "different set of values."[174]

In his closing argument, Williams stated, "The defendant was motivated by sheer greed and sexual lust and had been for years. That she had planned for years to kill her husband. She disregarded her marital vows and the noticeable obligations of motherhood."[175] The weakness of the case against Patty posed a problem for the prosecution. However, the appeal to gender stereotypes provided a solution—it moved the jury. Resorting to an invidious appeal to gender bias raises significant ethical issues.

Lawyers committed to social justice should be attuned to gender and racial bias, intentional or implicit. They should be able to identify not only their own biases but also when others appeal to biases. This provides a hedge against tunnel vision. It is critical that lawyers realize such bias is most appealing when cases are weak and, therefore, to be vigilant in their self-reflection.

## XI. TUNNEL VISION AND POST-CONVICTION RELIEF

Tunnel vision does not end with a conviction but instead intensifies as a case proceeds through post-conviction litigation.[176] In a motion for a new trial, cognitive bias may prejudice the trial judge toward making his findings consistent with the trial court result.[177]

After Patty had been convicted, the judge volunteered his opinion in the matter. In thanking the jury, Judge Donald Barnes stated, "For whatever help it might be, I think that the verdict, my personal opinion

171. *Id.* at 300.
172. *Id.*
173. *Id.*
174. *Id.*
175. *Id.* at 659.
176. Findley & Scott, *supra* note 3, at 303-04.
177. Stephanie Roberts Hartung, *Missing the Forest for the Trees: Federal Habeas Corpus and the Piecemeal Problem in Actual Innocence Cases*, 10 STAN. J. C.R. & C.L. 55, 61-62 (2014).

is, now that it is over, is proper under the circumstances."[178] Just over one month later, Judge Barnes would rule on a motion for a new trial.[179]

When she learned of Patty's conviction, Ethel Stephens was troubled that that Sheriff Norman never revisited her account of a suspicious vehicle near the Prewitt home the night of Bill's murder. Stephens shared her account with Patty's lawyer, who promptly sought a new trial.[180] Sheriff Norman testified that he did not recall the conversation and, upon review of his case file, "found no report of contact" with Stephens.[181] He did not mention that there had been a report of a vehicle recorded, undisclosed to the defense, which law enforcement apparently failed to investigate.[182] In his ruling, Judge Barnes credited Sheriff Norman's testimony over Stephen's testimony.[183] However, Judge Barnes ruled that, even if the lead had been available at trial, "such evidence would have been unlikely to have affected the verdict" due to the "substantial evidence linking [Patty] to the killing and the relative weakness of her contention that an intruder was the murderer."[184] Judge Barnes's analysis failed to address how tunnel vision had taken hold of investigators and resulted in the view that evidence of an intruder was weak. Most damaging, Judge Barnes, who had already formed and expressed his own view of Patty's guilt, foreclosed the possibility of a jury ever hearing Stephens's account.

Tunnel vision is prescribed on appeal by legal rules.[185] For example, appellate courts do not decide the accuracy of factual determinations.[186] Rather, trial court rulings are afforded deference. In the Prewitt case, this meant that the appellate court gave deference to the factual determinations of Judge Barnes, including his ruling that Patty was not prejudiced by the omission of evidence on the suspicious vehicle.[187] Thus, the finding that the trial court made no errors was affirmed on appeal.[188]

It is true that a showing of actual innocence may result in an overturned conviction. In Missouri, for example, a freestanding claim of

178. Transcript of Record, *supra* note 45, at 711.

179. *Id.* at 651, 712.

180. *Id.* at 712, 718-25.

181. State v. Prewitt, 714 S.W.2d 544, 549-50 (Mo. Ct. App 1986); *see* Transcript of Record, *supra* note 45, at 731.

182. Ruling on Defendant's Motion for New Trial at 6, State v. Prewitt, No. CR484-5F (Mo. Cir. Ct. 1985); *see* Transcript of Record, *supra* note 45, at 728-35.

183. Ruling on Defendant's Motion for New Trial, *supra* note 183, at 6.

184. *Id.*

185. *See* Findley & Scott, *supra* note 3, at 333, 348-53.

186. *Id.* at 333, 348-49; *see, e.g., Prewitt*, 714 S.W.2d at 551.

187. *See* State v. Prewitt, 714 S.W.2d 544, 549-51 (Mo. Ct. App 1986).

188. *Id.* at 546, 551-52.

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 457 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM




actual innocence requires the defendant to make a clear and convincing showing that undermines confidence in the correctness of the judgment.[189] Meeting this high standard is quite difficult. Normally, clear and convincing evidence is more than undisclosed leads that point toward a possible intruder as the perpetrator. It requires a showing that the person is actually innocent, which often requires evidence such as DNA, witness recantation, or a confession from the actual perpetrator.[190] In a case like Patty's—where the tunnel vision exhibited by investigators resulted in uncollected evidence and ignored exculpatory leads and where witnesses did not offer testimony about the crime itself but rather damaging character evidence—it will likely be impossible to ever meet the clear and convincing standard.

The wrongfully convicted must then put their hope in an executive to grant relief through clemency, as Patty has done. At a time when many governors are reluctant to use their clemency power,[191] this is a fanciful hope. Indeed, where a prisoner continues to insist on his or her innocence, but cannot prove it, such steadfastness can be fatal to a clemency petition. One former federal judge observed that a prisoner's acceptance of responsibility and expressions of remorse are considered the most important factors in granting release from confinement.[192] In Patty's case, this means that her extraordinary record over the past thirty years, which includes obtaining multiple academic degrees, serving the state as a computer programmer, and decades of mentorship of younger inmates, has not moved the Governor to act.[193]

## XII. CONCLUSION

The increased awareness of wrongful convictions in recent years has rightfully led many to question the effectiveness of our criminal justice system.[194] We have learned that tunnel vision—the tendency

189. State *ex rel.* Amrine v. Roper, 102 S.W.3d 541, 543 (Mo. 2003) (en banc).

190. *See* John M. Leventhal, *A Survey of Federal and State Courts' Approaches to a Constitutional Right of Actual Innocence: Is There a Need for a State Constitutional Right in New York in the Aftermath of CPL § 440.10(G-1)?*, 76 ALB. L. REV. 1453, 1485-86 (2013).

191. Maggie Clark, *Governors' Pardons Are Becoming a Rarity*, GOVERNING (Feb. 8, 2013), http://www.governing.com/news/state/sl-governors-balance-politics-with-pardons.html.

192. H. Lee Sarokin, *The Guilty Have a Better Chance for Parole or Pardon Than the Innocent*, HUFFINGTON POST (Dec. 28, 2015, 10:49 PM), http://www.huffingtonpost.com/judge-h-lee-sarokin/the-guilty-have-a-better-_b_8885290.html.

193. Mary Ann McGivern, Opinion, *Clemency for Patty Prewitt* (Dec. 29, 2015), http://www.stltoday.com/news/opinion/clemency-for-patty-prewitt/article_9c75491c-90a4-5d25-83a7-378382e7437e.html.

194. *See generally* Scott Martelle, Opinion, *Exonerations of the Wrongfully Convicted Are on the Rise*, L.A. TIMES (Feb. 3, 2016, 5:05 AM), http://www.latimes.com/opinion/opinion-la/la-ol-wrongful-convictions-exonerations-death-penalty-20160202-story.html.


Case No: 23-KH-377 | Page 411 of 758

Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 458 of 856
Court of Appeal, Fifth Circuit Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM




fueled by bias and pressure that leads actors in the criminal justice system to focus singularly on a suspect and build a case for conviction while ignoring evidence that points away from guilt—has devastating consequences. It not only creates a sense that the case is open and shut but, if the evidence generated through tunnel vision is weak, can also tempt a prosecutor to bolster a weak case by withholding evidence, relying on false testimony, or appealing to jurors' biases.[195]

The impact of tunnel vision has had a tragic impact on Patty Prewitt and her family. Today, as she seeks clemency—her only hope of release before 2036—Patty is still paying the price for choices that investigators and prosecutors made over thirty years ago. In some instances, these choices were unintentional and in others they were calculated to secure a conviction. The net effect is that Patty Prewitt, though no fault of her own, is not in a position where she can prove her innocence.

Given the link between tunnel vision and wrongful convictions, educators have an ethical obligation to teach future legal actors about the pernicious effects of tunnel vision and equip them with the tools to mitigate it. The methods for inculcating reflective skepticism into the investigation and prosecution are well developed. It is time that they become a regular and essential part of the training of legal actors.

195. *See supra* notes 139-50 and accompanying text.


Case No: 23-KH-377 | Page 412 of 758

***

# Exhibit M

UNIVERSITY of WISCONSIN LAW SCHOOL

Legal Studies Research Paper Series

Paper No. 1023

June 2006

# The Multiple Dimensions of Tunnel Vision

# In Criminal Cases

Keith A. Findley & Michael S. Scott

This paper can be downloaded without charge from the
Social Science Research Network Electronic Paper Collection at:
http://ssrn.com/abstract=911240

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.

# THE MULTIPLE DIMENSIONS OF TUNNEL VISION IN CRIMINAL CASES

KEITH A. FINDLEY* AND MICHAEL S. SCOTT**

## INTRODUCTION

The discovery of hundreds of wrongful convictions in the last fifteen years has shaken up the criminal justice world. Since the advent of postconviction DNA testing around 1990, more than 170 people convicted of serious crimes have been exonerated by DNA, a number off of death row, and most after serving many years in prison.[1] Literally hundreds of additional exonerations in the last fifteen years alone have been based on evidence other than DNA.[2] Because DNA evidence exists in only a small minority of all cases—and is preserved and available for postconviction testing in an even smaller proportion of cases—and because innocence is so very difficult to prove postconviction without DNA, these known exonerations almost surely reflect only the tip of a very large iceberg.[3] These exonerations have challenged the traditional assumption that the criminal justice system does all it can to accurately determine guilt, and that erroneous conviction of the innocent is, as the Supreme Court has assumed,

---

* Clinical Professor, University of Wisconsin Law School; Co-Director, Wisconsin Innocence Project. J.D., Yale Law School 1985; B.A., Indiana University 1981. I am grateful to D. Michael Risinger, Richard A. Leo, Meredith Ross, John Pray, Byron Lichstein, and Frances Reynolds, as well as Ken Hammond and Dennis Hanson, both of the Wisconsin Department of Justice Division of Law Enforcement Services, Training & Standards Bureau, for their valuable feedback on drafts of this Article.

** Clinical Assistant Professor, University of Wisconsin Law School; Director, Center for Problem-Oriented Policing; former police executive. J.D., Harvard Law School 1987; B.A. University of Wisconsin-Madison 1980. I wish to acknowledge the valuable insights offered by several veteran police investigators and supervisors, including Deputy Chief Ron Glensor and Commander Steve Pitts, Reno (Nev.) Police Department; Chief Dan Reynolds, Greer (S.C.) Police Department; Chief Richard Thomas, Port Washington (Wis.) Police Department; Chief R. Gil Kerlikowske, Seattle Police Department; Ken Hammond, Wisconsin Department of Justice Training & Standards Bureau; and Assistant United States Attorney Rita Rumbelow, Western District of Wisconsin.

1. Innocence Project, www.innocenceproject.org (last visited Feb. 22, 2006).

2. Samuel R. Gross et al., *Exonerations in the United States, 1989 Through 2003*, 95 J. CRIM. L. & CRIMINOLOGY 523, 523-24 (2005).

3. *Id.* at 529.

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 463 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



"extremely rare."[4] Further, they have opened a window for scholarly and institutional inquiry into the causes of wrongful convictions and the reforms that might prevent such miscarriages of justice in the future.

This burgeoning inquiry has identified many of the recurrent causes of error, including fallible eyewitness identification evidence and flawed eyewitness identification procedures, false confessions, jailhouse snitch testimony, police and prosecutorial misconduct, forensic science error or fraud, and inadequate defense counsel.[5] A theme running through almost every case, that touches each of these individual causes, is the problem of tunnel vision.

Tunnel vision is a natural human tendency that has particularly pernicious effects in the criminal justice system. By tunnel vision, we mean that "compendium of common heuristics and logical fallacies," to which we are all susceptible, that lead actors in the criminal justice system to "focus on a suspect, select and filter the evidence that will 'build a case' for conviction, while ignoring or suppressing evidence that points away from guilt."[6] This process leads investigators, prosecutors, judges, and defense lawyers alike to focus on a particular conclusion and then filter all evidence in a case through the lens provided by that conclusion.[7] Through that filter, all information supporting the adopted conclusion is elevated in significance, viewed as consistent with the other evidence, and deemed relevant and probative.[8] Evidence inconsistent with the chosen theory is easily overlooked or dismissed as irrelevant, incredible, or unreliable.[9] Properly understood, tunnel vision is more often the product of the human condition as well as institutional and cultural pressures, than of maliciousness or indifference.

Tunnel vision both affects, and is affected by, other flawed procedures in the criminal justice system. For example, mistaken eyewitness identifications—the most frequent single cause of wrongful convictions[10]—can convince investigators early in a case that a

4. Schlup v. Delo, 513 U.S. 298, 321 (1995).

5. BARRY SCHECK ET AL., ACTUAL INNOCENCE: FIVE DAYS TO EXECUTION AND OTHER DISPATCHES FROM THE WRONGLY CONVICTED 246 (2000).

6. Dianne L. Martin, *Lessons About Justice from the "Laboratory" of Wrongful Convictions: Tunnel Vision, the Construction of Guilt and Informer Evidence*, 70 UMKC L. REV. 847, 848 (2002).

7. *See, e.g.*, Myrna Raeder, *What Does Innocence Have to Do With It?: A Commentary on Wrongful Convictions and Rationality*, 2003 MICH. ST. L. REV. 1315, 1327-28.

8. *See, e.g.*, Martin, *supra* note 6, at 848.

9. *See id.*

10. In various studies of wrongful convictions, eyewitness error has been cited as a contributing factor in anywhere from 60 to 85 percent of all wrongful convictions.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



particular individual is the perpetrator. Convinced of guilt, investigators might then set out to obtain a confession from that suspect,[11] producing apparently inculpatory reactions or statements from the suspect, or leading investigators to interpret the suspect's innocent responses as inculpatory. The process of interrogating an innocent suspect might even produce a false confession. Police and prosecutors, convinced of guilt, might recruit or encourage testimony from unreliable jailhouse snitches, who fabricate stories that the defendant confessed to them, in hopes that they will benefit in their own cases from cooperation with authorities.[12] Forensic scientists, aware of the desired result of their analyses, might be influenced—even unwittingly—to interpret ambiguous data or fabricate results to support the police theory.[13] All of this additional evidence then enters a feedback loop that bolsters the witnesses' confidence in the reliability and accuracy of their incriminating testimony and reinforces the original assessment of guilt held by police, and ultimately by prosecutors, courts, and even defense counsel.[14]

Tunnel vision, in a general sense at least, is a well-recognized phenomenon in the criminal justice system. Most official inquiries into specific wrongful convictions have noted the role that tunnel vision played in those individual cases of injustice.[15] For example, former

*See* SCHECK ET AL., *supra* note 5, at 246 (finding eyewitness error in 84 percent of the first sixty-two postconviction DNA exonerations); Gross et al., *supra* note 2, at 542 (finding eyewitness error in 64 percent of the cases identified in their study of 340 wrongful convictions between 1989 and 2003).

11. When investigators believe a suspect is the perpetrator, their inquiry shifts from a fact-gathering "interview" to a confession-seeking "interrogation." In many departments, police are taught to "interrogate" suspects only when they are satisfied the suspect is guilty; at that point the objective is obtaining a confession. Various stratagems are then employed to break the suspect down psychologically and to induce a confession. *See infra* Part II.C.1.

12. Martin, *supra* note 6, at 861.

13. *See* Peter J. Neufeld, *The (Near) Irrelevance of* Daubert *to Criminal Justice and Some Suggestions for Reform*, 95 AM. J. PUB. HEALTH S107, S111 (2005) (noting that "examiner bias" produces skewed results in forensic laboratories where, as is common, "police . . . offer a detailed narrative of the crime and an inventory of whatever other inculpatory evidence they have against the suspect on the request form used to order a particular scientific test"); *see generally* D. Michael Risinger et al., *The* Daubert/Kumho *Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion*, 90 CAL. L. REV. 1 (2002).

14. *See* Martin, *supra* note 6, at 848; George Castelle & Elizabeth F. Loftus, *Misinformation and Wrongful Convictions*, *in* WRONGLY CONVICTED 17, 18-19, 24, 29-30 (Saundra D. Westervelt & John A. Humphrey eds., 2001).

15. Both scholarly and popular accounts of wrongful convictions have also observed the problem of tunnel vision: "Perhaps the most common fault with criminal investigations is their failure to explore all the possible suspects. When attention begins to focus on a single individual, too often the detectives are called off the general hunt to

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Illinois Governor George Ryan's Commission on Capital Punishment concluded that tunnel vision played a significant role in most of the thirteen Illinois cases studied in which an innocent person was sentenced to death before being exonerated and released from death row.[16] The official investigation of the wrongful convictions in Chicago's "Ford Heights Four" case also concluded that tunnel vision was largely to blame.[17] Official Canadian governmental inquiries, held after high-profile exonerations,[18] have repeatedly identified tunnel vision as a significant problem in those cases.[19] And the Innocence

go after the single target. Tunnel vision sets in." BILL KURTIS, THE DEATH PENALTY ON TRIAL: CRISIS IN AMERICAN JUSTICE 33 (2004); *see also* Martin, *supra* note 6, at 849; James McCloskey, *Convicting the Innocent*, 8 CRIM. JUST. ETHICS 2, 56 (1989). Even before the problem of wrongful convictions was widely recognized, the American Bar Association (ABA) and the Association of American Law Schools (AALS) described the process that can lead to tunnel vision. In a 1966 joint report, the two organizations observed:

> What generally occurs in practice is that at some early point a familiar pattern will seem to emerge from the evidence; an accustomed label is waiting for the case and, without awaiting further proofs, this label is promptly assigned to it. It is a mistake to suppose that this premature cataloguing must necessarily result from impatience, prejudice or mental sloth. Often it proceeds from a very understandable desire to bring the hearing into some order and coherence, for without some tentative theory of the case there is no standard of relevancy by which testimony may be measured. But what starts as a preliminary diagnosis designed to direct the inquiry tends, quickly and imperceptibly, to become a fixed conclusion, as all that confirms the diagnosis makes a strong imprint on the mind, while all that runs counter to it is received with diverted attention.

AM. BAR ASS'N & ASS'N OF AM. LAW SCH., *Report of the Joint Conference of the American Bar Association and the Association of American Law Schools on Professional Responsibility*, 44 A.B.A. J. 1159, 1160 (1958) *reprinted in* THE LAWYER IN MODERN SOCIETY 188, 189 (V. Countryman & T. Finman eds., 1966).

16. *See* STATE OF ILL., REPORT OF THE GOVERNOR'S COMMISSION ON CAPITAL PUNISHMENT 20 (2002), *available at* http://www.idoc.state.il.us/ccp/ccp/reports/commission_report/complete_report.pdf.

17. Steve Mills & John Biemer, *Ford Heights 4 Inquiry Clears Cops, Prosecutors*, CHI. TRIB., Aug. 22, 2003, at 1.

18. In Canada, unlike most jurisdictions in the United States, the government has responded to exonerations by holding extensive inquiries into what went wrong and what might prevent such errors in the future. For a discussion contrasting that response to the typical response in the United States, in which the exonerated are released without official comment or inquiry, see Keith A. Findley, *Learning from Our Mistakes: A Criminal Justice Study Commission to Study Wrongful Convictions*, 38 CAL. W. L. REV. 333, 338-39, 342-44 (2002).

19. *See* FPT HEADS OF PROSECUTION COMM. WORKING GROUP, REPORT ON THE PREVENTION OF MISCARRIAGES OF JUSTICE 35 (2004), *available at* http://canada.justice.gc.ca/en/dept/pub/hop/; Province of Manitoba, The Inquiry Regarding Thomas Sophonow, http://www.gov.mb.ca/justice/publications/sophonow/arnold/recommend.html (last visited Feb. 25, 2006).

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 466 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Commission for Virginia issued a report finding that tunnel vision played a significant role in many of Virginia's thirteen proven wrongful convictions.[20]

Most discussions of tunnel vision have focused on its effects in the initial stages of criminal cases—during the police investigation.[21] That is indeed where tunnel vision begins, and in many respects where it can be most damaging, because all later stages of the process feed off the information generated in the police investigation.[22] But tunnel vision in the criminal justice system is more pervasive than that. Considerable literature also examines various pressures on prosecutors that can cause them to act in ways that subvert justice, whether intentionally or, as is more often the case, unintentionally.[23] That literature also depicts a form of tunnel vision. But the problem is more pervasive than even that literature suggests. In this Article, we explore the ways in which tunnel vision infects all phases of criminal proceedings, beginning with the investigation of cases and then proceeding through the prosecution, trial or plea-bargaining, appeal, and postconviction stages. We seek to expose some of the myriad expressions of this tunnel vision, and to come to some understanding of its multiple causes. We examine the roots of the problem in cognitive biases, institutional pressures, and deliberate policies reflected in rules and training throughout the system. In the end, we attempt to draw from this inquiry some understanding of the measures that might be taken to mitigate the harmful effects of tunnel vision.

Part I begins with a discussion of several case studies in wrongful convictions that help demonstrate how tunnel vision can derail the search for the truth. Part II seeks to identify sources of tunnel vision in three domains. First, it draws on the cognitive sciences to seek an understanding of the cognitive biases that can produce tunnel vision, even in well-meaning participants in the process. Second, it turns to an analysis of other institutional pressures, many of which are products of the adversary system and the feedback loops inherent in that system, that magnify the natural, cognitively based tendency toward tunnel vision. Third, it examines normative features of the criminal justice system that exacerbate the problem of tunnel vision—rules and

20. INNOCENCE COMM'N FOR VA., A VISION FOR JUSTICE: REPORT AND RECOMMENDATIONS REGARDING WRONGFUL CONVICTIONS IN THE COMMONWEALTH OF VIRGINIA 10 (2005), *available at* http://www.wcl.american.edu/innocenceproject/ICVA/full_r.pdf?rd=1.

21. *See* Martin, *supra* note 6, at 850 (describing an example of tunnel vision during the police investigation stage).

22. *Id.* at 849.

23. *See infra* Part II.B.2.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 467 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



deliberate practices that reinforce the natural cognitive biases and institutional pressures. Finally, Part III discusses possible reforms that might counter the tendencies toward tunnel vision, and that might thereby help the system perform more accurately and reliably.

## I. CASE STUDIES IN TUNNEL VISION

### *A. Marvin Anderson*

After a trial that lasted less than five hours, Marvin Anderson was convicted of robbery, forcible sodomy, abduction, and two counts of rape of a twenty-four-year-old woman in Hanover, Virginia, in 1982.[24] In 2002, DNA testing proved that he did not commit the crime.[25] Police investigators had focused on Anderson because the rapist, who was African American, had mentioned to the victim that he had a white girlfriend, and Anderson was the only black man police knew of who was living with a white woman.[26]

Anderson did not fit the victim's description of her attacker in several respects; Anderson was taller than the man the victim described and, unlike the attacker, Anderson had a dark complexion, no mustache, and no scratches on his face.[27] Nonetheless, investigators obtained a photo of Anderson from his employer (he had no prior record and hence no mug photo) and presented it to the victim in an array of six to ten photos. Anderson's photo was the only one in color, and the only one with his social security number printed on it.[28] The victim selected Anderson's photograph. Thirty minutes later, police put together a live-person lineup that again included Anderson.[29] Anderson was apparently the only person in the lineup whose photo had

24. Innocence Project, Case Profiles: Marvin Anderson, http://www.innocenceproject.org/case/display_profile.php?id=99 (last visited Mar. 28, 2006). Anderson was sentenced to 210 years in prison, was paroled after fifteen years in prison, and was serving lifetime parole at the time of his exoneration. *Id.*

25. *Id.*; *see also* Demme Doufekias Joannou & W. Hunter Winstead, A Report on the Case of Marvin Anderson 8-9, 15 (unpublished report prepared for the Innocence Commission of Virginia, on file with authors).

26. INNOCENCE COMM'N FOR VA., *supra* note 20, at 13; Joannou & Winstead, *supra* note 25, at 4, 6.

27. INNOCENCE COMM'N FOR VA., *supra* note 20, at 13, 70; Joannou & Winstead, *supra* note 25, at 6.

28. INNOCENCE COMM'N FOR VA., *supra* note 20, at 13; Joannou & Winstead, *supra* note 25, at 5.

29. It is unclear whether the true perpetrator was included in either the photo array or the lineup because police did not keep track of the names of the individuals included. Joannou & Winstead, *supra* note 25, at 8.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



also been included in the photo array.[30] Police told the victim to "go in and look at the people in the line up to see if she could pick out the suspect," and she again picked Anderson.[31] Many of the procedures used in Anderson's identification process are now widely recognized as suggestive or flawed in ways that can lead an eyewitness to mistakenly identify an innocent person.[32]

There were other reasons to doubt the identification as well. DNA testing was not yet available at the time, but a forensic scientist testified that she had performed blood typing on swabs from both Anderson and the victim and was unable to identify Anderson as the source of semen samples collected in the rape kit.[33] In addition, Anderson presented four alibi witnesses, including his mother, his girlfriend, and two neighbors, who all testified that they saw him outside his mother's house washing his car at the time of the attack.[34] None of this evidence, however, was enough to overcome the eyewitness identification.[35]

Tunnel vision infected Anderson's case from the beginning, leading police, prosecutors, defense counsel, and eventually the jury

---

30. *Id.* at 20-21.

31. *Id.* at 7.

32. The flawed procedures used in this case included using a photograph of the suspect that stood out as distinctive; showing the photographs and individuals simultaneously rather than sequentially; leading the victim to believe that the suspect was included among the photographs and individuals presented and that her task was "to see if she could pick out the suspect"; using officers who knew that Anderson was the suspect to conduct the identification procedure; and showing the suspect to the victim in multiple proceedings, especially when he was the only one included in each of those proceedings. *See, e.g.*, John Turtle, R.C.L. Lindsay & Gary L. Wells, *Best Practice Recommendations for Eyewitness Evidence Procedures: New Ideas for the Oldest Way to Solve a Case*, 1 CAN. J. POLICE & SECURITY SERVICES 5 (Spring 2003) (explaining "recommended" policies and procedures for eyewitness identification), *available at* http://www.psychology.iastate.edu/faculty/gwells/CJPSSarticle.pdf; WIS. DEP'T OF JUSTICE, OFFICE OF ATTORNEY GEN., MODEL POLICY & PROCEDURE FOR EYEWITNESS IDENTIFICATION (2005), *available at* http://www.doj.state.wi.us/dles/tns/eyewitness.asp.

33. INNOCENCE COMM'N FOR VA., *supra* note 20, at 13.

34. Joannou & Winstead, *supra* note 25, at 10-11.

35. It is not uncommon for juries to reject alibi evidence—even true alibi evidence—particularly when the alibi witnesses are perceived as motivated to protect the defendant. *See* Elizabeth A. Olson & Gary L. Wells, *What Makes a Good Alibi? A Proposed Taxonomy*, LAW & HUM. BEHAV. 157, 157-58 (2004) (noting that, even for individuals later exonerated by DNA testing, alibi evidence is often ineffectual and that indeed "'weak alibis' [are] often exploited by prosecutors and used as incriminating evidence"); R.C.L. Lindsay et al., *Mock-Juror Evaluations of Eyewitness Testimony: A Test of Metamemory Hypotheses*, 15 J. APP. SOC. PSYCHOL. 447 (1986) (finding that only alibi witnesses who were not relatives of the defendant were effective at reducing convictions in cases where an eyewitness identified the defendant as the perpetrator).

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 469 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



and reviewing courts, to minimize and discredit the alibi evidence, the mismatch between the victim's description of the perpetrator and Anderson's appearance, and the absence of physical evidence. Even more significantly, the premature focus on Anderson meant that no one pursued evidence that was available before trial that pointed toward the true perpetrator.[36] As the Virginia Innocence Commission concluded, "[o]nce the victim identified Anderson, . . . the police did not pursue additional leads."[37]

The DNA testing that exonerated Anderson in 2002 identified the true perpetrator—a man named Otis "Pop" Lincoln.[38] The match to Lincoln should not have come as a surprise. Lincoln's name had been circulating in the community as a likely suspect for some time prior to Anderson's conviction, but no one investigated him.[39] Two friends of the Anderson family said before trial that just before the rape they saw Lincoln riding a bicycle toward the shopping center where the attack occurred—a fact of particular significance because the attacker rode a bicycle.[40] Moreover, these witnesses heard Lincoln make sexually suggestive comments to two young white girls, and then boast as he rode past that he would force himself onto a woman if she refused his advances.[41] The owner of the bicycle that was used by the assailant also said that Lincoln had stolen it from him approximately thirty minutes before the rape.[42] After Anderson was arrested, others in the community reported to Anderson's mother that Lincoln drove by her house one day because he wanted to see "the young boy who was taking his rap."[43] Moreover, unlike Anderson, Lincoln had a criminal record for sexual assault and was awaiting trial for another sexual attack at the time.[44] Nonetheless, even Anderson's defense lawyer declined to investigate or call any witnesses who could have linked Lincoln to the crime at trial.[45]

Eventually, six years later, at proceedings on Anderson's application for habeas corpus, Lincoln confessed fully to the crime in court under oath and provided details of the attack.[46] Nevertheless, the

36. INNOCENCE COMM'N FOR VA., *supra* note 20, at 13.
37. *Id.*
38. *Id.* at 14.
39. *Id.* at 70.
40. *Id.*
41. *Id.*
42. *Id.*
43. *Id.*
44. *Id.* at 13.
45. Innocence Project, *supra* note 24.
46. *Id.*; Joannou & Winstead, *supra* note 25, at 13.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



same judge who presided over the original trial refused to credit Lincoln's confession, finding that it was untruthful.[47] The Governor subsequently refused to intervene and denied clemency.[48] Anderson remained in prison, and then on parole, for several more years until DNA testing confirmed that Lincoln, not Anderson, was the attacker.[49]

Other aspects of the case also reveal just how stubborn erroneous beliefs in guilt can be. Despite the weakness of the case against Anderson, and the abundance of evidence that should have alerted authorities to investigate Lincoln, the original prosecutor in the case claimed that, from his perspective and until the exoneration, the Anderson case was "the clearest case he had ever had."[50] Although Anderson's trial lawyer made numerous egregious errors, the trial court was unwilling to grant a new trial on a claim of ineffective assistance of counsel. The court concluded that it made no difference that: (1) counsel had a conflict of interest because he had previously represented Lincoln on a previous attempted rape charge; (2) although the lawyer knew there was evidence against Lincoln, and admitted that he suspected Lincoln, he failed to disclose his prior representation of Lincoln, his suspicions about Lincoln, and his conflict of interest to Anderson; (3) despite Anderson's mother's repeated pleas, the lawyer failed to call Lincoln or the other witnesses who had watched Lincoln harass the young women, make threats, and ride off on a bicycle toward the crime scene just before the attack in this case; and (4) the lawyer failed to ask that the bicycle ridden by the attacker on the day of the rape be fingerprinted or introduced into evidence, even though the bicycle was in police custody. The trial court found that all of this was insufficient to meet the two-pronged test for ineffective assistance of counsel.[51]

### *B. Steven Avery*

Like Marvin Anderson, Steven Avery was convicted of a brutal rape primarily on the strength of the victim's eyewitness identification.[52] Like Anderson, Avery was convicted despite strong alibi evidence, and even though the true perpetrator was well known to

47. Innocence Project, *supra* note 24.
48. *Id.*
49. *Id.*
50. Joannou & Winstead, *supra* note 25, at 18.
51. *See* Strickland v. Washington, 466 U.S. 668, 669 (1984).
52. Memorandum from Peggy A. Lautenschlager, Attorney General, State of Wisconsin, to Mark Rohrer, District Attorney, Manitowoc County, Wisconsin (Dec. 17, 2003), *available at* http://www.doj.state.wi.us/newsarchive/rep121803_DCI.asp.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



police and prosecutors and should have been a prime suspect.[53] Also like Anderson, Avery was wrongly convicted because tunnel vision prevented system actors from considering alternative theories about the crime until DNA evidence finally proved in 2003 that Avery was innocent, and that another man, Gregory Allen, was guilty.[54] By then, Avery had served more than eighteen years in prison.[55]

The rape and attempted murder in Avery's case was committed in broad daylight on a beach in Manitowoc County, Wisconsin, in 1985.[56] While being treated in the hospital after the attack, the victim gave police a description of her attacker and helped create a composite sketch.[57] Based on that description and sketch, local sheriff's deputies thought the attacker might be Avery.[58] Law enforcement knew Avery because Manitowoc was a small community, he had relatives who worked in the sheriff's department, he had previously been convicted of two counts of burglary and one count of cruelty to an animal, and he was being prosecuted at the time for allegedly forcing the wife of a deputy off the road at gunpoint as part of an ongoing feud.[59]

The sheriff presented Avery's photo to the victim as part of a nine-photo simultaneous array, telling her that "the suspect might be in there."[60] The victim later said that the sheriff's statement led her to "believe[] that the suspect's photograph was included in the group of nine photos."[61] However, a photograph of Allen, the true perpetrator, was not included in the array and the victim instead selected Avery's photo.[62] Three days later, after the victim had been informed that police had arrested the man she identified, police conducted a live-person lineup to confirm her identification.[63] Avery was the only

53. *Id.*

54. *Id.*

55. *Id.* Two years later, Avery was charged with a subsequent rape and murder of a young woman committed in October 2005. As of this writing, Avery has not yet been tried on those charges. The new charges raise no questions about the validity of the previous exoneration. Regardless of the outcome of the pending trial, Avery's wrongful conviction in 1985 remains an important case study in the problem of tunnel vision.

56. *Id.*

57. *Id.*

58. *Id.*

59. *Id.*

60. *Id.*

61. *Hearings of the Wisconsin Assemb. Judiciary Comm. Avery Task Force*, 2003-2004 Leg., Reg. Sess. (Wis. 2004) (statement of Penny Beerntsen) [hereinafter Beerntsen Statement].

62. *Id.* at 1.

63. Memorandum from Peggy A. Lautenschlager to Mark Rohrer, *supra* note 52.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



person in the lineup whose photo had also been in the previous photo array.[64] Avery was also the shortest, youngest, and fairest person in the lineup.[65] Unlike Avery, a few of the people in the lineup wore professional attire such as neck ties, and some wore glasses.[66] Records from the lineup indicate that one lineup member looked at Avery during most of the lineup.[67] Again, the victim picked Avery.[68]

The State bolstered its eyewitness evidence with circumstantial evidence. Deputies swore that the night of the arrest they told Avery only that he was being arrested for attempted murder, yet they claimed Avery told his wife that he was being accused of attempting to murder a "girl."[69] Despite the ambiguous nature of that evidence, the deputies, the prosecutor, and, ultimately, the courts thought it was highly incriminating that Avery seemed to know the gender of the victim.[70] In addition, to rebut Avery's alibi—his claim that he had spent the day pouring concrete with his extended family and friends—the State offered evidence that the State Crime Laboratory could find no traces of concrete dust on his clothing.[71] The State also offered evidence that a hair found on Avery's tee shirt was microscopically similar to the victim's head hair.[72]

Avery's defense was unusually strong. He presented sixteen alibi witnesses who confirmed that he had been pouring concrete during the day and then had taken his wife and five young children—including six-day-old twins—to Green Bay, more than an hour's drive away, for

64. *Id.*
65. *Id.*
66. *Id.*
67. *Id.*
68. *Id.*
69. *Id.*
70. *See* State v. Avery, 213 Wis. 2d. 228, 245, 570 N.W.2d 573, 581 (Ct. App. 1997) (referring to the "powerful" evidence that Avery referred to the victim as a female prior to being told the gender of the victim by the police).
71. *Id.*; Memorandum from Peggy A. Lautenschlager to Mark Rohrer, *supra* note 52.
72. Microscopic hair analysis has been roundly criticized in recent years as "junk science." Postconviction DNA testing has shown that microscopic hair analysis is frequently misleading or inaccurate. *See* Neufeld, *supra* note 13, at S107-8; Clive A. Stafford Smith & Patrick D. Goodman, *Forensic Hair Comparison Analysis: Nineteenth Century Science or Twentieth Century Snake Oil?*, 27 COLUM. HUM. RTS. L. REV. 227 (1996) (discussing the questionable scientific foundation of microscopic hair analysis). The Wisconsin State Crime Laboratory no longer performs microscopic hair analysis, in part because DNA testing is so much more reliable. Telephone interview by Keith Findley with Jerome Geurts, Director, Wis. State Crime Laboratory (April 27, 2006).

Court of Appeal Fifth Circuit
Case No: 23-KH-377  Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



supper and to shop for paint.[73] Instead of taking pause from this evidence, the State sought a way to minimize its significance. The prosecutor impeached the testimony of Avery's family and friends as biased.[74] When Avery presented the testimony of unbiased witnesses—the clerk and the manager at the Shopko store where Avery purchased his paint in Green Bay—sheriff's deputies sought a way around their testimony. The clerk and the manager, who had not known Avery previously, remembered him checking out because it was unusual to see a family with five young children, including twins who were less than a week old. And they produced the cash register tape showing that Avery and his family had checked out at 5:13 p.m.—a little over an hour after the victim claimed the attack had begun.[75] Sheriff's deputies countered that they had done a timed drive from the location of the assault to the Green Bay Shopko and had been able to make it to the checkout line in fifty-seven minutes.[76] But, as the Attorney General concluded after investigating Avery's wrongful conviction in 2003:

> [T]he officers admitted that they went ten miles per hour over the speed limit to reach those numbers and the officers did not account for potential delays resulting from the presence of five children, including six-day old twins, all of whom were seen with Avery and his wife at the Shopko. Moreover, the reenactment did not allow any time for picking up Avery's family and would therefore assume that Avery's wife and five children were at the beach somewhere or in the car while he committed the assault.[77]

Simply put, tunnel vision prevented the deputies, the prosecutor, the judge, and the jury from appreciating the implausibility of that scenario.

Even more startling, however, the sheriff's department and prosecutor refused to consider or investigate the true perpetrator, even though he was in their sights all along. Allen, who was identified as the true perpetrator by a cold hit in the DNA database in 2003, was a known sexual offender in Manitowoc County prior to this offense, and his offenses were escalating.[78] Two years earlier, the same prosecutor

73. Memorandum from Peggy A. Lautenschlager to Mark Rohrer, *supra* note 52.

74. *See Avery*, 213 Wis. 2d. at 245, 570 N.W.2d at 581.

75. Memorandum from Peggy A. Lautenschlager to Mark Rohrer, *supra* note 52.

76. *Id.*

77. *Id.*

78. *Id.*

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



who prosecuted Avery had convicted Allen of a very similar attempted sexual assault—Allen masturbated while walking behind a woman and then lunged at her—on the same beach as the site of the attack in 1985.[79] At the time of the 1985 offense, Allen was a chief suspect in the murder of a fifteen-year-old girl in North Carolina, and was suspected of a series of attempted sexual assaults, attempted burglaries, window peepings, and acts of exposing himself in Manitowoc County.[80] Allen was considered such a threat to commit a sexual assault that Manitowoc police maintained daily surveillance on him, checking on his whereabouts as many as fourteen times each day, during the two weeks prior to the 1985 assault for which Avery was wrongly convicted.[81] The day of the attack, police were called away to other duties and were only able to check on Allen once.[82] In fact, before Avery was convicted, at least two employees in the district attorney's office expressed concern that they believed Allen, not Avery, was responsible for the assault for which Avery stood charged.[83]

Nonetheless, the sheriff's department and prosecutor steadfastly refused to consider that Avery might not be guilty, or to investigate Allen. When the police department suggested to the sheriff's department that Allen might be the perpetrator, the sheriff simply responded that Allen had been ruled out as a suspect.[84] When the victim inquired about the police department's concerns regarding Allen, the sheriff's department told her, "Do not talk to the Manitowoc Police Department. It will only confuse you. We have jurisdiction."[85] and all "other suspects ha[ve] been looked at and were ruled out . . . ."[86]

The resilience of the view that Avery was guilty also infected the postconviction and appellate stages of the case. On direct appeal, the court of appeals rejected challenges to the out-of-court identifications, concluding that, despite the now-apparent deficiencies in the

79. *Id.*

80. *Id.* Finally, ten years after the 1985 assault, Gregory Allen was convicted of a subsequent sexual assault of a woman in Green Bay, and was sentenced to sixty years in prison. Meg Jones, *Man Linked to Sexual Assault Transferred to Waupun*, MILWAUKEE J. SENTINEL, Sept. 26, 2003, at 3B, *available at* http://www.jsonline.com/news/state/sep03/172525.asp.

81. Tom Kertscher, *Police Were Watching Man Now Linked to Avery Case*, MILWAUKEE J. SENTINEL, Oct. 20, 2003, at 1A, *available at* http://www.jsonline.com/news/state/oct03/178587.asp.

82. *Id.*

83. Memorandum from Peggy A. Lautenschlager to Mark Rohrer, *supra* note 52.

84. *Id.*

85. Kertscher, *supra* note 81.

86. Beerntsen Statement, *supra* note 61, at 7-8.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 475 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



identification procedures that were employed, "the photo array constitute[d] one of the fairest ones this court ha[d] seen."[87] Subsequently, in 1995, Avery obtained postconviction DNA testing in an attempt to prove his innocence.[88] Unfortunately, the technology was not advanced enough at that time to produce dispositive results.[89] The DNA taken from the victim's fingernail scrapings (she said she had scratched at her attacker) showed the presence of DNA from the victim and an unknown third person, but could not conclusively exclude (or include) Avery.[90] Avery argued that the third-party DNA had to be the real attacker's, but the courts denied relief, concluding that the foreign DNA could have gotten under the victim's fingernails innocently.[91] Despite the now-apparent weaknesses in the State's case, including Avery's sixteen alibi witnesses, the court of appeals asserted that it did not "view this case as 'extremely close,'" and accordingly concluded that the new DNA evidence was not enough to warrant a new trial.[92]

In September 2003, the Wisconsin State Crime Laboratory was able to use previously unavailable technologies to extract a DNA profile from the victim's pubic hair combings.[93] That DNA profile conclusively excluded Avery.[94] Moreover, when laboratory analysts ran that profile through the State DNA Databank, they obtained a cold hit on Allen, whose profile was in the databank because he had subsequently committed another sexual assault, for which he was by then serving sixty years in prison.[95] By stipulation of the parties and order of the court, Avery was exonerated and released the following day.[96]

---

87. State v. Avery, No. 86-1831-CR, 1987 WL 267394, *5 (Wis. Ct. App. Aug. 5, 1987) (unpublished opinion).

88. Wisconsin Innocence Project, Case Profiles: Steven Avery, http://www.law.wisc.edu/fjr/innocence/avery_Summary2.htm (last visited Mar. 28, 2006).

89. *Id.*

90. The tests done at that time could not exclude or include Avery because they revealed genetic markers consistent with both the victim and Avery. *See id.*

91. State v. Avery, 213 Wis. 2d 228, 243, 570 N.W.2d 573, 580 (Ct. App. 1997).

92. *Id.* at 245, 570 N.W.2d at 581.

93. Tom Kertscher & Jesse Garza, *DNA Clears Prisoner 17 Years Into His Term*, MILWAUKEE J. SENTINEL, Sept. 11, 2003, at 1A, *available at* http://www.jsonline.com/news/racine/sep03/168842.asp.

94. *Id.*

95. Memorandum from Peggy A. Lautenschlager to Mark Rohrer, *supra* note 52.

96. *See* Kertscher & Garza, *supra* note 93.

Case No: 23-KH-377 | Page 429 of 758

Court of Appeal, Fifth Circuit
Case No: 23-KH-377  Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



### *C. The Central Park Jogger Case*

To say that tunnel vision has affected the investigation and prosecution of a case is not necessarily to say that police were motivated improperly, or that their initial suspicions about the defendant were unfounded. Rather, it is simply to observe that police (and eventually prosecutors and courts) might have focused too quickly or exclusively on a suspect or suspects. It is to caution everyone in the criminal justice system to be receptive to, and make inquiry into, alternative possibilities, even when the evidence against a given suspect looks powerful.

The Central Park Jogger case serves as an example. On an April evening in 1989, around 9:15 p.m., a young woman was attacked, beaten, sexually assaulted, and left nearly dead in New York City's Central Park.[97] Remarkably, she survived despite the loss of nearly 80 percent of her blood.[98] But she retained no memory of the attack.[99]

Quickly, and with good reason, police and prosecutors focused their attention on a group of youths who had been "wilding" in the park that night. This group of teenage boys, estimated at up to forty or fifty in number, spent the evening roaming the park, harassing, physically beating, and attempting to rob joggers, cyclists, and others in the park.[100] Responding to complaints about these attacks, several police officers spotted fifteen to twenty boys in the park around 10:15 p.m. and caught several of them as they fled.[101]

Later that night, around 1:00 a.m., two men discovered the female jogger's nearly lifeless body in the park.[102] Because she was found near the location where several other victims had been attacked that night, police suspected the boys were also responsible for the attack on the female jogger.[103] Throughout the rest of that night and the next day, police and prosecutors interrogated the fourteen- to sixteen-year-old suspects (including several who were arrested the next day).[104] Ultimately, after interrogations that ranged from fourteen to thirty hours,[105] police and prosecutors succeeded in obtaining confessions

97. Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. REV. 891, 894 (2004).

98. *Id.*

99. Saul M. Kassin & Gisli H. Gudjonsson, *The Psychology of Confessions: A Review of the Literature and Issues*, 5 PSYCHOL. SCI. IN THE PUB. INT. 33, 34 (2004).

100. Drizin & Leo, *supra* note 97, at 894-95.

101. *Id.* at 895.

102. *Id.*

103. *Id.* at 895-96.

104. *Id.* at 896.

105. Kassin & Gudjonsson, *supra* note 99, at 60.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 477 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



from five boys to the rape of the Central Park Jogger.[106] Four of those five confessions were videotaped.[107] But only the confessions were recorded; the hours of interrogations that led up to the confessions were not.[108]

Precisely what happened during the hours of unrecorded interrogations was a matter of contention both before and at trial. The boys and their parents claimed coercion, alleging that the police slapped, yelled, and cursed at the boys, called them liars, and suggested they would be released if they confessed.[109] Police admitted lying to the boys about fingerprint evidence, but denied any coercive tactics.[110] The trial court credited the police version and held that the boys' confessions were admissible at trial.[111] Regardless of where the truth about those interrogations lay, two things are clear: police and prosecutors were focused on the boys as suspects, and they succeeded in getting the boys to confess.

At trial, prosecutors also introduced evidence that hair consistent with the victim's hair was found on one of the boys' clothing, along with a bloody rock that prosecutors claimed the boys used to bludgeon the jogger.[112] All five boys were convicted of participating in the rape of the jogger and other attacks committed in the park that night.[113]

In 2002, evidence began to emerge that the boys were innocent.[114] In January of that year, a man named Matias Reyes confessed to authorities that he raped the Central Park Jogger, and that he had acted alone.[115] It turned out that Reyes "was one of New York City's most notorious serial rapists."[116] In the months following the Central Park attack, until his apprehension in August 1989, he had "terrorized the Upper East Side, raping four women, one of whom, a pregnant woman, he killed after raping her in front of her children."[117] DNA subsequently confirmed the confession: Reyes's DNA matched semen on the jogger's sock.[118] Mitochondrial DNA testing of the hair found on one of the boys' clothing also showed that it probably was not the

106. Drizin & Leo, *supra* note 97, at 896.
107. *Id.*
108. *Id.*
109. *Id.* at 896-97.
110. *Id.* at 897.
111. *Id.*
112. *Id.*
113. *Id.*
114. *Id.* at 898.
115. *Id.*
116. *Id.*
117. *Id.*
118. *Id.*

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



jogger's, and additional testing on the bloody rock showed the blood and hair on the rock were not hers either.[119] A subsequent investigation by the district attorney's office found no link between Reyes and any of the five defendants.[120] Moreover, the district attorney's office concluded that the confessions from the five boys were inconsistent with one another on "virtually every major aspect of the crime,"[121] were inconsistent with the objectively verifiable evidence, and were demonstrably false in significant respects.[122] Accordingly, the district attorney's office joined in a motion to vacate the convictions and the court set aside all five convictions in December 2002.[123]

Despite this new evidence, former prosecutors and police involved in the case sharply criticized the district attorney's office for joining in the motion to vacate the convictions.[124] The police department conducted its own investigation and issued a report that ultimately supported the decision to vacate the convictions, but disputed many of the district attorney's conclusions, sought to discredit Reyes's detailed confession, and offered several theories to explain how the boys might have committed the crime with Reyes.[125]

## II. THE SOURCES OF TUNNEL VISION

### A. *Tunnel Vision as a Function of Cognitive Biases*

The tendency toward tunnel vision is partly innate; it is part of our psychological makeup. Tunnel vision is the product of a variety of cognitive distortions that can impede accuracy in what we perceive and in how we interpret what we perceive. Psychologists analyze tunnel vision as the product of various cognitive "biases,"[126] such as

119. *Id.* at 899.

120. Affirmation in Response to Motion to Vacate Judgment of Conviction ¶ 46, New York v. Wise, No. 4762/89 (N.Y. Sup. Ct. Dec. 5, 2002), *available at* http://files.findlaw.com/news.findlaw.com/hdocs/crim/nywiseetal120502aff.pdf.

121. *Id.* ¶ 86.

122. *Id.* ¶¶ 91-93.

123. Drizin & Leo, *supra* note 97, at 899.

124. *Id.*

125. *Id.* at 899-900; *see also* NEW YORK POLICE DEP'T, CENTRAL PARK JOGGER CASE PANEL REPORT (2003), *available at* http://www.nyc.gov/html/nypd/html/dcpi/executivesumm_cpjc.html.

126. It should be kept in mind that in the social sciences the term "bias" is value neutral. It merely describes a situation in which any errors that might be made are skewed in one direction or another, as opposed to a situation of random error, where errors have no directionality. In some contexts, biases may be desirable when they run in the direction of errors that are less costly than their opposites.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 479 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



confirmation bias, hindsight bias, and outcome bias. These cognitive biases help explain how and why tunnel vision is so ubiquitous, even among well-meaning actors in the criminal justice system. Understanding these biases offers some insight into the reforms or remedies that might be implemented to try to counteract tunnel vision, as well as insight into reforms that are likely to be futile.

The cognitive biases to which we refer have been the subject of substantial study by experimental psychologists over the course of many decades,[127] but the tendency of humans toward such biases has been obvious to careful observers since time immemorial.[128] What has not been so obvious prior to the investigation of modern science is the extent to which such biases can operate without conscious recognition, and the variety of circumstances that can intensify the effects of the underlying biases.

Different researchers use slightly different labels for related and sometimes overlapping conditions and effects. The foundational tendency is probably best understood as an expectancy bias, which is a form of confirmation bias.[129] When people are led by circumstances to expect some fact or condition (as people commonly are), they tend to perceive that fact or condition in informationally ambiguous situations.[130] This can lead to error biased in the direction of the expectation.[131] When what a person expects to see is the result of the person's own generation of hypotheses, theories, or scenarios about what must be the case, the personal investment in those hypotheses will reinforce the tendency to perceive or overvalue confirming information

127. *See* THOMAS GILOVICH, HOW WE KNOW WHAT ISN'T SO: THE FALLIBILITY OF HUMAN REASON IN EVERYDAY LIFE 33 (1991); RICHARD NISBETT & LEE ROSS, HUMAN INFERENCE: STRATEGIES AND SHORTCOMINGS OF SOCIAL JUDGMENT (James J. Jenkins et al. eds., 1980); Alafair S. Burke, *Improving Prosecutorial Decision Making: Some Lessons of Cognitive Science*, 47 WM. & MARY L. REV. 8 (2006); Charles G. Lord et al., *Biased Assimilation and Attitude Polarization: The Effects of Prior Theories on Subsequently Considered Evidence*, 37 J. PERSONALITY & SOC. PSYCHOL. 2098 (1979); Raymond S. Nickerson, *Confirmation Bias: A Ubiquitous Phenomenon in Many Guises*, 2 REV. GEN. PSYCHOL. 175, 175 (1998); Yaacov Trope & Akiva Liberman, *Social Hypothesis Testing: Cognitive and Motivational Mechanisms*, *in* SOCIAL PSYCHOLOGY: HANDBOOK OF BASIC PRINCIPLES 239, 239-70 (E. Tory Higgins & Arie W. Kruglanski eds., 1996).

128. Julius Caesar, for example, observed that "people easily believe that which they want to be true." Risinger et al., *supra* note 13, at 6 (quoting G. JULIUS CAESAR, CAESAR'S COMMENTARIES ON THE GALLIC WAR 155 (Frederick Holland Dewey ed., Translation Publishing Co. 1918) (51 B.C.E.) ("[H]omines fere credunt libentur id quod volunt.")).

129. Risinger et al., *supra* note 13, at 12-26.

130. *Id.*

131. *Id.*

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 480 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



and to miss or irrationally undervalue disconfirming information.[132] Similarly, when such hypotheses are provided by a person of superior status in a team effort, or when self-worth and role-success contribute to emotional investment, the confirmation bias can be amplified, so that even the most obvious and unambiguous "disconfirming" information may remain undiscovered, or be dismissed.[133]

In a sense, cognitive biases are a byproduct of our need to process efficiently the flood of sensory information coming from the outside world. Without some system of categories or "schemata" to organize that information, it would remain, in the imagery of noted psychologist and philosopher William James, a "blooming, buzzing confusion."[134] It is likely that most of the cognitive biases and heuristics that appear to be wired into us were adaptive to the conditions under which we evolved as a species. But as a result of this necessary system of categorization, interpretation, and selective attention, we can be subject to error. The effects can be pernicious, whether the investigators involved are scientists or homicide detectives, unless the biasing tendencies are recognized and steps are taken to control or correct for them.

### 1. CONFIRMATION BIAS

Confirmation bias, as the term is used in psychological literature, typically connotes the tendency to seek or interpret evidence in ways that support existing beliefs, expectations, or hypotheses.[135] The bias has several expressions. In part, the bias reflects that, when testing a hypothesis or conclusion, people tend to *seek* information that confirms their hypothesis and to avoid information that would disconfirm their hypothesis.[136]

For example, a classic study asked people to find the rule that was used to generate a series of triplets of numbers (that is, a series such as 4-6-8).[137] The experimenter presented the triplet and asked the subjects

132. *Id.*

133. *Id.*

134. *Id.* at 14 (quoting WILLIAM JAMES, THE PRINCIPLES OF PSYCHOLOGY, 1890, ch. 13, *reprinted in* 53 GREAT BOOKS OF THE WESTERN WORLD 318 (Robert Maynard Hutchins ed., 1952)).

135. NISBETT & ROSS, *supra* note 127, at 169-71; Nickerson, *supra* note 127, at 175; Trope & Liberman, *supra* note 127, at 239-70.

136. GILOVICH, *supra* note 127, at 33; Burke, *supra* note 127, at 8; Lord et al., *supra* note 127, at 2098; Nickerson, *supra* note 127, at 177.

137. CATHERINE FITZMAURICE & KEN PEASE, THE PSYCHOLOGY OF JUDICIAL SENTENCING 30 (1986); Nickerson, *supra* note 127, at 179.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 481 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



to hypothesize a rule that explained the sequence.[138] The subjects then tested their hypotheses by proposing additional triplets; the experimenter then told them whether the proposed sequences fit the rule.[139] The subjects typically tested their hypotheses only by proposing triplets that fit their hypotheses.[140] Because the subjects rarely proposed triplets that did not fit their hypotheses, they were precluded from ever discovering that their hypotheses were wrong and that they had merely proposed triplets that *also* fit the actual rule.[141] In essence, subjects showed a preference for evidence that would *confirm* their hypothesis over evidence that would *disconfirm* it, even though the latter would have been more probative.[142]

In another experiment, subjects were given four cards, each with a different letter or number—an A, B, 2, or 3—on the side facing up.[143] They were then given a hypothesis, that any card with a vowel facing up had an even number on the reverse side, and were asked which card or cards they would turn over first to test that hypothesis.[144] The most common response was to turn over the A and 2 cards—cards that could offer evidence consistent with the hypothesis.[145] Turning over the 2 card, however, was actually uninformative because it could only confirm the hypothesis—a vowel on the other side would be consistent with the hypothesis, but a consonant would neither confirm nor disprove the hypothesis.[146] Turning over the 3 card potentially could have been very informative because a vowel on the other side would have disproved the hypothesis.[147] But subjects rarely turned over the 3 card because they naturally sought confirming, not disconfirming, evidence.[148]

Studies show that this preference for confirming information prevails in a social context as well.[149] For example, in a study that has been repeated numerous times in different ways, subjects were asked to

138. Nickerson, *supra* note 127, at 179.
139. *Id.*
140. *Id.*
141. *Id.*
142. Burke, *supra* note 127, at 7.
143. GILOVICH, *supra* note 127, at 33.
144. *Id.*
145. *Id.*
146. *Id.*
147. *Id.*
148. *See id.*; P.C. Wason, *Reasoning*, *in* NEW HORIZONS IN PSYCHOLOGY 135, 139-41 (B.M. Foss ed. 1966).
149. Mark Snyder & William B. Swann, Jr., *Behavioral Confirmation in Social Interaction: From Social Perception to Social Reality*, 14 J. EXPERIMENTAL SOC. PSYCHOL. 148, 156 (1978).

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



interview a target person to determine whether that person was an introvert or an extrovert.[150] In one study, the interviewers were given a list of questions to select from to probe the target's personality.[151] Half of the interviewers were told to choose questions that would test whether the person was an extrovert, and the other half were told to choose questions that would test whether the person was an introvert.[152] Consistently, interviewers chose questions that would prove, but never disprove, the implicit hypothesis.[153] Hence, subjects told to ask questions to test for extroversion chose questions like, "What would you do if you wanted to liven things up at a party?" while subjects testing for introversion asked questions like, "What is it about large groups that make you feel uncomfortable?"[154]

Numerous studies have repeatedly shown this confirmation bias, and have found that people seek information in ways that increase their confidence in prior beliefs or hypotheses—as in the studies cited here—even when they have no vested interest in those hypotheses.[155] Consistently, studies also confirm that people prefer to test a hypothesis or rule "by choosing only examples that would be classified as instances of the sought-for concept if the hypothesis were correct."[156] People disfavor choices that would disprove the hypothesis.[157] Ironically, this confirmation preference not only inhibits discovering the incorrectness of a particular hypothesis, but "this strategy would not yield as strongly confirmatory evidence, logically, as would that of deliberately selecting tests that would show the hypothesis to be wrong,

150. *See id.* at 151-52.

151. Miriam Bassok & Yaacov Trope, *People's Strategies for Testing Hypotheses About Another's Personality: Confirmatory or Diagnostic?*, 2 SOC. COGNITION 199, 202 (1984).

152. *Id.*

153. *Id.* at 210.

154. Burke, *supra* note 127, at 9; Mark Snyder & William B. Swann, Jr., *Hypothesis-Testing Processes in Social Interaction*, 36 J. PERSONALITY & SOC. PSYCHOL. 1202, 1202-12 (1978); GILOVICH, *supra* note 127, at 34-35.

155. Nickerson, *supra* note 127, at 178; GILOVICH, *supra* note 127, at 33.

156. Nickerson, *supra* note 127, at 178.

157. In part, we have a natural preference for confirmatory information because "it is easier to deal with cognitively." GILOVICH, *supra* note 127, at 31. Confirming information tends to be directly relevant to the proposition at issue, whereas information that fails to confirm a proposition can be only indirectly relevant, and accordingly requires additional cognitive steps "to put the information to use." *Id.* at 31-32. In addition, nonconfirmatory information is typically framed as a negative, "and we sometimes have trouble conceptualizing negative assertions." *Id.* at 32. To illustrate, Gilovich has noted how much easier it is to conceptualize the statement, "All Greeks are mortals," than the negative of that statement, "All non-mortals are non-Greeks." *Id.*

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



if it is wrong, and failing in the attempt."[158] Although such confirmation-biased information is often less probative than disconfirming information might be, people fail to recognize the weakness of the confirming feedback they receive or recall.[159] In this sense, the data "suggest that feedback that is typically interpreted by participants to be strongly confirmatory often is not logically confirmatory, or at least not strongly so. The 'confirmation' the participant receives in this situation is, to some degree, illusory."[160]

Empirical research also demonstrates that people not only *seek* confirming information, they also tend to *recall* information in a biased manner. Experiments show that, when revisiting information previously obtained, people search their memories in biased ways, preferring information that tends to confirm a presented hypothesis or belief.[161] For example, in one study participants were read a story about a woman who behaved in a number of both introverted and extroverted ways.[162] Two days later, half the participants were asked to assess the woman's suitability for a job that obviously required extroversion; the other half were asked to assess the woman's suitability for a job that would presumably demand introversion.[163] Those asked to assess the woman's suitability for the extroverted job recalled more examples of the woman's extroversion, and those asked to assess her suitability for the introverted job recalled more instances of her introversion.[164] The hypothesis at issue—the woman's suitability for the particular job—biased the way participants searched their memories for confirming evidence.[165]

In addition to seeking and recalling confirming information, people also tend to give greater weight to information that supports existing beliefs than to information that runs counter to them;[166] that is to say,

158. Nickerson, *supra* note 127, at 179. All writers on the general theory of investigation appear to agree that looking for disconfirming evidence is the preferable way to structure an investigation if the goal is to maximize accuracy. *See* Risinger et al., *supra* note 13, at 6. As Sir Frances Bacon wrote in 1620, "it is the peculiar and perpetual error of the human understanding to be more moved and excited by affirmatives than negatives, whereas it ought duly to be impartial; nay, in establishing any true axiom, the negative instance is the most powerful." *Id.* (quoting FRANCIS BACON, NOVUM ORGANUM, BOOK I, 109, point 46 (1620), *reprinted in* 30 GREAT BOOKS OF THE WESTERN WORLD 110 (Robert M. Hutchins ed., 1952)).

159. *See id.*

160. *See* Nickerson, *supra* note 127, at 179.

161. Burke, *supra* note 127, at 9-10.

162. GILOVICH, *supra* note 127, at 36.

163. *Id.*

164. *Id.*

165. *See id.*

166. Nickerson, *supra* note 127, at 178.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



people tend to *interpret* data in ways that support their prior beliefs.[167] Empirical research demonstrates that people are "incapable of evaluating the strength of evidence independently of their prior beliefs."[168] This process of selective information processing has been studied extensively, and the findings have been replicated in many contexts.[169] In part, the research shows a general tendency to "overweight positive confirmatory evidence" and "underweight negative discomfirmatory evidence."[170] In other words, "people generally require less hypothesis-consistent evidence to accept a hypothesis than hypothesis-inconsistent evidence to reject a hypothesis."[171]

Social scientists have attributed this phenomenon, at least in part, to motivational factors.[172] When presented with information that challenges their beliefs, people are motivated to defend those beliefs in a way that reinforces their initial viewpoint.

> [People] will search internally for material that refutes the disconfirming evidence, and, once that material is retrieved from memory, there will be a bias to judge the disconfirming evidence as weak. In contrast, when presented with information that supports prior beliefs, people allocate fewer resources to scrutinizing the information and are more inclined to accept the information at face value.[173]

Indeed, studies show that, in some circumstances, people do not respond to information at variance with their beliefs by simply ignoring it, but rather by working hard to examine it critically so as to undermine it.[174] "The end product of this intense scrutiny is that the contradictory information is either considered too flawed to be relevant, or is redefined into a less damaging category."[175] Moreover, people tend to use different criteria when they evaluate data or conclusions that they desire than when they evaluate conclusions they disfavor.[176] For preferred conclusions, "we ask only that the evidence not force us to

167. *See id.*
168. Burke, *supra* note 127, at 10.
169. *Id.* at 11.
170. Nickerson, *supra* note 127, at 180.
171. *Id.*
172. Burke, *supra* note 127, at 11.
173. *Id.* at 12 (footnotes omitted).
174. GILOVICH, *supra* note 127, at 55-56.
175. *Id.*
176. *Id.* at 83.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 485 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



believe otherwise . . . ."[177] For disfavored conclusions, however, "we ask whether the evidence *compels* such a distasteful conclusion—a much more difficult standard to achieve."[178] Thus, "[f]or desired conclusions . . . it is as if we ask, '*Can* I believe this?' but for unpalatable conclusions we ask, '*Must* I believe this?'"[179]

Accordingly, when considering data, people sometimes see patterns they are looking for even when those patterns are not really there.[180] On a social level, numerous studies have shown that descriptions provided in advance (expectations) about a person's qualities can affect how others assess that person.[181] For example, observers who were told in advance that a person had particular personality characteristics tended to see those qualities in that person, whether or not those characteristics were objectively present.[182] This phenomenon can be particularly significant in criminal cases, where an individual is being judged—by police, prosecutors, defense lawyers, judges, and jurors—and where the initial working hypothesis presented to each actor in the system is that the defendant is guilty (despite the theoretical presumption of innocence).

While biases thus affect the acquisition and interpretation of information, and thereby impede rational or logical adjustment of hypotheses or conclusions to reflect new information, natural tendencies also make people resistant to change even in the face of new evidence that wholly undermines their initial hypotheses.[183] This phenomenon, known as *belief perseverance* or *belief persistence*, can render a belief or opinion very intractable.[184] People are naturally disinclined to relinquish initial conclusions or beliefs, even when the bases for those initial beliefs are undermined.[185] Thus, people are more likely to question information that conflicts with preexisting beliefs, and are more likely to interpret ambiguous information as supporting rather than disconfirming their original beliefs.[186] People "can be quite facile

177. *Id.*

178. *Id.* at 84.

179. *Id.*

180. Nickerson, *supra* note 127, at 181; *see* GILOVICH, *supra* note 127, at 15-18.

181. Nickerson, *supra* note 127, at 181.

182. *Id.*

183. *Id.* at 187.

184. *Id.*; Burke, *supra* note 127, at 13; Joel D. Lieberman & Jamie Arndt, *Understanding the Limits of Limiting Instructions: Social Psychological Explanations for the Failures of Instructions to Disregard Pretrial Publicity and Other Inadmissible Evidence*, 6 PSYCHOL. PUB. POL'Y & L. 677, 691 (2000).

185. Nickerson, *supra* note 127, at 187.

186. *Id.*

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



at explaining away events that are inconsistent with their established beliefs."[187]

For example, empirical research has shown that people find it quite easy to form beliefs that generally explain an individual's behavior, and to persevere with those beliefs even after the premise for the initial belief is shown to be fictitious.[188] In a classic study, subjects were asked to distinguish between authentic and fake suicide notes.[189] At various points, subjects were given feedback about how they were performing.[190] The feedback was in fact independent of the choices they made; researchers randomly informed the participants that they were performing far above average or far below average.[191] Researchers then debriefed the participants, explicitly revealing to them that the feedback had been false, predetermined, and independent of their choices.[192] Yet, when later asked to rate their ability to make such judgments, those who had received positive feedback rated their ability much higher than those who had received negative feedback, even though they had all been told that their feedback was arbitrary.[193]

A follow-up experiment found similar perseverance effects for people who did not perform the tasks themselves, but who observed others performing the tasks as well as the debriefing sessions.[194] In other words, observers also maintained their beliefs about the subject's ability to perform the assigned task, even after learning that the bases for their beliefs were false.[195]

The belief perseverance phenomenon is apparent in many of the wrongful conviction cases.[196] For example, even when presented with DNA evidence proving that semen taken from a sexual assault victim could not have come from the defendant, prosecutors sometimes persist in their guilt judgments and resist relief for the defendant.[197] As

187. *Id.*

188. *Id.* at 188.

189. *Id.* at 187-88.

190. *Id.* at 188.

191. *Id.*

192. *Id.*

193. *Id.* at 181; Burke, *supra* note 127, at 13; Lee Ross, Mark R. Lepper & Michael Hubbard, *Perseverance in Self-Perception and Social Perception: Biased Attributional Processes in the Debriefing Paradigm*, 32 J. PERSONALITY & SOC. PSYCHOL. 880, 882 (1975).

194. Nickerson, *supra* note 127, at 188.

195. *See id.*; Burke, *supra* note 127, at 14.

196. *See* Daniel S. Medwed, *The Zeal Deal: Prosecutorial Resistance to Post-Conviction Claims of Innocence*, 84 B.U. L. REV. 125, 129 (2004).

197. *See id.* According to Medwed, empirical evidence shows that prosecutors have consented to DNA tests in less than 50 percent of the cases in which testing later proved innocence. *Id.* Medwed has expressed alarm at the "qualitative evidence of

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Professor James Liebman has observed, "prosecutors have become . . . sophisticated about hypothesizing the existence of 'unindicted co-ejaculators' (to borrow Peter Neufeld's phrase) to explain how the defendant can still be guilty, though another man's semen is found on the rape-murder victim."[198]

Thus, these cognitive biases help explain what went wrong in many wrongful conviction cases, including the cases of Anderson, Avery, and the Central Park Jogger defendants. Convinced by an early—although plainly flawed—eyewitness identification, police and prosecutors in the Anderson and Avery cases sought evidence that would confirm guilt, not disconfirm it. They searched for incriminating evidence against their suspects, but never looked at viable alternative perpetrators. When confronted with ambiguous or inherently weak evidence—such as the microscopic hair "matches" and Avery's statement that police had accused him of killing a "girl"—police and prosecutors interpreted it as powerfully incriminating. When confronted with contrary evidence—such as the many alibi witnesses in Avery and Anderson's cases, the inconsistencies and inaccuracies in the confessions in the Central Park Jogger case, and the perpetrator's confessions in Anderson's case and the Central Park Jogger case—they sought to discredit or minimize that evidence. In Avery's case, for example, the prosecution even hypothesized that Avery committed the rape while his wife and five children waited for him in the car; that Avery then collected his family and made a mad dash to the Shopko store in Green Bay, exceeding the speed limit the entire way; toted his children, including two infants, through the store; and raced to the checkout line with paint in time to checkout within the time frame permitted by the evidence. The stubborn assessment of guilt in these cases persisted on appeal and through postconviction proceedings, tainting perspectives on the relative strength of the States' and defendants' cases and even leading authorities to reject a full confession by the true perpetrator in Anderson's case.[199]

---

prosecutorial indifference and, on occasion, hostility to even the most meritorious of post-conviction innocence claims." *Id.*

198. James S. Liebman, *The New Death Penalty Debate: What's DNA Got to Do with It?*, 33 COLUM. HUM. RTS. L. REV. 527, 543 (2002).

199. While confirmation bias is typically associated with the investigation stages of cases, the same phenomenon is present throughout the criminal justice system, and is even encouraged as a matter of policy. *See infra* Part II.C.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



### 2. HINDSIGHT BIAS AND OUTCOME BIAS

Tunnel vision is reinforced by other cognitive distortions as well, including hindsight bias, or the "knew-it-all-along effect."[200] Cognitive research has repeatedly shown that, in hindsight, people tend to think that an eventual outcome was inevitable, or more likely or predictable, than originally expected.[201] Hindsight bias essentially operates as a means through which people project new knowledge—outcomes—into the past, without any awareness that the perception of the past has been tainted by the subsequent information.[202]

Hindsight bias is a product of the fact that memory is a dynamic process of reconstruction.[203] Memories are not drawn from our brains fully formed, but are assembled from little bits and pieces of information as we recall an event.[204] Those little pieces of information about an event or situation are constantly being updated and replaced in our brains by new information.[205] The updated information is then used each time we reconstruct a relevant memory, making the ultimate conclusion appear preordained, or more likely than we could have known at the outset.[206] Understood another way, the process is one in which an individual reanalyzes an event so that the early stages of the process connect causally to the end.[207] "During this process, evidence

200. Scott A. Hawkins & Reid Hastie, *Hindsight: Biased Judgments of Past Events After the Outcomes Are Known*, 107 PSYCHOL. BULL. 311, 311 (1990); Ulrich Hoffrage, Ralph Hertwig & Gerd Gigerenzer, *Hindsight Bias: A By-Product of Knowledge Updating?*, 26 J. EXPERIMENTAL PSYCHOL.: LEARNING, MEMORY & COGNITION 566, 566 (2000); Erin M. Harley, Keri A. Carlsen & Geoffrey R. Loftus, *The "Saw-It-All-Along" Effect: Demonstrations of Visual Hindsight Bias*, 30 J. EXPERIMENTAL PSYCHOL.: LEARNING, MEMORY & COGNITION 960, 960 (2004); FITZMAURICE & PEASE, *supra* note 137, at 32.

A host of other psychological phenomena are also at work in ways that interfere with rational assessment of data. Those phenomena include "anchoring effects" (referring to the fact that estimates people make of points along a continuum are influenced by preexisting or predetermined but task-irrelevant data); "role effects" (referring to the fact that asking people to adopt a particular function or perspective affects the way they seek and perceive information); "conformity effects" (reflecting that people tend to conform to the perceptions, beliefs, and behavior of others); and "experimenter effects" (referring to the tendency of subjects in an experiment to alter their behavior in response to an experimenter's behavior). For a discussion of these and related phenomena, see Risinger et al., *supra* note 13, at 12-21.

201. Harley, Carlsen & Loftus, *supra* note 200, at 960.

202. Hawkins & Hastie, *supra* note 200, at 311.

203. Ian Weinstein, *Don't Believe Everything You Think: Cognitive Bias in Legal Decision Making*, 9 CLINICAL L. REV. 783, 800 (2003).

204. *Id.*

205. *Id.*

206. *Id.* at 800-01.

207. Harley, Carlsen & Loftus, *supra* note 200, at 960.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



consistent with the reported outcome is elaborated, and evidence inconsistent with the outcome is minimized or discounted. The result of this rejudgment process is that the given outcome seems inevitable or, at least, more plausible than alternative outcomes." [208]

Hindsight bias might reinforce premature or unwarranted focus on an innocent suspect in several ways. First, once a suspect becomes the focus of an investigation or prosecution—that is, once police or prosecutors arrive at an outcome in their own quest to determine who they believe is guilty—the hindsight bias would suggest that, upon reflection, the suspect would appear to have been the inevitable and likely suspect from the beginning.[209] Moreover, events supporting a given outcome are typically better remembered than events that do not support that outcome.[210] Hence, once police and prosecutors conclude that a particular person is guilty, not only might they overestimate the degree to which that suspect appeared guilty from the beginning, but they will likely best remember those facts that are incriminating (thereby reinforcing their commitment to focus on that person as the culprit). [211]

Second, hindsight bias has implications for the quality of the evidence used to convict.[212] For example, hindsight bias helps explain one way that eyewitness identification errors can contribute to tunnel vision, and ultimately to conviction of the innocent.[213] It is well recognized that eyewitness confidence is highly malleable.[214] Confirming feedback offered after an eyewitness identification can dramatically inflate not only the witness's confidence in the ultimate identification, but also the witness's assessment of the conditions surrounding the identification.[215] For example, if an eyewitness had a poor view of a perpetrator or paid little attention to the incident at the time, the witness likely had a poor memory of the perpetrator.[216] But if the witness nonetheless were to attempt an identification by examining a clear picture of a suspect in a photo spread, or a good view of the

208. *Id.*

209. *See* Lieberman & Arndt, *supra* note 184, at 692.

210. *Id.*

211. *See* Harley, Carlsen & Loftus, *supra* note 200, at 960.

212. *See* Amy L. Bradfield, Gary L. Wells & Elizabeth A. Olson, *The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy*, 87 J. APPLIED PSYCHOL. 112, 112-13 (2002).

213. *Id.* at 113.

214. *Id.*

215. *See id.* at 112-13; Gary L. Wells & Amy L. Bradfield, *"Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience*, 83 J. APPLIED PSYCHOL. 360, 360-62 (1998).

216. Harley, Carlsen & Loftus, *supra* note 200, at 966.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 490 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



suspect in a live lineup, the witness would likely replace the original, low-quality memory of the suspect with a clearer image from the identification procedure.[217] Given that the witness really had a very poor memory of the perpetrator, the witness very well could be mistaken in the identification.[218] But, especially if given confirming feedback, the witness might then draw on the cleaned-up memory of the perpetrator together with the confirming feedback to overstate both the quality of the original viewing conditions and the confidence—the inevitability—of the ultimate identification.[219] In hindsight, the identification will appear as if it was always inevitable and was based upon clear memories and an excellent opportunity to view the suspect.[220]

Third, a *reiteration effect* is also linked to hindsight bias.[221] Studies have established that confidence in the truth of an assertion naturally increases if the assertion is repeated.[222] This increase in confidence from repetition is independent of the truth or falsity of the assertion.[223] Accordingly, the longer that police and prosecutors (and witnesses) live with a conclusion of guilt, repeating the conclusion and its bases, the more entrenched their conclusion becomes, and the more obvious it appears that all evidence pointed to that conclusion from the very beginning.[224] As a result, the reiteration effect makes it increasingly difficult for police and prosecutors to consider alternative perpetrators or theories of a crime.[225]

Closely related to hindsight bias is outcome bias.[226] Like hindsight bias, outcome bias involves a process in which people project new knowledge—outcomes—into the past without any awareness that the outcome information has influenced their perception of the past.[227] But outcome bias differs from hindsight bias in that outcome bias does not refer to the effect of outcome information on the judged probability of an outcome, but to its effect on the evaluations of *decision quality*.[228]

217. *Id.* at 966-67.

218. *Id.*

219. *See id.* at 967.

220. *See id.* at 966-67.

221. Ralph Hertwig, Gerd Gigerenzer & Ulrich Hoffrage, *The Reiteration Effect in Hindsight Bias*, 104 PSYCHOL. REV. 194, 194 (1997).

222. *Id.*

223. *Id.*

224. *See id.*

225. *See id.*

226. Jonathan Baron & John C. Hershey, *Outcome Bias in Decision Evaluation*, 54 J. PERSONALITY & SOC. PSYCHOL. 569, 570 (1988).

227. *See id.*

228. *Id.*

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



In other words, outcome bias does not reflect hindsight judgments about how likely an event appears to have been, but hindsight judgments about whether a decision was a good or bad one.[229] For example, in a medical context, subjects are more likely to judge the decision to perform surgery as a bad decision when they are told that the patient died during surgery than when told that the same patient survived the surgery.[230] While at a naïve level this might seem intuitively reasonable, decision analysts teach that, rationally,

> [i]nformation that is available only after a decision is made is irrelevant to the quality of the decision. Such information plays no direct role in the advice we may give decision makers ex ante or in the lessons they may learn. The outcome of a decision, by itself, cannot be used to improve a decision unless the decision maker is clairvoyant.[231]

Even when people understand that outcome bias is inappropriate, it is difficult to overcome; as with hindsight bias, people tend to show an outcome bias "even when they think they should not, and . . . even though they think they do not."[232]

Hindsight bias and outcome bias have particularly serious implications for appellate and postconviction review by judges, especially in the application of harmless error and related doctrines such as the prejudice prong of the ineffective assistance of counsel analysis and the materiality prong of *Brady v. Maryland*.[233] Hindsight bias and outcome bias, together, should be expected to have an affirmance-biasing effect in postconviction and appellate review because the outcome of the case—conviction[234]—tends to appear, in hindsight, to have been both inevitable and a "good" decision. Empirical data appear to support that conclusion, as reversals in

229. *See id.*

230. *Id.* at 571.

231. *Id.* at 569.

232. *Id.* at 572.

233. 373 U.S. 83 (1963). *Brady* and its progeny hold that a prosecutor violates due process by failing to disclose to the defense exculpatory evidence if that evidence is material—that is, if disclosure of the evidence would have created a reasonable probability of a different outcome. *Id.* at 87.

234. In criminal cases, the appellate review almost always focuses on challenges to convictions brought by criminal defendants because the double jeopardy clause prohibits government appeals of acquittals. United States v. Sanges, 144 U.S. 310, 312-13 (1892). States' appeals are typically limited to interlocutory appeals of evidentiary rulings or a limited range of sentencing issues. URSULA BENTELE & EVE CARY, APPELLATE ADVOCACY: PRINCIPLES AND PRACTICE 63, 69, 76 (4th ed. 2004).

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 492 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



criminal cases are quite rare.[235] Even where courts find error, they frequently forgive the error under the harmless error doctrine.[236] With hindsight knowledge that a jury found the defendant guilty beyond a reasonable doubt, judges are likely to be predisposed to view the conviction as both inevitable and a sound decision, despite a procedural or constitutional error in the proceedings.[237] To some extent, placing the burden of proving the harmless nature of an error on the beneficiary of the error—in criminal cases, requiring the government to prove harmless error beyond a reasonable doubt[238]—might be intended to mitigate the effects of hindsight and outcome biases. Nonetheless, courts routinely find significant errors harmless,[239] and that is partly because hindsight bias and outcome bias work in tandem with other values, such as a desire to respect finality and avoid wasteful retrials of obviously guilty defendants.

All of these cognitive distortions help to explain the reluctance of the appellate courts in Avery's case to recognize the flaws in the eyewitness identification procedures used in his case, or even to recognize that the evidence against him was weak and his alibi defense was unusually strong.[240] Now, in hindsight, with the benefit of both greater understanding of the nature of eyewitness identification error and the knowledge from DNA testing that Avery was actually innocent, it seems apparent that the eyewitness procedure was flawed, that the conviction was suspect, and that the case was close from the beginning. (Of course, in fairness, we cannot overlook the fact that hindsight bias likely makes Avery's innocence look all the more apparent to us now than it might have at the time. But that does not negate the fact that hindsight bias appeared to impair the judgment of the courts that reviewed Avery's case before his exoneration.)

---

235. *See infra* notes 353-60, 428-31 and accompanying text.

236. *See infra* notes 358-60 and accompanying text.

237. The harmless error doctrine has received considerable scholarly attention, including significant criticism that it unduly focuses on the guilt of a defendant. *See, e.g.*, Brandon L. Garrett, *Innocence, Harmless Error, and Federal Wrongful Conviction Law*, 2005 WIS. L. REV. 35, 58-61; Harry T. Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. REV. 1167, 1170 (1995). Hindsight and outcome bias provide another basis for questioning the wisdom of a doctrine that turns on after-the-fact, guilt-based assessments of the effects of an error on the outcome of a case.

238. Chapman v. California, 386 U.S. 18, 24 (1967).

239. *See* Garrett, *supra* note 237, at 38 (stating that harmless error analysis "all but bar[s] relief in criminal appeals").

240. *See supra* notes 87-92 and accompanying text (noting that the court believed the photo array used in Avery's case to be one of the fairest the court had seen, and subsequently denied postconviction relief, in part upon the conclusion that the case against Avery had not been close).

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 493 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



The effect of hindsight bias on appellate and postconviction review is likely to be even more pronounced in situations where the burden of persuasion is placed on the defendant. Yet many of the innocence-based challenges to convictions do just that. Claims that the government withheld exculpatory evidence, or that trial counsel provided ineffective assistance, require the defendant to show affirmatively that those errors might have made a difference in the outcome of the proceedings.[241] Given the combination of those burdens of persuasion and the cognitive biases that affect hindsight review, it is not at all surprising that ineffective assistance of counsel claims were denied in cases like Anderson's and Avery's. We consider these burden-shifting doctrines in greater detail later in this Article when we address rulebound dimensions of the tunnel vision problem.[242]

In sum, with an understanding of the natural cognitive biases and distortions that we are all susceptible to as human beings, it becomes clear that tunnel vision in criminal investigations and prosecutions is to an extent inevitable. To suggest that tunnel vision infects police investigations, prosecutions, and judicial proceedings is not necessarily to make a value judgment about the nature or qualities of police and prosecutors and judges, but, to some degree at least, merely to acknowledge the natural tendencies that can and do influence *anyone's* access to and interpretation of data. In this sense, police, prosecutors, and judges are not bad people because they are affected by tunnel vision; they are merely human. But the innateness of these cognitive biases and distortions does not absolve actors in the criminal justice system from responsibility to try to overcome tunnel vision; to the contrary, it demands that we become aware of these cognitive processes and the tunnel vision they produce, and that we search for ways to neutralize them. Unfortunately, the criminal justice system fails to do that. Rather, both institutional pressures inherent in the adversary system and explicit policy choices reinforce and exacerbate the natural tendencies toward tunnel vision.

### *B. Institutional Pressures that Reinforce Tunnel Vision*

The adversary system has many virtues, but one byproduct of an adversary model is that it polarizes the participants, imposing pressures

241. *See* Strickland v. Washington, 466 U.S. 668, 686-87 (1984) (holding that errors by defense counsel that constitute both deficient performance and prejudice to the defense violate the Sixth Amendment right to counsel); Brady v. Maryland, 373 U.S. 83, 86-87 (1963) (holding that due process is violated when the government withholds exculpatory, material evidence).

242. *See infra* Part II.C.3.b.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



on them to dogmatically pursue their own perceived interests or their own assessments of the proper outcome of a case. In contrast, advocates of an inquisitorial system maintain that one advantage of that model is that, because it posits neutrality and a search for the truth rather than advocacy and a quest for victory, it avoids many of these biasing pressures.[243] Whether that is true or not, one thing is clear: biasing pressures that exacerbate our natural cognitive biases do exist in our adversarial system. Tunnel vision is a product not just of the psychological tendencies discussed above, but also of multiple external forces imposed by the adversary system at various stages of the process.

### 1. INSTITUTIONAL PRESSURES ON POLICE

As noted above, tunnel vision in criminal investigations typically originates during the initial police investigation of a crime.[244] When police investigators are under pressure—from victims, the community, the media, elected officials, and their supervisors—to solve cases quickly, the resulting stress may contribute to investigative tunnel vision.[245] That is, investigators' thought processes may become distorted by the desire to alleviate the pressure that comes from not being able to assure the public that the offender has been caught and the community is safe. Highly publicized unsolved crimes foster public

---

243. *See, e.g.*, Franklin Strier, *Making Jury Trials More Truthful,* 30 U.C. DAVIS L. REV. 95, 142-51 (1996) (comparing the truth-seeking strengths of the adversarial and inquisitorial models). Others have also observed that adversarial adjudication places a high priority on dispute resolution and party participation, while inquisitorial systems place a higher priority on accuracy. *See* Darryl K. Brown, *The Decline of Counsel and the Rise of Accuracy in Criminal Adjudication*, 93 CAL. L. REV. 1585 (2005); Daniel Givelber, *The Adversary System and Historical Accuracy: Can We Do Better? in* WRONGLY CONVICTED 253, 253-54 (Saundra D. Westervelt & John A. Humphrey eds., 2001).

244. Police are also concerned with a more literal form of tunnel vision: in officer-involved shootings, officers commonly experience a sort of tunnel vision that manifests itself by blocking out of the officer's sensory realm some sights and sounds other than those immediately surrounding the threat, usually a weapon. *See* WILLIAM A. GELLER & MICHAEL S. SCOTT, DEADLY FORCE: WHAT WE KNOW 325 (1992). The officer's mind concentrates its attention on the immediate threat, to the exclusion of any possible distractions. *Id.* This may or may not work to the officer's advantage, depending on what else is occurring outside the "tunnel." *Id.* This sort of tunnel vision is an intense and immediate psychological reaction to life-threatening stress. *Id.* Accordingly, when discussing tunnel vision with police or reviewing the police literature on tunnel vision, it is important that one recognize the distinction between the figurative form with which this Article concerns itself and the literal form associated with police use of force.

245. *See* NAT'L RESEARCH COUNCIL, FAIRNESS & EFFECTIVENESS IN POLICING: THE EVIDENCE 227-28 (2004).

Court of Appeals Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 495 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



fear of crime, which in turn undermines public confidence in and support for police, thereby generating significant pressure on police to solve high-profile cases quickly. Contrary to popular impressions that are often reinforced by police, their capacity to solve crimes is more limited than is commonly understood. Most property crimes, and even a large proportion of violent crimes, that are reported to police are never solved.[246] Police find it difficult to live up to their nearly mythical image as highly competent crime solvers.[247] Unrealistic public and media expectations can and have resulted in police administrators pressuring police investigators to solve (or in the technical parlance of police, to "clear") as many cases as possible so that the case clearance rates that are ultimately reported to the Federal Bureau of Investigation and the public are not so low as to erode public confidence in police.

Police bear multiple, and at times competing, obligations in a criminal investigation: to care for the victim (part of which might mean not traumatizing the victim by expressing disbelief in the victim's account of the crime), to identify and apprehend the offender, and to safeguard suspects' constitutional rights. Indeed, police and prosecutors have devoted increasing resources to assisting crime victims, often establishing special units for just this purpose. While much good has come of the victims' rights movement, it also constitutes another source of pressure on police that can contribute to tunnel vision if left unchecked. Investigators can become too willing to take at face value all of a victim's statements—even those statements that are distorted by the sorts of psychological biases at issue in this Article—if they worry excessively that disbelieving a crime victim will reflect poorly on the police. It is understandably difficult for investigators to appear to accuse a purported crime victim—particularly a violent-crime victim—of lying, even when police have some reasonable doubts about the accuracy of the victim's statement.[248]

246. *See id.*; Andrew D. Leipold, *How the Pretrial Process Contributes to Wrongful Convictions*, 42 AM. CRIM. L. REV. 1123, 1159 (2005).

247. *See* Kenneth Dowler, *Media Consumption and Public Attitudes Toward Crime and Justice: The Relationship Between Fear of Crime, Punitive Attitudes, and Perceived Police Effectiveness* 10 J. CRIM. JUST. & POPULAR CULTURE 109, 111 (2003). For a broader exploration of the nature and consequences of the police-media relationship, see JARRET S. LOVELL, GOOD COP/BAD COP: MASS MEDIA AND THE CYCLE OF POLICE REFORM (2003); Jerome H. Skolnick & Candace McCoy, *Police Accountability and the Media*, 1984 AM. B. FOUND. RES. J. 521, 522.

248. By way of example, Madison (Wis.) Police Department detectives were widely criticized for disbelieving a rape victim whose account ultimately proved likely to be truthful. *See* Patricia Simms & Barry Adams, *Abduction Story a Fake*, WIS. ST. J., Apr. 3, 2004, at A4. That criticism reportedly influenced police decisions in a subsequent missing person case in which police detained a suspect in spite of reasons to

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



In particularly heinous and harmful crimes, police investigators can naturally become emotionally affected by the crime in spite of their best efforts to remain dispassionate. Police are particularly vulnerable because they often witness the most viscerally disturbing aspects of crime. Emotion serves a productive purpose in that it can give investigators greater resolve to solve the case, but it also constitutes another source of psychological pressure that can foster tunnel vision.

The sheer volume of reported crimes begging for police investigation constitutes yet another source of pressure on police investigators that reinforces tunnel vision. Police investigators are often under constant pressure to complete their assigned cases by solving the case and arresting an offender or determining that there is insufficient evidence to warrant further investigation. Investigative supervisors must constantly make judgments about how much time and investigative resources each case deserves.[249] Newly occurring crimes awaiting investigation perpetually pressure investigators to dispose of older cases. Moreover, in many jurisdictions where the volume of serious crime investigations is high and many cases compete for limited resources, police investigators might be reluctant to request time-consuming and expensive forensic testing of evidence, particularly in cases where police already believe they have sufficient testimonial evidence (eyewitness identification or suspect confession) to establish probable cause against a particular suspect.

The standards of performance by which police investigators are measured, most significantly by their supervisors and administrators, also significantly influence investigative practices and can potentially reinforce tunnel vision. The most common measure of investigator performance—at both the organizational and the individual level—is the so-called "clearance rate," the rate at which crimes reported to the police are deemed satisfactorily closed.

The rules for calculating clearance rates are set by the Federal Bureau of Investigation through its Uniform Crime Reporting program.[250] According to the FBI rules, cases can be cleared either by arresting an offender and turning the case file over to prosecutors for prosecution[251] or by so-called "exceptional means" (a variety of

believe that the purported victim had concocted the crime, a belief ultimately proven to be true. *Id.*

249. *See* JOHN E. ECK, MANAGING CASE ASSIGNMENTS: THE BURGLARY INVESTIGATION DECISION MODEL REPLICATION 71-72 (1979).

250. FED. BUREAU OF INVESTIGATION, UNIFORM CRIME REPORTING HANDBOOK 78-81 (2004). Although participation in the Uniform Crime Reporting program is voluntary, most police agencies do participate and, consequently, are held publicly accountable to its figures.

251. *Id.* at 79.

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 497 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



circumstances under which police can be deemed to have identified the offender, but through no fault of their own are unable to take the offender into custody).[252] The not-unreasonable assumption that the police can only be held accountable for so much is built into this performance measurement system; police investigators and police agencies should not be penalized for circumstances beyond their control, including the case filing decisions of prosecutors.[253]

Where this principle is applied loosely, the net effect can lead police to conclude that their responsibility ends with the arrest of an offender, after only meeting the threshold probable cause standard. To the extent that a police agency measures its investigators' performances by such minimal standards (many police agencies apply more stringent standards), investigators might conclude that arresting a plausible offender constitutes the beginning and the end of their responsibility. Where that occurs, concern for other performance standards—such as whether the case was subsequently dismissed by prosecutors or courts for insufficiency of evidence or violation of evidence-collection rules, or more to the point of this Article, that a different offender was ultimately determined to be the true perpetrator—assume a lesser significance than the fact that a legally plausible arrest was made. The performance standards to which individual police investigators and investigative units are held—beyond the minimal legal standards—are largely a matter of administrative policy and practice. The performance standards to which an entire police agency is held are largely a matter of political judgment and public expectations. Accordingly, the stringency of performance measurement standards for police investigations constitutes a potential source of institutional pressure contributing to tunnel vision.

Police investigators can become emotionally attached to their preferred theory of the case, including which suspect is the most likely offender. Under such conditions, the criminal investigation objective shifts, perhaps subtly, from an open search for evidence to proving that the preferred theory of the case is correct.[254]

Moreover, some have argued that "tunnel vision" can be self-reinforcing: police, once persuaded that an individual is the offender, employ questionable investigative methods to further substantiate their

252. *Id.* at 80-81.

253. *See id.*

254. *See* C. RONALD HUFF, ARYE RATTNER & EDWARD SAGARIN, CONVICTED BUT INNOCENT: WRONGFUL CONVICTION AND PUBLIC POLICY 111 (1996).

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



belief.[255] They might even rationalize doing so as merely helping the truth along.[256]

A detective's preferred theory of the case might also influence the collection of physical evidence: deciding where and what type of evidence to look for is significantly influenced by the theory of how the crime unfolded, including the sequence of actions taken by the offender. Important physical evidence, either confirmatory or exculpatory, might also be overlooked if the theory of the case prevailing at the time of evidence collection later proves wrong.[257]

In addition, empirical research shows that the pressures and culture that bear upon police officers can increase investigator bias: in clinical studies, investigator biases in "judgments of truth and deception [are] positively correlated with [police] experience and training. It is also important to realize that these biases are unlikely to self-correct as a result of feedback, which is seldom available to permit a diagnostic evaluation of their beliefs."[258]

### 2. INSTITUTIONAL PRESSURES ON PROSECUTORS

While police bear institutional pressure to solve crimes, the adversary process imposes pressure on prosecutors to ensure conviction of the suspects apprehended by police. The public pressure on prosecutors to convict may even be more acute than the public pressure on police to arrest because the prosecutor's role in society is widely perceived even more narrowly than is the police role in society. While broad-minded prosecutors and legal scholars might envision the proper prosecutorial role to be something like "to do justice on behalf of the people," it is more likely that prosecutors, and citizens alike, perceive the prosecutor's role more narrowly as limited to prosecuting offenders via the criminal law.[259] Although arresting offenders is widely

255. *See id.*

256. This phenomenon is part of the larger phenomenon of "ratification of error" in which subsequent phases of a criminal investigation and prosecution serve not to detect and correct prior errors, but rather to reinforce the correctness of the prior errors. *See id.*

257. See Robert B. Bates, *Curing Investigative Tunnel Vision*, 54 POLICE CHIEF 41, 41-43 (1987), for a discussion of the risks of tunnel vision in physical evidence collection.

258. Richard A. Leo, *The Third Degree and the Origins of Psychological Interrogation in the United States*, *in* INTERROGATIONS, CONFESSIONS, AND ENTRAPMENT 37, 99 (G. Daniel Lassiter ed., 2004).

259. *See* Catherine M. Coles, *Community Prosecution, Problem Solving, and Public Accountability: The Evolving Strategy of the American Prosecutor* (Harvard Univ. Program in Criminal Justice Policy & Mgmt., Working Paper No. 00-02-04,

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 499 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



perceived as the dominant police role, the broader functions of police also include such tasks as maintaining order, controlling traffic, assisting persons in danger, and so forth.[260]

Extensive scholarly work has focused on the role of prosecutors and the pressures that induce them to seek convictions, even when doing so may subvert justice. While the role of a prosecutor is often described as that of "minister of justice,"[261] in reality that idealized role often conflicts with the prosecutor's rough-and-tumble role in the adversarial process.[262] Others have noted, for example, that prosecutors' offices often place an emphasis on conviction rates, as a matter of pride, as confirmation of the justness of their work, and as a "quantifiable method for superiors in the office to measure that prosecutor's success in an occupation where job performance, aside from anecdotal evidence, is otherwise difficult to gauge."[263] This emphasis, combined with public pressure to convict the guilty,[264] can engender what has been called a "conviction psychology"—an emphasis on obtaining convictions over "doing justice."[265] Evidence that institutional and cultural pressures in prosecutors' offices contribute to

---

2000), *available at* http://www.ksg.harvard.edu/criminaljustice/publications/community_prosecution.pdf.

260. *See* HERMAN GOLDSTEIN, POLICING A FREE SOCIETY 24-25 (1977).

261. MODEL RULES OF PROF'L CONDUCT R. 3.8 cmt. 1 (2001) ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."); Kenneth Bresler, *Pretty Phrases: The Prosecutor as Minister of Justice and Administrator of Justice*, 9 GEO. J. LEGAL ETHICS 1301, 1301-02 (1996); Medwed, *supra* note 196, at 132.

262. *See* Stanley Z. Fisher, *In Search of the Virtuous Prosecutor: A Conceptual Framework*, 15 AM. J. CRIM. L. 197, 198-99 (1988). As one former prosecutor noted of his own office, in which prosecutors took pride in "doing justice," "there have always been cross-cutting themes in the prosecutor's office. Most significantly, there was a tradition of machismo, of the prosecutor as aggressive trial lawyer facing down the lawbreaking adversary." Bruce A. Green, *Why Should Prosecutors "Seek Justice"?*, 26 FORDHAM URB. L.J. 607, 609 (1999).

263. Medwed, *supra* note 196, at 134; *see also* George T. Felkenes, *The Prosecutor: A Look at Reality*, 7 SW. U. L. REV. 98, 99, 114 (1975).

264. Prosecutors also feel pressure to convict from the relationships they develop with crime victims and with law enforcement colleagues who have invested in developing the case against a defendant. *See* Medwed, *supra* note 196, at 145.

265. *See* Fisher, *supra* note 262, at 198; Felkenes, *supra* note 263, at 108-12. According to Felkenes,

> [t]he prosecutor who displays 'conviction psychology' thinks of the defendant as guilty, and reasons that an innocent person would not be introduced into the system. He sees the judicial system as the means through which he must work in order that the guilty might receive their proper punishment. . . . The result of these attitudes is a deterioration of the ideal purpose of the prosecutor—to seek justice.

*Id.* at 110.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



conviction psychology can be seen in empirical data showing that it increases over time; the more experience a prosecutor has, the more likely he or she is to express an interest in obtaining convictions over an interest in doing justice.[266]

Ironically, even for the most ethical prosecutors, those most committed to the ideal of doing justice, the prosecutorial role inevitably fosters tunnel vision. Unlike a defense attorney, an ethical and honorable prosecutor *must* be convinced of the righteousness of his position; "[t]he honorable prosecutor simply cannot believe that he is prosecuting the blameless."[267] Indeed, prosecutors motivated to do justice "must satisfy themselves of an individual's guilt as a precondition to determining that the conviction of an individual is an end to be sought on behalf of the state or the federal government."[268]

But prosecutors' assessments of guilt can be flawed both by the information provided to them and the feedback they receive. Prosecutors are particularly vulnerable to distortions based on the types of information to which they have access. The problem of absent or hidden data, which is recognized in studies of cognitive error,[269] can lead actors in the criminal justice system astray. As we have seen, various cognitive biases impede a person's ability to rationally and accurately assess the significance of information, or to use all available information. This tendency is worsened in situations where important information is unavailable—where it is hidden or absent for various reasons. For example, company personnel directors might conclude that their hiring criteria are highly effective because the people they hire perform well on the job. But, because they do not have a control group to study—they do not have access to data on how well people who do not meet their criteria might perform because those people are never given a job—their conclusions might be flawed. The same process applies to the criminal justice system.

First, prosecutors receive only incomplete pictures of their cases. Tunnel vision that might have led police investigators to focus on a

266. *Id.* at 111 (reporting survey data revealing that "[t]hose district attorneys expressing a concern for conviction had, on the average, about twice as much experience on the job as those who mentioned a concern for justice").

267. Randolph N. Jonakait, *The Ethical Prosecutor's Misconduct*, 23 CRIM. L. BULL. 550, 551 (1997).

268. Green, *supra* note 262, at 641; *see also* Felkenes, *supra* note 263, at 113 (noting that most prosecutors cannot presume innocence because they believe it is morally wrong to prosecute a person unless they are personally convinced of guilt); Bennett L. Gershman, *A Moral Standard for the Prosecutor's Exercise of the Charging Discretion*, 20 FORDHAM URB. L.J. 513, 530 (1993) (arguing that prosecutors must be morally certain of the defendant's guilt).

269. *See* GILOVICH, *supra* note 127, at 37-44.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



suspect, and to develop evidence against that suspect and disregard inconsistent or disconfirming evidence, shapes the information upon which prosecutors base their judgments. Prosecutors see the evidence generated by the police investigation, but often do not see the evidence about alternative suspects who were rejected too quickly, about eyewitnesses who failed to identify the defendant, or about other disconfirming evidence that police dismissed as insignificant. As Professor Randolph Jonakait has observed, "Not surprisingly, the picture presented to the prosecutor almost always shows a guilty defendant."[270]

Second, like the personnel director who only sees evidence that confirms the wisdom of the company's hiring criteria, prosecutors very rarely receive feedback inconsistent with their assessments of guilt. Most people whom the prosecutor charges admit guilt and plead guilty.[271] Even where the prosecutor has a weak case, the prosecutor can usually induce a plea by offering the defendant a generous deal. Hence, plea-bargaining teaches prosecutors that the defendants they prosecute are guilty, even if the evidence is weak.[272] Trials confirm those judgments about guilt because the vast majority of trials result in convictions.[273] And, in most cases, there is no way to obtain data proving the opposite—that an innocent person was wrongly convicted.[274] The problem of hidden or absent data thus amplifies in significant ways the cognitive biases that contribute to tunnel vision.

In those rare cases where a defendant is acquitted, the conclusion that ethical prosecutors, convinced that they would only prosecute a guilty person, must reach is not that the defendant was truly innocent, but that the system failed, that the truth did not prevail, that justice miscarried.[275] Jonakait has argued that, under these circumstances,

270. Jonakait, *supra* note 267, at 553; *see also* Medwed, *supra* note 196, at 142.

271. Ninety-five percent of all convictions in both state and federal court are obtained by way of a guilty or no contest plea. U.S. DEP'T OF JUSTICE, STATE COURT SENTENCING OF CONVICTED FELONS, 2000: STATISTICAL TABLES tbls.4.1 & 4.2 (2003); U.S. DEP'T OF JUSTICE, FEDERAL CRIMINAL CASE PROCESSING, 2001 tbl.5 (2003). The trend toward resolving cases through guilty pleas is increasing. Ronald F. Wright, *Trial Distortion and the End of Innocence in Federal Criminal Justice*, 154 U. PA. L. REV. 79, 90 (2005).

272. *See* Jonakait, *supra* note 267, at 553.

273. Recent data indicates that 84 percent of federal criminal trials result in guilty verdicts. *See infra* note 329.

274. Even with the advent of postconviction DNA testing, the vast majority of innocent people go undetected, if for no other reason than the simple reality that most criminal cases have no biological evidence that can yield dispositive DNA test results. *See* Gross et al., *supra* note 2, at 531.

275. *See* Jonakait, *supra* note 267, at 554-55.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



even ethical prosecutors feel a pressure to push hard to obtain convictions, because only a conviction serves the interest of justice.[276] Thus, role pressures naturally incline prosecutors to investigate in ways that confirm guilt, to fail to recognize and hence fail to disclose to the defense exculpatory evidence, to coach and prepare witnesses in ways that make their testimony more compelling or consistent with the theory of guilt,[277] or to discourage witnesses from talking to defense counsel or investigators.[278] The result is an even stronger picture of guilt, whether accurate or not. The process of being a prosecutor, even an ethical prosecutor, thus exacerbates general cognitive biases and contributes to tunnel vision.

### 3. INSTITUTIONAL PRESSURES ON DEFENSE LAWYERS

Defense lawyers are also susceptible to institutional pressures that contribute to tunnel vision. Defense lawyers, like prosecutors, quickly learn that most people charged with crimes are guilty.[279] They see that most of their clients plead guilty, and most of the remainder who go to trial are convicted. Defense lawyers learn that, more often than not, their clients fare much better in the criminal justice system if they plea-bargain rather than go to trial. To take an adversarial posture in a case—to investigate aggressively, file discovery motions for access to evidence from police and prosecutor's files, and file motions to suppress—not only requires an investment of scarce resources, but also often comes at a cost in terms of the ultimate resolution of the case. Experienced defense lawyers learn that better deals can be obtained by being cooperative: "Prosecutors and judges alike thus indoctrinate defense attorneys into the plea bargain process by communicating to attorneys that time-consuming motions should be forsaken in favor of plea negotiation."[280]

276. *Id.* at 556 ("Since the prosecutor 'knows' that the right result is a conviction, conduct that helps the jury reach a guilty verdict is appropriate."). Defense attorneys are in a different position; defense attorneys also know that most of their clients are guilty, so for them a conviction is not always, or even frequently, viewed as a miscarriage of justice. *Id.* at 555.

277. *Id.* at 559-62.

278. David S. Caudill, *Professional Deregulation of Prosecutors: Defense Contact with Victims, Survivors, and Witnesses in the Era of Victims' Rights*, 17 GEO. J. LEGAL ETHICS 103, 105 (2003).

279. *See* F. Andrew Hessick III & Reshma M. Saujani, *Plea Bargaining and Convicting the Innocent: The Role of the Prosecutor, the Defense Counsel, and the Judge*, 16 B.Y.U. J. PUB. L. 189, 211 (2002).

280. *Id.* at 213.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



The case of a Texas man, Christopher Ochoa, reveals just how much even defense counsel can be compromised by tunnel vision, and how disastrous the consequences can be. Ochoa and his codefendant, Richard Danziger, were convicted of a brutal rape and murder of a young Pizza Hut employee committed in 1988 in Austin, Texas.[281] After observing Ochoa and Danziger asking questions about the murder at the restaurant where the murder occurred, detectives picked up the men for questioning. After two twelve-hour interrogation sessions, detectives broke Ochoa down by threatening him with physical harm, fabricating evidence against him, convincing him he would be convicted, and threatening him that he would be executed if he did not confess. Ochoa, who was twenty-two at the time and had never before been in trouble with the law, was coerced into signing a lengthy confession filled with details of the crime that detectives wrote for him.[282]

Despite Ochoa's subsequent protestations to his attorney that he was innocent and that the confession was false, his attorney refused to investigate and counseled him that his only option to avoid execution was to accept the State's plea offer. Under that offer, not only would Ochoa have to plead guilty to the rape and murder, but he would have to testify against Danziger as well. Seeing no options, Ochoa did just that and both men were convicted and sentenced to life in prison. Both served over twelve years in prison before DNA testing in 2000 proved that another man, who by then was confessing to the crime, was in fact the source of DNA found in the dead woman.[283] Defense counsel was so convinced of his own innocent client's guilt that not only did he refuse to investigate and present a defense, but when postconviction counsel contacted him to inquire about obtaining postconviction DNA testing, he told counsel not to waste time on this case because there was "'not a chance' that Ochoa [was] innocent."[284] Defense counsel went so far as to either concoct or misremember facts that would support his judgment of guilt: he asserted erroneously that there had been an eyewitness who saw Ochoa at the scene and that Ochoa's fingerprints had been found on the murder weapon.[285]

281. Keith A. Findley & John Pray, *Lessons from the Innocent*, WIS. ACAD. REV., Fall 2001, at 33, 33.

282. *Id.* at 34; Ronald Earle & Carl Bryan Case, Jr., *The Prosecutorial Mandate: See That Justice Is Done*, JUDICATURE, Sept.-Oct. 2002, at 69, 72.

283. *Id.*

284. Memorandum from Wendy Seffrood to John Pray, Wisconsin Innocence Project (Nov. 9, 1999) (on file with authors).

285. *Id.* After his exoneration and release from prison, Ochoa completed his undergraduate education, and then enrolled at the University of Wisconsin Law School, where he worked for a year with the Wisconsin Innocence Project, the project that

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Unfortunately, Ochoa's experience is not unique.[286] Empirical evidence indicates that meaningful investigation by defense counsel is rare. One study found that appointed defense attorneys in New York City conducted an investigation in only 27 percent of all homicide cases, 12 percent of all felonies, and less than 8 percent of all misdemeanors.[287] Appointed counsel interviewed witnesses in only 4 percent of nonhomicide cases and 21 percent of homicides.[288] And defense counsel employed experts in only 2 percent of felony cases (17 percent of homicides).[289]

### *C. Prescribed Tunnel Vision*

To a surprisingly large extent, tunnel vision in the criminal justice system exists not despite our best efforts to overcome these cognitive biases and institutional pressures, but because of our deliberate systemic choices. Those choices are reflected in training that is provided to police officers and express rules of law that limit the inquiry, both in trial and on appeal, to considerations that will confirm guilt. Some of these rules reflect service to other values, such as finality and efficiency. But, to the extent that they institutionalize tunnel vision and impede the search for the truth, such rules and their effects should be exposed and understood so that the adequacy of the justifications can be measured. Examples of a few of these normative dimensions of the phenomenon follow.

#### 1. PRESCRIBED INVESTIGATIVE TUNNEL VISION: POLICE INTERROGATION TRAINING AND TECHNIQUES

Law enforcement training rarely includes any instruction on recognizing or overcoming tunnel vision, or on the dangers of tunnel vision. Worse, in some significant respects, law enforcement training *affirmatively teaches* police investigators to engage in practices that encourage tunnel vision. Most dramatically, this troubling message is prevalent in law enforcement training on interrogation tactics.

---

helped secure his freedom. He graduated in May 2006. *See* Diane Molvig, *Chris Ochoa, 1L*, WIS. LAW., May 2004, at 12.

286. *See* Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 YALE L.J. 1835 (1994) (recounting recurrent inadequacies in attorneys provided for the indigent).

287. Michael McConville & Chester L. Mirsky, *Criminal Defense of the Poor in New York City*, 15 N.Y.U. REV. L. & SOC. CHANGE 581, 762 (1986-1987).

288. *Id.*

289. *Id.* at 764.

Court of Appeals Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Most police in the United States are trained in what is known as the "Reid Technique" of interrogation. The most influential of the police training manuals that teach this method is Inbau, Reid, Buckley, and Jayne's *Criminal Interrogation and Confessions*[290]—"the bible of the American interrogator"[291]—which was first published in 1962 and is now in its fourth edition.[292] Under what is known as the Reid Technique, law enforcement investigators are taught to distinguish between "interviews" and "interrogations." An interview is designed to elicit information, to learn what the interviewee knows about the crime. An interrogation, on the other hand, is designed to elicit a confession. As the Inbau manual puts it, "an interrogation is conducted only when the investigator is reasonably certain of the suspect's guilt."[293]

Once police commit to an interrogation as opposed to an interview, the Reid Technique advocates a nine-step interrogation process designed to break suspects down, convince them that they are doomed, and then make a confession appear to be a rational or risk-reducing choice.[294] The first steps of the process are designed to overcome resistance by isolating the suspect and confronting him or her with assertions of guilt; in these stages, officers are taught to interrupt any denials of guilt, and to convince the suspect both that police *know* he or she is guilty and that they have the evidence to prove it.[295] Often, this process involves confronting suspects with false evidence of guilt, such as false claims that police have an eyewitness, the suspect's DNA, or a

---

290. FRED E. INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS (2001).

291. AMINA MEMON, ALDERT VRIJ & RAY BULL, PSYCHOLOGY AND LAW: TRUTHFULNESS, ACCURACY AND CREDIBILITY 63 n.4 (2d ed. 2003) (quoting K. McKenzie, *Regulating Custodial Interviews: A Comparative Study*, 22 INT'L J. SOC. L. 239, 249 (1994)).

292. Fred Inbau first published an interrogation manual—the first sophisticated interrogation manual for police in this country—in 1942. That manual, entitled *Lie Detection and Criminal Interrogation*, was eventually rewritten into two series—*Truth and Deception*, and the more recently updated *Criminal Interrogation and Confessions*. Leo, *supra* note 258, at 63-64; *see also* GISLI H. GUDJONSSON, THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK 7 (2003).

293. INBAU ET AL., *supra* note 290, at 8.

294. For summaries and critiques of the Reid Technique's nine-step process, see MEMON, VRIJ & BULL, *supra* note 290, at 58-65; Leo, *supra* note 258, at 72-73; Gudjonsson, *supra* note 292, at 10-21. While most police in the United States profess to follow this technique, there are indeed multiple manuals, and various interpretations of the general technique, which vary the specific techniques and the degree of persuasion recommended. *See, e.g.*, Gudjonsson, *supra* note 292, at 7.

295. *See* Saul M. Kassin, *On the Psychology of Confessions*, 60 AM. PSYCHOL. 215, 220 (2005); Leo, *supra* note 258, at 72-73.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



surveillance video catching the suspect in the act.[296] These stages of the process are then followed by offers of sympathy, understanding, and an alternative "theme" that minimizes the moral seriousness of the act, and that are designed to make the "doomed" suspect believe that confessing is the most attractive option.[297]

The very notion of a Reid "interrogation," therefore, expressly embraces the foundational problems with tunnel vision—a premature conclusion of guilt, and an unwillingness to consider alternatives.[298] In this context, however, the tunnel vision is not inadvertent, but deliberate; police are taught that this is the way to advance their investigation. Cognitive biases are openly encouraged.

This approach is problematic on multiple levels.[299] To start, the conclusion of guilt at this stage is necessarily tentative, and hence potentially inaccurate. Police typically attempt to obtain confessions because a confession is powerful evidence,[300] and police are most motivated to seek confessions in cases where they lack other sufficient

296. One study that examined 182 actual police interrogations concluded that police used trickery involving false evidence roughly 30 percent of the time. *See* Elizabeth F. Loftus, *Editorial: The Devil in Confessions*, 5 PSYCHOL. SCI. IN THE PUB. INT., at i, i (2004).

297. *See* Saul M. Kassin, Christine C. Goldstein & Kenneth Savitsky, *Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt*, 27 LAW & HUM. BEHAV. 187, 188 (2003).

298. As one experienced police interrogator has put it, "When an interrogator becomes married to a theory, he risks ignoring all contrary evidence or indications that he could be wrong." WARREN D. HOLMES, CRIMINAL INTERROGATION: A MODERN FORMAT FOR INTERROGATING CRIMINAL SUSPECTS BASED ON THE INTELLECTUAL APPROACH 4 (2002).

299. In addition to the problems discussed here, critics of the Reid Technique have identified numerous other concerns, including that it encourages trickery and deceit, which are illegal in many Western European countries and considered unethical (even if justified) elsewhere; the tricks and deceit and high-pressure approach can cause innocent as well as guilty people to confess; pressing suspects to confess may create a "boomerang effect," in which suspects who might otherwise confess might become resistant if they feel they are being rushed or treated unfairly; bluffing can backfire when police are caught fabricating evidence by a suspect who knows the purported evidence cannot be true; by cutting off denials and explanations and asking questions that can be answered in a few words, police risk that the confession reflects more what they believe has happened than what actually has happened; and suspects who have been pressured to confess may retain strong feelings of resentment towards police, even afterwards. MEMON, VRIJ & BULL, *supra* note 291, at 63-64.

300. Mock jury studies show that confessions are among the most powerful types of evidence, more persuasive to jurors than other evidence, including such potent evidence as eyewitness identifications. Kassin, Goldstein & Savitsky, *supra* note 297, at 187; Saul M. Kassin & Holly Sukel, *Coerced Confessions and the Jury: An Experimental Test of the "Harmless Error" Rule*, 21 LAW & HUM. BEHAV. 27, 27 (1997).

Court of Appeals Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 507 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



evidence to ensure a conviction.[301] Police therefore have the strongest incentives to push hard for a confession where, based on the other evidence, the confession is least likely to be truthful.

Moreover, the process of assessing an interview is likely to produce misjudgments about the suspect's veracity and guilt. Police are trained to look for signs of deceit in the interview process to help them determine whether to shift from an interview to an interrogation. Police also use their interpretations of guilty responses to help them shape the remainder of their interrogation, and the content of their testimony at trial. Yet, considerable research indicates that people are poor intuitive judges of truth and deception.[302] In clinical studies, people consistently perform at only slightly better than chance levels (with typical accuracy rates of about 45 to 60 percent, when chance is 50 percent) at distinguishing lies from truth.[303] Some studies suggest that some professionals, including secret service agents, CIA agents, sheriffs, and police officers, perform somewhat better than other people.[304] But even in those studies these professionals made significant and frequent errors.[305] Indeed, most studies indicate that trained detectives and others with relevant on-the-job experience "perform only slightly better than chance, if at all,"[306] and do not perform more

301. In addition to relying on traditional interrogation techniques, police also turn to polygraph examinations before evidence sufficient to convict has been developed. This, in turn, can lead to what has been termed "Othello Error." MEMON, VRIJ & BULL, *supra* note 291, at 29-30. Polygraph examinations (and other purported lie detectors, like voice stress analyzers) do not measure veracity directly, but rather physiological responses to the fear engendered by lying. Leo, *supra* note 258, at 61. But, "both guilty and innocent suspects might be afraid during police interviews: guilty suspects because they are afraid of getting caught, and innocent suspects because they are afraid that they will not be believed. Therefore, because of that fear, guilty and innocent suspects may show the same nervous behaviours." MEMON, VRIJ & BULL, *supra* note 291, at 29. Thus, innocent people subject to polygraph examinations can be like Desdemona in Shakespeare's *Othello*, whose emotional response upon realizing that she could not prove her innocence to false accusations of infidelity led Othello to misinterpret her reaction as a sign of guilt—the "Othello Error." Consistent with this theory, a recent literature review of polygraph field studies "revealed that 21 percent of innocent suspects failed the polygraph test and were wrongly accused." *Id.* at 30.

302. Kassin, Goldstein & Savitsky, *supra* note 297, at 188.

303. Samantha Mann, Aldert Vrij & Ray Bull, *Detecting True Lies: Police Officers' Ability to Detect Suspects' Lies*, 89 J. APPLIED PSYCHOL. 137, 137 (2004).

304. *Id.*

305. "'[E]xperts' who make [lie detection] judgments for a living—such as psychiatrists, police investigators, judges, customs inspectors, and polygraphers for the FBI, CIA, and military—are highly prone to error." Kassin, Goldstein & Savitsky, *supra* note 297, at 188.

306. Leo, *supra* note 258, at 90.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



reliably than untrained individuals.[307] Research also suggests that neither prosecutors nor judges are any more adept than police in detecting lies or in understanding the science of lie detection.[308]

Additionally, the signs that police officers are trained to believe indicate lies are not empirically related to lie detection. Police manuals, including the Inbau book, teach police to look for deception cues; according to interrogation dogma, liars show gaze aversion, display unnatural posture changes, exhibit physical self-manipulations, and cover their mouths or eyes with their hands while speaking.[309] Research confirms that most police officers rely on such indicators.[310] But research also convincingly shows that such cues are not indicative of fabrication,[311] and can actually reduce accuracy.[312] Indeed, research suggests that "looking at Inbau et al.'s . . . cues is counterproductive."[313]

To compound these lie-detection errors, trained detectives and interrogators tend to be more confident in their judgments than untrained individuals, and tend to have a deception bias such that their errors in judging veracity are biased towards finding deception.[314] More precisely, trained investigators tend to err by accepting false confessions, not by rejecting true confessions. "Hence, the bias is not to see lies per se, but to presume guilt."[315] As a consequence, "the

307. Kassin, Goldstein & Savitsky, *supra* note 297, at 189; Christian A. Meissner & Saul M. Kassin, *"He's Guilty!": Investigator Bias in Judgments of Truth and Deception*, 26 LAW & HUM. BEHAV. 469 (2002).

308. Leif A. Strömwall & Pär Anders Granhag, *How to Detect Deception: Arresting the Beliefs of Police Officers, Prosecutors and Judges*, 9 PSYCHOL. CRIME & LAW 1, 19-36 (2003).

309. Mann, Vrij & Bull, *supra* note 303, at 144; INBAU ET AL., *supra* note 290, at 143-53.

310. Mann, Vrij & Bull, *supra* note 303, at 142, 144.

311. *Id.* at 144; DePaulo et al., *Cues to Deception*, 129 PSYCHOL. BULL. 74 (2003); MEMON, VRIJ & BULL, *supra* note 291, at 30-31 (stating that a review of more than 100 studies reveals that "a typical nonverbal response during deception does not exist").

312. Mann, Vrij, & Bull, *supra* note 303, at 139; Saul M. Kassin & C.T. Fong, *"I'm Innocent!": Effects of Training on Judgments of Truth and Deception in the Interrogation Room*, 23 LAW & HUM. BEHAV. 499, 499 (1999).

313. Mann, Vrij, & Bull, *supra* note 303, at 144.

314. Kassin, Goldstein & Savitsky, *supra* note 297, at 189; Meissner & Kassin, *supra* note 307, at 478.

315. Saul M. Kassin, Christian A. Meissner & Rebecca J. Norwick, *"I'd Know a False Confession if I Saw One": A Comparative Study of College Students and Police Investigators*, 29 LAW & HUM. BEHAV. 211, 222 (2005).

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



pivotal decision to interrogate a suspect may well be based on prejudgments of guilt confidently made but frequently in error."[316]

For example, a common questioning technique is to employ hypotheticals, asking an alcoholic, for instance, if it was possible to have committed the crime during a blackout that left the suspect with no memory of the crime.[317] Such questioning puts the suspect in a box: virtually any answer is susceptible to being viewed as incriminating. Denying the possibility of a blackout is implausible and could be viewed as defensiveness that indicates a guilty conscience. At the same time, admitting the *possibility* of a blackout is viewed as an admission that the suspect might have committed the crime. Confirmation bias would likely lead the interrogator to see either response as confirming his or her operative theory that the defendant was guilty.[318]

---

316. Kassin, Goldstein & Savitsky, *supra* note 297, at 189; *see also* Leo, *supra* note 258, at 91.

317. The case of Evan Zimmerman, a former client of the Wisconsin Innocence Project, offers an example of questioning of this type that contributed to the murder conviction of an individual whose conviction was subsequently reversed, and against whom all charges were eventually dismissed at the prosecutor's request. State v. Zimmerman, 2003 WI App 196, ¶¶ 11-20, 266 Wis. 2d. 1003, ¶¶ 11-20, 669 N.W.2d 762, ¶¶ 11-20. In another case, Gary Gauger was convicted of murdering his parents and sentenced to death based in part on evidence gathered after police persuaded him that it was hypothetically possible he had committed the double murder during an alcoholic blackout. See Center on Wrongful Convictions at Northwestern University School of Law, http://www.law.northwestern.edu/depts/clinic/wrongful/exonerations/gauger.htm. Gauger was subsequently exonerated after a federal grand jury in Milwaukee indicted two members of a Wisconsin motorcycle gang known as the Outlaws for thirty-four acts of racketeering, including the murder of Gauger's parents. One of the Outlaws, James Schneider, was caught in a secretly recorded conversation admitting to the murder of the Gaugers. *Id.*

318. Other types of responses to questioning are similarly likely to be interpreted by police as inculpatory if police begin with a presumption of guilt. In the *Zimmerman* case, for example, police told Zimmerman (falsely) that they had an eyewitness who saw him with the victim on the night of her murder. *Zimmerman,* 2003 WI App 196, ¶ 11. According to one detective, Zimmerman responded by saying: "Nobody saw us." Transcript of Trial at 166, State v. Zimmerman, No. 2001CF63 (Circuit Court Branch 2, Eau Claire County, May 16, 2001). A second detective remembered Zimmerman as saying, "Who saw me?" *Id.* at 70. The detectives interpreted Zimmerman's response as an incriminating admission. On cross-examination, the detectives conceded that, in fact, Zimmerman actually said, "Nobody saw us because we weren't together." *Id.* at 172. They nonetheless minimized the significance of the latter part of that statement, because they insisted that there was a suspicious "pause" between the third and fourth words of that sentence. *Id.* at 173. The detectives' testimony raises significant questions about what in fact Zimmerman said, and whether there was any real pause, or what any such pause, if it existed, might have signified. To officers who presumed guilt, confirmation bias inevitably led them to see a facially exculpatory statement as an incriminating response.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377  Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Other forms of too-readily embraced evidence can also lead police astray. Warren D. Holmes, a former investigator in the Miami Police Department's Lie Detection Bureau and an experienced interrogator, has observed that police can be misled into believing a suspect is guilty by relying too readily on "witness identification, forensic lab reports and expert testimony."[319] He explains:

> I once interrogated a murder suspect for more hours than I should have. I was convinced of his guilt based on the ballistics report. The exasperated suspect finally looked at me and said, "Tell me what you want me to say and I'll say it." I knew then that something was wrong. I suggested that the investigator take the suspect's gun and have it tested in another department. Their report indicated that the suspect's gun was not the murder weapon. I had placed so much faith in the initial ballistics report, that I had ignored my own polygraph test results.[320]

When interrogators approach an interrogation with a firmly held presumption of guilt, confirmation biases can be particularly pronounced. Clinical studies show that interrogators who approach an interrogation with a perception or presumption of guilt typically choose guilt-presumptive questions and use high-pressure tactics (such as presentation of false evidence and promises of leniency), even when not trained in the Reid Technique.[321] Presumably, training in the Reid Technique would only amplify this natural tendency. At the same time, guilt-presuming interrogators are significantly more likely than those with innocent expectations to perceive suspect responses in incriminating terms.[322] Paradoxically, and troublingly, interrogators in one study employed the most aggressive interrogation behavior when they were questioning actually innocent suspects, even when the innocent suspects told denial stories judged plausible by neutral observers.[323] The researchers in this study concluded:

319. HOLMES, *supra* note 298, at 4.

320. *Id.*

321. Kassin, Goldstein & Savitsky, *supra* note 297, at 199. This inclination reflects what researchers have referred to variously as the self-fulfilling prophecy, interpersonal expectancy effect, and behavioral conformation—the tendency people have, once they form a belief, to "unwittingly create behavioral information that verifies that belief." Leo, *supra* note 258, at 94.

322. Kassin, Goldstein & Savitsky, *supra* note 297, at 199.

323. *Id.* at 200.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



> Interrogators who approached the task with a guilty base-rate expectation never stopped to reevaluate this belief—even when paired with innocent suspects who issued plausible denials. Rather, it appears that they interpreted the denials as proof of a guilty person's resistance—and redoubled their efforts to elicit a confession.[324]

The investigator bias infects neutral observers of such interrogation sessions as well. In studies, observers who listened to tapes of interrogations by guilt-presuming interrogators perceived the suspects in that condition as more defensive and somewhat guiltier than suspects interrogated by innocence-presuming interrogators.[325] In other words, "the presumption of guilt, which underlies all interrogation, sets in motion a process of behavioral confirmation by which expectations influence an interrogator's behavior, and ultimately the judgments of judges, juries, and other neutral observers."[326]

Through this process, therefore, police training that encourages guilt-presumptive interrogation tactics contributes to tunnel vision.

### 2. PRESCRIBED TUNNEL VISION AT TRIAL

Normative dimensions of tunnel vision are not limited to the investigation stages. In some respects, trials also institutionalize the tendency toward tunnel vision. In an idealized sense, trials seek to neutralize guilt-presumptive cognitive biases by bringing in neutral decision-makers (jurors) and instructing them that the defendant is presumed innocent and that the state must prove guilt beyond a reasonable doubt. There are reasons to doubt the efficacy of these measures, however. Despite the formal constitutional demand for a presumption of innocence, many observers have noted that there in fact appears to be a "presumption of guilt."[327] After all, it is neither

324. *Id.*

325. Leo, *supra* note 258, at 96; *see also* Kassin & Gudjonsson, *supra* note 100, at 42 (noting that "laboratory experiments have . . . shown that behavioral confirmation is the outcome of a three-step chain of events in which (a) a perceiver forms a belief about a target person; (b) the perceiver unwittingly behaves toward that person in a manner that conforms to that belief; and (c) the target responds in turn, often behaving in ways that support the perceivers belief . . ..").

326. Leo, *supra* note 258, at 96. For a discussion of how this "interviewer bias" can distort the results of an interview or interrogation, see STEPHEN J. CECI & MAGGIE BRUCK, JEOPARDY IN THE COURTROOM: A SCIENTIFIC ANALYSIS OF CHILDREN'S TESTIMONY 79-80, 87-92 (1995).

327. *See* Michael J. Saks & D. Michael Risinger, *Baserates, the Presumption of Guilt, Admissibility Rulings, and Erroneous Convictions*, 2003 MICH. ST. L. REV. 1051, 1056; *see also* HERBERT L. PACKER, THE LIMITS OF THE CRIMINAL SANCTION 160

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



irrational nor unusual to believe that the defendant is likely guilty, or at least that there is significant evidence of guilt; otherwise, why was the defendant charged? Empirical research reveals that prior to trial mock jurors predict a 50 percent chance of voting to convict—a probability significantly higher than if jurors took the presumption of innocence seriously.[328] The outcomes of most cases—that is, the feedback the system provides—confirm the assumption that most defendants are guilty; recent data show that federal juries return guilty verdicts in 84 percent of the cases that go to trial,[329] and, in total, defendants are acquitted in less than 1 percent of all cases.[330] Moreover, others have argued that the reasonable doubt instruction, as currently formulated in most jurisdictions, is significantly weaker than as first developed at common law[331] and is sometimes misunderstood by juries as weaker than the law requires.[332]

---

(1968) ("The presumption of guilt is what makes it possible for the system to deal efficiently with large numbers, as the Crime Control Model demands."); Felkenes, *supra* note 263, at 112 (noting that surveys of prosecutors reveal that more than half do not presume that a person is innocent until proven guilty, and that "[m]any believe that once an accused reaches the trial stage, his guilt has been determined by the screening processes of the police and prosecutor"); Daniel Givelber, *Meaningless Acquittals, Meaningful Convictions: Do We Reliably Acquit the Innocent?*, 49 RUTGERS L. REV. 1317, 1326 (1997) ("The presumption of guilt, not the presumption of innocence, permeates the criminal adjudicatory system.").

328. Saks & Risinger, *supra* note 327, at 1062 (citing Thomas M. Ostrom, Carol Werner & Michael J. Saks, *An Integration Theory Analysis of Jurors' Presumptions of Guilt or Innocence*, 36 J. PERSONALITY & SOC. PSYCHOL. 436 (1978)). Risinger and Saks have gone on to observe that "[s]ome evidence exists to suggest that jurors set their probabilities lower than they think they do," and that jurors might actually start with "assumptions close to zero (innocence), but to which they attach[] very little weight, so that the presumption of innocence [is] abandoned as soon as the first piece of inculpatory evidence [is] presented." *Id.* As Professor Daniel Givelber has explained, "Jurors apparently do not listen, evaluate and deliberate on the assumption that the defendant is innocent unless the government proves otherwise. Rather, jurors take the logical position that they are in equipoise concerning the defendant's guilt and will await the presentation of evidence before reaching a verdict." Givelber, *supra* note 327, at 1372.

329. Saks & Risinger, *supra* note 327, at 1060 n.33 (citing U.S. DEP'T OF JUSTICE, SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS 2001 tbl.5.17 (2002) (showing the disposition of cases terminated in U.S. District Courts in the fiscal year 2000)).

330. Ronald F. Wright, *Trial Distortion and the End of Innocence in Federal Criminal Justice*, 154 U. PA. L. REV. 79, 103 (2005).

331. *See* Steve Sheppard, *The Metamorphoses of Reasonable Doubt: How Changes in the Burden of Proof Have Weakened the Presumption of Innocence*, 78 NOTRE DAME L. REV. 1165, 1170 (2003) (arguing that the proof required to convict has shifted from a "certainty" standard to a much weaker one, in which juries are instructed to acquit only if they can identify reasonable doubts, defined as specific and articulable doubts).

332. *See* Lawrence M. Solan, *Refocusing the Burden of Proof in Criminal Cases: Some Doubt About Reasonable Doubt*, 78 TEX. L. REV. 105 (1999) (finding

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Aside from the possibility that these features of the trial process are ineffectual at neutralizing tunnel vision, other features of the trial experience expressly limit the ability to consider the possibility that anyone other than the accused might have committed the crime, thereby making some aspects of tunnel vision prescriptive. Regardless of how or whether this is justified by other values (such as interests in convicting the guilty or in efficiency and conservation of judicial resources), rules that limit the availability or admissibility of exculpatory evidence inevitably increase the risk of convicting the innocent.[333] A few examples of rules that directly limit the ability to explore alternative case theories follow.

### *a. Limited Admissibility of Evidence Suggesting an Alternative Perpetrator*

#### I. THE "DIRECT CONNECTION" DOCTRINE

Evidentiary rules in most jurisdictions impose significant limitations on the ability of defendants to introduce evidence of

---

inconsistency and confusion among jurors, including that some jurors understand the reasonable doubt standard to be less rigorous than civil standards, depending on the wording of the instruction); Elisabeth Stoffelmayr & Shari Seidman Diamond, *The Conflict Between Precision and Flexibility in Explaining "Beyond a Reasonable Doubt,"* 6 PSYCHOL. PUB. POL'Y & L. 769, 774-78 (2000) (discussing empirical studies on the effect of the "beyond a reasonable doubt" standard).

333. For example, Professor Andrew Leipold has noted that rules that limit pretrial release on bail, tolerate precharging delay, or minimize government disclosure obligations, among others, limit the ability of criminal defendants to develop exonerating evidence and hence contribute to wrongful convictions. Leipold, *supra* note 246, at 1163. Leipold acknowledges that the "policy considerations that lead courts and legislatures to accept the risks" of some of these procedures "are legitimate," but argues that the cost in terms of wrongful convictions must be considered in assessing the value of such rules. *Id.* at 1163. Some evidence-limiting rules are derived from a concern for reliability. Excluding "unreliable" defense evidence (hearsay, for example) can indeed be justified by concern about the reliability of the outcome of a trial. But it can be justified only if one is willing to accept that, while excluding such evidence will on balance enhance the odds of finding the "truth," it will do so at the cost of prohibiting some innocent people from proving their innocence. In a system where the risks of error are apportioned roughly equally between the two opposing parties in a case (as in our civil system), such rules that enhance "truth" in the aggregate make perfect sense. But in a system that ostensibly places all of the risk of error on the government (as does the criminal justice system), rules that limit evidence that in some cases might prove innocence are more problematic. *See* Katherine Goldwasser, *Vindicating the Right to Trial by Jury and the Requirement of Proof Beyond a Reasonable Doubt: A Critique of the Conventional Wisdom About Excluding Defense Evidence*, 86 GEO. L.J. 621 (1998).

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 514 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



alternate or third-party suspects. At trial, evidence is generally admissible if merely relevant (unless excludable for some other specific evidentiary reason, such as hearsay, privilege, or other such exceptions). Relevancy is an exceedingly broad standard. The Federal Rules of Evidence, which are extensively replicated in most state evidentiary codes, define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[334] Evidence—even relatively weak evidence—suggesting that someone other than the defendant committed the crime seems to fit a common sense understanding of relevance under this standard; it surely has a "tendency to make" the defendant's guilt "less probable than it would be without the evidence." Indeed, given that criminal defendants have a constitutional right to present a defense,[335] it would seem that relevancy might be construed particularly liberally when a defendant seeks to offer evidence that someone else might have committed the crime. It is, after all, the stuff of Perry Mason.[336]

But, to the contrary, courts apply a particularly restrictive view of relevance when considering the admissibility of evidence about alternative perpetrators. The "direct connection" doctrine limits admissibility to evidence that not only has a "tendency" to make the defendant's guilt "less probable," but that also has a "direct connection" to the crime.[337] As a leading case explained the rule, evidence of an alternative perpetrator

334. FED. R. EVID. 401.

335. *See* Crane v. Kentucky, 476 U.S. 683, 690 (1986); United States v. Nixon, 418 U.S. 683, 711 (1974); Davis v. Alaska, 415 U.S. 308, 319-20 (1974); Chambers v. Mississippi, 410 U.S. 284, 295-303 (1973); Washington v. Texas, 388 U.S. 14, 18 (1967).

336. *See* David McCord, *"But Perry Mason Made It Look So Easy!": The Admissibility of Evidence Offered by a Criminal Defendant to Suggest That Someone Else Is Guilty*, 63 TENN. L. REV. 917 (1996).

337. Various jurisdictions employ different phraseology to refer to the direct connection requirement, including "clearly link," "point directly," "point unerringly," or "inherent tendency," but all such terms are employed in essentially the same fashion and to essentially the same effect. *Id.* at 921, 928, 938. In Wisconsin, the doctrine is generally referred to as the "legitimate tendency" doctrine. *See* State v. Denny, 120 Wis. 2d. 614, 623-24, 357 N.W.2d 12, 17 (Ct. App. 1984). In a few other jurisdictions, including Texas, Alabama, and Kansas, the rule is even more draconian. "In those three states, a defendant could offer [third-party suspect] evidence only if the prosecution's case was entirely circumstantial. Thus, if the prosecution had even one eyewitness, no matter how weak, the defendant was completely disabled from offering [third-party suspect] evidence." McCord, *supra* note 336, at 927 (citing Dubose v. State, 10 Tex. Crim. 230, 251 (1881); Tatum v. State, 31 So. 369 (Ala. 1902); and State v. Neff, 218 P.2d 248, 256 (Kan. 1950)). According to McCord, "this

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 515 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



> is inadmissible if it simply affords a possible ground of suspicion against such person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense. . . . The rule is designed to place reasonable limits on the trial of collateral issues . . . and to avoid undue prejudice to the People from unsupported jury speculation as to the guilt of other suspects . . . .[338]

As another court put it, the alternative-perpetrator evidence must not only raise a reasonable inference of the defendant's innocence, but must also "directly connect the other person with the corpus delicti."[339] The rule frequently excludes evidence of strong motive or opportunity because courts often require "direct evidence placing the third party at the scene."[340]

At times, defense evidence of an alternate suspect is excluded at trial even when that evidence is arguably of the same nature and quality as the circumstantial evidence offered by the State to support its charges against the defendant. While the State is permitted to build its case entirely on circumstantial evidence, the direct connection doctrine suggests that wholly circumstantial evidence offered by the defense is not admissible in many courts unless it is particularly powerful circumstantial evidence.[341] Professor Ellen Suni has noted that,

> the fact that the alternative perpetrator may have made threats against the victim, or was seen with blood on his hands in the vicinity of the crime, or had assaulted the victim two weeks before the crime, have been deemed insufficient in the

aberrant . . . doctrine is probably still good law in Texas, Alabama and Kansas." McCord, *supra* note 336, at 927 (citing Erwin v. State, 729 S.W.2d 709, 714-15 (Tex. Crim. App. 1987); Coral v. State, 628 So. 2d 954, 983 (Ala. Crim. App. 1992); and State v. Peckham, 875 P.2d 257, 266 (Kan. 1994) (footnotes omitted)).

338. People v. Green, 609 P.2d 468, 480 (Cal. 1980) (citations omitted).

339. Santana v. State, 510 S.E.2d 916, 917 (Ga. Ct. App. 1999) (quoting Klinect v. State, 501 S.E.2d 810, 814 (Ga. Ct. App. 1998)).

340. State v. Williams, 593 N.W.2d 227, 234 (Minn. 1999).

341. Some courts permit alternative perpetrator evidence where there is "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." Pyles v. State, 947 S.W.2d 754, 757 (Ark. 1997) (quoting People v. Kaurish, 802 P.2d 278, 295-96 (Cal. 1990)). Even in those cases, however, the circumstantial evidence must directly link the alternative suspect to the offense.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



> absence of evidence clearly linking the alternative perpetrator to the actual crime itself.[342]

To the extent that the direct connection doctrine serves to choke off inquiry into possible alternate suspects at trial, it enforces a kind of tunnel vision as a normative matter. Thus, not only do cognitive biases and institutional pressures disincline police and prosecutors to consider alternatives to the defendant's guilt, the rules of evidence reinforce those biases by preventing the trier of fact from having access to alternate theories of the case.

## II. STATEMENTS AGAINST PENAL INTEREST

In a similar and related way, most evidentiary codes expressly limit the ability of criminal defendants to offer hearsay evidence that a third party confessed to the crime. Federal Rule of Evidence 804 creates a hearsay exception for statements against the penal interest of a declarant if the declarant was unavailable at the time of trial.[343] The Rule, however, does not apply equally to all litigants, in all types of cases. Rather, the Rule uniquely disfavors statements against interest offered by a defendant in a criminal case to show that someone else might have committed the crime: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."[344] Like the direct connection doctrine, this rule reflects a distrust of criminal defense evidence and an institutionalized unwillingness to consider the possibility that someone else committed the crime, absent particularly strong showings of that possibility. As the Advisory Committee to the Federal Rules has noted:

> The refusal of the common law to concede the adequacy of a penal interest was no doubt indefensible in logic. . . . [B]ut one senses in the decisions a distrust of evidence of confessions of third persons offered to exculpate the accused arising from suspicions of fabrication either of the fact of the making of the confession or in its contents, enhanced in either instance by the required unavailability of the declarant. . . .

342. Ellen Yankiver Suni, *Who Stole the Cookie from the Cookie Jar?: The Law and Ethics of Shifting Blame in Criminal Cases*, 68 FORDHAM L. REV. 1643, 1677 (2000) (citing State v. Robinson, 628 A.3d 664, 667 (Me. 1993); State v. Luna, 378 N.W.2d 229, 232 (S.D. 1985); State v. Stokes, 638 S.W.2d 7151, 723 (Mo. 1982) (footnotes omitted)).

343. FED. R. EVID. 804(a) & (b)(3).

344. FED. R. EVID. 804(b)(3).

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



> The requirement of corroboration is included in the rule in order to effect an accommodation between these competing considerations.[345]

This "distrust of evidence of confessions of third persons" also reflects manifestations of the psychological processes underlying tunnel vision. And it contributes to tunnel vision by narrowing the focus to the charged suspect.

To recognize that these rules constitute a form of prescribed tunnel vision is not necessarily to say that the rules are indefensible, or that they should be abandoned or modified; it may be that these forms of tunnel vision are appropriate at this stage of the process. Nonetheless, it is important to recognize that these rules constitute a form of prescribed tunnel vision that reinforces natural tendencies. This understanding is necessary for evaluating the potential that these rules present to contribute to erroneous convictions, and for assessing whether the rationale for the rules justifies the risk inherent in any form of tunnel vision. We consider whether these rules can be justified, or whether they should be modified or abandoned in light of their effect on tunnel vision, when we consider reforms designed to overcome tunnel vision later in this Article.

*b. Other Trial-Related Rules that Foster Tunnel Vision*

Other legal rules governing the admissibility of evidence also contribute to tunnel vision, although many do so in less direct ways. Our purpose is not to catalogue all such rules, but merely to illustrate the point.

Standards set by the Supreme Court for the admissibility of eyewitness identification evidence are particularly susceptible to the kinds of cognitive biases that underlie tunnel vision. Justice Brennan, writing for the Court in 1967, famously observed that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."[346] Yet the Court's response to the problem has been largely ineffectual. Unreliable identifications are rarely excluded,[347] and mistaken eyewitness

345. FED. R. EVID. 804 advisory committee's note.

346. United States v. Wade, 288 U.S. 218, 228 (1967).

347. Empirical evidence indicates that motions to exclude eyewitness identifications are filed in somewhere between 1.2 percent and 4.8 percent of cases, and, when such motions are filed, they are granted only between 1.6 percent and 5.75 percent of the time. Stephen G. Valdes, *Frequency and Success: An Empirical Study of Criminal Law Defenses, Federal Constitutional Evidentiary Claims, and Plea Negotiations*, 153 U. PA. L. REV. 1709, 1730-31 nn.123, 124 & 125 (basing results on

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



identification remains the leading cause of wrongful conviction of the innocent in this country.[348]

To a great extent, the problem lies in the doctrine developed by the Supreme Court, which permits—indeed feeds—the kinds of cognitive biases that foster tunnel vision. The Court has developed a two-step due process analysis for determining admissibility of eyewitness evidence. First, courts evaluate whether the procedures used by police to obtain the identification were "impermissibly suggestive."[349] Second, even if the procedures were impermissibly suggestive, due process does not require suppressing the identification if, considering the totality of the circumstances, the out-of-court identification was nonetheless sufficiently reliable.[350] But any such postidentification reliability assessment is bound to be affected by cognitive distortions that will make the identification appear reliable, accurate, and even inevitable. Confirmation bias will lead decision-makers to interpret data to support the reliability of the identification, and hindsight bias will make the identification appear to have been inevitable.

Moreover, as social science research has shown, many of the factors that the Supreme Court instructs courts to rely on when assessing reliability are not well correlated to reliability and are themselves influenced by the very suggestiveness that the "reliability" analysis is intended to assess.[351] Thus, a few courts, recognizing that

---

surveys of judges, prosecutors, and defense lawyers); Peter F. Nardulli, *The Societal Cost of the Exclusionary Rule: An Empirical Assessment*, 1983 AM. B. FOUND. RES. J. 585, 594, 595 tbl.2, 596, 597 tbl.7 (basing results on analysis of nearly 8000 trial court files).

348. *See supra* note 10.

349. Manson v. Brathwaite, 432 U.S. 98, 111 (1977)

350. *Id.* at 111, 114; Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

351. Those factors, according to the Supreme Court, include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200. Most of those factors, however, are subjective and reported by the witness, and hence subject to influence by the suggestiveness of the procedure itself. *See* Benjamin E. Rosenberg, *Rethinking the Right to Due Process in Connection with Pretrial Identification Procedures: An Analysis and a Proposal*, 79 KY. L.J. 259, 275 (1991); Siegfried Ludwig Sporer, *Eyewitness Identification Accuracy, Confidence, and Decision Times in Simultaneous and Sequential Lineups*, 78 J. APPLIED PSYCHOL. 22, 23 (1998); Nancy Steblay et al., *Eyewitness Accuracy Rates in Police Showup and Lineup Presentations: A Meta-Analytic Comparison*, 27 L. & HUM. BEHAV. 523 (2003); Wells & Bradfield, *supra* note 215, at 360-76; Gary L. Wells & Donna M. Murray, *What Can Psychology Say About the* Neil v. Biggers *Criteria for Judging Eyewitness Accuracy?*, 68 J. APPLIED PSYCHOL. 347 (1983).

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



trial courts are virtually doomed to fail in their attempts to assess reliability under these circumstances, have invoked their state constitutions to eliminate the reliability assessment. Under those decisions, due process is violated whenever police employ an unnecessarily suggestive procedure, without any further attempt to assess reliability.[352]

### 3. PRESCRIBED TUNNEL VISION ON APPEAL AND POSTCONVICTION REVIEW

Normative tunnel vision does not end after conviction; it intensifies as cases proceed through appellate and postconviction litigation. Once again, saying that the rules require tunnel vision on appeal and in postconviction review is not to say that such rules are necessarily flawed; good reasons may justify the increasing hostility to claims of innocence as a case works its way through the system. To evaluate those rules properly, the effect they have on enforcing tunnel vision—and hence on sustaining the conviction and imprisonment (or execution) of innocent persons—must be acknowledged and understood.

#### *a. Deferential Review of Factual Guilt Determinations*

One of the most startling revelations to newcomers to the justice system is that appeals have almost nothing to do with guilt or innocence. Appellate courts, as a matter of principle, decide legal questions and focus on process, not the accuracy of factual determinations. Trial courts, not appellate courts, decide facts. Indeed, the Supreme Court has notoriously held that the due process clause is generally not concerned about the accuracy of criminal proceedings (including whether an innocent person has been condemned to die) as long as the proceedings themselves were fair.[353] Accordingly, appellate courts are particularly loath to reverse jury verdicts in criminal cases based on insufficiency of the evidence. While the Supreme Court established in *Jackson v. Virginia*[354] that due process requires a sufficient quantum of evidence in criminal cases to protect the constitutional requirement of proof beyond a reasonable doubt,

352. *See, e.g.*, State v. Dubose, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582; Commonwealth v. Johnson, 650 N.E.2d 1257, 1260 (Mass. 1995); People v. Adams, 423 N.E.2d 379 (N.Y. 1981).

353. *See* Herrera v. Collins, 506 U.S. 390 (1993). In *Herrera*, the Court held that, except perhaps in the most extraordinary circumstances, a freestanding claim of actual innocence, without an accompanying claim of procedural error, does not raise a constitutional due process issue. *Id.* at 399.

354. 443 U.S. 307 (1979).

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



appellate review of the sufficiency of the evidence is expressly very limited. Under *Jackson*, courts consider only whether the evidence, viewed in the light most favorable to the verdict, could reasonably support a finding of guilt beyond a reasonable doubt.[355] Under this standard, almost any evidence suffices, so long as there is some evidence.[356]

The deference to trial courts on questions of fact is usually justified by considerations of institutional competence. According to the conventional wisdom, appellate courts are comparatively disadvantaged at fact-finding because, unlike trial judges and juries, they were not present to observe the witnesses testify.[357] With access only to the "cold record" comprised of written transcripts and documents, appellate courts miss significant information arguably necessary for reliable fact determinations.

While there is much to this argument, one effect of such a deferential standard of review of factual determinations is that appellate courts, by design, are constrained in their ability to consider seriously the possibility that someone other than the defendant committed the crime, or that no crime was committed. This deference to the trial court, as a matter of rule, effectively prohibits appellate courts from looking outside the tunnel, except in the most extreme cases. Later in this Article, we analyze the justifications for this standard when we consider reforms that might be implemented to overcome tunnel vision.

### *b. Guilt-Based Harmless Error and Prejudice Assessments*

Even when appellate courts do find constitutional or procedural errors at trial, they are disinclined to grant relief. Increasingly, the harmless error doctrine enables and encourages appellate courts to overlook trial error when they are satisfied that the defendant was in fact guilty.[358] The harmless error doctrine has long posed challenges of definition and application for courts. Increasingly, harmless error

355. *Id.* at 318.

356. *Id.* at 335 (Stevens, J., concurring) (noting that "in practice there may be little or no difference between" the "no evidence" standard and the standard adopted by the Court in *Jackson*); *see also* D. Michael Risinger, *Unsafe Verdicts: The Need for Reformed Standards for the Trial and Review of Factual Innocence Claims*, 41 HOUS. L. REV. 1281, 1314 (2004) (observing that, because the *Jackson* standard requires courts to "accept[] at face value all testimonial evidence in favor of the verdict and assum[e] all testimonial evidence to the contrary to have been rejected on credibility grounds," courts rarely find the evidence insufficient).

357. *See* Chad M. Oldfather, *Appellate Courts, Historical Facts, and the Civil-Criminal Distinction*, 57 VAND. L. REV. 435, 439 (2004).

358. *See* Edwards, *supra* note 237.

Court of Appeal, Fifth Circuit Case No: 23-KH-377 Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 521 of 856 Submitted On: 8/2/2023 3:58:48 PM Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



analysis is applied in a way that turns on an appellate court's assessment of a defendant's guilt, as opposed to whether the error might have had an effect on the verdict.[359] Under some current formulations and typical applications of the doctrine, courts look not "to whether an error actually 'contributed' to the jury's actual verdict. . . . [Rather,] courts broadly search the record by asking whether independent evidence of guilt taken alone *could* support the conviction."[360] Under this doctrine, cognitive biases can contribute in powerful ways to a conclusion that the defendant was indeed guilty, and that the error was therefore harmless.

Other doctrines that expressly shift the burden to prove that an alleged error might have affected the outcome of the case to the defendant are even more likely to reinforce cognitive- and role-based tunnel vision. For example, ineffective assistance of counsel claims require a defendant to show both that counsel performed deficiently, and also that counsel's errors prejudiced the defense—that is, that there was a reasonable possibility of a different outcome if counsel had not made the errors.[361] Similarly, to succeed on a claim that the prosecutor unlawfully withheld exculpatory evidence, the defendant must show that the withheld evidence was material—which, again, requires a showing that disclosure of the evidence would have created a reasonable probability of a different outcome.[362]

Professor Stephanos Bibas has observed that, because of hindsight and confirmation biases, "the very enterprise of after-the-fact review [of ineffective assistance of counsel claims] is doomed to failure. Judges simply cannot see the errors, because psychological biases make it hard to imagine that cases could have come out any differently."[363] Existing data suggest that Bibas's analysis is correct: despite woefully inadequate funding of services for indigent defendants,[364] and despite abysmal representation in many cases,[365] courts almost never grant relief on ineffective assistance grounds. An analysis of 4,000 reported

359. *See id.* at 1171 (noting that courts increasingly rely on a "guilt-based approach" to harmless error, rather than an "effect-on-the-verdict approach"); Garrett, *supra* note 237, at 58-60.

360. Garrett, *supra* note 237, at 59.

361. Strickland v. Washington, 466 U.S. 668, 687 (1984).

362. Brady v. Maryland, 373 U.S. 83, 87 (1963).

363. Stephanos Bibas, *The Psychology of Hindsight and After-the-Fact Review of Ineffective Assistance of Counsel*, 2004 UTAH L. REV. 1, 2.

364. *See* Bright, *supra* note 286, at 1843-44, 1846.

365. Judge Richard Posner has observed: "I can confirm from my own experience as a judge that indigent defendants are generally rather poorly represented." Richard A. Posner, *The Cost of Rights: Implications for Central and Eastern Europe—and for the United States*, 32 TULSA L.J. 1, 14 (1996).

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 522 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



appellate decisions between 1970 and 1983 involving an ineffective assistance claim showed that only 3.9 percent resulted in a finding of reversible error.[366] Indeed, courts have failed to find ineffective assistance even where the lawyer was asleep, drunk, or otherwise nonfunctional during significant portions of a trial.[367]

The picture is similar—perhaps even bleaker—when one considers the prosecutor's duty to disclose exculpatory evidence under *Brady v. Maryland*.[368] The Supreme Court has held that prosecutors have no duty to disclose evidence unless the evidence is "material"—that is, unless disclosure of the evidence presents a reasonable probability of a different outcome.[369] For the same reasons that judges are unlikely to be able to envision an alternative outcome in ineffective assistance of counsel cases, prosecutors (and ultimately reviewing judges) are unlikely to be able to envision a different outcome based on withheld evidence. Not only do cognitive biases make it unlikely that prosecutors (and judges) can envision a different outcome or appreciate the value of the withheld evidence, prosecutors situated as adversaries are not well-positioned to handle that task.[370] *Brady* demands too much of prosecutors when it simultaneously asks them to act as advocates charged with prosecuting a defendant and as neutral observers responsible for assessing the value of evidence from the defendant's perspective.

To make prospects for disclosure even worse, most *Brady* violations are never detected because, by definition, the defense does

366. Richard Klein, *The Emperor* Gideon *Has No Clothes: The Empty Promise of the Constitutional Right to Effective Assistance of Counsel*, 13 HASTINGS CONST. L.Q. 625, 632 (1986).

367. *See* Jeffrey L. Kirchmeier, *Drink, Drugs, and Drowsiness: The Constitutional Right to Effective Assistance of Counsel and the* Strickland *Prejudice Requirement*, 75 NEB. L. REV. 425 (1996); Bright, *supra* note 286, at 1843.

368. 373 U.S. 83, 87 (1963).

369. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985) (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)).

370. Stephanos Bibas, *The Story of* Brady v. Maryland: *From Adversarial Gamesmanship Toward The Search for Innocence?*, *in* CRIMINAL PROCEDURE STORIES (Carol Steiker ed., 2005) ("Adversarial-minded prosecutors are poorly suited to do that job."); Givelber, *supra* note 327, at 1389. Givelber has noted that prosecutors cannot reasonably be expected to assess materiality because:

> [o]nly the unusual prosecutor will believe: (a) the defendant is guilty; (b) the jury will so find in light of all the evidence in the prosecutor's possession; and (c) the potentially exculpatory but undisclosed evidence in the prosecutor's possession is material in the sense that there is a reasonable probability that it will change the outcome of the case.

*Id.*

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



not know about them; violations can be litigated only if the defense learns of the nondisclosed information through some fortuity that usually occurs sometime after trial.[371] Moreover, the Supreme Court has held that the *Brady* duty does not apply, at least regarding exculpatory impeachment evidence, unless the defendant goes to trial.[372] Yet 95 percent of all cases are resolved by a guilty or no contest plea.[373] And, as the *Brady* dissenters pointed out, the *Brady* test oddly imposes a retrospective analysis on decisions that must be made prospectively, pretrial.[374] *Brady* asks reviewing courts to determine *after* trial whether the withheld evidence might have made a difference to the outcome of the trial in light of all evidence presented at trial.[375] Yet the prosecutor must determine the materiality of the evidence *prior* to trial, *before* hearing any of the trial evidence or exposure to the defense presented at trial.[376] Not surprisingly, empirical evidence confirms what these considerations suggest: *Brady* claims are rarely successful. An analysis of 210 *Brady* and related claims in cases decided in 2004 found that 83 percent were unsuccessful.[377]

For these reasons, *Brady* and other such burden-shifting doctrines should be reexamined.[378] The dissenters in *United States v. Bagley* might have had it right when they insisted that the prosecution should be required to turn over to the defense all evidence "that might reasonably be considered favorable to the defendant's case," not just evidence the prosecutor deems "material."[379] Given the pressures of

371. "Commitment to the rhetoric and formalities of the adversary system, coupled with a refusal to acknowledge the profound inequality between certain adversaries, means that innocent people will be convicted simply because there is no meaningful way for them to learn about or present exculpatory evidence." Givelber, *supra* note 327, at 1321.

372. United States v. Ruiz, 536 U.S. 622, 630-31 (2002).

373. *Id.* at 632.

374. 373 U.S. at 92 (Marshall, J., dissenting).

375. *Id.*

376. *Id.*; *see also* Bibas, *supra* note 370.

377. Bibas, *supra* note 370.

378. *See* Burke, *supra* note 127, at 39 ("The problem with the Court's *Brady* doctrine is its use of a harmless error standard not just in determining whether the reversal of a conviction is warranted based on the non-disclosure of exculpatory evidence, but also in determining whether disclosure is required in the first place.").

379. United States v. Bagley, 473 U.S. 667, 695-96 (1985) (Marshall, J., dissenting); *see also* Burke, *supra* note 127, at 40.

> Importantly, to mitigate cognitive bias, the standard for disclosure should require prosecutors to evaluate the potential exculpatory value of evidence from the perspective of the defense, not through the lens of their existing theory of guilt. . . . [P]rosecutors should be required to disclose any evidence "favorable to the defendant's preparation or presentation of his defense."

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



the adversarial system and the unavoidable cognitive distortions that skew even the fairest prosecutor's judgments, the pressures toward tunnel vision do not need help from doctrines that shift the burden of proving the significance of evidence to the defense.

*c. Limitations on Postconviction Consideration of New Evidence*

As grim as the prospects look for obtaining relief based on an innocence-based claim on direct appeal, the prospects are even grimmer thereafter. State postconviction procedures limit the range of issues that can be raised on collateral attack of a conviction, and impose heightened burdens on the defendants to obtain relief after conviction and direct appeal, as finality interests are given greater prominence over concerns about wrongful convictions.[380] In many jurisdictions, strict time limits and onerous burdens of proof make it difficult even for defendants with powerful new evidence of innocence to find a forum for presenting that evidence.[381] At the federal level, habeas review is ever more constricting, especially after Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, which imposes strict time limits and numerous procedural and substantive barriers to federal court challenges to convictions.[382] The details of these

*Id.* (quoting Daniel J. Capra, *Access to Exculpatory Evidence: Avoiding the* Agurs *Problems of Prosecutorial Discretion and Retrospective Review*, 53 FORDHAM L. REV. 391, 428 (1984)).

380. *See* INNOCENCE COMM'N FOR VA., *supra* note 20, at 95 (noting the need to balance a prisoner's interest in access to a forum to test the fundamental correctness of his conviction against the government's "interest in the finality of its criminal justice proceedings").

381. For a thorough summary and analysis of the barriers to obtaining postconviction relief on a claim of actual innocence, see Daniel S. Medwed, *Up the River without a Procedure: Innocent Prisoners and Newly Discovered Non-DNA Evidence in State Courts*, 47 ARIZ. L. REV. 655 (2005). Medwed has argued that to protect the rights of innocent defendants to establish their innocence, states should:

> (1) refashion their procedures to minimize the chance newly discovered non-DNA evidence claims will be rejected due solely to procedural default; (2) construct each remedy so as to enhance the likelihood that viable claims will be heard in open court in front of an unbiased judge; and (3) utilize a de novo standard of review for appellate courts in assessing summary denials of motions for post-trial relief based on newly discovered evidence, i.e., cases where the trial court declines to hold an evidentiary hearing on the merits of an innocence claim prior to rejecting it.

*Id.* at 661.

382. *See* James S. Liebman, *An "Effective Death Penalty"? AEDPA and Error Detection in Capital Cases*, 67 BROOK. L. REV. 411, 416 (2001); Lyn S. Entzeroth, *Struggling for Federal Judicial Review of Successive Claims of Innocence: A Study of How Federal Courts Wrestled with the AEDPA to Provide Individuals Convicted of Non-Existent Crimes with Habeas Corpus Review*, 60 U. MIAMI L. REV. 75 (2005).

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 525 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



constraints are beyond the scope of this Article. For our purposes, the point is simple: severe limitations on considering innocence in postconviction procedures further prescribe tunnel vision. Whether or not justified by countervailing interests in finality, they impose a cost on the wrongly convicted that must be included in an assessment of tunnel vision in the criminal justice system.

#### 4. CONCLUSION

In sum, tunnel vision is the product of innate cognitive biases, institutional pressures, and normative features of the criminal justice system. Tunnel vision permeates all levels of the criminal justice system, and intensifies in response to these three dimensions as criminal cases pass through each stage of the system—from police investigation, to prosecution and trial, and to appeal and postconviction review.

## III. CORRECTING FOR TUNNEL VISION

Overcoming tunnel vision in these various manifestations is one of the most intractable problems underlying wrongful convictions of the innocent. Because it has so many causes that are so deeply rooted in our psyches, our culture, and our institutions, and because it has such multivariate expressions, tunnel vision defies simple solutions. It is surely beyond the scope of this initial inquiry to conceive solutions to the problem in all its complexities. But we do offer a few preliminary considerations as a starting point for discussions about what might be done to minimize tunnel vision in criminal cases.

Reforms can begin along several fronts. First, to the extent that existing legal rules enforce tunnel vision, doctrinal reform is an obvious place to begin. Second, education and training must be an important part of the solution to help system actors understand the nature of the problem and attempt to overcome the cognitive biases and institutional pressures that produce tunnel vision. Third, to the extent that tunnel vision is produced by flawed evidence collection and investigation techniques and procedures, those techniques and procedures should be reexamined. Fourth, police and prosecutors can adopt a variety of management and supervision practices to reduce the risk that tunnel vision will lead to wrongful arrest, prosecution, and conviction. Fifth, to the extent that the cognitive biases and institutional pressures are simply too powerful to overcome from within, greater transparency throughout the criminal justice system offers a way to provide both incentives for police and prosecutors to overcome tunnel vision, and, more importantly, the necessary information to those who already have an incentive to see outside the tunnel so that they can pursue alternative

Case No: 23-KH-377 | Page 479 of 758

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



theories about a case. Finally, we propose a few major reforms to the police and prosecution institutions to minimize the effects of tunnel vision. We consider each of these aspects of the solution in turn.

### *A. Doctrinal Reform*

Thorough review of the rules of the criminal system should be undertaken to look for those rules that reinforce tunnel vision. We have identified several in preceding sections of this Article: 1) the direct connection doctrine; 2) the corroboration requirement for admissibility of statements against penal interest that exculpate the accused; 3) admissibility standards for eyewitness identification evidence; 4) the exceptional deference appellate courts exhibit when reviewing sufficiency of the evidence to convict; 5) guilt-based harmless error and prejudice rules such as the *Strickland* and *Brady* doctrines;[383] and 6) postconviction rules that limit the ability to present new evidence of innocence. As implied previously, some of these rules should be abandoned entirely, while others should be modified. Regardless, each should be reevaluated with awareness of the cost it incurs in terms of reinforcing tunnel vision and contributing to the wrongful conviction of innocent persons. In addition, a searching inquiry should be made for any and all other rules that reflect a presumption of guilt and a constraint on introducing evidence of innocence. Once identified, these rules should be carefully evaluated to determine if they truly can be justified despite their role in contributing to tunnel vision. To illustrate, we analyze a few—but not all—of those rules in greater detail to assess whether they should be reformed in light of their effect on tunnel vision.

#### 1. THE DIRECT CONNECTION DOCTRINE AND LIMITATIONS ON ADMISSIBILITY OF STATEMENTS AGAINST PENAL INTEREST

As discussed previously, both the direct connection doctrine and the exclusion of uncorroborated statements against penal interest offered to exculpate the accused contribute directly to the problem of tunnel vision.[384] Surprisingly, however, these rules—and particularly the direct connection doctrine[385]—have been subjected to very little judicial analysis, and almost no scholarly attention.[386]

383. Others have made compelling arguments that the *Brady* and *Strickland* doctrines require repair. *See supra* notes 370-79 and accompanying text.

384. *See supra* Part II.C.2.a.

385. "Curiously, although this body of law raises basic issues of both criminal and evidence law, it has remained virtually unexplored by scholars and has been rarely

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Both rules have been defended on the basis that such alternate-suspect evidence is "too easily fabricated falsely for the purpose of deceiving."[387] Perhaps more significantly, the direct connection doctrine in particular is defended by the contention that, unless alternate-perpetrator evidence is strong and direct, it is likely to distract and confuse the jury, waste judicial resources, and invite jury speculation.[388] While these are legitimate and weighty concerns as a general matter, it is far from clear why they should apply with particular force when the defense offers evidence of an alternate suspect. Commenting on the special burden imposed by such rules on the admissibility of exculpatory evidence offered by the accused, Professor James Joseph Duane has observed: "This asymmetry in favor of the Government is logically and morally indefensible, and flies in the face of the constitutional imperative that '[i]n the administration of criminal justice, our society imposes almost the entire risk of error upon itself.'"[389]

subjected to any significant scrutiny by the very courts that promulgate and rely upon it." McCord, *supra* note 336, at 919. Indeed, until recently, McCord's 1996 *Tennessee Law Review* article stood as one of the only scholarly pieces that analyzed the direct connection doctrine. Recently, Ellen Suni has added a significant article to that literature. *See* Suni, *supra* note 342.

386. The statement against penal interests exception to the hearsay rule has received somewhat more scholarly attention, much of it critical of the asymmetry between evidence offered by a criminal defendant, and evidence offered by the State or for purposes other than to exculpate the criminally accused. *See, e.g.*, James Joseph Duane, *The Proposed Amendments to Federal Rules of Evidence 608(b) and 804(b)(3): Two Great Ideas that Don't Go Far Enough*, 209 F.R.D. 235 (2002) (criticizing the asymmetry); Peter W. Tague, *Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception*, 69 GEO L. J. 851, 978-1011 (1981) (arguing that the corroboration requirement is unjustified, unbalanced, and unconstitutional); Glen Weissenberger, *Federal Rule of Evidence 804: Admissible Hearsay from an Unavailable Declarant*, 55 U. CIN. L. REV. 1079, 1113-28 (1987). *But see* John P. Cronan, *Do Statements Against Interests Exist? A Critique of the Reliability of Federal Rule of Evidence 804(b)(3) and a Proposed Reformulation*, 33 SETON HALL L. REV. 1, 14-24 (2002) (employing the "rational actor theory" to criticize the very notion that people rationally make statements against interest, and in particular arguing that statements against penal interest are suspect).

387. McCord, *supra* note 336, at 925, 930 (quoting State v. May, 15 N.C. (1 Dev.) 328, 333 (1833)); *see also* FED. R. EVID. 804 advisory committee's note.

388. McCord, *supra* note 336, at 930

389. Duane, *supra* note 386, at 244 (quoting Addington v. Texas, 441 U.S. 418, 423-24 (1979)). Duane also points out that, not only is the rule asymmetric in that it requires corroboration when a defendant offers a statement against penal interest, and not when the government offers that same statement, but it is also asymmetric in the sense that no similar corroboration rule exists when either party in a civil law suit offers that statement, or when anyone offers a statement that might tend to subject the declarant to only *civil* liability, but not also *criminal* liability. *Id.* at 245-49. In 2003, after several years of work, the Judicial Conference Advisory Committee on Evidence

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 528 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Certainly, courts have a legitimate interest in preventing fabricated testimony. But that does not explain why the rules presuppose that exonerating evidence—evidence of a third-party perpetrator or of a self-inculpatory statement made by another person—is uniquely easy to manufacture. Indeed, although hard data does not exist, most criminal defense lawyers would likely agree that developing usable alternative-perpetrator evidence, or obtaining inculpatory statements from third parties, is exceedingly difficult. Eminent scholars have long derided this heightened suspicion of statements offered to exculpate the accused. Wigmore, for example, characterized the rule excluding statements against penal interest as a "barbarous doctrine," and dismissed the contention that such statements are unusually susceptible to fabrication:

> This [fabrication argument] is the ancient rusty weapon that has always been brandished to oppose any reform in the rules of evidence, *viz.*, the argument of danger of abuse. This would be a good argument against admitting any witnesses at all, for it is notorious that some witnesses will lie and that it is difficult to avoid being deceived by their lies. The truth is that any rule which hampers an honest man in exonerating himself is a bad rule, even if it also hampers a villain in falsely passing for an innocent.[390]

Rules proposed amendments to the Federal Rules of Evidence that would have addressed some of this asymmetry, not by eliminating the corroboration requirement, but by adding a corresponding requirement that statements against penal interest offered against the accused (that is, by the Government) must be "supported by particularized guarantees of trustworthiness." Daniel J. Capra, *Amending the Hearsay Exception for Declarations Against Penal Interest in the Wake of* Crawford, 105 COLUM. L. REV. 2409, 2433 (2005). That language was proposed to satisfy the confrontation clause requirements imposed by *Ohio v. Roberts*, 448 U.S. 56 (1980). Capra, *supra*, at 2439-40. The amendments were forwarded to the Supreme Court, but before the amendments were adopted the Court decided *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford* changed the Court's confrontation clause jurisprudence, and those changes scuttled the proposed amendments. Capra, *supra*, at 2426.

390. 5 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1477, at 358-59 (Chadbourn ed. 1974); *see also* CHARLES T. MCCORMICK, MCCORMICK ON EVIDENCE § 278, at 822-23 (Edward W. Cleary ed., 3d ed. 1984) ("Wigmore rejects the argument of the danger of perjury since the danger is one that attends all human testimony . . . ."); Donnelly v. United States, 228 U.S. 243, 277-78 (1913) (Holmes, J., dissenting) ("[N]o other statement is so much against interest as a confession of murder; it is far more calculated to convince than dying declarations, which would be let in to hang a man . . . ."). Justice Holmes, however, nonetheless went on to advocate for a corroboration requirement for statements against penal interest offered by a criminal defendant. *Id.* at 278.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Moreover, limiting the admissibility of evidence because of a concern that the evidence might be false is inconsistent with most rules that do not require corroboration and do not permit courts to prescreen otherwise competent testimony to assess its reliability. Outside of the limited gatekeeping function courts in many jurisdictions perform to assess the validity of scientific or expert testimony[391] (and of course, the rule against hearsay), our system typically does not prescreen evidence for reliability, but relies on juries and cross-examination to test the veracity of evidence.

Indeed, even some of the most notoriously unreliable—and most frequently fabricated—evidence is typically not subject to any such prescreening or limitation based upon concerns about easy fabrication when offered by the State. Jailhouse snitch or informer testimony is widely recognized as easily and frequently fabricated, because such witnesses are "incentivized"[392]—they are frequently offered, or at least expect, favorable treatment in their own cases in return for evidence against a defendant.[393] Unlike third-party perpetrator evidence or statements against interest, which might require witnesses to make statements contrary to their own interests, jailhouse snitches have no such disincentive to lie; to the contrary, they have an overt incentive to lie. Not surprisingly, jailhouse snitch testimony has been shown to be a leading cause of wrongful convictions of the innocent.[394] Because it is so easily concocted, it is also a significant contributor to the problem of tunnel vision. When police or prosecutors, focused on a suspect, fear that they have insufficient evidence to convict in a serious case, a devious inmate can frequently be found to bolster the State's case with

391. *See* Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 597 (1993).

392. ROB WARDEN, THE SNITCH SYSTEM: HOW INCENTIVISED WITNESSES PUT 38 INNOCENT AMERICANS ON DEATH ROW (2002), *available at* http://www.law.northwestern.edu/depts/clinic/wrongful/documents/Snitch.htm.

393. For a description of how jailhouse snitches manufacture their evidence, see Steven Mills & Ken Armstrong, *The Inside Informant*, CHI. TRIB., Nov. 16, 1999, at A1.

394. Scheck, Neufeld & Dwyer's analysis of the first sixty-two DNA exonerations found that jailhouse snitch testimony played a part in 21 percent of the cases. SCHECK ET AL., *supra* note 5, at 156. A more recent analysis of the first 111 cases in which a person sentenced to death was released based on evidence of innocence found that jailhouse snitch testimony was the leading cause of the wrongful convictions in that category of cases, present in 45.9 percent of the death row exonerations. NORTHWESTERN UNIV. SCH. OF LAW, CENTER ON WRONGFUL CONVICTIONS, THE SNITCH SYSTEM: HOW SNITCH TESTIMONY SENT RANDY STEIDL AND OTHER INNOCENT AMERICANS TO DEATH ROW 3 (2004-2005), *available at* http://www.law.northwestern.edu/wrongfulconvictions/documents/SnitchSystemBooklet.pdf.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 530 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



claims that the defendant confessed to him or her.[395] Yet, recommendations for special prescreening rules and limitations on admissibility of this type of evidence have been almost uniformly rejected by courts and legislatures.[396] If concerns about easy and frequent fabrication of jailhouse snitch testimony do not warrant special limitations on admissibility, surely those concerns do not warrant limitations on admissibility of third-party perpetrator evidence or statements *against* one's penal interest.

Preventing jury confusion or distraction, waste of judicial resources, or jury speculation is also an important goal. But that concern applies to any evidence, not just third-party-perpetrator evidence offered by a defendant. Concerns about confusion, distraction, and waste of resources in other contexts are handled by a balancing of the probative value of the evidence against the risk of unfair prejudice, as provided by Federal Rule of Evidence 403.[397]

395. The case of Wilton Dedge, who spent twenty-two years in prison for a rape that DNA testing eventually proved he did not commit, is illustrative. *See* Editorial, *It's Time to Right the Wrong*, THE LEDGER (Lakeland, Fla.), Mar. 29, 2005. The State's case against Dedge was suspect from the beginning. *Id.* The primary evidence against Dedge included an eyewitness identification and microscopic hair comparison testimony. *Id.* But the victim originally said her attacker was about six feet tall, 160 pounds and had a receding hairline, while Dedge was only five-foot-six, weighed 125 pounds, and had a full head of hair. *Id.* Moreover, Dedge, who had no criminal record, had eight witnesses who placed him at work at the time of the rape. *Id.* After Dedge's first conviction was reversed on appeal, prosecutors responded by presenting, at his second trial, the testimony of a seven-time convicted felon who said Dedge confessed to him while the two were locked up together. *Id.* The snitch received a significant reduction in his sentence in return for his testimony. *Id.* Dedge was convicted again, and remained in prison until DNA testing finally proved his innocence. *Id.*; *see also* Innocence Project, Case Profiles: Wilton Dedge, http://www.innocenceproject.org/case/display_profile.php?id=149 (last visited Mar. 28, 2006).

396. Numerous studies and governmental inquiries have proposed limitations on jailhouse snitch or informer testimony. *See, e.g.*, STATE OF ILL., *supra* note 16, at 119-24; Province of Manitoba, *supra* note 19, at 6-7. Little has been done, however, to implement such recommendations. Several courts have also attempted to remedy the problem, but their attempts have been quickly reversed. *See, e.g.*, Dodd v. State, No. F-97-26 (Okla. Crim. App. July 22, 1999) (imposing a pretrial "reliability" hearing to screen out unreliable snitch testimony), *reh'g granted vacating and withdrawing opinion*, No. F-97-26 (Okla. Crim. App. Oct. 6, 1999), *new opinion issued in* 2000 OK CR 2, ¶ 2, 993 P.2d 778, 784 (requiring discovery related to snitches, but no "reliability hearings"); United States v. Singleton, 144 F.3d 1343, 1346 (10th Cir. 1998) (holding that, under 18 U.S.C. § 201(c)(2), no party, including the government, can offer incentivized testimony), *rev'd en banc*, United States v. Singleton, 165 F.2d 1297 (10th Cir. 1999) (holding that the government is exempt from the prohibition against offering inducements to witnesses).

397. FED. R. EVID. 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Indeed, some have suggested that the direct connection doctrine, in particular, is not really an enhanced relevance standard, but merely "a specialized application of the balance between probative value and countervailing considerations."[398]

Regardless of whether the doctrine is conceptualized as a heightened relevancy requirement or an application of the balancing of probative value versus prejudicial effect, it is clear that the rule reflects more than an unexceptional expression of the routine weighing of probative value and unfair prejudice. Under the standard Rule 403 balancing analysis, evidence is presumptively *admissible* unless its probative value is *substantially* outweighed by the danger of *unfair* prejudice or other countervailing factor.[399] The direct connection doctrine reverses the Rule 403 burden and presumption. Third-party perpetrator evidence is, in effect, presumptively *inadmissible* unless the defendant can show a direct connection to the charged crime, and that burden, as we have seen, is not insubstantial. As Professor Ellen Suni has explained, the direct connection doctrine "substitutes a mechanical determination of connection for the careful balancing of probative value and legitimate prejudicial effect that is normally necessary to exclude relevant evidence."[400] Hence, the Rule 403 analogy does not explain or justify the direct connection doctrine, but merely leads to the question: "[W]hy is evidence offered by a criminal defendant that merely casts suspicion on an [alternate perpetrator] almost invariably excluded, while evidence offered by the prosecution that merely casts suspicion on the *defendant* routinely admitted—and usually without any explicit effort to balance probative value against countervailing considerations?"[401]

---

of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

398. McCord, *supra* note 336, at 975.

399. FED. R. EVID. 403.

400. Suni, *supra* note 342, at 1683.

401. McCord, *supra* note 336, at 975. McCord answers that question by suggesting that the asymmetry in the probative-prejudice balancing is explained, and justified, by the asymmetry in the burdens of proof that apply in criminal trials. Because the prosecution must prove guilt beyond a reasonable doubt, he contends, there is little danger that admitting evidence of the defendant's opportunity or motive alone "will result in the prosecution's suggesting—but not really showing—the defendant's guilt." *Id.* at 976. If the State's evidence is insufficient to establish proof beyond a reasonable doubt, the court must (theoretically) intervene as a matter of law and acquit. *Id.* But, McCord says, because the defendant does not have to prove anything—let alone that a third party committed the crime—admissibility of weak alternative-perpetrator evidence might indeed lead to an acquittal based on speculation rather than a reasonable doubt, which a court cannot intervene to prevent. *Id.* McCord's analysis on this point, however, essentially permits the rules of evidence to compensate for, and

Court of Appeal, Fifth Circuit Case No: 23-KH-377 Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 532 of 856 Submitted On: 8/2/2023 3:58:48 PM Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



The concern regarding speculation is particularly troubling. Circumstantial evidence (which is what is typically at issue, given that direct evidence, by definition, should satisfy the direct connection doctrine) is rarely conclusive, requiring fact finders to make inferential connections to arrive at a judgment. Yet courts routinely recognize that circumstantial evidence can support the inferences necessary to establish proof beyond a reasonable doubt.[402] Even when reviewing whether the State presented evidence sufficient to meet its high burden of proof beyond a reasonable doubt, which the Supreme Court has held presents a question of constitutional law,[403] courts reject the contention that the evidence was merely speculative unless the evidence was virtually absent on an essential element of the crime.[404]

Even greater deference to the fact finders—which should at least include permitting the jurors to hear the disputed evidence—should apply when a criminal defendant offers evidence of a third-party perpetrator. Unlike the State, the defendant need not meet any burden of proof whatsoever. Evidence that might require speculation to satisfy the high burden of proof beyond a reasonable doubt might require no speculation at all to undermine the State's proof. To create reasonable doubt, the jury need not speculate that the third party actually committed the crime, because the jury need not conclude that the third party actually committed the crime; the jury must only be sufficiently and reasonably unsettled about the sufficiency of the State's proof.[405] That determination will be made, as it should be, on an assessment both of the strength of the evidence against the defendant, and the strength of the exculpatory evidence presented by the defendant, including any third-party-perpetrator evidence. The stronger the State's evidence, the less likely it is the jury will have its confidence in the defendant's guilt undermined by weak evidence that an alternate perpetrator committed the crime; the weaker the State's evidence, or the stronger the third-party evidence, the more likely the jury will entertain reasonable doubt.

---

therefore dilute, the constitutionally required burden of proof and presumption of innocence at trial.

402. *See, e.g.*, State v. Poellinger, 153 Wis. 2d 493, 499-500, 451 N.W.2d 752, 755 (1990).

403. Jackson v. Virginia, 443 U.S. 307, 313-14 (1979).

404. *See* Irene Merker Rosenberg & Yale L. Rosenberg, *"Perhaps What Ye Say Is Based Only on Conjecture"—Circumstantial Evidence Then and Now*, 31 HOUS. L. REV. 1371, 1416 (1995) (stating that, under *Jackson*, "the appellate court will disturb a verdict based on circumstantial evidence only when the jury has no justifiable or rational bases for its inferences, in effect applying the discredited no-evidence test").

405. In this sense, "[t]he direct connection doctrine improperly shifts the focus of admissibility from whether the evidence sought to be offered has a tendency to negate the defendant's guilt to how effectively it proves the guilt of the alternative perpetrator." Suni, *supra* note 342, at 1683.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 533 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Excessive concern about speculation need not interfere with that balance; to a great extent, the concern about speculation impermissibly imposes on the defense a burden of proof that it constitutionally cannot be made to bear.

There is no good reason that anything more than the traditional balancing of probative value against countervailing factors ought to apply to third-party-perpetrator evidence offered by the defense.[406] All of the legitimate concerns animating the direct connection doctrine can be satisfied fully and fairly by evenly applying the Rule 403 balancing principle. By going beyond that, the direct connection doctrine institutionalizes tunnel vision, and does so without good reason.

There is little support—in experience or logic—for the fears expressed by some courts that, without the direct connection doctrine, defendants would flood their trials with irrelevant and distracting evidence about the conduct of others.[407] Although most jurisdictions adhere to the direct connection doctrine, there are jurisdictions in the United States that do not, and there is no evidence that courts in those jurisdictions are inundated with specious alternative-perpetrator evidence.[408] Even without the direct connection doctrine, courts still retain discretion to regulate the amount and flow of evidence to prevent presentation of truly irrelevant or cumulative evidence. In reality, no reasonable defense attorney would want to engage in such an obvious act of desperation—piling on patently weak or overly extensive alternative-perpetrator evidence—given the damage it would do to the defense's credibility, and to the jury's patience.

Efficiency concerns, therefore, should not trump the right to present relevant evidence of alternative suspects. At a commonsense level, most people would agree that, in deciding whether someone committed a wrong, it would be important to consider all of the

406. Indeed, Professor Katherine Goldwasser has argued that, because of our constitutional preference for erring on the side of acquittal rather than wrongful conviction, Rule 403 balancing ought not be used to exclude exculpatory defense evidence, at least without exceptionally powerful factors that overwhelm the probative value of the evidence. Goldwasser, *supra* note 333.

407. *See, e.g.*, State v. Denny, 120 Wis. 2d. 614, 623, 357 N.W.2d 12, 17 (1984) ("[E]vidence that simply affords a possible ground of suspicion against another person should not be admissible. Otherwise, a defendant could conceivably produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased—degenerating the proceedings into a trial of collateral issues.").

408. McCord has identified eight jurisdictions that "seem to rely on the standard balancing of probative value versus unfair prejudice (or other relevancy determinations)," three that add a "capable-of-raising-a-reasonable-doubt approach" without equating it to the direct connection doctrine, and one that directly rejects the direct connection doctrine "as setting too high a standard." McCord, *supra* note 336, at 937-38.

Case No: 23-KH-377 | Page 487 of 758

Court of Appeal, Fifth Circuit Case No: 23-KH-377 Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 534 of 856 Submitted On: 8/2/2023 3:58:48 PM Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



reasonable alternative suspects. The logic in this approach stems, in part, from another natural psychological tendency: the preference people typically exhibit for making relative judgments—comparing one thing to the next to decide which fits best—as opposed to making absolute judgments.[409] Prosecutors seem to understand this intuitively, as they frequently present evidence of alternative suspects who were investigated and excluded. They do this both to rebut any possible suggestion that the police investigation was not thorough or competent, and also to demonstrate that, comparatively, the person on trial is the most likely suspect. Ironically, there are no restrictions on prosecutors' abilities to use weak and discredited alternative-suspect evidence to bolster the claim that the defendant must have committed the crime; in this sense, the direct connection doctrine creates another asymmetry that favors the prosecution.

From the defendant's perspective, the relative judgment process means that a defendant who presents weak alternative-perpetrator evidence runs the risk of making himself or herself look comparatively even guiltier. Hence, there is no real risk that defendants will introduce too much or too weak alternative-perpetrator evidence, or that use of such evidence will mislead juries into acquitting inappropriately; the relative judgment process suggests that presenting marginal alternative-suspect evidence would likely enhance the likelihood of conviction, not lead to a risk of an "erroneous acquittal."[410] Conversely, preventing defendants from introducing such evidence in situations where they deem it helpful to their cause does run

409. The relative judgment process is explored extensively in the context of explaining how eyewitnesses react to photospreads and lineups. *See, e.g.*, Gary Wells et al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 LAW & HUM. BEHAV. 603, 613-17 (1998); Gary Wells & Elizabeth Olson, *Eyewitness Testimony*, 54 ANNUAL REV. OF PSYCHOL. 277, 286 (2003); Gary Wells & Elizabeth Loftus, *Eyewitness Memory for People and Events*, *in* 11 HANDBOOK OF PSYCHOLOGY: FORENSIC PSYCHOLOGY 149, 157-58 (Goldstein et al. eds., 2003).

410. Some courts have suggested that one reason for limiting alternative perpetrator evidence—a reason related to the concern that juries might speculate—is that it might produce "erroneous acquittals." *See* State v. Scheidell, 227 Wis. 2d. 285, 304, 595 N.W.2d 661, 671 (1999). Such a concern, however, distorts the fundamental principles that underlie our criminal justice system and "ignores the value our system places on avoiding conviction of the innocent." Suni, *supra* note 342, at 1687. Through the presumption of innocence and the requirement of proof beyond a reasonable doubt, our system expresses a preference for allowing acquittal of some guilty people to minimize the risk of convicting the innocent. If we take the presumption of innocence and requirement of proof beyond a reasonable doubt seriously, "to exclude defense evidence (and thereby increase the risk of an erroneous conviction) solely out of concern about the risk of an erroneous acquittal is flatly unacceptable." Goldwasser, *supra* note 333, at 635-36.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



the risk of foreclosing legitimate options, misleading the jury, and inducing wrongful convictions.[411]

Moreover, in assessing whether trial considerations justify this type of prescribed tunnel vision, other effects of this evidence-limiting doctrine must be considered as well. In addition to directly promoting this tunnel vision effect at trial, the direct connection doctrine also might indirectly encourage or reward tunnel vision in law enforcement at the pretrial investigation stage. The rule might serve as a disincentive for police to investigate any suspects other than the defendant they have selected. If police look too hard at alternate suspects, and develop too much evidence, they might weaken their case by providing an evidentiary basis for admitting the third-party evidence. Suni has argued that,

> [i]f police and prosecutors know that defendants have limited resources to investigate other possibilities, and that even if defendants obtain resources to do so, evidence that they find will be unusable unless they can establish a direct connection to the crime, police and prosecutors will have little incentive to explore alternative theories once they have reached a preliminary conclusion.[412]

On the other hand, it might be that the direct connection rule has the opposite effect on investigator and prosecutor decision-making. That is, investigators and prosecutors might feel more confident exploring alternate suspects knowing that the rule makes it unlikely that defendants will be permitted to introduce third-party perpetrator evidence detrimental to the case against the primary suspect. Further research would be useful to better understand the actual effect of the rule on investigative decision-making.

In either event, there might be "significant systemic benefits" to eliminating the direct connection doctrine "even in cases of relatively strong evidence of guilt and weak alternative perpetrator showings."[413] As Suni has explained,

> Over time, if alternative perpetrator evidence is admissible at trial, police may have an incentive to better investigate all

411. The direct connection doctrine "totally prevents a defendant from introducing evidence to advance an alternative perpetrator theory of defense unless the defendant can overcome a high preliminary hurdle by showing a direct connection. In doing so, the doctrine totally excludes relevant defense evidence from consideration by the jury." Suni, *supra* note 342, at 1682 (footnotes omitted).

412. *Id.* at 1690 (citations omitted).

413. *Id.* at 1691.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



> alternatives. Such an expanded investigation may unearth evidence that clearly demonstrates that the alleged alternative perpetrator is not guilty of the offense. This will likely preclude the defendant from advancing the alternative perpetrator theory and make conviction of a guilty defendant more likely. Alternatively, the police may find evidence during their expanded investigation indicating that the alternative perpetrator, rather than the defendant, is responsible for the crime.[414]

At the very minimum, we must at least acknowledge that rules such as the direct connection doctrine have a tunnel-vision-enhancing function. If they are to be retained, they must be retained only after careful consideration of these harmful effects, and critical assessment of the arguments that purportedly support them. Such careful consideration powerfully suggests that the direct connection doctrine cannot be justified. Instead, traditional rules of relevance and balance between probative value versus prejudicial effect, tempered by sensitivity to the effects of exclusion on tunnel vision, should govern this evidence. In determining relevance, "courts should be clear that the focus is not on whether the evidence establishes the guilt of the third party, but on what relevance the evidence has to the guilt or innocence of the defendant on trial."[415] And, when balancing probative value against prejudice, "the court should 'ask what rational inferences of innocence the evidence supports, what risks of improper decision the evidence poses, and whether any response short of exclusion could secure the probative value of the evidence without its prejudicial baggage.'"[416] As Suni has concluded, courts should exclude relevant alternative-perpetrator evidence "only if it can make a finding on the record 'that the jury's consideration of the proffered evidence would make an irrational acquittal substantially more likely than a rational conviction."[417] Understood in the framework of this Article, liberalizing the admissibility rules governing third-party-perpetrator evidence at trial would serve an important role in combating tunnel vision at the police investigation level.[418]

414. *Id.* (citations omitted).

415. *Id.* at 1692.

416. *Id.* at 1693 (quoting Donald A. Dripps, *Relevant But Prejudicial Exculpatory Evidence: Rationality Versus Jury Trial and the Right to Put on a Defense*, 69 S. CAL. L. REV. 1389, 1421 (1996)).

417. *Id.* (quoting Dripps, *supra* note 416, at 1420).

418. Some movement in that direction may be under way already, in part as a response to the problem of wrongful convictions. Just before this Article was set to go to press, the United States Supreme Court decided *Holmes v. South Carolina*, in which

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 537 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



### 2. EXPANDED APPELLATE REVIEW OF THE FACTS UNDERLYING GUILT DETERMINATIONS

As also discussed above, deferential standards of review of factual guilt determinations constitute a form of prescribed tunnel vision. Understood in this way, it becomes important to determine whether this norm is justified.

As we have seen, the deference to trial courts on questions of fact is usually justified by considerations of institutional competence—appellate courts are not well situated to make factual determinations because they do not actually see and hear witnesses testify. Recently, however, scholars have argued that such deference is not always warranted, at least not on all factual issues where serious claims of innocence are at stake in criminal cases.

For example, Professor Chad Oldfather has pointed out that the conventional wisdom about the institutional inferiority of appellate courts in deciding factual questions is simply wrong in some respects.[419] While certainly appellate courts do lose significant information because of their inability to watch witnesses testify in person—because much of the meaning conveyed by oral communication is expressed outside the actual words spoken—they are actually better situated than juries in other respects to make factual judgments. Empirical research has shown that basing fact-finding on nonverbal cues can be misleading. People are best able to detect lies when they listen without looking at the speaker.[420] And, contrary to the conventional wisdom about the

the Court addressed South Carolina's particularly draconian version of the direct connection doctrine. 126 S. Ct. 1727 (2006). In *Holmes*, the South Carolina Supreme Court had held that a defendant may not introduce proof of third-party guilt if the prosecution had introduced forensic evidence that, if believed, strongly supported a guilty verdict. *Id.* at 1730. While acknowledging the widely accepted general limitations on third-party-perpetrator evidence, which the U.S. Supreme Court characterized as a specific application of the Rule 403 balancing test, the Court held that South Carolina's variation of the rule went too far and violated the defendant's constitutional right to present a defense. *Id.* at 1734-35. The Court noted that, under South Carolina's rule, if the prosecution appeared to have a strong case, no third-party guilt evidence, no matter how powerful or direct, was admissible. *Id.* This, the Court said, "does not rationally serve the end that the [direct connection doctrine was] designed to promote, *i.e.*, to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Id.* at 1734. The Court was also troubled by the asymmetry created by the South Carolina rule: "The rule applied in this case is no more logical than its converse would be, *i.e.*, a rule barring the prosecution from introducing evidence of a defendant's guilt if the defendant is able to proffer, at a pretrial hearing, evidence that, if believed, strongly supports a verdict of not guilty." *Id.* at 1734-35.

419. Oldfather, *supra* note 357, at 439-40, 449-66.

420. *Id.* at 459.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



deficiencies of a "cold record," people who base their judgments about veracity on a written transcript "perform[] nearly twice as effectively at detecting deceit as those exposed to both audio and visual cues."[421]

Appellate courts also enjoy other advantages over trial courts and juries in making some factual determinations. Oldfather has explained that the complexity of the information presented at trial often makes it difficult to assimilate all the salient information through such fleeting presentations as witness testimony.[422] Jurors have little opportunity to reflect on what they just heard, or to organize it into a logical and coherent scheme. A juror "may fail to connect a piece of information with the rest of what she has heard, fail to understand it, forget it, or simply miss it altogether."[423] For an appellate court with access to a written transcript, by contrast, the evidence is static, not fleeting, and is available to be read and reread, organized, and analyzed.[424] While evidence presentation at a trial is cumbersome and disjointed, presented witness-by-witness rather than in some overarching logical order, appellate courts can reorder the information to make comparisons, note inconsistencies and gaps, and "test whether the information works as a syllogism," and thus whether it is consistent "with logic."[425]

Oldfather has therefore contended that, while juries and trial courts have significant advantages over appellate courts when it comes to factual determinations that are particularly dependent on observing witness demeanor, they do not have an advantage with other types of fact-finding. For example, Oldfather has noted that appellate courts may have an institutional advantage in deciding factual issues that require particular experience or knowledge that juries are not likely to possess, such as factual issues about the reliability of an eyewitness identification that might require a more general understanding of the fallibility of eyewitness identifications and the psychological factors that can influence them.[426] In addition, appellate courts would likely have an institutional advantage in considering circumstantial and documentary evidence, and some types of hearsay evidence that do not rely on the jury's observational powers at trial at all.[427]

Our point is that, in criminal cases, it might make sense to permit appellate courts to more aggressively review sufficiency of the evidence

421. *Id.*

422. *Id.* at 451.

423. *Id.*

424. *Id.* at 454-56.

425. *Id.* at 457. In this way, Oldfather has argued that a transcript "facilitates a mode of thinking that is more consistent with the ideal of legal thought." *Id.* at 456.

426. *Id.* at 459-63.

427. *Id.* at 463-66.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



claims in cases where innocence and guilt are the central concern, at least where the evidence relied upon to convict is a type that appellate courts are institutionally capable of reviewing. Oldfather has noted that, while courts "almost never reverse convictions" on sufficiency grounds in criminal cases,[428] they take a much more active role in reviewing sufficiency of the evidence in civil cases. An analysis of 208 cases in which a court addressed challenges to the sufficiency of the evidence to support a jury verdict in civil cases revealed that courts found the evidence insufficient in at least one sense in 102, or 49 percent, of the cases.[429] Other empirical data is consistent with that finding.[430] Logically, one would expect to see greater scrutiny of facts in criminal cases than civil cases. In civil cases, facts are decided by the preponderance of the evidence, so significantly less evidence should be required to support a factual determination than in criminal cases, where proof must be established beyond a reasonable doubt. In criminal cases, the higher burden of proof places the risk of error on the government, while in civil cases the preponderance standard apportions the risk of error roughly equally between the litigants. While one would therefore expect to see greater involvement in reviewing sufficiency of the evidence in criminal cases, and less in civil cases, the data reveal just the opposite: "The problem is that the courts have their allocation of resources backwards."[431]

Appellate standards of review therefore should be reevaluated, at least concerning issues related to the reliability of the guilt determination. Oldfather has suggested that appellate review should be recalibrated to incorporate the notion of institutional competence at the case-by-case level, so that the degree to which an appellate court reviews the facts would turn in part in each case on the court's assessment of its institutional capacity to review the type of factual determination or evidence at issue.[432] Oldfather has suggested that courts should have to consider in each case "whether the nature of a particular sort of evidence in a particular case is such that the appellate

428. *Id.* at 478.

429. *Id.* at 497.

430. *Id.* at 498.

431. *Id.* at 503. As Oldfather has explained:

> Our criminal justice system places an asymmetric premium on factual accuracy, such that avoidance of wrongful convictions is (at least in most accounts of the system) of paramount importance. As such, the value that would flow from effective appellate scrutiny of facts is relatively high. Our civil justice system, in contrast, places a comparatively low value on factual accuracy and a relatively high value on the role of the jury.

*Id.*

432. *Id.* at 506, 509.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



court could do a better job of evaluating it than could the responsible actor at the trial level."[433]

Others also have suggested permitting greater scrutiny of guilt determinations in criminal cases, at least where the case includes an "innocence-in-fact" claim.[434] For example, Professor Michael Risinger has suggested that American courts should adopt something similar to the British "unsafe verdict" standard for reviewing claims of actual innocence.[435] Under Risinger's standard, when a claim of actual innocence is raised, a reviewing court would be required to engage in a probing review of the evidence, including evaluating (instead of accepting at face value) the strength of the State's evidence where appropriate and permitting courts to consider "any relevant fresh evidence, including research results casting doubt on the kind of evidence relied upon at trial."[436]

Expanding the role of appellate courts would be consistent with modes of fact-finding in other contexts, where it is not unusual to have someone who reviews a written record serve as the ultimate fact finder. For example, in police internal disciplinary cases, a high-level police official typically makes the determination of factual guilt or innocence based upon a review of the written investigative file.[437] Similarly, administrative agencies with significant fact-finding responsibilities, such as the National Traffic Safety Board, make determinations of historical facts in important matters based upon a written record of the evidence in a case or incident following a field investigation, or

433. *Id.* at 509. Appellate courts in some states have historically engaged in more aggressive review of some sufficiency-of-the-evidence claims in criminal cases, particularly those related to circumstantial evidence. *See, e.g.*, Stephen L. Richards, *Reasonable Doubt Redux: The Return of Substantive Criminal Appellate Review in Illinois*, 34 J. MARSHALL L. REV. 495, 515-21 (2000-2001) (tracing the historical practice in Illinois of reviewing sufficiency-of-the-evidence claims in cases that turn on particular types of evidence, including circumstantial evidence); Elizabeth A. Ryan, *The 13th Juror: Re-evaluating the Need for a Factual Sufficiency Review in Criminal Cases*, 37 TEX. TECH. L. REV. 1291, 1294 (2005) (criticizing a Texas law providing for more searching review of factual sufficiency claims than required by *Jackson v. Virginia*).

434. *See* Rosenberg & Rosenberg, *supra* note 404, at 1416 (arguing that appellate courts should review evidence independently for reasonable hypotheses of innocence in circumstantial evidence cases, given that in such cases "guilt is based . . . on inferences from the evidence, and the [appellate] court is in as good, if not better, position to assess the rationality of these inferences and whether they establish guilt beyond a reasonable doubt").

435. Risinger, *supra* note 356, at 1331-33.

436. *Id.* at 1332.

437. *See* JAMES J. FYFE ET AL., POLICE ADMINISTRATION 467-78 (5th ed. 1997).

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 541 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



sometimes following a hearing that produced a written transcript of the proceedings.[438]

Whatever its form, more active appellate review of factual innocence claims in criminal cases would be at least be one step toward freeing appellate courts from prescribed tunnel vision.

### *B. Education and Training*

Education is an important and frequently suggested part of the solution to the tunnel vision problem.[439] It is obviously important to sensitize police, prosecutors, defense lawyers, and judges to the problem, to help them understand its consequences and the nature and effects of its underlying cognitive biases and institutional pressures. Beyond helping these individuals understand the nature and effects of the problem, the more difficult educational challenge is to equip these actors with the tools to help them overcome the cognitive biases and institutional pressures that produce tunnel vision.

---

438. *See* John F. Easton & Walter Mayer, *The Rights of Parties and Civil Litigants in an NTSB Investigation*, 68 J. AIR L. & COM. 205, 214-17 (2003).

439. Most inquiries into to the problem of wrongful convictions, and specifically to tunnel vision, call for better education of police and prosecutors. The Illinois Commission on Capital Punishment, for example, specifically recommended that police investigators should receive periodic training in the following areas: (1) the risks of false testimony by in-custody informants ("jailhouse snitches"), (2) the risks of false testimony by accomplice witnesses, (3) the dangers of tunnel vision or confirmatory bias, (4) the risks of wrongful convictions in homicide cases, (5) police investigative and interrogation methods, (6) police investigating and reporting of exculpatory evidence, (7) forensic evidence, and (8) the risks of false confessions. STATE OF ILL., *supra* note 16, at 40; *see also* ABA CRIMINAL JUSTICE SECTION, AD HOC INNOCENCE COMM. TO ENSURE THE INTEGRITY OF THE CRIMINAL PROCESS, ACHIEVING JUSTICE: FREEING THE INNOCENT, CONVICTING THE GUILTY 95 (Paul Giannelli & Myrna Raeder eds., 2006) [hereinafter ABA REPORT] (calling for police training that includes "presentation and discussion of actual cases where illegal, unethical, or unprofessional behavior led to the arrest, prosecution, or conviction of an innocent person, thus compromising public safety"); MINISTRY OF THE ATTORNEY GEN. OF ONT., REPORT OF THE KAUFMAN COMMISSION ON PROCEEDINGS INVOLVING GUY PAUL MORIN 26 (2005), *available at* http://www.attorneygeneral.jus.gov.on.ca/english/about/pubs/morin/morin_recom.pdf (recommending training about tunnel vision); Burke, *supra* note 127 (arguing for increased education for prosecutors about cognitive biases); Medwed, *supra* note 196, at 170 (arguing for better education to help prosecutors "transform[] the theoretical underpinnings of their ethical obligations to do justice in the postconviction sphere into a reality of everyday practice"); Fisher, *supra* note 262, at 201-02 (calling for a better definition of and education about prosecutors' "quasi-judicial role"); Richard A. Leo, *False Confessions: Causes, Consequences, and Solutions*, *in* WRONGLY CONVICTED 36, 48 (Saundra D. Westervelt & John A. Humphrey eds., 2001) (calling for better training to help police understand the psychology of interrogation and suspect decision-making, and improve the ability of police to recognize and prevent false confessions).

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



The challenge is difficult because the cognitive biases that contribute to the problem are not easily suppressed by self-awareness, training, or practice. Unfortunately, research suggests that merely informing people about a cognitive bias, or urging a person to overcome the bias, is to some degree ineffective.[440] For example, research shows that people are incapable of overcoming hindsight bias even when advised about it and instructed to try to ignore reported outcomes.[441] That is to say, outcome information has a substantial effect on judgments even when individuals are given unambiguous instructions to ignore the outcome information.[442]

Education and training can nonetheless have some beneficial effect. Asking individuals to consider the opposite of their position, and to articulate the reasons why the results at issue could have been different, is somewhat helpful in overcoming hindsight bias.[443] Confirmation bias tends to produce, among other things, overconfidence about the accuracy of one's own judgments.[444] Research suggests that this "illusion of validity"[445] also can be reduced to some degree by forcing people to articulate reasons that counter their own position.[446] Similarly, while belief perseverance is extremely powerful, it can be mitigated if individuals are compelled to explain why beliefs contrary to their own might be true.[447] But it is difficult to get people to argue against their own position, and even when they do, overconfidence in their positions is generally only reduced, not eliminated.[448]

To facilitate this process, education must be coupled with other mechanisms that institutionalize the process, and that make counterarguing an established part of every investigation and prosecution. We explore some ideas for facilitating this process in

---

440. Bibas, *supra* note 363, at 5; Richard M. Kurtz & Sol L. Garfield, *Illusory Correlation: A Further Exploration of Chapman's Paradigm*, 46 J. CONSULTING & CLINICAL PSYCHOL. 1009 (1978); Daniel Kahneman & Amos Tversky, *Subjective Probability: A Judgment of Representativeness*, *in* JUDGMENT UNDER UNCERTAINTY: HEURISTICS AND BIASES 32 (Daniel Kahneman et al. eds., 1982).

441. Hawkins & Hastie, *supra* note 200, at 312; Harley, Carlsen & Loftus, *supra* note 200, at 960, 963.

442. Hawkins & Hastie, *supra* note 200, at 314.

443. *Id.* at 318 (citing Hal R. Arkes et al., *Eliminating the Hindsight Bias*, 73 J. APPLIED PSYCHOL. 305 (1988); Charles G. Lord et al., *Considering the Opposite: A Corrective Strategy for Social Judgment*, 47 J. PERSONALITY & SOC. PSYCHOL. 1231 (1984)).

444. Nickerson, *supra* note 127, at 188.

445. *Id.*

446. *Id.*

447. Lieberman & Arndt, *supra* note 184, at 691.

448. *Id.*

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 543 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



greater detail later in this Article.[449] Moreover, because pet theories or set conclusions about guilt are so difficult to overcome, much of the training must focus on helping police, prosecutors, defense lawyers, and judges understand why it is important to suspend judgment as long as possible, and to resist the impulse to develop conclusions about a case too soon.[450] Once developed, judgments about a case can distort subsequent perceptions and can be very difficult to dislodge, even with an awareness of the cognitive biases at play.

A new awareness or understanding of the roles of police and prosecutors is necessary. Although the adversary system exerts polarizing pressures that feed the cognitive distortions underlying tunnel vision, it is possible to layer some features of a more neutral, inquisitorial system within the adversarial framework.[451] The police investigative function, in particular, can be conceived as an essentially inquisitorial one.[452] In general, police and prosecutor training needs to place greater value on neutrality, emphasizing the need to postpone judgment, and to develop all the facts rather than merely building a case against a suspect.

We offer a few special considerations relating to the education and training of police, prosecutors, and judges below.

### 1. POLICE

Once again, police interrogation training serves as an example—here as an example of the way in which a paradigm shift can be effected through new training. As discussed in Part II.C.1, interrogation training that encourages police both to make judgments about guilt or innocence before the proof is in, and then to interrogate a suspect for the purpose of obtaining a confession, is a form of deliberate tunnel vision. Like all forms of tunnel vision, it runs the risk of obscuring the truth. Defenders of the Reid Technique maintain that it works because it gets suspects to confess, and that it is necessary in

449. *See infra* notes Parts III.D.1.c., e. & f., and Parts III.D.2.c. & d.

450. *See infra* Part III.C.1. & 2.

451. *See, e.g.*, Thomas M. Williamson, *From Interrogation to Investigative Interviewing; Strategic Trends in Police Questioning*, 3 J. COMMUNITY & APPLIED SOC. PSYCHOL. 89, 89 (1993).

452. *See id.* at 90 ("Within the adversarial system, it is Police questioning which is the most important inquisitorial element."). Others have noted that in a similar way, to some extent innocence projects, with their focus on utilizing DNA to obtain the truth, whatever it might be, operate as an inquisitorial layer at the conclusion of the adversarial criminal process. *See* Ralph-Pierre Grunewald, The Role of Innocence Projects in American Criminal Procedure (2005) (unpublished LL.M. thesis, University of Wisconsin-Madison) (on file with authors).

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



the harsh world of criminal investigations.[453] Given the potential for harm, those claims ought to be carefully scrutinized and must be balanced against the risk of convicting the innocent (and correspondingly, failing to convict the truly guilty). In the end, tunnel vision suggests the need to consider altering the dominant paradigm of criminal investigations from a focus on making a case against a chosen suspect to a more objective search for the truth.

Police training is important in other respects as well. Whether any police officer naturally possesses the mental abilities necessary to guard against tunnel vision, police agencies should ensure that all officers—pre-service recruits, patrol officers, detectives, and supervisors—receive some formalized training about the various psychological phenomena that contribute to tunnel vision and, ultimately, to erroneous investigations. Such training should include an understanding of the fallibility of eyewitnesses' memories; the memory-distorting effects of certain eyewitness identification procedures; the reasons why and conditions under which suspects will falsely confess to the police; the potential to fixate on one theory of a criminal case to the exclusion of rival theories; and the tendency to become defensive about one's professional decisions, methods, and judgments. Training exercises might include role-playing scenarios where police trainees witness an incident and are subsequently asked to describe and identify the individuals involved in the incident. These sorts of training exercises can be profoundly influential in helping police officers recognize their own memory fallibility, and consequently, to better appreciate the fallibility of other eyewitnesses. Other training exercises might lead police trainees to draw erroneous conclusions from obvious, but false or misleading, clues in criminal cases.[454] Police trainees should also have some of their own criminal case investigations subjected to

453. Inbau et al., for example, have argued:

> [A] killer would not have been moved one bit toward a confession by being subjected to a reading or lecture regarding the morality of his conduct. It would have been futile merely to give him a pencil and paper and trust that his conscience would impel him to confess. Something more was required—something that was in its essence an "unethical" practice on the part of the investigator—but under the circumstances involved in this case, how else would the murderer's guilt have been established?

INBAU ET AL., *supra* note 290, at xv.

454. For example, trainees might read investigative reports that indicate that a suspect's DNA was conclusively matched to DNA found at a crime scene, but have it subsequently revealed that either the suspect's identical twin was the true perpetrator or that there was an innocent explanation for the presence of the DNA at the scene. The purpose of such exercises is to reinforce the notion that even strong direct evidence can be explained by other than the most apparent explanation, and, therefore, can be misleading.

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 545 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



critique, partly to improve their investigative techniques and skills, but partly to gauge how well they handle critiques and to help them be more comfortable with having their work critiqued. Case studies of investigations known to have resulted in wrongful arrests, prosecutions, and convictions might be used to train investigators to recognize the critical points in the investigation where decisions took the investigation down the wrong path. Those who train police officers in criminal investigation would do well to review known cases of tunnel vision and wrongful arrest to improve training.

There is an abundance of specialized training available for police investigators, ranging from forensic science to interrogation techniques. There is less available in the areas pertaining to the tunnel vision phenomenon. Training programs that serve the police investigation field should remedy this training gap. The textbooks and training documents that supplement criminal investigation training programs should likewise devote greater attention to tunnel vision and its contribution to wrongful arrest and conviction. Commendably, some such recent publications already do so.[455]

### 2. PROSECUTORS AND JUDGES

Like police officers, prosecutors and judges should be educated about the causes of, and correctives for, tunnel vision.[456] This education should begin in the juris doctorate programs in law schools and continue through the various continuing legal education opportunities afforded to prosecutors and judges by law schools, national and state judicial and prosecutorial colleges and institutes, state bar associations, and so forth.[457]

Professor Alafair Burke has noted that, because established beliefs in guilt can be so difficult to overcome, "prosecutorial neutrality should be at its peak prior to the prosecutor's charging decision, before she has

455. *See* JAMES W. OSTERBURG & RICHARD H. WARD, CRIMINAL INVESTIGATION: A METHOD FOR RECONSTRUCTING THE PAST (4th ed. 2004) (addressing issues relating to sources of investigator bias, eyewitness identification fallibility, improper interrogation procedures, informant reliability, and wrongful convictions).

456. Fisher, *supra* note 262, at 258; Burke, *supra* note 127, at 30 (advocating training for prosecutors "about the sources of cognitive bias and the potential effects of cognitive bias upon rational decision making").

457. Joseph Rand has observed that some movement in this direction is beginning in law schools: "We are already seeing a dramatic increase in academic attention to cognitive biases and their effect on legal doctrine, theory, and practice." Joseph W. Rand, *Understanding Why Good Lawyers Go Bad: Using Case Studies in Teaching Cognitive Bias in Legal Decision-Making*, 9 CLINICAL L. REV. 731, 734 (2003).

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 546 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



formed a theory of guilt that will taint subsequent information processing."[458] For this reason, it is especially important that prosecutors be taught to suspend judgment as long as possible—to resist the temptation to assume that the suspect is guilty, and instead to engage in an independent analysis of the case before reaching any assessment.

### *C. Procedures and Protocols for Collecting and Assessing Evidence*

A word of caution about police investigative reform is in order: police investigative policies, procedures, and practices have, for a variety of reasons, remained more impervious to change than other dimensions of police work.[459] Although forensic technology has changed and improved dramatically in recent years, most police investigative operations are hampered by excessive caseloads, inadequate case management systems, and insufficient training for investigators.[460] Any effort to significantly reform the police investigation function, including measures described below to remedy tunnel vision, must be done with an appreciation of the factors that have historically inhibited investigative reform.

Improved evidence collection and assessment procedures are important because they minimize the risks of producing tainted evidence that can reinforce the erroneous judgments that contribute to tunnel vision. In this regard, any improvements in the procedures related to factors that contribute to the problem of wrongful convictions will help solve the problem of tunnel vision. Such reforms include, but are not limited to, improving procedures for handling eyewitness identifications, greater safeguards against unreliable jailhouse snitch testimony, electronic recording of interrogations, and better oversight of crime laboratories.[461] Reforms in all of these areas are under way, and each improvement makes an incremental correction to the problem of tunnel vision.

To counter the natural preference for seeking out confirming evidence, investigation protocols should require police and prosecutors to test their theories by searching for facts *inconsistent* with their early

---

458. Burke, *supra* note 127, at 29.

459. *See* Frank Horvath, Robert T. Meesig & Yung Hyeock Lee, National Survey of Police Policies and Practices Regarding the Criminal Investigations Process: Twenty-Five Years After Rand 110-11 (Nov. 17, 2003) (unpublished report), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/202902.pdf.

460. *Id.* at 2-4

461. Improvements in each of these areas are typically recommended following inquiry into the causes of wrongful convictions. *See, e.g.*, STATE OF ILL., *supra* note 16, at 19, 31, 40, 51.

Court of Appeal Fifth Circuit Case No: 23-KH-377 Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 547 of 856 Submitted On: 8/2/2023 3:58:48 PM Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



assessments of a case—that is, to deliberately seek disconfirming evidence. For example, when evaluating physical evidence, police and prosecutors should consider not just the evidence that was found, but anything that was not found and that one would have expected to find if the suspect had committed the crime. Similarly, when evaluating a confession, police and prosecutors should look carefully for any statements that are not corroborated by other evidence, or that are inconsistent with known facts of the case.[462]

To help overcome the tendency to seek only confirming evidence, former Attorney General Janet Reno, among others, has advocated that police develop checklists to help guide their investigations.[463] Those checklists could require police to note, for example, all the evidence expected to be found, all that was found, all that was sought but not found, all possible suspects and what the investigations into them produced,[464] any inconsistencies in the evidence, and whether nearby

462. Richard Leo has urged that, when evaluating confessions, "police investigators and prosecutors should routinely review and analyze the statements they take in a genuine effort at external corroboration." Leo, *supra* note 258, at 100. Leo says that review should include consideration of three factors. Police and prosecutors should: 1) analyze the conditions under which statement was made and the extent to which coercive forces were present; 2) analyze the extent to which the statement contains details that are internally consistent and consistent with known crime facts; and 3) look for the source of details of the confession, that is, examine whether the statement contains details knowable only by the perpetrator. *Id.* In their article published in this symposium issue of the *Wisconsin Law Review*, Leo and his co-authors go a step further and argue that admissibility of confession evidence at trial should turn on weighing three factors: 1) whether the confession contains nonpublic information that can be independently verified that would only be known by the true perpetrator or an accomplice and cannot likely be guessed by chance; 2) whether the suspect's confession led the police to evidence about the crime that the police did not already know; and 3) whether the suspect's postadmission narrative 'fits' (or fails to fit) with the crime facts and existing objective evidence. Richard A. Leo et al., *Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century*, 2006 WIS. L. REV. 479.

463. Tom Kertscher, *Reno Advocates for Use of a Judicial Checklist*, MILWAUKEE J. SENTINEL, Apr. 23, 2004, at 7B, *available at* http://www.jsonline.com/news/state/apr04/224261.asp; *see also* Stanley Z. Fisher, *The Prosecutor's Ethical Duty to Seek Exculpatory Evidence in Police Hands: Lessons From England*, 68 FORDHAM L. REV. 1379, 1435 (2000) (noting that English law provides "checklists of potentially exculpatory evidence—such as notebook entries, first descriptions by potential witnesses, information from tapes or telephone records, [and the] defendant's explanation of an offense," which police must keep, turn over to the prosecutor, and, if appropriate, disclose to the defense).

464. If police had listed all possible suspects and the results of the investigations into them in the Steven Avery case, for example, and if that information had then been disclosed to the prosecution and then the defense, the name of Gregory Allen (the true perpetrator) would have come to light much sooner in the case (because he was indeed a known suspect early in the investigation, but was never pursued), and

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



police agencies have been consulted to identify possible alternative perpetrators.[465]

### 1. PHYSICAL EVIDENCE

Collecting physical evidence from a crime scene or other location can be influenced by the theory of the crime. Where the primary investigator is also the primary collector of physical evidence, there is a heightened risk that important physical evidence might be overlooked if the investigator prematurely settles on one theory of the crime. Even where separate crime scene technicians collect the physical evidence, their work can be influenced by learning about the primary investigator's preferred theory of the crime. Obviously, we do not want to preclude primary investigators from communicating with crime scene technicians, or any investigator from hypothesizing about the crime to guide the search for physical evidence, but care should be taken to collect the greatest amount of potential physical evidence at the crime scene, regardless of the theory of the crime. Crime scene technicians should be guided by the theories of primary investigators to the extent that discussion of theories broadens the search for, and collection and analysis of, evidence, but not to the extent that it limits it. At least several alternative theories of the crime should be considered at the time physical evidence is collected.

### 2. TESTIMONIAL EVIDENCE

Development of testimonial evidence is also influenced by the theory of the crime. And, as we have discussed, when the theory of the crime is wrong, the testimonial evidence developed in the investigation can be misleading or inaccurate. To minimize the risk that police will inadvertently produce flawed testimonial evidence—for example, regarding a suspect's own statements—we have suggested a shift away from high-pressure, confession-driven interrogation techniques toward more neutral investigative interviewing techniques.

We recognize, however, that there might be a cost to such a shift, a cost reflected in the concern that a shift away from high-pressure interrogation techniques will lead to too many guilty suspects avoiding conviction. Yet, precisely that kind of shift is occurring in other countries, and to some extent within some American jurisdictions. The

follow-up investigations by the prosecutor or defense might have prevented Avery's wrongful conviction. Allen might have been prosecuted instead, and the crimes he went on to commit might have been prevented. *See supra* Part I.B.

465. Kertscher, *supra* note 463.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



experience in those jurisdictions offers an opportunity to examine whether such a shift does indeed come with unacceptable costs.

In response to a series of high-profile British wrongful convictions, including the "Guildford Four" and the "Birmingham Six," Great Britain adopted the Police and Criminal Evidence Act (PACE) in 1984, which significantly reformed police practices in that country.[466] The Act includes rules against the use of undue police pressure or oppression, and a requirement that suspect interviews be audiotaped.[467] Police in Great Britain have since shifted to a practice that they call "investigative interviewing."[468] The product of a collaborative effort between psychologists, academics, and practitioners to establish best practices based on findings from empirical studies, investigative interviewing is designed as an alternative to previous confession-driven interrogation approaches.[469] It is viewed as "a less oppressive approach to interviewing suspects. The use of trickery, deceit, and other methods to build up psychological pressure is no longer included, and nonverbal cues to deception are disregarded."[470] Police in England and Wales have created a national training course on investigative interviewing that "encourage[s] a non-oppressive, non-coercive approach, with an emphasis on information gathering rather than obtaining a confession *per se*."[471] The effort was explicitly intended "to introduce an inquisitorial element into a scenario traditionally dominated by the adversarial nature of the judicial system."[472]

---

466. MEMON, VRIJ & BULL, *supra* note 291, at 66-67; John Pearse & Gisli H. Gudjonsson, *Police Interviewing Techniques at Two South London Police Stations*, 3 PSYCHOL. CRIME & L. 63, 63 (1996).

467. MEMON, VRIJ & BULL, *supra* note 291, at 67. To various degrees, other European countries also encourage nonconfrontational interrogation techniques. German law, for example, provides that "the accused must be given every opportunity to remove any suspicion against him and to point to out those circumstances which are favourable to his defence." Barbara Huber, *Criminal Procedure in Germany*, *in* COMPARATIVE CRIMINAL PROCEDURE 118 (John Hatchard et al. eds., 1996).

468. Williamson, *supra* note 451, at 90, 97-98.

469. *Id.* at 90. Williamson describes the model in this way:

> The role of investigative interviewing is to obtain accurate and reliable information from suspects, witnesses or victims to discover the truth about matters under Police investigation. Investigative interviewing should be approached with an open mind. Information obtained from the person who is being interviewed should always be tested against what the interviewing Officer already knows or what can reasonably be established.

*Id.* at 98.

470. *Id.* at 65.

471. Pearse & Gudjonsson, *supra* note 466, at 65.

472. *Id.*

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Despite PACE, continuing observation of a number of coercive interrogations prompted the Royal Commission on Criminal Justice Report in 1993, which endorsed a new "culture" of interrogation practices and led to the development of a PEACE model (Preparation and Planning, Engage and Explain, Account, Closure, and Evaluate).[473] As Richard Leo has explained,

> [a]t the heart of this approach, and in sharp contrast to the confrontational Reid Technique, is an ethical and inquisitorial frame of mind. . . . Overall, PEACE proposes a formal interrogation in which the purpose is clearly communicated to the suspect, rights are properly administered, rapport is established, and a "conversation" is engaged between the lead investigator and suspect. More an interview than an interrogation, the primary purpose of this conversation is to gather information, not to elicit a confession . . . .[474]

Significantly, research conducted in Great Britain after implementing PACE and the new interviewing model has suggested that, although interrogations have become less coercive, the confession rate has not been affected.[475] British police continue to report interrogations in more than half of all cases.[476] Experiences in jurisdictions like Great Britain, Canada,[477] and in some American jurisdictions where police are experimenting with less confrontational and judgmental interrogation tactics on a smaller scale,[478] suggest that

473. Leo, *supra* note 258, at 101.

474. *Id.* at 101-02.

475. *Id.* at 101. The research also indicates, however, that, despite significant changes in the way police in Great Britain conduct interviews, vestiges of the old, confession-driven interrogation techniques have persisted even after the adoption of PACE. John Baldwin, *Police Interviewing Techniques: Establishing Truth or Proof?*, 33 BRIT. J. CRIMINOLOGY 325, 334-44 (1993).

476. Various studies show continuing confession rates in the range of 42 to 76 percent, with most post-PACE studies showing confessions in the 55 to 62 percent range. Pearse & Gudjonsson, *supra* note 466, at 72. This confession rate is comparable to, or even higher than, the confession rate in the United States, which studies suggest ranges from 42 to 50 percent. Kassin & Gudjonsson, *supra* note 99, at 44.

477. *See* Michel St-Yves, *The Psychology of Rapport: Five Basic Rules*, *in* INVESTIGATIVE INTERVIEWING: RIGHTS, RESEARCH, REGULATION 87, 88 (Tom Williamson ed., 2006) (describing a model for investigative interviewing in Quebec, Canada, that emphasizes: 1) keeping an open mind, 2) building up rapport, 3) paying attention, 4) keeping a professional attitude, and 5) knowing how to conclude).

478. *See infra* notes 515-20 and accompanying text. In Wisconsin, for example, the attorney general has established an interrogation training model that encourages a less-aggressive interviewing technique that is closer to the British model than the Reid Technique. WIS. DEP'T OF JUSTICE, OFFICE OF ATTORNEY GEN.,

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 551 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



such approaches can be employed profitably on a wider scale in the United States as one response to the problem of tunnel vision.

### *D. Management and Supervision of Investigations and Cases*

#### 1. POLICE

Education and training are necessary, but not sufficient, to guard against the harmful effects of tunnel vision. Even when detectives and their supervisors understand the tunnel vision phenomenon and make their best personal efforts not to succumb to it, investigations can still focus on the wrong suspect or the wrong theory of the case. Several investigative management practices can further mitigate the probability that tunnel vision will lead to an erroneous result in a case.

#### *a. Selection of Police Investigators*

Nearly all police officers, regardless of their particular assignment, are expected to be able to investigate criminal matters. A select few are given criminal investigation as a full-time, specialized assignment. In most police agencies the position of criminal investigator (most commonly referred to as a detective) is filled by police officers who have demonstrated that they possess a high level of investigative skill. In most agencies, assignment as a detective is a promotion from the position of patrol officer; in other agencies, it is a nonpromotional specialized assignment, which may or may not be permanent. Every police agency determines for itself what particular knowledge, skills, and abilities are desired for the detective position, and what criteria and processes determine which police officers will become detectives. The knowledge, skills, and abilities that are conventionally prized include: keen inductive reasoning abilities (the ability to draw logical conclusions from bits of evidence); the ability to write clear and comprehensive reports; the ability to organize, analyze, and retrieve information; the ability to communicate effectively orally (for courtroom testimony); the ability to persuade others (witnesses and suspects) to provide information necessary to an investigation; a comprehensive knowledge of the law and procedures as they relate to criminal investigation (including the elements of crimes, constitutional guidelines, criminal procedures, and investigative and evidentiary policies and procedures); the ability to manage one's time effectively

RECOMMENDATIONS FOR ELECTRONIC RECORDING OF CUSTODIAL INTERVIEWING (2005), *available at* http://www.doj.state.wi.us/dles/tns/elecrecord/10BestPractices.pdf.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



and efficiently so as to be able to investigate multiple cases simultaneously while under time constraints; determination and persistence in seeking clues to solve cases; and knowledge of the community (including knowing and understanding criminal suspects and their accomplices, criminal networks, and who might have information that will help solve cases).

Given what we know about human psychology and its inherent vulnerability to the tunnel vision phenomenon, an additional criterion for choosing detectives is called for: the ability to understand and guard against tunnel vision. Police executives who appoint officers as detectives should seek out officers who have demonstrated a willingness and ability to explore alternative theories of criminal cases; seek and accept input from other investigators; be aware of and control their own personal biases; resist the temptation to lock in on some suspects to the total exclusion of others; avoid becoming defensive about one's decisions, methods, and judgments; and be open to constructive critiques of the same. Official job descriptions for a detective should reflect these mental abilities in addition to the conventional sets of knowledge, skills, and abilities. Detective selection procedures should incorporate some assessment of the degree to which candidates possess the ability to guard against tunnel vision.

*b. Selection of Investigative Supervisors*

The investigative supervisor is perhaps the most critical role in guarding against tunnel vision in criminal investigations. Depending on the size and structure of the police agency, the investigative supervisor is typically either a sergeant or a lieutenant responsible for assigning cases to detectives, monitoring their progress, reviewing their reports, and liaising with prosecutors about investigative procedures. In larger police agencies there will be several layers of investigative supervision—first-line supervisors, investigative commanders, and perhaps high-level investigative executives. While anyone in the investigations hierarchy might take the initiative to caution against tunnel vision and to challenge the accumulated evidence in a particular case, it is the first-line investigative supervisor who is in the best position to do so. The first-line supervisor should consult with the case detectives regularly and read their reports.

Careful consideration should be given to the knowledge, skills, and abilities sought in individuals who assume these supervisory roles. Investigative supervisor candidates should demonstrate an understanding of the tunnel vision phenomenon and be familiar with techniques for guarding against it. They must be comfortable challenging detectives, especially experienced detectives, about their

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 553 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



theories, methods, and conclusions in such a way as to mitigate tunnel vision without undermining the investigation. This is not always done so easily, especially where, as is oftentimes true, the major case detectives have more experience than do their supervisors. For a variety of reasons, the police culture grants detectives a considerable amount of independence and discretion. It is commonly believed that detectives have earned this independence by virtue of having demonstrated certain skills and knowledge about their craft. Many detectives resent what they perceive to be excessive and undue scrutiny of their work. Moreover, detectives often deal directly with prosecutors on matters relating to their cases, oftentimes bypassing their own investigative supervisors in these communications. While this is usually a more efficient way to handle matters, it can make it more difficult for a police investigations supervisor to be part of the deliberations and decision-making in a particular case, particularly if the detective and the prosecutor are already in agreement about the theory and direction of the case.

*c. Posing Alternate Theories of the Case*

The investigative supervisor should routinely posit alternate theories of each case during the briefing sessions in which cases are discussed. Much as scientists seek to "prove" theories by testing the null hypothesis (providing a reason to reject the hypothesis that something occurred merely by chance), police investigative supervisors should seek to "prove" a case by offering evidence and a rationale to reject all reasonable alternate theories as to how the crime was committed and by whom.

*d. Approaching an Investigation from the Perspective of Ignorance*

Police investigators commonly formulate theories about cases and suspects on the basis of what they know (or what the available evidence appears to indicate) at any particular point in time. At some point, they might reasonably conclude that they have enough evidence and knowledge (applying the probable cause standard) to support a conclusion that a particular suspect committed the crime, even if gaps remain in their evidence and knowledge. They might conclude that the gaps in knowledge either cannot be filled or will be filled at a later stage (after arrest, during pretrial preparation, or during trial). A different approach to criminal investigations can help reduce the likelihood of tunnel vision and premature conclusions about the case. By anticipating all of the information that a reasonable person might want to know about a case, the investigation can be built around what

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



investigators do not know, but should try to discover. By aggressively seeking to fill in all of the significant knowledge gaps in a case, investigators should be constantly challenged to explain those knowledge gaps. Do the gaps exist merely because the evidence has not yet been found, or do they exist because the theory of the case is wrong?[479]

To be sure, "probable cause" is a slippery notion. While it constitutes a minimal threshold of knowledge necessary to support a criminal arrest in a court of law, it need not be interpreted by police investigators and supervisors at its most minimal level. Police can and should hold themselves to a higher standard of proof than that which might minimally satisfy a judge or grand jury in a probable cause determination, particularly when the potential penalty for the crime under investigation is severe.

*e. Apportioning Case Investigation Responsibilities*

Assigning different detectives different tasks in the context of one investigation is another technique police supervisors can use to minimize the likelihood that tunnel vision will distort the conclusions in a criminal investigation. For example, one detective could be assigned to process and analyze physical evidence, while another detective interviews potential witnesses, and a third reviews documents. Alternately, different detectives could be assigned to interview the same witnesses, analyze the same physical evidence, or review the same documents previously investigated by another investigator. A second set of eyes, ears, and minds might either detect what the first set might have missed or reach different conclusions from the same evidence.

---

479. Criminal investigations in which the identity of the offender is genuinely a mystery and many individuals might be suspected commonly take many turns, with many promising leads and suspects failing to pan out. For a fascinating and detailed account of a criminal investigation of a serial killer that spanned over two decades and which took many such turns, see DAVID REICHERT, CHASING THE DEVIL: MY TWENTY-YEAR QUEST TO CAPTURE THE GREEN RIVER KILLER (2004). As Reichert wrote:

> In real life, physical evidence is hard to come by, most people don't want to talk to you, and snitches can push you in the wrong direction. As a result, investigators spend an awful lot of time chasing down the witnesses, associates, friends, and acquaintances who might fill in the details of a crime suspect's story. Although we often discover contradictions and startling revelations that blow a story apart, our goal is to get at the truth. If a second, third, or fourth party confirms what we have been told and that helps us rule out a suspect, that's a good thing. It means we can move on to another lead.

*Id.* at 81.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 555 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



Under this approach, the supervisor can periodically bring the detectives together to present their findings and challenge one another's methods and conclusions. This technique goes beyond a standard case briefing in which one detective might summarize the progress being made on a case. It openly invites detectives to challenge the evidence and the theories of the case, and increases the likelihood that a false theory or wrong suspect will be revealed prior to arrest.

### *f. Assigning an Advisory Investigator*

As an alternative approach, investigative supervisors might select another experienced criminal investigator to periodically review the existing evidence and conclusions, and to offer suggestions to the lead case investigator about investigative methods, alternate theories of the case, or alternate conclusions that could be drawn from the available evidence. This could be done either by having advisory investigators review the written case file or by having the lead case investigator conduct an oral briefing of the case. Whichever briefing method is used, written recommendations are preferable to oral recommendations because they minimize the likelihood that the case investigator will perceive a need to defend the methods or conclusions under review.

This technique does not give the advisory investigator any responsibility for investigating the case at hand. That person merely gives an independent, but generally knowledgeable, perspective on the investigation. The advisory investigator may or may not work for the same police agency as the primary investigator. It is only important that the primary investigator have some basis for respecting the knowledge, experience, and perspective of the advisory investigator. By not assuming any investigative responsibility, the advisory investigator is less likely to become emotionally attached to any particular suspect or theory of the case, and is freed of the pressures, frustrations, and anxieties that come with assuming responsibility for a successful conclusion to the case. This advisory review should occur before the case is presented to the prosecutor for formal filing of charges.

### *g. Presenting the Case to the Prosecutor*

In some instances it might be advisable for someone other than the lead investigator, ideally someone without a significant emotional attachment to the investigation, to present the evidence and conclusions drawn in the case to the prosecutor. This reduces the possibility that the evidence and investigative procedures of the case will be presented selectively.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



In addition, investigative supervisors should require that a complete log of all evidence gathered in the investigation—physical and testimonial evidence, both confirmatory and exculpatory—be maintained and submitted to the prosecutor at the conclusion of the investigation.[480] Even if such a requirement were to prove infeasible in less serious criminal investigations, it should be standard practice in more serious ones.

Generally speaking, few rules require police to preserve evidence or make records of all case-related information discovered during an investigation.[481] Professor Dianne Martin has observed that, in Canada, police are known for "boxing the notes"—drafting their investigative notes in a way that ensures that "no officer contradicts another, and where possible, that officers corroborate the version [of the offense] decided on."[482] Professor Stanley Fisher has argued that, while American police ostensibly attempt to report "all relevant evidence," in practice police reports are "artifacts of the adversary process" that tend to include evidence of guilt and omit exculpatory facts.[483] Given the cognitive distortions and institutional pressures in play, such omissions are inevitable.[484] The consequence, however, is that "we suffer a systematic loss and suppression of exculpatory evidence at the stage of police investigation and reporting."[485]

After studying a series of wrongful convictions in Illinois's death penalty system, former Illinois Governor Ryan's Commission on Capital Punishment noted that police failure to document and disclose

480. *See* Thomas P. Sullivan, *Preventing Wrongful Convictions*, 86 JUDICATURE 106, 108 (2002).

481. In *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), and *Trombetta v. California*, 467 U.S. 479, 491 (1984), the Supreme Court held that due process is not violated by police destruction of even potentially exculpatory evidence unless the exculpatory nature of the evidence was apparent and police acted in bad faith. Given the cognitive biases at work, this doctrine is destined to produce many instances in which police fail to recognize the potentially exculpatory nature of such evidence and few instances in which, in hindsight, courts will hold that the exculpatory nature of the evidence was apparent or that police acted in bad faith. Ironically, Larry Youngblood, the defendant in *Arizona v. Youngblood*, was denied relief under the doctrine announced by the Supreme Court in his case, but was exonerated many years later when newly discovered DNA evidence proved his innocence. *See* Barbara Whitaker, *DNA Frees Inmate Years After Justices Rejected Plea*, N.Y. TIMES, Aug. 11, 2000, at A12. However one might otherwise assess the merits of this constitutional doctrine, it is undeniable that it contributes to tunnel vision and wrongful conviction of the innocent.

482. Martin, *supra* note 6, at 850.

483. Stanley Z. Fisher, "*Just the Facts Ma'am": Lying and the Omission of Exculpatory Evidence in Police Reports*, 28 NEW ENG. L. REV. 1, 18-31, 57 (1993).

484. *See id.* at 17.

485. Fisher, *supra* note 463, at 1384.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



to the prosecutor all exculpatory evidence was one cause of the errors.[486] Accordingly, the commission specifically recommended that:

> (a) The police must list on schedules all existing items of relevant evidence, including exculpatory evidence, and their location.
> (b) Record-keeping obligations must be assigned to specific police officers or employees, who must certify their compliance in writing to the prosecutor.
> (c)The police must give copies of the schedules to the prosecution.
> (d)The police must give the prosecutor access to all investigatory materials in their possession.[487]

Greater attention to preserving and recording all evidence is important to ensure that potentially exculpatory evidence is not overlooked.

### *h. Disclosing Investigative Information to the Media*

Although police are often eager to publicize at least some of the details regarding an investigation because an arrest might be considered the culmination of a police investigation, an arrest is also only the beginning of the legal adjudication of the case. Further investigation, either by police or prosecutors, is often conducted after an arrest is made. Moreover, citizens who comprise the jury pool are almost certainly influenced by media reporting of investigative details in their prejudgments about the guilt or innocence of the arrested person. For this reason, police should be more cautious than is the current norm in making details about the nature and strength of evidence against the arrested suspect public. Aside from assuring the public that a suspect has been arrested or requesting additional information from the public about the crime, the desire to provide the details about the State's

486. STATE OF ILL., *supra* note 16, at 22. Similarly, the Virginia Innocence Commission, after reviewing proven wrongful convictions in that state, recommended that, to counter tunnel vision,

> [l]aw enforcement agencies should train their officers to document all exculpatory, as well as inculpatory, evidence about a particular suspect/individual that they discover and to include this information in their official reports to ensure that all exculpatory information comes to the attention of prosecutors and subsequently to defense attorneys.

INNOCENCE COMM'N FOR VA., *supra* note 20, at 73.

487. STATE OF ILL., *supra* note 16, at 22. These recommendations were based in large part on the British Criminal Procedure and Investigations Act of 1996. *Id.* at 20 (citing Fisher, *supra* note 463).

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



evidence is nearly always outweighed by the possible prejudice to the suspect. Although defense attorneys often release investigative information to the media when they believe doing so will create a more favorable public opinion of the suspect's defense, police should nonetheless refrain from this practice. Prosecutors are equally advised not to create the appearance that they are trying the case in the media.

### 2. PROSECUTORS

Scholars have proposed a range of measures to reign in the adversarial excesses that prosecutors sometimes exhibit. Those suggestions run the gamut from revised ethical rules,[488] to stricter prosecutor discipline,[489] to revised incentive structures,[490] to more frequent reversals of convictions based on prosecutorial misconduct.[491] Several reforms that some prosecutors' offices have adopted and that could be adopted more widely through policy and practice are discussed below.

#### *a. Demanding the Fullest Disclosure of Information from Police*

Prosecutors must have access to all case investigative materials, not just those that support the conclusion reached by police. Providing prosecutors with *all* such materials, and providing those materials early in the process, better enables prosecutors to evaluate cases with an open mind before they have settled on a theory of guilt, when neutrality is at its peak. This requirement highlights the importance of ensuring that police record, retain, and forward to prosecutors all investigative information.[492] It is well within the power and prerogative of a

488. *See, e.g.*, Fisher, *supra* note 463.

489. *See, e.g.*, Ellen Yaroshefsky, *Wrongful Convictions: It Is Time To Take Prosecution Discipline Seriously*, 8 UDC/DCSL L. REV. 275, 278 (2004); Medwed, *supra* note 196, at 174.

490. *See* Fisher, *supra* note 262, at 200; Medwed, *supra* note 196, at 171-72 (citing Erwin Chemerinsky, *The Role of Prosecutors in Dealing with Police Abuse: The Lessons of Los Angeles*, 8 VA. J. SOC. POL'Y & L. 305, 320 (2001) (arguing that prosecutor performance measures ought to include factors other than conviction rates, such as decisions not to prosecute or to turn over biological evidence for DNA testing without litigating the case)).

491. Fisher, *supra* note 262, at 201; Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors for* Brady *Violations: A Paper Tiger*, 65 N.C. L. REV. 693, 737 (1987); Medwed, *supra* note 196, at 172-73 (noting that appellate courts reverse infrequently and "invariably neglect to identify the prosecutor by name as a matter of 'professional courtesy'").

492. *See supra* Part III.D.1.g.

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 559 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



prosecutor's office to insist upon such full disclosure from police investigators and many already do so.

*b. Maintaining Independence from Police Investigators*

Prosecutors should seek to maximize their neutrality during the precharging phase in other ways as well. Where the prosecutor assigned to a case has a personal relationship with a police investigator who had a key role in the investigation, the prosecutor can easily lose objectivity.[493] Prosecutors must also guard against blindly trusting, without evidentiary substantiation, police investigators whom the prosecutor has come to know and trust professionally. Even well-intentioned, honest, and trustworthy investigators can unwittingly be affected by tunnel vision.

While it may be difficult to achieve true neutrality, it is clear that prosecutors do manage to maintain some measure of neutrality in the precharging context, because they do refuse to charge in a meaningful proportion of cases.[494] The lessons from the cognitive sciences and their implications for tunnel vision reinforce the importance of enhancing the capacity and rewards for prosecutors to exercise independence and neutrality.

*c. Employing Multiple Levels of Case Review*

Multiple levels of case screening, whether achieved by a supervisor reviewing cases prior to assigning them to individual prosecutors or after assignment but prior to formal charging, can serve as another check against tunnel vision. As others have noted, many U.S. Attorney offices have policies requiring trial attorneys to seek review and approval from a supervisor for some charging and disposition decisions.[495]

*d. Counterarguing*

Once the decision to charge is made, cognitive biases make it difficult to see alternative conclusions about a case. Although the task becomes more difficult at that point, prosecutors need to understand the importance of striving for objectivity. Because the research into cognitive biases suggests that being compelled to argue against one's own position is one of the more effective means of countering one's

493. *See supra* note 264.
494. Brown, *supra* note 243, at 1600; Givelber, *supra* note 243, at 255.
495. *See* Brown, *supra* note 243, at 1619.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 560 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



cognitive biases, prosecutors should be taught to switch sides, to play their own Devil's Advocate.[496]

Because it can be difficult to get people to conceive counterarguments, however, more formalized methods of counterarguing should also be considered. Formal processes can be developed within a prosecutor's office for obtaining second opinions from other prosecutors, or from review committees. Accordingly, Professor Alafair Burke has argued that "[t]he reduction of bias might be achieved internally within a prosecutor's office by establishing a process for 'fresh looks' of a file by a lawyer or a committee of lawyers whose evaluation would not be tainted by earlier developments in the case."[497] Professor Darryl Brown has noted that separating prosecutors into "distinct offices and assignments establishes them as checks both on police and on other prosecutors," and that "[s]eparating investigators from prosecutors helps make the latter a check on the former."[498]

Burke and Brown, however, have also acknowledged that getting prosecutors to engage in critical review of a colleague's conclusions, free from time- and guilt-presuming pressures, can be difficult.[499] Accordingly, Burke has suggested that, because "a fresh look attorney may be reluctant to dissent from her colleague's initial case evaluation, . . . a more meaningful fresh look process might involve an advisory committee that includes non-prosecutors."[500] While an external review committee would no doubt be too cumbersome to use regularly in routine cases, it could be employed in serious disputed cases. In such cases, a review committee could function much like the civil review boards that monitor police.[501]

Even where formal procedures for arguing and counterarguing cases are not feasible, encouraging informal discussions and debates among peer prosecutors regarding serious, complex, and borderline cases can help reduce the risk that tunnel vision will negatively affect prosecutorial decision-making.

### *E. Transparency*

To the extent that training and new procedures are inadequate to overcome the powerful forces that produce tunnel vision, an additional

496. Burke, *supra* note 127, at 34.
497. *Id.* at 34.
498. Brown, *supra* note 243, at 1618.
499. *Id.* at 1619; Burke, *supra* note 127, at 36.
500. Burke, *supra* note 127, at 36.
501. *Id.* at 38.

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



reform is necessary. Given that police and prosecutors, because they are human, cannot be expected to recognize and correct for all of their natural biases, the system must find a way to give sufficient case information to those who have different incentives and different natural biases. In the end, greater transparency at all stages of the criminal process is the most powerful way to counter tunnel vision.[502]

In criminal cases, greater transparency requires providing the fullest possible investigative information to the defendant.[503] At a minimum, this requires greater discovery.[504] Expanding the *Brady* doctrine would go a long way toward achieving this goal. But even more can and should be done. Providing full investigative information to the defense improves the capacity of the one party best situated to evaluate the evidence free from guilt-confirming biases.[505]

The trend in state criminal justice systems is toward broad, reciprocal discovery.[506] In federal court and most state systems, however, discovery in criminal cases is far less extensive than in civil cases.[507] That gap can and should be closed. For example, some states effectively mandate open investigation files, while others allow witness depositions in criminal cases.[508] In many northern European countries, police compile a single investigative file for each case that includes all investigative material; those files are then disclosed fully to

502. *See, e.g.*, INNOCENCE COMM'N FOR VA., *supra* note 20, at 68.

503. "The defendant is the actor in our system who has the true stake in preventing, exposing, and mitigating prosecutorial misconduct and making sure the adversary system works as intended." Jonakait, *supra* note 267, at 567.

504. *See* Mary Prosser, *Reforming Criminal Discovery: Why Old Objections Must Yield to New Realities*, 2006 WIS. L. REV 541. More expansive discovery is also a frequently cited measure to protect against wrongful convictions. *See, e.g.*, INNOCENCE COMM'N FOR VA., *supra* note 20, at 3, 59-68 (recommending "formal discovery rules to mandate open-file discovery procedures"); Jonakait, *supra* note 267, at 567; Brown, *supra* note 243, at 1619. Professor Jenny Roberts has argued that fuller discovery is necessary not only as a matter of due process, but also because "restrictive discovery rules block the delivery of effective assistance of counsel when defense counsel has insufficient information to investigate the case." Jenny Roberts, *Too Little, Too Late: Ineffective Assistance of Counsel, the Duty to Investigate, and Pretrial Discovery in Criminal Cases*, 31 FORDHAM URB. L.J. 1097, 1100 (2004).

505. Although, as noted above, defense counsel are also conditioned to believe that their clients are guilty, *see supra* Part II.B.3, they at least are subject to considerable countervailing pressures, not to mention ethical obligations, that make them better situated than police or prosecutors to approach a case with an alternative perspective.

506. Brown, *supra* note 243, at 1596.

507. *Id.* at 1622.

508. *Id.*

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 562 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



prosecutors, defense counsel, and judges.[509] Applied to the American criminal justice system, this approach would effectively position police as neutral inquisitors, and would strengthen the adversary system itself by balancing the adversary playing field.

Transparency helps to counter tunnel vision in another important way as well. In addition to sharing the information with actors who have an incentive to look outside the tunnel, transparency also helps to modify the effects of biases on decision-makers. Psychological research has shown that, "when people feel publicly accountable for decisions, they exhibit less bias in their hypothesis testing strategies."[510] Thus, the more that police investigations are conducted and prosecutor's decisions are made in open and observable ways, the more likely police and prosecutors are to resist biasing pressures and tendencies. This is not, of course, to suggest that there is no room for secrecy or confidentiality in police work or prosecution. Plainly, sensitive information relating to ongoing investigations, or that could jeopardize witness safety, cannot be made public. But this research does suggest that, whenever possible, transparency in the criminal justice system should be an objective because it enhances reliability as well as public trust and confidence.[511]

Once again, interrogation practices provide an example. Increasingly, jurisdictions in the United States, as well as other countries such as Great Britain and Australia, are mandating that custodial interrogations of suspects be electronically recorded.[512] Jurisdictions are moving toward electronic recording principally because it provides a record of what happened during an interrogation, thereby deterring coercive interrogation tactics and assisting courts in determining whether *Miranda* rights were properly waived as well as

509. *Id.* at 1623-24. Brown has noted that this approach distinguishes the typical American system from many European inquisitorial systems: "narrow discovery rules in adversarial systems make factual accounts reliable by redundant investigations, [while] this European model puts more emphasis on multiple scrutiny of a single file." *Id.* at 1625.

510. Leo, *supra* note 258, at 99.

511. Stephanos Bibas has argued that greater transparency is needed throughout the criminal justice system, particularly to make the system more understandable and accessible to victims and the public, and to make insiders like police, prosecutors, and judges more accountable. Stephanos Bibas, *Transparency and Participation in Criminal Procedure*, 86 N.Y.U. L. REV. (forthcoming June 2006). As an example that is particularly germane here, Bibas has noted that "[v]ideotaping police interrogations and searches, and mandatory record-keeping, could improve monitoring and credibility." *Id.*

512. *See* Thomas P. Sullivan, *Electronic Recording of Custodial Interrogations: Everybody Wins*, 95 J. CRIM. L. & CRIMINOLOGY 1127, 1131-35 (2005).

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



precisely what the defendant actually said.[513] After initial resistance, police in those jurisdictions that record have come to embrace the practice because they have learned that it is also a powerful law enforcement tool; recording provides compelling evidence of guilt when a suspect confesses or responds evasively, and, at the same time, protects police against baseless claims of misconduct.[514]

Interestingly, the transparency imposed by electronic recording is also beginning to change the way that police interrogate.[515] Police with considerable experience with electronic recording find that it not only provides a means for evaluating their own interrogation skills, but it also requires new strategies that look better in an electronic recording than some of the confrontational methods of the Reid Technique.[516] For example, one leading detective with many years of experience recording interrogations, who does extensive interrogation training for police, has noted in his training materials that "[e]xisting strategies don't work well on tape."[517] He teaches that, when recorded, the officer is better served not by cutting off denials or engaging in hostile confrontations with suspects, but instead by being "disarming," trying to "'see, hear, and feel' from the interviewee's point of view," treating the interviewee "like a fellow human being," maintaining a "friendly atmosphere," keeping "an open mind," asking "objective questions," and asking "difficult, delicate, or distressing questions in a firm, gentle, considerate (yet persistent) manner."[518]

In essence, electronic recording has fostered a new approach that moves police away from the Reid Technique. Instead of cutting off denials and pressuring suspects to confess, the new approach permits the suspect keep talking and responding to cordial but challenging questions until the suspect's own statements either convince the observer of innocence, or trap the suspect in a web of lies. Nelson reminds police that, while other interrogation techniques "[w]ere

513. *See id.* at 1127.

514. *See* THOMAS P. SULLIVAN, POLICE EXPERIENCES WITH RECORDING CUSTODIAL INTERROGATIONS 6 (2004) (surveying 238 law enforcement agencies in thirty-eight states that electronically record interrogations, and reporting that "[v]irtually every officer with whom we spoke, having given custodial recording a try, was enthusiastically in favor of the practice").

515. *Id.* at 15.

516. *Id.* at 16-17.

517. NEIL NELSON, MAXIMIZING THE OPPORTUNITY: INTERVIEW AND INTERROGATION C2 (2005). Neil Nelson is a commander with the St. Paul, Minnesota, Police Department, who has been recording his interrogations for more than ten years. *Id.* He also provides police interviewing and interrogation training through Neil Nelson & Associates. *Id.*

518. *Id.* at B5.

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 564 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



created with the goal of getting a suspect to confess," the real objective is to gather information and "to keep[] the suspect talking (even if only to tell lies)."[519]

Such new methods of interrogation, which are similar to the new "investigative interviews" in England (which were also developed after police began recording their interrogations), reveal that the transparency brought by electronic recording has not just provided fuller information to the judicial proceedings, but has also more directly mitigated the cognitive biases that might otherwise impede the search for the truth. In this way, Dr. Richard Leo has noted, "the presence of a camera, and the scrutiny it implies, may help to increase the diagnostic value of interviews and interrogations and protect the innocent from false confessions."[520]

### *F. Institutional Reforms*

Finally, we suggest several major institutional reforms for the police and prosecution.

#### 1. POLICE CRIME LABORATORIES

Given our understanding of how scientists in crime laboratories are susceptible to having their findings and conclusions influenced by what investigators tell them they should expect to find and to conclude,[521] consideration should be given to promoting a greater degree of independence between crime laboratories on the one hand, and police and prosecutors on the other.

There are over 350 publicly funded crime laboratories in the United States, including some thirty-three federal labs, 203 state or regional labs, sixty-five county labs, and fifty municipal labs.[522] Crime laboratories are generally considered an arm of law enforcement. The nation's largest crime lab is operated by the FBI.[523] In Wisconsin, the State Crime Laboratories operate under the jurisdiction of the Division of Law Enforcement Services in the State Department of Justice.[524] In

519. *Id.* at E1-E2.

520. Leo, *supra* note 258, at 99.

521. Risinger et al., *supra* note 13, at 27-41; William C. Thompson, *Accepting Lower Standards: The National Research Council's Second Report on Forensic DNA Evidence*, 37 JURIMETRICS J. 405, 408 (1997).

522. JOSEPH L. PETERSON & MATTHEW J. HICKMAN, U.S. DEP'T OF JUSTICE, CENSUS OF PUBLICLY FUNDED FORENSIC CRIME LABORATORIES, 2002, at 1 (2005).

523. *Id.* at 11.

524. *See* Wis. Dep't of Justice, The Wisconsin Crime Lab System, http://www.doj.state.wi.us/dles/crimelabs/labinfo.asp (last visited Mar. 21, 2006).

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



many larger municipalities, the police department operates its own forensic crime lab.[525] It is not self-evident, however, that crime laboratories should be arms of law enforcement agencies rather than independent government agencies, as are medical examiners' or coroners' offices. While organizational independence from law enforcement is not a guarantee that forensic scientists will not share a police investigator's tunnel vision, independent oversight and funding can help minimize that risk.[526]

Even if crime laboratories are not made organizationally independent from law enforcement, they can and should be made operationally independent. Ideally, this means that precautions should be taken to insulate laboratory analysts from all case investigation information they do not need to perform their scientific analyses.[527] Thus, contrary to common current practice, laboratory analysts should be shielded from information about the detectives' theory of the case, the nature of other evidence and other test results in the case, and the results police hope to obtain from the laboratory analyses.[528] Only by insulating analysts in this way can the objectivity (and hence, reliability) of the analysts' conclusions be assured.[529]

---

525. PETERSON & HICKMAN, *supra* note 522, at 12.

526. *See, e.g.*, Paul C. Giannelli, *The Abuse of Scientific Evidence in Criminal Cases: The Need for Independent Crime Laboratories*, 4 VA. J. SOC. POL'Y & L. 439, 470 (1997) (recommending independent crime labs); Craig M. Cooley, *Reforming the Forensic Science Community to Avert the Ultimate Injustice*, 15 STAN. L. & POL'Y REV. 381, 422-23 (2004) (recommending independent crime labs); STATE OF ILL., *supra* note 16, at 52 (endorsing independent crime labs).

527. Because observer effects can influence any scientific endeavor, standard scientific procedures—such as "double blind testing" (in which both the subject in a study and the scientist or study administrator are blinded to the conditions or expected results of a procedure)—require shielding the observer (the scientist or analyst) from extraneous information that can bias perception. Risinger et al., *supra* note 13, at 12.

528. As Risinger and his colleagues have put it,

> A wall of separation must be created between forensic science examiners and any examination-irrelevant information about a case. That means properly controlling information flowing to examiners from external investigators, from laboratory managers, and from fellow examiners . . . . The solution is to provide examiners with the information they need to perform the tests, and only that information.

*Id.* at 45; s*ee also* Brown, *supra* note 243, at 1605.

529. The importance of this recommendation is highlighted by a recent study of fingerprint examiners. In that study, five experienced examiners who had previously analyzed fingerprints in a case and had all concluded that the latent prints matched a suspect's prints, were presented with the same prints five years later, but were told that other evidence had excluded the suspect. Unaware that they had previously called the prints a match, this time four out of the five examiners (80 percent) either declared that the prints did not match (three of the four) or that the prints provided insufficient information to permit a definite decision (one examiner). Only one of the five

Court of Appeal, Fifth Circuit Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 566 of 856 Submitted On: 8/2/2023 3:58:48 PM
Case No: 23-KH-377 Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



### 2. PROSECUTION

Once a conviction has been obtained, beliefs in guilt are, quite naturally and appropriately, at their peak. Yet, the emerging mass of postconviction exonerations has shown that those beliefs still can be wrong. Although protecting the finality of judgments is a weighty concern, there is no legitimate interest in preserving the finality of factually incorrect judgments. Prosecutors need to find a way to overcome the biases and pressures that inevitably make it nearly impossible to conceive the possibility that the defendant, found guilty beyond a reasonable doubt, might in fact be innocent, so that they can at least fairly consider the import of new evidence of innocence.

The task for any prosecutor is daunting. To accept the possibility that the defendant is innocent is to accept the possibility that the prosecutor played a role in an unthinkable injustice. Reopening a case admits the possibility that a prosecutor made a grievous error, and it is only natural for prosecutors to fear the opprobrium or political consequences of admitting such an error—the "fear-based assumption that the public is intolerant of mistakes and unforgiving of those who admit to them."[530] Moreover, the crush of ongoing business makes prosecutors naturally disinclined to revisit settled matters.[531] As Travis County, Texas, prosecutors Ronnie Earle and Brian Case have put it,

> Cases in which the evidence proves the defendant's guilt beyond a reasonable doubt are difficult to put together, harder to hold together, and happily left behind once a conviction is obtained. The ongoing onslaught of current cases and

---

examiners adhered to the original conclusion, calling the prints a match. Expectation effects caused by the insertion of non-domain-specific information altered the conclusions of these examiners. Itiel Dror, David Charlton, & Ailsa E. Péron, *Contextual Information Renders Experts Vulnerable to Making Erroneous Identifications*, 156 FORENSIC SCI. INT. 74 (2006).

530. Earle & Case, *supra* note 282, at 73. Prosecutors Brian Case and Ronnie Earle, however, reflecting on their experience facilitating the exoneration and release of several innocent men in their jurisdiction, found that the fear was unfounded:

> Ronnie Earle readily confessed astonishment at the public reaction [to the exonerations], having been convinced that mistakes of such horrendous moment as convictions of innocent men would result in his being thrown ignominiously out of office. Acknowledgement and remedy seemed to matter to the public more than the game of Gotcha often played out on political fields.

*Id.*

531. *Id.*

Court of Appeal, Fifth Circuit
Case No: 23-KH-377

Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



opposition from victims certain of the identity of the perpetrator add to the pressure to let sleeping dogs lie.[532]

To counter these forces, external review panels might be especially important when prosecutors are presented with postconviction claims of actual innocence. Alternatively, Professor Daniel Medwed has suggested "altering the manner in which [prosecutor's offices] assign post-conviction motions by creating internal innocence or post-conviction units," so that prosecutors wedded to a theory of guilt are not the ones deciding the significance of new DNA or other evidence of innocence.[533] More dramatically, initial evaluations of postconviction claims of innocence can be removed from the adversarial process altogether and submitted for initial evaluation to an independent body with inquisitorial powers, such as the Criminal Cases Review Commission in Great Britain,[534] or the new postconviction review commission currently being considered by the legislature in North Carolina.[535]

## CONCLUSION

Tunnel vision is the product of multiple processes and pressures. Cognitive distortions such as confirmation bias, hindsight bias, outcome bias, and a host of other psychological phenomena make some degree of tunnel vision inevitable. Institutional pressures on police, prosecutors, defense lawyers, and courts amplify those natural tendencies. Yet, instead of countering those pressures and tendencies, normative features of the criminal justice system, from police training to legal doctrine, institutionalize them.

The inevitability of tunnel vision does not relieve us from an obligation to do what we can to minimize its effects. A host of interlocking measures can reduce the distorting effects of tunnel vision, even if they cannot eliminate it altogether. The first step toward addressing the problem is to recognize its multiple causes and expressions. Serious efforts must be made to identify tunnel vision, or the features of the criminal justice system that contribute to tunnel

532. *Id.*

533. Medwed, *supra* note 196, at 175.

534. *See* Lissa Griffin, *The Correction of Wrongful Convictions: A Comparative Perspective*, 16 AM. U. INT'L L. REV. 1241 (2001); David Horan, *The Innocence Commission: An Independent Review Board for Wrongful Convictions*, 20 N. ILL. U. L. REV. 91 (2000); Findley, *supra* note 18, at 347.

535. *See* Christine C. Mumma, *The North Carolina Actual Innocence Commission: Uncommon Perspectives Joined by a Common Cause*, 52 DRAKE L. REV. 647, 654 (2004).

Court of Appeal, Fifth Circuit
Case No: 23-KH-377
Case 2:24-cv-02678-DJP Document 1-2 Filed 11/14/24 Page 568 of 856
Submitted On: 8/2/2023 3:58:48 PM
Accepted On: 8/3/2023 8:38:56 AM

Reprinted with permission of the Wisconsin Law Review, further reproduction forbidden without permission.



vision, at every stage in the life of a criminal case. The recognized costs of those features then can be measured against their ostensible benefits (such as the perceived benefits in terms of obtaining convictions, or in efficiency and finality). Where appropriate, measures can then be taken to overcome tunnel vision. Education and training; improved policies and procedures for interviewing suspects, obtaining identifications, processing physical evidence, and reviewing charging decisions; greater transparency; and doctrinal reform can all be profitably employed to mitigate the effects of tunnel vision, and thereby more reliably convict only the guilty.

We have suggested a range of tangible measures that can be taken to mitigate the effects of tunnel vision, but perhaps the most important factor toward that end is one that cannot be prescribed merely by rule: creating and sustaining an ethical organizational and professional culture. An ethical organizational or professional culture is more than the just the sum of doctrine, rules, policies, procedures, and training programs. Such a culture—among police, prosecutors, defense counsel, and the judiciary—is one that treats wrongful arrest, prosecution, and conviction with the utmost seriousness. It seeks to minimize tunnel vision as a contributor to wrongful conviction not because it must, but because it is right. Where there is a strong ethical culture, police investigators, prosecutors, defense attorneys, and judges do not take shortcuts in cases where it might lead them away from the truth. Instead, they embrace the fullest disclosure of information consistent with a fair hearing of the evidence, they are cognizant of and guard against the pernicious effects of tunnel vision, and they are open to the possibility—however remote—that a confluence of even honest errors can yield an invalid result.[536]

Public trust and confidence in the criminal justice system has been shaken by the recent host of exonerations. Recognizing that the system is not perfect, a dose of humility coupled with openness to serious reform is needed to mitigate the effects of tunnel vision and restore trust and confidence in the system.

536. As Norm Maleng, a King County, Washington, prosecuting attorney, wrote in the foreword to the recent report of the American Bar Association's Ad Hoc Innocence Committee: "The next step is to instill in every prosecutor's office, police agency, and crime laboratory an unwavering ethic to seek the truth through the most reliable methods available. This carries with it the obligation to refrain from using investigative techniques that may yield questionable results." ABA REPORT, *supra* note 439, at ix.

# Exhibit N

## Table of Contents

**Subject Summary** ..... 2
**Others Using SSN - 0 records found** ..... 2
**Address Summary - 31 records found** ..... 2
**Voter Registrations - 0 records found** ..... 7
**Driver Licenses - 19 records found** ..... 22
**Professional Licenses - 0 records found** ..... 22
**Health Care Providers - 0 records found** ..... 22
**Health Care Sanctions - 0 records found** ..... 22
**Pilot Licenses - 0 records found** ..... 22
**Sport Licenses - 0 records found** ..... 22
**Weapon Permits - 0 records found** ..... 22
**Real Property - 0 records found** ..... 22
**Motor Vehicle Registrations - 2 records found** ..... 40
**Boats - 0 records found** ..... 40
**Aircraft - 0 records found** ..... 40
**Bankruptcy Information - 0 records found** ..... 40
**Judgments/Liens - 1 records found** ..... 41
**UCC Liens - 0 records found** ..... 41
**Fictitious Businesses - 0 records found** ..... 41
**Notice Of Defaults - 0 records found** ..... 41
**Potential Relatives - 10 records found** ..... 42
**Business Associates - 0 records found** ..... 42
**Person Associates - 9 records found** ..... 46
**Neighbors - 3 records found** ..... 50
**Employment Locator - 0 records found** ..... 50
**Criminal Filings - 32 records found** ..... 50
**Sexual Offenders - 0 records found** ..... 81
**Cellular & Alternate Phones - 2 records found** ..... 81
**Utility Information - 2 records found** ..... 81
**Possible Education - 0 records found** ..... 81
**Sources - 135 records found** ..... 83

LexisNexis

**1 OF 1 RECORD(S)**

FOR INFORMATIONAL PURPOSES ONLY
Copyright 2022 LexisNexis
a division of Reed Elsevier Inc. All Rights Reserved.

Date:12/25/2022
Report processed by:
Justin Bonus Esq Attorney at Law

| Full Name | Address | County | Phone |
|---|---|---|---|
| LARCK, AMY MARIE | 4017 VALLEY SPRINGS RD<br>DURHAM, NC 27712-2938<br>DURHAM COUNTY | DURHAM | None Listed |

**ADDITIONAL PERSONAL INFORMATION**

| SSN | DOB | Gender | LexID(sm) | Email |
|---|---|---|---|---|
| 323-64-XXXX | 3/1976<br>(Age:46) | Female | 001468568144 | AMYMARIE1976IL@GMAIL.COM<br>LARCKAMY@YAHOO.COM<br>LAAL143GATORZ@YAHOO.COM |

## Subject Summary

## Name Variations

1: LARCK, AMY

2: LARCK, AMY M

3: LARCK, AMY MARIE

4: WALLER, AMY MARIE

## SSNs Summary

| No. | SSN | State Iss. | Date Iss. | Warnings |
|---|---|---|---|---|
| | | **Most frequent SSN attributed to subject:** | | |
| 1: | 323-64-XXXX | Illinois | 1978 | |

## DOBs

**Reported DOBs:**

3/1976

## Others Using SSN - 0 records found

## Address Summary - 31 records found

**No. Address**

| No. | Address |
|---|---|
| 1: | 4017 VALLEY SPRINGS RD<br>DURHAM, NC 27712-2938<br>DURHAM COUNTY |
| 2: | 646 CORBY BRIDGE RD<br>CHUCKEY, TN 37641-2053<br>WASHINGTON COUNTY |
| 3: | 1460 OLD STATE ROUTE 34<br>TELFORD, TN 37690-2723<br>WASHINGTON COUNTY |
| 4: | 511 MCCLOUD RD<br>ELIZABETHTON, TN 37643-4643<br>CARTER COUNTY |
| 5: | 133 CARTERS VIEW WAY<br>TELFORD, TN 37690-2459<br>WASHINGTON COUNTY |
| 6: | 723 S LYNN AVE<br>ELIZABETHTON, TN 37643-4214<br>CARTER COUNTY |
| 7: | N ADDRESS<br>OGDEN, UT 84401<br>WEBER COUNTY |

**No.** **Address**

8: 8623 WALBROOK DR APT 170

KNOXVILLE, TN 37923-3011

KNOX COUNTY Social Services Facility

9: 25 JORDAN LN APT 050506

HENDERSON, NC 27537-8833

VANCE COUNTY

10: 4817 REIGAL DR

DURHAM, NC 27712

DURHAM COUNTY

11: 1669 ENON RD

OXFORD, NC 27565-9078

GRANVILLE COUNTY

12: 2701 34TH ST N LOT 227

SAINT PETERSBURG, FL 33713-3667

PINELLAS COUNTY

13: 154 BRYAN AVE

SAINT ALBANS, WV 25177-9522

KANAWHA COUNTY

14: 4 3RD ADA

JUNCTION CITY, KS 66441

GEARY COUNTY

| No. | Address |
|---|---|
| 15: | 640 W 14TH ST LOT 8<br>JUNCTION CITY, KS 66441-4702<br>GEARY COUNTY |
| 16: | BTRY APT 4<br>JUNCTION CITY, KS 66441<br>GEARY COUNTY |
| 17: | C BTRY 2/3 ADA<br>FT RILEY, KS 66442<br>GEARY COUNTY |
| 18: | 226 7TH AVE N APT 1<br>SAINT PETERSBURG, FL 33701-2427<br>PINELLAS COUNTY |
| 19: | 1510 N CLAY ST LOT 17<br>JUNCTION CITY, KS 66441-4528<br>GEARY COUNTY |
| 20: | 640 W 14TH ST LOT 16<br>JUNCTION CITY, KS 66441<br>GEARY COUNTY |
| 21: | 2 3RD B BTRY ADA<br>FORT RILEY, KS 66442<br>GEARY COUNTY |

| No. | Address |
| --- | --- |
| 22: | PO BOX 2<br>FORT RILEY, KS 66442<br>GEARY COUNTY |
| 23: | 1 B BTRY 2 3 ADA<br>FORT RILEY, KS 66442<br>GEARY COUNTY |
| 24: | 3 ADA APT<br>FORT RILEY, KS 66442<br>GEARY COUNTY |
| 25: | BTRY 4<br>JUNCTION CITY, KS 66441<br>GEARY COUNTY |
| 26: | 4817 REIGAL WOOD RD<br>DURHAM, NC 27712-2531<br>DURHAM COUNTY |
| 27: | 3647 ORCHI RD<br>MEMPHIS, TN 38108-2063<br>SHELBY COUNTY |
| 28: | 8623 WALBROOK DR APT B139<br>KNOXVILLE, TN 37923-3011<br>KNOX COUNTY Social Services Facility |

| No. | Address |
|---|---|
| 29: | 2025 S 15TH PL<br>MILWAUKEE, WI 53204-3704<br>MILWAUKEE COUNTY |
| 30: | 110 S 13TH ST APT A<br>ALLENTOWN, PA 18102-4793<br>LEHIGH COUNTY |
| 31: | 600 E B ST APT C3<br>BUTNER, NC 27509-2449<br>GRANVILLE COUNTY |

## Address Details

## Voter Registrations - 0 records found

### 1: 4017 VALLEY SPRINGS RD DURHAM, NC 27712-2938

| Address | Dates | Phone |
|---|---|---|
| 4017 VALLEY SPRINGS RD<br>DURHAM, NC 27712-2938<br>DURHAM COUNTY | 1/1999 - 12/2022 | |

### Census Data for Geographical Region

Median Head of Household Age: 48

Median Income: $71,898

Median Home Value: $209,434

Median Education: 15 years

### Household Members

None Listed

### Other Associates

None Listed

### 2: 646 CORBY BRIDGE RD CHUCKEY, TN 37641-2053

| Address | Dates | Phone |
|---|---|---|
| 646 CORBY BRIDGE RD | 4/2022 - 5/2022 | |
| CHUCKEY, TN 37641-2053 | | |
| WASHINGTON COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 45

Median Income: $44,066

Median Home Value: $105,896

Median Education: 12 years

**Household Members**

None Listed

**Other Associates**

FUNDERBURG, DEBRA RAE

**3: 1460 OLD STATE ROUTE 34 TELFORD, TN 37690-2723**

| Address | Dates | Phone |
|---|---|---|
| 1460 OLD STATE ROUTE 34 | 12/2020 - 2/2022 | |
| TELFORD, TN 37690-2723 | | |
| WASHINGTON COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 38

Median Income: $43,030

Median Home Value: $109,455

Median Education: 12 years

**Household Members**

None Listed

**Other Associates**

FUNDERBURG, DEBRA RAE

**4: 511 MCCLOUD RD ELIZABETHTON, TN 37643-4643**

| Address | Dates | Phone |
|---|---|---|

| | | |
|---|---|---|
| 511 MCCLOUD RD | 2/2008 - 2/2016 | |
| ELIZABETHTON, TN 37643-4643 | | |
| CARTER COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 39

Median Income: $21,378

Median Home Value: $82,973

Median Education: 12 years

**Household Members**

None Listed

**Other Associates**

CLAWSON, SANDRA LYNN

**5: 133 CARTERS VIEW WAY TELFORD, TN 37690-2459**

| Address | Dates | Phone |
|---|---|---|
| 133 CARTERS VIEW WAY | 10/2012 - 3/2015 | |
| TELFORD, TN 37690-2459 | | |
| WASHINGTON COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 38

Median Income: $45,128

Median Home Value: $141,621

Median Education: 14 years

**Household Members**

None Listed

**Other Associates**

None Listed

**6: 723 S LYNN AVE ELIZABETHTON, TN 37643-4214**

| Address | Dates | Phone |
|---|---|---|
| 723 S LYNN AVE | 12/2009 - 3/2014 | |

ELIZABETHTON, TN 37643-4214

CARTER COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 47

Median Income: $29,385

Median Home Value: $87,090

Median Education: 11 years

**Household Members**

None Listed

**Other Associates**

None Listed

**7: N ADDRESS OGDEN, UT 84401**

| Address | Dates | Phone |
|---|---|---|
| N ADDRESS | 2/2013 - 11/2013 | |

OGDEN, UT 84401

WEBER COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 32

Median Income: $31,081

Median Home Value: $88,362

Median Education: 11 years

**Household Members**

None Listed

**Other Associates**

None Listed

**8: 8623 WALBROOK DR APT 170 KNOXVILLE, TN 37923-3011**

| Address | Dates | Phone |
|---|---|---|
| 8623 WALBROOK DR APT 170 | 7/2010 - 7/2010 | |

KNOXVILLE, TN 37923-3011

KNOX COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 29

Median Income: $38,156

Median Home Value: $158,304

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**9: 25 JORDAN LN APT 050506 HENDERSON, NC 27537-8833**

| Address | Dates | Phone |
|---|---|---|
| 25 JORDAN LN APT 050506 | 4/2006 - 10/2022 | |

HENDERSON, NC 27537-8833

VANCE COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 39

Median Income: $38,446

Median Home Value: $81,818

Median Education: 12 years

**Household Members**

None Listed

**Other Associates**

None Listed

**10: 4817 REIGAL DR DURHAM, NC 27712**

| Address | Dates | Phone |
|---|---|---|
| 4817 REIGAL DR | 7/1994 - 10/2004 | |

DURHAM, NC 27712

DURHAM COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 45

Median Income: $97,680

Median Home Value: $238,462

Median Education: 15 years

**Household Members**

None Listed

**Other Associates**

None Listed

**11: 1669 ENON RD OXFORD, NC 27565-9078**

| Address | Dates | Phone |
|---|---|---|
| 1669 ENON RD | 2/1999 - 2/2004 | |
| OXFORD, NC 27565-9078 | | |
| GRANVILLE COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 51

Median Income: $55,469

Median Home Value: $126,724

Median Education: 11 years

**Household Members**

None Listed

**Other Associates**

None Listed

**12: 2701 34TH ST N LOT 227 SAINT PETERSBURG, FL 33713-3667**

| Address | Dates | Phone |
|---|---|---|
| 2701 34TH ST N LOT 227 | 1/1998 - 9/2002 | |
| SAINT PETERSBURG, FL 33713-3667 | | |

PINELLAS COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 50

Median Income: $30,000

Median Home Value: $50,857

Median Education: 12 years

**Household Members**

WALLER, JAMES HARLAN J

**Other Associates**

None Listed

**13: 154 BRYAN AVE SAINT ALBANS, WV 25177-9522**

| Address | Dates | Phone |
| --- | --- | --- |
| 154 BRYAN AVE | 7/1994 - 4/2008 | (304) 721-9699 |
| SAINT ALBANS, WV 25177-9522 | | |
| KANAWHA COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 49

Median Income: $57,617

Median Home Value: $116,171

Median Education: 14 years

**Household Members**

LARCK, JIMMIE LEROY JR

LARCK, JIMMIE LEROY JR

LARCK, SHARON L

LARCK, SHARON LYNN

**Other Associates**

None Listed

**14: 4 3RD ADA JUNCTION CITY, KS 66441**

| Address | Dates | Phone |
| --- | --- | --- |

| | | |
|---|---|---|
| 4 3RD ADA | 5/1999 - 5/1999 | |

JUNCTION CITY, KS 66441

GEARY COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 31

Median Income: $65,489

Median Home Value: $90,833

Median Education: 14 years

**Household Members**

None Listed

**Other Associates**

None Listed

**15: 640 W 14TH ST LOT 8 JUNCTION CITY, KS 66441-4702**

| Address | Dates | Phone |
|---|---|---|
| 640 W 14TH ST LOT 8 | 11/1997 - 1/1999 | |

JUNCTION CITY, KS 66441-4702

GEARY COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 25

Median Income: $31,706

Median Home Value: $72,308

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**16: BTRY APT 4 JUNCTION CITY, KS 66441**

| Address | Dates | Phone |
|---|---|---|
| BTRY APT 4 | 12/1998 - 12/1998 | |

JUNCTION CITY, KS 66441

GEARY COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 30

Median Income: $56,920

Median Home Value: $98,750

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**17: C BTRY 2/3 ADA FT RILEY, KS 66442**

| Address | Dates | Phone |
|---|---|---|
| C BTRY 2/3 ADA | 2/1998 - 7/1998 | |

FT RILEY, KS 66442

GEARY COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 24

Median Income: $44,808

Median Home Value: $0

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**18: 226 7TH AVE N APT 1 SAINT PETERSBURG, FL 33701-2427**

| Address | Dates | Phone |
|---|---|---|
| 226 7TH AVE N APT 1 | 2/1998 - 2/1998 | (727) 327-9203 |

SAINT PETERSBURG, FL 33701-2427

PINELLAS COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 42

Median Income: $34,462

Median Home Value: $379,070

Median Education: 14 years

**Household Members**

None Listed

**Other Associates**

None Listed

**19: 1510 N CLAY ST LOT 17 JUNCTION CITY, KS 66441-4528**

| Address | Dates | Phone |
|---|---|---|
| 1510 N CLAY ST LOT 17 | 6/1994 - 1/1997 | |

JUNCTION CITY, KS 66441-4528

GEARY COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 25

Median Income: $31,706

Median Home Value: $72,308

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**20: 640 W 14TH ST LOT 16 JUNCTION CITY, KS 66441**

| Address | Dates | Phone |
|---|---|---|
| 640 W 14TH ST LOT 16 | 6/1995 - 12/1995 | |

JUNCTION CITY, KS 66441

GEARY COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 25

Median Income: $31,706

Median Home Value: $72,308

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**21: 2 3RD B BTRY ADA FORT RILEY, KS 66442**

| Address | Dates | Phone |
|---|---|---|
| 2 3RD B BTRY ADA | 5/1995 - 5/1995 | |

FORT RILEY, KS 66442

GEARY COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 24

Median Income: $44,808

Median Home Value: $0

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**22: PO BOX 2 FORT RILEY, KS 66442**

| Address | Dates | Phone |
|---|---|---|
| PO BOX 2 | 4/1995 - 4/1995 | |

FORT RILEY, KS 66442

GEARY COUNTY

**Census Data for Geographical Region**

Median Head of Household Age: 24

Median Income: $44,808

Median Home Value: $0

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**23: 1 B BTRY 2 3 ADA FORT RILEY, KS 66442**

| Address | Dates | Phone |
|---|---|---|
| 1 B BTRY 2 3 ADA<br>FORT RILEY, KS 66442<br>GEARY COUNTY | 4/1995 - 4/1995 | |

**Census Data for Geographical Region**

Median Head of Household Age: 24

Median Income: $44,808

Median Home Value: $0

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**24: 3 ADA APT FORT RILEY, KS 66442**

| Address | Dates | Phone |
|---|---|---|
| 3 ADA APT<br>FORT RILEY, KS 66442<br>GEARY COUNTY | 4/1995 - 4/1995 | |

**Household Members**

None Listed

**Other Associates**

None Listed

**25: BTRY 4 JUNCTION CITY, KS 66441**

| Address | Dates | Phone |
|---|---|---|
| BTRY 4<br>JUNCTION CITY, KS 66441<br>GEARY COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 30

Median Income: $56,920

Median Home Value: $98,750

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**26: 4817 REIGAL WOOD RD DURHAM, NC 27712-2531**

| Address | Dates | Phone |
|---|---|---|
| 4817 REIGAL WOOD RD<br>DURHAM, NC 27712-2531<br>DURHAM COUNTY | | (919) 471-5422 |

**Census Data for Geographical Region**

Median Head of Household Age: 49

Median Income: $96,756

Median Home Value: $196,802

Median Education: 15 years

**Household Members**

None Listed

**Other Associates**

None Listed

**27: 3647 ORCHI RD MEMPHIS, TN 38108-2063**

| Address | Dates | Phone |
| --- | --- | --- |
| 3647 ORCHI RD | 3/2015 - 3/2015 | |
| MEMPHIS, TN 38108-2063 | | |
| SHELBY COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 33

Median Income: $27,816

Median Home Value: $49,000

Median Education: 11 years

**Household Members**

None Listed

**Other Associates**

None Listed

**28: 8623 WALBROOK DR APT B139 KNOXVILLE, TN 37923-3011**

| Address | Dates | Phone |
| --- | --- | --- |
| 8623 WALBROOK DR APT B139 | 7/2010 - 7/2010 | |
| KNOXVILLE, TN 37923-3011 | | |
| KNOX COUNTY | | |

**Census Data for Geographical Region**

Median Head of Household Age: 29

Median Income: $38,156

Median Home Value: $158,304

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**29: 2025 S 15TH PL MILWAUKEE, WI 53204-3704**

| Address | Dates | Phone |
| --- | --- | --- |
| 2025 S 15TH PL<br>MILWAUKEE, WI 53204-3704<br>MILWAUKEE COUNTY | 2/2008 - 2/2008 | |

**Census Data for Geographical Region**

Median Head of Household Age: 26

Median Income: $25,745

Median Home Value: $86,364

Median Education: 8 years

**Household Members**

None Listed

**Other Associates**

None Listed

**30: 110 S 13TH ST APT A ALLENTOWN, PA 18102-4793**

| Address | Dates | Phone |
| --- | --- | --- |
| 110 S 13TH ST APT A<br>ALLENTOWN, PA 18102-4793<br>LEHIGH COUNTY | 4/2005 - 4/2005 | |

**Census Data for Geographical Region**

Median Head of Household Age: 34

Median Income: $41,452

Median Home Value: $122,627

Median Education: 13 years

**Household Members**

None Listed

**Other Associates**

None Listed

**31: 600 E B ST APT C3 BUTNER, NC 27509-2449**

| Address | Dates | Phone |
|---|---|---|
| 600 E B ST APT C3<br>BUTNER, NC 27509-2449<br>GRANVILLE COUNTY | 10/1998 - 10/1998 | |

**Census Data for Geographical Region**

Median Head of Household Age: 30

Median Income: $24,850

Median Home Value: $9,351

Median Education: 12 years

**Household Members**

None Listed

**Other Associates**

None Listed

## Driver Licenses - 19 records found
## Professional Licenses - 0 records found
## Health Care Providers - 0 records found
## Health Care Sanctions - 0 records found
## Pilot Licenses - 0 records found
## Sport Licenses - 0 records found
## Weapon Permits - 0 records found
## Real Property - 0 records found

**1: Tennessee Driver License**

**Driver Information**

| | |
|---|---|
| **Name:** | LARCK, AMY MARIE |
| **Address:** | 646 CORBY BRIDGE RD<br>CHUCKEY, TN 37641-2053<br>WASHINGTON COUNTY |
| **Data source:** | Governmental: TN |

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**License Information**

**License Type:** CLASS D LICENSE

**Issue Date:** 05/23/2022

**Expiration Date:** 04/2030

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Current

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**2: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 646 CORBY BRIDGE RD

CHUCKEY, TN 37641-2053

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**License Information**

**License Type:** CLASS D LICENSE

**Issue Date:** 04/04/2022

**Expiration Date:** 04/2030

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

### 3: Tennessee Driver License

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 646 CORBY BRIDGE RD

CHUCKEY, TN 37641-2053

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**License Information**

**License Type:** CLASS D LICENSE

**Issue Date:** 04/04/2022

**Expiration Date:** 04/2030

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**4: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 1460 OLD STATE ROUTE 34

TELFORD, TN 37690-2723

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**License Information**

**License Type:** CLASS D PERMIT

**Issue Date:** 02/28/2022

**Expiration Date:** 02/2023

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**5: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 1460 OLD STATE ROUTE 34

TELFORD, TN 37690-2723

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**License Information**

**License Type:** EXPIRING OR NON-EXPIRING ID LICENSE

**Issue Date:** 04/12/2021

**Expiration Date:** 12/2028

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**6: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 1460 OLD STATE ROUTE 34

TELFORD, TN 37690-2723

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**License Information**

**License Type:** EXPIRING OR NON-EXPIRING ID LICENSE

**Issue Date:** 12/11/2020

**Expiration Date:** 12/2028

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05''

**Weight:** 169 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**7: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 3647 ORCHI RD

MEMPHIS, TN 38108-2063

SHELBY COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05''

**Weight:** 150 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**License Information**

**License Type:** EXPIRING OR NON-EXPIRING ID LICENSE

**Issue Date:** 03/18/2015

**Expiration Date:** 03/2016

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05"

**Weight:** 150 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**8: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 3647 ORCHI RD

MEMPHIS, TN 38108-2063

SHELBY COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 150 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**License Information**

**License Type:** EXPIRING OR NON-EXPIRING ID LICENSE

**Issue Date:** 03/18/2015

**Expiration Date:** 03/2016

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05"

**Weight:** 150 lbs.

**Hair:** BLONDE

**Eyes:** Brown

**9: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 133 CARTERS VIEW WAY

TELFORD, TN 37690-2459

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 150 lbs.

**Hair:** Blond

**Eyes:** Brown

**License Information**

**License Type:** TEMPORARY IDENTIFICATION (EXPIRING)

**Issue Date:** 09/24/2014

**Expiration Date:** 03/2016

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**History:** Historical

**Height:** 5'05"

**Weight:** 150 lbs.

**Hair:** Blond

**Eyes:** Brown

**10: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 133 CARTERS VIEW WAY

TELFORD, TN 37690-2459

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 145 lbs.

**Hair:** Blond

**Eyes:** Brown

**License Information**

**License Type:** TEMPORARY IDENTIFICATION (EXPIRING)

**Issue Date:** 04/15/2014

**Expiration Date:** 03/2016

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**History:** Historical

**Height:** 5'05"

**Weight:** 145 lbs.

**Hair:** Blond

**Eyes:** Brown

**11: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 133 CARTERS VIEW WAY

TELFORD, TN 37690-2459

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**License Information**

**License Type:** TEMPORARY IDENTIFICATION (EXPIRING)

**Issue Date:** 09/25/2012

**Expiration Date:** 03/2016

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**History:** Historical

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**12: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 133 CARTERS VIEW WAY

TELFORD, TN 37690-2459

WASHINGTON COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**License Information**

**License Type:** TEMPORARY IDENTIFICATION (EXPIRING)

**Issue Date:** 09/25/2012

**Expiration Date:** 03/2016

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**History:** Historical

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**13: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 511 MCCLOUD ROAD

ELIZABETHTON, TN 37643-4643

CARTER COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**License Information**

**License Type:** TEMPORARY IDENTIFICATION (EXPIRING)

**Issue Date:** 01/08/2008

**Expiration Date:** 03/2011

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**History:** Historical

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

### 14: Tennessee Driver License

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 723 S LYNN AVE

ELIZABETHTON, TN 37643-4214

CARTER COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**License Information**

**License Type:** TEMPORARY IDENTIFICATION (EXPIRING)

**Issue Date:** 01/08/2008

**Expiration Date:** 03/2011

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**History:** Historical

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**15: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 723 S LYNN AVE

ELIZABETHTON, TN 37643-4214

CARTER COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**License Information**

**License Type:** TEMPORARY IDENTIFICATION (EXPIRING)

**Issue Date:** 01/08/2008

**Expiration Date:** 03/2011

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**History:** Historical

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**16: Tennessee Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 723 S LYNN AVE

ELIZABETHTON, TN 37643-4214

CARTER COUNTY

**Data source:** Governmental: TN

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**License Information**

**License Type:** TEMPORARY IDENTIFICATION (EXPIRING)

**Issue Date:** 01/08/2008

**Expiration Date:** 03/2011

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**History:** Historical

**Height:** 5'05"

**Weight:** 130 lbs.

**Hair:** Blond

**Eyes:** Brown

**17: Florida Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 2701 34TH STREET NORTH #227

SAINT PETERSBURG, FL 33713-3667

PINELLAS COUNTY

**Data source:** Governmental: FL

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**License Information**

**License Class:** Non-Commercial - Regular Operator License

**Attention Flags:** ORGAN DONOR

**Issue Date:** 07/26/1996

**Expiration Date:** 03/2003

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05"

**18: Florida Driver License**

**Driver Information**

**Name:** LARCK, AMY MARIE

**Address:** 2701 34TH STREET NORTH #227

SAINT PETERSBURG, FL 33713-3667

PINELLAS COUNTY

**Data source:** Governmental: FL

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Gender:** Female

**Height:** 5'05"

**License Information**

**License Type:** RECORD DELETED

**Additional Driver Information**

**DOB:** 03/1976

**Gender:** Female

**Race:** WHITE

**History:** Historical

**Height:** 5'05"

**19: Florida Driver License**

**Driver Information**

**Name:** LARCK, AMY M

**Address:** 2701 34TH ST N LOT 227

SAINT PETERSBURG, FL 33713-3667

PINELLAS COUNTY

**Data source:** Non-Governmental: FL

**Personal Information**

**SSN:** 323-64-XXXX

**DOB:** 03/1976

**Additional Driver Information**

**DOB:** 03/1976

**Motor Vehicle Registrations - 2 records found**
**Boats - 0 records found**
**Aircraft - 0 records found**
**Bankruptcy Information - 0 records found**

**1: NC MVR**

**Registrant Information**

**Registrant:** LARCK, AMY MARIE

**DOB:** 3/1976

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Registration Information**

**Original Registration Date:** 5/22/2006

**Registration Date:** 5/22/2006

**Registration Expiration Date:** 5/31/2007

**Vehicle Information**

**VIN:** JM1BC1413V0159983

**Class:** PASSENGER CAR/LIGHT TRUCK

**Model Year:** 1997

**Make:** Mazda

**Model:** Protege

**Series:** DX/LX/ES

**Body Style:** Sedan 4 Door

**Plate Information**

**License Plate Type:** Private

**Previous Plate Number:** GAA145

**Previous Plate State:** MD

**License Plate Number:** VWW5924

**Plate State:** NC

**Source Information**

**Data Source:** GOVERNMENTAL

**2: NC MVR**

**Vehicle Information**

**VIN:** JM1BC1413V0159983

**Class:** PASSENGER CAR/LIGHT TRUCK

**Model Year:** 1997

**Make:** Mazda

**Model:** Protege

**Series:** DX/LX/ES

**Body Style:** Sedan 4 Door

**Owner Information**

**Name:** LARCK, AMY MARIE

**DOB:** 3/1976

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Title Information**

**Title Number:** 778574061423021

**Title Transfer Date:** 5/22/2006

**Title Issue Date:** 5/22/2006

**Source Information**

**Data Source:** GOVERNMENTAL

## Judgments/Liens - 1 records found
## UCC Liens - 0 records found
## Fictitious Businesses - 0 records found
## Notice Of Defaults - 0 records found

**1: KS Judgments and Liens Filings**

**Debtor Information**

**Name:** LARCK, AMY M

**SSN:** 323-64-XXXX

**Address:** 3 ADA

FORT RILEY, KS 66442

GEARY COUNTY

**Creditor Information**

**Name:** KANSAS CHECK ASSOCIATES

**Filing Information**

**Jurisdiction:** KS

**Amount:** $409

**Filing Date:** 4/14/1995

**Eviction** N

**Filing 1**

**Number:** 95L912

**Type:** CIVIL JUDGMENT

**Agency:** GEARY DISTRICT MAGISTRATE

**Agency State:** KS

**Agency County:** GEARY

## Potential Relatives - 10 records found

1st Degree: 6, 2nd Degree: 4

## Business Associates - 0 records found

| No. | Full Name | Address/Phone |
|---|---|---|
| 1. | WALLER, JAMES HARLAN J<br>• AKA WALLER, JAMES HARLAN JR<br>SSN:354-62-XXXX<br>DOB:12/1962<br>(Age: 59) | 111 LEWIS CIR<br>JONESBOROUGH, TN 37659-5445<br>225 FORESTVIEW DR<br>JONESBOROUGH, TN 37659-5622<br>133 CARTERS VIEW WAY 04<br>TELFORD, TN 37690-2459<br>2701 34TH ST N LOT 227<br>SAINT PETERSBURG, FL 33713-3667<br>222 ANGLE ST<br>JONESBOROUGH, TN 37659-1008 |
| 1.A. | WALLER, JAMES HARLAND SR | |

| No. | Full Name | Address/Phone |
|---|---|---|
| | Deceased<br>• AKA WALLER, JIM H<br>• AKA WALLNER, JAMES HARLAN SR<br>• AKA WALKER, JAMES H<br>• AKA WALLER, JAMES W SR<br>SSN:324-28-XXXX<br>DOB:7/1935<br>(Age: 87) | |
| 1.B. | WALLER, LINDA LOU<br>• AKA WALLER, L<br>• AKA WALLER, LNDA<br>• AKA WALLER, LINDA V<br>• AKA WALLER, LINDA LOU<br>SSN:348-34-XXXX<br>DOB:12/1940<br>(Age: 82) | 111 LEWIS CIR<br>JONESBOROUGH, TN 37659-5445<br>225 FORESTVIEW DR<br>JONESBOROUGH, TN 37659-5622<br>222 ANGLE ST<br>JONESBOROUGH, TN 37659-1008<br>133 CARTERS VIEW WAY 04<br>TELFORD, TN 37690-2459<br>1460 OLD STATE ROUTE 34<br>TELFORD, TN 37690-2723 |
| 1.C. | WALLER, ALEXANDRA ROSE<br>• AKA WALLER, ALEXANDRA A<br>• AKA WALLER, ALEXANDRA H<br>DOB:6/1996<br>(Age: 26) | 7869 CHERRYTREE LN<br>NEW PORT RICHEY, FL 34653-2107<br>(727) 494-7020<br>(727) 817-1882<br>1512 NURSERY RD<br>CLEARWATER, FL 33756-2319<br>(727) 563-9462 |

| No. | Full Name | Address/Phone |
|---|---|---|
| | | 2098 SEMINOLE BLVD APT 1111<br>LARGO, FL 33778-1713<br>9015 BAY ST NE<br>SAINT PETERSBURG, FL 33702-3257<br>6090 RIVER TRACE RD<br>TAMPA, FL 33617-9100 |
| 2. | LARCK, JIMMIE LEROY JR<br>• AKA LARCK, JIMMY L<br>• AKA LARCH, JIMMY<br>SSN:232-23-XXXX<br>DOB:6/1974<br>(Age: 48) | 30 S BREMEN ST APT 209<br>BOSTON, MA 02128-2722<br>8 VIOLET RD<br>PEABODY, MA 01960-3172<br>154 BRYAN AVE<br>SAINT ALBANS, WV 25177-9522<br>(304) 721-9699<br>435-3863<br>804 LARCHMONT DR<br>CHARLESTON, WV 25387-1204<br>905 PARK DR<br>DUNBAR, WV 25064-2624 |
| 3. | LARCK, JIMMIE LEROY JR<br>• AKA LARCH, JIMMY<br>• AKA LARCK, JIMMIIE L<br>• AKA LARCK, JIMMY L SR<br>• AKA LARK, JAMIE L SR<br>SSN:007-48-XXXX<br>DOB:4/1950 | 154 BRYAN AVE<br>SAINT ALBANS, WV 25177-9522<br>(304) 721-9699<br>(304) 722-9683<br>229 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354<br>68 MOONEY DR |

| No. | Full Name | Address/Phone |
|---|---|---|
| | (Age: 72) | SAINT ALBANS, WV 25177-2108<br>754 BRYAN AVE<br>SAINT ALBANS, WV 25177<br>227 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354 |
| 4. | LARCK, SHARON LYNN<br>• AKA LARCH, SHARON L<br>SSN:236-86-XXXX<br>DOB:3/1952<br>(Age: 70) | 154 BRYAN AVE<br>SAINT ALBANS, WV 25177-9522<br>(304) 721-9699<br>229 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354<br>PO BOX 1107<br>SAINT ALBANS, WV 25177-1107<br>PO BOX<br>SAINT ALBANS, WV 25177<br>PO BOX B<br>SAINT ALBANS, WV 25177 |
| 5. | LARCK, SHARON L<br>DOB:6/1974<br>(Age: 48) | 154 BRYAN AVE<br>SAINT ALBANS, WV 25177-9522<br>(304) 721-9699 |
| 6. | LARCK, HENRYETTA E<br>Deceased<br>• AKA LARCK, HENRIETTA<br>• AKA LARCK, HENRYRETTA E<br>• AKA LARCK, HENNYETTA<br>SSN:233-54-XXXX | 227 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354<br>(304) 727-8103<br>229 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354<br>RR 7 BOX 314 |

| No. | Full Name | Address/Phone |
|---|---|---|
| | DOB:12/1935<br>(Age: 86) | ASHLAND, KY<br>231 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354<br>(304) 727-8103 |
| 6.A. | LARCK, BILLIE J<br>Deceased<br>• AKA LARCK, BILLIE JOE<br>• AKA LARCK, BILLIE J<br>SSN:233-56-XXXX<br>DOB:1937<br>(Age: 85) | 229 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354<br>(304) 727-0847<br>227 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354<br>(304) 727-0847<br>231 EMPIRE DR<br>SAINT ALBANS, WV 25177-3354<br>(304) 727-0847 |

## Person Associates - 9 records found

| No. | Full Name | Address | SSN | Phone | DOB |
|---|---|---|---|---|---|
| 1: | BARRETT, MISTI JO<br>CLAWSON, MISTI JO<br>BARRETT, MISTY<br>CLAWSON, MISTI J | 110 HAZELWOOD DR<br>JOHNSON CITY, TN 37615-2938<br>6210 LONE STAR RD<br>KINGSPORT, TN 37660-7961<br>133 CARTERS VIEW WAY 04<br>TELFORD, TN 37690-2459<br>3454 MERGANSER DR<br>CLARKSVILLE, TN 37042-7282<br>174 HIGHWAY 93<br>FALL BRANCH, TN 37656-2030 | 409-31-XXXX | (423) 349-6218 | 9/1977 |

| No. | Full Name | Address | SSN | Phone | DOB |
|---|---|---|---|---|---|
| 2: | CLAWSON, SANDRA LYNN<br>BROYLES, SANDRA LYNN<br>PHILLIPS, SANDRA L | 191 PATTON MAY RD<br>TELFORD, TN 37690-2703<br>169 PATTON MAY RD<br>TELFORD, TN 37690-2703<br>181 PATTON MAY RD<br>TELFORD, TN 37690-2703<br>511 MCCLOUD RD<br>ELIZABETHTON, TN 37643-4643<br>PO BOX 3571<br>JOHNSON CITY, TN 37602-3571 | 409-41-XXXX | | 8/1967 |
| 3: | CLAWSON, DAVID FOSTER<br>LAWSON, DAVID F<br>CLAWSON, DAVID F<br>CLAWSON, DAVIDE F | 1901 DARNELL DR LOT 3<br>KINGSPORT, TN 37665-1110<br>133 CARTERS VIEW WAY 04<br>TELFORD, TN 37690-2459<br>110 HAZELWOOD DR<br>JOHNSON CITY, TN 37615-2938<br>26 HEROS WAY<br>JONESBOROUGH, TN 3765 9-6393<br>812 MEADOWVIEW DR<br>ERWIN, TN 37650-1813 | 409-53-XXXX | (423) 348-8107 | 12/1968 |
| 4: | CLOHAN, SANDRA KAY<br>CLOHAN, SANDY K | 35732 PLATINUM DR<br>ROUND HILL, VA 20141-3521 | 353-58-XXXX | (540) 338-7357<br>(703) 729-2244 | 7/1961 |

| No. | Full Name | Address | SSN | Phone | DOB |
|---|---|---|---|---|---|
| | WALLER, SANDRA K<br>CLOHAN, SANDRA W | 44351 OLDETOWNE PL<br>ASHBURN, VA 20147-6014<br>20250 CATLETT PL<br>ASHBURN, VA 20147-3303<br>20250 CATLETT PLCE<br>ASHBUM, VA 22011<br>PO BOX 787<br>WILLIAMSBURG, VA 23187-0787 | | | |
| 5: | FUNDERBURG, DEBRA RAE<br>WALLER, DEBRA R<br>CLAWSON, DEBRA RAE<br>THORNTON, DEBRA R<br>FUNDERBURG, D R<br>LYON, DEBRA R<br>WALLER FUNDERBURG, DEBRA RAE<br>FUNDERBURG, DEBRA RAE WALLER<br>PHORNTON, DEBRA R<br>CLAWSON, DEBRA RAE<br>DEBRA, R CLAWSON | 646 CORBY BRIDGE RD<br>CHUCKEY, TN 37641-2053<br>1460 OLD STATE ROUTE 34<br>TELFORD, TN 37690-2723<br>812 MEADOWVIEW DR<br>ERWIN, TN 37650-1813<br>110 HAZELWOOD DR<br>JOHNSON CITY, TN 37615-2938<br>111 LEWIS CIR<br>JONESBOROUGH, TN 3765 9-5445 | 356-58-XXXX | | 1961<br>3/1960 |
| 6: | RUCKER, WENDY E<br>KIDD, WENDY E | 1031 BRANCH RD<br>BELLE, WV 25015-9657<br>137 MIRACLE DR<br>SAINT ALBANS, WV 25177-1522 | | (304) 513-6419 | 10/1977 |

| No. | Full Name | Address | SSN | Phone | DOB |
|---|---|---|---|---|---|
| | | 3732 WASHINGTON ST W<br>CHARLESTON, WV 25387-1121<br>948 DUTCH HOLLOW RD<br>DUNBAR, WV 25064-1173 | | | |
| 7: | WALLER, JAMES HARLAND SR<br>WALLER, JIM H<br>WALLNER, JAMES HARLAN SR<br>WALKER, JAMES H<br>WALLER, JAMES W SR | | 324-28-XXXX | | 7/1935 |
| 8: | WALLER, LINDA LOU<br>WALLER, L<br>WALLER, LNDA<br>WALLER, LINDA V<br>WALLER, LINDA LOU | 111 LEWIS CIR<br>JONESBOROUGH, TN 37659-5445<br>225 FORESTVIEW DR<br>JONESBOROUGH, TN 37659-5622<br>222 ANGLE ST<br>JONESBOROUGH, TN 37659-1008<br>133 CARTERS VIEW WAY 04<br>TELFORD, TN 37690-2459<br>1460 OLD STATE ROUTE 34<br>TELFORD, TN 37690-2723 | 348-34-XXXX | | 12/1940 |
| 9: | CLAWSON, JEREMIAH BROCK | 191 PATTON MAY RD<br>TELFORD, TN 37690-2703 | 408-91-XXXX | | 1/2001 |

| No. | Full Name | Address | SSN | Phone | DOB |
|---|---|---|---|---|---|
| | | 511 MCCLOUD RD<br>ELIZABETHTON, TN 37643-4643 | | | |

## Neighbors - 3 records found

## Employment Locator - 0 records found

**4017 VALLEY SPRINGS RD DURHAM, NC 27712-2938**

| Name | Address | Phone |
|---|---|---|
| FINLEY, LAURA P | 4039 VALLEY SPRINGS RD<br>DURHAM, NC 27712-2938 | |
| FINLEY, DELORES G | 4121 VALLEY SPRINGS RD APT R<br>DURHAM, NC 27712-2940 | |
| FINLEY, BARBARA SALMON<br>FINLEY, HAROLD LOYD SR | 4125 VALLEY SPRINGS RD<br>DURHAM, NC 27712-2940 | |

## Criminal Filings - 32 records found

### 1: Tennessee Court Report

**Offender information**

| | |
|---|---|
| **Name:** | LARCK, AMY |
| **Address:** | 3647 ORCHI RD<br>MEMPHIS, TN 38108-2063<br>SHELBY COUNTY |
| **Case Number:** | 15202750-03 |
| **Case Filing Date:** | 04/20/2015 |
| **Case Type:** | MISDEMEANOR CLASS A |
| **County:** | SHELBY |
| **DOB:** | 03/1976 |
| **SSN:** | 323-64-XXXX |
| **Race:** | WHITE |

### Offenses

**Groups:** CRIMES AGAINST PROPERTY, FRAUD OFFENSES

**Categories:** THEFT

**Case Filing Date:** 04/20/2015

**Number Counts:** 1

**Offense Date:** 04/20/2015

**Court Description:** DIVISION 11

**Case Number:** 15202750-03

**Court Offense:** THEFT OF PROPERTY $500 OR LESS

**Court Disposition:** HELD TO STATE WAIVED PRELIMINARY HEARINGStatus:HELD TO STATE

**Court Disposition Date:** 05/29/2015

**Court Level/Degree:** MISDEMEANOR CLASS A

### Court Activity

[NONE FOUND]

## 2: Tennessee Court Report

### Offender information

**Name:** LARCK, AMY

**Address:** 3647 ORCHI RD

MEMPHIS, TN 38108-2063

SHELBY COUNTY

**Case Number:** 15202750-02

**Case Filing Date:** 04/10/2015

**Case Type:** FELONY CLASS B

**County:** SHELBY

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

### Offenses

**Groups:** CRIMES AGAINST PERSONS

**Categories:** ROBBERY RESIDENTIAL

**Case Filing Date:** 04/10/2015

**Number Counts:** 1

**Offense Date:** 04/10/2015

**Court Description:** DIVISION 7

**Case Number:** 15202750-02

**Court Offense:** AGGRAVATED ROBBERY

**Court Disposition:** HELD TO STATE(PROBABLE CAUSE FOUND) Status:HELD TO STATE

**Court Disposition Date:** 06/05/2015

**Court Level/Degree:** FELONY CLASS B

### Court Activity

[NONE FOUND]

## 3: Tennessee Court Report

### Offender information

**Name:** LARCK, AMY

**Address:** 3647 ORCHI RD

MEMPHIS, TN 38108-2063

SHELBY COUNTY

**Case Number:** 15202750-01

**Case Filing Date:** 04/07/2015

**Case Type:** FELONY CLASS B

**County:** SHELBY

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

### Offenses

**Groups:** CRIMES AGAINST PERSONS

**Categories:** ROBBERY RESIDENTIAL

**Case Filing Date:** 04/07/2015

**Number Counts:** 1

**Offense Date:** 04/07/2015

**Court Description:** DIVISION 7

**Case Number:** 15202750-01

**Court Offense:** AGGRAVATED ROBBERY

**Court Disposition:** HELD TO STATE(PROBABLE CAUSE FOUND) Status:HELD TO STATE

**Court Disposition Date:** 06/05/2015

**Court Level/Degree:** FELONY CLASS B

**Court Activity**

[NONE FOUND]

**4: Texas Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 3333 S WW WHITE RD

SAN ANTONIO, TX 78222-4829

BEXAR COUNTY

**Case Number:** CC2 295558

**Case Filing Date:** 07/04/2009

**County:** BEXAR

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Offenses**

**Groups:** CRIMES AGAINST PROPERTY

**Categories:** TRESPASS OF REALPROPERTY

**Case Filing Date:** 07/04/2009

**Offense Date:** 07/04/2009

**Arrest Date:** 07/05/2009

**Arresting Agency:** BEXAR COUNTY DISTRICT ATTORNEY

**Case Number:** CC2 295558

**Court Offense:** CRIMINAL TRESPASS-PRIVATE PROP

### Court Activity

[NONE FOUND]

## 5: Wisconsin Court Report

### Offender information

**Name:** LARCK, AMY MARIE

**Address:** 2025 S 15TH PL

MILWAUKEE, WI 53204-3704

MILWAUKEE COUNTY

**Case Number:** 2007CM003068

**Case Filing Date:** 07/17/2007

**Case Type:** MISDEMEANOR CLASS A

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Sex:** Female

### Offenses

**Groups:** SEXUAL OFFENSES

**Categories:** PROSTITUTION

**Case Filing Date:** 07/17/2007

**Number Counts:** 1

**Offense Date:** 07/14/2007

**Case Number:** 2007CM003068

**Court Offense:** PROSTITUTION-SEXUAL GRATIFICATION

**Court Statute:** 944.30(2)

**Court Disposition:** DISPOSITION NOT PROVIDED BY SOURCE Status:OPEN

**Court Level/Degree:** MISDEMEANOR CLASS A

### Court Activity

[NONE FOUND]

## 6: Wisconsin Court Report

### Offender information

**Name:** LARCK, AMY MARIE

**Address:** 2025 S 15TH PL

MILWAUKEE, WI 53204-3704

MILWAUKEE COUNTY

**Case Number:** 2007CM003068

**Case Filing Date:** 07/17/2007

**Case Type:** MISDEMEANOR

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

### Offenses

**Groups:** SEXUAL OFFENSES

**Categories:** PROSTITUTION

**Case Filing Date:** 07/17/2007

**Offense Date:** 07/14/2007

**Court Description:** 40 - MILWAUKEE

**Case Number:** 2007CM003068

**Court Offense:** PROSTITUTION-SEXUAL GRATIFICATION

**Court Statute:** 944.30(2)

**Court Disposition:** Status:OPEN

**Court Level/Degree:** MISDEMEANOR CLASS A

**Court Activity**

[NONE FOUND]

**7: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002007CR 050521

**Case Filing Date:** 02/13/2007

**Case Type:** CRIMINAL

**SSN:** 323-64-XXXX

**Sex:** Female

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 02/13/2007

**Court Case Number:** 9002007CR 050521

**Court Offense:** NOT SPECIFIED

**Court Activity**

[NONE FOUND]

**8: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002007CR 050522

**Case Filing Date:** 02/13/2007

**Case Type:** CRIMINAL

**SSN:** 323-64-XXXX

**Sex:** Female

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 02/13/2007

**Court Case Number:** 9002007CR 050522

**Court Offense:** NOT SPECIFIED

**Court Activity**

[NONE FOUND]

**9: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002007CR 050523

**Case Filing Date:** 02/13/2007

**Case Type:** CRIMINAL

**SSN:** 323-64-XXXX

**Sex:** Female

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 02/13/2007

**Court Case Number:** 9002007CR 050523

**Court Offense:** NOT SPECIFIED

**Court Activity**

[NONE FOUND]

**10: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002007CR 050524

**Case Filing Date:** 02/13/2007

**Case Type:** CRIMINAL

**SSN:** 323-64-XXXX

**Sex:** Female

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 02/13/2007

**Court Case Number:** 9002007CR 050524

**Court Offense:** NOT SPECIFIED

**Court Activity**

[NONE FOUND]

**11: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002007CR 050527

**Case Filing Date:** 02/13/2007

**Case Type:** CRIMINAL

**SSN:** 323-64-XXXX

**Sex:** Female

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 02/13/2007

**Court Case Number:** 9002007CR 050527

**Court Offense:** NOT SPECIFIED

**Court Activity**

[NONE FOUND]

**12: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Names Associated with Suspect:** LARCK, AMY

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 3802007CR 050411

**Case Filing Date:** 02/13/2007

**Case Type:** CRIMINAL

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

### Offenses

**Categories:** OTHER

**Case Filing Date:** 02/13/2007

**Court Case Number:** 3802007CR 050411

**Court Offense:** NOT SPECIFIED

### Court Activity

[NONE FOUND]

## 13: North Carolina Court Report

### Offender information

**Name:** LARCK, AMY M

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002006CR 004731

**Case Filing Date:** 08/31/2006

**Case Type:** CRIMINAL

**SSN:** 323-64-XXXX

### Offenses

**Categories:** OTHER

**Case Filing Date:** 08/31/2006

**Court Case Number:** 9002006CR 004731

**Court Offense:** NOT SPECIFIED

### Court Activity

[NONE FOUND]

**14: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Names Associated with Suspect:** LARCK, AMY

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 3802006CR 052862

**Case Filing Date:** 08/31/2006

**Case Type:** CRIMINAL

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 08/31/2006

**Court Case Number:** 3802006CR 052862

**Court Offense:** NOT SPECIFIED

**Court Activity**

[NONE FOUND]

**15: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY M

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002006CR 004662

**Case Filing Date:** 08/28/2006

**Case Type:** CRIMINAL

**SSN:** 323-64-XXXX

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 08/28/2006

**Court Case Number:** 9002006CR 004662

**Court Offense:** NOT SPECIFIED

**Court Activity**

[NONE FOUND]

**16: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY M

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002006CR 004666

**Case Filing Date:** 08/28/2006

**Case Type:** CRIMINAL

**SSN:** 323-64-XXXX

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 08/28/2006

**Court Case Number:** 9002006CR 004666

**Court Offense:** NOT SPECIFIED

**Court Activity**

[NONE FOUND]

### 17: North Carolina Court Report

**Offender information**

**Name:** LARCK, AMY MARIE

**Names Associated with Suspect:** LARCK, AMY

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

VANCE COUNTY

**Case Number:** 9002006CRS051704

**Case Filing Date:** 04/30/2006

**Case Type:** CRIMINAL

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 04/30/2006

**Court Case Number:** 9002006CRS051704

**Court Offense:** NOT SPECIFIED

**Court Disposition:** DISMISSAL WITH LEAVE

**Court Activity**

[NONE FOUND]

### 18: Florida Court Report

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** FL

**Case Number:** 0524499CFANO

**Case Filing Date:** 12/11/2005

**Case Type:** FELONY

**County:** PINELLAS

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Height:** 5'5"

**Weight:** 130 lbs.

**Offenses**

**Groups:** DRUG ALCOHOL OFFENSES

**Categories:** DRUG NARCOTIC

**Case Filing Date:** 12/11/2005

**Number Counts:** 1

**Offense Date:** 12/10/2005

**Court Description:** DIVISION D

**Case Number:** 0524499CFANO

**Court Offense:** POSSESSION OF COCAINE

**Court Plea:** CHANGE OF PLEA TO NO

**Court Statute:** 893.13(6)(A)

**Court Disposition:** NO TRIAL - ADJUDICATED GUILTY

**Court Disposition Date:** 01/17/2006

**Court Level/Degree:** FELONY THIRD DEGREE

**Court Activity**

[NONE FOUND]

**19: Florida Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 2701 34TH ST N LOT 227

SAINT PETERSBURG, FL 33713-3667

PINELLAS COUNTY

**Case Number:** CRC0524499CFANO

**Case Filing Date:** 12/11/2005

**Case Type:** FELONY THIRD DEGREE

**County:** PINELLAS

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Height:** 5'5"

**Offenses**

**Groups:** DRUG ALCOHOL OFFENSES

**Categories:** DRUG NARCOTIC

**Case Filing Date:** 12/11/2005

**Offense Date:** 12/10/2005

**Court Description:** CIRCUIT

**Case Number:** CRC0524499CFANO

**Court Offense:** POSSESSION OF COCAINE

**Court Statute:** 893.13(6)(A)

**Court Disposition:** NO TRIAL - ADJUDICATED GUILTY

**Court Disposition Date:** 01/17/2006

**Court Level/Degree:** FELONY THIRD DEGREE

**Court Activity**

[NONE FOUND]

**20: North Carolina Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 1669 ENON RD

OXFORD, NC 27565-9078

GRANVILLE COUNTY

**Case Number:** 3801999CR 001496

**Case Filing Date:** 04/06/1999

**Case Type:** CRIMINAL

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Offenses**

**Categories:** OTHER

**Case Filing Date:** 04/06/1999

**Court Case Number:** 3801999CR 001496

**Court Offense:** NOT SPECIFIED

**Court Disposition:** DISPOSED

**Court Activity**

[NONE FOUND]

**21: Florida Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** FL

**Case Number:** 9719175MMANO

**Case Filing Date:** 06/10/1997

**Case Type:** MISDEMEANOR

**County:** PINELLAS

**DOB:** 03/1976

**SSN:** 323-64-XXXX

| | |
|---|---|
| **Height:** | 5'5" |
| **Weight:** | 130 lbs. |

**Offenses**

| | |
|---|---|
| **Categories:** | OTHER |
| **Case Filing Date:** | 06/10/1997 |
| **Number Counts:** | 1 |
| **Offense Date:** | 06/02/1997 |
| **Court Description:** | DIVISION F |
| **Case Number:** | 9719175MMANO |
| **Court Offense:** | VIOL ROR SOLICIT FOR PROSTITUTION |
| **Court Plea:** | CHANGE OF PLEA TO NO |
| **Court Disposition:** | NO TRIAL - ADJUDICATED GUILTY |
| **Court Disposition Date:** | 11/18/1997 |
| **Court Level/Degree:** | MISDEMEANOR CLASS 2 |

**Court Activity**

[NONE FOUND]

**22: Florida Court Report**

**Offender information**

| | |
|---|---|
| **Name:** | LARCK, AMY MARIE |
| **Address:** | SAINT PETERSBURG, FL 33713 |
| | PINELLAS COUNTY |
| **Case Number:** | CTC9719175MMANO |
| **Case Filing Date:** | 06/10/1997 |
| **Case Type:** | MISDEMEANOR SECOND D |
| **County:** | PINELLAS |
| **DOB:** | 03/1976 |
| **SSN:** | 323-64-XXXX |
| **Race:** | WHITE |

**Sex:** Female

**Height:** 5'5"

### Offenses

**Categories:** OTHER

**Case Filing Date:** 06/10/1997

**Offense Date:** 06/02/1997

**Court Description:** COUNTY

**Case Number:** CTC9719175MMANO

**Court Offense:** VIOL ROR SOLICIT FOR PROSTITUTION

**Court Disposition:** NO TRIAL - ADJUDICATED GUILTY

**Court Disposition Date:** 11/18/1997

**Court Level/Degree:** MISDEMEANOR SECOND DEGREE

**Sentence - Jail:** Max: 01 Months

### Court Activity

[NONE FOUND]

## 23: Florida Court Report

### Offender information

**Name:** LARCK, AMY MARIE

**Address:** FL

**Case Number:** 9715182MOANO

**Case Filing Date:** 05/06/1997

**Case Type:** MUNICIPAL - ORDINANC

**County:** PINELLAS

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Height:** 5'5"

**Weight:** 130 lbs.

### Offenses

**Groups:** DRUG ALCOHOL OFFENSES

**Categories:** LIQUOR LAW VIOLATIONS

**Case Filing Date:** 05/06/1997

**Number Counts:** 1

**Offense Date:** 05/06/1997

**Court Description:** DIVISION P

**Case Number:** 9715182MOANO

**Court Offense:** DRINKING WITHIN 500 FEET OF A BAR

**Court Plea:** CHANGE OF PLEA TO NO

**Court Disposition:** NO TRIAL - ADJUDICATED GUILTY

**Court Disposition Date:** 11/18/1997

### Court Activity

[NONE FOUND]

## 24: Florida Court Report

### Offender information

**Name:** LARCK, AMY MARIE

**Address:** SAINT PETERSBURG, FL 33713

PINELLAS COUNTY

**Case Number:** CTC9715182MOANO

**Case Filing Date:** 05/06/1997

**Case Type:** MUNICIPAL ORDINANCE

**County:** PINELLAS

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Height:** 5'5"

**Offenses**

**Groups:** DRUG ALCOHOL OFFENSES

**Categories:** LIQUOR LAW VIOLATIONS

**Case Filing Date:** 05/06/1997

**Offense Date:** 05/06/1997

**Court Description:** COUNTY

**Case Number:** CTC9715182MOANO

**Court Offense:** DRINKING WITHIN 500 FEET OF A BAR

**Court Disposition:** NO TRIAL - ADJUDICATED GUILTY

**Court Disposition Date:** 11/18/1997

**Court Level/Degree:** MUNICIPAL ORDINANCE

**Sentence - Jail:** Max: 01 Months

**Court Activity**

[NONE FOUND]

**25: Florida Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** FL

**Case Number:** 9622559CFANO

**Case Filing Date:** 12/11/1996

**Case Type:** FELONY

**County:** PINELLAS

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Height:** 5'5"

**Weight:** 130 lbs.

**Offenses**

**Groups:** DOMESTIC PERSONAL OFFENSES

**Categories:** FAMILY OFFENSES

**Case Filing Date:** 12/11/1996

**Offense Date:** 12/11/1996

**Court Description:** DIVISION D

**Case Number:** 9622559CFANO

**Court Offense:** NEGLECT OF A CHILD

**Court Statute:** 827.03(3)(B)

**Court Level/Degree:** FELONY THIRD DEGREE

**Court Activity**

[NONE FOUND]

**26: Florida Court Report**

**Offender information**

**Name:** LARCK, AMY MARIE

**Address:** 2701 34TH ST N LOT 227

SAINT PETERSBURG, FL 33713-3667

PINELLAS COUNTY

**Case Number:** CRC9622559CFANO

**Case Filing Date:** 12/11/1996

**Case Type:** FELONY THIRD DEGREE

**County:** PINELLAS

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Height:** 5'5"

**Offenses**

**Groups:** DOMESTIC PERSONAL OFFENSES

**Categories:** FAMILY OFFENSES

**Case Filing Date:** 12/11/1996

**Offense Date:** 12/11/1996

**Court Description:** CIRCUIT

**Case Number:** CRC9622559CFANO

**Court Offense:** NEGLECT OF A CHILD

**Court Statute:** 827.03(3)(B)

**Court Disposition:** DISPOSITION NOT PROVIDED BY SOURCE

**Court Level/Degree:** FELONY THIRD DEGREE

**Court Activity**

[NONE FOUND]

**1: Florida Department Of Corrections**

**Offender information**

**Name:** LARCK, AMY M

**Names Associated with Suspect:** LARCK, AMYLARCK, AMY MARIEWALLER, AMY MARIE

**Address:** 4218 BELLTOWN RD

OXFORD, NC 27565-9060

GRANVILLE COUNTY

**DOC Number:** R06445

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Party Status:** RELEASED

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Offenses**

Offense #1

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT AGGRAVATED, FAMILY OFFENSES

**Case Number:** 9622589

**Case Type:** Department Of Correction

**Offense Date:** 12/11/1996

**Offense Type:** F

**Sentence Date:** 04/14/1997

**Sentence Length Description:** Time served: 30Days

**Offense:** NEGLECTING A CHILD OR ABUSING A CHILD CAUSING INJURY (AGGRAVATED CHILD ABUSE)

**Level:** F

Offense #2

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Sentence Date:** 11/18/1997

**Offense:** CHILD ABUSE-NEGLECT

Offense #3

**Groups:** DOMESTIC PERSONAL OFFENSES

**Categories:** FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense Type:** F

**Offense:** NEGLECT CHILD OR DEPRIVE OF NECESSITIES CAUSING PERMITS PHYSICAL OR MENTAL INJURY, RESULTING IN GREA

**Level:** F

Offense #4

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Sentence Date:** 11/18/1997

**Offense:** CHILD ABUSE-NEGLECT

Offense #5

**Groups:** DOMESTIC PERSONAL OFFENSES

**Categories:** FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense Type:** F

**Sentence Date:** 11/18/1997

**Sentence Length Description:** Time served: 30Days

**Offense:** NEGLECT CHILD OR DEPRIVE OF NECESSITIES CAUSING PERMITS PHYSICAL OR MENTAL INJURY, RESULTING IN GREA

**Level:** F

**Parole/Probations**

**Start Date:** 04/14/1997

**Status:** ACTIVE

**Jurisdiction:** PINELLAS

**Actual End Date:** 11/18/1997

**Start Date:** 04/29/1998

**Status:** ACTIVE

**Jurisdiction:** PINELLAS

**Prison Inmate Records**

**Sentence:** Time served: 30Days

**Prison Location:** NORTH CAROLINA

**Scheduled Release Date:** 04/29/1998

**Custody Type:** CUSTODY CLASS: MINIMUM, 1

**Status:** VALID RELEASE DATE

**Prison Location:** LOWELL C.I.

**Scheduled Release Date:** 04/29/1998

**Custody Type:** MINIMUM

**1: Florida Department Of Corrections**

**Offender information**

**Name:** LARCK, AMY M

**Names Associated with Suspect:** LARCK, AMYLARCK, AMY MARIEWALLER, AMY MARIE

**Address:** 4218 BELLTOWN RD

OXFORD, NC 27565-9060

GRANVILLE COUNTY

**DOC Number:** R06445

**Case Number:** 9622559

**Case Type:** Department Of Correction

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Offenses**

Offense #1

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense:** CHILD ABUSE-NEGLECT

Offense #2

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense:** CHILD ABUSE-NEGLECT

**Parole/Probations**

[NONE FOUND]

**Prison Inmate Records**

**Scheduled Release Date:** 04/29/1998

**1: Florida Department Of Corrections**

**Offender information**

**Name:** LARCK, AMY MARIE

**Names Associated with Suspect:** LARCK, AMYWALLER, AMY MARIE

**Address:** 4218 BELLTOWN RD

OXFORD, NC 27565-9060

GRANVILLE COUNTY

**DOC Number:** R06445

**Case Number:** 9622559

**Case Type:** Department Of Correction

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Offenses**

Offense #1

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense:** CHILD ABUSE-NEGLECT

Offense #2

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense:** CHILD ABUSE-NEGLECT

**Parole/Probations**

[NONE FOUND]

**Prison Inmate Records**

**Scheduled Release Date:** 04/29/1998

**1: Florida Department Of Corrections**

**Offender information**

**Name:** LARCK, AMY

**Names Associated with Suspect:** LARCK, AMY MARIEWALLER, AMY MARIE

**Address:** 4218 BELLTOWN RD

OXFORD, NC 27565-9060

GRANVILLE COUNTY

**DOC Number:** R06445

**Case Number:** 9622559

**Case Type:** Department Of Correction

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

## Offenses

Offense #1

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense:** CHILD ABUSE-NEGLECT

Offense #2

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense:** CHILD ABUSE-NEGLECT

## Parole/Probations

[NONE FOUND]

## Prison Inmate Records

**Scheduled Release Date:** 04/29/1998

**1: Florida Department Of Corrections**

**Offender information**

**Name:** WALLER, AMY MARIE

**Names Associated with Suspect:** LARCK, AMYLARCK, AMY MARIE

**Address:** 4218 BELLTOWN RD

OXFORD, NC 27565-9060

GRANVILLE COUNTY

**DOC Number:** R06445

**Case Number:** 9622559

**Case Type:** Department Of Correction

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Race:** WHITE

**Sex:** Female

**Offenses**

Offense #1

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense:** CHILD ABUSE-NEGLECT

Offense #2

**Groups:** CRIMES AGAINST PERSONS, DOMESTIC PERSONAL OFFENSES

**Categories:** ASSAULT OTHER, FAMILY OFFENSES

**Case Number:** 9622559

**Case Type:** Department Of Correction

**Offense Date:** 12/06/1996

**Offense:** CHILD ABUSE-NEGLECT

**Parole/Probations**

[NONE FOUND]

**Prison Inmate Records**

**Scheduled Release Date:** 04/29/1998

**1: Utah Department Of Corrections**

**Offender information**

**Name:** LARCK, AMY MARIE

**Names Associated with Suspect:** LARK, AMYWALLER, AMY L

**Address:** UT

**DOC Number:** 195878

**Case Type:** Department Of Correction

**DOB:** 03/1976

**SSN:** 323-64-XXXX

**Sex:** Female

**Height:** 5'5"

**Weight:** 120 lbs.

**Offenses**

**Categories:** OTHER

**Case Type:** Department Of Correction

**Offense:** NOT SPECIFIED

**Parole/Probations**

[NONE FOUND]

**Prison Inmate Records**

[NONE FOUND]

## Sexual Offenders - 0 records found
## Cellular & Alternate Phones - 2 records found

**1:**

**Personal Information**

**Name:** LARCK, AMY

**Address:** 25 JORDAN LN

HENDERSON, NC 27537-8833

**Phone Number:** (252) 431-9173

**Phone Type:**

**Carrier Information**

**Carrier:** CENTURYLINK

**Carrier City:** HENDERSON

**Carrier State:** NC

**2:**

**Personal Information**

**Name:** LARCK, AMY

**Address:** 723 LYNN AVE

ELIZABETHTON, TN 37643-4214

**Phone Number:** (423) 956-1992

**Phone Type:** Mobile

**Carrier Information**

**Carrier:** VERIZON WIRELESS-TN

**Carrier City:** BRISTOL

**Carrier State:** TN

## Utility Information - 2 records found
## Possible Education - 0 records found

**1: Utility Data**

**Utility Type**

**Utility Type:** Infrastructure (Coal, Electric, Gas, Oil, Propane Gas, Water)

**Dates Associated With Utility**

**Date Service Connected:** 8/8/2014

**Date First Verified:** 8/8/2014

**Date Last Verified:** 8/8/2014

**Name Associated With Utility**

**Consumer Last Name:** LARCK

**First Name:** AMY

**Address**

**Address Type:** Residential

**Service Address Street Number:** 211

**Service Address Street Name:** TAYLOR

**Service Address Street Type:** ST

**Service Address City:** ROGERSVILLE

**Service Address State Abbreviation:** TN

**Service Address Zip:** 37857

**Billing Information Associated With Address**

**Billing Address Street Number:** 211

**Billing Address Street Name:** TAYLOR

**Billing Address Street Type:** ST

**Billing Address City:** ROGERSVILLE

**Billing Address State Abbreviation:** TN

**Billing Address Zip:** 37857

**Phone Information**

**Service Phone Number:** (423) 956-2387

**2: Utility Data**

**Utility Type**

**Utility Type:** Infrastructure (Coal, Electric, Gas, Oil, Propane Gas, Water)

**Dates Associated With Utility**

**Date Service Connected:** 6/5/2014

**Date First Verified:** 6/5/2014

**Date Last Verified:** 6/5/2014

**Name Associated With Utility**

**Consumer Last Name:** LARCK

**First Name:** AMY

**Middle Name:** M

**Address**

**Address Type:** Residential

**Service Address Street Number:** 133

**Service Address Street Name:** CARTERS VIEW

**Service Address Street Type:** WAY

**Service Address City:** TELFORD

**Service Address State Abbreviation:** TN

**Service Address Zip:** 37690

**Billing Information Associated With Address**

**Billing Address Street Number:** 133

**Billing Address Street Name:** CARTERS VIEW

**Billing Address Street Type:** WAY

**Billing Address City:** TELFORD

**Billing Address State Abbreviation:** TN

**Billing Address Zip:** 37690

## Sources - 135 records found

| | |
|---|---|
| **All Sources** | 135 Source Document(s) |
| **Criminal** | 32 Source Document(s) |
| **Driver Licenses** | 19 Source Document(s) |
| **Email** | 8 Source Document(s) |
| **Historical Person Locator** | 17 Source Document(s) |
| **Liens and Judgments** | 1 Source Document(s) |
| **Motor Vehicle Registrations** | 3 Source Document(s) |
| **Person Locator 1** | 6 Source Document(s) |
| **Person Locator 2** | 9 Source Document(s) |
| **Person Locator 5** | 30 Source Document(s) |
| **Person Locator 6** | 8 Source Document(s) |

**PhonesPlus Records** 2 Source Document(s)

Key

High Risk Indicator. These symbols may prompt you to investigate further.

Moderate Risk Indicator. These symbols may prompt you to investigate further.

General Information Indicator. These symbols inform you that additional information is provided.

✓ The most recent telephone listing as reported by the EDA source.

**Important:** The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

Your DPPA Permissible Use: Litigation

Your GLBA Permissible Use: Persons with a Legal or Beneficial Interest Regarding a Consumer

Copyright© 2022 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

End of Document

LexisNexis

**1 OF 1 RECORD(S)**

## North Carolina Criminal Records

**This data is for informational purposes only.**

### General Information

| | |
|---|---|
| **Name :** | LARCK,AMY,MARIE |
| **Address :** | 1669 ENON ROAD<br><br>OXFORD, NC 27565 |
| **County :** | GRANVILLE |
| **DOB :** | 01/1976 |
| **Sex :** | F |

### Offenses

| | |
|---|---|
| **Case Number :** | 99CR 001496 |
| **Offense Number :** | 01 |
| **Offense :** | SIMPLE ASSAULT |
| **Offense Type :** | M |
| **Court Type :** | CRIMINAL DISTRICT COURT CASE |
| **Complainant :** | FUNDERBURG,DEBRA,RAE |
| **Defendant Continuances :** | 00 |
| **State Continuances :** | 00 |
| **Judge Continuances :** | 00 |
| **Not Reached Continuances :** | 00 |
| **Method Of Disposition :** | DISMISSAL WITHOUT LEAVE BY DA |
| **Commercial Drivers License :** | N |
| **Commercial Motor Vehicle :** | N |
| **Hazardous Material :** | N |
| **Special Conditions :** | INVENTORY CONTROL AND JUDICIAL EFFICIENCY 19R135 CRMENUP 1; CCCHEKOY |
| **Domestic Violence Conviction Flag :** | N |
| **Offense Date :** | 01/05/1999 |
| **Filing Date :** | 01/06/1999 |
| **Disposition Date :** | 01/28/2019 |
| **Issued Date :** | 01/05/1999 |
| **Served Date :** | 01/05/1999 |

**Important:**The Public Records and commercially available data sources used on reports have

errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

**FCRA:**The data provided to you by use of this product may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment or other purposes identified under the Fair Credit Reporting Act (FCRA).

**Your DPPA Permissible Use:**Litigation

**Your GLBA Permissible Use:**Persons with a Legal or Beneficial Interest Regarding a Consumer

Report Created: 12-25-2022 10:33 AM EST | Copyright 2022 LexisNexis, All rights reserved.

---

End of Document

# Exhibit O

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| MICHAEL WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT ATTORNEY PAUL CONNICK, JR., FORMER DISTRICT ATTORNEY JOHN MAMOULIDES, DETECTIVE GREY THURMAN, SHERIFF NEWELL NORMAND, JEFFERSON PARISH SHERIFF'S OFFICE, JEFFERSON PARISH DISTRICT ATTORNEY'S OFFICE, ASSISTANT DISTRICT ATTORNEY KEN DOHRE, JOHN DOE 1 , JANE DOE 1, JOHN AND JANE DOES 2-10<br>Defendants. | ) | Civ. No. ________________ |

**COMPLAINT**

**NATURE OF THE ACTION**

1. Plaintiff Michael Williams spent more than 15 years in prison after being wrongfully convicted of the murder of Michelle Gallagher in July 1997. The State's case against Mr. Williams hinged on the testimony of a known crack addict, Christopher Landry, whose testimony was actively shaped by police and prosecutors in advance of trial; no physical evidence linked Mr. Williams to the crime. Landry was also treated as a suspect in the case and was threatened with prosecution if he did not testify against Mr. Williams.

2. Landry—the single eyewitness to testify against Mr. Williams at trial—did not initially claim that Mr. Williams killed Michelle Gallagher when he gave his first recorded statement to Detective Grey Thurman of the Jefferson Parish Sheriff's Office ("JPSO"). Defendant Thurman made sure that no one else knew about this first statement, not even the trial prosecutor.

3. Approximately twelve years after Mr. Williams' conviction, Landry admitted in two sworn affidavits that his testimony inculpating Mr. Williams was a complete fabrication, and that he had been coerced by the police and prosecutors to inculpate Mr. Williams. Landry stated that he testified against Mr. Williams because he was "scared" after the police and the Jefferson Parish District Attorney's Office ("JPDA") told him that *he* would be prosecuted for Ms. Gallagher's murder if he did not give a statement inculpating Mr. Williams and testify against Mr. Williams at trial. Mr. Landry's affidavits are attached hereto as Exhibits A and B.

4. Shortly after Landry's recantation, Mr. Williams filed a *pro se* application for post-conviction relief on the basis that the recantation exonerated Mr. Williams and entitled him to a new trial.

5. Mr. Williams, through counsel, later learned that Defendants Thurman, Assistant District Attorney Ken Dohre, JPSO, and JPDA had withheld multiple pieces of material exculpatory evidence from Mr. Williams' trial counsel and manufactured Landry's testimony.

6. On the basis of this newly discovered evidence, Mr. Williams filed a second application for post-conviction relief with the assistance of Innocence Project New Orleans ("IPNO"). On November 17, 2011, the District Court for the 24th Judicial District

granted a joint motion filed by JPDA and Mr. Williams to vacate the conviction. That same day, JPDA dismissed the indictment against Mr. Williams.

7. Mr. Williams' ordeal was not a mistake. It was the result of a concerted bad faith effort by Defendants, acting under color of state law, to cut out of whole cloth a case against Mr. Williams that had no factual basis, and falsely convict him of murder in violation of his clearly established constitutional rights and state law. Mr. Williams' rights to due process of law and a fair trial were violated when he was wrongfully convicted of murder (i) as a result of proceedings in which Defendants failed to disclose myriad pieces of exculpatory evidence to Mr. Williams before, during, and after his criminal trial; and (ii) on the basis of testimony that was manufactured by the Defendants.

8. As a direct and proximate result of Defendants' conduct, Mr. Williams suffered injuries and damages, including but not limited to the following: personal injuries, pain and suffering, severe mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restriction of all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression.

9. Mr. Williams now brings this Complaint against Defendants seeking damages under 42 U.S.C. § 1983 and the laws of the State of Louisiana to recover damages for the violation of his rights guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, the Louisiana Constitution, and the laws of the State of Louisiana.

## PARTIES

10. Plaintiff Michael Williams is a 46-year-old citizen of Louisiana who lives in Avondale, Louisiana. In 1997, at the age of 31, he was wrongfully convicted of the murder of Michelle Gallagher. He spent more than 15 years in prison before being released in November 2011.

11. Defendant Jefferson Parish Sheriff's Office ("JPSO") performs general law enforcement functions within Jefferson Parish, including enforcement of state and local laws and ordinances.

12. Defendant Jefferson Parish District Attorney's Office ("JPDA") prosecutes accused criminal defendants in Jefferson Parish, Louisiana.

13. Defendant Detective Grey Thurman, whom Mr. Williams sues in his individual capacity only, at all relevant times was a detective employed by JPSO. He was the lead detective investigating the July 1996 murder of Michelle Gallagher. Upon information and belief, Defendant Thurman is currently employed as a supervisor in the Detectives' Bureau of JPSO. Defendant Thurman at all relevant times acted under color of state law, and in whole or in part, in his capacity as a JPSO employee.

14. Defendant Ken Dohre, whom Mr. Williams sues in his individual capacity, at all relevant times was an Assistant District Attorney for JPDA and was the lead prosecutor in Mr. Williams' case. Defendant Dohre at all relevant times acted under color of state law, and in whole or in part, in his capacity as an employee of JPDA.

15. Defendants John Doe 1 and Jane Doe 1, whom Mr. Williams sues in their individual capacities, at all relevant times were employed by JPDA and presented the case against Mr. Williams to the grand jury that indicted Mr. Williams. Defendants John Doe 1 and

Jane Doe 1 at all relevant times acted under color of state law, and in whole or in part, in their capacities as employees of JPDA.

16. Defendant Paul Connick Jr., whom Mr. Williams sues in his official capacity only, is the Jefferson Parish District Attorney. Defendant Connick has been the Jefferson Parish District Attorney since 1997 and is a policymaker of JPDA.

17. Defendant John Mamoulides, whom Mr. Williams sues in his official capacity only, at all relevant times prior to 1997 was the Jefferson Parish District Attorney and a policymaker of JPDA.

18. Defendant Newell Normand, whom Mr. Williams sues in his official capacity only, is the Sheriff of Jefferson Parish. Defendant Normand has been the Sheriff of Jefferson Parish since 2007 and is a policymaker of JPSO.

19. Defendants John and Jane Does 2-10 are yet unknown individuals who, on information and belief, participated in or are responsible for the actions that are subject to this lawsuit. To the extent any of them can be said to be policymaking authorities whose actions represent the government entities they represent or to the extent any of them acted under color of law, Mr. Williams sues them in their official capacities.

## JURISDICTION AND VENUE

20. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

21. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

A. **Introduction**

23. On July 3, 1997, in the District Court for the 24th Judicial District, Mr. Williams was wrongfully convicted of the March 6, 1996 murder of Michelle Gallagher. Mr. Williams was sentenced to life without parole.

24. Ms. Gallagher was discovered lying in the middle of the street just outside the Kennedy Heights subdivision at approximately 10:45 p.m. on March 6, 1996. Ms. Gallagher had been stabbed through the navel and died a short time later after arriving at the hospital.

25. The police agency investigating Ms. Gallagher's death was defendant JPSO. JPSO's lead investigator on the case was Defendant Thurman.

26. For the first fourteen days following Ms. Gallagher's murder, Defendant Thurman's investigation yielded no solid suspects.

27. Shortly thereafter, Defendant Thurman received a tip that Christopher Landry had witnessed the murder. Landry lived in the Kennedy Heights neighborhood, very near to where Ms. Gallagher's body was found.

28. Landry was a habitual drug user who had had previous run-ins with the law, including a drug conviction.

29. When Defendant Thurman met with Landry, he told him that Landry would be charged with murder if he did not give a statement saying that Mr. Williams murdered Ms. Gallagher.

30. Landry became the government's key witness at Mr. Williams' trial, and was the only government witness who claimed to have witnessed the crime.

31. Through Landry, the State presented the following theory of the murder: Landry witnessed Mr. Williams drive Ms. Gallagher around the Kennedy Heights neighborhood, argue with Ms. Gallagher, and then dump her body in the middle of River Road.

32. The State failed to disclose to Mr. Williams' counsel the following pieces of exculpatory evidence that directly undercut the State's theory at trial:

a) The first time Landry gave a recorded statement to Defendant Thurman, Landry did not claim Mr. Williams killed Ms. Gallagher. Upon information and belief, Defendant Thurman made sure that no one else knew about this statement, not even the trial prosecutor. During Mr. Williams' post-conviction proceedings, a microcassette containing this recorded statement was found in JPSO's files. Neither the microcassette nor a transcription thereof appeared in JPDA's files.

b) Landry made two additional statements prior to trial that were inconsistent with his trial testimony: a second statement made to Defendant Thurman a few hours after Landry's first recorded statement, and testimony before the grand jury. The State did not disclose either statement to the defense.

c) Landry only implicated Mr. Williams because he felt threatened. The State did not disclose documents and statements revealing that Landry was treated as a suspect during the investigation of Ms. Gallagher's murder.

d) A witness named Lori Ramsey told police that she saw the victim hitchhiking more than a mile from Kennedy Heights, where Landry claimed to have seen her with Mr. Williams during the same time period. The State did not disclose this witness's statement to the defense.

## B. The Evidence Presented at Trial

33. At trial, the State argued that on the night of the murder Mr. Williams drove Ms. Gallagher around the Kennedy Heights neighborhood, smoked crack and argued with Ms. Gallagher, and then stabbed her and dumped her body along River Road outside Kennedy Heights, where her body was soon found by several motorists. The State established its theory of the case primarily through the testimony of Landry.

34. One of the motorists who saw Ms. Gallagher lying on the street was a newspaper deliveryman named Dewey Bruce. Mr. Bruce testified that he had seen Ms.

Gallagher just fifteen minutes before, two and a half miles away outside the Waggaman subdivision, where she had been staggering along the road.

35. After he saw Ms. Gallagher, Mr. Bruce continued on his regular paper delivery route through the Waggaman subdivision. He encountered Ms. Gallagher again when he saw her lying in the street just outside the Kennedy Heights subdivision—again, only fifteen minutes later, and two and a half miles from where he had just seen her. A map illustrating Mr. Bruce's testimony is attached hereto as Exhibit C.

36. Mr. Bruce could not testify as to what happened to Ms. Gallagher in the ten to fifteen minutes that she traveled two and a half miles down River Road and got stabbed. JPDA instead relied on its star witness, Landry, to fill in the missing timeline in Mr. Bruce's testimony.

37. Landry offered the following testimony at trial, all of which turned out to be demonstrably and avowedly false:

a) At approximately 10:30 on the night of Ms. Gallagher's murder, he saw Ms. Gallagher in the passenger seat of Mr. Williams' white Mustang as they drove by Landry in the Kennedy Heights neighborhood.

b) Landry stole a bicycle from the yard of a nearby house and rode the bike to follow Mr. Williams and Ms. Gallagher. Ms. Gallagher was thought to be a prostitute, and Landry followed Mr. Williams and Ms. Gallagher because he suspected that they were going to have sex and he wanted to watch.

c) Landry followed the Mustang on the stolen bike across the Kennedy Heights subdivision to an abandoned lot approximately one mile away. Once there, he watched Mr. Williams and Ms. Gallagher smoke crack and then argue because Ms. Gallagher refused to have sex with Mr. Williams.

d) Mr. Williams then drove off with Ms. Gallagher, and Landry again followed on the stolen bike, taking more or less the same route as Mr. Williams. The car stopped on River Road shortly thereafter, and Landry watched as Mr. Williams exited the car, walked around

> to the passenger side door, opened it, dumped Ms. Gallagher's body to the ground on River Road, and then drove away.

38. The State elicited testimony from Landry that his trial testimony was consistent with every account of the events that he had previously provided to the police. The State then emphasized this point in its closing argument.

39. Landry was the <u>only</u> witness who testified to facts inculpating Mr. Williams.

40. No physical evidence supported the State's theory that Mr. Williams allegedly stabbed Ms. Gallagher in his car, and the State presented none. Mr. Williams' car did not contain any blood, fibers, or hairs that could be associated with Ms. Gallagher. Similarly, the State did not locate any fibers or hairs on Ms. Gallagher that could be associated with the car.

41. Defendant Thurman also testified on behalf of the State. The relevant aspects of his testimony are as follows:

a) JPSO went out the night after the murder and put up three road blocks along River Road to try to find people who may have been traveling to or from work at the same time on the night of Ms. Gallagher's murder and therefore may have had relevant information.

b) The road blocks did not yield any information to help the investigation. JPSO "got a bunch of I was driving up and down the street about this time last night, but nothing that was really earth shattering."

c) After first interviewing Landry on March 21, 1996, police arrested Mr. Williams while he was in the company of a woman named Susan Boudreaux.

d) Ms. Boudreaux told police that she had seen a knife in Mr. Williams' car.

e) Mr. Williams gave a statement to police after he was arrested. In that statement, Mr. Williams denied involvement in or knowledge about Ms. Gallagher's death and he explained that he had come back from Hattiesburg, Mississippi earlier that evening and had

> spent the night with a friend. Mr. Williams further said in his statement that he did not see Ms. Gallagher on the night of her death and did not drive her in his car on the night of her death. He ended his statement with a declaration that he was "completely innocent."

42. In closing argument, the State argued that Landry's testimony dovetailed with the testimony provided by Dewey Bruce—everything Landry described could have taken place between the first time Mr. Bruce saw Ms. Gallagher outside the Waggaman neighborhood and when he saw her body fifteen minutes later lying on the road outside Kennedy Heights. The State emphasized in closing that Landry's story <u>had not changed</u> since he first spoke to police, noting particularly that Landry had consistently described the route that Mr. Williams took out of the Kennedy Heights neighborhood after his argument with Ms. Gallagher. The State re-emphasized Landry's consistent description of the route taken by Mr. Williams in rebuttal closing. The State argued that Landry had no reason to lie, and in fact had put himself at risk by coming to testify.

43. The Judge in Mr. Williams' bench trial agreed with the State and found Mr. Williams guilty of second degree murder after a five-minute recess following the State's rebuttal argument. Mr. Williams was sentenced to life without parole.

**C. Exculpatory Evidence That Was Never Disclosed**

44. In February 2009, Landry gave a sworn affidavit stating that he gave false statements against Mr. Williams concerning the death of Michelle Gallagher to JPSO and the Grand Jury. Landry further stated that he was offered a deal to receive a lesser sentence on a pending drug charge if he testified against Mr. Williams. Landry stated that JPDA informed him that he would serve a life sentence instead of Mr. Williams if he didn't testify against Mr. Williams at trial. *See* Ex. A.

45. In September 2009, Landry provided another sworn affidavit to IPNO lawyers. In this affidavit, Landry stated that his statements to police and in court about the death of Ms. Gallagher "was a lie." He "did not see Michael Williams in a car with Michelle Gallagher on the night she was killed," "did not get on a bike and follow them," "did not see them smoke crack," "did not see them get in an argument," and "did not see Michael Williams dump Michelle Gallagher's body from his car." Landry "made up all of this." Landry stated that he was "high on crack" when the police showed up at his house to take him in for questioning. Landry stated that the police told him if he "did not give a statement saying that Michael Williams murdered Michelle Gallagher, they would charge [him] with the murder." Because Landry was "scared," he "told the police what they wanted to hear." *See* Ex. B.

46. After Landry recanted his testimony in 2009, IPNO discovered numerous pieces of evidence—none of which had been disclosed to Mr. Williams or his defense counsel at trial—that directly contradicted or undercut Landry's fabricated testimony at trial as well as the State's argument that Landry adhered to a consistent story throughout the course of the State's investigation.

47. The newly discovered evidence includes at least ten statements from witnesses taken during the course of the investigation, including multiple statements from Landry. Although Mr. Williams' trial counsel had requested notice "of the existence of any oral statements which the state has in its possession regarding the case, including information as to when, where, and to whom such oral statements were made," JPDA referred defense counsel only to Mr. Williams' transcribed statement to police. Mr. Williams' trial counsel had also requested "copies of any audio or video recordings or written statements prepared or signed by every State witness," such as Landry.

***i. Exculpatory Evidence Pertaining to Christopher Landry, the State's Key Witness at Trial***

48. The State failed to disclose to the defense any of the three statements made by its key witness, Landry, in the course of the investigation: (1) a statement made to Defendant Thurman beginning at 11:55 a.m. on March 21, 1996 (the "Noon Statement"); (2) a statement made to Defendant Thurman at 3:00 p.m. on March 21, 1996 (the "3 P.M. Statement"); and (3) the testimony Landry provided before the grand jury.

49. Defendants Dohre, John Doe 1, Jane Doe 1, and JPDA similarly did not provide Mr. Williams or his counsel with a "Rights of Arrestee or Suspects" form signed by Landry. This form notified Landry that he was a suspect in the Gallagher murder. Instead, Defendant Dohre blatantly misrepresented the record by arguing in closing argument that Landry had "no motive . . . to lie, he was never a suspect."

a) <u>The Noon Statement</u>

50. Landry initially gave a statement to Defendant Thurman at 11:55 on March 21, 1996. At the time of questioning, Landry was delinquent in paying a fine on a previous drug conviction and had been released on a pre-trial bond for a felony theft, for which he was still under the threat of prosecution.

51. Landry's Noon Statement included the following significant discrepancies from his trial testimony:

a) Landry did not claim to have seen Ms. Gallagher's body dumped on the road, as he later testified at trial. Rather, Landry stated that after Mr. Williams and Ms. Gallagher smoked crack and had an argument, they drove out of the Kennedy Heights neighborhood. Landry had no idea where they went. Ms. Gallagher was alive.

b) Defendant Thurman specifically asked Landry if he saw Mr. Williams and Ms. Gallagher near the intersection of George Street and River Road, where Ms. Gallagher's body was found. Landry said no.

c) The last time Landry saw Mr. Williams and Ms. Gallagher was around 11:00 or 11:15 p.m.—fifteen to thirty minutes after Ms. Gallagher was found in the middle of River Road.

52. The Noon Statement also revealed that Landry was treated as a suspect:

a) Defendant Thurman reminded Landry that he had completed the "Rights of Arrestee or Suspects" form and confirmed that he understood his rights and was speaking voluntarily.

b) Defendant Thurman asked Landry if he stabbed Ms. Gallagher.

c) Defendant Thurman asked Landry if he hit Ms. Gallagher.

53. The Noon Statement was never transcribed. Upon information and belief, Defendant Thurman never provided the Noon Statement to Defendants JPDA, Dohre, John Doe 1, or Jane Doe 1. While a microcassette containing this recorded statement was found in JPSO's files during Mr. Williams' post-conviction proceedings, neither the microcassette nor a transcription thereof has been located in JPDA's files.

54. Prior to trial, Defendant Thurman provided a "synopsis" of the case to Defendant JPDA that made no mention of Landry's Noon Statement, although it did summarize parts of the statement Landry gave to Defendant Thurman at 3 p.m. on March 21, 1996. On information and belief, Defendant Thurman concealed the Noon Statement because he knew that it demonstrated that Landry's testimony was unreliable, and if it was disclosed, he would have no case against Mr. Williams.

b) The 3 P.M. Statement

55. Landry's 3 P.M. Statement differed from his Noon Statement in several critical respects. Most notably, although Landry told Detective Thurman in his Noon Statement that he last saw Mr. Williams and Ms. Gallagher heading towards Avondale Garden Road around 11 or 11:15 p.m., Landry claimed in his 3 P.M. Statement that he saw Mr. Williams stop the car, open his car door, and dump Ms. Gallagher's body on the road.

56. The 3 P.M. Statement also contained critical inconsistencies that could have been used to impeach Landry at trial had the statement been disclosed:

a) Landry stated that Ms. Gallagher's body was dumped about a block from where it was actually found, and Defendant Thurman had to correct Landry during his statement.

b) Landry gave a highly implausible route that he supposedly rode on his bike after Mr. Williams and Ms. Gallagher smoked crack and argued, which differed from the direct route to which Landry testified at trial.

57. Although the 3 P.M. Statement was in JPDA's files, JPDA never turned this statement over to Mr. Williams or his counsel.

c) Landry's Grand Jury Testimony

58. Before the grand jury, Landry provided yet another version of the events that occurred on the night of Ms. Gallagher's murder. Landry testified that Mr. Williams took something out of the car, "let it go and it fell to the ground." Landry testified that he had "no idea" what Mr. Williams took out of the car, and that he didn't find out what it was that Mr. Williams took out of the car "until the next morning."

59. In the year following his 3 P.M. Statement to Defendant Thurman, Landry apparently forgot seeing Mr. Williams dump a human body out of his car onto the road, remembering only that "something" was dropped out of the car. JPDA did not disclose this inconsistent statement to Mr. Williams' counsel until June 2011, after IPNO discovered the Noon Statement.

60. At trial, Defendants Dohre and JPDA elicited testimony from Landry that they knew to be false: that Landry had not changed his story at any time since he first spoke to the police.

61. In closing argument, Defendant Dohre referred to Defendant Thurman's testimony at trial to argue that Landry testified at trial to the same route that he gave when he spoke to the police only two weeks after the murder.

62. At trial, Defendant Thurman referred to "the statement" that he took from Landry, although he in fact took two statements from the witness.

***ii. Exculpatory Evidence from Other Witnesses***

63. JPDA also failed to disclose a statement by Lori Ramsey, a witness who was stopped by Defendant Thurman at a road block the night after Ms. Gallagher's murder. Ms. Ramsey told Defendant Thurman that she saw Ms. Gallagher hitchhiking on the side of the road opposite River Road on the evening of Ms. Gallagher's death. Ms. Ramsey's statement directly contradicted the State's theory at trial—that Mr. Williams stabbed Ms. Gallagher after driving around the Kennedy Heights neighborhood and smoking crack with her—because Ms. Ramsey saw Ms. Gallagher hitchhiking a mile away from Kennedy Heights at the same time Landry claimed Ms. Gallagher was driving around Kennedy Heights with Mr. Williams.

64. Although Ms. Ramsey's statement placed the victim in a completely different location than Landry's statement at approximately the same time, the State failed to disclose this statement to the defense. A map illustrating Ms. Ramsey's statement is attached hereto as Exhibit D.

65. The State did not disclose Ms. Ramsey's statement to defense counsel or to Mr. Williams. The State did, however, elicit testimony from Defendant Thurman at trial that the roadblocks set up by JPSO failed to yield any leads. Defendant Thurman testified about JPSO's roadblocks: "[W]e got a bunch of I was driving up and down the street about this time last night, but nothing that was really earth shattering."

66. Defendants Dohre and JPDA did not provide the defense with transcribed exculpatory statements from other witnesses, including Mark Shane Billiot, Philipe Billiot, Bruce Kelsey (two statements), Chad Chimento, Brenda Robinson, and Gary Miller.

67. Defendants Dohre and JPDA failed to turn over this exculpatory evidence to Mr. Williams despite his continued assertions of innocence throughout his appeal and multiple post-conviction motions in state and federal court, many of which were filed prior to Landry's recantation of his testimony.

D. **The Defendants Manufactured Evidence Against Mr. Williams**

68. In addition to withholding several pieces of material exculpatory evidence from the defense, Defendants also actively manufactured evidence prior to trial and presented false and misleading evidence at trial in order to build a case around Landry's testimony.

***i. Landry's Testimony About the Victim***

69. In his Noon Statement, Landry did not implicate Mr. Williams in Ms. Gallagher's murder. Instead, Landry told Defendant Thurman that the last time he saw Mr. Williams and Ms. Gallagher on the night of her murder, they were heading towards Avondale Garden Road and Ms. Gallagher was still alive.

70. Upon information and belief, Defendant Thurman did not transcribe Landry's Noon Statement and did not provide a copy of this statement to JPDA. Instead, Defendant Thurman provided JPDA a synopsis of the case describing an interview with Landry in which Landry witnessed Mr. Williams remove Ms. Gallagher from her car and saw her fall onto the road. By omitting critical facts from his synopsis, Defendant Thurman lead JPDA to believe that there was a colorable case against Mr. Williams, when, in fact, the entire case was premised on false testimony of Landry, obtained after he was threatened with prosecution for Ms. Gallagher's murder.

71. Landry testified before the grand jury that Mr. Williams dropped "something" out of his car, but "had no idea" what it was. At Mr. Williams' trial, Landry testified that he saw Mr. Williams drop Ms. Gallagher's body to the ground.

72. Landry told Defendant Thurman in his 3 P.M. Statement that Mr. Williams dumped Ms. Gallagher's body on George Street. Defendant Thurman responded, "Is it possible that he dumped her in the River Rd. and not on George St.?" Landry agreed that it "could be possible." At trial, Landry testified that Ms. Williams dumped Ms. Gallagher's body on River Road, where her body was actually found. Defendant Thurman manufactured evidence against Mr. Williams by feeding a critical fact of the case to Landry, who had no first-hand knowledge of the murder.

***ii. Landry's Testimony About His Bicycle Route***

73. Defendants JPDA and JPSO had within their files a copy of Landry's 3 P.M. Statement in which he claimed to have taken an implausible and circuitous route on his bike to follow Mr. Williams and Ms. Gallagher after they allegedly smoked crack and argued.

74. The evidence obtained by IPNO from JPDA's files after Landry's recantation of his trial testimony included three color-coded maps of the Kennedy Heights neighborhood. Upon information and belief, these maps were created to coach Landry in his trial testimony, because of concerns that he would not stick to the story implicating Mr. Williams.

75. Two of the color-coded maps show Landry's bicycle route as he explained it in the 3 P.M. Statement. The third map shows the much more direct bicycle route to which Landry testified at trial.

76. At trial, Defendants Dohre and JPDA elicited false testimony from Landry that he had not changed his story at any time since he first spoke to the police.

***iii. Landry was Threatened***

77. In a sworn affidavit, Landry stated that the police told him that if he "did not give a statement saying that Michael Williams murdered Michelle Gallagher, they would charge [him] with the murder." Landry further stated that the police brought his girlfriend in for questioning as well and he was "scared that the police were going to do something to her if I did not tell them what they wanted to hear." *See* Ex. B.

78. In a sworn affidavit, Landry stated that he was informed by JPDA that if he didn't testify against Michael Williams at trial, he "would be the one serving a life sentence instead of Mr. Williams." Because Landry was "scared," he agreed to testify against Mr. Williams. *See* Ex. A.

79. Upon information and belief, the Defendants coached Landry's testimony to fit their theory of the case, including the timeline established by Mr. Bruce's two sightings of the victim on the night she was murdered.

**E. JPDA's Unconstitutional Policies Concerning *Brady* Material**

80. The failure to disclose exculpatory evidence in Mr. Williams' case and other cases in JPDA was indicative of a JPDA custom, practice, or policy to suppress such evidence.

81. Over a period of decades, despite repeated violations of *Brady v. Maryland*, 373 U.S. 83 (1963), by its prosecutors and serious and obvious deficiencies in its policies and procedures for discharging its *Brady* obligations, as well as attorney training and supervision policies and procedures, JPDA failed to adequately train, supervise, and monitor its employees regarding their constitutional duty to disclose exculpatory evidence. JPDA also failed to take appropriate remedial and disciplinary measures in the wake of *Brady* violations by members of its staff; hired new staff members that it knew or should have known had committed

*Brady* violations in the past; and ignored a pattern of serious and firmly-established *Brady* violations that had accumulated over a period spanning multiple decades.

82. The blatant violation of Mr. Williams' constitutional rights under *Brady* was not an isolated incident in JPDA, but rather was the direct and actual result of an unconstitutional policy concerning the requirements of *Brady*, and the office's failure to train and supervise its Assistant District Attorneys regarding the prosecution's duty to disclose all exculpatory evidence to the defense.

83. It was entirely foreseeable, in fact, obvious, that JPDA's deficient *Brady* policies and procedures, and failure to adequately train on *Brady* would result in *Brady* violations committed by JPDA prosecutors.

84. JPDA's grossly deficient policies and procedures and its failure to properly train its attorneys, and the *Brady* violations in this case that unsurprisingly occurred, are part of a pattern of strikingly similar *Brady* violations over a period of time that began no later than the early 1980s and continued through the time of Mr. Williams's prosecution, conviction, incarceration, and subsequent appeals and petitions for post-conviction relief.

85. The following list is illustrative of JPDA's pattern of *Brady* violations:

a) During a murder trial in the early 1980s, JPDA failed to turn over to the defense an exculpatory statement made by an eyewitness while under hypnosis. *See State v. Porretto*, 468 So. 2d 1142, 1148-50 (La. 1985). Although the Louisiana Supreme Court ultimately concluded that the withheld evidence did not create a reasonable doubt as to the defendant's guilt, it recognized that the evidence was exculpatory and that the defendant could have used it to impeach the credibility of the eyewitness.

b) In 1985, the Fifth Circuit found that JPDA had failed to provide the defense in a capital murder case with a statement by a critical eyewitness that he did not see the perpetrator's face. The Fifth Circuit further concluded that the prosecutor's failure to provide the statement was in defiance of a court order, that the prosecutor later attempted to "cover his tracks," and that the prosecutor's

behavior was "beyond reprehension." The Fifth Circuit reversed the federal district court's denial of the defendant's petition for a writ of habeas corpus and ordered that the defendant be released or retried within 90 days. *See Lindsey v. King*, 769 F.2d 1034, 1040, 1043 (5th Cir. 1985); *see also State v. Lindsey*, 543 So. 2d 886, 889 (La. 1989) (describing violations).

c) In the mid-1990s, not long before Mr. Williams' arrest, JPDA failed to turn over exculpatory eyewitness statements in a first-degree murder trial. Two eyewitnesses gave statements that were inconsistent with one another and inaccurate in several respects. Although the statements were exculpatory because they were valuable for impeachment purposes, the prosecution refused to turn them over to the defense, despite several defense requests for all exculpatory material. Louisiana's Fifth Circuit Court of Appeal concluded that the prosecution's failure to disclose the statements was a serious *Brady* violation that necessitated setting aside the defendant's conviction and sentence:

> After considering all of the above, we find that the ability to present a defense was seriously undermined by the State's refusal to turn over the statements of Eure and Perez to the defense . . . . We find that defendant was entitled to have the jury consider that the state's 'best witness,' Eure, who made the critical identification of defendant as the perpetrator of the crime, had originally described a suspect who was older, taller and larger than defendant. The defense was further entitled to present to the jury the numerous inconsistencies raised by the statements of both witnesses. The evidence was material directly to guilt or innocence and to credibility or impeachment of the witnesses. The failure to provide this information to the defense seriously undermines the confidence in the verdict.

*State v. Calloway*, 718 So. 2d 559, 561-64, 569 (La. Ct. App. 1998).

d) In a 1994 prosecution for conspiracy to commit murder, JPDA waited until the last day of trial to provide the defense with the transcript of an exculpatory statement given by a confidential informant—despite the fact that the defendants had filed pretrial motions expressly requesting all *Brady* material. *See State v. Ellis*, 657 So. 2d 341, 355-58 (La. Ct. App. 1995). The court found the evidence was exculpatory because it "supported defendants'

testimony that they were not serious in their plans to kill" the alleged intended victims. *Id.*

e) In another murder case, the Fifth Circuit concluded that JPDA violated *Brady* when it failed to provide the defense with exculpatory evidence, including statements by witnesses suggesting that someone other than the defendant might have committed the crime. The defendant discovered the violation in 1994, after he obtained a copy of the state's complete investigatory file pursuant to a Freedom of Information Act request. The Fifth Circuit affirmed the federal district court's decision to grant the defendant's petition for a writ of habeas corpus and ordered that the defendant be either released or retried within 120 days. The defendant was released from prison, and the charges against him were dropped two years later. See *DiLosa v. Cain*, 279 F.3d 259, 263, 264-65 (5th Cir. 2002); *DiLosa v. City of Kenner*, No. 03-0310, 2004 U.S. Dist. LEXIS 25767, at *3-5 (E.D. La. Dec. 15, 2004).

86. JPDA continued its pattern and practice of *Brady* violations — and more specifically, the failure to turn over exculpatory witness statements — even as Mr. Williams appealed his conviction, moved for post-conviction relief, and steadfastly maintained his innocence:

a) In 2000, a Louisiana state trial court concluded that JPDA had committed a serious *Brady* violation when it failed to disclose exculpatory statements made by an eyewitness who died prior to trial. The prosecutor failed to provide the statements despite a discovery request by the defense and despite the prosecutor's claim that she had provided the defense with open-file discovery. *See Jones v. Cain*, 601 F. Supp. 2d 769, 775-76, 782-83 (E.D. La. 2009); *see also State v. Jones*, 841 So. 2d 965, 968 (La. Ct. App. 2003).

b) In 2004, in an armed robbery case, JPDA failed to turn over to the defense a handwritten statement in which an eyewitness to the robbery described the perpetrator in a manner inconsistent with videotape evidence. Although Louisiana's Fifth Circuit Court of Appeal ultimately concluded that the failure to disclose the evidence did not prejudice the defendant, it nevertheless agreed with the trial court's conclusion that "the State should have supplied the defense with the handwritten statement prior to trial." *See State v. Johnson*, 917 So. 2d 576, 579-81 (La. Ct. App. 2005).

c) In 2007, the United States District Court for the Eastern District of Louisiana found that JPDA violated *Brady* when it failed to properly disclose evidence that could have been used to impeach witnesses who testified against the defendant. The Court granted the defendant's petition for a writ of habeas corpus and ordered that he be released or retried within 180 days. *See Tassin v. Cain*, 482 F. Supp. 2d 764, 766-67, 771-75 (E.D. La. 2007).

87. On information and belief, JPDA prosecutors have similarly withheld potentially exculpatory *Brady* material or otherwise violated the constitutional rights of criminal defendants on other occasions, consistent with a pattern and practice of such violations.

88. JPDA also hired prosecutors known to have committed *Brady* violations. In 2005, the Supreme Court of Louisiana suspended a Jefferson Parish prosecutor from the practice of law after concluding that the prosecutor had committed a serious *Brady* violation while working as a prosecutor in Orleans Parish. In particular, the Court concluded that, in the mid-1990s, while prosecuting a capital case that resulted in a death sentence, the prosecutor failed to turn over an "obviously exculpatory" statement by an eyewitness to the murder. At some point thereafter, JPDA hired the prosecutor, despite the fact that disciplinary proceedings against him were initiated beginning in 1998. *See In re Jordan*, 913 So. 2d 775, 777-81, 784 (La. 2005).

89. On information and belief, the repeated suppression of exculpatory material by JPDA prosecutors in violation of *Brady* was known to JPDA, such that there was an obvious need to take steps to control, train, or supervise in order to prevent future similar constitutional violations. The failure of JPDA to take such actions to control, train, or supervise JPDA prosecutors amounted to deliberate indifference to the unconstitutional practices of these prosecutors, directly resulting in the violation of Mr. Williams' constitutional rights and Mr. Williams' injuries as alleged herein.

### F. Defendant JPSO's Unconstitutional Policies With Respect to *Brady* Material and Manufacturing Witness Testimony

90. The failure to disclose exculpatory evidence and use of manufactured evidence in Mr. Williams' case and other cases in Defendant JPSO was indicative of a custom, practice, or policy to manufacture evidence and suppress exculpatory evidence that existed in Jefferson Parish.

91. Over a period of decades, despite repeated *Brady* violations and the use of manufactured evidence by its detectives, as well as serious deficiencies in its policies and procedures relating to *Brady* training and supervision procedures, Defendant JPSO failed to adequately train, supervise, and monitor its employees regarding their constitutional duty to disclose exculpatory evidence and to refrain from manufacturing evidence and using manufactured evidence. Defendant JPSO also failed to take appropriate remedial and disciplinary measures in the wake of *Brady* violations and uses of manufactured evidence by members of its staff and ignored a pattern of serious and firmly-established *Brady* violations and instances of manufactured evidence.

92. Defendant Thurman's deliberate violations of Mr. Williams' constitutional rights was the direct and actual consequence of Defendant JPSO's failure to properly train and supervise its detectives with respect to their duty to disclose all material exculpatory evidence and to refrain from manufacturing evidence and using manufactured evidence.

93. The blatant violation of the requirements of *Brady* and used of manufactured evidence in Mr. Williams' case was not an isolated incident in Defendant JPSO, but rather was the result of an unconstitutional policy concerning the requirements of *Brady* and the constitutional duty to refrain from manufacturing evidence and using manufactured evidence, and the office's failure to train and supervise its employees regarding same.

94. Prior to Mr. Williams' arrest, Defendant JPSO was on notice of a pattern of strikingly similar violations by its detectives, including earlier violations committed by Defendant Thurman. Upon information and belief, Defendant JPSO nevertheless failed to incorporate appropriate instructions or policies and procedures regarding *Brady* duties and duties to refrain from manufacturing evidence into its new detective training programs, continuing education programs, hiring and retention policies, office operating procedures, and detective disciplinary policies.

95. As a result of these failures, Defendant Thurman was not properly trained in his duty to ensure the preservation of suspects' constitutional rights, nor was he terminated or disciplined after his earlier, nearly identical violations. Because he was not so trained, and because he remained in the employ of Defendant JPSO at the time of Ms. Gallagher's murder, he ultimately withheld critical exculpatory statements and manufactured witness testimony, which directly and actually resulted in violations of Mr. Williams' constitutional rights.

96. Among the prior violations that placed Defendant JPSO on actual notice of deficiencies in its training programs were at least two incidents in which Defendant Thurman intimidated a witness into testifying against defendants by threatening the witness with prosecution.

97. In 1992 and 1993, in the course of investigating the murder of Samuel George in Jefferson Parish, JPSO targeted suspects Glenn Davis, Larry Delmore, and Terrence Meyers. Norman Jackson, a crack-addicted career criminal, testified against the defendants after Defendant Thurman threatened him with prosecution.

98. Defendant Thurman also withheld critical exculpatory evidence during the prosecution of Davis, Delmore, and Meyers. Years after the men were convicted of second-

degree murder and sentenced to life in prison without the possibility of parole, a court ordered that the three men be retried due to egregious errors in the investigation and prosecution—including those committed by Defendant Thurman—that came to light. JPDA later dismissed the cases altogether. The men were released from incarceration after spending more than 13 years in prison. Recently, the judge who presided over their post-release compensation proceedings found that there was "clear and convincing" evidence that the men were in fact innocent.

99. In the mid-1990s, not long before Mr. Williams' arrest, Defendant Thurman again engaged in conduct remarkably similar to the events at issue here when, in the course of a homicide investigation, he attempted to intimidate a witness into testifying against the defendant by suggesting that, without his testimony, the witness might be prosecuted for the murder. *See State v. Calloway*, 718 So. 2d 559, 568-69 (La. Ct. App. 1998). In that case, Louisiana's Fifth Circuit Court of Appeal set aside a murder conviction in part because the trial court refused to allow the intimidated witness to testify at trial. The appellate court explained: "According to the defense proffer, another witness, Guidry, would have testified that Detective Thurman accused him of being involved in the murder, but offered him a 'deal' to testify against defendant." *State v. Calloway*, 718 So. 2d 559, 568-69 (La. Ct. App. 1998).

100. Defendant JPSO was on notice of *Brady* violations by employees other than Defendant Thurman. In August or September of 1997, during an investigation into a series of murders, a supervising JPSO Lieutenant tore up and discarded a gasoline receipt suggesting that a key suspect was in Texas—as opposed to Louisiana—at the time of the crimes. Two other Jefferson Parish officers were present at the time of the event, and neither confronted the

supervising officer or attempted to retrieve the torn receipt from the garbage can into which it was thrown. *See Ramon v. Lee*, 304 F.3d 473, 474-75 (5th Cir. 2002).

101. Together, these violations, among others, placed Defendant JPSO on actual notice of deficiencies in its detective training and supervision programs, procedures, and policies.

102. On information and belief, detectives and police in JPSO have similarly withheld potentially exculpatory *Brady* material, coerced witnesses into manufacturing testimony, or otherwise violated the constitutional rights of criminal defendants on other occasions, consistent with a pattern and practice of such violations.

103. The repeated suppression of exculpatory material and manufacture of witness testimony by JPSO detectives was known or should have been known to Defendant JPSO, such that there was an obvious need to take steps to control, train, or supervise in order to prevent constitutional violations from occurring. The failure of Defendant JPSO to take such actions to control, train, or supervise JPSO employees amounted to deliberate indifference to the unconstitutional practices of these officers, directly resulting in the violation of Mr. Williams' constitutional rights and Mr. Williams' injuries as alleged herein.

## FIRST CAUSE OF ACTION
## (42 U.S.C. §1983: *Brady* Claim Against Detective Thurman)

104. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

105. Defendant Thurman was in charge of investigating the murder of Michelle Gallagher.

106. Despite having in his possession exculpatory evidence that demonstrated that the case against Mr. Williams' had no merit, Defendant Thurman did not disclose this evidence to JPDA or the defense.

107. The Noon Statement suppressed by Defendant Thurman was exculpatory as to Mr. Williams' responsibility for the murder of Michelle Gallagher because it was material directly to Mr. Williams' innocence and would have allowed the defense to impeach the veracity and reliability of the testimony of the only witness to provide inculpatory testimony against Mr. Williams.

108. When JPDA learned about the Noon Statement in 2011, JPDA agreed to file a joint motion to vacate Mr. Williams' conviction and dismissed the indictment.

109. Mr. Williams' conviction was vacated.

110. As a direct result of Defendant Thurman's conduct, Mr. Williams endured an unfair trial, was falsely convicted of murder, served more than 15 years in prison for a crime he did not commit, and suffered the additional damages described above.

111. The actions of Defendants constitute, among other things, a violation of Mr. Williams' right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION**
**(42 U.S.C. § 1983: *Brady* Claim Against Defendants Dohre, John Doe 1, and Jane Doe 1)**

112. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

113. The suppressed evidentiary materials were exculpatory as to Mr. Williams' responsibility for the murder of Michelle Gallagher because they were material

directly to Mr. Williams' innocence, would have allowed the defense to impeach the veracity and reliability of the testimony of the only witness to provide inculpatory testimony against Mr. Williams, and would have directly contradicted the story told by the government's key witness at trial.

114. Mr. Williams' conviction was eventually vacated.

115. As a direct result of Defendants' conduct, Mr. Williams endured an unfair trial, was falsely convicted of murder, served more than 15 years in prison for a crime he did not commit, and suffered the additional damages described above.

116. The actions of Defendants constitute, among other things, a violation of Mr. Williams' right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

**THIRD CAUSE OF ACTION**
**(42 U.S.C. § 1983: Manufacturing Evidence Claim Against Defendant Thurman)**

117. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

118. Defendant Detective Thurman was in charge of investigating the murder of Michelle Gallagher.

119. After two weeks without any leads, Defendant Thurman threatened Landry—a crack addict who remained under the threat of prosecution for a felony theft—with prosecution for Ms. Gallagher's murder unless he testified against Mr. Williams.

120. Detective Thurman concealed Landry's Noon Statement in which Landry specifically stated (i) that he did not see Mr. Williams and Ms. Gallagher near the location where Ms. Gallagher's body was found and (ii) that the last time he saw Mr. Williams and Ms.

Gallagher was around 11:00 or 11:15 p.m.—fifteen minutes to a half hour after Ms. Gallagher was found in the middle of River Road. Defendant Thurman provided JPDA with a memorandum summarizing the case that made no mention of the Noon Statement. He further testified at trial as to "a statement" — singular — that he took from Landry.

121. Defendant Thurman testified that JPSO's roadblocks yielded no information other than "I was driving up and down the street about this time last night." In fact, Defendant Thurman interviewed a witness at a road block who claimed to have seen the victim hitchhiking within 15 to 25 minutes of when her body was discovered lying in the road, an account of the victim's whereabouts that was irreconcilable with Landry's later statements.

122. Defendant Thurman's concealment of evidence, manufacturing of evidence and knowing use of that evidence, along with his misleading testimony, to obtain a wrongful conviction deprived Mr. Williams of his right to a fair trial.

123. The actions of Defendants constitute, among other things, a violation of Mr. Williams' right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

**(42 U.S.C. § 1983: Manufacturing Evidence Claim Against Dohre, John Doe 1, and Jane Doe 1)**

124. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

125. Defendants were in charge of prosecuting Mr. Williams.

126. Defendants knowingly elicited false testimony from Landry to that was blatantly inconsistent with the 3 P.M. Statement he had earlier given the police.

127. Defendants coached Landry to shape his testimony about the route he took on his bicycle when he purportedly followed Mr. Williams so that Landry's testimony fit with the other evidence presented by the State at trial.

128. Defendants' manufacturing of evidence and knowing use of that evidence to obtain a wrongful conviction deprived Mr. Williams of his right to a fair trial.

129. The actions of Defendants constitute, among other things, a violation of Mr. Williams' right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

**(42 U.S.C. § 1983 claim against Defendants JPDA, Mamoulides, and Connick for unconstitutional policy, custom, or practice and/or deliberate indifference with respect to the discharge of JPDA's Brady obligations)**

130. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

131. JPDA charged or indicted Mr. Williams with the murder of Michelle Gallagher.

132. JPDA failed to disclose critical exculpatory evidence to Mr. Williams prior to or during the murder trial. The concealed exculpatory evidence was material, and the failure to turn over this evidence gave rise to constitutional violations of Mr. Williams' rights under *Brady*.

133. The suppressed evidentiary materials were exculpatory as to Mr. Williams' responsibility for the murder of Michelle Gallagher because they were material directly to Mr. Williams' innocence, would have allowed the defense to impeach the veracity and

reliability of the testimony of the only witness to provide inculpatory testimony against Mr. Williams, and would have directly contradicted the story told by the government's key witness at trial.

134. Mr. Williams' conviction was eventually vacated upon a joint motion by JPDA and IPNO.

135. The actions of Defendants constitute a violation of Mr. Williams' right to due process and a fair trial under the United States Constitution and under 42 U.S.C. § 1983.

136. Defendant JPDA demonstrated deliberate indifference to Mr. Williams' constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised the employees of JPDA regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees of JPDA had failed to comply with the obligations of *Brady*.

137. Defendants Mamoulides and Connick, acting in their final policymaking authority and under color of law, demonstrated deliberate indifference to Mr. Williams's constitutional rights by adopting and maintaining constitutionally deficient policies with respect to discharging JPDA's *Brady* obligations, including but not limited to failing to adequately train, monitor, and supervise the employees of JPDA regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obvious need for such training, monitoring or supervision given that their awareness of numerous prior incidents in which employees of JPDA had failed to comply with the obligations of *Brady*.

138. The general practice of withholding exculpatory evidence and failing to appropriately train was so common and well established as to constitute official policy that fairly represented JPDA's official custom, policy, and/or practice.

139. Defendants' actions and the official policy, practice, and/or custom resulted directly in the constitutionally deficient investigation and prosecution of Mr. Williams and abridged his rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

140. The official policy, practice, and/or custom of concealing exculpatory evidence and maliciously prosecuting individuals, without regard to guilt or innocence, proximately and directly caused Mr. Williams' injuries, including spending over 15 years in prison for a murder he did not commit as well as the other injuries stated herein.

141. Defendants are liable to Mr. Williams for their conduct pursuant to 42 U.S.C. § 1983.

## <u>SIXTH CAUSE OF ACTION</u>

**(42 U.S.C. § 1983 claim against Defendants JPSO and Normand for unconstitutional policy, custom, or practice and/or deliberate indifference with respect to the discharge of JPSO's *Brady* obligations and obligations to refrain from manufacturing evidence)**

142. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

143. Defendant Thurman deliberately concealed exculpatory evidence, manufactured evidence against Mr. Williams, knowingly provided misleading testimony and otherwise sought by various efforts to obtain the indictment and conviction of Mr. Williams for the murder of Michelle Gallagher.

144. Among other things, Defendant Thurman: (i) threatened Landry, a crack addict, with prosecution unless he testified against Mr. Williams; (ii) deliberately concealed a statement made by Landry in which he failed to implicate Mr. Williams; and (iii) provided JPDA prosecutors with a road map for the case based on a later statement by Landry in which inculpated Mr. Williams for Ms. Gallagher's murder.

145. Defendant Thurman further provided misleading testimony that JPSO's roadblocks yielded no information other than "I was driving up and down the street about this time last night." In fact, Defendant Thurman interviewed a witness at a road block who claimed to have seen the victim hitchhiking within 15 to 25 minutes of when her body was discovered lying in the road—the same time period in which Landry claimed she was driving around Kennedy Heights with Mr. Williams.

146. Defendant JPSO demonstrated deliberate indifference to Mr. Williams' constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised the employees of JPSO regarding the constitutional duty to disclose exculpatory evidence and to refrain from manufacturing and using manufactured evidence, despite the obviousness that such training, monitoring or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees of JPSO had failed to comply with the obligations of *Brady*.

147. The general practice by JPSO officers of manufacturing evidence in order to build a case and/or failing to disclose *Brady* material in efforts to obtain criminal convictions, and failure to adequately train with regard to same, was so common and well established as to constitute official policy that fairly represented JPSO's official custom, policy, and/or practice.

148. Defendants' actions and the official policy, practice, and/or custom resulted directly in the constitutionally deficient investigation and prosecution of Mr. Williams and abridged his rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

149. JPSO's official policy, practice, and/or custom of manufacturing evidence and/or providing perjured testimony in their efforts to obtain Mr. Williams' indictment and conviction proximately and directly caused Mr. Williams' constitutional and other injuries, including spending over 15 years in prison for a murder he did not commit as well as the other injuries stated herein.

150. Defendants are liable to Mr. Williams for their conduct pursuant to 42 U.S.C. § 1983.

**SEVENTH CAUSE OF ACTION**
**(State Law: Malicious Prosecution against Defendants JPDA, Dohre, John Doe 1, and Jane Doe 1)**

151. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

152. Defendants charged or indicted Mr. Williams with the murder of Ms. Gallagher.

153. Defendants caused the prosecution of Mr. Williams for the murder of Ms. Gallagher despite the fact that the case was based around the testimony of a known crack addict who was threatened with prosecution himself unless he gave a statement implicating Mr. Williams and who changed his story throughout the course of the investigation, indictment, and prosecution.

154. Defendants caused the prosecution of Mr. Williams for the murder of Ms. Gallagher despite having in their possession exculpatory evidence that cast doubt on the testimony of their key witness—the only witness to provide inculpatory evidence against Mr. Williams.

155. Mr. Williams' conviction was eventually vacated.

156. The actions of Defendants constitute malicious prosecution of Mr. Williams in violation of the laws of the State of Louisiana.

157. Defendants' malicious prosecution of Mr. Williams proximately and directly caused Mr. Williams' injuries, including spending over 15 years in prison for a murder he did not commit as well as the other injuries stated herein.

158. Defendants are liable to Mr. Williams for their conduct under the Laws of the State of Louisiana.

**EIGHTH CAUSE OF ACTION**
**(State Law: Intentional Infliction and/or Negligent Infliction of Emotional Distress against Defendants JPDA, JPSO, Dohre, Thurman, John Doe 1, and Jane Doe 1)**

159. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

160. The Defendants did intentionally, maliciously, and with reckless disregard and deliberate indifference to Mr. Williams' rights engage in extreme and outrageous conduct in connection with the investigation and prosecution of Mr. Williams, including but not limited to, malicious and deficient investigations and prosecutions of Mr. Williams; concealing exculpatory evidence; manufacturing inculpatory evidence; and presenting and conspiring to present false and misleading arguments and evidence to courts and juries, and as further described herein.

161. The unlawful, extreme and outrageous acts of these Defendants were undertaken for the purpose of ensuring that Mr. Williams was arrested, indicted, convicted, and imprisoned, so that Defendants could secure a conviction in the Gallagher murder investigation.

162. By their actions, the Defendants intended to inflict severe emotional distress on Mr. Williams and/or knew that such severe emotional distress would be certain or substantially certain to result from their conduct.

163. As a proximate and direct result of these Defendants' extreme and outrageous actions, Mr. Williams suffered severe emotional distress, including but not limited to the effects of losing his freedom for over 15 years of his life during which he was wrongly incarcerated as a result of Defendants' actions, for which he is entitled to damages.

164. Defendants are liable to Mr. Williams for their conduct under the Laws of the State of Louisiana.

**NINTH CAUSE OF ACTION**
**(State Law: Defamation Against Defendants Thurman, Dohre, John Doe 1, and Jane Doe 1)**

165. Mr. Williams repeats and incorporates by reference each of the preceding paragraphs.

166. Defendants published false and defamatory statements about Mr. Williams when they described Mr. Williams' alleged car ride with Michelle Gallagher, which included smoking crack and arguing, and when they otherwise described Mr. Williams' guilt for the murder of Michelle Gallagher.

167. In publishing these statements, Defendants acted with actual malice, knowing that the statements were false.

168. As a result of the actions of these Defendants, Mr. Williams suffered the ignominy of being labeled in his community as a murderer, suffered injury from his 15-plus-year

confinement including, but not limited to, pain and suffering, severe mental anguish, loss of personal freedom and personal contact, and injury to reputation.

169. Defendants are liable to Mr. Williams for defamation.

**Prayer for Relief**

Mr. Williams respectfully requests that this Court enter judgment against all Defendants on all counts of this Complaint: (a) awarding Mr. Williams compensatory and punitive damages in amounts to be determined at trial; (b) awarding Mr. Williams costs and reasonable attorneys' fees in this action pursuant to 42 U.S.C. § 1988; and (c) granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

May 16, 2012

s/ William E. Rittenberg

William E. Rittenberg (Bar No. 11287)
RITTENBERG, SAMUEL, & PHILLIPS LLC
715 Girod Street, Suite 100
New Orleans, Louisiana 70130
Phone: (504) 524-5555
Fax: (504) 524-0912
Email: Rittenberg@RittenbergSamuel.com

Christopher M. Denig
Benjamin S. Haley
Jennifer H. Saperstein
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 662-6000
Fax: (202) 778-5314
Email: bhaley@cov.com; jsaperstein@cov.com

*Attorneys for Plaintiff Michael Williams*

SERVE

**TWENTY FOURTH JUDICIAL DISTRICT COURT**
**PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** **DIVISION "O"**

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

FILED FOR RECORD 02/01/2023 13:54:37
Melissa A. Perry DY CLERK
JEFFERSON PARISH LA

**FILED:**____________________

____________________
**DEPUTY CLERK**

**ORDER**

This matter comes before the court on Petitioner's **APPLICATION FOR POST-CONVICTION RELIEF, MEMORANDUM IN SUPPORT, AND EXHIBITS, STAMPED AS FILED DECEMBER 28, 2022, AND PETITIONER'S REQUEST TO STAY POST CONVICTION PROCEEDINGS, STAMPED AS FILED JANUARY 9, 2023.**

On June 13, 2002, Petitioner was convicted by jury of the second degree murder, and on July 18, 2002, the court sentenced him to life imprisonment at hard labor. His conviction and life sentence were upheld on direct appeal. *State v. Bradley,* 2003-KA-384, (La. App. 5th Cir. 9/16/03), writ denied, 2003-K-2745 (La. 2/13/04), 867 So.2d 688. Petitioner's previously filed applications for post-conviction relief (APCRs) were denied in February 2005, in May 2008, in July 2008, and on May 2021.

Petitioner, through counsel, now files another APCR and claims factual innocence under La. C.Cr.P. art. 926.2.

Post-conviction relief law requires that if an application alleges a claim which, if proven, would entitle petitioner to relief, the court shall order the district attorney to file any procedural objections, or an answer on the merits if there are no procedural objections, within 30 days. La.C.Cr.P. art. 927. A district court may grant a summary disposition on an application for post conviction relief only after the required answer by the State has been filed. La.C.Cr.P. art. 929.

For these reasons, it is the order of this court that the State file a response raising what ever procedural objections it may have, or if no procedural objections, an answer on the merits to Petitioner's allegations.

Petitioner has also requested that the court stay proceedings. The court will allow petitioner deny petitioner extra time to supplement said APCR.

Accordingly,

**IT IS ORDERED BY THE COURT** that the State file a response within 30 days raising whatever procedural objections it may have, or if no procedural objections, an answer within 30 days on the merits.

**IT IS FURTHER ORDERED BY THE COURT** that Petitioner's may supplement his Application for Post-Conviction Relief, and any such supplements must be filed with the Clerk of Court no later than April 3, 2023.

Gretna, Louisiana, this 1st day of Feb., 2023

[signature]
**JUDGE**

**PLEASE SERVE:**
PETITIONER: Earl Bradley, DOC # 403836, Louisiana State Penitentiary, Angola, LA 70712

Defense Counsel:
Walker Lasiter, 1100 Poydras St., Ste. 2610, New Orleans, LA 70163

Justin C. Bonus, 11835 Queens Blvd., Suite 400, Forest Hills, NY 11375

Thomas Butler, Appeals Division, District Attorney's Office, 200 Derbigny Street, Gretna, LA 70053

issued 2/1/23 MP

A TRUE COPY OF THE ORIGINAL ON FILE IN THIS OFFICE.
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON



**EXHIBIT B**

RETURN

**TWENTY FOURTH JUDICIAL DISTRICT COURT**
**PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** **DIVISION "O"**

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

FILED FOR RECORD 02/01/2023 13:54:37
Melissa A. Perry DY CLERK
JEFFERSON PARISH LA

**FILED:**____________________

____________________
**DEPUTY CLERK**

**ORDER**

This matter comes before the court on Petitioner's **APPLICATION FOR POST-CONVICTION RELIEF, MEMORANDUM IN SUPPORT, AND EXHIBITS, STAMPED AS FILED DECEMBER 28, 2022, AND PETITIONER'S REQUEST TO STAY POST CONVICTION PROCEEDINGS, STAMPED AS FILED JANUARY 9, 2023.**

On June 13, 2002, Petitioner was convicted by jury of the second degree murder, and on July 18, 2002, the court sentenced him to life imprisonment at hard labor. His conviction and life sentence were upheld on direct appeal. *State v. Bradley,* 2003-KA-384, (La. App. 5th Cir. 9/16/03), writ denied, 2003-K-2745 (La. 2/13/04), 867 So.2d 688. Petitioner's previously filed applications for post-conviction relief (APCRs) were denied in February 2005, in May 2008, in July 2008, and on May 2021.

Petitioner, through counsel, now files another APCR and claims factual innocence under La. C.Cr.P. art. 926.2.

Post-conviction relief law requires that if an application alleges a claim which, if proven, would entitle petitioner to relief, the court shall order the district attorney to file any procedural objections, or an answer on the merits if there are no procedural objections, within 30 days. La.C.Cr.P. art. 927. A district court may grant a summary disposition on an application for post conviction relief only after the required answer by the State has been filed. La.C.Cr.P. art. 929.

For these reasons, it is the order of this court that the State file a response raising what ever procedural objections it may have, or if no procedural objections, an answer on the merits to Petitioner's allegations.

Petitioner has also requested that the court stay proceedings. The court will allow petitioner deny petitioner extra time to supplement said APCR.

Accordingly,

**IT IS ORDERED BY THE COURT** that the State file a response within 30 days raising whatever procedural objections it may have, or if no procedural objections, an answer within 30 days on the merits.

**IT IS FURTHER ORDERED BY THE COURT** that Petitioner's may supplement his Application for Post-Conviction Relief, and any such supplements must be filed with the Clerk of Court no later than April 3, 2023.

Gretna, Louisiana, this 1st day of Feb., 20 23

[signature]
**JUDGE**

**PLEASE SERVE:**
PETITIONER: Earl Bradley, DOC # 403836, Louisiana State Penitentiary, Angola, LA 70712

Defense Counsel:
Walker Lasiter, 1100 Poydras St., Ste. 2610, New Orleans, LA 70163

Justin C. Bonus, 11835 Queens Blvd., Suite 400, Forest Hills, NY 11375

Thomas Butler, Appeals Division, District Attorney's Office, 200 Derbigny Street, Gretna, LA 70053

issued 2/1/23 MP

A TRUE COPY OF THE ORIGINAL ON FILE IN THIS OFFICE.
Melissa
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

**TWENTY-FOURTH JUDICIAL DISTRICT COURT**
**FOR THE PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** **DIVISION "O"**

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

**FILED:**________________________ ________________________
**DEPUTY CLERK**

**STATE'S PROCEDURAL OBJECTION TO POST-CONVICTION RELIEF**

STATEMENT OF THE CASE

On October 28, 1999, the Jefferson Parish Grand Jury returned an indictment charging Earl Bradley (hereinafter "Petitioner") and co-defendant, Albert T. Russell, with Second Degree Murder (La. R.S. 14:30.1) committed on or about July 31, 1999 of Barton Sandford. The petitioner pled not guilty on February 28, 2000. The matter proceeded to trial on August 21, 2000 which resulted in a mistrial. A second trial began on June 11, 2002 wherein a twelve-person jury returned a verdict of guilty as charged. Petitioner was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on July 18, 2002. Petitioner filed an appeal seeking direct review of the following assignments of error: (1) the evidence was insufficient to convict him of second degree murder; and (2) the trial court erroneously denied the motion to suppress.

On September 16, 2003, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence. *See* State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80. Petitioner subsequently filed a writ application with the Louisiana Supreme Court, which was denied on February 13, 2004. *See* State v. Bradley, 03-2745 (La. 2/13/04), 867 So.2d 688. Pursuant to La. C.Cr.P. art. 922(D), petitioner's conviction and sentence became final on February 13, 2004.

Petitioner has previously filed four (4) applications for post-conviction relief. Petitioner filed an application for post-conviction relief on January 20, 2005, setting forth a request for DNA testing, as well as a claim for ineffective assistance of counsel with regards to Amy Larck's testimony. The claim for ineffective assistance of counsel and request for DNA testing were denied on February 1, 2005. Petitioner filed a subsequent application for post-conviction relief on May 14, 2008, which was denied on May 20, 2008 for failing to comply with La. C.Cr.P. art. 926(D).



**EXHIBIT C**

Petitioner filed a subsequent application for post-conviction relief on July 2, 2008, claiming his conviction was obtained in violation of the United State and the Louisiana Constitution in that petitioner was not informed of the nature and cause of the accusation against him, that the trial court exceeded its jurisdiction by allowing insufficient accusation allegation sheet be used for criminal charges, and double jeopardy. The application was denied on July 11, 2008. Petitioner then filed an application for post-conviction relief on April 12, 2021, claiming his conviction was unconstitutional in light of the *Ramos v. Louisiana* decision. The application was denied on May 18, 2021.

Petitioner, through counsel, filed the present application for post-conviction relief with this Honorable Court on December 28, 2022, claiming factual innocence under La. C.Cr.P. art. 926.2. The State now files the instant response in opposition to that filing. Petitioner has also asked this Honorable Court to stay the proceedings to avoid piecemeal litigation and for judicial economy.

## STATEMENT OF THE FACTS

The following facts are taken from the Louisiana Fifth Circuit opinion in petitioner's direct appeal.[1] While it is the general practice of this Court to request, as a general rule, that the facts not be included, the State includes them because they are directly pertinent to petitioner's claims of factual innocence.

> On August 1, 1999, the body of Barton Sanford was found beneath a trailer located at 7501 ½ Fourth Street near the Happy Hour Saloon in Marrerro. The cause of death was a bullet wound to the chest. Detective Donald Meunier of the Jefferson Parish Sheriff's Office investigated and eventually developed Bradley as a possible suspect. On August 7, 1999, Detective Meunier interviewed Bradley and obtained several statements.
>
> In the statements, Bradley indicated that he had attended a party at the Happy Hour Saloon on Friday, July 30, 1999 but denied knowing the victim. However, when confronted with a surveillance video tape taken outside of the Happy Hour Saloon on July 30, 1999 showing him with the victim, Bradley recanted his prior statements. Bradley told Detective Meunier that the victim wanted to purchase crack cocaine and that he had arranged for the victim to make the purchase from an individual named Jason Rivet. However, before the drug deal was completed, Bradley stopped the drug transaction and pulled the victim away because "something looked like it was going down." Bradley subsequently returned to the bar where he remained for approximately one hour before going to the Budget Motel where he remained for the night.
>
> Detective Meunier also interviewed an eyewitness, Amy Larck, who identified Bradley as the shooter. At trial, Lark testified that at the time of the shooting she was a drug addict who supported her habit by prostitution. Larck knew both Bradley and

[1] State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80.

Russell and had been at Russell's house on the evening of July 30, 1999. While there, she overheard Bradley ask Russell if he had a gun to which Russell responded, "I got that for you."

Later that evening, Larck was outside the Happy Hour Saloon where she smoked crack for most of the night. Later that night, while inside the Happy Hour Saloon, Bradley informed Larck that he had a "trick" for her, whom Larck identified as the victim. Larck and Bradley left the bar and walked around the block to give the victim time to come outside. Larck then walked into an alley behind the Happy Hour Saloon where she met the victim. Larck agreed to perform oral sex upon the victim and the victim displayed approximately sixty dollars. At that moment, Bradley and Russell walked around the corner. Bradley had a gun and was screaming at the victim. Larck began backing out of the alley and heard a gunshot. She then ran from the scene and ended up at the Budget Motel with Bradley. After five to ten minutes, Larck left the motel and received a ride to the levee from a stranger who later raped her. She later reported the rape to police but did not mention the murder at that time. Not until police picked her up in connection with the homicide investigation did she mention anything to police about the murder.

After Larck's testimony, the State rested and the defense called its first witness, Karen Breaux. Breaux testified that on July 30, 1999 she was at Russell's house until midnight and did not recall either Larck or Bradley being at the home that day or evening. At around midnight that evening, she went to the Happy Hour Saloon where she observed the victim and Bradley engaged in an argument outside. The victim was accusing Bradley of having ripped him off which Bradley denied. After a brief moment, Breaux left the area fearing police would arrive shortly.

The defense also called Tammy Disher who testified that, on the evening of July 30, 1999, she saw the victim fighting with an individual named Jason Rivet, who was carrying a gun. She did not see an argument between Bradley and the victim. However, Disher testified that while she was incarcerated with Larck prior to trial, Lark had told her that she was involved in the killing of the victim. Larck told her that she was supposed to "trick" the victim and that Bradley was supposed to rob him but that something went wrong and Bradley ended up shooting the victim.

ISSUES PRESENTED

Whether Bradley is factually innocent of the offense for which he was convicted.

BURDEN OF PROOF

Pursuant to La. C.Cr.P. art. 930.2, "[t]he petitioner in an application for post conviction relief shall have the burden of proving that relief should be granted." More particularly, La. C.Cr.P. art. 926.2 sets forth explicit parameters, discussed in more detail infra, as to what need be shown for a petitioner to demonstrate "factual innocence" thereunder.

LAW AND ARGUMENT

*Factual Innocence Claim*

The Petitioner contends he is factually innocence of the second degree murder of Barton Sandford. In support of his claim, petitioner presents affidavits of Teri-Lee Isaac and Mae Lucille Rivet Smith which purport to assert new evidence that was not known or discoverable at or prior to

trial and that which is a recantation of sworn testimony.

La. C.Cr.P. art. 926.2, governing claims of factual innocence, was enacted in Act 104 of 2021, with an effective date of August 1, 2021. Prior to Act 104 of 2021, Louisiana jurisprudence was unsettled as to whether a non-DNA based factual innocence claim was cognizable in post-conviction relief. The Louisiana Supreme Court had declined to hold that free-standing, post-conviction claims of actual innocence not based on DNA were, in fact, cognizable in collateral attacks on final convictions; however, it had observed that such claims must necessarily involve "new, material, noncumulative and conclusive evidence which meets an extraordinarily high standard, and which undermine[s] the prosecutory's entire case." State v. Conway, 01-2808 (La. 4/12/02), 816 So.2d 290, 291. (internal quotation marks and citations omitted). *See also,* State v. Paul, 15-2278 (La. 11/2/16), 202 So.3d 995, State v. Pierre, 13-873 (La. 10/15/13), 125 So.3d 403.

The State submits that it is now the provisions of La. C.Cr.P. art. 926.2 which govern petitioner's claim of factual innocence.

La. C.Cr.P. art. 926.2 provides, in pertinent part that:

> A. A petitioner who has been convicted of an offense may seek post conviction relief on the grounds that he is factually innocent of the offense for which he was convicted. A petitioner's first claim of factual innocence pursuant to this Article that would otherwise be barred from review on the merits by the time limitation provided in Article 930.8 or the procedural objections provided in Article 930.4 shall not be barred if the claim is contained in an application for post conviction relief filed on or before December 31, 2022, and if the petitioner was convicted after a trial completed to verdict. This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner. An application for post conviction relief filed pursuant to this Article by a petitioner who pled guilty or nolo contendere to the offense of conviction or filed by any petitioner after December 31, 2022, shall be subject to Articles 930.4 and 930.8.
>
> B. (1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:
>
> (i) Scientific, forensic, physical, or nontestimonial documentary evidence.
>
> (ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.
>
> (b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in

> light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.
>
> (2) A recantation of prior sworn testimony may be considered if corroborated by the evidence required by Subsubparagraph (1)(a) of this Paragraph. However, a recantation of prior sworn testimony cannot form the sole basis for relief pursuant to this Article.

La. C.Cr.P. art. 926.2 allows for a "grace period" from the procedural bars of La. C.Cr.P. arts. 930.4 and 930.8 when a petitioner convicted after trial completed to verdict files an application for post-conviction relief that invokes La. C.Cr.P. art. 926.2 on or before December 31, 2022. The State notes that the "grace period" only applies to the claim of factual innocence under La. C.Cr.P. art. 926.2 ("[t]his exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner.").

Factual innocence under La. C.Cr.P. art. 926.2 sets forth specific evidence that must be provided to assert such a claim. Per the Article, petitioner must present new, reliable, and noncumulative evidence that would be legally admissible at trial and was not known or discoverable at or prior to trial. The new, reliable, and noncumulative evidence must be either scientific, forensic, physical, or nontestimonial documentary evidence or testimonial evidence that is corroborated by evidence of the type which is scientific, forensic, physical, or nontestimonial documentary evidence. The affidavits of Ms. Isaac and Ms. Smith are insufficient to meet petitioner's burden.

Petitioner's factual innocence claim is based upon "new evidence" set forth in the affidavits of Ms. Isaac and Ms. Smith. La. C.Cr.P. art. 926.2(B)(1)(a) requires "new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial." While the State certainly does not concede that the petitioner can show that these requirements could be met by these affidavits, the affidavits most assuredly cannot satisfy the next and crucial requirement that the "new evidence" be either: (i) scientific, forensic, physical, or nontestimonial documentary evidence; or, (ii) testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subparagraph. *See* La. C.Cr.P. art.

926.2(B)(1)(a)(ii).

The affidavits of Ms. Isaac and Ms. Smith are simply "testimonial evidence." The Louisiana Fifth Circuit has recognized that an affidavit is testimonial evidence and alone, is insufficient to prove "factual innocence" under the Article. *See* Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order)[2], writ denied Jackson v. Hooper, 22-1123 (La. 11/1/22), 348 So.3d 1267.[3] As testimonial evidence, the affidavits must be corroborated by scientific, forensic, physical, or nontestimonial documentary evidence that is new, reliable, and noncumulative and was not known or discoverable at or prior to trial. La. C.Cr.P. art. 926.2(B)(1)(a)(i) and (ii). The Fifth Circuit has further held in claims of factual innocence that depositions are considered "testimonial evidence" which must be corroborated by scientific, forensic, physical, or nontestimonial documentary evidence pursuant to La. C.Cr.P. art. 926.2(B)(1)(a)(ii). *See* Washington v. State, 23-KH-29 (La. App. 5 Cir. 2/1/23) (unpublished order)[4], writ denied Washington v. State 22-1026 (La. 11/22/22), 350 So.3d 498. In State v. Granger, 23-KH-38 (La. App. 5 Cir. 2/1/23) (unpublished order),[5] the Fifth Circuit also found in claims of factual innocence that transcripts and documents alone do not comply with the Article's evidentiary requirements and must be corroborated by scientific, forensic, physical, or nontestimonial documentary evidence per La. C.Cr.P. art. 926.2(B)(1)(a)(ii). Similarly here, petitioner seeks to support his claim of factual innocence with testimonial evidence alone and fails to provide any corroborating scientific, forensic, physical, or nontestimonial documentary evidence as mandated by La. C.Cr.P. art. 926.2.

Petitioner has provided the affidavit of Ms. Isaac to support his claim of factual innocence. Ms. Isaac's affidavit is testimonial evidence that must be corroborated by that evidence listed in La. C.Cr.P. art. 926.2(B)(1)(a)(ii). *See* Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order)[6], writ denied Jackson v. Hooper, 22-1123 (La. 11/1/22), 348 So.3d 1267. Ms. Isaac attests to the petitioner's innocence in her affidavit and references copies of handwritten letters to petitioner and printouts from Facebook messenger that purport to be from a trial witness, Ms.

[2] Exhibit 3 - Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order).

[3] Exhibit 4 - Jackson v. Hooper, 22-1123 (La. 11/1/22), 348 So.3d 1267.

[4] Exhibit 5 - Washington v. State, 23-KH-29 (La. App. 5 Cir. 2/1/23) (unpublished order).

[5] Exhibit 6 - State v. Granger, 23-KH-38 (La. App. 5 Cir. 2/1/23) (unpublished order).

[6] Exhibit 3 - Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order).

Larck. The "corroborating evidence" of handwritten letters to petitioner and Facebook messenger communications are clearly not scientific, forensic, physical, or nontestimonial documentary evidence as required per La. C.Cr.P. art. 926.2(B)(1)(a)(ii). As such, Ms. Isaac's affidavit and "corroborating evidence" are insufficient to meet the standards set forth in a factual innocence claim.

Additionally, petitioner has provided the affidavit of Ms. Smith to promote his claim of factual innocence. Ms. Smith's affidavit is, likewise, testimonial evidence that must be corroborated by the evidence specified in La. C.Cr.P. art. 926.2(B)(1)(a)(ii). Ms. Smith states in her affidavit that Ms. Larck was not in the alley at the time of the shooting. Petitioner has provided no evidence of any kind to corroborate the testimonial evidence of Ms. Smith's affidavit, much less evidence that meets the criteria set forth in La. C.Cr.P. art. 926.2(B)(1)(a)(ii).[7]

The State maintains petitioner's evidence is categorically and explicitly insufficient to meet petitioner's burden in factual innocence. Accordingly, petitioner has failed to meet the burden clearly set forth in La. C.Cr.P. art. 926.2(B)(1)(a)(ii).

La. C.Cr.P. art. 926.2(B)(1)(b) further provides the petitioner's burden as:

> To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

While petitioner's "evidence" does not meet the "clear and convincing" standard therein, this Honorable Court need not and should not reach that point in the analysis because petitioner's "evidence" of Ms. Isaac and Ms. Smith's affidavits does not meet the requirement that the evidence "satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph" because affidavits and trial transcript are not scientific, forensic, physical, or nontestimonial documentary evidence" nor are they

---

[7] Dr. Susan Garcia was the forensic pathologist who performed Mr. Sanford's autopsy and testified at trial. Petitioner has attached as an Exhibit a portion of Dr. Garcia's trial testimony to support his claim of factual innocence. "Transcripts and documents alone do not comply with this Article's evidentiary requirements; they must be corroborated by scientific, forensic, physical, or nontestimonial documentary evidence, as per La. C.Cr.P. art. 926.2(B)(1)(a)(ii.)." *See* State v. Granger, 23-KH-38 (La. App. 5 Cir. 2/1/23) (unpublished order). Thus, petitioner's use of Dr. Garcia's trial transcript, alone, is insufficient as it must be corroborated by scientific, forensic, physical, or nontestimonial documentary evidence. Petitioner has failed to provide the requisite evidence under factual innocence as petitioner has not provided the necessary evidence to corroborate Dr. Garcia's trial testimony as per La. C.Cr.P. art. 926.2(B)(1)(a)(ii).

corroborated by that type of evidence required per the Article. Petitioner is unable to state a facially qualifying claim of "factual innocence" under La. C.Cr.P. art. 926.2 and his application for post-conviction relief should thus be denied without further proceedings.[8]

*Claims of Ineffective Assistance of Counsel, Due Process Violation under Brady and Napue*

The "grace period" in La. C.Cr.P. art. 926.2(A) only applies to the "factual innocence" claim itself, not to any claim "bootstrapped" thereto.[9] The Article provides, in pertinent part:

> This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner.

La. C.Cr.P. art. 930.8(A) provides that "[n]o application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922…" subject to certain exceptions which do not apply. Petitioner was convicted and sentenced on July 18, 2002. Petitioner's appeal was denied on September 16, 2003[10] and his writ application to the Louisiana Supreme Court denied on February 13, 2004.[11] Thus, petitioner's conviction and sentence became final on February 13, 2004, per La. C.Cr.P. art. 922(D), and petitioner had two years from that date, or until February 13, 2006, to seek post-conviction relief. Petitioner did not file his instant application until December 28, 2022, obviously far beyond February 13, 2006.

The timeliness requirements in La. C.Cr.P. art. 930.8 are jurisdictional. State v. Clark, 18-519 (La. App. 5 Cir 12/27/18), 263 So.3d 957, 960. The burden is on petitioner to demonstrate that an exception is applicable. *See* State ex rel. Banks v. State, 15-1776 (La. 2/26/16), 184 So.3d 1277

---

[8] Petitioner claims that the affidavit of Ms. Isaac is a recantation of prior sworn testimony of Ms. Larck. La. C.Cr.P. art. 926.2(B)(2) provides a recantation of sworn testimony may be considered if corroborated by scientific, forensic, physical, or nontestimonial documentary evidence. A recantation of sworn testimony, which the State does not concede has occurred, may be considered if corroborated by scientific, forensic, physical or nondocumentary evidence. Petitioner has attached to Ms. Isaac's affidavit what purport to be copies of handwritten letters to petitioner and Facebook messenger communications which clearly are not scientific, forensic, physical, or nontestimonial documentary evidence that could be used to corroborate a recantation of sworn testimony. As such, petitioner has failed to set forth a basis upon which Ms. Larck's alleged recantation of sworn testimony could be considered by this Honorable Court in a claim of factual innocence.

[9] Petitioner contends that McQuiggin v. Perkins, 569 U.S. 383, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013), is applicable and serves as a basis for petitioner to seek post-conviction relief. In State v. Edwards, 14-1737 (La. 4/10/15), 164 So.3d 823, the Louisiana Supreme Court held that "McQuiggin does not purport to govern state post-conviction proceedings conducted under state law..." Therefore, the State asserts any reliance upon McQuiggin by petitioner is misplaced.

[10] State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80.

[11] State v. Bradley, 03-2745 (La. 2/13/04), 867 So.2d 688.

(denying the writ application on the basis that "[t]he application was not timely filed in the district court, and relator fails to carry his burden to show that an exception applies"). Petitioner has failed to set forth a basis wherein an exception to La. C.Cr.P. art. 930.8 applies.

Furthermore, the instant application for post-conviction relief is successive. Petitioner has unsuccessfully litigated previous applications for post-conviction relief over the years (in 2005, 2008, and 2021). La. C.Cr.P. art. 930.4(D) provides that "[a] successive application shall be dismissed if it fails to raise a new or different claim," and La. C.Cr.P. art. 930.4(E) provides that "[a] successive application shall be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application." Accordingly, petitioner's claim for ineffective assistance of counsel is procedurally barred pursuant to La. C.Cr.P. art. 930.8 and La. C.Cr.P. art. 930.4 as untimely and successive.

Petitioner seeks post-conviction relief claiming the State failed to provide to defense counsel information concerning prior arrests of Ms. Larck, which petitioner contends is a *Brady* violation. Petitioner claims the State violated Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1174, 3 L.Ed2d 1217 (1959) by knowingly using Ms. Larck's false testimony to obtain a conviction. Again, the exception to La. C.Cr.P. arts. 930.4 and 930.8 shall apply only to the claim of factual innocence and shall not apply to any other claims raised by the petitioner. Thus, petitioner's request for post-conviction relief claiming alleged *Brady* and *Napue* violations are procedurally barred as untimely pursuant to La. C.Cr.P. art. 930.8.

Petitioner is not seeking a new or different claim, as petitioner has repeatedly addressed Ms. Larck's testimony in both his direct appeal and his 2005 application for post-conviction relief. Moreover, if the statements made in the affidavits of Ms. Isaac and Ms. Smith are considered a "new or different claim," petitioner inexcusably failed to raise the claim in his four previous applications for post-conviction relief. Therefore, in addition to being untimely, petitioner's application for post-conviction relief regarding alleged *Brady* and *Napue* violations are procedurally barred as successive pursuant to La. C.Cr.P. art. 930.4(D) and/or (E).

*Request for Stay*

Petitioner asks this Honorable Court to stay the proceedings. Petitioner argues that petitioner's investigation of factual innocence is ongoing and that he intends to supplement and/or amend his application as a result. The State maintains there is no basis upon which this Honorable

Court should stay the proceedings and asks the Honorable Court to rule upon petitioner's claims at this time.

RESERVATION OF RIGHTS

La. C.Cr.P. art. 927(A) provides, in pertinent part, "[i]f procedural objections are timely filed, no answer on the merits of the claim may be ordered until subject objections have been considered and rulings thereon have become final." The State does not waive any procedural objections or defenses. The State would respectfully reserve the right raise additional procedural objections, as well as to submit argument on the merits of the claims and additional legal authority, documents, record citations and/or other evidence in the case in support of and/or supplementation to its opposition.

CONCLUSION

Petitioner's claims are without merit. Additionally, as this Court can justly rule upon Petitioner's claims without an evidentiary hearing, an evidentiary hearing is unnecessary. The State prays that this Court deny the Petitioner's application for post-conviction relief and the request to stay the proceedings. The State respectfully does not waive any procedural objections or arguments on the merits and would respectfully reserve the right to submit additional documentation and argument should this Court required.

Respectfully submitted,
**PAUL D. CONNICK, JR.**

MONIQUE D. NOLAN, #27431
ASSISTANT DISTRICT ATTORNEY
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053
(504) 368-1020

CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served on all parties by placing the same in the United States mail, postage prepared, this 3rd day of March, 2023.

MONIQUE D. NOLAN

TWENTY-FOURTH JUDICIAL DISTRICT COURT

FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

NO. 99-5825 DIVISION "O"

STATE OF LOUISIANA

VERSUS

EARL BRADLEY

FILED:____________________ ____________________
DEPUTY CLERK

STATE'S SUPPLEMENT TO PROCEDURAL OBJECTION TO POST-CONVICTION RELIEF

NOW INTO COURT, through the undersigned Assistant District Attorney, comes the State of Louisiana, which respectfully seeks to supplement the State's Procedural Objection to Post-Conviction Relief in the above-captioned case for the following reasons:

1.

On March 3, 2023, the State filed its Procedural Objections to Post-Conviction Relief in this matter. The State referenced as Exhibits three unpublished writ opinions and a writ denial. The Exhibits were inadvertently omitted by the State and not attached.

2.

The State seeks to supplement its response with the State's Exhibits 3-6, which are Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order), Jackson v. Hooper, 22-1123 (La. 11/1/22), 348 So.3d 1267, Washington v. State, 23-KH-29 (La. App. 5 Cir. 2/1/23) (unpublished order), and State v. Granger, 23-KH-38 (La. App. 5 Cir. 2/1/23) (unpublished order).

3.

The State contends the Exhibits are necessary for a full and fair evaluation of the issues presented. Accordingly, the State respectfully supplements its Procedural Objections to Post-Conviction Relief with the Exhibits.

EXHIBIT D

WHEREFORE, the State of Louisiana supplements its Procedural Objections to Post-Conviction Relief with Exhibits 3-6.

Respectfully submitted,

MONIQUE D. NOLAN #27421
ASSISTANT DISTRICT ATTORNEY
OFFICE OF THE DISTRICT ATTORNEY
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053
(504) 368-1020
mnolan@jpda.us

I do hereby certify that a copy of the foregoing *State's Supplement to Procedural Objections to Post Conviction Relief* has been served upon:

P. Walker Lasiter
1100 Poydras St., Ste. 2610
New Orleans, La. 70163

Justin C. Bonus
118-35 Queens Blvd., Ste. 400
Forest Hills, NY 11375

as counsel for the State of Louisiana, by placing same in the United States mail, postage prepaid, this 8th day of March, 2023.

MONIQUE D. NOLAN

HOUSTON JACKSON

VERSUS

TIM HOOPER, WARDEN

NO. 22-KH-251

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS
Susan S. Buchholz
Susan S. Buchholz
First Deputy, Clerk of Court

June 24, 2022

Susan Buchholz
First Deputy Clerk

**IN RE** HOUSTON JACKSON

---

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE LEE V. FAULKNER, JR., DIVISION "P", NUMBER 98-4959

---

Panel composed of Judges Jude G. Gravois,
Robert A. Chaisson, and Hans J. Liljeberg

## WRIT DENIED

Relator, Houston Jackson, seeks this Court's supervisory review of the trial court's May 4, 2022 ruling which denied his fourth application for post-conviction relief ("APCR"). He argues herein that the trial court erred when it found that the affidavit of Larry Stovall, submitted in support of relator's actual innocence claims under La. C.Cr.P. art. 926.2, was not new evidence, and further did not meet the strict requirements of Article 926.2. Upon review, for the following reasons, we find that the trial court did not abuse its discretion in denying relator's APCR, and accordingly, we deny the writ application.

In November of 1998, relator was convicted of one count of second degree murder and one count of conspiracy to commit armed robbery. He was sentenced to life imprisonment on the second degree murder count, and 49½ years at hard labor on the conspiracy count as a second-felony offender. This Court affirmed relator's convictions on appeal. *State v. Jackson*, 00-221, c/w *State v. Kelly*, 00-222, c/w *State v. Culverson*, 00-223 (La. App. 5 Cir. 3/15/01), 783 So.2d 482, *writs denied*, *State v. Jackson*, 01-1071 (La. 5/9/03), 843 So.2d 385.

Previously, relator filed three APCRs, all of which were denied by the trial court. Writ applications filed to this Court were thereafter denied, as well as by the Louisiana Supreme Court, as detailed in the trial court's May 4, 2022 ruling.[1] The

---

[1] The trial court's ruling provided the following background information regarding relator's previous APCRs:

> This court denied Petitioner's first application for post-conviction relief (APCR) on May 7, 2004, holding that the case under which he filed his application was dismissed on April 18, 1998. Petitioner sought writs, which were

PENGAD 800-631-6989
STATE'S EXHIBIT
3

trial court also noted that the Supreme Court issued a *per curiam* on January 9. 2018, finding that relator had exhausted his right to state collateral review, unless he could show one of the narrow exceptions authorizing a successive application. *See State v. Jackson*, 232 So.3d at 543.

In his writ application, relator argues that the trial court erred in denying his most recent APCR, wherein he asserted four claims: ineffective assistance of counsel (claim 1); claims of actual innocence pursuant to La. C.Cr.P. art. 926.2, which was enacted in 2021 (claims 2 and 3), and a claim of "cumulative errors" (claim 4). In his writ application, however, relator assigns as error only the portion of the ruling that pertains to the affidavit of Larry Stovall, submitted in support of his actual innocence claims.

Relator argues that the affidavit of Larry Stovall is "new evidence," that in combination with the "other evidence" (recantations of other witnesses, provided in previous APCRs), is "clear and convincing evidence" of factual innocence, and therefore his claims are timely and not procedurally barred under Articles 926.2, 930.4, or 930.8. He also argues that he is entitled to an evidentiary hearing.

Under La. C.Cr.P. art. 930.2, the petitioner in an application for post-conviction relief has the burden of proving that relief should be granted. The standard of review of a trial court's ruling on an application for post-conviction relief is abuse of discretion. *Carlin v. Cain*, 97-2390 (La. 1998), 706 So.2d 968.

The trial court's ruling properly considered the Stovall affidavit in the context of the requirements of Article 926.2. Importantly, the trial court found that the Stovall affidavit did not fit the required criteria found in paragraph B(1) of Article 926.2, which provides:

> B.(l)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:

---

denied. *State v. Jackson*, 04-832 (La. App. 5 Cir. 7/22/04) (unpublished opinion). The Louisiana Supreme Court denied cert. *State v. Jackson*, 04-2376 (La. 6/3/05), 903 So.2d 451. Petitioner later filed a writ pursuant to *Cordero*, and the Fifth Circuit reviewed the merits of his previously filed application, finding no error in the prior ruling of the court. *Jackson v. State*, 08-WR-975 (La. App. 5 Cir. 2/24/10), *writ denied*, 2010-KH-649 (La. 3/4/11).

Petitioner filed another APCR on September 18, 2012, alleging the State withheld *Brady* evidence and denial of fair trial due to cumulative error. This court denied Petitioner's successive APCR relief on January 30, 2013. Petitioner sought appellate writs, which were denied. *Jackson v. State*, 13-KH-221 (La. App. 5 Cir. 4/16/13), *writ denied*, *State ex rel. Jackson v. State*, 2013-KH-1120 (La. 11/15/13), 125 So.3d 1102, *reconsideration denied*, 2013-KH-1 12.0 (La. 2/7/14), 131 So.3d 851.

Petitioner, through counsel, filed another APCR on October 23, 2015, alleging prosecutorial misconduct, and that the State withheld exculpatory evidence at trial and intentionally coerced and introduced perjured testimony. Petitioner claimed the State forced State's witness Derrick Dunbar to present perjured testimony by being threatened by revocation. Petitioner attached an affidavit of Dunbar to his pleading. The court denied that APCR on February 22, 2016. Petitioner sought appellate writs, which were denied. *State v. Jackson*, 16-KH-314 (La. App. 5 Cir. 7/20/16), *writ denied*, 2016-KP-1600 (La. 1/9/18), 232 So.3d 543.

(i) Scientific, forensic, physical, or nontestimonial documentary evidence.

(ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.

(b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

An affidavit is testimonial evidence, and under Article 926.2(B)(l)(a) must be supported by "new, reliable, and noncumulative evidence … not known or discoverable at or prior to trial" <u>and</u> that is either "scientific, forensic, physical, or nontestimonial documentary evidence." First, the trial court found that the Stovall affidavit was not new evidence. The writ application indicates that this witness was known to relator well before trial. The claim herein that Mr. Stovall was prevented from coming forward sooner or that this evidence was previously undiscoverable is unsupported and uncorroborated. Further, as the trial court found, under Article 926.2(B)(l)(a)(i) and (ii), an affidavit alone is insufficient to prove innocence. This affidavit is uncorroborated by any "scientific, forensic, physical, or nontestimonial documentary evidence." Also, the affidavit itself, as the trial court also noted, does not absolve relator of any culpability.

Relator argues that the affidavit should be considered along with all the prior affidavits of recanting witnesses found in previous APCRs. This argument, however, is contrary to the specific requirements of Article 926.2 as previously noted.

Finally, relator argues that he is entitled to an evidentiary hearing under La. C.Cr.P. art. 930. La. C.Cr.P. art. 929(A) provides: "If the court determines that the factual and legal issues can be resolved based upon the application and answer, and supporting documents, including relevant transcripts, depositions, and other reliable documents submitted by either party or available to the court, the court may grant or deny relief without further proceedings." Considering the above analysis, we find no error in the trial court's ruling that relator's claims are procedurally barred, and thus relator does not show that he is entitled to an evidentiary hearing under Article 930.

In conclusion, for the foregoing reasons, we find that the trial court did not abuse its discretion in rejecting relator's factual innocence claims on both procedural and substantive grounds. Thus, we find that the trial court did not abuse its discretion in denying relator's APCR. Accordingly, this writ application is denied.

Gretna, Louisiana, this 24th day of June, 2022.

**JGG**
**RAC**
**HJL**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
INTERIM CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **06/24/2022** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

Curtis B. Pursell
CURTIS B. PURSELL
CLERK OF COURT

# 22-KH-251

**E-NOTIFIED**

24th Judicial District Court (Clerk)
Hon. Lee V. Faulkner, Jr. (DISTRICT JUDGE)
Thomas J. Butler (Respondent)
Jeigh Britton (Relator)
Samuel H. Winston (Relator)

**MAILED**

348 So.3d 1267 (Mem)
Supreme Court of Louisiana.

Houston JACKSON
v.
Tim HOOPER, Warden

No. 2022-KP-01123
|
November 1, 2022

Applying For Supervisory Writ, Parish of Jefferson, 24th Judicial District Court Number(s) 98-4959, Court of Appeal, Fifth Circuit, Number(s) 22-KH-251.

**Opinion**

***1** Writ application denied. See per curiam.

PER CURIAM:

Denied. Applicant has previously exhausted his right to state collateral review and fails to show that any exception permits his successive filing. *See State v. Jackson*, 16-1600 (La. 1/9/18), 232 So.3d 543.

**All Citations**

348 So.3d 1267 (Mem), 2022-01123 (La. 11/1/22)

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.



STATE'S EXHIBIT 4
PENGAD 800-631-6989

| | |
|---|---|
| KENNETH WASHINGTON | NO. 23-KH-29 |
| VERSUS | FIFTH CIRCUIT |
| STATE OF LOUISIANA | COURT OF APPEAL |
| | STATE OF LOUISIANA |

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS
Wiseman
Linda Wiseman
First Deputy, Clerk of Court

February 01, 2023

Linda Wiseman
First Deputy Clerk

**IN RE** KENNETH WASHINGTON

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE RAYMOND S. STEIB, JR., DIVISION "A", NUMBER 14-3904

Panel composed of Judges Fredericka Homberg Wicker, Jude G. Gravois, and Marc E. Johnson

**WRIT DENIED**

Relator, Kenneth Washington, seeks this Court's supervisory review of the trial court's November 3, 2022 ruling which denied his application for post-conviction relief ("APCR"). For the reasons that follow, we deny this writ application.

On January 20, 2016, relator was found guilty of aggravated obstruction of a highway of commerce (count one) and resisting a police officer with force or violence (count two). On April 28, 2016, the trial court sentenced relator to one year and six months' imprisonment at hard labor on each count, to run concurrently. On that same date, the trial court adjudicated relator as a third-felony offender. Relator's original sentence on count one was vacated, and he was resentenced to ten years' imprisonment at hard labor without the benefit of probation or suspension of sentence, to run concurrently with the sentence on count two. Relator's conviction for aggravated obstruction of a highway of commerce and his habitual offender sentence were affirmed by this Court on September 26, 2017. *State v. Washington*, 17-16 (La. App. 5 Cir. 9/26/17), 228 So.3d 289. Relator did not file a writ application with the Louisiana Supreme Court.

On October 31, 2022, relator filed his APCR with the trial court, raising a claim of factual innocence pursuant to La. C.Cr.P. art. 926.2. On November 3, 2022, the trial court denied relief, finding that relator failed to meet his burden of proof under La. C.Cr.P. art. 926.2.

In his APCR and writ application, in support of his claim of factual innocence, relator relies on the depositions of three police officers involved in his pursuit and arrest: Detective William Whittington, Detective Joseph Waguespack,

STATE'S EXHIBIT 5

and Deputy Sean Lee. The three depositions, all dated October 14, 2016, were taken approximately nine months after relator's trial in connection with a lawsuit relator had filed against the officers for injuries he suffered during his arrest. According to relator, the depositions reveal that the officers were instructed to terminate the pursuit but failed to do so. Specifically, relator points to Detective Whittington's statement that he was contacted by Lieutenant Emilio Lopez who told him to stop the pursuit. Thus, according to relator, the instant offenses would not have occurred had the officers complied with the order to stop the pursuit. Relator also contends that Detective Waguespack and Deputy Lee both revealed during their depositions that relator was struck by Deputy Lee, thereby showing that relator's actions during the arrest were an attempt to defend himself from excessive force rather than resistance on his part.

La. C.Cr.P. art. 926.2 provides in pertinent part:

A. A petitioner who has been convicted of an offense may seek post conviction relief on the grounds that he is factually innocent of the offense for which he was convicted. A petitioner's first claim of factual innocence pursuant to this Article that would otherwise be barred from review on the merits by the time limitation provided in Article 930.8 or the procedural objections provided in Article 930.4 shall not be barred if the claim is contained in an application for post conviction relief filed on or before December 31, 2022, and if the petitioner was convicted after a trial completed to verdict. This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner. ...

B. (1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:

(i) Scientific, forensic, physical, or nontestimonial documentary evidence.

(ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.

(b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

* * *

Upon review, we find that relator failed to meet the requirements established by La. C.Cr.P. art. 926.2(B) to produce scientific, forensic, physical, or nontestimonial documentary evidence to corroborate the officers' depositions. As testimonial evidence, the depositions alone are not sufficient to satisfy the requirements of Section (B)(1)(a)(ii), which requires corroboration by scientific, forensic, physical, or nontestimonial documentary evidence. Accordingly, we find that relator's factual innocence claim failed to meet the requirements set forth in La. C.Cr.P. art. 926.2.

Therefore, because relator's claim does not meet the requirements of La. C.Cr.P. art. 962.2, we find that his claim is untimely, given that relator's convictions and sentences became final in 2017. *See* La. C.Cr.P. art. 930.8(A).

Accordingly, this writ application is denied.

Gretna, Louisiana, this 1st day of February, 2023.

**JGG**
**FHW**
**MEJ**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
INTERIM CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **02/01/2023** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

*Curtis B. Pursell*

CURTIS B. PURSELL
CLERK OF COURT

# 23-KH-29

**E-NOTIFIED**
24th Judicial District Court (Clerk)
Hon. Raymond S. Steib, Jr. (DISTRICT JUDGE)
Thomas J. Butler (Respondent)

**MAILED**
Kenneth Washington #486881 (Relator)
Rayburn Correctional Center
27268 Highway 21
Angie, LA 70426

STATE OF LOUISIANA

VERSUS

CLEVERN GRANGER

NO. 23-KH-38

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS
Wiseman
Linda Wiseman
First Deputy, Clerk of Court

February 01, 2023

Linda Wiseman
First Deputy Clerk

**CONFIDENTIAL**
LSA-RS 46:1844(W)
ATTORNEYS OF RECORD
ONLY

**IN RE** CLEVERN GRANGER

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE FRANK A. BRINDISI, DIVISION "E", NUMBER 09-1789

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Robert A. Chaisson

**WRIT DENIED**

Relator, Clevern Granger, seeks a writ of mandamus from this Court, directing the district court to order the State to respond to relator's application for post-conviction relief ("APCR") and to set a hearing on relator's APCR that set forth a claim of factual innocence as per the recently enacted La. C.Cr.P. art. 926.2. Relator states that he filed his APCR within the time limit allowed by Article 926.2 (December 30, 2022). He argues that the trial court erred in denying his APCR without a response from the State and a hearing, which he contends is required under the new statutory scheme for the assertion of factual innocence claims in post-conviction proceedings.

By way of background, in 2011, relator was tried by a jury and convicted as charged of one count of aggravated burglary in violation of La. R.S. 14:60, and one count of forcible rape in violation of La. R.S. 14:42.1. Relator's convictions and sentences were affirmed on appeal. *State v. Granger*, 12-193 (La. App. 5 Cir. 10/30/12), 103 So.3d 576, *writ denied*, 12-2587 (La. 4/26/13), 112 So.3d 840.

Relator filed the instant APCR in the district court on December 8, 2022, asserting a claim of factual innocence under La. C.Cr.P. art. 926.2. In its ruling denying relator's APCR, the trial court found that relator's application failed to comply with the requirements of La. C.Cr.P. 926.2, in that relator did not support his claim of factual innocence with "any evidence as required by La. C.Cr.P. art. 926.2(B)(l)(a)," but rather attached various transcripts and documents to his APCR in support of his claim, and further that his claims were "vague, purely speculative, and conclusory." The trial court then denied relator's APCR after finding that the time bars of La. C.Cr.P. arts. 930.3, 930.4, and 930.8 applied to relator's claim.

STATE'S EXHIBIT 6

La. C.Cr.P. art. 926.2(B)(l)(a) requires that an applicant asserting a factual innocence claim support the application by the following:

> B.(1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:
>
> (i) Scientific, forensic, physical, or nontestimonial documentary evidence.
> (ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.

Upon review, we find no basis upon which to rule that the trial court erred in its conclusion that relator failed to support his factual innocence claim with the type of evidence required by La. C.Cr.P. art. 926.2. Transcripts and documents alone do not comply with this Article's evidentiary requirements; they must be corroborated by scientific, forensic, physical, or nontestimonial documentary evidence, as per La. C.Cr.P. art. 926.2(B)(1)(a)(ii). Relator's writ application to this Court fails to contain or attach the exhibits (transcripts and documents) which the trial court reviewed and refers to in its ruling of January 5, 2023. For the same reason, we find no basis upon which to rule that the trial court erred in dismissing relator's APCR without ordering a response from the State or an evidentiary hearing, as per La. C.Cr.P. arts. 928 and 929.

Further, relator argues that a remand is necessary because the trial court failed to specifically address whether the time bar exception applied to relator's application, as per *Dickerson v. Hooper*, 21-740 (La. App. 5 Cir. 1/12/22), 2022 WL 110231. On the contrary, however, we find that the trial court addressed the time bar when it found that relator failed to properly support his claim of factual innocence as required by La. C.Cr.P. art. 926.2(B)(1)(a)(ii) and concluded that the time bars of La. C.Cr.P. arts. 930.3, 930.4, and 930.8 therefore applied to relator's APCR.

For the foregoing reasons, this writ application is denied.

Gretna, Louisiana, this 1st day of February, 2023.

**JGG**
**FHW**
**RAC**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
INTERIM CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **02/01/2023** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

# 23-KH-38

**E-NOTIFIED**
24th Judicial District Court (Clerk)
Honorable Frank A. Brindisi (DISTRICT JUDGE)
Thomas J. Butler (Respondent)

**MAILED**
Clevern Granger #587600 (Relator)
Dixon Correctional Institute
Post Office Box 788
Unit-2 Dorm
Jackson, LA 70748

**24TH JUDICIAL DISTRICT COURT**
JEFFERSON PARISH
STATE OF LOUISIANA

EARL BRADLEY
Petitioner

DOCKET No. 99-5825

Versus

TIMOTHY HOOPER, Warden
Louisiana State Penitentiary

FILED:____________________

____________________
DEPUTY CLERK

**OPPOSITION TO STATE'S PROCEDURAL OBJECTIONS**

**NOW INTO COURT**, through undersigned counsel, comes Petitioner Earl Bradley, DOC # 403836, respectfully submitting this Opposition to the State's Procedural Objections. Here, the State has taken the position that procedure takes precedence over substantial claims of innocence and constitutional violations that have never been litigated and were just discovered. Murray v. Carrier, 477 U.S. 478, 494 (1986) (substantive claims of innocence and due process violations overcome any procedural bar).[1] Here, Mr. Bradley has presented new testimonial evidence in the form of affidavits (Terri Lee Isaac, Mae Rivet Smith, and Albert Russell) that are corroborated by physical and medical evidence, thereby meeting the requirements of 926.2 and met the exceptions in 930.3, 930.4 and 930.8.[2]

Significantly, the cases cited by the State in its exhibits *do not support the position that* La.C.Cr.P. § 926.2(B)(1)(a)(i)[3] must be newly discovered when it is submitted along with testimonial evidence in the form of sworn affidavits. None of the cases cited by the State offered both testimonial and physical, medical and nontestimonial documentary evidence as Mr. Bradley

[1]Carrier and the progeny of cases that follow have long established that the law of the land in both state and federal court is that both factual evidence of innocence and substantive due process violations overcome procedural bars. This applies to Louisiana law. The Supremacy Clause of the Constitution of the United States (Article VI, Clause 2) establishes that the Constitution, federal laws made pursuant to it, and treaties made under its authority, constitute the "supreme Law of the Land," and thus take priority over any conflicting state laws.

[2] Not to mention that the State committed a Brady violation when it failed to turn over Amy Larck's criminal history that included several convictions *prior to the trial.*

[3] "Scientific, forensic, physical, or nontestimonial documentary evidence." La. Code Crim. Proc. art. 926.2(A)(1)(a)(i).



**EXHIBIT E**

E-Filed:03/31/2023 11:27:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

has done in the case at bar. See Memorandum Exhibits A, B, E, F, D, H, and Albert Russell's affidavit submitted in Mr. Bradley's supplemental PCR. Contrary to the State's position, this Court must consider all the evidence submitted to the jury pursuant to La.C.Cr.P. § 926.2(B)(1)(b), which aligns with Petitioner's position that "[s]cientific, forensic, physical, or nontestimonial documentary evidence", when submitted as corroborative evidence of La.C.Cr.P. § 926.2(B)(1)(a)(ii), does not have to be "new". Interestingly, the language in La.C.Cr.P. § 926.2(B)(1)(b) aligns with the United Supreme Court precedent in House v. Bell, 547 U.S. 518, 537-538 (2006), which held that a post-conviction court *must consider all of the evidence, whether old or new "without regard to whether it would be necessarily admitted under rules of admissibility that would govern at trial*." Id. (citing Schlup v. Delo, 513 U.S. 298, 327-328 (1995)). The video evidence (Exhibit B of Mr. Bradley's PCR), the supplemental report from the Jefferson Parish Sheriff's department (Exhibit A of Mr. Bradley's PCR), which is a business record, the medical findings regarding the time of death by Dr. Garcia[4] (Exhibit E of Mr. Bradley's PCR), and the drug arrest of Earl Bradley (Exhibit D of Mr. Bradley's PCR) corroborate all of the testimonial evidence submitted in Terri-lee Isaac's, Mae Rivet Smith's, and Albert Russell's affidavits.

But here, Earl Bradley *has submitted* new "nontestimonial documentary evidence" that substantiates all three affidavits and Mr. Bradley's position that Amy Larck lied at trial and perjured herself: the letters and Facebook messages from Amy Larck herself. See State v. Lang, (La.app. 5 Cir 10/9/2013) 128 So.3d 330, 338-339 (citing Crawford v. Washington, 124 St. C. 1354, 1364, 1374 (2004); State v. Leonard, (La.app. 5 Cir. 7/26/2005) 910 So.2d 977, 989-990 (Testimonial evidence is defined as "affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements" used by the prosecution.) Here, the letters and Facebook messages from Amy Larck are not testimonial; they are an unobstructed window into mind of a liar who would do anything to get out of jail. As the Court can now see from Ms. Larck's Facebook messages to Ms. Isaac, Ms. Larck never believed that those messages would end up in court as she admitted that she was afraid of perjury charges and wanted money for her potential testimony. These statements, along with the letters (again, which Ms. Larck never believed would end up in court), are nontestimonial that support Terri-lee Isaac's, Mae Rivet

[4] Dr. Garcia's testimony is corroborated by the supplemental report submitted and her autopsy report that was submitted as a trial exhibit. But more importantly, it is not Dr. Garcia's testimony that is the evidence, it is her medical findings relating to the time of death, which she provided to the Sheriff's Department, which is the medical evidence in the case at bar.



E-Filed:03/31/2023 11:27:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Smith's and Albert Russell's affidavits.

There, on the points related to freestanding actual innocence claims pursuant to La.C.Cr.P. § 926.2, this Court should allow this petition to be heard and a hearing held.

With regard to Mr. Bradley's argument relating to newly discovered evidence, it is Mr. Bradley's position that the newly discovered evidence in this case, namely the affidavits of Isaac, Smith, and Russell, the criminal history of Larck, and the discovery of the past misconduct of Det. Grey Thurman prove that Mr. Bradley's conviction was obtained in violation of the United State's and Louisiana Constitution because this evidence significantly undermines the case that the State presented a trial. See La. Cr.P. § 930.3(1). Plainly the holding in State v. Hurst, 209 So. 3d 701 (La. 2015) applies, requiring Mr. Bradley's newly discovered evidence claims to be heard. Id. (citing State v. Pierre, 125 So. 3d 403 (La. 2013); State v. Conway, 816 So. 2d 290 (La. 2002)). Mr. Bradley, a pro se litigant through his time incarcerated, is presenting claims that have never been presented before, has been diligent as this evidence was unavailable until he obtained it and presented it forthwith, thereby meeting the requirements in La. Cr.P. § 930.4 & 8. Lastly, the evidence he presented meets the newly discovered evidence standard pursuant to State v. Cavalier, 701 So. 2d 949, 951 (La. 1997). His newly discovered evidence claims should be heard.

Additionally, his Brady claim related to Amy Larck's previous convictions also evade bar under La. Cr.P. § 930.4 & 8. It is plain that there is no procedural bar on a constitutional claim that was recently discovered. Larck's previous history was not discovered until December of *2022*. I will not belabor the Court with its importance.

Lastly, relating to Mr. Bradley's claims of ineffective assistance of counsel and fraud upon the court, much of the evidence used to support these claims has been submitted for the first time in this application. The State conflates duplicate claims with the same evidence versus new evidence supporting new claims of different issues dealing with ineffective assistance of counsel and fraud upon the court. Here, Mr. Bradley could not have previously presented Mr. Russell's affidavit because Mr. Russell has a 5th Amendment privilege that was only extinguished when he was ready to come forward and tell the truth in February of 2023.[5] Mae Rivet Smith's affidavit is also new and supports the position that trial counsel failed to investigate and call her. These affidavits are interwoven together in the claims of fraud upon the

[5] Legal support for Mr. Russell's unavailability is laid out in Mr. Bradley's supplemental PCR.



E-Filed:03/31/2023 11:27:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

court in that they prove that Amy Larck testified falsely and Mr. Bradley's ineffective assistance of counsel claims.

But even if this Court were to believe that there is a bar, the interest of justice requires these claims to be heard, including the claims of ineffectiveness and fraud upon the court that relate to the ME's time of death, video evidence and the Jefferson Parish Sheriff's Department's supplemental report. La. Cr.P. § 930.4(A). Louisiana acknowledges the Supreme Court precedence relating to "gateway" claims of innocence that would allow an otherwise procedurally barred constitutional claim to heard when there is new evidence that it is *more probable than not* that no reasonable juror would convict petitioner. Schlup, 513 U.S. at 324, 327-328, 329-330; see Pierre, 125 So. 3d at 409.[6] As such, all of the evidence, old and new, including but not limited to the video evidence (Exhibit B) which proves that Amy Larck lied during her testimony, that Earl Bradley was not in the alleyway that night, the Sheriff's supplemental report (Exhibit A), and the time of death given by Dr. Garcia (Exhibit E), should be considered by this Court in relation to all of Mr. Bradley's claims, including his claims of ineffective assistance of counsel and fraud upon the court.

Petitioner submits that no hearing is necessary to grant this motion. However, at a minimum a hearing is required in this case. See La.C.Cr.P. §§ 926.2, 928, 929, 930(A); see Hurst, supra.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court should overrule the State's procedural objections and issue an Order granting this petition or alternatively scheduling a hearing thereon and granting such other and further relief to petitioner as it may deem just and proper.

**Dated: March 31, 2023**
**New Orleans, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

Walker Lasiter

P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

[6] The State also argued that McQuiggin v. Perkins, 569 U.S. 383 (2013) does not govern state law. However, Pierre clearly sites McQuiggin as the basis for a proper consideration of a gateway innocence claim. As such, McQuiggin is applicable in the case at bar.



E-Filed:03/31/2023 11:27:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

E-Filed:03/31/2023 11:27:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**24TH JUDICIAL DISTRICT COURT**
JEFFERSON PARISH
STATE OF LOUISIANA

EARL BRADLEY
Petitioner

DOCKET No. 99-5825

Versus

TIMOTHY HOOPER, Warden
Louisiana State Penitentiary

FILED:____________________

____________________
DEPUTY CLERK

E-Filed:03/31/2023 11:23:11 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF APPLICATION FOR POST-CONVICTION RELIEF**

**NOW INTO COURT**, through undersigned counsel, comes Petitioner Earl Bradley, DOC # 403836, respectfully submitting this Supplemental Memorandum in Support of Application for Post-Conviction Relief pursuant to the Court's order on February 1, 2023.

Mr. Bradley adopts all of the factual and legal averments made within his post-conviction motion for relief filed on December 28, 2022, as if they have the same force and effect within this supplemental memorandum. Specifically, Mr. Bradley supplements **POINTS I (THIS COURT SHOULD HEAR THIS PETITION), II (ACTUAL INNOCENCE), III (NEWLY DISCOVERED EVIDENCE), IV (FRAUD UPON THE COURT),** and **VII (A HEARING MUST BE HELD).** In order to avoid any redundancy, Mr. Bradley adopts all of the factual and legal arguments made within those claims herein as if they have the same force and effect within this supplemental memorandum.

On February 18, 2023, Mr. Bradley's co-defendant provided a sworn statement stating the following: (See Exhibit A – Albert Russell sworn affidavit dated February 18, 2023)

> I am a witness to the events of the above-captioned matter.
>
> At the time of the incident, I was living at 468 Wilson Street in Marrero, Louisiana.
>
> I came home one morning and my door was kicked in.
>
> My grandfather came over and gave me a business card of an FBI agent.
>
> I called the agent and he told me to come to the Gretna Detectives Bureau.



**EXHIBIT F**

> They questioned me about some guy that I never knew or seen before, and showed me a picture of a guy that I never seen before and asked me if I knew him.
>
> I told them I had never seen the guy in my life.
>
> The detectives left out the room for about 3 minutes and came back in and told me I was under arrest for second degree murder. I couldn't believe it.
>
> I was incarcerated for 3 years fighting the charge of killing a person I never seen or heard before.
>
> The detectives tried placing me at a club on 4th Street and Jung Boulevard called the Happy Hour.
>
> The club had surveillance cameras inside and out.
>
> I was never at the club at the time the murder happened.

For the first time, Mr. Russell has been able to tell the truth: that he was not at the bar at all and was not with Earl Bradley on July 31, 1999. Mr. Russell's statement is new and corroborated by the video evidence admitted as evidence at trial, by Mae Rivet Smith's sworn statement and by Amy Larck's admission to Terri Isaac. See La.C.Cr.P. § 926.2.

The facts provided by Mr. Russell can only be described as newly discovered evidence that requires a new trial pursuant to La.C.Cr.P. § 930.3(1), because the evidence wholly undermines the confidence in the conviction in violation of both the United States and Louisiana constitutions. State v. Hurst, 209 So. 3d 701 (La. 2015); State v. Cavalier, 701 So. 2d 949, 951 (La. 1997); see also Alvarez v. State, ___ So. 3d ___, 2018 WL 4354727, *3 (La. App. 2018) (hearing required where there was reason to infer that facts were unknown to petitioner or his prior counsel, and where "defendant has argued persuasively that the nature of the new evidence is not such that it should have been discovered by the exercise of due diligence"); State v. Kang, ___ So. 3d ___, 2019 WL 150635, *4-5 (La. App. 2019) (where affidavits of defense counsel and investigator stated that they had not previously seen documents obtained post-trial, the petition could not be dismissed on the pleadings and a hearing was required). Here, Mr. Bradley could not have produced this evidence until now because Mr. Russell had a 5th Amendment privilege at the time of Mr. Bradley's trial *and* it is only by the grace of God that Mr. Russell has come forward now – Russell has no benefit to come forward now on Bradley's behalf; only problems await. See e.g., State v. Bice, 407 So. 2d 1234 (1981).

Russell's affidavit goes to the heart of the State's theory in the case at bar – that Earl Bradley and Albert Russell, together, went into the alleyway, and Earl Bradley shot Barton Sanford. That did not happen. And Mr. Russell's affidavit is newly discovered evidence that the



E-Filed:03/31/2023 11:23:11 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

State's theory is false, Amy Larck's testimony is false, Earl Bradley is innocent and, at the very least, deserves a new trial.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court should issue an Order granting this petition or alternatively scheduling a hearing thereon and granting such other and further relief to petitioner as it may deem just and proper.

**Dated: March 30, 2023**
**New Orleans, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

Walker Lasiter

P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

E-Filed:03/31/2023 11:23:11 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

E-Filed:03/31/2023 11:23:11 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

24TH JUDICIAL DISTRICT COURT
JEFFERSON PARISH
STATE OF LOUISIANA

---

STATE OF LOUISIANA CASE No. 99-5825

Versus

EARL BRADLEY

Defendant.

---

AFFIDAVIT OF ALBERT RUSSELL

---

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned Notary Public, personally came and appeared,

**ALBERT RUSSELL,**

a person of full age and majority and a resident of the Parish of CALCASIEU, State of Louisiana, who after first being duly sworn, depose and states:

1. I am a witness to the events of the above-captioned matter.

2. At the time of the incident, I was living at 468 Wilson Street in Marrero, Louisiana.

3. I came home one morning and my door was kicked in.

4. My grandfather came over and gave me a business card of an FBI agent.

5. I called the agent and he told me to come to the Gretna Detectives Bureau.

6. They questioned me about some guy that I never knew or seen before, and showed me a picture of a guy that I never seen before and asked me if I knew him.

7. I told them I had never seen the guy in my life.

8. The detectives left out the room for about 3 minutes and came back in and told me I was under arrest for second degree murder. I couldn't believe it.

9. I was incarcerated for 3 years fighting the charge of killing a person I never seen or heard before.

10. The detectives tried placing me at a club on 4th Street and Jung Boulevard called the Happy Hour.

11. The club had surveillance cameras inside and out.

12. I was never at the club at the time the murder happened.

13. I make this statement of my own freewill and certify subject to the penalty of perjury that this statement is true and correct.

Dated:

Albert Russell
ALBERT RUSSELL

Sworn to and subscribed before me this 18th day of FEBRUARY, 2023, in NEW ORLEANS, Louisiana.

D G Ebert
NOTARY PUBLIC

DAVID G EBERT
(Print Name)

LA. BAR ROLL # 2241

NOTARY PUBLIC
DAVID G. EBERT
NOTARY PUBLIC ID NO. 2241
JEFFERSON PARISH, LA
MY COMMISSION IS FOR LIFE.



E-Filed:03/31/2023 11:23:11 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**TWENTY-FOURTH JUDICIAL DISTRICT COURT**
**FOR THE PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** **DIVISION "O"**

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

**FILED:**____________________ ____________________

**DEPUTY CLERK**

**STATE'S RESPONSE TO PETITIONER'S OPPOSITION TO STATE'S PROCEDURAL OBJECTIONS**

The State set forth procedural objections in response to Bradley's application for post-conviction relief for factual innocence pursuant to La. C.Cr.P. art. 926.2. The State adopts, incorporates, and re-urges the previous procedural objections and argument set forth in the State's Procedural Objections to Post-Conviction Relief filed on March 3, 2023. The State now responds to Bradley's Opposition to the State's Procedural Objections and supplementation of his application for post-conviction relief. The State maintains that Bradley has failed to meet the necessary threshold requirements for a factual innocence claim under La. C.Cr.P. art. 926.2 despite his supplementation of the application.

Bradley has supplemented his factual innocence claim with the affidavit of Bradley's co-defendant, Albert Russell.[1] An affidavit is testimonial evidence. *See* Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order), writ denied Jackson v. Hooper, 22-1123 (La. 11/1/22), 348 So.3d 1267. In a factual innocence claim under La. C.Cr.P. art. 926.2, testimonial evidence must be new, reliable, and noncumulative evidence that is corroborated by scientific, forensic, physical, or nontestimonial documentary evidence. *See* La. C.Cr.P. art. 926.2 (B)(1)(a)(ii). Bradley has not even argued to this Court what evidence he purports to corroborate Mr. Russell's affidavit.[2]

[1] The defendants were severed by the State. Russell had been charged with the second degree murder of Barton Sandford in violation of La. R.S. 14:30.1. Mr. Russell entered a plea under Alford on the amended charge of Accessory after the Fact to Second Degree Murder in violation of La. R.S. 14:25:30.1.

[2] The State notes that the affidavit of Mr. Russell is void of any basis upon which Bradley could argue supports a claim of factual innocence, let alone supported by evidence required to corroborate testimonial evidence on a factual innocence claim. The affidavit does not set forth any specific name, date, or other fact. Mr. Russell's affidavit does not mention Bradley, the victim, Ms. Larck, or any specific details regarding the shooting. Mr. Russell's affidavit only says he was a "witness to the events



**EXHIBIT G**

Mr. Russell's affidavit is not supported by the necessary evidence to meet the standard to proceed with a claim of factual innocence. Mr. Russell's affidavit, like that of the previously attached affidavits of Terri Lee Isaac and Mae Rivet Smith, fails to meet the necessary evidentiary requirements under La. C.Cr.P. art. 926.2. Accordingly, the State avers the claim is procedurally barred as untimely under La. C.Cr.P. art. 930.4 and successive under La. C.Cr.P. art. 930.8.

While the State sets forth procedural objections to Bradley's claim of factual innocence and asks that this Honorable Court deny the application for post-conviction relief on such grounds, the State would like to briefly address Bradley's assertion of Brady violations by the State and Ms. Larck's purported untruthful testimony at trial.

The State denies any Brady violation occurred in this matter. The record reflects that the State gave Bradley access to discovery through Open File discovery on March 23, 2000, which is noted with a minute entry. Moreover, Ms. Larck's past criminal history was acknowledged in Bradley's 2005 application for post-conviction relief, wherein Bradley stated:

> Amy has a procuress lifestyle. Along with no known friends or family, she comes from out of town to Louisiana. With a extensive criminal background she lives on the Westbank from one Motel to another...But her lifestyle as a thief, as a prostitute is to satisfy her compelling need and desire to get high. In the morning, afternoon and all hours of the night. Anything it takes, sex, stealing or dealing. What about lying? In the six to eight months, she spent in Louisiana her criminal spree covered:
>
> > six felony charges. Theft of goods over $300.00 99-483, shoplifting and crime against nature 00-4857 2 counts of distribution 00-5303 and simple possession 00-4737.

(Bradley's Application for Post-Conviction Relief filed on 1/20/05; p.4)

Bradley again notes Ms. Larck's prior criminal history in his 2005 application for post-conviction relief when he states, "Beyond her pass [sic] criminal history and new charges, Amy Larck was sentence[d] to 5 years, she was repeatedly bond out of jail as a material witness and placed in Bridge house drug rehab." (Bradley's Application for Post-Conviction Relief filed on

---

of the above-captioned matter" and "I was never at the club at the time the murder happened." Despite Bradley's attempt to enlarge the contents of Mr. Russell's affidavit, Mr. Russell's affidavit is vague and ambiguous as to any fact to which it attempts to attest.

1/20/05; p. 14). These statements affirm Bradley was aware Ms. Larck had a criminal history.

Bradley has argued to this Honorable Court that Ms. Larck testified she had no prior arrests or prior convictions than her Louisiana cases. Ms. Larck testified as follows on direct examination:

Q: Now Mr. [sic] Larck, are you from Louisiana?

A: No, sir.

Q: Where are you from?

A: I was born in Illinois, raised in Virginia; and my Mother lives in North Carolina.

Q: Now, that Fourth Street area, roughly the Happy Hour Bar; do you know that area?

A: Yes, sir.

Q: How do you know that area?

A: I started hanging out after I came down here.

Q: "Hanging out"; you don't mean like - I understood like on a street corner. What type of hanging out did you do?

A: Prostitution, drugs.

Q: Okay. How long had you been hanging out at the Happy Hour Bar area? When did you get there?

A: I got in Louisiana on July 4th of 1999.

Q: Okay. How did you get here?

A: I drove.

Q: From where?

A: Illinois.

Q: Down from Illinois.

A: Yes.

Q: Okay. What was the reason why you came here?

A: A change, something different.

Q: What were you doing in Illinois.

A: I was- I had my own apartment and things. I have sort of like step-family up there. And my Step-Father hit me and I called the Police. And his mother didn't want me to stay there.

Q: What type of job did you have in Illinois?

A: I was working in a telemarketing place.

Q: You're one of those people that use to bother us late at night, right?

A: Yes, sir.

Q: Now, what I want to do Ms. Larck, I want to take you back to July 30th, 31st, into the early morning hours. Were you at The Happy Hour Saloon or Lounge at that time?
A: Yes, sir.

Q: How long had you been there? When did you get there? Lets say it was July 30th, before it went to the early morning hours. What time did you get there on July 30th?

A: Maybe around eight, eight-thirty.

***

Q: Okay. Where had you been prior to that time?

A: During the daytime?

Q: Yes.

A: Everywhere; anywhere I could get crack.

***

Q: How did you accommodate yourself?

A: Prostitution.

(Appellate Record, Vol.II, pp. 474-476)

Ms. Larck testified in "prison garb," which the State addressed on direct examination. Ms. Larck then went on to testify about her several criminal convictions in Louisiana, including possession with intent to distribute, crimes against nature, possession, and theft. (Appellate Record, Vol.II, pp. 497-499). On cross-examination, Ms. Larck was asked about her prior convictions.

Q: Ms. Larck, you had indicated on Direct Examination that you had several prior convictions.

A: Yes, sir.

Q: And Mr. Rowan went through each one with you. Lets make this a little more clear. You had indicated - you testified on Direct Examination that you had previously pled guilty to theft of goods, a shoplifting.

A: Yes, sir.

Q: Number 99-4931; for an incident that occurred on or about July 6th, 1999; correct?

A: Yes, sir.

Q: Was that your first conviction?

A: It was, I believe it was running concurrent with a theft by fraud, or skimming poker machines, whatever you want to call it.

Q: Pled guilty in December, 1999; correct?

A: Yes, sir.

(Appellate Record, Vol.III516-517).

Ms. Larck went on to testify about her numerous convictions and the sentences concerning those convictions. (Appellate Record, Vol. III, pp. 516-521). The State can only surmise that Bradley believes Ms. Larck's response to an unclear question from defense counsel asking Ms. Larck about her "first conviction" is the basis for the assertion that Ms. Larck lied about prior convictions.[3] Prior to asking the question, defense counsel was asking Ms. Larck about her theft of goods, a shoplifting charge in Louisiana. This line of questioning does not support the position that Ms. Larck testified she had never been convicted of any crimes prior to coming to Louisiana. The response to the question about Ms. Larck's "first conviction" appears to be in response to her theft of goods, a shoplifting conviction, and how it relates to the conviction for theft by fraud, or skimming poker machines. Again, the State has pointed to statements made by Bradley in his 2005 application for post-conviction relief wherein Bradley notes Ms. Larck had a prior criminal history of which Bradley was aware. Ms. Larck went into great detail about her criminal history with both the State and the Defense at trial.

Finally, Bradley argues Ms. Larck lied at trial and perjured herself. Ms. Larck's credibility has been addressed in the direct appeal of this matter, as well as in Bradley's January 20, 2005 application for post-conviction relief. On appeal, the Fifth Circuit stated:

> While there were numerous inconsistencies in Larck's testimony, the inconsistencies concerned Larck's activities prior to and after the shooting. These were not determinative of any element of the offense. Larck's testimony was not internally inconsistent with any other evidence. Although she gave conflicting statements at times, she consistently testified as to the location of the murder and that Bradley shot the victim. The jury in the instant case heard Larck's testimony and her reasons for initially lying to investigating officers. The jury chose to accept her testimony in light of circumstantial evidence that Bradley initially lied to police about knowing the victim and that he had been engaged in an argument with the victim on the night of the murder.

State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 86. As such, the credibility of Ms. Larck has been addressed and found to be without merit.

---

[3] The State notes the difficulties in reviewing a cold record and deciphering a witness's testimony from a trial which occurred more than twenty years ago. Despite such, the record clearly reflects that the jury was made aware of Ms. Larck's extensive criminal history based upon her testimony on direct and cross-examination, as well as the fact Ms. Larck was wearing her prisoner's uniform in Court.

## RESERVATION OF RIGHTS

Petitioner is not entitled to the grace period afforded in La. C.Cr.P. art. 926.2(A) and therefore, this claim is clearly untimely and successive. The State does not waive any procedural objections or defenses. The State would respectfully reserve the right raise additional procedural objections, as well as to submit argument on the merits of the claims and additional legal authority, documents, record citations and/or other evidence in the case in support of and/or supplementation to its opposition.

## CONCLUSION

Petitioner's claims are without merit. Additionally, as this Court can justly rule upon Petitioner's claims without an evidentiary hearing, an evidentiary hearing is unnecessary. The State prays that this Court deny the Petitioner's application for post-conviction relief. The State respectfully does not waive any procedural objections or arguments on the merits and would respectfully reserve the right to submit additional documentation and argument should this Court required.

Respectfully submitted,

**PAUL D. CONNICK, JR.**

MONIQUE D. NOLAN, #27431
ASSISTANT DISTRICT ATTORNEY
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053
(504) 368-1020

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served on all parties by placing the same in the United States mail, postage prepared, this 3rd day of May, 2023.

MONIQUE D. NOLAN

**24[TH] JUDICIAL DISTRICT COURT**
JEFFERSON PARISH
STATE OF LOUISIANA

EARL BRADLEY
Petitioner

DOCKET No. 99-5825

Versus

TIMOTHY HOOPER, Warden
Louisiana State Penitentiary

FILED:____________________

____________________
DEPUTY CLERK

**REPLY TO STATE'S RESPONSE**

**NOW INTO COURT**, through undersigned counsel, comes Petitioner Earl Bradley, DOC # 403836, respectfully submitting this reply to the State's Response to Mr. Bradley's Opposition to the State's Procedural Objections.[1] Mr. Bradley adopts all of his previous pleadings and re-urges this Court either to vacate Mr. Bradley's conviction outright or hold a hearing to test the veracity of Mr. Bradley's claims, as there are, at the very least, questions of fact that need to be determined on the merits. See La.C.Cr.P. §§ 926.2, 928, 929, 930(A).

The State has resorted to misrepresenting the record, whether it be the affidavit provided by Albert Russell or the trial transcript regarding Amy Larck.

First, the State has conceded, through the admission that Mr. Russell took an Alford plea, that Mr. Russell never implicated Mr. Bradley, or even admitted guilt for that matter. But more importantly, Russell's affidavit goes on to directly refute the State's theory at trial: that Russell and Bradley went into the alleyway and killed the victim together. Larck was clear in her testimony that Russell was in the alleyway – that he played a role in this crime. Mr. Russell's affidavit is supported by the video evidence, police reports, medical evidence, Mr. Rivet Smith's and Ms. Isaac's affidavits and the admissions by Larck that she lied. As such, his affidavit meets the threshold set by La.C.Cr.P. §§ 926.2.

The State's theory is clear: Bradley and Russell were involved with Mr. Sanford's

[1] As it is Mr. Bradley's burden in the case at bar, Mr. Bradley should be allowed to reply to any response offered by the State to deny Mr. Bradley's post-conviction petition.

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER



**EXHIBIT H**

murder, plain and simple. Russell's affidavit plainly addresses that he was charged with a murder that happened at the Happy Hour Bar. It clearly states that he was not at that bar directly refuting the State's theory and Amy Larck's testimony. This is very simple. His affidavit does not need to be clearer than that.

As for the Brady claim regarding Ms. Larck's convictions, we have now confirmed that Ms. Larck had several convictions that she served **prison time for** in the State of Florida and was on probation in Florida when she was arrested in Louisiana and testified in the case at bar. See Exhibit A – Certified copy of Florida Conviction Record.[2] None of these records were turned over. The State actually, in its supplemental response/objections to Mr. Bradley's PCR, cited the trial testimony from Amy Larck **that supports Mr. Bradley's contention that there was an egregious Brady violation here**. Larck was clear; she had no convictions prior to her arrival in Louisiana. Larck also never testified that, at the time of trial, she had absconded from probation in the State of Florida based upon her child neglect conviction.

As shown by the State's quotes of Larck's testimony, the trial prosecutor actually pulled out of Larck that she arrived in Louisiana from Illinois and that she was a telemarketer prior to this case. Larck's trial testimony painted a picture that she was a tax paying civilian prior to July 6, 1999, which was her first arrest in Louisiana. Defense counsel, a highly experienced attorney, for Bradley failed to cross her on any of the convictions from Florida that proceeded this case or regarding the fact that she was on probation.[3] [4]

The Supreme Court has already been very clear that impeachment material that was not turned over is a Brady violation warranting a new trial. Wearry v. Cain, 136 S. Ct. 1002, 1006-07 (2016) (A case stemming out of Louisiana, the United States Supreme Court found a Brady violation where prosecutor failed to disclose impeachment evidence concerning the witness who provided "the only evidence directly tying [Wearry] to [the] crime" of which he was convicted, even though other impeachment evidence was available); Smith v. Cain, 565 U.S. 73, 75-76 (2012) (A case stemming out of Louisiana, the United States Supreme Court found a Brady violation occurred where impeachment evidence was withheld concerning the only eyewitness to the crime); see generally Cone v. Bell, 556 U.S. 449, 469-70 (2009) (summarizing the Brady

---

[2] See Cycles 4-7. Larck was extradited from Louisiana to Florida because she fled from probation that stemmed from her neglect of a child conviction that occurred in 1996.

[3] As of this moment, we await the Court's signed subpoena for the certified records in North Carolina.

[4] Also interesting to note is the fact that Larck's criminal history would have warranted a higher sentence on her guilty pleas.



E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

standard); Banks v. Dretke, 540 U.S. 668, 698-99 (2004) (same).

Specifically, the Louisiana Supreme Court has held that when impeachment material related to a witness, especially the lone witness like Amy Larck in this case, is not turned over, a new trial is warranted. See generally State v. Bright, 875 So. 2d 37 (La. 2004). The Bright court held:

> When the State's case hinges on the testimony of one eyewitness, the Brady violation looms larger.

State v. Bright, 875 So. 2d 37 at 43-44.

Here, Amy Larck was the sole piece of evidence used to convict Bradley. There was no physical evidence or otherwise that connected him to the crime. The State presented Larck as an open book, revealing all of her "sins", completely forthright that she only began to have a criminal career when she was sucked into the criminal element when she arrived in Louisiana. This was just not true, and the State knew it.[5]

Not only did the State commit a Brady violation, but the State also allowed Ms. Larck to testify falsely regarding her criminal history and omit the fact that Ms. Larck faced a probation violation due to her rearrest and flight from probation in the State of Florida. A prosecutor has a duty of fairness to the accused and candor to the court. The prosecutor has an obligation to correct false or mistaken testimony by one of his or her witnesses. The "Supreme Court has made clear that prejudice is readily shown in such cases [wherein the prosecutor allowed a witness to testify falsely], and the conviction must be set aside unless there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Shih Wei Su v. Filion, 335 F.3d 119, 127 (2002) (citing United States v. Agurs, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); Giglio v. United States, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972); see also United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (citing Agurs and adding that the Supreme Court cases mean that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" (quotation marks omitted)).

This Court should vacate Mr. Bradley's conviction just based on the fact that the State allowed Ms. Larck to testify falsely about her criminal history and the potential jail exposure that

[5] By the point of Ms. Larck's testimony, she had been incarcerated for a significant amount of time. She had been fingerprinted and her background would have been checked; the prosecutors would have also known that she was on probation in Florida and violated that probation by her rearrest in Louisiana. Apparently, the State of Florida was aware that she was a fugitive from the state, as there seems to be a warrant for her arrest that was generated on July 17, 2000. The State had this criminal history but just did not disclose it.



E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

she was facing which went directly to her character and credibility as a witness.

The fact of the matter is that Amy Larck, by July 6, 1999, was a career criminal – a child abuser, prostitute, and thief. She also fled from the State of Florida when she was on probation.[6] What would a jury do now having heard that Larck was lying so substantially about her criminal history and had additional liability hanging over her head from the State of Florida based upon the felony probation violation? The prejudice that Bradley faced in this regard was significant – at least one of the jurors did not believe Ms. Larck.[7] Any amount of impeachment material would have swung the needle in a case wherein there was no evidence that connected Bradley to the murder other than Larck. See Bright, supra.; Wearry, supra.; Smith, supra. But under Agurs and its progeny, reversal is required because there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." On these points alone, Bradley deserves a new trial.

As previously stated, the Petitioner submits that no hearing is necessary to grant this motion. However, at a minimum a hearing is required in this case. See La.C.Cr.P. §§ 926.2, 928, 929, 930(A); see Hurst, supra.

## CONCLUSION

**WHEREFORE,** in light of the foregoing, this Court should overrule the State's procedural objections and issue an Order granting this petition or alternatively scheduling a hearing thereon and granting such other and further relief to petitioner as it may deem just and proper.

**Dated: May 10, 2023**
**New Orleans, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

Walker Lasiter
P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

[6] Interestingly, when Larck was returned to Florida in August of 2005, she was arrested again in December of 2005 for possession of drugs facing up to 5 years in prison. See Exhibit A; see also Florida Statute 893.13. 6A (makes it a third-degree felony to possess a controlled substance. A third-degree felony is punishable by up to five years in prison and a fine of $5,000). Larck ended up only serving two months in jail for everything.

[7] This Court should remember that Mr. Bradley's first trial ended up in a 6-6 mistrial. Larck didn't just lie once, she lied twice.

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Thursday 06 April 2023

Florida Department of Law Enforcement
Criminal History Services
P.O. Box 1489
Tallahassee, FL 32302

#C-134621

JUSTICE PARTNERS, INC
MOLLY FOWLER
1023 MONTEGUT STREET
NEW ORLEANS, LA 70117

JUSTICE PARTNERS, INC
MOLLY FOWLER
1023 MONTEGUT STREET
NEW ORLEANS, LA 70117

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**EXHIBIT A**

Thursday 06 April 2023

#C-134621

FLORIDA DEPARTMENT OF LAW ENFORCEMENT
CRIMINAL JUSTICE INFORMATION SYSTEMS

SHIELD CRIMINAL RECORD CHECK SYSTEM

****************************
* CUSTOMER SUMMARY REPORT1 *
****************************

TODAYS DATE: 04/06/2023

ID ORGANIZATION

C00089689 JUSTICE PARTNERS, INC

ADDRESS: ATTN: MOLLY FOWLER
1023 MONTEGUT STREET
NEW ORLEANS, LA 70117

BATCH NUMBER: 20230404001 RECEIVED DATE: 04/04/2023

| | |
|---|---|
| TOTAL TRANSACTIONS: | 1 |
| ERRORS: | 0 |
| PROCESSED: | 1 |
| CRIMINAL HISTORIES: | 1 |
| IN PROGRESS: | 0 |

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

The Florida Department of Law Enforcement (FDLE), Division of Criminal Justice Information Services (CJIS), is the central repository for criminal history information for the State of Florida. In addition to maintaining criminal history information, it is our responsibility to provide public access to this information when requested.

In accordance with s. 943.053 (3), Florida Statutes, a State of Florida background check will include the following:

- Fingerprint based arrest information received by FDLE from State of Florida law enforcement agencies;

- All felony and serious Florida arrests not sealed or expunged;

- Arrest information includes date of arrest, arresting agency, charge, and charge level;

- Final judicial outcome as reported to FDLE by county Clerk of Court offices including prosecuting agency, court disposition, plea, sentence date, and confinement date (if applicable); and

- Juvenile arrest information provided the same offense would be a felony if committed by an adult.

Failure to supply the required information (name, race, sex and date of birth) will greatly reduce our chances of reasonably associating your subject with a possible record in our extensive files.

Please keep in mind that when fingerprints are not submitted, the results are based on the name and other identifying information. Since some persons have similar or identical descriptors, fingerprints may be necessary to positively state whether it is the same individual.

If you have any questions on your State of Florida criminal history results, please contact a member of the Criminal History Services section at (850) 410-8161.

**** TRANSACTION LISTING FOLLOWS ****

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

FLORIDA DEPARTMENT OF LAW ENFORCEMENT
CRIMINAL JUSTICE INFORMATION SYSTEMS

SHIELD CRIMINAL RECORD CHECK SYSTEM

*************************************
* TRANSACTION LISTING FOR C00089689 *
*************************************

CUSTOMER: JUSTICE PARTNERS, INC BATCH: 20230404001

| | SEQ-NBR | APPLICANT NAME | RESULT | DOB | RAC | SEX | SSN | CONTROL NBR |
|---|---|---|---|---|---|---|---|---|
| I | 1 | LARCK, AMY MARIE | IDENT | 03/27/1976 | W | F | 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 | |

**END OF TRANSACTIONS** **END OF TRANSACTIONS** **END OF TRANSACTIONS** **END OF TRANSACTIONS**

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

FLORIDA DEPARTMENT OF LAW ENFORCEMENT
CHARGES AND DISPOSITIONS AS CODED HEREIN REFLECT STANDARDIZED UNIFORM OFFENSE AND DISPOSITION CLASSIFICATIONS FOR COMPUTERIZED CRIMINAL HISTORY RECORDS. MORE DETAILED AND SPECIFIC INFORMATION MAY BE AVAILABLE FROM CONTRIBUTORS. FDLE DOES NOT WARRANT THAT THESE RECORDS ARE COMPREHENSIVE OR ACCURATE, ONLY THAT THIS RECORD CONTAINS ALL INFORMATION ON THE SUBJECT THAT THE DEPARTMENT HAS RECEIVED AND IS PRESENTLY AUTHORIZED BY LAW TO DISSEMINATE.
==============================================================================

REPORT FOR JUSTICE PARTNERS, INC BATCH 20230404001

THE FOLLOWING RECORD IS ASSOCIATED WITH TRANSACTION: 000001
CONTROL NBR: NAME: LARCK, AMY MARIE

--FLORIDA CCH RESPONSE--
FC.DLE/04426921.PUR/P.ATN/C00089689/SHIELD
SID NUMBER: 04426921 PURPOSE CODE: Public Record Checks

==============================================================================
Because additions or deletions may be made at any time, a new copy should be requested when needed for future use.
==============================================================================
- Florida Criminal History -
==============================================================================

============================ IDENTITY SECTION ============================

State ID
04426921

FBI Number

DOC Number
R06445

============================== DEMOGRAPHICS ==============================

| | | |
|---|---|---|
| Name<br>LARCK, AMY MARIE | Date of Birth<br>03/27/1976 | Social Security Number<br>XXX-XX-3349 |
| Sex<br>Female | Race<br>White | Place of Birth<br>Illinois |
| Height<br>5' 05" | Weight<br>130 lbs | Ethnicity |
| Hair Color<br>Blonde or Strawberry | Eye Color<br>Brown | |

Other Name(s)
LARCH, AMY MARIE

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Address
2701 34TH ST N #227, ST PETERSBU, Florida

Scars Marks Tattoos
TAT UL ARM
SC FACE
SC HEAD
TAT L ARM

=================================== Cycle 1 ===================================

| | | |
|---|---|---|
| OBTS | 0009742158 | |
| Arrest | | |
| Date of Arrest | 12/11/1996 | |
| Charge | 001 | |
| Arresting Agency ORI | FL0521400 | |
| Arresting Agency Name | St Petersburg Police Department | |
| Date of Offense | 12/11/1996 | |
| Agency Case Number | 161375 | |
| AON Description | Cruelty Toward Child | |
| Statute | Level | Degree |
| | Felony | Unknown |
| Offense Literal | AGGRAV DOM ABUSE | |
| Charge Count | 1 | |
| Judicial | | |
| Charge | 001-1 | |
| Arrest Charge Status | Charge Resulted From Arrest | |
| Judicial Agency ORI | FL052015J | |
| Judicial Agency Name | Pinellas County Clerk of Court | |
| Uniform Case Number | 521996CF022559AXXXNO | |
| Sequence Number | 1 | |
| Prosecution | | |
| Prosecution | | |
| Charge Status | Amended | |
| PON Description | Neglect Child | |
| Offense Literal | NEGLECT OF A CHILD CAUSING GREAT BODILY HARM | |
| Statute | Level | Degree |
| 827.03.2b | Felony | 2nd Degree |
| Statute Description | Neglect Child With Great Bodily Harm | |
| Charge Count | 1 | |
| Counsel Type | Private Attorney | |
| Final Action Taken | Filed | |
| Final Decision Date | 12/20/1996 | |
| Court | | |
| Court Charge Status | Same | |
| CON Description | Neglect Child | |
| Offense Literal | NEGLECT OF A CHILD CAUSING GREAT BODILY HARM | |
| Statute | Level | Degree |
| 827.03.2b | Felony | 2nd Degree |
| Statute Description | Neglect Child With Great Bodily Harm | |
| Charge Count | 1 | |
| Trial Type | None | |

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

```
Final Plea              Guilty
Final Action Taken      Adjudication Withheld
Final Decision Date     04/14/1997

Sentence
 Sentence Type          N/A - Not Applicable
 Sentence Imposed Date  04/14/1997
 Sentence
 Sequence Number        0
 Confinement Type       Not Applicable
 Credit Time Served     125 days
 Probation Length       5 years
 Court Fine ($)         0.00
 Court Cost ($)         0.00
 Restitution ($)        0.00
 Sentence Provision(s)  Sentenced Under Sentencing Guidelines

================================= Cycle 2 ==================================

OBTS                     0010726199
Arrest

 Date of Arrest          09/18/1997
 Charge                  001 Re-Arrest
  Arresting Agency ORI   FL0520000
  Arresting Agency Name  Pinellas County Sheriffs Office
  Agency Case Number     325294
  AON Description        Prob Violation

  Statute                Level                  Degree
                         Unknown                Unknown

  Offense Literal        AGG CHILD ABUSE
  Charge Count           1

 Charge                  002 Re-Arrest
  Arresting Agency ORI   FL0520000
  Arresting Agency Name  Pinellas County Sheriffs Office
  Agency Case Number     325294
  AON Description        Failure To Appear

  Statute                Level                  Degree
                         Unknown                Unknown

  Offense Literal        DRINK WI 500 FT
  Charge Count           1

 Charge                  003 Re-Arrest
  Arresting Agency ORI   FL0520000
  Arresting Agency Name  Pinellas County Sheriffs Office
  Agency Case Number     325294
  AON Description        Failure To Appear

  Statute                Level                  Degree
                         Unknown                Unknown

  Offense Literal        SOLICIT PROSTITUTION
  Charge Count           1

================================= Cycle 3 ==================================

OBTS                     0010728699
Arrest

 Date of Arrest          10/19/1997
 Charge                  001
```

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

| | | |
|---|---|---|
| Arresting Agency ORI | FL0520000 | |
| Arresting Agency Name | Pinellas County Sheriffs Office | |
| Agency Case Number | 325294 | |
| AON Description | Bail-Personal Recog | |
| Statute | Level | Degree |
| | Unknown | Unknown |
| Offense Literal | VOP NEGLECT OF A CHILD | |
| Charge Count | 1 | |
| Charge | 002 | |
| Arresting Agency ORI | FL0520000 | |
| Arresting Agency Name | Pinellas County Sheriffs Office | |
| Agency Case Number | 325294 | |
| AON Description | Bail-Personal Recog | |
| Statute | Level | Degree |
| | Unknown | Unknown |
| Offense Literal | SOLICIT FOR PROSITITION | |
| Charge Count | 1 | |
| Judicial | | |
| Charge | 002-1 | |
| Arrest Charge Status | Charge Resulted From Arrest | |
| Judicial Agency ORI | FL052013J | |
| Judicial Agency Name | Pinellas County Clerk of Court | |
| Uniform Case Number | 9719175MMANOA | |
| Sequence Number | 1 | |
| Court | | |
| Court Charge Status | Amended | |
| CON Description | Prostitution | |
| Offense Literal | VIOL ROR SOLICIT FOR PROSTITUTION | |
| Statute | Level | Degree |
| 796.07 | Misdemeanor | 2nd Degree |
| Statute Description | Prostitution | |
| Charge Count | 1 | |
| Trial Type | None | |
| Final Plea | Nolo Contendre | |
| Final Action Taken | Guilty/Convicted | |
| Final Decision Date | 11/18/1997 | |
| Sentence | | |
| Sentence Type | N/A - Not Applicable | |
| Sentence Imposed Date | 11/18/1997 | |
| Sentence | | |
| Sequence Number | 0 | |
| Maximum Confinement | 1 months 17 days | |
| Confinement Type | County Jail | |
| Credit Time Served | 47 days | |
| Court Fine ($) | 0.00 | |
| Court Cost ($) | 0.00 | |
| Restitution ($) | 0.00 | |
| Charge | 003 | |
| Arresting Agency ORI | FL0520000 | |
| Arresting Agency Name | Pinellas County Sheriffs Office | |
| Agency Case Number | 325294 | |
| AON Description | Bail-Personal Recog | |

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

```
  Statute                    Level                     Degree
                             Unknown                   Unknown

  Offense Literal            DRINK  W IN 500FT OF ESTABLISHMENT
  Charge Count               1

================================== Cycle 4 ==================================

Correction Admission
 Date of Admission           DOC Number
 11/26/1997                  R06445

 Admission Agency ORI        FL063025C
 Admission Agency Name       Northwest Florida Reception Center
 Admission Type              New Commitment / Prisoner
 Admission Literal           CHILD ABUSE NEGLECT

Correction Release

 Date of Release             DOC Number                Release Type
 04/29/1998                  R06445                    Discharged/Expiration

 Release Agency ORI          FL063025C
 Release Agency Name         Northwest Florida Reception Center
 Release Literal             CHILD ABUSE NEGLECT

================================== Cycle 5 ==================================

OBTS                         1307033605
Arrest

 Date of Arrest              07/17/2000
 Charge                      001
  Arresting Agency ORI       FL0130000
  Arresting Agency Name      Miami Dade County Sheriffs Office/PD
  Agency Case Number         0747778
  AON Description            Flight-Escape

  Statute                    Level                     Degree
                             Felony                    Unknown

  Offense Literal            FUGITIVE FROM  PINELLAS COUNTY
  Charge Count               1

================================== Cycle 6 ==================================

OBTS                         5203006644
Arrest

 Date of Arrest              07/27/2000
 Charge                      001 Re-Arrest
  Arresting Agency ORI       FL0521400
  Arresting Agency Name      St Petersburg Police Department
  Agency Case Number         SOA886581
  AON Description            Prob Violation

  Statute                    Level                     Degree
  948.06                     Felony                    Unknown

  Statute Description
  Offense Literal            VOP  NEGLECT OF CHILD
  Charge Count               1

  Judicial
   Charge                    001-1
```

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Arrest Charge Status    Charge From Which Subject Was Re-Arrested

Judicial Agency ORI    FL052015J
Judicial Agency Name    Pinellas County Clerk of Court
Uniform Case Number    9622559CFANOA
Sequence Number    1

Reference Arrest
Reference
OBTS Number    0009742158

================================== Cycle 7 ==================================

OBTS    5205095708
Arrest

Date of Arrest    08/19/2005
Charge    001 Re-Arrest
Arresting Agency ORI    FL0521400
Arresting Agency Name    St Petersburg Police Department
Agency Case Number    SO1148089
AON Description    Prob Violation

| Statute | Level | Degree |
|---|---|---|
| 948.06 | Felony | Unknown |

Statute Description
Offense Literal    FTV NEGLECT OF CHILD EXTRADITED FROM LA
Charge Count    1

================================== Cycle 8 ==================================

OBTS    5202106597
Arrest

Date of Arrest    12/10/2005
Charge    001
Arresting Agency ORI    FL0521400
Arresting Agency Name    St Petersburg Police Department
Agency Case Number    1167467
AON Description    Drugs-Possess

| Statute | Level | Degree |
|---|---|---|
| 893.13.6a | Felony | Unknown |

Statute Description    ACTUAL CONSTRUCTIVE POSS SYNTHETIC CANNABINOID
Offense Literal    POSSESSION OF CONTROLLED SUBSTANCE
Charge Count    1

Judicial
Charge    001-1

Arrest Charge Status    Charge Resulted From Arrest

| Name(s) | Date(s) of Birth | Social Security Number(s) |
|---|---|---|
| LARCK, AMY MARIE | 03/27/1976 | XXX-XX-3349 |

| Sex | Race | Place of Birth |
|---|---|---|
| Female | White | |

Judicial Agency ORI    FL052103J
Judicial Agency Name    Pinellas County Clerk of Court
Uniform Case Number    522005CF024499AXXXNO
Sequence Number    1

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

| | | |
|---|---|---|
| Prosecution | | |
| Prosecution | | |
| Charge Status | Amended | |
| PON Description | Drugs-Possess | |
| Offense Literal | POSSESSION OF COCAINE | |
| Statute | Level | Degree |
| 893.13.6A | Felony | 3rd Degree |
| Statute Description | ACTUAL CONSTRUCTIVE POSS SYNTHETIC CANNABINOID | |
| Charge Count | 1 | |
| Filing Date | 12/23/2005 | |
| Counsel Type | Public Defender | |
| Final Action Taken | Filed | |
| Final Decision Date | 12/23/2005 | |
| Court | | |
| Court Charge Status | Same | |
| CON Description | Drugs-Possess | |
| Offense Literal | POSSESSION OF COCAINE | |
| Statute | Level | Degree |
| 893.13.6A | Felony | 3rd Degree |
| Statute Description | ACTUAL CONSTRUCTIVE POSS SYNTHETIC CANNABINOID | |
| Charge Count | 1 | |
| Trial Type | None | |
| Final Plea | Nolo Contendre | |
| Final Action Taken | Guilty/Convicted | |
| Final Decision Date | 01/17/2006 | |
| Sentence | | |
| Sentence Imposed Date | 01/17/2006 | |
| Sentence | | |
| Effective Date | 01/17/2006 | |
| Maximum Confinement | 2 months | |
| Confinement Type | County Jail | |
| Credit Time Served | 38 days | |
| Court Fine ($) | 59.00 | |
| Court Cost ($) | 391.00 | |
| Sentence Provision(s) | Sentenced Under Sentencing Guidelines | |

================================ REGISTRATION ================================

| | |
|---|---|
| OBTS | 0011219698 |
| Date of Registration | 04/30/1998 |
| Registering Agency ORI | FL0520000 |
| Registering Agency Name | Pinellas County Sheriffs Office |
| Charge | 001 |
| AON Description | Criminal Registration |
| Registration Literal | CHILD NEGLECT, PROSTITUTION |
| Registration Type | Criminal Registrant |
| Agency Case Number | 325294 |

================================================================================

This record contains Florida information only. When explanation of a charge or disposition is needed, communicate directly with the agency that contributed the record information.

================================================================================

This record may only be used for the purpose requested as defined by the Code of Federal Regulations and/or Florida Statute.

================================================================================

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

As mandated by Florida Statute 119.071(5), full social security numbers are no
w exempt from public disclosure and may be disclosed only to governmental enti
ties and certain commercial entities (upon a showing of business necessity as
defined by the law). FDLE will, however, release the last four digits of the s
ocial security number. Example: XXX XX 1234.

================================================================================

End of record

================================================================================

--END--

STATE OF FLORIDA
COUNTY OF LEON

Administrator,
Criminal History Services
Florida Dept. of Law Enforcement
Sworn and subscribed before me by means
of [X] physical presence
or [ ] online notarization, this
5 day of April, 2023
By LaKeidra Barber, who is
personally known to me

JOHNNY MARTINEZ
Commission # HH 320392
Expires October 10, 2026

E-Filed:05/10/2023 09:59:49 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

SERVE

**TWENTY FOURTH JUDICIAL DISTRICT COURT**
**PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** 2610 **DIVISION "O"**

1100 W L ALSTER

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

FILED FOR RECORD 05/31/2023 11:35:23
Melissa A. Perry DY CLERK
JEFFERSON PARISH LA

**FILED:**____________________

____________________
**DEPUTY CLERK**

**ORDER**

This matter comes before the court on:

- **PETITIONER'S APPLICATION FOR POST-CONVICTION RELIEF, MEMORANDUM IN SUPPORT, AND EXHIBITS, STAMPED AS FILED DECEMBER 28, 2022,**
- **STATE'S PROCEDURAL OBJECTIONS, STAMPED AS FILED MARCH 3, 2023,**
- **STATE'S SUPPLEMENT TO PROCEDURAL OBJECTIONS AND EXHIBITS, STAMPED AS FILED MARCH 8, 2023,**
- **PETITIONER'S OPPOSITION TO STATE'S PROCEDURAL OBJECTIONS, STAMPED AS FILED MARCH 31, 2023, AND**
- **STATE'S RESPONSE TO PETITIONER'S OPPOSITION TO STATE'S PROCEDURAL OBJECTIONS, STAMPED AS FILED MAY 3, 2023.**

On June 13, 2002, Petitioner was convicted by jury of the second degree murder, and on July 18, 2002, the court sentenced him to life imprisonment at hard labor. His conviction and life sentence were upheld on direct appeal. *State v. Bradley*, 2003-KA-384, (La. App. 5th Cir. 9/16/03), writ denied, 2003-K-2745 (La. 2/13/04), 867 So.2d 688. Petitioner's previously filed applications for post-conviction relief (APCRs) were denied in February 2005, May 2008, July 2008, and May 2021.

Petitioner, through counsel, has filed another APCR, now claiming factual innocence pursuant to La. C.Cr.P. art. 926.2, which was recently enacted in Act 104 of 2021, and provides:

> *A. A petitioner who has been convicted of an offense may seek post conviction relief on the grounds that he is factually innocent of the offense for which he was convicted. A petitioner's first claim of factual innocence pursuant to this Article that would otherwise be barred from review on the merits by the time limitation provided in Article 930.8 or the procedural objections provided in Article 930.4 shall not be barred if the claim is contained in an application for post conviction relief filed on or before December 31, 2022, and if the petitioner was convicted after a trial completed to verdict. This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner. An application for post conviction relief filed pursuant to this Article by a petitioner who pled guilty or nolo contendere to the offense of conviction or filed by any petitioner after December 31, 2022, shall be subject to Articles 930.4 and 930.8.*
> *B. (1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:*
> *(i) Scientific, forensic, physical, or nontestimonial documentary evidence.*
> *(ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.*
> *(b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any*

**EXHIBIT I**

*felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.*
*(2) A recantation of prior sworn testimony may be considered if corroborated by the evidence required by Subsubparagraph (1)(a) of this Paragraph. However, a recantation of prior sworn testimony cannot form the sole basis for relief pursuant to this Article.*
*(3) If the petitioner pled guilty or nolo contendere to the offense of conviction, in addition to satisfying all of the criteria in this Paragraph and in any other applicable provision of law, the petitioner shall show both of the following to prove entitlement to relief:*
*(a) That, by reliable evidence, he consistently maintained his innocence until his plea of guilty or nolo contendere.*
*(b) That he could not have known of or discovered his evidence of factual innocence prior to pleading guilty or nolo contendere.*
*C. (1) A grant of post conviction relief pursuant to this Article shall not prevent the petitioner from being retried for the offense of conviction, for a lesser offense based on the same facts, or for any other offense.*
*(2) If the petitioner waives his right to a jury trial and elects to be tried by a judge, the district judge who granted post conviction relief pursuant to this Article shall be recused and the case shall be allotted to a different judge in accordance with applicable law and rules of court.*
*(3) If the district judge denied post conviction relief pursuant to this Article and an appellate court later reversed the ruling of the district judge and granted post conviction relief pursuant to this Article, and if the petitioner waives his right to a jury trial and elects to be tried by a judge, upon the petitioner's motion the district judge who denied post conviction relief shall be recused and the case shall be allotted to a different judge in accordance with applicable law and rules of court.*

La. C.Cr.P. art. 926.2

Petitioner's evidence presented includes affidavits of Teri-Lee Isaac and Mae Lucelle Rivet Smith, which are recantations of sworn testimony. He also includes an affidavit of his co-defendant, Albert Russell. He submits "corroborating evidence" of handwritten letters to petitioner and Facebook messenger communications. He also claims that newly discovered evidence includes criminal history of Larck, and discovery of past misconduct of Det. Grey Thurman. Petitioner also relies on video evidence from the night of the murder, the Sheriff's supplemental report, and time of death given from Dr. Garcia.

Petitioner fails to present any evidence in support of his claim which meets the necessary criteria of the above statute. The newly enacted statute requires, "new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial." Id. The next crucial requirement includes that new evidence be either (i) "Scientific, forensic, physical or nontestimonial evidence," or (ii) "testimonial evidence that is corroborated by evidence of the type described in item (i) of this subparagraph." Id. The evidence presented in APCR and the affidavits provided are purely testimonial in nature are not corroborated by any **new evidence that is scientific, forensic, physical, or nontestimonial documentary evidence** as per La. C.Cr.P. art 926.2(B)(1)(a)(ii). As such, the affidavits presented fail to meet the criteria statutorily mandated, and petitioner fails to meet the burden set forth by La. C.Cr.P. art. 926.2(B)(1)(a)(ii).

As to petitioner's claims involving ineffective assistance of counsel, and *Brady* and *Napue* violations, these claims are untimely under La.C.Cr.P. art. 930.8. As the State points out in its response, the "grace period" provided in La. C.Cr.P. art. 926.2(A) only applies to "factual innocence" claims, and not to any claim "bootstrapped" thereto. No APCR may be considered if it is filed more than two years after the judgment of conviction and sentence have become final (unless one of four very restricted exceptions apply). LSA-C.Cr.P. art. 930.8 (A). The petitioner's conviction has long been final. The petitioner does not provide or meet any of the exceptions for filing an untimely application.

Furthermore, these claims regarding alleged *Brady* and *Napue* violations are procedurally barred as successive under La. C.Cr.P. art. 930.4(D) and/or (E).

Under LSA-C.Cr.P. art. 928, an application may be dismissed without an answer if the application fails to allege a claim which, if established, would entitle petitioner to relief. In this

case, the petitioner has not alleged a valid claim reviewable in accordance with LSA-C.Cr.P. art. 930.3 or 930.4. Petitioner is not entitled to relief sought.

Accordingly,

**IT IS ORDERED BY THE COURT** that Petitioner's application for post-conviction relief be and is hereby **DENIED.**

Gretna, Louisiana, this 31st day of May, 2023.

[signature]

JUDGE

PETITIONER: Earl Bradley, DOC # 403836, Louisiana State Penitentiary, Angola, LA 70712

Defense Counsel:

Walker Lasiter, 1100 Poydras St., Ste. 2610, New Orleans, LA 70163

Justin C. Bonus, 11835 Queens Blvd., Suite 400, Forest Hills, NY 11375

Thomas Butler, Appeals Division, District Attorney's Office, 200 Derbigny Street, Gretna, LA 70053

Issued 5/31/23 [initials]

A TRUE COPY OF THE ORIGINAL ON FILE IN THIS OFFICE.
[signature]
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**24TH JUDICIAL DISTRICT COURT**
JEFFERSON PARISH
STATE OF LOUISIANA

STATE OF LOUISIANA DOCKET No. 99-5825

Versus

EARL BRADLEY

FILED:____________________ ____________________
DEPUTY CLERK

**PETITIONER'S MOTION TO RECONSIDER**

Pursuant to LAC. Cr. P. Art. 925, this Honorable Court is vested with jurisdiction over the instant post-conviction relief application. Mr. Bradley makes this motion for reconsideration of Petitioner's application for post-conviction relief (herein referred to as "APCR") and request for a hearing based upon this Court's failure to consider Mr. Bradley's reply filed on May 10, 2023, the Court's erroneous findings of fact, and the Court's misapplication of the newly discovered evidence that would have probably changed the verdict and United States Supreme Court precedent.

**PROCEDURAL HISTORY**

On December 28, 2022, Earl Bradley filed the following motions: (1). Motion and order requesting an evidentiary hearing, (2). petition and order for writ of habeas corpus testifcandum, and (3) motion for post-conviction relief. On February 1, 2023, this Court issued an order based upon an APCR filed by Petitioner on December 28, 2022. The order requested that the State respond to Mr. Bradley's APCR by March 3, 2023. The State filed its objections on March 3, 2023 and supplemented its objections on March 8, 2023.

On March 31, 2023, Mr. Bradley filed his opposition to the State's objections. On May 3, 2023, the State filed its response to Mr. Bradley's opposition. On May 10, 2023, Mr. Bradley replied to the State's response and attached certified copies of Amy Larck's criminal history.

The Court denied Mr. Bradley's APCR on May 31, 2023[1]. In the denial, the Court failed to consider Mr. Bradley's May 10, 2023 reply to the State's objections.

[1] The Ruling was not served on the parties until June 2, 2023.

**EXHIBIT J**

## ARGUMENT AND RELIEF REQUESTED

First, a significant point to Mr. Bradley's APCR is that this Court misapprehended critical facts in Mr. Bradley's motion; specifically the affidavits of Terri-lee Isaac and Mae Lucelle Rivet Smith. First, Amy Larck has not provided a recantation. She made admissions in letters and through Facebook to Terri-lee Isaac. Terri-lee Isaac's affidavit is rebuttal evidence and evidence of a statement against penal interest, in that Larck admitted to lying and that her trial testimony was false. Isaac just provided this affidavit, so it is not subject to any procedural bar under 930.3, 930.4 and 930.8.

The Court also misapprehended Mae Lucelle Rivet Smith's affidavit. Ms. Smith's affidavit, which was procured in the last year and is not subject to the bars mentioned above, is not a recantation. It is evidence that Earl Bradley was not in the alley way when the shots were fired. Smith is an eyewitness to these events, as even the investigators would agree. Her statements now are either newly discovered evidence or the product of defense counsel failing to investigate or call her as a witness.

Lastly, this Court has misapprehended the law with regard to *Brady*. As the State conceded in its objections, Mr. Bradley's attorney never had possession of Larck's Florida record; Mr. Fleming was an experienced attorney and would have used such. So, the first time Mr. Bradley received this information, at the earliest, was when the undersigned conducted a background check in December of 2022. This Court must consider that Mr. Bradley was an indigent petitioner and only had the means to find what he could. Once this was found, it was submitted.

Interestingly, this Court failed to consider the certified records that were only obtained in May of 2023 and submitted to the Court. Not only did Ms. Larck have an extensive record in Florida that was not disclosed, but she was also on probation. This was never disclosed to a jury.

This Court should know that constitutional violations are **never procedurally barred when a gateway claim of innocence is alleged.** *See* Exhibit A *Simmons v. Darrell Vannoy*, 12th Judicial District, Docket No. 37596-A, pages 13-16 (February 14, 2022) (Bennett, W) (Judge William Bennett found that prescription did not apply in a case wherein there were constitutional violations [such as the fraud upon the court, *Brady* violations, ineffective assistance of counsel and the compulsory process violation in the case at bar] even after Vincent Simmons had filed **sixteen post-conviction motions**. Significantly, Judge Bennett found this after the evidence in



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Simmons' case that caused Judge Bennett to vacate the conviction was turned **over in 1993** and had been litigated several times with Mr. Simmons being denied based upon procedural bars). Gateway claims of innocence are separate and distinct from innocence claims under 926.

*Murray v. Carrier*, 477 U.S. 478 (1986) and the progeny of cases that follow have long established that the law of the land in both state and federal court is that both factual evidence of innocence and substantive due process violations overcome procedural bars. *See also McQuiggin v. Perkins*, 569 U.S. 383 (2013). This applies to Louisiana law. The Supremacy Clause of the Constitution of the United States (Article VI, Clause 2) establishes that the Constitution, federal laws made pursuant to it, and treaties made under its authority, constitute the "supreme Law of the Land," and thus take priority over any conflicting state laws. Pursuant to the Supreme Court precedent that follows from *Carrier, House v. Bell*, 547 U.S. 518, 537-538 (2006) and *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995, this Court **must consider all of the evidence, whether old or new "without regard to whether it would be necessarily admitted under rules of admissibility that would govern at trial."**

We request the Court reconsider Mr. Bradley's APCR based upon the above. Finally, Mr. Bradley requests a hearing (alternatively oral argument) based upon his APCR to address any of the Court's concerns.

**BASED ON THE FOREGOING,** Petitioner respectfully moves this Honorable Court to reconsider his APCR filed on December 28, 2022, and to set a hearing/oral argument date.

**Dated: June 14, 2023**
**New Orleans, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

Walker Lasiter

P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

## CERTIFICATE OF SERVICE

I, Walker Lasiter, do hereby certify that a copy of the foregoing has been delivered via electronic mail to the Jefferson Parish District Attorney's Office this 14th day of June, 2023.

Walker Lasiter
P. Walker Lasiter

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

TWELFTH JUDICIAL DISTRICT COURT

STATE OF LOUISIANA

PARISH OF AVOYELLES

-o0o-

| | |
|---|---|
| VINCENT SIMMONS | DOCKET #37596-A |
| VERSUS | HONORABLE WILLIAM J. BENNETT |
| DARRELL VANNOY | JUDGE PRESIDING |

**STATE'S EXCEPTION OF PRESCRIPTION AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

APPEARANCES BY:

HONORABLE CHARLES A. RIDDLE, III
DISTRICT ATTORNEY
P.O. BOX 1200
MARKSVILLE, LA 71351 — REPRESENTING STATE OF LA

MR. JUSTIN BONUS
ATTORNEY AT LAW
118-35M QUEENS BLVD-STE 400
FOREST HILLS, NEW YOUR 11375 — REPRESENTING VINCENT SIMMONS

MR. MALCOLM LARVARDAIN
ATTORNEY AT LAW
626 EIGHTH STREET
ALEXANDRIA, LA 71301

---

| RECORDED BY | TRANSCRIBED BY |
|---|---|
| ROSE L. BATISTE<br>OFFICIAL COURT REPORTER<br>12TH JUDICIAL DISTRICT COURT<br>P.O. BOX 1301<br>MARKSVILLE, LA 71351 | ROSE L. BATISTE<br>OFFICIAL COURT REPORTER<br>12TH JUDICIAL DISTRICT COURT<br>P.O. BOX 1301<br>MARKSVILLE, LA 71351 |

---

DATE OF HEARING — FEBRUARY 14TH, 2022



EXHIBIT A



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

BY THE COURT:

I don't want anybody standing, if necessary Court personnel. Any court personnel in here, to the Jury box please, since it's a little crowded.

We're on the record in docket 37596 Vincent Simmons Versus Darrel Vannoy, before the court, the first hearing we have before the court is in regards to an Exception of Prescription , Res Judicata filed by the State. First of all make your appearances for the record please.

BY MR. SALARIO:

Anthony Salario, First Assistant District Attorney.

BY MR. RIDDLE:

Charles Riddle, district attorney.

BY MR. BONUS:

On behalf of Mr. Simmons, Justin Bonus.

BY MR. LARVADAIN:

Malcolm Larvadain, also on behalf of Mr. Simmons.

BY THE COURT:

All right. Counsels, as you know practicing before me I read everything, and I've read everything that ya'll have submitted and give you the opportunity to add to anything that you have submitted then I'm going to have some questions for you, if you wish to add or you can submit your argument based on what you have filed.

The issue before the court … the first issue concerns the filing on October 20th, 2020 of the Application of Post-Conviction Relief by Mr. Simmons and whether or not it is

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

prescribed having been heard before and/or res judicata, prescribed under the law.

Mr. Salario, do you wish to make any argument or submit on your filings, sir?

BY MS. SALARIO:

Just very briefly, Your Honor. I've put everything that I wished to submit at least into my memorandum in my exception. Two things that I did want to touch on that were raised in their exception is that they raised a new amendment to the post-conviction law that 90.8 actually it's 90.3 and 2, I don't think that applies because …

BY THE COURT:

9.3…

BY MR. SALARIO:

Yeah, 830.2 if you read that it talks about on this first … if he's asserting actual innocence for his first time, this is not his first time, he's done it in the past several times. So therefore that Article would not apply. And then simply in the diligence out of the 930.8 and 936.4 I think that that needs to be taken into account as well.

BY THE COURT:

All right. Mr. Bonus, do you wish to add anything to what you have filed?

BY MR. BONUS:

Just briefly in response to that. First of all it's the first time he could raise it after the statute. Louisiana just

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

recognized actual innocence. So it's the first time he could have raised it.

Also the other thing with regard getting into the underlying motion itself Dana Brouillette is a family member, I mean no one knew when Dana Brouillette was going to come forward, that took hours of investigation and you know the statements that Keith Laborde made …

BY THE COURT:

We're going to get to those particular issues…

BY MR. BONUS:

Right.

BY THE COURT:

In a minute but if … any other response to what he said?

BY MR. BONUS:

No, nothing other than … and the only other thing with regard on point to the law is in 2019 was the first time that an identification expert could have been used. So when you talk about prescription, I mean these are the first time… this is the first time in the State that an identification expert it was recognized as a person … and the type of science that could have been presented to the court. So you know I mean with regard to due diligence Mr. Simmons filed everything within six months of having these expert reports and affidavits and that doesn't even obviously we got to Mike



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Kelly's testimony, that's the first time anyone ever heard that and that opened the door to all of the other discovery that we now know was not disclosed.

BY THE COURT:

You're jumping way ahead of where I want you to be.

BY MR. BONUS:

I'm sorry.

BY THE COURT:

No, no while you're up there I have a question. My first question … I have a couple of questions I want to ask. This one is directed to you. It is alleged in your filings in this parish it is clear that Vincent Simmons will not receive a fair review of anything that he brings to the court's attention. And I ask you before we go further, since I've been on this case has Vincent Simmons received a fair review and do you expect a fair review to take place or is it your position that this court is unfair and has been unfair? Because that's in your filing.

BY MR. BONUS:

I know. And I'll definitely address that. That was before you actually took over the case. And I actually … I actually think I stand corrected. I think that you've been extraordinarily fair and it's actually an honor to be in front of you. And I say that wholeheartedly that you've



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

been probably one of the most candid judges I've been in front of.

BY THE COURT:

Sometimes it gets me in trouble but regardless of the outcome you will stand here and say this has been a fair proceeding, regardless of the outcome here today?

BY MR. BONUS:

Yes.

BY THE COURT:

Yes or no? O.K., very good.

BY MR. BONUS:

I believe that.

BY THE COURT:

Next question. And I can address to both of you. In 2018 the State filed this same exception of prescription and Res Judicata before Judge Spruill and it was granted and Judge Spruill said that the other new evidence and … other evidence you're alleging now it's other evidence, was inapplicable, was not a finding it was no due diligence and he also basically stated that the alleged constitutional violation had prescribed. So why is the case … why is that different than what …

BY MR. BONUS:

Because we never heard from Mike Kelly, you can't prescribe a constitutional violation. And the fact of the matter is in Louisiana statute 930 … I think it's C.1 or

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

something like … I think it's 930.1 it says that when there's a constitutional violation, the court shall grant. No one ever actually got to the material substantive issue of whether there was a constitutional violation. When Judge Johnson, not Jeansonne, when Judge Johnson denied Vincent in 1994, by the way with no response from the State the issue was procedurally barred. The material and substantive facts of what Vincent was claiming 28 years ago no one ever evaluated that. In 2004 Mark Jeansonne didn't evaluate, he didn't actually address the merits of the claims. Like was the evidence actually turned over, did Mike Kelly and Harold Brouillette receive it. Nobody considered the letter from Harold Brouillette. What we heard from Mike Kelly was chilling and from Mr. Riddle it sounds like the State doesn't even refute …

BY THE COURT:

So your response to my question is that constitutional violations cannot prescribe?

BY MR. BONUS:

Correct.

BY THE COURT:

And that you have new evidence?

BY MR. BONUS:

Correct. Once you've determined that there is a constitutional violation and once

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

you've proven, once you've proven that there is a constitutional violation.

BY THE COURT:

So you're saying the fact that these alleged violations have been the subject of filings before multiple courts throughout the years, and all denied don't count because there hasn't been an actual hearing?

BY MR. BONUS:

Right.

BY THE COURT:

O.K. Mr. Salario, do you wish to respond on that issue please?

BY MR. SALARIO:

It just goes back to my argument on diligence under the statute. I mean Mike Kelly has been practicing in the same spot right down the street since 1977, he's had the same office. So when you talk about diligence, what does that mean under the law? They hire an ex… they hire a private investigators now and someone goes and talks to him. And then they say hey, this happened let's have a hearing. And they get an affidavit or testimony from him, he's been practicing three hundred yards down the street since the trial and no one has ever talked to him. And so there's been multiple attorneys since 1993, private attorneys involved with this. And in fact the last one in 2017 appeared to have all the access to whatever he needed, Mr. Hortzberg, he



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

could have done this in 2017. And I understand that Vincent Simmons didn't have … he didn't have control over whatever they were doing at the time. But certainly under the law diligence applies that's why …

BY THE COURT:

Mr. Bonus states that these constitutional violations that have been alleged and let it be known that I have said there have been constitutional violations without hearing the State's evidence on that issue. I found there have been clear violations, he's saying you cannot prescribe against constitutional violations and that they've actually never been heard, they've only been submitted to courts in writing. So any response to that?

BY MR. SALARIO:

No I don't have a response to that, I understand that diligence would have brought Mike Kelly here earlier, but he wasn't. And so he testified and if … and if he testified truthfully to those facts and you actually said from the bench that you believed that there is constitutional violations so that could defeat the prescription argument. I don't know the answer to that, haven't come across it.

BY THE COURT:

All right, thank you.

BY MR. BONUS:

May I briefly just?



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

BY THE COURT:

Yes, sir.

BY MR. BONUS:

So Mike Kelly worked for the prosecutor's office until 2018. I mean that is somewhat of an uncomfortable situation, okay.

BY THE COURT:

I've already discussed Mike Kelly's testimony, Mr. Bonus, and find it as stated on the record I find it to be some of the bravest testimony…

BY THE COURT:

I've ever seen.

BY MR. BONUS:

Right.

BY THE COURT:

And the due diligence aspect of it was in my opinion is not really an issue dealing with Mr. Kelly…

BY MR. BONUS:

Right.

BY THE COURT:

And the due diligence issue to me, the only issue on due diligence is was Mr. Simmons in his capacity at Angola, doesn't have the ability and capability of going search out all this new evidence. But in his situation in all of these years and this is the next question I was going to get at, in all of these years he's had … there's been documentaries, there have been

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

investigations, private investigators, there have been all kinds of things, most of which I have not seen I want you to know. But with all this resources at hand now you come with Dana Brouillette, now you come with Mike Kelly and the State's argument is hey, due diligence could have found this before. Why are we just getting to this now.

BY MR. BONUS:

O.K. Dana Brouillette didn't … Keith Laborde didn't say what he said to Dana Brouillette until 2011, 2012. So that was well after Vincent Simmons was … you know the documentaries were ten years past, I guess. And again it takes time, people … for witnesses to come forward, witnesses come forward whenever they come forward. That's just the way post-conviction is. And that's why the statute that's written with regard to actual innocence in Louisiana is so beautiful, because it's an understanding that substantive due process violations and a prima facie case of innocence trumps anything procedural. It's about fairness and correcting injustices. If that's the bedrock of our justice system, then that's what it has to be. We have to be able to evaluate our mistakes at any time that we discover them.

And when we talk about due diligence, that's not … let's be clear when Harold Brouillette wrote his letter in 1998 Vincent

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

… when Laurie White was hired, I think it was 2004, she filed the motion. And Harold Brouillette's letter was in that motion. So you talk about due diligence, he's actually been diligent. And I'm not saying that you've punished him but most of the time people like Mr. Simmons when they file over and over and over again they get punished because they're filing over and over and over again. And it takes time … you know it takes time to get to severance. And that's the thing, is pro se litigant he's litigated. I actually … I mean what am I supposed to say, he's liti… every time he's gotten something, the man literally got that evidence on December 7th, 1993, probably got it a little after that, that was the date of when they mailed it to him.

And then he files a motion to vacate, I think with newly discovered evidence in Brady in March of 94.

BY THE COURT:

Which was dismissed, okay. All right, any other argument on the prescription?

BY MR. SALARIO:

Yeah, Mike as you know Mike Kelly is one of my mentors, and I just want to say for the record that if anyone would have approached him whether work for the DA's office or not, he would have talked to them because that's the kind of man he is.

BY THE COURT:



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

All right. Any other argument on the Exception of Prescription Res Judicata?

BY MR. BONUS:

One quick addition. There was a man named Troy Davis in Georgia. Your Honor, I cited over and over again and he was denied over and over again. And our case went all the way up to the supreme court after he was denied habeas petition after habeas petition and the supreme court said that due process and innocence trumps procedural bars.

BY THE COURT:

O.K.

BY MR. BONUS:

That was 2009 that case.

COURT'S RULING ON EXCEPTION OF PRESCRIPTION - RES JUDICATA

BY THE COURT:

This application for post … I'm going to give my ruling now on the Exception of Prescription. Usually I take a break and go because I have my rulings in my mind after reviewing everything of what I intend to do. And usually see whether or not the attorneys are going to convince me I'm right, or convince me I'm wrong, sometimes change my opinion.

I've reviewed everything regarding the Exception of Prescription. It's interesting to note that at least sixteen post-conviction applications have been filed by Mr. Simmons since 1980 in the nature of Writs of Mandamus,

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Habeas Corpus, post-conviction relief applications.

His applications have been reviewed by eight of nine Avoyelles parish judges, including my dad in the late 1980's before the evidence in 1993.

How many judges on the court of appeal have reviewed his case, I have no clue. But a lot. How many supreme court justices have reviewed the Writs, several. All have been denied.

The most recent filing was October 20th, 2020 and the question is it prescribed. Mr. Simmons says no, because there are several due process violations, newly discovered evidence, alleges witness fraud. First claim of actual innocence.

So the question is why is Vincent Simmons still in prison. His answer is because of a judicial system that has never fairly heard his petitions. And I quote from Mr. Simmons' filing.

First issue on prescription, res judicata filed by the State, this was filed December 1st, 2020 in Division A and was not heard, and is being heard today. As I stated there were sixteen previous filings that were denied. The State claims it's not timely filed in the State claims. And this is of fact, on June 3rd, 2019 our Louisiana Supreme Court in reviewing the claim of Vincent Simmons said 'the claims of Vincent Simmons have been fully litigated in accord with Code of Criminal Procedure Article



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

930.6 and this denial is final. Hereafter unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, Vincent Simmons has exhausted his right to state collateral review.

In 2019 the Louisiana Supreme Court says hey, Mr. Simmons, it's over. Mr. Simmons says now it is now.

In response to the Exception of Prescription Mr. Simmons has made argument here today and says that it's the job of the prosecutor to seek justice, and that's true. It is the job of the prosecutor to seek justice. And in this case since Mr. Riddle has been on it, he has followed his job. Although Mr. Simmons says otherwise. We've got to remember Mr. Riddle has victims that he has to answer to also. And we can't ever forget the victims that were involved in this case, who I do not know and have never met. But these victims reported a horrible rape that occurred in May of 1977.

Mr. Simmons claims that everything that has happened to him has been a procedural bar and has never received a fair hearing. He has alleged new evidence. Affidavit of Dana Brouillette, investigative report of Brian Andrews, affidavit of Diane Prater who was a juror. He's got expert reports regarding the lineup, the medical report, motives of people to lie. A report concerning racism, and my God how embarrassing it is to bring up that word; it's

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

2022, shouldn't have that word in here. It's a shame and I'm embarrassed.

Not saying it might not be applicable, that word should have gone away long ago, we're all created equal.

So the law says in 930.4 unless required in the interest of justice any claim for relief which was fully litigated on an appeal from the proceedings, leading to the judgment of conviction and sentence shall not be considered. And that defendant's have two years to file post-conviction relief applications with certain exceptions. One of those being the interest of justice would be served by the consideration of new evidence.

I specifically find that the time limitations have been overcome by the allegations of newly discovered evidence and in the interest of justice because what is justice, fair treatment, the process or result or using laws to fairly judge people accused of committing crimes. Did Vincent Simmons commit this crime, he may have I don't know. I wasn't on the jury and I'm not going to be on the next jury, if there is a new trial. But justice cannot prescribe. He is entitled to have his application for post-conviction relief presented to the court and the Exception of Prescription and Res Judicata is according overruled and objection to the ruling of the court is noted and error is assigned.

We will now proceed to a hearing on the

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Motion for Summary Judgment which is an allegation made by Mr. Simmons that there remains no genuine issue of material fact that his conviction and sentence should be vacated and set aside.

Does counsel wish to argue that Motion or submit on the various filings that have been made?

BY MR. RIDDLE:

We submit.

BY MR. BONUS:

I leave it to Your Honor, if you have any questions I'd be willing to answer them.

BY MR. SALARIO:

Correct Your Honor, we will submit.

**COURT'S RULING ON VINCENT SIMMONS' MOTION FOR SUMMARY JUDGMENT**

BY THE COURT:

Before you submit I must tell you that if I go with what I've got it's going to take a little while. I've got a lot to say. Ya'll submit?

BY MR. SALARIO:

Yes, sir.

BY THE COURT:

Submit?

BY MR. BONUS:

Submit.

BY THE COURT:

All right. Again I state that I have no opinion on the guilt or innocence of Vincent Simmons. That is for another day. I also state



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

that in everything that I've considered here I have kept the victims in my mind in that these ladies as young girls by all accounts sustained and underwent a horrible event. That without question had a long-lasting and continuous and life-time impact on them.

But nothing I say here today has anything to do with the guilt or innocence in my opinion of the guilt or innocence of Vincent Simmons. Mr. Simmons has applied to this court on a Motion for Summary Judgment saying hey Judge, we don't need to hear anything else, there's no material issue of fact remaining that the continued litigation in it's present state is only procedural at this point and vacatur of his conviction is only being delay

Mr. Simmons claims that there's no genuine issue of fact remains of his right to discovery and a fair trial were violated, that there were Brady violations, Ginks Act violations. There's more discovered evidence now. That the due diligence factors have been met that are set by jurisprudence. Makes mention of Harold Brouillette's letter, Mike Kelly's testimony. And we all know that on December 7, 1993 around that time the State of Louisiana provided to Mr. Simmons for the first time a lot of evidence.

I'm going to talk about the specific laws and evidence in a minute.

To this claim that there's no genuine issue of material fact the State responds by saying hey it's res judicata, these claims have all



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

gone before the court, they're all been heard, the files were made available by open file discovery which discharges the obligation of the prosecutor to with Brady information, Brady obligations. And they conducted a preliminary exam.

The affidavit of Eddie Knoll who was the prosecutor in 1977 was submitted to indicate that there is a genuine issue of material fact. And quite frankly in reading his affidavit it seems to create a genuine issue of material fact. We'll talk about that in one minute.

The law claimed to be applicable, we've mentioned Brady violations. Mr. Simmons claims Ocites Brady versus Maryland. Which the US Supreme Court in 1963 said the withholding of evidence favorable to the defendant violates due process.

The Supreme Court said where the evidence is material either to guilt or punishment, it has to be divulged to the defense. Justice William O. Douglas stated 'we now hold that the suppression of evidence by the prosecution favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment.

Justice Douglas said 'society wins not only when the guilty are convicted but also when criminal trials are fair.'

Subsequent case law expanded Brady obligations to law enforcement officers ordering them to turn over all evidence favorable to the

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

defendant. All evidence, including evidence favorable to the defendant.

Subsequent case law defined exculpatory evidence as any evidence that could be favorable to the accused. And exculpatory evidence is material if there is a reasonable probability that the conviction or sentence would have been different had these materials been disclosed.

Mr. Simmons also alleges a violation of a federal statute called the Ginks Act which provides that there is a duty to turn over witness statements, the prosecution must produce no later than the close of direct examination of any prosecution witness, any statement of a witness in their possession which relates to the subject matter which the witness testified.

Mr. Simmons also cites Kyles versus Whitley, 1995 case that stated the actions of police are imputed to the prosecutor and they have a duty to disclose favorable evidence.

And as stated before Mr. Simmons has alleged newly discovered evidence and that he has complied with and met all factors in State versus Calvalier a ruling of our supreme court, Louisiana Supreme Court in 1997.

The issue of open file discovery was discussed by Mr. Simmons in his claim alleging that State versus Ballard said that open file discovery does not discharge of Brady violations. State versus Ballard was a very recent case.



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

In response to the Motion for Summary Judgment the State claims Brady violations and Ginks Act allege violations that have already been decided by our courts, so application of these laws cannot now occur.

And the State claims that the affidavit of Eddie Knoll, which I'll discuss later, indicates there was nobody … confirms there was no Brady violation, therefore creating an issue of fact.

I must note that several of these laws cited by Mr. Simmons came about long after 1977.

Let's talk about 1977 for a moment. The victims were 14 years of age, Mr. Simmons I don't know what his age was. Approximately two weeks after being raped, according to what is in all the filings, these young girls reported to Avoyelles parish sheriff's office on the fourth floor of this building they were raped.

By all accounts these ladies, these young girls at the time had been raped. Vincent Simmons was arrested. There was a lineup upstairs on the fourth floor. Case went to DA's office who had open file discovery, allowed a preliminary exam when he didn't have t. There was a trial and a conviction. Didn't occur in this courtroom. It occurred on this floor, the wall right there was not here. This was all one large courtroom.

And I'm going to mention something that I've never mentioned to anyone other than Mr. Riddle and I talking about years ago when we were public defenders. And one of the things I



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

changed when I first became judge; took office in December of 1996 and configuration of that courtroom was changed. Because in that courtroom there was a jury box, much smaller than the jury box you see in this room. It was two feet behind the prosecution table. There was a witness chair, it's not the configuration now, the judge's bench was between the two doors in that courtroom. And there was a witness chair and there were benches and the DA by law the district attorney has a right to sit closest to the jury.

I am not exaggerating when I tell you that the back of the district attorney's staff was no less than two feet, maybe three from the front of the jury box. I raised that many times when I was a public defender and a defense lawyer, as did Mr. Riddle. I never thought that in and of itself was right, but I digress. That's how it was in 1977, remember this is 1977, we didn't have computers, we didn't have fax machines, cell phones, email, text messages.

1977 was a much different time, we didn't even have the University of Facebook School of Law back then (courtroom chuckles). Which now in 1977 Mr. Riddle and I were in law school, I've learned in the last several years that to be a lawyer all you need is a computer and a Facebook account and you know as lot more law than I'll ever know. In fact I have a tee shirt they gave me just to prove it.



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

There's been a lot made that in 1977 this case went to trial very quickly. In today's world, …

BY MR. BONUS:

Your Honor, Mr. Simmons has to really go to the bathroom. Is there a way we could just take a …

BY THE COURT:

We can take a recess I've got it marked where I am.

BY MR. BONUS:

Save your spot please.

BY THE COURT:

Might change my mind.

RECESS - RESUMED

BY THE COURT:

All right, we're back on the record State versus Vincent Simmons. I'm going to try to pick up where I left off.

I kind of was on a roll there for a minute. We were talking about 1977 and I just mentioned the allegation made by Mr. Simmons that it was unfair as to the amount of time that elapsed between his arrest and his trial.

Remember that's 1977, in the year 2020 in the Twelfth Judicial District Court with two judges we processed two thousand eight hundred seventeen criminal cases, that's misdemeanor and felonies. Doesn't count civil, doesn't count juvenile, doesn't count traffic.

In 1996 we process fourteen hundred seventy-five. Half of what we processed, we're



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

still two judges in 1996. So in 1997 how many we processed with one judge. I dare say a lot less.

It was not unusual back then to have a matter go to trial quickly that was a serious case because there wasn't that much other business going on. Today's world is quite different.

The time of trial is not the unusual thing, in looking at the genuine issue of material facts what are alleged and it must be noted that counsel for Mr. Simmons continuously states that there is the law of the case that there's been a clear constitutional violation and I have ruled that and found that over and over waiting to hear what the State's position was on this. Whether or not the State could present a genuine issue of material fact.

We know that on December … on or about December 7th, 19993 sixteen years after trial the State of Louisiana provided the defense with a medical report, statements of the victims, statement of Keith Laborde, a photo lineup, supplemental police reports. Later comes Harold Brouillette's letter, Mike Kelly's testimony confirming that they didn't have any of this information at trial.

The question remains does the affidavit of Eddie Knoll create a genuine issue of material fact. Mr. Knoll states in his sworn statement that the evidence in the preliminary examination





E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

and the trial in 1977 was strong and convincing and refutes any claim of actual innocence.

Mr. Knoll is correct that the evidence submitted at trial in 1977 the little bit I've reviewed indicating guilt. Wasn't all the evidence.

Mr. Knoll states that the defendant did not file any pre-trial motions except a Motion For A Preliminary Exam, which he did not have to grant and he did grant. A preliminary examination is used by defense lawyers as a fishing mechanism to see what evidence the State has. And Mr. Knoll allowed that.

Mr. Knoll's affidavit states that he had a progressive and liberal open file policy. As a practicing attorney from 1979 until December 1st, 1996 I can assure you that is a true statement. We were able to look at his files and have access to the files without formal discovery.

Mr. Knoll states that he believes that he had the entire file, he is not sure, in 1977. So the answer to the question of whether or not this affidavit creates a genuine issue of material fact would appear to be absolutely yes. Because this affidavit that claims that all evidence was made available to Mr. Simmons via an open file discovery. That leaves to question what was in the file in 1977.

Mr. Knoll said he thinks he had the whole file. I'm going to tell you in my review it wasn't possible and I'm going to tell you why.

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Yes it was open file policy, Eddie Knoll as a prosecutor never hid anything that I mean never, I practiced law against him for years and years. He never hid a thing, he had something against you, he told you what he had, he told you he was coming for you, said he was going to get you and more often than not he did. He was a very effective prosecutor. I must also say that applies to Mr. Riddle, same qualities.

How about Harold Brouillette and Michael Kelly? Judge Earl Edwards in 1977 was getting to the twilight of his career and first was elected in 1960. He didn't appoint any run of the mill attorneys to a rape case. He said Harold Brouillette and Mike Kelly. Harold Brouillette had a reputation of being one of the best most honest lawyers in Avoyelles parish.

In 2007 Boston Legal, Adam Shore ABC TV, sorry Mr. Begnaud, said being a lawyer is an ugly occupation, calling upon it's participants to do ugly things. Harold Brouillette and Mike Kelly didn't do ugly things. Eddie Knoll didn't do ugly things, Harold Brouillette and Mike Kelly were two of the finest attorneys I ever had … and I got to watch Harold Brouillette when I was a little boy. And practice in front of him as a judge.

Judge Earl Edwards appointed lawyers that he knew would do the best job that they could.

Remember again it's 1977, remember wasn't that much technology then.



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

It is my finding specifically that all evidence that the prosecution had in 1977 was made available to the defendant via an open file policy and the agreement to conduct a preliminary exam. This evidence was made available however not until December of 1993 and very simply and there's no need for a trial on this issue. This evidence could not have been in the file of the district attorney in 1977 and I'm going to tell you why.

If there had been a photo lineup in that file, Eddie Knoll would have used it at trial, he used it against me every time there was one. There's a photo lineup in this case that now people say is not the real lineup, it's one taken after the line so my oh my where is the original. I still haven't seen it. Had Eddie Knoll had it in 1977 he would have used it.

How about the testimony of Dr. Bordelon, was he called as a witness at trial? No. He performed the physical examination upon the victims. He was not called as a witness, I can assure you Eddie Knoll would have called him as a witness. Every time he had Dr. Bordelon in a trial or any coroner when I was a lawyer, he testified. Oh somebody might say well he didn't want to call as a witness because one of the findings wasn't necessarily … well it could have been used favorable to the defense, that wasn't Eddie Knoll. If he had Dr. Bordelon would have been here to testify and he was not.



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

The other things that were in the file in 1993 if they … if all of this was there in 1977 and Eddie Knoll was suppressing it why would he turn it over in 1993, hide it then too. He simply didn't have it in 1977. When did it come? After. Did he necessarily see it, did somebody in his office get it and just say oh well this is in Vincent Simmons' file, he's already been convicted let's put it in the file, it's a dead file let it be. I don't know what happened.

But I'm one hundred per cent convinced that information was not in Eddie Knoll's file because had it been he would have given it to the defense. He did it when I practiced, he never hid anything. It was Poppa I'm going to give you something that's favorable to your client because I have to, boom.

Logic says that evidence was not there in 1977. Mr. Knoll says he thinks sit was, it might have been but he can't confirm for sure. I don't need him to testify on that issue. If he had he would have given it. He gave it in '93. That's enough for me.

The law as it stands today clearly reflects that due process violations occurred. Of laws that weren't in effect in 1977. There are procedural laws and show any procedure of law be allowed to let stand a violation of a person's constitutional right to due process of law in a fair trial.

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

God we all know that answer. Can't let procedure violate a man's rights. Again I don't know if Vincent Simmons is guilty, and I wasn't on the jury, I know in the evidence then it was very convincing of what I've seen. What we know now that there is a lot of evidence that was not presented.

There remains in the opinion of this court which opinion is obviously different from many other judges, district court judges, court of appeal judges, and supreme court justices, that no genuine issue of material fact remains that Vincent Simmons did not receive a fair trial.

No fault of Eddie Knoll, no fault of his defense attorneys. Was it fault of agencies for not timely delivering the evidence? I don't know that. And I specifically find that that evidence wasn't available and it's through no fault of Mr. Knoll and no fault of Harold Brouillette or Mike Kelly, they went with what they had.

Therefore there is no need for this court to consider anything further. Newly discovered evidence, certainly there's some newly discovered evidence which is important and I believe the four factors of State versus Cavalier have been met. But we don't even need to get there.

Claims of actual innocence, that's for another day. It's not for today. Again I do not have an opinion on the guilt or innocence of

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

Mr. Simmons as he sat here and came in here today, he was adjudged a guilty man.

However based on the above in all of my findings and readings, I find there is no genuine issue of material fact; Mr. Simmons is entitled to a new trial; his conviction and sentence is vacated and set aside and a new trial is ordered.

Objection by the State is noted, error is assigned. Gentlemen, get your calendars let's pick a new trial date.

(CHEERING IN COURTROOM BY PEOPLE PRESENT)… Whoa, whoa this is still a courtroom please, please. You wish to set it for trial.

BY MR. RIDDLE:

Your Honor, may I make a Motion?

BY THE COURT:

You sure may.

BY MR. RIDDLE:

Your Honor, this matter ahs been going on for forty-four years with nearly two dozen filings in state and federal court. Tony Salario and I have had personal involvement for nearly twenty years. If this matter would go to trial it would have to be for only the attempted rape charges. All other charges that could have been brought have prescribed. He can no longer be charged for attempted murder for pulling the trigger of the pistol while aiming at a deputy. And he can no longer be charged for kidnapping.

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

After the new trial when found guilty it is doubtful that the sentencing in today's justice system would be for more than forty years.

That would be what we would recommend. We offered this previously to release, but Louisiana law requires sex registration even though that law did not exist in 1977.

We believe that we have sufficient evidence to find Vincent Simmons guilty, yet for what purpose? These two victims of these horrible crimes do not need to undergo the trauma of another trial. They don't need to be victimized again which occurs so often in rape cases. They have been through enough. The deputy who was a victim in the attempted murder is satisfied. The attorney bringing up no blood, no evidence of sexual assault when no one was capable of DNA in 1977 is spouting words to again do what happens in many rape cases. That is attack the victim an cause them to be traumatized again.

It is no wonder that many sexual assault victims never want to come forward and never want to testify. The CBS story referred to a medical report stated that no evidence of sexual assault when actually the exam was two weeks later. And the report said the hymen was in tact. Rape only requires slightest penetration. And this was for attempted rape.

I'd like to introduce the two victims Your Honor, that you've never met. Sharon and Karen Sanders.

BY THE COURT:



E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

As you've heard through my comments, thoughts of you have never left me. We know what you underwent was so traumatic and affected your lives. However and I know you might not agree with me and I respect that. But I believe that Mr. Simmons is entitled to a fair trial, with all evidence, okay. Thank you, Ladies.

BY MR. RIDDLE:

We will not appeal this decision. We will not take a writ. Based upon all of this and with complete consent of the victims, the district attorney is asking to nolle prosse the charges which would allow Mr. Simmons to be freed from the Department of Corrections immediately.

Just in case any one has any doubt, no this not a declaration of innocence at all. We attempted to free him months ago because we felt like he served enough time. Let this case be put to bed and the victims free from suffering again. We ask that we nolle prosseque.

BY THE COURT:

Mr. Riddle, you are stating that my ordering of a new trial the State is deciding not to prosecute Mr. Simmons based on the consent of the victims and the fact that he has already served more time than he might have served if convicted in todays' world?

BY MR. RIDDLE:

Correct.

BY THE COURT:

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

You're asking that a dismissal of any charge against Mr. Simmons be issued?

BY MR. RIDDLE:

Yes, sir.

BY THE COURT:

A dismissal of the charge … all charges against Mr. Simmons is entered into the court as the district attorney has announced he will not prosecute and there will be no need for a trial.

BY MR. BONUS:

We'd join in that obviously.

BY THE COURT:

O.K. Mr. Riddle, thank you.

BY MR. RIDDLE:

Thank you, Your Honor.

BY THE COURT:

Everybody would you please hold your places until I get out. Also I know this is emotional there are court proceedings going on next door so please be mindful of that.

<u>**END OR HEARING….**</u>

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

STATE OF LOUISIANA

PARISH OF AVOYELLES

COURT REPORTER'S CERTIFICATE

I, ROSE L. BATISTE, Official Court Reporter Twelfth Judicial District Court, Marksville, Avoyelles Parish, Louisiana, do hereby certify as follows to-wit:

That the above and foregoing was recorded by:

ROSE L. BATISTE

Official Court Reporter, by FTR Gold Digital Recording System, before the:

HONORABLE WILLIAM J. BENNETT

Judge presiding, 12th Judicial District Court, Marksville, Avoyelles Parish, Louisiana.

That was same was transcribed by me to the best of my knowledge, ability and understanding.

That I am not an attorney, not related to any of the parties, and not interested in the outcome of the case.

That the attorneys, as per cover sheet attached hereto, made part hereto, were present throughout the entire proceeding.

MARKSVILLE, AVOYELLES PARISH, LOUISIANA, this 2nd day of the month of March, 2022.

ROSE L. BATISTE #91305
OFFICIAL COURT REPORTER

ROSE L. BATISTE CERTIFICATE #91305 EXPIRES 12-31-22 CERTIFIED COURT REPORTER

E-Filed:06/14/2023 11:28:55 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

**CRIMINAL DOCKET NO. 99-5825**

**24TH JUDICIAL DISTRICT COURT**

**PARISH OF JEFFERSON**

**STATE OF LOUISIANA**

**FILED:** ____________________

____________________
**DEPUTY CLERK**

---

**BRADLEY'S NOTICE OF INTENT TO APPLY FOR WRIT OF SUPERVISORY REVIEW AND REQUEST FOR RETURN DATE**
**(SUMMARY DENIAL OF PCR)**

---

PLEASE TAKE NOTICE of Earl Bradley's intention to apply to the Louisiana Fifth Circuit Court of Appeal for a Writ of Supervisory Review. In this Application, Mr. Bradley will seek review and reversal of the action of the District Court summarily denying Mr. Bradley's application for post-conviction relief on May 31, 2023, which was apparently filed and mailed to Mr. Bradley's counsel on June 2, 2023.

Mr. Bradley respectfully requests this Honorable Court grant Mr. Bradley a reasonable Return Date within which to apply for a Writ of Supervisory Review noticed herein.

**RESPECTFULLY SUBMITTED,**

MANARD LAW OFFICES

Walker Lasiter
P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

**CERTIFICATE OF SERVICE**

I, Walker Lasiter, do hereby certify that a copy of the foregoing has been delivered via electronic mail to the Jefferson Parish District Attorney's Office this 14th day of June, 2023.

Walker Lasiter
P. Walker Lasiter

E-Filed:06/14/2023 11:38:44 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**EXHIBIT K**

**TWENTY-FOURTH JUDICIAL DISTRICT COURT**
**PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** **DIVISION "O"**

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

FILED FOR RECORD 06/21/2023 13:11:47
Melissa A. Perry DY CLERK
JEFFERSON PARISH LA

**FILED:** ______

______
**DEPUTY CLERK**

**ORDER**

This matter comes before the court on **BRADLEY'S NOTICE OF INTENT TO APPLY FOR WRIT OF SUPERVISORY REVIEW AND REQUEST FOR RETURN DATE (SUMMARY DENIAL OF PCR) STAMPED AS FILED June 14, 2023.**

The defendant seeks writs to challenge the court's denial of his Application for Post-Conviction Relief on May 31, 2023.

Uniform Rules of the Courts of Appeal Rule No. 4-3 provides that a writ return date must be within 30 days of the ruling sought to be reviewed. Defense counsel was served June 2, 2023. Thus the Court finds petitioner's notice is timely.

Rule No. 4-3 provides that the court shall set a reasonable return date and that the court may extend the time for filing the application upon a proper showing. Due to the fact that a Motion to Reconsider has also been filed, and the timely filing notice of intention to apply for writs, this Court finds good cause to extend the return date.

Accordingly,

**IT IS ORDERED BY THE COURT** that the defendant's writ application is returnable to the Fifth Circuit Court of Appeal on or before July 20, 2023.

Gretna, Louisiana, this 21st day of June 2023.

[signature]
**JUDGE**

**PLEASE SERVE:**

PETITIONER: Earl Bradley, DOC # 403836, Louisiana State Penitentiary, Angola, LA 70712

Defense Counsel:

Walker Lasiter, 1100 Poydras St., Ste. 2610, New Orleans, LA 70163

Justin C. Bonus, 11835 Queens Blvd., Suite 400, Forest Hills, NY 11375

Thomas Butler, Appeals Division, District Attorney's Office, 200 Derbigny Street, Gretna, LA 70053

issued 6/21/23 (MP)

1100 2610

SERVE

TWENTY FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

NO. 99-5825 DIVISION "O"

STATE OF LOUISIANA

VERSUS

EARL BRADLEY

FILED FOR RECORD 06/21/2023 13:14:58
Melissa A. Perry DY CLERK
JEFFERSON PARISH LA

FILED:______________ ______________
DEPUTY CLERK

**ORDER**

This matter comes before the court on **PETITIONER'S MOTION TO RECONSIDER, E-FILED JUNE 14, 2023.**

Petitioner, through counsel, moves the court to reconsider its recent denial of petitioner's Application for Post-Conviction Relief (APCR), which was originally filed on December 28, 2022, and denied by this court on May 31, 2023. Nothing in petitioner's present pleading affects or changes the court's order of May 31, 2023, denying relief.

A Motion for Reconsider is improper at this time, and is not authorized by law, as *Post Conviction Relief* statutes do not provide for this procedural vehicle. Under La. C.Cr.P. art. 930.6, the proper remedy at this time would be for petitioner to invoke supervisory jurisdiction of the court of appeal by filing a writ of review to the appellate court, as per La. C.Cr.P. art. 930.6(A).

However, in abundance of caution, to provide clarity, and in the interest of judicial efficiency, the court will address petitioner's Motion to Reconsider at this time.

As to the factual innocence claim, petitioner supplies affidavits which include recantations (including second-hand) and alibi(s) for the murder. The court maintains that the affidavits provided are purely testimonial in nature **are not corroborated by any new evidence that is scientific, forensic, physical, or nontestimonial documentary evidence** as per La. C.Cr.P. art 926.2(B)(1)(a)(ii). As such, the affidavits presented in petitioner's APCR fail to meet the criteria statutorily mandated in a factual innocence claim, and petitioner fails to meet the burden set forth by La. C.Cr.P. art. 926.2(B)(1)(a)(ii).

As to petitioner's claim regarding the alleged *Brady* violation and Larck's criminal history, this claim involving impeachment evidence does not in any way relate to or support petitioner's factual innocence claim permitted by La. C.Cr.P. art. 926.2. As this court ruled, the "grace period" provided in La. C.Cr.P. art. 926.2(A) only applies to "factual innocence" claims, and not to any claim "bootstrapped" thereto. Furthermore, the issue concerning Larck's credibility was addressed/litigated on direct appeal (see appellate record, pp. 516-522) and her credibility/criminal history was litigated in petitioner's 2005 APCR. In denying petitioner's APCR on May 31, 2023, the court ruled that the issues surrounding this claim are procedurally barred from review at this time as they are untimely under La. C.Cr.P. art. 930.8. Thus, the court will not address the merits at this time.

This claim is also barred from review at this time under LSA-C.Cr.P. art. 930.4(A), which dictates that unless required in the interest of justice, any claim

**EXHIBIT L**

for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered. As the issues surrounding this claim were addressed by the appellate court on direct appeal, they are now procedurally barred from review and will be denied.

Furthermore, the claim is barred from review as successive. Under La.C.Cr.P. art. 930.4(d), "a successive application shall be dismissed if it fails to raise a new or different claim." As petitioner previously raised the issues in this claim in his APCR in 2005, which was denied by this court, the claim is now successive, and thus, procedurally barred from review.

As to petitioner's contention that the court failed to consider his May 10, 2023, pleading entitled *Reply to State's Response*, the court maintains that the content included in petitioner's response is ultimately untimely, successive, and not pertinent to the factual innocence claim, which as previously noted, is the only claim authorized for review in post-conviction relief at this time. Furthermore, such pleading by petitioner is not statutorily authorized by the statutes governing Post Conviction Relief. (*See La. C.Cr.P. art. 924 et seq.*)

Accordingly,

**IT IS ORDERED BY THE COURT** that petitioner's Motion to Reconsider be and is hereby **DENIED.**

Gretna, Louisiana, this 21st day of June, 2023.

[signature]
**JUDGE**

PETITIONER: Earl Bradley, DOC # 403836, Louisiana State Penitentiary, Angola, LA 70712

Defense Counsel:

Walker Lasiter, 1100 Poydras St., Ste. 2610, New Orleans, LA 70163

Justin C. Bonus, 11835 Queens Blvd., Suite 400, Forest Hills, NY 11375

Thomas Butler, Appeals Division, District Attorney's Office, 200 Derbigny Street, Gretna, LA 70053

issued 6/21/23 [initials]

A TRUE COPY OF THE ORIGINAL ON FILE IN THIS OFFICE.
[signature]
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

1100 2610

SERVE

**TWENTY FOURTH JUDICIAL DISTRICT COURT**
**PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** **DIVISION "O"**

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

FILED FOR RECORD 06/21/2023 13:14:58
Melissa A. Perry DY CLERK
JEFFERSON PARISH LA

**FILED:____________________** ____________________
**DEPUTY CLERK**

**ORDER**

This matter comes before the court on **PETITIONER'S MOTION TO RECONSIDER, E-FILED JUNE 14, 2023.**

Petitioner, through counsel, moves the court to reconsider its recent denial of petitioner's Application for Post-Conviction Relief (APCR), which was originally filed on December 28, 2022, and denied by this court on May 31, 2023. Nothing in petitioner's present pleading affects or changes the court's order of May 31, 2023, denying relief.

A Motion for Reconsider is improper at this time, and is not authorized by law, as *Post Conviction Relief* statutes do not provide for this procedural vehicle. Under La. C.Cr.P. art. 930.6, the proper remedy at this time would be for petitioner to invoke supervisory jurisdiction of the court of appeal by filing a writ of review to the appellate court, as per La. C.Cr.P. art. 930.6(A).

However, in abundance of caution, to provide clarity, and in the interest of judicial efficiency, the court will address petitioner's Motion to Reconsider at this time.

As to the factual innocence claim, petitioner supplies affidavits which include recantations (including second-hand) and alibi(s) for the murder. The court maintains that the affidavits provided are purely testimonial in nature **are not corroborated by any new evidence that is scientific, forensic, physical, or nontestimonial documentary evidence** as per La. C.Cr.P. art 926.2(B)(1)(a)(ii). As such, the affidavits presented in petitioner's APCR fail to meet the criteria statutorily mandated in a factual innocence claim, and petitioner fails to meet the burden set forth by La. C.Cr.P. art. 926.2(B)(1)(a)(ii).

As to petitioner's claim regarding the alleged *Brady* violation and Larck's criminal history, this claim involving impeachment evidence does not in any way relate to or support petitioner's factual innocence claim permitted by La. C.Cr.P. art. 926.2. As this court ruled, the "grace period" provided in La. C.Cr.P. art. 926.2(A) only applies to "factual innocence" claims, and not to any claim "bootstrapped" thereto. Furthermore, the issue concerning Larck's credibility was addressed/litigated on direct appeal (see appellate record, pp. 516-522) and her credibility/criminal history was litigated in petitioner's 2005 APCR. In denying petitioner's APCR on May 31, 2023, the court ruled that the issues surrounding this claim are procedurally barred from review at this time as they are untimely under La. C.Cr.P. art. 930.8. Thus, the court will not address the merits at this time.

This claim is also barred from review at this time under LSA-C.Cr.P. art. 930.4(A), which dictates that unless required in the interest of justice, any claim

**EXHIBIT M**

for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered. As the issues surrounding this claim were addressed by the appellate court on direct appeal, they are now procedurally barred from review and will be denied.

Furthermore, the claim is barred from review as successive. Under La.C.Cr.P. art. 930.4(d), "a successive application shall be dismissed if it fails to raise a new or different claim." As petitioner previously raised the issues in this claim in his APCR in 2005, which was denied by this court, the claim is now successive, and thus, procedurally barred from review.

As to petitioner's contention that the court failed to consider his May 10, 2023, pleading entitled *Reply to State's Response*, the court maintains that the content included in petitioner's response is ultimately untimely, successive, and not pertinent to the factual innocence claim, which as previously noted, is the only claim authorized for review in post-conviction relief at this time. Furthermore, such pleading by petitioner is not statutorily authorized by the statutes governing Post Conviction Relief. (*See La. C.Cr.P. art. 924 et seq.*)

Accordingly,

**IT IS ORDERED BY THE COURT** that petitioner's Motion to Reconsider be and is hereby **DENIED.**

Gretna, Louisiana, this 21st day of June, 2023.

[signature]
**JUDGE**

PETITIONER: Earl Bradley, DOC # 403836, Louisiana State Penitentiary, Angola, LA 70712

Defense Counsel:

Walker Lasiter, 1100 Poydras St., Ste. 2610, New Orleans, LA 70163

Justin C. Bonus, 11835 Queens Blvd., Suite 400, Forest Hills, NY 11375

Thomas Butler, Appeals Division, District Attorney's Office, 200 Derbigny Street, Gretna, LA 70053

issued 6/21/23 (initials)

A TRUE COPY OF THE ORIGINAL ON FILE IN THIS OFFICE.
[signature]
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

**24TH JUDICIAL DISTRICT COURT**
JEFFERSON PARISH
STATE OF LOUISIANA

STATE OF LOUISIANA DOCKET No. 99-5825

Versus DIVISION "O"

EARL BRADLEY

FILED:____________________

____________________
DEPUTY CLERK

E-Filed:07/07/2023 02:57:41 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**BRADLEY'S MOTION FOR AN EXTENSION OF TIME TO FILE A SUPERVISORY WRIT**

**NOW INTO COURT**, through undersigned counsel, comes Petitioner Earl Bradley, DOC # 403836, respectfully submitting this motion for an extension of time to file a supervisory writ before the Fifth Circuit Court of Appeal.

On June 21, 2023, this Court set a return date of July 20, 2023, for Mr. Bradley to file his supervisory writ.

On June 26, 2023, the undersigned began a jury trial in Kings County Supreme Court Criminal Term in Brooklyn, New York. The trial is slated to last until the week of July 24, 2023.

As such, the undersigned respectfully requests until August 10, 2023 to file Mr. Bradley's supervisory writ. I have conferred with the State, and the State does not oppose Mr. Bradley's request.

**CONCLUSION**

**WHEREFORE**, in light of the foregoing, Mr. Bradley prays that the motion to extend the return date until August 10, 2023 be granted and granting such other and further relief to petitioner as it may deem just and proper.

**Dated: July 7, 2023**
**New Orleans, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

*Walker Lasiter*

**EXHIBIT N**

P. Walker Lasiter, Bar Roll # 38102
1100 Poydras St., Ste 2610
New Orleans, LA 70163

**JUSTIN C. BONUS, ESQ.**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley

E-Filed:07/07/2023 02:57:41 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER

**24TH JUDICIAL DISTRICT COURT**
JEFFERSON PARISH
STATE OF LOUISIANA

STATE OF LOUISIANA | DOCKET No. 99-5825

Versus | DIVISION "O"

EARL BRADLEY

**ORDER**

Considering Mr. Bradley's motion for an extension to file a Writ of Supervisory Review, the Court hereby GRANTS Mr. Bradley's request to extend the return date.

Accordingly, Mr. Bradley is HEREBY GRANTED a return date and Mr. Bradley's Application for Writ of Supervisory Review shall be returnable to the Louisiana Fifth Circuit Court of Appeal on or before the 10th day of August, 2023.

Gretna, Louisiana, this 11 day of July 2023

Honorable Danyelle F. Taylor
Judge, 24th Judicial District Court [Division O]

E-Filed:07/07/2023 02:57:41 CSE:99-05825 Div:O Atty:38102 P. WALKER LASITER


SIGNED: HON. DANYELLE M. TAYLOR - DIVISION: O - 07/11/2023 10:58:39 - CASE:99-05825 - ID:46674/238209

IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUISIANA

NO. 23-KH-377

STATE OF LOUISIANA,
RESPONDENT

VERSUS

EARL BRADLEY,
RELATOR

OPPOSITION TO APPLICATION FOR SUPERVISORY WRITS TO REVIEW THE RULING OF THE HONORABLE DANYELLE TAYLOR, JUDGE TWENTY-FOURTH JUDICIAL DISTRICT COURT PARISH OF JEFFERSON, STATE OF LOUISIANA,
NO. 99-5825, DIVISION "O"

OPPOSITION OF THE STATE OF LOUISIANA, RESPONDENT

PAUL D. CONNICK, JR.
DISTRICT ATTORNEY
24TH JUDICIAL DISTRICT
PARISH OF JEFFERSON
STATE OF LOUISIANA

THOMAS J. BUTLER #22982
MONIQUE D. NOLAN #27431
ASSISTANT DISTRICT ATTORNEYS
DISTRICT ATTORNEY'S OFFICE
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053
(504) 368-1020
mnolan@jpda.us

**EXHIBIT C**

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

LAW AND ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Assignment of Error No. One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Assignment of Error No. Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Assignment of Error No. Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Assignment of Error No. Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

AFFIDAVIT/CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## *CASES*

Page

Carlin v. Cain, 97-2390 (La. 1998), 706 So.2d 968. . . . . . . . . . . . . . . . . . . . . . . . 22
Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order). . 10
Jackson v. Hooper, 22-1123 (La. 11/1/22), 348 So.3d 1267. . . . . . . . . . . . . . . . . 10
McQuiggin v. Perkins, 569 U.S. 383, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013).......12
Ramos v. Louisiana, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). . . . . . . . . . . . . . . . . 3
State ex rel. Banks v. State, 15-1776 (La. 2/26/16), 184 So.3d 1277 . . . . . . . . . . 14
State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80 . . . . . . . 2, 14, 21
State v. Bradley, 03-2745 (La. 2/13/04), 867 So.2d 688 . . . . . . . . . . . . . . . . . . 2, 14
State v. Clark, 18-519 (La. App. 5 Cir. 12/27/18), 263 So.3d 957 . . . . . . . . . . . . 14
State v Conway, 01-2808 (La. 4/12/02), 816 So.2d 290 . . . . . . . . . . . . . . . . . . . . . 6
State v. Edwards, 14-1737 (La. 4/10/15), 164 So.3d 823 . . . . . . . . . . . . . . . . . . . 12
State v. Granger, 23-KH-38 (La. App. 5 Cir. 2/1/23) (unpublished order) . . . . . 11
State v. Paul, 15-2278 (La. 11/2/16), 202 So.3d 955. . . . . . . . . . . . . . . . . . . . . . . . 6
State v. Pierre, 13-873 (La. 10/15/13), 125 So.3d 403 . . . . . . . . . . . . . . . . . . . . . . 6
State v. Sparkman, 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98 . . . . . . . . . . 21

## *STATUTORY AUTHORITY*

Page

Louisiana Constitution, Art. V § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
La. R.S. 14:30.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
La. C.Cr.P. art. 922(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13
La. C.Cr.P. art. 924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
La. C.Cr.P. art. 926(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
La. C.Cr.P. art. 926.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5-13, 20-22
La. C.Cr.P. art. 928. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
La. C.Cr.P. art. 929. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
La. C.Cr.P. art. 930. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
La. C.Cr.P. art. 930.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13, 14
La. C.Cr.P. art. 930.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13, 14

## *EXHIBIT INDEX*

Exhibit A - May 31, 2023 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Exhibit B - June 21, 2023 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Exhibit C - Jackson v. Hooper, 22-KH-251. . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Exhibit D - State v. Granger, 23-KH-38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Exhibit E - Appellate Record, Trial testimony Ms. Larck (excerpts) . . . . . . . . . . 37

IN THE

FIFTH CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

NO. 23-KH-377

STATE OF LOUISIANA,
RESPONDENT

VERSUS

EARL BRADLEY,
RELATOR

OPPOSITION TO APPLICATION FOR SUPERVISORY WRITS TO REVIEW THE RULING OF THE HONORABLE DANYELLE TAYLOR, JUDGE TWENTY-FOURTH JUDICIAL DISTRICT COURT PARISH OF JEFFERSON, STATE OF LOUISIANA,
NO. 99-5825, DIVISION "O"

OPPOSITION OF THE STATE OF LOUISIANA, RESPONDENT

## STATEMENT OF JURISDICTION

Jurisdiction is vested in this Honorable Court by virtue of Article V §10 of the Louisiana Constitution of 1974.

## STATEMENT OF THE CASE

On October 28, 1999, the Jefferson Parish Grand Jury returned an indictment charging Earl Bradley (hereinafter "Bradley") and co-defendant, Albert T. Russell, with Second Degree Murder (La. R.S. 14:30.1) committed on or about July 31, 1999 of Barton Sandford. Bradley pled not guilty on February 28, 2000. The matter

proceeded to trial on August 21, 2000, which resulted in a mistrial. A second trial began on June 11, 2002, wherein the jury returned a verdict of guilty as charged. Bradley was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on July 18, 2002. Bradley filed an appeal seeking direct review of the following assignments of error: (1) the evidence was insufficient to convict him of second degree murder; and (2) the trial court erroneously denied the motion to suppress.

On September 16, 2003, the Louisiana Fifth Circuit Court of Appeal affirmed Bradley's conviction and sentence. *See* State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80. Bradley subsequently filed a writ application with the Louisiana Supreme Court, which was denied on February 13, 2004. *See* State v. Bradley, 03-2745 (La. 2/13/04), 867 So.2d 688. Pursuant to La. C.Cr.P. art. 922(D), Bradley's conviction and sentence became final on February 13, 2006.

Bradley has previously filed four (4) applications for post-conviction relief. Bradley filed an application for post-conviction relief on January 20, 2005, setting forth a request for DNA testing, as well as a claim for ineffective assistance of counsel with regards to Amy Larck's testimony. The claim for ineffective assistance of counsel and request for DNA testing were denied on February 1, 2005. Bradley filed a subsequent application for post-conviction relief on May 14, 2008, which was denied on May 20, 2008 for failing to comply with La. C.Cr.P. art. 926(D). Bradley filed another application for post-conviction relief on July 2, 2008, claiming his conviction was obtained in violation of both the United States and the Louisiana Constitutions in that Bradley was not informed of the nature and cause of the accusation against him, that the trial court exceeded its jurisdiction by allowing an insufficient accusation allegation sheet to be used for criminal charges, and double

jeopardy. The application was denied on July 11, 2008. Bradley then filed a counseled application for post-conviction relief on April 12, 2021, claiming his conviction was unconstitutional in light of the *Ramos v. Louisiana* decision. That application was denied on May 18, 2021.

Bradley filed the present application for post-conviction relief on December 28, 2022, claiming factual innocence under La. C.Cr.P. art. 926.2. The application was denied on May 31, 2023. Bradley filed a motion to reconsider on June 14, 2023, which was denied by the trial court on June 21, 2023. Bradley seeks review by this Honorable Court of the denial of the application for post-conviction relief on the claim of factual innocence.

## FACTS

Bradley was indicted for, and convicted of, the murder of Barton Sanford. The following summary of events leading to the arrest and conviction of Bradley is taken from the published court of appeal decision:

> On August 1, 1999, the body of Barton Sanford was found beneath a trailer located at 7501 ½ Fourth Street near the Happy Hour Saloon in Marrerro. The cause of death was a bullet wound to the chest. Detective Donald Meunier of the Jefferson Parish Sheriff's Office investigated and eventually developed Bradley as a possible suspect. On August 7, 1999, Detective Meunier interviewed Bradley and obtained several statements.
>
> In the statements, Bradley indicated that he had attended a party at the Happy Hour Saloon on Friday, July 30, 1999 but denied knowing the victim. However, when confronted with a surveillance video tape taken outside of the Happy Hour Saloon on July 30, 1999 showing him with the victim, Bradley recanted his prior statements. Bradley told Detective Meunier that the victim wanted to purchase crack cocaine and that he had arranged for the victim to make the purchase from an individual named Jason Rivet. However, before the drug deal was completed, Bradley stopped the drug transaction and pulled the victim away because "something looked like it was going down." Bradley subsequently returned to the bar where he remained for approximately one hour before going to the Budget Motel where he remained for the night.

Detective Meunier also interviewed an eyewitness, Amy Larck, who identified Bradley as the shooter. At trial, Lark testified that at the time of the shooting she was a drug addict who supported her habit by prostitution. Larck knew both Bradley and Russell and had been at Russell's house on the evening of July 30, 1999. While there, she overheard Bradley ask Russell if he had a gun to which Russell responded, "I got that for you."

Later that evening, Larck was outside the Happy Hour Saloon where she smoked crack for most of the night. Later that night, while inside the Happy Hour Saloon, Bradley informed Larck that he had a "trick" for her, whom Larck identified as the victim. Larck and Bradley left the bar and walked around the block to give the victim time to come outside. Larck then walked into an alley behind the Happy Hour Saloon where she met the victim. Larck agreed to perform oral sex upon the victim and the victim displayed approximately sixty dollars. At that moment, Bradley and Russell walked around the corner. Bradley had a gun and was screaming at the victim. Larck began backing out of the alley and heard a gunshot. She then ran from the scene and ended up at the Budget Motel with Bradley. After five to ten minutes, Larck left the motel and received a ride to the levee from a stranger who later raped her. She later reported the rape to police but did not mention the murder at that time. Not until police picked her up in connection with the homicide investigation did she mention anything to police about the murder.

After Larck's testimony, the State rested and the defense called its first witness, Karen Breaux. Breaux testified that on July 30, 1999 she was at Russell's house until midnight and did not recall either Larck or Bradley being at the home that day or evening. At around midnight that evening, she went to the Happy Hour Saloon where she observed the victim and Bradley engaged in an argument outside. The victim was accusing Bradley of having ripped him off which Bradley denied. After a brief moment, Breaux left the area fearing police would arrive shortly.

The defense also called Tammy Disher who testified that, on the evening of July 30, 1999, she saw the victim fighting with an individual named Jason Rivet, who was carrying a gun. She did not see an argument between Bradley and the victim. However, Disher testified that while she was incarcerated with Larck prior to trial, Lark had told her that she was involved in the killing of the victim. Larck told her that she was supposed to "trick" the victim and that Bradley was supposed to rob him but that something went wrong and Bradley ended up shooting the victim.

## ISSUES PRESENTED

1. Whether the district court abused its discretion in denying Bradley's application for post-conviction relief without a hearing.

2. Whether the district court erred in its application of La. C.Cr.P. art. 926.2 in this matter.

3. Whether the trial court erred by finding Bradley was procedurally barred from presenting newly discovered evidence of ineffective assistance of counsel, *Brady* violations, fraud upon the court, and Bradley's indigent defendant status.

4. Whether the trial court erred in denying Bradley's application for post-conviction relief before addressing Bradley's alleged Brady violations and claims of fraud upon the court.

## LAW AND ARGUMENT

### *Assignment of Error No. One*

*Whether the district court abused its discretion in denying Bradley's application for post-conviction relief without a hearing.*

Bradley contends that the district court abused its discretion in denying the claims set forth in his application for post-conviction relief. Specifically, Bradley argues the district court erred in denying his application for post-conviction relief summarily and without a hearing. There is no merit to this assignment of error as the trial court's denial of the application for post-conviction relief without a hearing was proper.

Post-conviction relief is governed by the Louisiana Code of Criminal Procedure La. C.Cr.P. art. 924, *et seq*. La. C.Cr.P. art. 926.2, governing claims of factual innocence, was enacted in Act 104 of 2021, with an effective date of August 1, 2021. Prior to Act 104 of 2021, Louisiana jurisprudence was unsettled as to whether a non-DNA based factual innocence claim was cognizable in post-conviction relief. The Louisiana Supreme Court had not explicitly held that free-standing, post-conviction claims of actual innocence not based on DNA were, in fact, cognizable in

collateral attacks on final convictions; however, it had observed that such claims must necessarily involve "new, material, noncumulative and conclusive evidence which meets an extraordinarily high standard, and which undermine[s] the prosecution's entire case." State v. Conway, 01-2808 (La. 4/12/02), 816 So.2d 290, 291. (internal quotation marks and citations omitted). *See also,* State v. Paul, 15-2278 (La. 11/2/16), 202 So.3d 995, State v. Pierre, 13-873 (La. 10/15/13), 125 So.3d 403. The State submits that it is now the provisions of La. C.Cr.P. art. 926.2 which govern Bradley's claim of factual innocence.

La. C.Cr.P. art. 926.2 allows for a "grace period" from the procedural bars of La. C.Cr.P. arts. 930.4 and 930.8 when a petitioner convicted after trial completed to verdict files an application for post-conviction relief that invokes La. C.Cr.P. art. 926.2 on or before December 31, 2022. The State notes that the "grace period" only applies to the claim of factual innocence under La. C.Cr.P. art. 926.2 ("[t]his exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner.").

Factual innocence under La. C.Cr.P. art. 926.2 sets forth specific evidence that must be provided to assert such a claim.[1] Per the Article, Bradley must present new, reliable, and noncumulative evidence that would be legally admissible at trial and was not known or discoverable at or prior to trial. The new, reliable, and noncumulative evidence must be either scientific, forensic, physical, or nontestimonial documentary evidence or testimonial evidence that is corroborated by evidence of the type which is scientific, forensic, physical, or nontestimonial documentary evidence. The

---

[1] The State is addressing Bradley's claim that the trial court erred in summarily denying the application for post-conviction relief without a hearing in *Assignment of Error No. One*. The State will address the merits of Bradley's factual innocence claim and evidence set forth in support in *Assignment of Error No. Two.*

affidavits of Ms. Terri Lee Isaac, Ms. Mae Lucille Rivet Smith, and Mr. Albert Russell, along with the "corroborating evidence," are insufficient as a matter of law to meet Bradley's burden.

Upon review of the evidence set forth by Bradley in his application for post-conviction relief under La. C.Cr.P. art. 926.2, the trial court held:

> Petitioner's evidence presented includes affidavits of Terri-Lee Isaac and Mae Lucelle Rivet Smith, which are recantations of sworn testimony. He also includes an affidavit of his co-defendant, Albert Russell. He submits "corroborating evidence" of handwritten letters to petitioner and Facebook messenger communications. He also claims that newly discovered evidence includes criminal history of Larck, and discovery of past misconduct of Det. Grey Thurman. Petitioner also relies on video evidence from the night of the murder, the Sheriff's supplemental report, and time of death given from Dr. Garcia.
>
> Petitioner fails to present any evidence in support of his claim which meets the necessary criteria of the above statute. The newly enacted statute requires, "new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial." Id. The next crucial requirement includes that new evidence be either (i) "Scientific, forensic, physical or nontestimonial evidence," or (ii) "testimonial evidence that is corroborated by evidence of the type described in item (i) of this subparagraph." Id. The evidence presented in APCR and the affidavits are purely testimonial in nature are not corroborated by any **new evidence that is scientific, forensic, physical, or nontestimonial documentary evidence** as per La. C.Cr.P. art. 926.2(B)(1)(a)(ii). As such, the affidavits presented fail to meet the criteria statutorily mandated, and petitioner fails to meet the burden set forth by La. C.Cr.P. art. 926.2(B)(1)(a)(ii). (Exhibit A - May 31, 2023 Order[2])

The trial court reviewed the evidence Bradley provided in support of his claim of factual innocence. In its June 21, 2023 Order, the trial court again discussed Bradley's insufficient basis for his factual innocence claim. The trial court noted:

> As to the factual innocence claim, petitioner supplies affidavits which include recantations (including second-hand) and alibi(s) for the murder. The court maintains that the affidavits provided are purely testimonial in nature **are not corroborated by any new evidence that is scientific, forensic, physical, or nontestimonial documentary evidence** as per La. C.Cr.P. art. 926.2(B)(1)(a)(ii). As such, the affidavits presented in

[2] Exhibit A - May 31, 2023 Order

> petitioner's APCR fail to meet the criteria statutorily mandated in a factual innocence claim, and petitioner fails to meet the burden set forth in La. C.Cr.P. art. 926.2(B)(1)(a)(ii). (Exhibit B - June 21, 2023 Order[3])

Bradley argues he is entitled to an evidentiary hearing under La. C.Cr.P. art. 930. However, La. C.Cr.P. art. 928 provides:

> The application may be dismissed without an answer if the application fails to allege a claim which, if established, would entitle the petitioner to relief.

Further, La. C.Cr.P. art. 929 provides, in pertinent part:

> A. If the court determines that the factual and legal issues can be resolved based upon the application and answer, and supporting documents, including relevant transcripts, depositions, and other reliable documents submitted by either party or available to the court, the court may grant or deny relief without further proceedings.[4]

Bradley was not entitled to an evidentiary hearing. *See* La. C.Cr.P. arts. 928 and 929. The trial court unequivocally found that Bradley failed to meet his burden under La. C.Cr.P. art. 926.2. As the trial court properly concluded Bradley did not state a facially qualifying claim of factual innocence under La. C.Cr.P. art. 926.2 and that the "grace period" of La. C.Cr.P. art. 926.2 was inapplicable to Bradley's claims of ineffective assistance of counsel, *Brady* violations, and fraud upon the court, the trial court correctly denied Bradley's application for post-conviction relief without further proceedings. There is no merit to this assignment of error.

*Assignment of Error No. Two*

*Whether the district court erred in its application of La. C.Cr.P. art. 926.2 in this matter.*

Bradley asserts the trial court erred in its application of La. C.Cr.P. art. 926.2

---

[3] Exhibit B - June 21, 2023 Order

[4] There is no reason to require a full evidentiary hearing in all cases. In some cases, the record will clearly refute or sustain the petitioner's allegations. If so, relief may be granted or denied. In other cases, although some expansion of the record may be necessary, the case may nevertheless be decided without a full evidentiary hearing. *See* La. C.Cr.P. art. 929 *Official Revision Comments, 1980.*

to his claim of factual innocence. The Article clearly sets forth who may proceed with a factual innocence claim and the type of evidence necessary to support it. Upon review, the trial court found the evidence provided in support of Bradley's factual innocence claim did not meet the strict mandates of La. C.Cr.P. art. 926.2. The trial court discussed the insufficient nature of the evidence set froth by Bradley in both its May 31, 2023 and June 21, 2023 Orders. (Exhibits A & B). The trial court properly applied La. C.Cr.P. art. 926.2 and the mandatory evidence needed to support the claim. There is no merit to Bradley's claim that the trial court erred and incorrectly applied La. C.Cr.P. art. 926.2 in this matter.

La. C.Cr.P. art. 926.2 provides, in pertinent part that:

> A. A petitioner who has been convicted of an offense may seek post conviction relief on the grounds that he is factually innocent of the offense for which he was convicted. A petitioner's first claim of factual innocence pursuant to this Article that would otherwise be barred from review on the merits by the time limitation provided in Article 930.8 or the procedural objections provided in Article 930.4 shall not be barred if the claim is contained in an application for post conviction relief filed on or before December 31, 2022, and if the petitioner was convicted after a trial completed to verdict. This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner. An application for post conviction relief filed pursuant to this Article by a petitioner who pled guilty or nolo contendere to the offense of conviction or filed by any petitioner after December 31, 2022, shall be subject to Articles 930.4 and 930.8.
>
> B. (1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:
>
> (i) Scientific, forensic, physical, or nontestimonial documentary evidence.
>
> (ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.
>
> (b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant

> evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.
>
> (2) A recantation of prior sworn testimony may be considered if corroborated by the evidence required by Subsubparagraph (1)(a) of this Paragraph. However, a recantation of prior sworn testimony cannot form the sole basis for relief pursuant to this Article.

Bradley's factual innocence claim is based upon alleged "new evidence" set forth in the affidavits of Ms. Isaac, Ms. Smith, and Mr. Russell. The affidavits of Ms. Isaac, Ms. Smith, and Mr. Russell are categorically and explicitly insufficient to meet Bradley's burden. La. C.Cr.P. art. 926.2(B)(1)(a) requires "new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial." While the State certainly does not concede that Bradley can show that these requirements could be met by these affidavits, the affidavits most assuredly cannot satisfy the next and crucial requirement that the "new evidence" be either: (i) scientific, forensic, physical, or nontestimonial documentary evidence; or, (ii) testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subparagraph. *See* La. C.Cr.P. art. 926.2(B)(1)(a)(i) and (ii).

The affidavits of Ms. Isaac, Ms. Smith, and Mr. Russell are simply "testimonial evidence." The Louisiana Fifth Circuit has recognized that an affidavit is testimonial evidence and alone, is insufficient to prove "factual innocence" under the Article. *See* Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order)[5], *writ denied* Jackson v. Hooper, 22-1123 (La. 11/1/22), 348 So.3d 1267. As testimonial evidence, the affidavits must be corroborated by scientific, forensic, physical, or

---

[5] Exhibit C - Jackson v. Hooper, 22-KH-251 (La. App. 5 Cir. 6/24/22) (unpublished order).

nontestimonial documentary evidence that is new, reliable, and noncumulative and was not known or discoverable at or prior to trial. La. C.Cr.P. art. 926.2(B)(1)(a)(i) and (ii).

Bradley sought to support his claim of factual innocence and corroborate the testimonial evidence (affidavits of Ms. Isaac, Ms. Smith, and Mr. Russell) by providing the trial court with copies of handwritten letters to Bradley and Facebook messenger communications. Bradley also attached as "corroborating evidence" Ms. Larck's criminal history, a lawsuit that names Detective Grey Thurman as a party, video surveillance from the night of the murder, the Sheriff's supplemental report, and a portion Dr. Garcia's trial testimony discussing the victim's time of death.[6] There is no dispute that Bradley's "corroborating evidence" is not scientific, forensic, physical, or nontestimonial documentary evidence.

In State v. Granger, 23-KH-38 (La. App. 5 Cir. 2/1/23) (unpublished order),[7] the Fifth Circuit found in claims of factual innocence that transcripts and documents alone do not comply with the Article's evidentiary requirements and must be corroborated by scientific, forensic, physical, or nontestimonial documentary evidence per La. C.Cr.P. art. 926.2(B)(1)(a)(ii). Similarly here, Bradley sought to support his claim of factual innocence with testimonial evidence alone and failed to provide any corroborating scientific, forensic, physical, or nontestimonial documentary evidence as mandated by La. C.Cr.P. art. 926.2. Accordingly, Bradley failed to meet the burden clearly set forth in La. C.Cr.P. art. 926.2(B).

La. C.Cr.P. art. 926.2(B)(1)(b) further provides the petitioner's burden as:

---

[6] Even assuming the evidence listed could be considered scientific, forensic, physical, or nontestimonial documentary evidence under La. C.Cr.P. art. 926.(B)(1)(a)(i), which the State vigorously denies, the State contends the evidence Bradley has set forth as "corroborating evidence" is not new, reliable, and noncumulative evidence.

[7] Exhibit D - State v. Granger, 23-KH-38 (La. App. 5 Cir. 2/1/23) (unpublished order).

> To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

While Bradley "evidence" did not meet the "clear and convincing" standard therein, the trial court did not need to reach that point in the analysis because Bradley's "evidence" did not meet the requirement that the evidence "satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph" as the affidavits, documents, and trial transcript are not scientific, forensic, physical, or nontestimonial documentary evidence" nor are they corroborated by that type of evidence required per the Article. Bradley was unable to state a facially qualifying claim of "factual innocence" under La. C.Cr.P. art. 926.2 and his application for post-conviction relief was properly denied by the trial court without further proceedings.

Additionally, Bradley contends in this assignment of error that the trial court erroneously denied Bradley's "gateway" innocence claim that would have allowed Bradley to claim ineffective assistance of counsel, *Brady* violations, and fraud upon the court. Bradley argues that McQuiggin v. Perkins, 569 U.S. 383, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013), is applicable and serves as a basis for petitioner to seek post-conviction relief. In State v. Edwards, 14-1737 (La. 4/10/15), 164 So.3d 823, the Louisiana Supreme Court held that "McQuiggin does not purport to govern state post-conviction proceedings conducted under state law..." Therefore, the State asserts any reliance upon McQuiggin by Bradley is misplaced.

The trial court applied the correct law for Bradley's claim of factual innocence.

The legislature enacted the Article to provide petitioners, such as Bradley, with the opportunity to set forth their claim of factual innocence. The Article set forth specific, mandatory evidence necessary to bring a claim a successful factual innocence claim. Bradley's application for post-conviction relief under La. C.Cr.P. art. 926.2 was denied because Bradley failed to meet his burden set forth in La. C.Cr.P. art. 926.2(B)(1)(a)(i) and (ii). There is no merit to this assignment of error.

*Assignments of Error Nos. Three and Four*

*Whether the trial court erred by finding Bradley was procedurally barred from presenting newly discovered evidence of ineffective assistance of counsel, Brady violations, and fraud upon the court.*

Bradley avers that the trial court erred in finding Bradley was procedurally barred from presenting claims of ineffective assistance of counsel, *Brady* violations, and fraud upon the court in his factual innocence claim. The "grace period" in La. C.Cr.P. art. 926.2(A) only applies to the factual innocence claim itself, not to any claim "bootstrapped" thereto. As such, the trial court's finding that Bradley's claims of ineffective assistance of counsel, *Brady* violations, and fraud upon the court were barred from review under La. C.Cr.P. art. 930.8 as untimely and La. C.Cr.P. art. 930.4 as successive was proper as provided by law.

La. C.Cr.P. art. 926.2(A) provides, in pertinent part:

> This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner.

La. C.Cr.P. art. 930.8(A) provides that "[n]o application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922..." subject to certain exceptions which do not apply. Bradley was convicted and sentenced on July 18,

2002. Bradley's appeal was denied on September 16, 2003[8] and his writ application to the Louisiana Supreme Court denied on February 13, 2004.[9] Pursuant to La. C.Cr.P. art. 922(D), Bradley had two years from that date, or until February 13, 2006, to seek post-conviction relief. Bradley did not file his instant application until December 28, 2022, obviously far beyond February 13, 2006.

The timeliness requirements in La. C.Cr.P. art. 930.8 are jurisdictional. State v. Clark, 18-519 (La. App. 5 Cir 12/27/18), 263 So.3d 957, 960. The burden is on Bradley to demonstrate that an exception is applicable. *See* State ex rel. Banks v. State, 15-1776 (La. 2/26/16), 184 So.3d 1277 (denying the writ application on the basis that "[t]he application was not timely filed in the district court, and relator fails to carry his burden to show that an exception applies"). Bradley has failed to meet his burden wherein an exception to La. C.Cr.P. art. 930.8 applies. There is no proof that the facts alleged were not known to Bradley or his prior attorneys, nor has Bradley proven he exercised diligence to discover any post-conviction claims that may exist. *See* La. C.Cr.P. art. 930.8(A)(1).

Furthermore, Bradley has unsuccessfully litigated previous applications for post-conviction relief over the years (in 2005, 2008, and 2021). La. C.Cr.P. art. 930.4(D) provides that "[a] successive application shall be dismissed if it fails to raise a new or different claim," and La. C.Cr.P. art. 930.4(E) provides that "[a] successive application shall be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application." Accordingly, Bradley's claims for ineffective assistance of counsel, *Brady* violations, and fraud upon the court are procedurally barred pursuant to La. C.Cr.P. art. 930.8 and La. C.Cr.P. art. 930.4 as untimely and successive.

---

[8] State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80.

[9] State v. Bradley, 03-2745 (La. 2/13/04), 867 So.2d 688.

While Bradley's claims of ineffective assistance of counsel, *Brady* violations, and fraud upon the court are clearly procedurally barred pursuant to La. C.Cr.P. art. 930.4 and 930.8, the State would like to address the representation made that an alleged *Brady* violation and fraud upon the court occurred in this matter. The State denies any *Brady* violation or fraud upon the court occurred in this matter. Ms. Larck was a witness for the State and testified at trial. The jury was made aware of Ms. Larck's extensive criminal history based upon her testimony on direct and cross-examination, as well as the fact Ms. Larck was wearing her prison uniform in Court.

At trial, Ms. Larck's criminal history was thoroughly addressed by the State during her testimony. Ms. Larck testified as follows on direct examination:

> Q: Now Mr. [sic] Larck, are you from Louisiana?
>
> A: No, sir.
>
> Q: Where are you from?
>
> A: I was born in Illinois, raised in Virginia; and my Mother lives in North Carolina.
>
> Q: Now, that Fourth Street area, roughly the Happy Hour Bar; do you know that area?
>
> A: Yes, sir.
>
> Q: How do you know that area?
>
> A: I started hanging out after I came down here.
>
> Q: "Hanging out"; you don't mean like - I understood like on a street corner. What type of hanging out did you do?
>
> A: Prostitution, drugs.
>
> Q: Okay. How long had you been hanging out at the Happy Hour Bar area? When did you get there?
>
> A: I got in Louisiana on July 4th of 1999.
>
> Q: Okay. How did you get here?

A: I drove.

Q: From where?

A: Illinois.

Q: Down from Illinois.

A: Yes.

Q: Okay. What was the reason why you came here?

A: A change, something different.

Q: What were you doing in Illinois.

A: I was- I had my own apartment and things. I have sort of like step-family up there. And my Step-Father hit me and I called the Police. And his mother didn't want me to stay there.

Q: What type of job did you have in Illinois?

A: I was working in a telemarketing place.

Q: You're one of those people that use to bother us late at night, right?

A: Yes, sir.

Q: Now, what I want to do Ms. Larck, I want to take you back to July 30th, 31st, into the early morning hours. Were you at The Happy Hour Saloon or Lounge at that time?

A: Yes, sir.

Q: How long had you been there? When did you get there? Lets say it was July 30th, before it went to the early morning hours. What time did you get there on July 30th?

A: Maybe around eight, eight-thirty.

***

Q: Okay. Where had you been prior to that time?

A: During the daytime?

Q: Yes.

A: Everywhere; anywhere I could get crack.

***

Q: How did you accommodate yourself?

A: Prostitution.

Q: Is this the only place that you perform prostitution?

A: No.

Q: Where else?

A: All up and down Fourth Street. At the Budget Motels.

***

Q: How much money can you make in a night?

A: Anywhere from $300 to $500 a night.

Q: And what type of things are you doing for this money?

A: Sex, oral sex.

Q: You said that you smoked crack cocaine. How would you buy the crack cocaine? How did it come; large amounts, small amounts?

A: In a rock form, little rocks.

Q: How big were the rocks?

A: Twenty-dollar pieces.

***

Q: How would you smoke it?

A: In a pipe.

(Exhibit E - pp. 37-40; Appellate Record pp. 474-477)[10]

Ms. Larck testified in "prison garb," which the State addressed on direct examination. Ms. Larck testified that she was currently incarcerated in prison at St.

---

[10] Exhibit E - Appellate Record; Excerpts of Amy Larck's Trial Testimony

Gabriel. Ms. Larck then went on to testify about her several criminal convictions in Louisiana, including possession with intent to distribute, crimes against nature, possession, and theft. (Exhibit E - pp. 41-43; Appellate Record, pp. 497-499).

On cross-examination, Ms. Larck was asked about her prior criminal convictions. Again, Ms. Larck went on to testify about her numerous convictions and the sentences concerning those convictions. Ms. Larck testified she was serving five years pursuant to a guilty plea. (Exhibit E - p. 49; Appellate Record, p. 521).

> Q: Ms. Larck, you had indicated on Direct Examination that you had several prior convictions.
>
> A: Yes, sir.
>
> Q: And Mr. Rowan went through each one with you. Lets make this a little more clear. You had indicated - you testified on Direct Examination that you had previously pled guilty to theft of goods, a shoplifting.
>
> A: Yes, sir.
>
> Q: Number 99-4931; for an incident that occurred on or about July 6th, 1999; correct?
>
> A: Yes, sir.
>
> Q: Was that your first conviction?
>
> A: It was, I believe it was running concurrent with a theft by fraud, or skimming poker machines, whatever you want to call it.
>
> Q: Pled guilty in December, 1999; correct?
>
> A: Yes, sir.
>
> Q: Guilty; December, '99. Division "H"; correct?
>
> A: Yes, sir.
>
> Q: Judge Hand?
>
> A: Yes, sir.
>
> Q: So you have a possession of cocaine conviction; correct?

A: Yes, sir.

Q: That's in docket number 00-4737?

A: Yes, sir.

Q: That's for an incident that occurred on August 3, 2000; right?

A: Yes, sir.

Q: You pled guilty in that case as well?

A: Yes, sir.

Q: That was also in front of Judge Hand?

A: Yes, sir.

***

Q: You also had another prior shoplifting charge; right?

A: Yes, sir.

Q: That occurred April 8th, 2000; right?

A: Yes, sir.

Q: Plead guilty in May, 2001?

A: Yes, sir.

Q: That's the same day you pled guilty to this possession of cocaine charge?

A: Yes, sir.

Q: That same charge you pled guilty to Crime Against Nature; right?

A: What do you mean, the same charge?

Q: I'm sorry. The same case. Another charge of Crime Against Nature?

A: I have a charge of Crime Against Nature, yes.

Q: That occurred April 18th, 2002.

A: Sir; I was incarcerated in 2002.

Q: I apologize. April 18th, 2000.

A: Yes, sir.

***

Q: Those charges on matter number 00-4857. Also, Division "H"?

A: Yes, sir.

***

Q: ...You also have another conviction, right?

A: Right.

Q: And that's for two counts of distribution of cocaine?

A: Right.

Q: Which occurred March 21st, 2000; right?

A: That's correct.

Q: You pled guilty to that also in May, 2001; right?

A: Yes, sir.

Q: There's another count where you pled guilty to; right?

A: Yes, sir.

Q: April 11th, 2000.

A: Yes, sir.

Q: Another distribution of drugs; right?

A: Yes, sir.

Q: That was also cocaine. You pled guilty the same day; May, 2001. That's matter number 00-5303; also in Division "H".

(Exhibit E - pp. 44-48; Appellate Record, pp. 516-520).

The trial court addressed Ms. Larck's criminal history and alleged *Brady* violation in its Order denying Bradley's Motion to Reconsider. The trial court properly found Bradley's claim involving impeachment evidence in no way relates

to or supports Bradley's factual innocence claim under La. C.Cr.P. art. 926.2. Again, La. C.Cr.P. art. 926.2 only applies to factual innocence claims and not to any claim "bootstrapped" thereto. Therefore, trial court did not err in finding Bradley was procedurally barred from presenting claims of ineffective assistance of counsel, *Brady* violations, and fraud upon the court. There is no basis to these assignments of error.

Finally, Bradley argues Ms. Larck lied at trial and perjured herself. The State notes that Ms. Larck's credibility has been addressed in the direct appeal of this matter, as well as in Bradley's January 20, 2005 application for post-conviction relief. On appeal, this Honorable Court stated:

> While there were numerous inconsistencies in Larck's testimony, the inconsistencies concerned Larck's activities prior to and after the shooting. These were not determinative of any element of the offense. Larck's testimony was not internally inconsistent with any other evidence. Although she gave conflicting statements at times, she consistently testified as to the location of the murder and that Bradley shot the victim. The jury in the instant case heard Larck's testimony and her reasons for initially lying to investigating officers. The jury chose to accept her testimony in light of circumstantial evidence that Bradley initially lied to police about knowing the victim and that he had been engaged in an argument with the victim on the night of the murder.
> State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 86.

Ms. Larck's credibility has been addressed and this claim has been found to be without merit. [11]

Bradley was unable to state a facially qualifying claim of factual innocence under La. C.Cr.P. art. 926.2. Under La. C.Cr.P. art. 930.2, the petitioner in an application for post-conviction relief has the burden of proving that relief should be granted. The trial court found Bradley did not meet his burden of proving relief on a factual innocence claim based upon the evidence set forth in support of the claim.

---

[11] In the event Bradley is making a *Napue* claim, the claim is procedurally barred as untimely and successive. *See* La. C.Cr.P. arts. 930.4 and 930.8. Moreover, a *Napue* claim is not allowed on the merits as Bradley has not proven the required elements: (1) the statements at issue must be shown to be actually false; (2) the prosecution must have known that they were false; and, (3) the statements must be material. State v. Sparkman, 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98, 112-113 (citing United States v. O'Keefe, 128 F.3d 885, 893 (5th Cir. 1997)).

The standard of review of a trial court's ruling on an application for post-conviction relief is abuse of discretion. *See* Carlin v. Cain, 97-2390 (La. 1998), 706 So.2d 968. There is no basis to Bradley's assertion that the trial court erred or abused its discretion in denying his application for post-conviction relief on any of the grounds set forth. Accordingly, the State asks this Honorable Court to deny Bradley's application for supervisory writs.

CONCLUSION

For the foregoing reasons the State respectfully asks this Court to deny Bradley's writ application.

Respectfully Submitted,

MONIQUE D. NOLAN #27431
ASSISTANT DISTRICT ATTORNEY
DISTRICT ATTORNEY'S OFFICE
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053
(504) 368-1020
mnolan@jpda.us

AFFIDAVIT / CERTIFICATE OF SERVICE

STATE OF LOUISIANA

PARISH OF JEFFERSON

BEFORE ME, the undersigned, personally appeared

MONIQUE D. NOLAN

who, after being duly sworn by me, deposed and said:

That she is an Assistant District Attorney for the Parish of Jefferson, State of Louisiana; that she personally prepared the writ application and that all of the allegations contained therein are true and correct to the best of his knowledge; that the attached documents are true copies of the originals contained in the records of the clerk of the 24th Judicial District Court for the Parish of Jefferson; and that a copy has been served upon the Honorable Judge Danyelle Taylor, Division "O", by hand, and upon P. Walker Lasiter and Justin C. Bonus, attorneys for Earl Bradley, by email.

Monique Nolan

MONIQUE D. NOLAN

SWORN TO AND SUBSCRIBED BEFORE ME,

THIS 11 DAY OF Sept., 2023

NOTARY PUBLIC Matthew T. Clauss #31664

Hon. Danyelle Taylor
200 Derbigny Street
Thomas F. Donelon Courthouse
Suite 3100
Gretna, LA 70053
(504) 364-3959

Justin C. Bonus
118-35 Queens Blvd.
Ste. 400
Forest Hills, NY.11375
(347) 920-0160
justin.bonus@gmail.com

P. Walker Lasiter
1100 Poydras St.
Suite. 2610
New Orleans, La. 70163
(504) 585-7777
walker@wmanard.com

**TWENTY FOURTH JUDICIAL DISTRICT COURT**
**PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** **DIVISION "O"**

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

FILED FOR RECORD 05/31/2023 11:35:23
Melissa A. Perry DY CLERK
JEFFERSON PARISH LA

**FILED:____________________**

**____________________**
**DEPUTY CLERK**

**ORDER**

This matter comes before the court on:

- **PETITIONER'S APPLICATION FOR POST-CONVICTION RELIEF, MEMORANDUM IN SUPPORT, AND EXHIBITS, STAMPED AS FILED DECEMBER 28, 2022,**
- **STATE'S PROCEDURAL OBJECTIONS, STAMPED AS FILED MARCH 3, 2023,**
- **STATE'S SUPPLEMENT TO PROCEDURAL OBJECTIONS AND EXHIBITS, STAMPED AS FILED MARCH 8, 2023,**
- **PETITIONER'S OPPOSITION TO STATE'S PROCEDURAL OBJECTIONS, STAMPED AS FILED MARCH 31, 2023, AND**
- **STATE'S RESPONSE TO PETITIONER'S OPPOSITION TO STATE'S PROCEDURAL OBJECTIONS, STAMPED AS FILED MAY 3, 2023.**

On June 13, 2002, Petitioner was convicted by jury of the second degree murder, and on July 18, 2002, the court sentenced him to life imprisonment at hard labor. His conviction and life sentence were upheld on direct appeal. *State v. Bradley*, 2003-KA-384, (La. App. 5th Cir. 9/16/03), writ denied, 2003-K-2745 (La. 2/13/04), 867 So.2d 688. Petitioner's previously filed applications for post-conviction relief (APCRs) were denied in February 2005, May 2008, July 2008, and May 2021.

Petitioner, through counsel, has filed another APCR, now claiming factual innocence pursuant to La. C.Cr.P. art. 926.2, which was recently enacted in Act 104 of 2021, and provides:

> *A. A petitioner who has been convicted of an offense may seek post conviction relief on the grounds that he is factually innocent of the offense for which he was convicted. A petitioner's first claim of factual innocence pursuant to this Article that would otherwise be barred from review on the merits by the time limitation provided in Article 930.8 or the procedural objections provided in Article 930.4 shall not be barred if the claim is contained in an application for post conviction relief filed on or before December 31, 2022, and if the petitioner was convicted after a trial completed to verdict. This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner. An application for post conviction relief filed pursuant to this Article by a petitioner who pled guilty or nolo contendere to the offense of conviction or filed by any petitioner after December 31, 2022, shall be subject to Articles 930.4 and 930.8.*
> *B. (1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:*
> *(i) Scientific, forensic, physical, or nontestimonial documentary evidence.*
> *(ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.*
> *(b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any*

STATE'S EXHIBIT A
PENGAD 800-631-6989

*felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.*
*(2) A recantation of prior sworn testimony may be considered if corroborated by the evidence required by Subsubparagraph (1)(a) of this Paragraph. However, a recantation of prior sworn testimony cannot form the sole basis for relief pursuant to this Article.*
*(3) If the petitioner pled guilty or nolo contendere to the offense of conviction, in addition to satisfying all of the criteria in this Paragraph and in any other applicable provision of law, the petitioner shall show both of the following to prove entitlement to relief:*
*(a) That, by reliable evidence, he consistently maintained his innocence until his plea of guilty or nolo contendere.*
*(b) That he could not have known of or discovered his evidence of factual innocence prior to pleading guilty or nolo contendere.*
*C. (1) A grant of post conviction relief pursuant to this Article shall not prevent the petitioner from being retried for the offense of conviction, for a lesser offense based on the same facts, or for any other offense.*
*(2) If the petitioner waives his right to a jury trial and elects to be tried by a judge, the district judge who granted post conviction relief pursuant to this Article shall be recused and the case shall be allotted to a different judge in accordance with applicable law and rules of court.*
*(3) If the district judge denied post conviction relief pursuant to this Article and an appellate court later reversed the ruling of the district judge and granted post conviction relief pursuant to this Article, and if the petitioner waives his right to a jury trial and elects to be tried by a judge, upon the petitioner's motion the district judge who denied post conviction relief shall be recused and the case shall be allotted to a different judge in accordance with applicable law and rules of court.*

La. C.Cr.P. art. 926.2

Petitioner's evidence presented includes affidavits of Teri-Lee Isaac and Mae Lucelle Rivet Smith, which are recantations of sworn testimony. He also includes an affidavit of his co-defendant, Albert Russell. He submits "corroborating evidence" of handwritten letters to petitioner and Facebook messenger communications. He also claims that newly discovered evidence includes criminal history of Larck, and discovery of past misconduct of Det. Grey Thurman. Petitioner also relies on video evidence from the night of the murder, the Sheriff's supplemental report, and time of death given from Dr. Garcia.

Petitioner fails to present any evidence in support of his claim which meets the necessary criteria of the above statute. The newly enacted statute requires, "new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial." Id. The next crucial requirement includes that new evidence be either (i) "Scientific, forensic, physical or nontestimonial evidence," or (ii) "testimonial evidence that is corroborated by evidence of the type described in item (i) of this subparagraph." Id. The evidence presented in APCR and the affidavits provided are purely testimonial in nature are not corroborated by any **new evidence that is scientific, forensic, physical, or nontestimonial documentary evidence** as per La. C.Cr.P. art 926.2(B)(1)(a)(ii). As such, the affidavits presented fail to meet the criteria statutorily mandated, and petitioner fails to meet the burden set forth by La. C.Cr.P. art. 926.2(B)(1)(a)(ii).

As to petitioner's claims involving ineffective assistance of counsel, and *Brady* and *Napue* violations, these claims are untimely under La.C.Cr.P. art. 930.8. As the State points out in its response, the "grace period" provided in La. C.Cr.P. art. 926.2(A) only applies to "factual innocence" claims, and not to any claim "bootstrapped" thereto. No APCR may be considered if it is filed more than two years after the judgment of conviction and sentence have become final (unless one of four very restricted exceptions apply). LSA-C.Cr.P. art. 930.8 (A). The petitioner's conviction has long been final. The petitioner does not provide or meet any of the exceptions for filing an untimely application.

Furthermore, these claims regarding alleged *Brady* and *Napue* violations are procedurally barred as successive under La. C.Cr.P. art. 930.4(D) and/or (E).

Under LSA-C.Cr.P. art. 928, an application may be dismissed without an answer if the application fails to allege a claim which, if established, would entitle petitioner to relief. In this

case, the petitioner has not alleged a valid claim reviewable in accordance with LSA-C.Cr.P. art. 930.3 or 930.4. Petitioner is not entitled to relief sought.

Accordingly,

**IT IS ORDERED BY THE COURT** that Petitioner's application for post-conviction relief be and is hereby **DENIED.**

Gretna, Louisiana, this 31st day of May, 2023.

[signature]

JUDGE

PETITIONER: Earl Bradley, DOC # 403836, Louisiana State Penitentiary, Angola, LA 70712

Defense Counsel:

Walker Lasiter, 1100 Poydras St., Ste. 2610, New Orleans, LA 70163

Justin C. Bonus, 11835 Queens Blvd., Suite 400, Forest Hills, NY 11375

Thomas Butler, Appeals Division, District Attorney's Office, 200 Derbigny Street, Gretna, LA 70053

Issued 5/31/23 MP

**TWENTY FOURTH JUDICIAL DISTRICT COURT**
**PARISH OF JEFFERSON**
**STATE OF LOUISIANA**

**NO. 99-5825** **DIVISION "O"**

**STATE OF LOUISIANA**

**VERSUS**

**EARL BRADLEY**

FILED FOR RECORD 06/21/2023 13:14:58
Melissa A. Perry DY CLERK
JEFFERSON PARISH LA

**FILED:**____________________ ____________________
**DEPUTY CLERK**

**ORDER**

This matter comes before the court on **PETITIONER'S MOTION TO RECONSIDER, E-FILED JUNE 14, 2023.**

Petitioner, through counsel, moves the court to reconsider its recent denial of petitioner's Application for Post-Conviction Relief (APCR), which was originally filed on December 28, 2022, and denied by this court on May 31, 2023. Nothing in petitioner's present pleading affects or changes the court's order of May 31, 2023, denying relief.

A Motion for Reconsider is improper at this time, and is not authorized by law, as *Post Conviction Relief* statutes do not provide for this procedural vehicle. Under La. C.Cr.P. art. 930.6, the proper remedy at this time would be for petitioner to invoke supervisory jurisdiction of the court of appeal by filing a writ of review to the appellate court, as per La. C.Cr.P. art. 930.6(A).

However, in abundance of caution, to provide clarity, and in the interest of judicial efficiency, the court will address petitioner's Motion to Reconsider at this time.

As to the factual innocence claim, petitioner supplies affidavits which include recantations (including second-hand) and alibi(s) for the murder. The court maintains that the affidavits provided are purely testimonial in nature **are not corroborated by any new evidence that is scientific, forensic, physical, or nontestimonial documentary evidence** as per La. C.Cr.P. art 926.2(B)(1)(a)(ii). As such, the affidavits presented in petitioner's APCR fail to meet the criteria statutorily mandated in a factual innocence claim, and petitioner fails to meet the burden set forth by La. C.Cr.P. art. 926.2(B)(1)(a)(ii).

As to petitioner's claim regarding the alleged *Brady* violation and Larck's criminal history, this claim involving impeachment evidence does not in any way relate to or support petitioner's factual innocence claim permitted by La. C.Cr.P. art. 926.2. As this court ruled, the "grace period" provided in La. C.Cr.P. art. 926.2(A) only applies to "factual innocence" claims, and not to any claim "bootstrapped" thereto. Furthermore, the issue concerning Larck's credibility was addressed/litigated on direct appeal (see appellate record, pp. 516-522) and her credibility/criminal history was litigated in petitioner's 2005 APCR. In denying petitioner's APCR on May 31, 2023, the court ruled that the issues surrounding this claim are procedurally barred from review at this time as they are untimely under La. C.Cr.P. art. 930.8. Thus, the court will not address the merits at this time.

This claim is also barred from review at this time under LSA-C.Cr.P. art. 930.4(A), which dictates that unless required in the interest of justice, any claim

PENGAD 800-631-6989 STATE'S EXHIBIT B

for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered. As the issues surrounding this claim were addressed by the appellate court on direct appeal, they are now procedurally barred from review and will be denied.

Furthermore, the claim is barred from review as successive. Under La.C.Cr.P. art. 930.4(d), "a successive application shall be dismissed if it fails to raise a new or different claim." As petitioner previously raised the issues in this claim in his APCR in 2005, which was denied by this court, the claim is now successive, and thus, procedurally barred from review.

As to petitioner's contention that the court failed to consider his May 10, 2023, pleading entitled *Reply to State's Response*, the court maintains that the content included in petitioner's response is ultimately untimely, successive, and not pertinent to the factual innocence claim, which as previously noted, is the only claim authorized for review in post-conviction relief at this time. Furthermore, such pleading by petitioner is not statutorily authorized by the statutes governing Post Conviction Relief. (*See La. C.Cr.P. art. 924 et seq.*)

Accordingly,

**IT IS ORDERED BY THE COURT** that petitioner's Motion to Reconsider be and is hereby **DENIED.**

Gretna, Louisiana, this 21st day of June, 2023.

[signature]
**JUDGE**

PETITIONER: Earl Bradley, DOC # 403836, Louisiana State Penitentiary, Angola, LA 70712

Defense Counsel:

Walker Lasiter, 1100 Poydras St., Ste. 2610, New Orleans, LA 70163

Justin C. Bonus, 11835 Queens Blvd., Suite 400, Forest Hills, NY 11375

Thomas Butler, Appeals Division, District Attorney's Office, 200 Derbigny Street, Gretna, LA 70053

issued 6/21/23 [initials]

HOUSTON JACKSON

VERSUS

TIM HOOPER, WARDEN

NO. 22-KH-251

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS
Susan S. Buchholz
Susan S. Buchholz
First Deputy Clerk of Court

June 24, 2022

Susan Buchholz
First Deputy Clerk

IN RE HOUSTON JACKSON

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE LEE V. FAULKNER, JR., DIVISION "P", NUMBER 98-4959

Panel composed of Judges Jude G. Gravois,
Robert A. Chaisson, and Hans J. Liljeberg

**WRIT DENIED**

Relator, Houston Jackson, seeks this Court's supervisory review of the trial court's May 4, 2022 ruling which denied his fourth application for post-conviction relief ("APCR"). He argues herein that the trial court erred when it found that the affidavit of Larry Stovall, submitted in support of relator's actual innocence claims under La. C.Cr.P. art. 926.2, was not new evidence, and further did not meet the strict requirements of Article 926.2. Upon review, for the following reasons, we find that the trial court did not abuse its discretion in denying relator's APCR, and accordingly, we deny the writ application.

In November of 1998, relator was convicted of one count of second degree murder and one count of conspiracy to commit armed robbery. He was sentenced to life imprisonment on the second degree murder count, and 49½ years at hard labor on the conspiracy count as a second-felony offender. This Court affirmed relator's convictions on appeal. *State v. Jackson*, 00-221, c/w *State v. Kelly*, 00-222, c/w *State v. Culverson*, 00-223 (La. App. 5 Cir. 3/15/01), 783 So.2d 482, *writs denied*, *State v. Jackson*, 01-1071 (La. 5/9/03), 843 So.2d 385.

Previously, relator filed three APCRs, all of which were denied by the trial court. Writ applications filed to this Court were thereafter denied, as well as by the Louisiana Supreme Court, as detailed in the trial court's May 4, 2022 ruling.[1] The

[1] The trial court's ruling provided the following background information regarding relator's previous APCRs:

> This court denied Petitioner's first application for post-conviction relief (APCR) on May 7, 2004, holding that the case under which he filed his application was dismissed on April 18, 1998. Petitioner sought writs, which were

STATE'S EXHIBIT C

PENGAD 800-631-6989

trial court also noted that the Supreme Court issued a *per curiam* on January 9. 2018, finding that relator had exhausted his right to state collateral review, unless he could show one of the narrow exceptions authorizing a successive application. *See State v. Jackson*, 232 So.3d at 543.

In his writ application, relator argues that the trial court erred in denying his most recent APCR, wherein he asserted four claims: ineffective assistance of counsel (claim 1); claims of actual innocence pursuant to La. C.Cr.P. art. 926.2, which was enacted in 2021 (claims 2 and 3), and a claim of "cumulative errors" (claim 4). In his writ application, however, relator assigns as error only the portion of the ruling that pertains to the affidavit of Larry Stovall, submitted in support of his actual innocence claims.

Relator argues that the affidavit of Larry Stovall is "new evidence," that in combination with the "other evidence" (recantations of other witnesses, provided in previous APCRs), is "clear and convincing evidence" of factual innocence, and therefore his claims are timely and not procedurally barred under Articles 926.2, 930.4, or 930.8. He also argues that he is entitled to an evidentiary hearing.

Under La. C.Cr.P. art. 930.2, the petitioner in an application for post-conviction relief has the burden of proving that relief should be granted. The standard of review of a trial court's ruling on an application for post-conviction relief is abuse of discretion. *Carlin v. Cain*, 97-2390 (La. 1998), 706 So.2d 968.

The trial court's ruling properly considered the Stovall affidavit in the context of the requirements of Article 926.2. Importantly, the trial court found that the Stovall affidavit did not fit the required criteria found in paragraph B(1) of Article 926.2, which provides:

> B.(l)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:

---

denied. *State v. Jackson*, 04-832 (La. App. 5 Cir. 7/22/04) (unpublished opinion). The Louisiana Supreme Court denied cert. *State v. Jackson*, 04-2376 (La. 6/3/05), 903 So.2d 451. Petitioner later filed a writ pursuant to *Cordero*, and the Fifth Circuit reviewed the merits of his previously filed application, finding no error in the prior ruling of the court. *Jackson v. State*, 08-WR-975 (La. App. 5 Cir. 2/24/10), *writ denied*, 2010-KH-649 (La. 3/4/11).

Petitioner filed another APCR on September 18, 2012, alleging the State withheld *Brady* evidence and denial of fair trial due to cumulative error. This court denied Petitioner's successive APCR relief on January 30, 2013. Petitioner sought appellate writs, which were denied. *Jackson v. State*, 13-KH-221 (La. App. 5 Cir. 4/16/13), *writ denied, State ex rel. Jackson v. State*, 2013-KH-1120 (La. 11/15/13), 125 So.3d 1102, *reconsideration denied*, 2013-KH-l 12.0 (La. 2/7/14), 131 So.3d 851.

Petitioner, through counsel, filed another APCR on October 23, 2015, alleging prosecutorial misconduct, and that the State withheld exculpatory evidence at trial and intentionally coerced and introduced perjured testimony. Petitioner claimed the State forced State's witness Derrick Dunbar to present perjured testimony by being threatened by revocation. Petitioner attached an affidavit of Dunbar to his pleading. The court denied that APCR on February 22, 2016. Petitioner sought appellate writs, which were denied. *State v. Jackson*, 16-KH-314 (La. App. 5 Cir. 7/20/16), *writ denied*, 2016-KP-1600 (La. 1/9/18), 232 So.3d 543.

(i) Scientific, forensic, physical, or nontestimonial documentary evidence.
(ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.

(b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

An affidavit is testimonial evidence, and under Article 926.2(B)(1)(a) must be supported by "new, reliable, and noncumulative evidence … not known or discoverable at or prior to trial" and that is either "scientific, forensic, physical, or nontestimonial documentary evidence." First, the trial court found that the Stovall affidavit was not new evidence. The writ application indicates that this witness was known to relator well before trial. The claim herein that Mr. Stovall was prevented from coming forward sooner or that this evidence was previously undiscoverable is unsupported and uncorroborated. Further, as the trial court found, under Article 926.2(B)(1)(a)(i) and (ii), an affidavit alone is insufficient to prove innocence. This affidavit is uncorroborated by any "scientific, forensic, physical, or nontestimonial documentary evidence." Also, the affidavit itself, as the trial court also noted, does not absolve relator of any culpability.

Relator argues that the affidavit should be considered along with all the prior affidavits of recanting witnesses found in previous APCRs. This argument, however, is contrary to the specific requirements of Article 926.2 as previously noted.

Finally, relator argues that he is entitled to an evidentiary hearing under La. C.Cr.P. art. 930. La. C.Cr.P. art. 929(A) provides: "If the court determines that the factual and legal issues can be resolved based upon the application and answer, and supporting documents, including relevant transcripts, depositions, and other reliable documents submitted by either party or available to the court, the court may grant or deny relief without further proceedings." Considering the above analysis, we find no error in the trial court's ruling that relator's claims are procedurally barred, and thus relator does not show that he is entitled to an evidentiary hearing under Article 930.

In conclusion, for the foregoing reasons, we find that the trial court did not abuse its discretion in rejecting relator's factual innocence claims on both procedural and substantive grounds. Thus, we find that the trial court did not abuse its discretion in denying relator's APCR. Accordingly, this writ application is denied.

Gretna, Louisiana, this 24th day of June, 2022.

**JGG**
**RAC**
**HJL**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
INTERIM CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **06/24/2022** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

# 22-KH-251

**E-NOTIFIED**

24th Judicial District Court (Clerk)
Hon. Lee V. Faulkner, Jr. (DISTRICT JUDGE)
Thomas J. Butler (Respondent)
Jeigh Britton (Relator)
Samuel H. Winston (Relator)

**MAILED**

STATE OF LOUISIANA

VERSUS

CLEVERN GRANGER

NO. 23-KH-38

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS
Linda Wiseman
First Deputy, Clerk of Court

February 01, 2023

Linda Wiseman
First Deputy Clerk

**CONFIDENTIAL**
LSA-RS 46:1844(W)
ATTORNEYS OF RECORD
ONLY

**IN RE** CLEVERN GRANGER

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE FRANK A. BRINDISI, DIVISION "E", NUMBER 09-1789

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Robert A. Chaisson

**WRIT DENIED**

Relator, Clevern Granger, seeks a writ of mandamus from this Court, directing the district court to order the State to respond to relator's application for post-conviction relief ("APCR") and to set a hearing on relator's APCR that set forth a claim of factual innocence as per the recently enacted La. C.Cr.P. art. 926.2. Relator states that he filed his APCR within the time limit allowed by Article 926.2 (December 30, 2022). He argues that the trial court erred in denying his APCR without a response from the State and a hearing, which he contends is required under the new statutory scheme for the assertion of factual innocence claims in post-conviction proceedings.

By way of background, in 2011, relator was tried by a jury and convicted as charged of one count of aggravated burglary in violation of La. R.S. 14:60, and one count of forcible rape in violation of La. R.S. 14:42.1. Relator's convictions and sentences were affirmed on appeal. *State v. Granger*, 12-193 (La. App. 5 Cir. 10/30/12), 103 So.3d 576, *writ denied*, 12-2587 (La. 4/26/13), 112 So.3d 840.

Relator filed the instant APCR in the district court on December 8, 2022, asserting a claim of factual innocence under La. C.Cr.P. art. 926.2. In its ruling denying relator's APCR, the trial court found that relator's application failed to comply with the requirements of La. C.Cr.P. 926.2, in that relator did not support his claim of factual innocence with "any evidence as required by La. C.Cr.P. art. 926.2(B)(l)(a)," but rather attached various transcripts and documents to his APCR in support of his claim, and further that his claims were "vague, purely speculative, and conclusory." The trial court then denied relator's APCR after finding that the time bars of La. C.Cr.P. arts. 930.3, 930.4, and 930.8 applied to relator's claim.



PENGAD 800-631-6989
STATE'S EXHIBIT
D

La. C.Cr.P. art. 926.2(B)(l)(a) requires that an applicant asserting a factual innocence claim support the application by the following:

> B.(1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:
>
> (i) Scientific, forensic, physical, or nontestimonial documentary evidence.
>
> (ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.

Upon review, we find no basis upon which to rule that the trial court erred in its conclusion that relator failed to support his factual innocence claim with the type of evidence required by La. C.Cr.P. art. 926.2. Transcripts and documents alone do not comply with this Article's evidentiary requirements; they must be corroborated by scientific, forensic, physical, or nontestimonial documentary evidence, as per La. C.Cr.P. art. 926.2(B)(1)(a)(ii). Relator's writ application to this Court fails to contain or attach the exhibits (transcripts and documents) which the trial court reviewed and refers to in its ruling of January 5, 2023. For the same reason, we find no basis upon which to rule that the trial court erred in dismissing relator's APCR without ordering a response from the State or an evidentiary hearing, as per La. C.Cr.P. arts. 928 and 929.

Further, relator argues that a remand is necessary because the trial court failed to specifically address whether the time bar exception applied to relator's application, as per *Dickerson v. Hooper*, 21-740 (La. App. 5 Cir. 1/12/22), 2022 WL 110231. On the contrary, however, we find that the trial court addressed the time bar when it found that relator failed to properly support his claim of factual innocence as required by La. C.Cr.P. art. 926.2(B)(1)(a)(ii) and concluded that the time bars of La. C.Cr.P. arts. 930.3, 930.4, and 930.8 therefore applied to relator's APCR.

For the foregoing reasons, this writ application is denied.

Gretna, Louisiana, this 1st day of February, 2023.

**JGG**
**FHW**
**RAC**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
INTERIM CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

# NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **02/01/2023** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

**23-KH-38**

**E-NOTIFIED**
24th Judicial District Court (Clerk)
Honorable Frank A. Brindisi (DISTRICT JUDGE)
Thomas J. Butler (Respondent)

**MAILED**
Clevern Granger #587600 (Relator)
Dixon Correctional Institute
Post Office Box 788
Unit-2 Dorm
Jackson, LA 70748

work also? Is it on?

THE COURT:

Yes.

EXAMINATION BY MR. ROWAN:

Q Ma'am, would you tell the ladies and gentlemen of the Jury your name.

A Amy Larck.

Q Now Mr. Larck, are you from Louisiana?

A No, sir.

Q Where are you from?

A I was born in Illinois, raised in Virginia; and my Mother lives in North Carolina.

Q Now, that Fourth Street area, roughly The Happy Hour Bar; do you know that area?

A Yes, sir.

Q How do you know that area?

A I started hanging out after I came down here.

Q "Hanging out"; you don't mean like - I understood like on a street corner. What type of hanging out did you do?

A Prostitution, drugs.

Q Okay. How long had you been hanging out at The Happy Hour Bar area? When did you get there?

A I got in Louisiana on July 4th of 1999.

Q Okay. How did you get here?

A I drove.

Q From where?

A Illinois.

Q Down from Illinois.

A Yes.

Q Okay. What was the reason why you came here?



STATE'S EXHIBIT E

PENGAD 800-631-6989

47Y

A A change, something different.
Q What were you doing in Illinois?
A I was - I had my own apartment and things. I have sort of like step-family up there. And my Step-Father hit me and I called the Police. And his mother didn't want me to stay there.
Q What type of job did you have in Illinois?
A I was working in a telemarketing place.
Q You're one of those people that use to bother us late at night, right?
A Yes, sir.
Q Now, what I want to do Ms. Larck; I want to take you back to July 30th, 31st, into the early morning hours. Were you at The Happy Hour Saloon or Lounge at that time?
A Yes, sir.
Q How long had you been there? When did you get there? Lets say it was July 30th, before it went to the early morning hours. What time did you get there on July 30th?
A Maybe around eight, eight-thirty.
Q In the morning?
A No; in the evening.
Q Okay. Where had you been prior to that time?
A During the daytime?
Q Yes.
A Everywhere; anywhere I could get crack.
Q Now, you ever sleep?
A On crack, rarely.
Q You get there at 8:30. What do you want to do at 8:30?

A Get high.
Q What do you want to do at nine o'clock?
A Get high.
Q Ten o'clock?
A Get high.
Q Eleven o'clock?
A Get high.
Q Twelve o'clock?
A Get high.
Q How were you going to get high? What job do you have?
A I don't. You have to accommodate yourself anyway you can.
Q And how did you accommodate yourself?
A Prostitution.
Q Is this the only place that you perform prostitution?
A No.
Q Where else?
A All up and down Fourth Street. At the Budget Motels.
Q You've been in this area since July 4th. Did a lot of the regulars know you?
A No. Not at that time, no.
Q Tell the ladies and gentlemen of the Jury what happens when somebody is knew, that's not known; what do the regulars do when you get there?
A You're like fresh meat out there, new faces; the men go crazy.
Q How much money can you make in a night?
A Anywhere from $300 to $500 a night.

Q And what type of things are you doing for this money?
A Sex, oral sex.
Q You said that you smoked crack cocaine. How would you buy the crack cocaine? How did it come; large amounts, small amounts?
A In a rock form, little rocks.
Q How big were the rocks?
A Twenty-dollar pieces.
Q How big is a twenty-dollar piece? I mean, like in reference to the top of this pen-top; is it bigger than that?
A It's smaller than that.
Q Smaller?
A Yes.
Q And you smoked something that was smaller than this?
A Yes, sir.
Q How would you smoke it?
A In a pipe.
Q How long would that actually stay lit, something like that? How do you smoke it? I presume it's a hard substance. How exactly do you smoke it?
A You put it - I used a glass pipe with holes at both ends. And you can buy them legally out of the store. You put the screen in, you put the crack on the top. You melt the crack down and you smoke it.
Q When you're smoking it, do you have like a lighter, or somebody else have the lighter?
A No; you have the lighter.



477

A Yes.
Q Now, what did you tell them about Micey?
A After - I was incarcerated at the time. And I didn't tell him until I found out he had turned himself in.
Q What were you incarcerated for?
A Skimming Poker machines.
Q Skimming Poker machines. How do you do that?
A There is a certain way. You cut a ten-dollar bill, and you put paper on it. And you put it in a poker machine; and when the credit is paid, you pull it back out.
Q Why were you skimming a poker machine?
A For the money for drugs.
Q During these particular times when you were being interviewed and you're being talked to, do you want to be with the Detectives?
A No.
Q Why is that?
A Because. I mean, when you're put in a situation like that, of course you don't want to be there. You just want to - I mean - And besides that, I wasn't - I would just get back out of jail just to go get loaded again. I wasn't interested in none of that. I didn't want to be involved in any of that.
Q Well, you're in prison garb right now. Where are you from? What prison are you in?
A St. Gabriel.
Q For what?
A For possession with intent to distribute, crimes against nature, possession and theft.

MR. ROWAN:

If I might Your Honor, I believe the records are over here.

EXAMINATION BY MR. ROWAN:

Q You're the same Amy Larck that pled guilty in Case Number 00-4857, to theft of goods, three-hundred plus, and crime against nature?

A Yes, sir.

Q Crime against nature being what you were going to do to Mr. whatever his name is? I apologize, Your Honor. Mr. Sanford.

A Yes, sir.

Q Case Number 99-4831; theft of goods?

A Yes, sir.

Q That's like a shoplifting?

A Yes, sir.

Q Case Number 00-5303. It says here that you knowingly and intentionally distributed cocaine on the 21st day of March, 2000?

A Yes, sir.

Q And it says here that you distributed cocaine on the 11th day of April of 2000.

A Yes, sir.

Q Who were you distributing cocaine to?

A It was an undercover.

Q Why were you doing that?

A Because when you run - I was basically a runner. When you run for somebody, somebody else's drugs, you can break off somebody else's rock so you can get loaded too.

Q The same person that pled guilty in 00-4737 to



Y98

possession of cocaine?
A Yes, sir.
Q In what Division did you pled guilty to these?
A Division "H".
Q Who is the Prosecutor in that case?
A Frank Brandisi.
Q Did he ever talk to you and offer you an exchange to testify for us?
A No, sir.
Q Did he talk to you?
A No, sir.
Q You mean to tell me he didn't talk to you at all?
A No, sir.
Q If he would have talked to you, would you have talked to him?
A No, sir.
Q Why is that?
A 'Cause he was trying to give me five years.
Q You were looking at thirty years on that, or upwards.
A Yes, sir.
Q And you're complaining about five years?
A Yes, sir.
Q Why?
A Because prison is horrible.
Q When is it that you went to prison for all of these offenses; I mean, when you were picked up? Not before you were sentenced.
A I was picked up on August 24th of 2000.
Q Okay.
MR. ROWAN:

morning. Are we clear?

MS. BREAUX:

We're clear.

THE COURT:

Thank you. See you then.

MR. FLEMING:

Thank you, Judge.

( R E C E S S )

THE COURT:

Polling waived by the State and Defense?

MR. ROWAN:

Yes, Your Honor.

MR. FLEMING:

Yes, Judge.

THE COURT:

Please be seated. Ms. Larck, you are still under oath. Commence your Cross Examination.

MR. FLEMING:

Yes, Judge.

CROSS EXAMINATION

BY MR. FLEMING:

Q Ms. Larck, you had indicated Direct Examination that you had several prior convictions.

A Yes, sir.

Q And Mr. Rowan went through each one with you. Lets make this a little more clear. You had indicated - you testified on Direct Examination that you had previously pled guilty to a theft of goods, a shoplifting.

A Yes, sir.

Q Number 99-4831; for an incident that occurred

on or about July 6th, 1999; correct?
A Yes, sir.
Q Was that your first conviction?
A It was, I believe it was running concurrent with a theft by fraud, or skimming poker machines, whatever you want to call it.
Q Pled guilty in December, 1999; correct?
A Yes, sir.
Q Guilty; December, '99. Division "H"; correct?
A Yes, sir.
Q Judge Hand?
A Yes, sir.
Q So you have a possession of cocaine conviction; correct?
A Yes, sir.
Q That's in docket number 00-4737?
A Yes, sir.
Q That's for an incident that occurred on August 3rd, 2000; right?
A Yes, sir.
Q You pled guilty in that case as well?
A Yes, sir.
Q Pled guilty in May of 2001; right?
A Yes, sir.
Q That was also in front of Judge Hand?
A Yes, sir.
Q And were you Multiple Billed and charged?
A No.
Q Multiple Billed, for the purposes of the Jury; that means they could have used this prior conviction which occurred prior to this incident, and that could have been used



517

against you to enhance that sentence; right?
A I believe so.
Q You could have gotten up to ten years in prison on this simple possession of cocaine charge; right?
A I don't know. Because when everything - when I was charged with everything, they were all running concurrent; so I don't know.
Q You also had another prior shoplifting charge; right?
A Yes, sir.
Q That occurred April 8th, 2000; right?
A Yes, sir.
Q Pled guilty in May, 2001?
A Yes, sir.
Q That's the same day you pled guilty to this possession of cocaine charge?
A Yes, sir.
Q That same charge you pled guilty to Crime Against Nature; right?
A What do you mean, the same charge?
Q I'm sorry. The same case. Another charge of Crime Against Nature?
A I have a charge of Crime Against Nature, yes.
Q That occurred April 18th of 2002?
A Sir; I was incarcerated in 2002.
Q I apologize. April 18th, 2000.
A Yes, sir.
Q As Mr. Rowan indicated, and you, and this was on Direct; this was essentially the same thing you were discussing with Mr. Sanford, oral sex?

A Ye, sir. Except that I solicited to an undercover.
Q You pled guilty the same day, in May, 2001; right?
A Yes, sir.
Q Those charges on matter number 00-4857. Also, Division "H"?
A Yes, sir.
Q And you are multiple billed on this case either; right?
A Yes, sir.
Q Both incidents occurred, and your conviction for the first shoplifting?
A Yes, sir.
Q You could have been - You understand that you could have been Multiple Billed; right?
A It was never discussed; no.
Q Could have gotten up to four years for the shoplifting; right?
A I have no idea.
Q And you could have gotten up to ten years for the oral sex charge; right? Crime against nature.
A I have no idea.
Q You didn't get Multiple Billed, did you?
A No.
Q You know what Multiple Bill means?
A Not really.
Q You know it deals with something with -
A More time.
Q - You get more time concerning the prior felony conviction; right?



519

A Yes.
Q That you knew?
A Yes.
Q And you know that didn't happen. You also have another conviction; right?
A Right.
Q And that's for two counts of distribution of cocaine?
A Right.
Q Which occurred March 21st, 2000; right?
A That's correct.
Q You pled guilty to that also in May, 2001; right?
A Yes, sir.
Q There's another count where you pled guilty to; right?
A Yes, sir.
Q April 11th, 2000.
A Yes, sir.
Q Another distribution of drugs; right?
A Yes, sir.
Q That was also cocaine. You pled guilty the same day; May, 2001. That's matter number 00-5303; also in Division "H".
You didn't get Multiple Billed on this case, did you?
A No, sir.
Q You know you could have gotten up to sixty years on each charge?
A (no response)
Q You know that?
A That's what I heard.

Q Twenty years; twenty years oral sex. Four years for shoplifting. On this one you could have gotten ten years. On your last three conviction you could have gotten 144 years; right?
A If that's what you say; yes, sir.
Q You got five years.
A Yes, sir.
Q Concurrent.
A Yes, sir.
Q No Multiple Bill.
A No, sir.
Q Everything runs together.
A Yes, sir.
Q So, you save 139 years from your possible sentence; right?
A Yes, sir.
Q And this is all after you pled guilty, after you spoke with Mr. Kelly, the District Attorney that was initially handling this case; right?
A (No response)
Q You pled guilty in May, 2001; you had previously spoken to Mr. Kelly?
A I have spoken to him many times.
Q Okay. You know Mr. Kelly is no longer working with –
A Yes, I do.
Q Mr. Kelly placed you in a drug rehabilitation program; didn't he?
A Yes, sir.
Q You didn't pay for that program; did you?