**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **EARL BRADLEY** | **CIVIL ACTION** |
| | **NO.2:24-cv-02678** |
| ***versus*** | **SECTION:** |
| **TIM HOOPER, WARDEN, LOUISIANA STATE PENITENTIARY** | **HON. JUDGE** |
| | **MAGISTRATE JUDGE** |
| | **JURY TRIAL** |

# MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO TITLE 28 U.S.C. SECTIONS 2254

**MAY IT PLEASE THE COURT:**

**NOW INTO COURT**, comes Petitioner, Earl Bradley, through undersigned counsel, who respectfully submits this memorandum in support of his Petition for Writ of Habeas Corpus, and requests that the law and argument contained herein be considered in this matter. Here, Mr. Bradley never received a full and fair hearing, as the State Court rendered credibility determinations without hearing the evidence and used procedural bars to summarily denied his motion. Within Mr. Bradley's petition now before this court, Mr. Bradley submits new evidence that the jury never heard in the

form of affidavits from an eyewitness, Mae Rivet Smith, his co-defendant, Albert Russell, and Terri-Lee Isaac, detailing Amy Larck's admissions of perjury, and criminal convictions that were never disclosed regarding the lone witness that testified against Mr. Bradley, Amy Larck. Notably, at the time of Ms. Larck's arrest and even testimony during the instant action, she was on probation in the State of Florida. Her arrest was plainly a violation of her Florida probation. Defense counsel was never informed of this evidence. Additionally, in support of the testimonial and documentary evidence presented before the state court, Bradley submitted a supplemental police report, surveillance footage, and medical evidence that all supported his innocence. In the face of this evidence, the state court found, without a hearing, that Mr. Bradley was not entitled to a new trial.

The evidence submitted to the state court proved that the evidence used to convict was unreliable and Earl Bradley is innocent and remains in prison for life wrongfully convicted. His claims have been exhausted and are ripe for a determination by this Court.

**GROUNDS FOR RELIEF**

This petition for writ of habeas corpus is filed pursuant to 28 U.S.C.A. § 2254. Petitioner is in custody of respondent pursuant to a state court judgment of conviction that was obtained in violations of the Constitution of the United States. In particular, Petitioner represents that his right to a fair trial was violated in the following ways:

1. The State failed to disclose the lone eyewitness, Amy Larck, had criminal convictions and was on probation at the time that she testified. *See Brady v. Maryland*, 373 U.S. 83 (1963)
2. The State presented a fraud upon the Court when it allowed its lone witness to testify falsely about her criminal history and other matters that were clearly controverted by the physical

evidence. *Napue v. Illinois*, 360 U.S. 264 (1959)

3. Trial counsel rendered ineffective assistance of counsel when:

    a. he failed to investigate or call Mae Lucille Rivet Smith;

    b. use the surveillance footage that showed that Earl Bradley was not in the alley when the victim was killed;

    c. use the medical examiner's time of death to show that, at the time the victim was killed, Mr. Bradley was in custody;

    d. the sheriff's supplemental report to prove Earl Bradley's innocence.

The evidence above supports Mr. Bradley's contention that he is incarcerated in violation of the 8th and 14th Amendment as it is cruel and unusual punishment to keep an innocent man in prison for a crime that he did not commit.

**WRIT GRANT STATEMENT**

Petitioner's federal habeas should be granted pursuant to 28 U.S.C. § 2254(d) for the following reasons: there has been a state court adjudication of all of the issues presented in this petition; the issues in question involve federal law; the issues were adjudicated in formal state court proceedings; the adjudication resulted in a decision that was contrary to clearly established federal law under the Fifth, Sixth, Eighth, and Fourth Amendments of the United State's Constitution; and the adjudication of Petitioner's claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. Petitioner claims that his Petition is timely based upon tolling and because he has met the standard of "gateway innocence" pursuant to Supreme Court precedent and *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018).

## STATEMENT OF FACTS: TRIAL AND POST-CONVICTION PROCEEDINGS[1]

On August 1, 1999, the body of Barton Sanford was found beneath a trailer located at 7501 1/2 Fourth Street near the Happy Hour Saloon in Marrero. The cause of death was a bullet wound to the chest. Detective Donald Meunier of the Jefferson Parish Sheriff's Office investigated and eventually developed Bradley as a possible suspect. On August 7, 1999, Detective Meunier interviewed Bradley and obtained several statements.

In the statements, Bradley indicated that he had attended a party at the Happy Hour Saloon on Friday, July 30, 1999, but denied knowing the victim. However, when confronted with a surveillance video tape taken outside of the Happy Hour Saloon on July 30, 1999, showing him with the victim, Bradley recanted his prior statements. Bradley told Detective Meunier that the victim wanted to purchase crack cocaine and that he had arranged for the victim to make the purchase from an individual named Jason Rivet. However, before the drug deal was completed, Bradley stopped the drug transaction and pulled the victim away because "something looked like it was going down." Bradley subsequently returned to the bar where he remained for approximately one hour before going to the Budget Motel where he remained for the night.

Detective Meunier also interviewed an eyewitness, Amy Larck, who identified Bradley as the shooter.[2] At trial, Lark testified that at the time of the shooting she was a drug addict who supported

[1] The statement of facts was taken directly from the Louisiana Court of Appeal, 5th Circuit's decision. *State v. Bradley*, 858 So. 2d 80 (La.App. 5 Cir. 09/16/03).
[2] Significantly, Det. Meunier interviewed many witnesses. Only Amy Larck stated that Bradley was the shooter.

her habit by prostitution. Larck knew both Bradley and Russell and had been at Russell's house on the evening of July 30, 1999. While there, she overheard Bradley ask Russell if he had a gun to which Russell responded, "I got that for you."

Later that evening, Larck was outside the Happy Hour Saloon where she smoked crack for most of the night. Later that night, while inside the Happy Hour Saloon, Bradley informed Larck that he had a "trick" for her, whom Larck identified as the victim. Larck and Bradley left the bar and walked around the block to give the victim time to come outside. Larck then walked into an alley behind the Happy Hour Saloon where she met the victim. Larck agreed to perform oral sex upon the victim and the victim displayed approximately sixty dollars. At that moment, Bradley and Russell walked around the corner. Bradley had a gun and was screaming at the victim. Larck began backing out of the alley and heard a gunshot. She then ran from the scene and ended up at the Budget Motel with Bradley. After five to ten minutes, Larck left the motel and received a ride to the levee from a stranger who later raped her. She later reported the rape to police but did not mention the murder at that time. Not until the police picked her up in connection with the homicide investigation did she mention anything to police about the murder.

After Larck's testimony, the State rested and the defense called its first witness, Karen Breaux. Breaux testified that on July 30, 1999, she was at Russell's house until midnight and did not recall either Larck or Bradley being at the home that day or evening. At around midnight that evening, she went to the Happy Hour Saloon where she observed the victim and Bradley engaged in an argument

outside. The victim was accusing Bradley of having ripped him off, which Bradley denied. After a brief moment, Breaux left the area fearing police would arrive shortly.

The defense also called Tammy Disher who testified that, on the evening of July 30, 1999, she saw the victim fighting with an individual named Jason Rivet, who was carrying a gun. She did not see an argument between Bradley and the victim. However, Disher testified that while she was incarcerated with Larck prior to trial, Lark had told her that she was involved in the killing of the victim. Larck told her that she was supposed to "trick" the victim and that Bradley was supposed to rob him but that something went wrong, and Bradley ended up shooting the victim.

Bradley was convicted based upon an 11-1 verdict.

On June 18, 2002, the trial court sentenced Mr. Bradley to life imprisonment with hard labor. Bradley appealed the decision, and the conviction was affirmed. *State v. Bradley*, 858 So. 2d 80 (La.App. 5 Cir. 09/16/03). The Louisiana Supreme Court denied Petitioner's writ on February 13, 2004. *State v. Bradley*, 867 So. 2d 688, 2004 La. LEXIS 549 (La., Feb. 13, 2004).

On January 20, 2005, Bradley filed a pro se motion for post-conviction relief based upon ineffective assistance of counsel and DNA testing, which was summarily denied.

On July 2, 2008, Mr. Bradley filed a subsequent post-conviction motion, which was again summarily denied.

On May 18, 2021, Bradley's post-conviction motion based upon his non-unanimous verdict was denied.

On December 28, 2022, Bradley filed an application for post-conviction relief (herein referred to as "APCR"). *See* Exhibit A. Bradley made the following claims:

**POINT I: THIS PETITION SHOULD BE HEARD**

**POINT II: EARL BRADLEY IS ACTUALLY INNOCENT. *See* La.C.Cr.P. Article 926.2; *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018).**

**POINT III: NEWLY DISCOVERED EVIDENCE WOULD HAVE PROBABLY CHANGED THE VERDICT HAD THE JURY HEARD WHAT IS NOW BEFORE THE COURT.**

**POINT IV: THE SOLE EYEWITNESS, AMY LARCK, TESITIFIED FALSELY. AS SUCH, A FRAUD WAS PRESENTED TO THE COURT.**

**POINT V: THE STATE COMMITTED A BRADY VIOLATION WHEN IT FAILED TO TURN OVER AMY LARCK'S PRIOR CONVICTIONS.**

**POINT VI: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED INVESTIGATE AND CALL MAE RIVET.**

**POINT VII: AT A MINIMUM, A HEARING MUST BE HELD TO DETERMINE THE VERACITY OF BRADLEY'S CLAIMS**

Along with the APCR, Petitioner requested a stay to further investigate and supplement his petition.

On February 1, 2023, the District Court issued a preliminary order, directing the State to file its objections within 30 days of the order, and Mr. Bradley to file his supplemental brief by April 3, 2023.

The State submitted its procedural objections on March 3, 2023 and supplemented those objections on March 8, 2023.

On March 31, 2023, Bradley submitted his opposition to the State's procedural objections. Simultaneously, he submitted his supplemental APCR with Albert Russell's affidavit.

On May 3, 2023, the State responded to Bradley's supplemental memorandum of law and opposition to procedural objections.

On May 10, 2023, Mr. Bradley replied to the State's response to his supplemental memorandum of law and the State's response to Mr. Bradley's opposition to the State's procedural objections.[3]

On May 31, 2023, the District Court summarily denied Mr. Bradley's APCR.

On June 14, 2023, Mr. Bradley filed a motion to reconsider his APCR and a notice of intent to file a supervisory writ. On June 21, 2023, the District Court denied Mr. Bradley's motion to reconsider. On the same date, the District Court set a return date for Mr. Bradley's supervisory writ, which was July 20, 2023. On July 7, 2023, Mr. Bradley requested an extension until August 10, 2023. The District Court granted said request.

Mr. Bradley's writ to the Louisiana Fifth Circuit Court of Appeals was denied on September 6, 2023. His writ to the Louisiana Supreme Court was denied on May 7, 2024.

## LIST OF THE EVIDENCE DISCOVERED SINCE TRIAL AND ITS APPLICATION TO THE CASE AT BAR

**Evidence Presented for the First Time in Bradley's 2022 APCR**

The following evidence *was not* presented at trial or in a previous post-conviction motion:

1. **Exhibit D – Police Reports for Earl Bradley drug arrest**
2. **Exhibit E – Affidavit of Terri-Lee Isaac**

[3] Bradley also supplemented his APCR with Larck's official criminal history from Florida.

3. **Exhibit F – Letters from Amy Larck to Earl Bradley**
4. **Exhibit G – Affidavit of Mae Lucille Rivet Smith**
5. **Exhibit M – Criminal history of Amy Larck**
6. **Exhibit N – Past history of misconduct by Sgt. Grey Thurman**
7. **Exhibit A of Bradley's Reply to State's Procedural Objections - Certified copy of Florida Conviction Record**

Earl Bradley was accused and convicted of killing Barton Sanford during the early morning hours of July 31, 1999. Investigators believed that time to be 1:30AM.[4] *See* Exhibit A of Mr. Bradley's APCR – Jefferson Parish Sheriff's Department's Supplemental Report, pg. 1; *see also* 6/12/1999 TT: 84, 88-100, 129-133.[5] The basis of the investigator's belief of the time, way, and who killed Sanford was the video time stamp at 1:25AM depicting Barton Sanford walking into the alleyway where he was found and Amy Larck's varying and plainly inconsistent statements to police. *See* Exhibit B of APCR – Video of the Alley behind the Happy Hour Bar on July 31, 1999, beginning at approximately 1AM; *see also* Amy Larck's trial testimony; *see also State v. Bradley*, 858 So. 2d 80, 86 (La.App. 5 Cir. 09/16/03).[6] It is undisputed by all parties that Barton Sanford was found in the alley behind the Happy Hour Bar

---

[4] However, as seen below, this time frame is disputed by the medical examiner who testified.

[5] The trial transcript will be delineated by the date of the testimony and "TT:" followed by the page number(s).

[6] Significantly, neither Amy Larck nor Det. Donald Meunier were impeached using the video submitted to the hearing court or Det. Meunier's supplemental report that details the investigators' findings regarding the video in reference to who entered and exited the alley from the late-night hours of July 30, 1999, until roughly August 1, 1999, when the body was found. Astoundingly, Larck was never confronted with what she now admits – that the reason why she is not on any of the surveillance footage is because she was not at the Happy Hour Bar the weekend beginning on July 30, 1999. Disturbingly, the trial prosecutor misrepresented the video evidence in the case at bar, merely presenting to the jury during summation that Sanford walked into the alley as Larck testified. 6/13/2002 TT: 130-134. Yet, the prosecutor failed to mention that neither Larck, Bradley, nor Russell were seen leaving that alleyway after Sanford entered it. *Id.* The failure to alert the jury to this fact was both the product of prosecutorial misconduct and ineffective assistance of counsel.

with one gunshot wound to the chest.

Larck was the only alleged "eyewitness". In fact, Larck was the only person out of the many that were interviewed in this case that stated the Earl Bradley killed Mr. Sanford. Larck stated that, during the early morning hours of July 31, 1999, first Barton Sanford and then she went into the back alley of the Happy Hour Bar so that she could perform a sexual favor on Sanford. *See* 6/12/1999 TT: 84, 88-100, 129-133. Larck testified that shortly after Larck and Sanford entered the alley, which is where Sanford was found shot in the chest, Bradley and his co-defendant, Albert Russel, entered the alley. Larck saw Bradley with a gun, quickly left and heard one gunshot as she ran out of the alley across Jung Blvd through the gas station parking lot. *See Id.*; *see also* Exhibit C of APCR – Sketch of the scene.

The problem for both the State and Amy Larck is that Mr. Bradley has the video of the entrance to the back alleyway during the time period when Sanford was seen entering. *See* Exhibit B of APCR (file labeled VTS_01_0), approximately 1:25AM;[7] *see also* Exhibit A of APCR, pg. 8. This video eviscerates Amy Larck's testimony. Her testimony is fictional; no one enters the alleyway with Sanford. Two black men are not seen entering the alley shortly after he entered. Larck is not seen entering with Sanford or seen running from the scene. Sanford never left the alleyway after he entered it at 1:25AM on July 31, 1999. *See* Exhibit B of APCR.

Further compounding the lie by the state is the fact that Earl is **never seen entering the alleyway between** 1:25AM and 8AM on July 31, 1999. Bradley was arrested on July 31, 1999, at

[7] The video submitted in this brief was presented to the jury as either State's Exhibits 27, 28, or 29.

approximately 7:30AM at the Pinnacle Hotel for drugs. *See* Exhibit D of APCR – Bradley's drug arrest report. Bradley has remained incarcerated ever since that day. The medical examiner in this case, Dr. Susan Garcia, testified that Sanford was dead 24-36 hours from when Mr. Sanford was brought to the medical examiner's office at approximately 6:30PM on August 1, 1999. *See* Exhibit E of APCR – Testimony of Dr. Susan Garcia.[8] Twenty-four hours would have placed Sanford's death at 6:30PM on July 31, 1999. By that point, Bradley had been incarcerated for almost 12 hours. If Sanford died thirty-six hours prior to his movement to the medical examiner's office, his time of death was at 6:30AM on July 31, 1999. No evidence at trial indicated that Earl Bradley was at the Happy Hour Bar at 6:30AM, let alone entering the alley at that time. In fact, the only evidence that anyone entered that alleyway, other than Mr. Sanford, between 1:25AM, and when Sanford was found at approximately 4PM on August 1, 1999, was Mae Rivet Smith. *See* Exhibit A of APCR, pg. 8.

Now, for the first time ever, Amy Larck has come forward through letters and Facebook messages and stated that she lied – that she did not witness Earl Bradley kill Barton Sanford and that she was coerced into her statement to the police and trial testimony. *See* Exhibit F of APCR – Sworn affidavit of Terri-Lee Isaac. Amy Larck provided the following statements against penal interest (La. C.E. art. 804(A); *State v. Raine*, 238 So.3d 1076, 1084-1086 (La. 4th Cir. 2018)) and rebuttal evidence (*State v. Trosclair*, 443 So. 1098, 1106 (La. 1983); *see generally State v. Heath*, 513 So.2d 493 (La. 2d Cir 1987)) to Ms. Isaac:

I am a Canadian citizen who was introduced to Earl Bradley in 2005.

[8] Frankly, this is a generous estimate to the State. Dr. Garcia never specified whether the time of death was from when the body was taken to the medical examiner's office at 6:30PM on August 1, 1999, or at the time of Autopsy at roughly 8AM on August 2, 1999.

Mr. Bradley is serving a life sentence for murder at the Louisiana State Penitentiary at Angola, LA. In the time leading up to, and during our first face to face meeting, Mr. Bradley told me the story of his arrest, shared court records, documents he had obtained from attorneys, and letters he had received in prison. After I read the material, I determined that I wanted to help him gain his freedom.

I am not an attorney, nor am I empowered as an investigator. I determined from reading what was shared with me, specifically the trial testimony, that one of the key witnesses against Mr. Bradley is Amy Larck.

Mr. Bradley showed me letters, (EXHIBIT A) written by Amy Larck, stating her remorse for lying on the witness stand at his trial.[9]

Among the things that Ms. Larck wrote:

> "This is something that God has been telling me to do. I am only trying to make a wrong, right."
>
> "Do you actually believe that I could make up all of those things up (sic) by myself? Come on Earl, there is no way I could have done that without being led and talked through it and threatened."
>
> "I was not at the Happy Hour at all the night that guy was killed. I did not even leave the area of the Budget (hotel.)"
>
> "Let me go back so that you can understand. I left 4th Street for a little while and I was skimming poker machines with Randy with the red car. The only thing that I heard was that someone was found under the trailer behind the Happy Hour. Everyone who ever hung out on 4th Street or the Happy Hour was questioned about the murder. except me. I did not know anything about anyone being questioned. A couple of us were at the gas lite motel and some under cover knocked on the door. They asked who I was and told me that I had reported a rape and they needed me to identify the guy. Everyone in that room except me knew that they were homicide detectives. When we got to the detective bureau they took me straight to homicide. I had NO idea what was going on."
>
> "I was in that room for 11 hours being interrogated (sic) 3 separate (sic) times (back to back), I told them that I had no idea what they were talking about. I did not know anything about it. The (sic) kep trying to put suggestions in my mouth and yes I

[9] The letters with envelopes attached, thereby proving that Amy Larck wrote these letters, are attached as Exhibit G of Mr. Bradley's APCR.

> was scared because I have never in my life been in that kind of situation and they were mean to me. Finally they took me back to some room with video tapes and showed me a video tape. He told me that the girl was me, the guy on the right was you, and he did not know who the other guy was. I told him that I was not even at the Happy Hour. He said he had talked to a number of people who said me and you were at the happy Hour together that night. None of this was true!"

I believe that Amy Larck's recantation to be an important thing in Mr. Bradley's pursuit of justice.

I reached out to Amy Larck via Facebook messenger beginning on Thursday September 19, 2013, and continuing to Wednesday, September 25, 2013. I preserved the messages between us, and have attached them to this affidavit as EXHIBIT B.

On Tuesday, September 24, 2013 Amy Larck wrote: "I was young and impressionable back then and scared to death of being threatened with accessory to murder. I have grown a lot and would like to help Earl be released from prison."

Amy Larck had written to Earl Bradley that she wanted nothing from him in exchange for the truth, but in our exchanges Ms. Larck wanted money, and to know that Earl Bradley would not harm her in any way for having lied on the witness stand. I assured her that I believed Earl Bradley was not interested in retaliation, only exoneration.

Amy Larck never told me what amount of money she wanted in order to come forth with the truth.

I shared our communication with Earl Bradley, who asserted it would be inappropriate to pay Amy Larck.

I have had no further communication from Amy Larck beyond what is attached.

The above statement is true and correct. I offer this information freely and Without hesitation. I have not been coerced, nor have I been given money, nor am I promised any reward for communicating this information.

Larck's letters and Facebook messages are true rebuttal evidence to her trial testimony. *State v. Trosclair*, 443 So. at 1106. While it is true that recantations are looked at skeptically, this is not a true recantation. This is an admission by Larck that she committed perjury and, in fact, fears that she could be charged with perjury. *State v. Hammons*, 597 So. 2d 990, 995-998 (La. 1992); *See* Exhibit F of APCR,

pg. B002. Larck, by her own admission, is not available to Bradley now, and most certainly was not available at the time of trial; she was adverse. And now, she's trying to extort Bradley.

And her admissions have more than a ring of truth. By Larck's own admission at trial, she implicated Bradley only after the police threatened to charge her as an accomplice. Her statements **and** trial testimony were inconsistent; a point which even the state court was clear to point out. *State v. Bradley*, 858 So. 2d at 86. But more importantly, no other witness corroborated her statements or testimony, especially with regard to Albert Russell. *See* Exhibit I of APCR – Hearing testimony dated February 7, 2001, pages 16-17. And more importantly, the video in the case at bar eviscerates Amy Larck's testimony – Larck's testimony regarding the murder is plainly false. *See* Exhibit B of APCR.

Amy Larck was the only evidence against Earl Bradley.[10] Her testimony was beyond material. Her admissions are shocking, documented in writing, and would have absolutely changed the verdict. *State v. Hammons*, 597 So. 2d at 999 (The standard is merely the probability of a different verdict). And here, the prosecutor's **entire** closing was about her credibility.

But Larck's testimony about the events that night was not her only lie. She also lied about her criminal record. Larck testified that her first criminal conviction was in Louisiana, from a case that she caught close in time to the case at bar (specifically the crime happened on July 6, 1999, only days after her arrival). 6/12/2002 TT: 122-123. This is plainly not true. *See* Exhibit A of Bradley's Reply to State's Procedural Objections; Exhibit N of APCR – Larck's background check. In December of 2022, Mr. Bradley, through counsel, found Larck's criminal history. In April of 2023, Mr. Bradley, through

---

[10] Bradley's statement was not inculpatory. While it was inconsistent in some respects, multiple witnesses in this case provided inconsistent statements.

counsel, received Larck's certified criminal history in Florida. *See* Exhibit A of Bradley's Reply to State's Procedural Objections. It turns out that Larck wasn't just a telemarketer in Illinois just prior to her arrival in Louisiana. Not long before Larck's arrival in Louisiana, she was convicted of simple assault in North Carolina. But prior to that, Larck was arrested and convicted of prostitution and child abuse in Florida. *See* Exhibit A of Bradley's Reply to State's Procedural Objections - Certified copy of Florida Conviction Record. For those convictions, of which some were felonies, Larck did prison time. **She was also on probation when she was arrested in Louisiana and at the time of her testimony. She was shipped back to Florida after her sentence only to be arrested again in Florida. For both the probation violation and that arrest, she received a time served sentence.** *See* Exhibit A of Bradley's Reply to State's Procedural Objections. None of this was revealed to defense counsel because counsel, who is a skilled defense attorney, never confronted Larck with these convictions. This is a clear *Brady* violation. *See State v. Bright*, 875 So.2d 37, 41-45 (La. 2004).

Terri-Lee Isaac is not the only witness that has come forward to support Earl's innocence in the case at bar. Mae Rivet Smith has come forward to definitely state that (a). she did not see a body behind the Happy Hour Bar until August 1, 1999, in the afternoon and (b). that, when she heard shots during the late-night hours of July 30, 1999, or the early morning hours of July 31, 1999, Earl Bradley was in her presence and did not have a gun. *See* Exhibit H of APCR – Mae Lucille Rivet Smith affidavit dated June 10, 2022. Ms. Smith swore to the following:

> 1. I have known Earl Bradley from more than 24 years. We met through friends and we both frequented a bar called The Happy Hour bar in Marerro, LA.
>
> 2. I was at the Happy Hour Bar in 1999, on the last weekend of July. The bar did not close through the entire weekend, and I left only once during that weekend.

3. Friday night, July 30th I was standing at the door of the Happy Hour with my friend Rachel Peret. We were talking and smoking a cigarette. During this time, I saw Earl Bradley enter the alleyway and waved to him. As we waved, we heard shots ring out somewhere beyond the alleyway.

4. Earl was traveling from Jung Boulevard toward Baritaria. The shots did not take place in the alleyway. The shots were likely coming from a side street.

5. I was waving to Earl and he was waving back when the shots rang out. He did not have a gun in his hand.

6. During the weekend I was in and out of the bar and the alleyway frequently because I am a smoker, and at the time it was not permitted to smoke in the bar.

7. At the time of the incident, I was homeless, and I spent my time in and around the Happy Hour Bar.

8. I was in and out of the alleyway Friday night the 30th; I was there all day and night Saturday the 31st; I was there all-day Sunday August 1st.

9. At the time I was also familiar with the victim of the shooting Bart Sanford. He was not in the alley when I waved to Earl and we heard shots ring out.

10. I did not see Bart Sanford until Sunday night, when I was talking with Lloyd Everett and he spotted Bart's body in the alleyway.

11. Lloyd Everett went to call the Police, and left me standing in the alleyway to make sure no one disturbed Bart's body. I left the scene after the Police arrived.

12. I later provided information to the police about what I saw at the time. They took a recorded statement from me.

13. I walked in and out of the alleyway many times from Friday until Sunday. I would have seen Bart's body where we eventually saw it had it been there all weekend.

14. I know Amy Larck from the neighborhood; she also frequented The Happy Hour. She was not at the bar that weekend.

15. I know Albert Russell, known as Micey. Albert was not at the Happy Hour that weekend.

16. I am aware Amy Larck gave testimony that she was present in the alleyway Friday night at the time of the shooting, with Albert. I am aware that she testified that she saw Earl Bradley

> shoot Bart Sanford.
>
> 17. I am completely certain Amy and Albert were not in the alleyway, and not with Earl Bradley when shots rang out Friday night.
>
> 18. I have always been willing to testify as to what I saw that weekend, and when. I was available to Earl Bradley's attorney and to the prosecutors before, during and after the trial. No one ever asked me to testify.
>
> 19. I have reached out to Earl Bradley several times over the last 20+ years to tell him that I know exactly where he was at the time of the shooting. I understand that he could not reply until he had someone who was willing to take my statement.
>
> I offer this statement freely, and am willing to testify under oath as to its authenticity and to provide further details about my recollection. No one has offered me money, or exerted pressure on me to make this statement.

Here, Ms. Smith's provides critical alibi evidence from a person that investigators **knew** was around the body the weekend that Sanford was killed. Her testimony for Bradley would have crushed the State's case, as Ms. Smith's statements to police were consistent and corroborated by police investigation, i.e., the video. Bradley's trial counsel's failure to investigate and call her was plainly ineffective assistance of counsel under the United States and Louisiana constitutions. *State v. Davis*, 295 So. 3d 396 (La. 2020).

Albert Russell has also come forward to support Bradley's innocence. On February 18, 2023, Mr. Bradley's co-defendant provided a sworn statement stating the following: (*See* Exhibit A of Supplemental APCR – Albert Russell sworn affidavit dated February 18, 2023)

> I am a witness to the events of the above-captioned matter.
>
> At the time of the incident, I was living at 468 Wilson Street in Marrero, Louisiana.
>
> I came home one morning and my door was kicked in.
>
> My grandfather came over and gave me a business card of an FBI agent.

I called the agent and he told me to come to the Gretna Detectives Bureau.

They questioned me about some guy that I never knew or seen before, and showed me a picture of a guy that I never seen before and asked me if I knew him.

I told them I had never seen the guy in my life.

The detectives left out the room for about 3 minutes and came back in and told me I was under arrest for second degree murder. I couldn't believe it.

I was incarcerated for 3 years fighting the charge of killing a person I never seen or heard before.

The detectives tried placing me at a club on 4th Street and Jung Boulevard called the Happy Hour.

The club had surveillance cameras inside and out.

I was never at the club at the time the murder happened.

This Court should note that Bradley has never been granted an evidentiary hearing. In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Supreme Court held that a persuasive showing of actual innocence should take precedence over time limitations and procedural bars. Likewise, in *In re Davis*, 557 U.S. 952 (2009), the Supreme Court directed the Georgia state courts to take evidence concerning the defendant's actual innocence and to hear from the witnesses who had previously been denied a hearing on procedural grounds. Doing so in this case would comport with the core function of the criminal justice system – convicting only the guilty and exonerating the innocent – and would recognize that allowing an innocent man to rot in prison on technical grounds is even more abhorrent than allowing a guilty person to evade justice for such reasons.

In sum, this Court should either vacate Mr. Bradley's conviction or hear the witnesses who have never been heard, evaluate the scientific evidence and surveillance evidence that obliterates the

only evidence against Bradley: Amy Larck's testimony. Earl Bradley's wrongful conviction and imprisonment is a miscarriage of justices that cries out to be fixed.

## ARGUMENT[11]

## POINT I

### MR. BRADLEY'S RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE STATE COMMITTED *BRADY* VIOLATIONS AND PRESENTED A FRAUD UPON THE COURT.

Equitable Tolling Allows this Court to Reach the Merits on the *Brady* and Fraud Upon the Court Claims

In Mr. Bradley's case, he failed to file a habeas petition within the AEDPA's one-year deadline. Accordingly, Petitioner's claims are untimely unless Petitioner can show that he is entitled to equitable tolling.

Here, Mr. Bradley first became aware of Amy Larck's criminal history on December 25, 2022. Mr. Bradley submitted this evidence as a part of his *Brady* and fraud upon the court claims to the state court on December 28, 2022. On April 6, 2023, Mr. Bradley received Ms. Larck's Florida criminal history, which showed that she had criminal convictions prior to her trial testimony and that she was on probation and in violation of that probation in Florida at the time of her arrest and eventual testimony in Louisiana. Mr. Bradley supplemented his application for post-conviction relief with this evidence on May 10, 2023. As such, Mr. Bradley has met the statutory deadline for filing this claim, as these claims were not exhausted until the State of Louisiana Supreme Court denied his claims on May

[11] In order to avoid redundancy, Mr. Bradley adopts all evidentiary arguments made in the section "**LIST OF THE EVIDENCE DISCOVERED SINCE TRIAL AND ITS APPLICATION TO THE CASE AT BAR"** throughout the argument section.

7, 2024.

The limitations period defined in 28 U.S.C. § 2244(d)(1) "is subject to equitable tolling" only where the petitioner shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation omitted); *see also Rivas v. Fischer*, 687 F.3d 514, 538 (2d Cir. 2012) (citations omitted). However, this period can be tolled during the time a properly filed application for state post-conviction or other collateral review is pending. *Williams v. Cain*, 66 F. Supp. 2d 816 (E.D.La. 1999); *Zapata v. Cain*, 614 F. Supp. 2d 714 (E.D.La. 2007); *Hines v. Louisiana*, 102 F. Supp. 2d 690 (E.D.La. 2000).

In Mr. Bradley's case, he did not become aware of Larck's convictions until December of 2022 and he has diligently litigated this claim, exhausting it in the state court. *Brown v. Cain*, 112 F. Supp. 2d 585 (E.D.La. 2000); *Zapata v. Cain*, 614 F. Supp. 2d 714. Therefore, this Court should hear his *Brady* and fraud upon the court claims based upon Larck's criminal history and probation status.

<u>The State Committed A *Brady* Violation and Presented a Fraud Upon the Court</u>

Mr. Bradley confirmed that Larck had several convictions that she served **prison time for** in the State of Florida and was on probation in Florida when she was arrested in Louisiana and testified in the case at bar. *See* Exhibit N of Bradley's APCR (Exhibit A); Exhibit A of Bradley's May 10, 2023 Reply (Exhibit H).[12] None of these records were turned over. The State actually, in its supplemental response/objections to Mr. Bradley's PCR (Exhibit G), cited the trial testimony from Amy Larck **that**

[12] *See* Cycles 4-7. Larck was extradited from Louisiana to Florida because she fled from probation that stemmed from her neglect of a child conviction that occurred in 1996.

**supports Mr. Bradley's contention that there was an egregious *Brady* violation here**. Larck was clear; she had no convictions prior to her arrival in Louisiana. Larck also never testified that, at the time of trial, she had absconded from probation in the State of Florida based upon her child neglect conviction.

As shown by the State's quotes of Larck's testimony, the trial prosecutor actually pulled out of Larck that she arrived in Louisiana from Illinois and that she was a telemarketer prior to this case. Larck's trial testimony painted a picture that she was a tax paying civilian prior to July 6, 1999, which was her first arrest in Louisiana. Defense counsel, a highly experienced attorney, for Bradley failed to cross her on any of the convictions from Florida that proceeded this case or regarding the fact that she was on probation. [13]

***Brady* Standard:** In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The Court observed that "[a] prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant." *Id.* at 87-88. "That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice," even if the suppression "is not the result of guile." Id. at 88.

In a series of subsequent decisions, the Court has refined both the scope of *Brady* disclosure

[13] Also, interesting to note is the fact that Larck's criminal history would have warranted a higher sentence on her guilty pleas.

and the meaning of the term "material to guilt or punishment." In *Giglio v. United States*, 405 U.S. 150 (1972), for instance, the Court held that the *Brady* obligation extends to evidence that would impeach the credibility of prosecution witnesses. "Where the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the] general [*Brady*] rule." *Id.* at 154. Thus, in a case where – as here – the government's proof "depended almost entirely" on the testimony of witnesses, the witnesses' credibility "was therefore an important issue in the case," and the jury was entitled to know of information bearing on it. *Id.* at 154-55.

The *Giglio* court also expanded upon the relevant standard of materiality, adopting the same metric as in *Napue v. Illinois*, 360 U.S. 264 (1959), i.e., that reversal is required where the withheld evidence "could in any reasonable likelihood have affected the judgment of the jury." *See Giglio*, 405 U.S. at 154.

In *United States v. Agurs*, 427 U.S. 97, 111-12 (1976), the Court held that the *Brady* obligation existed regardless of whether or not a specific request for exculpatory evidence was made, but that where no such request was made, the standard of materiality was more than that required to overcome a claim of harmless error. Nevertheless, "the proper standard of materiality must reflect [an] overriding concern with the justice of the finding of guilt." *Id.* at 112. Since a finding of guilt is permissible only if proven beyond a reasonable doubt, "it necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *Id.* "This means that the omission must be evaluated in the context of the entire record," and that "<u>if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.</u>" *Id.* at 113 (emphasis added).

In *United States v. Bagley*, 478 U.S. 667 (1985), the Court reaffirmed that, as held in *Giglio*, *supra*, "[i]mpeachment evidence… as well as exculpatory evidence, falls within the *Brady* rule," because "[s]uch evidence is favorable to the accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.* at 676. The Court "rejected any... distinction between impeachment evidence and exculpatory evidence" in terms of materiality. *Id.* The *Bagley* Court further found that the standard of materiality in all cases was reasonable probability, which it characterized, consistently with *Agurs*, as "a probability sufficient to undermine the outcome."

In *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), the Court elaborated upon the meaning of "reasonable probability," noting that "[f]our aspects of materiality under *Bagley* bear emphasis." First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* "[T]he adjective [reasonable] is important," and "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

"The second aspect of *Bagley* materiality bearing emphasis… is that it is not a sufficiency of the evidence test." *Id.* "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict," and thus, the required showing is "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

"Third, we note that, contrary to the assumption made by the Court of Appeals, once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review," because *Bagley* materiality includes a finding of harmfulness. *Id.* (citation omitted). And fourth, in determining materiality, "suppressed evidence [is to be] considered collectively, not item by item." *Id.* at 436.

In *Strickler v. Greene*, 527 U.S. 263, 280-82 (1999), the Court summed up its *Brady* jurisprudence by opining that there are three "essential elements of a *Brady* violation," namely (i) suppression, (ii) of favorable evidence, (iii) that is material to guilt or punishment. This formulation, as well as the *Bagley/Kyles* definition of materiality, has been reiterated in numerous subsequent Supreme Court decisions. *See, e.g.*, *Wearry v. Cain*, 136 S. Ct. 1002, 1006-07 (2016) (finding *Brady* violation where prosecutor failed to disclose impeachment evidence concerning the witness who provided "the only evidence directly tying [Wearry] to [the] crime" of which he was convicted, even though other impeachment evidence was available); *Smith v. Cain*, 566 U.S. 73, 75-76 (2012) (*Brady* violation occurred where impeachment evidence was withheld concerning the only eyewitness to the crime); *see generally Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (summarizing the *Brady* standard); *Banks v. Dretke*, 540 U.S. 668, 698-99 (2004) (same).

**Brady Was Violated:** The withholding of exculpatory evidence, namely the previous criminal history of Amy Larck and her probation status in Florida, in this case clearly violated *Brady*. This Court should note that the State's entire closing was focused on credibility – how credible Amy Larck was.

At least as much to the point, however, Amy Larck's previous out-of-state convictions falls well within *Brady*, *Giglio* and their progeny. As discussed above, *Brady* material is evidence that is (i)

suppressed, (ii) favorable to the accused, and (iii) material. Here, the prosecuting attorney has acknowledged that the evidence in question was in the possession of the State prior to trial but was not disclosed.

As to materiality, this evidence would certainly have resulted in a reasonable probability of a different verdict – had the jury heard that Larck had lied about her criminal history – that she was a career prostitute who abused children would have been devastating to the State's only piece of evidence. *Kyles v. Whitley*, 514 U.S. at 434; *State v. Bright*, 875 So.2d 37, 41-45 (La. 2004). This especially rings true when one considers the focus of the State's summation which focused on Larck's credibility.

Not only is a reasonable probability less than a preponderance as *Kyles* makes clear, but it is "fairly low threshold," *see Riggs v. Fairman*, 399 F.3d 1179, 1183 (9th Cir. 2005), which is satisfied whenever the chances of a different outcome are "better than negligible." *See Ward v. Jenkins*, 613 F.3d 692, 701 (7th Cir. 2010). Indeed, as the *Agurs* and *Wearry* Courts, *supra*, stated, even evidence of "relatively minor importance" will be sufficient to satisfy the outcome where, as here, the case was shaky to begin with.

And the withheld evidence here was far more than "minor." The lynchpin of the State's case at trial was solely Larck's credibility that Bradley shot and killed Sanford. The State presented Larck as an open book, revealing all of her "sins", completely forthright that she only began to have a criminal career when she was sucked into the criminal element when she arrived in Louisiana. This was just not true, and the State knew it.[14] Now with the body of evidence, including Larck's admissions

[14] By the point of Ms. Larck's testimony, she had been incarcerated for a significant amount of time. She had been fingerprinted and her background would have been checked; the prosecutors would have also known that she was on probation in Florida and violated that probation by her rearrest in Louisiana. Apparently, the

that she lied about Bradley's and her own involvement in Sanford's death, the State's case is devastated. The State's case is based upon a witness that lied about one thing after another. Falsus in uno, falsus in omnibus. *Holderfield v. Jones*, 903 F.Supp. 1011, n. 8 (E.D.La. 1995).

Not only did the State commit a *Brady* violation, but the State also allowed Ms. Larck to testify falsely regarding her criminal history and omit the fact that Ms. Larck faced a probation violation due to her rearrest and flight from probation in the State of Florida. A prosecutor has a duty of fairness to the accused and candor to the court. The prosecutor has an obligation to correct false or mistaken testimony by one of his or her witnesses. The "Supreme Court has made clear that prejudice is readily shown in such cases [wherein the prosecutor allowed a witness to testify falsely], and the conviction must be set aside unless there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2002) (*citing United States v. Agurs*, 427 U.S. at 103; *Giglio v. United States*, 405 U.S. at 154; *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (citing *Agurs* and adding that the Supreme Court cases mean that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" (quotation marks omitted)).

This Court should vacate Mr. Bradley's conviction just based on the fact that the State allowed Ms. Larck to testify falsely about her criminal history and the potential jail exposure that she was facing which went directly to her character and credibility as a witness.

The fact of the matter is that Amy Larck, by July 6, 1999, was a career criminal – a child abuser,

---

State of Florida was aware that she was a fugitive from the state, as there seems to be a warrant for her arrest that was generated on July 17, 2000. The State had this criminal history but just did not disclose it.

prostitute, and thief. She also fled from the State of Florida when she was on probation.[15] What would a jury do now having heard that Larck was lying so substantially about her criminal history and had additional liability hanging over her head from the State of Florida based upon the felony probation violation? The prejudice that Bradley faced in this regard was significant – at least one of the jurors did not believe Ms. Larck.[16] Any amount of impeachment material would have swung the needle in a case wherein there was no evidence that connected Bradley to the murder other than Larck. *See Bright, supra.*; *Wearry, supra.*; *Smith, supra.* But under *Agurs* and its progeny, reversal is required because there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." On these points alone, Bradley deserves a new trial.

**POINT II**

**MR. BRADLEY'S RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN HIS ATTORNEY WAS INEFFECTIVE AND THE STATE COMMITTED A FRAUD UPON THE COURT. THE STATE COURT'S PROCEDURAL BAR ON THESE CLAIMS FAILED TO RECOGNIZE MR. BRADLEY'S GATEWAY CLAIM OF INNOCENCE.**

The state court erroneously denied Mr. Bradley's gateway innocence claim which would have allowed his claims of ineffective assistance of counsel, fraud upon the court and *Brady* violations to be heard.

As the Supreme Court has emphasized, a defendant, like Bradley, who has never received a hearing to present his evidence, is not treated fairly where "no court, state or federal, has ever conducted a hearing to assess the reliability of the score of postconviction affidavits that, if reliable,

[15] Interestingly, when Larck was returned to Florida in August of 2005, she was arrested again in December of 2005 for possession of drugs facing up to 5 years in prison. *See* Exhibit A of Exhibit H; *see also* Florida Statute 893.13. 6A (makes it a third-degree felony to possess a controlled substance. A third-degree felony is punishable by up to five years in prison and a fine of $5,000). Larck ended up only serving two months in jail for everything.

[16] This Court should remember that Mr. Bradley's first trial ended up in a 6-6 mistrial. Larck didn't just lie once, she lied twice.

would satisfy the threshold showing for a truly persuasive demonstration of actual innocence," In re Davis, 577 U.S. 952 (2009) (Stevens, J., concurring), and Bradley, too, surely deserves that one day in court.

Moreover, as a separate and independent reason to overcome any procedural bars and/or timeliness objections, persuasive claims of actual innocence have been recognized as a gateway for a Court to review underlying constitutional errors[17] and are not subject to procedural bars. *Murray v. Carrier*, 477 U.S. 478, 494 (1986).[18] Timeliness, too, must yield where actual innocence is shown. *See McQuiggin v. Perkins*, 569 U.S. 383 (2013). The Supreme Court has recognized that, in the extraordinary case, the principles of finality must yield "to the imperative of correcting [fundamental injustice]." *House v. Bell*, 547 U.S. 518, 536 (2006) (*Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Carrier*, 477 U.S. at 495 (*citations omitted*)); *see also Herrera v. Collins*, 506 U.S. 390, 404 (1993).

The Supreme Court has established a criterion for individuals to assert actual innocence: with the presentation of the evidence the petitioner is now submitting to the court, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schulp*, 513 U.S. at 327; *see also Bell*, 547 U.S. at 537. This holds the petitioner to the standard of presenting a truly extraordinary case, "while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Schulp*, 513 U.S. at 327(*quoting McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).

As elucidated by the *Bell* Court, a habeas court must consider all of the evidence, whether old

---

[17] Bradley's claims of constitutional errors include fraud upon the court, *Brady* violations, and ineffective assistance of counsel.

[18] Indeed, at least one Federal court has held that a free-standing actual innocence claim was cognizable, although it found, after an evidentiary hearing, that the defendant had failed to sustain that claim. See In re Davis, 2010 U.S. Dist. LEXIS 87340 (S.D. Ga. 2010).

or new "without regard to whether it would be necessarily admitted under rules of admissibility that would govern at trial."' 547 U.S. at 537-38 (*Schulp*, 513 U.S. at 327-28 (*quoting* Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970) (emphasis added)).

Here, as described above and below, Bradley meets the threshold, and this Court should hear his claims.

The State Committed a Fraud Upon the Court Separate and Apart from the False Testimony of Larck Regarding Her Criminal Record.

Petitioner is entitled to relief on the ground that the old evidence – the trial testimony of Amy Larck – was perjured and that the prosecutor knew or should have known that it was perjured. This constituted a fraud on the court and a due process violation under *Napue v. Illinois*, 360 U.S. 264, 269-71 (1959), and its progeny. *See also Kinsel v. Cain*, 647 F.3d 265, 271-272 (5th Cir. 2011).

It is well settled under *Napue* and its progeny that prosecutors may not permissibly rely on false testimony to obtain a conviction, and in fact has an affirmative obligation to correct the record if its witnesses testify falsely. Notably, in order to obtain relief on a *Napue* claim, it is not necessary to prove that the State's notice of the falsehood was actual; instead, relief is mandated if the prosecuting attorney had constructive notice of the falsity of the testimony, e.g., through documents in its file. *See Creel v. Johnston*, 162 F.3d 385 (5th Cir. 1998); *Graham v. Wilson*, 828 F.2d 656 (10th Cir. 1987). "In order to establish knowing use of perjured testimony the petitioner may rely on circumstantial evidence, and need only show either actual or constructive knowledge." *Smith v. Page*, 1998 WL 25197 (N.D. Ill. 1998). Moreover, the State's knowing use of perjurious testimony in violation of *Napue* has been held to require "virtually automatic" reversal. *United States v. Wallach*, 935 F.2d 445, 456 (2d

Cir.1991).

In sum, *Napue* and its progeny require a new trial if "(1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material." *See United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997).

First, it is law of the case that the 5th Circuit Appellate Division of Louisiana found Larck to have provide inconsistent testimony, albeit, not about the material fact of who killed Barton Sanford. *See State v. Bradley*, *supra*.

Here, with the evidence presented in this motion, it is patent that the testimony of Larck was false regarding what exactly happened leading up to and at the time of the murder, and that such falsity was known to the prosecution through the surveillance video, the sheriff's supplemental report and the medical examiner's testimony.[19] *See Creel, supra*.

And there can be no doubt that the false testimony was material. Amy Larck was the only evidence of guilt and the State's entire closing was predicated on Larck's credibility. Without the false testimony, there was no evidence that Earl Bradley killed Barton Sanford. *Napue* and its progeny thus require that Bradley' conviction at long last be set aside.

<u>Trial counsel rendered ineffective assistance of counsel when he failed to investigate or call Mae Lucille Rivet Smith and use the surveillance footage, the medical examiner's time of death, and the sheriff's supplemental report to prove Earl Bradley's innocence.</u>

This is a patent case of ineffective assistance of counsel based upon defense counsel's failure

[19] In fact, there was a tense exchange between the trial prosecutor and the medical examiner, when the trial prosecutor attempted to lead the ME to state that the time of death fit the shooting of Barton Sanford in the early morning hours of July 31, 1999. The ME declined and stated a time of death that was far from that timeline. See Exhibit E, pg. 6.

to call Smith, and use the police investigation, surveillance footage and the ME's time of death determination to attack the fictional story told by Larck. What possible strategy could excuse counsel's failure to conduct even the most elementary follow-up and investigation concerning this evidence, much less his failure to use it when cross-examining the State's witnesses? There was no strategy to this failure. In fact, based upon the failure of defense counsel to use the surveillance video to exonerate Bradley, the prosecutor was able to cherry pick the portions of the video that supported the State's position without rebuttal on summation.[20] Without belaboring a factual recitation of these points, this Court should see the above to see in-depth arguments of the value of this evidence.

It is axiomatic that under the United States Constitution that criminal defendants are entitled to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland* and its progeny, a defendant who claims that he was denied the effective assistance of counsel must meet a two-prong test: he must show both that his attorney fell below accepted professional standards and that he was prejudiced by his counsel's lapse. *See id.*

The first prong of the standard measures counsel's performance against professional norms existing at the time of the representation. *See Strickland*, 466 U.S. at 688-89. Although counsel's performance is viewed deferentially, *see id.*, at 689-90, this deference does not extend to errors of omission for which counsel cannot provide any reasonable strategic or tactical justification. *See Berryman v. Morton*, 100 F.3d 1089, 1096-97 (3d Cir. 1996) (in Section 2254 habeas case, holding that even if the state court was correct in finding that the petitioner's counsel had a strategy, that strategy

[20] In fact, this strategy by the trial prosecutor was genius. He had the last word on a piece of evidence that would have eviscerated his case. His use of the video was the pinnacle point of the trial, and it highlights defense counsel's failure to do so. 6/13/2002 TT: 130-134.

was unreasonable as a matter of law); *see also Libberton v. Ryan*, 583 F.3d 1147, 1169 (9th Cir. 2009) (finding that failure to pursue mitigating evidence could not be justified by any valid strategy); *Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir.1987) (counsel "should not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy and tactics'").

In order to demonstrate prejudice under the *Strickland* standard, the defendant must show a reasonable probability that his counsel's errors affected the outcome of the trial or on his direct appeal. *See Strickland*, 466 U.S. at 686. The reasonable probability standard is the same as discussed above for *Brady* material – i.e., it is not a sufficiency test, it does not require a preponderance, and is satisfied by any "better than negligible" chance that the outcome would have been different. *See Kyles, supra.* Thus, a defendant need not show that he would have been acquitted or that he would have been entitled to judgment as a matter of law had his counsel not erred, but only that his counsel's performance undermines confidence in the outcome when considered as part of the whole case. *Id.* Moreover, this determination may be made with the benefit of hindsight. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

In this case, the strategy pursued by defense counsel was attacking the credibility of Amy Larck. Ms. Smith's statements to police were devastating to the State's case. As she stated in her affidavit, Bradley's attorney failed to even speak to her. The medical evidence in this case and the surveillance video are even more plainly exculpatory than Smith's statements. As is the Sheriff's Supplemental Report, which details the review of the video and provides no indication that Larck is anywhere near the Happy Hour Bar, let alone in the alleyway when Sanford enters it. It is incomprehensible as to why defense counsel did not marshal this evidence. "An attorney's failure to present available exculpatory evidence is *ordinarily* deficient, unless some cogent tactical or other

consideration justified it," *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) (emphasis added), and here, no such tactical consideration, cogent or otherwise, existed.

Petitioner has clearly demonstrated ineffective assistance of counsel and is entitled to vacatur on that basis in addition to the other reasons set forth above.

## POINT III

## EARL BRADLEY IS ACTUALLY INNOCENT

Earl Bradley, with the above evidence, has presented a freestanding claim of actual innocence, because no jury would convict him with the evidence presented to this Court. His continued incarceration is a violation of the Eighth Amendment – it is cruel and unusual punishment. This is plainly a constitutional violation that this Court recognized in its seminal decision *In re Davis*, 130 S. Ct. 1 (2009).

Specifically, *In Re Davis* made it clear that habeas relief is appropriate for an innocent man who does not have an underlying constitutional violation:

> Second, JUSTICE SCALIA assumes as a matter of law that, "[e]ven if the District Court were to be persuaded by Davis's affidavits, it would have no power to grant relief" in light of 28 U.S.C. § 2254(d)(1). *Post*, at 2. For several reasons, however, this transfer is by no means "a fool's errand." *Post*, at 5. The District Court may conclude that § 2254(d)(1) does not apply, or does not apply with the same rigidity, to an original habeas petition such as this. *See Felker v. Turpin*, 518 U.S. 651, 663, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (expressly leaving open the question whether and to what extent the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to original petitions). The court may also find it relevant to the AEDPA analysis that Davis is bringing an "actual innocence" claim. *See, e.g., Triestman v. United States*, 124 F.3d 361, 377-380 (CA2 1997) (discussing "serious" constitutional concerns that would arise if AEDPA were interpreted to bar judicial review of certain actual innocence claims); Pet. for Writ of Habeas Corpus 20-22 (arguing that Congress intended actual innocence claims to have special status under AEDPA). Even if the court finds that § 2254(d)(1) applies in full, it is arguably unconstitutional to the extent it bars relief for [an incarcerated] inmate who has established his innocence. Alternatively, the court may find in such a case that the statute's text is satisfied, because decisions of this Court clearly

> support the proposition that it "would be an atrocious violation of our Constitution and the principles upon which it is based" to [imprison] an innocent person. *In Re Davis*, 565 F.3d 820, 830 (11th Cir. 2009) (Barkett, J., dissenting); *cf. Teague v. Lane*, 489 U.S. 288, 311-313, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opinion).
>
> JUSTICE SCALIA would pretermit all of these unresolved legal questions on the theory that we must treat even the most robust showing of actual innocence identically on habeas review to an accusation of minor procedural error. Without briefing or argument, he concludes that Congress chose to foreclose relief and that the Constitution permits this. But imagine a petitioner in Davis's situation who possesses new evidence conclusively and definitively proving, beyond any scintilla of doubt, that he is an innocent man. The dissent's reasoning would allow such a petitioner to be [incarcerated] nonetheless. The Court correctly refuses to endorse such reasoning.

*In re Davis*, 130 S. Ct. at 1-2. (Justice Stevens, concur.)

Here, Mr. Bradly should be allowed to present the above evidence to prove his innocence.

## <u>POINT IV</u>

## THIS COURT SHOULD ORDER A HEARING

No state court has allowed Mr. Bradley to present the evidence now before the Court. Petitioner submits all the above arguments as proof that he is entitled to relief. The Supreme Court has set precedent that mandates this Court to grant an evidentiary hearing when the state court fails to do so. As elucidated in *Townsend v. Sain*, 372 U.S. 293, 313 (1963),

> We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

Bradley meets *all* the above criteria. The state court has refused to hear any of this evidence. As shown in the Statement of Facts and Argument, Petitioner has presented evidence that minimally warrants a hearing.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court should either order a new trial or remand this matter for a hearing or grant such other and further relief to petitioner as it may deem just and proper.

**Dated: November 14, 2024**
**Metairie, LA**

RESPECTFULLY YOURS,

MANARD LAW OFFICES

*Walker Lasiter*

P. Walker Lasiter, Bar Roll # 38102
4412 Trenton Street
Metairie, LA 70006

AND

**JUSTIN C. BONUS, ESQ.**
**(Pro Hac Vice)**
118-35 Queens Blvd, Suite 400
Forest Hills, NY 11375
(347)920-0160
justin.bonus@gmail.com

Attorneys for Petitioner,
Earl Bradley